IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ALFONSO NORMAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv893-MEF |
| UNITED STATES OF AMERICA, | ) | (CR No.: 2:03-cr-00229) |
| | ) | |
| Respondent. | ) | |

## UNITED STATES'S RESPONSE TO § 2255 MOTION

COMES NOW the United States of America ("the Government") by and through its

attorneys, Leura G. Canary, United States Attorney, and Sandra J. Stewart, Assistant United

States Attorney, and in compliance with this Court's October 5, 2007 order to show cause,

responds to Defendant/Petitioner Alfonso Norman's Motion Under § 2255 To Vacate, Set Aside,

Or Correct Sentence By A Person In Federal Custody, as follows:

## I. PROCEDURAL HISTORY AND RELEVANT FACTS

A.    <u>The Indictment</u>

On October 29, 2003, a grand jury for the Middle District of Alabama returned a four-

count indictment against three defendants, Petitioner/Defendant Alfonso Norman ("Norman"),

Andrew Kenneth James, and Capulco Peralte.  *See* GX A (Doc. 47)[1], a copy of the indictment,

attached to this response.  The indictment charged the three defendants with four counts of drug-

related crimes occurring in Montgomery County in the Middle District of Alabama.  *Id.*

---

[1]The reference to "Doc." are to the docketed entries from Norman's criminal case,
criminal case number 2:03-cr-00229-MEF-SRW.

1

The first two counts of the indictment were conspiracy counts. Count one of the indictment charged that Norman and his codefendants, from an unknown date and continuing to about September 2003, conspired with each other and others known and unknown to the grand jury to knowingly and intentionally distribute and possess with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846. *Id*. at 1. Count two of the indictment charged that Norman and his codefendants, from an unknown date and continuing to on about September 2003, conspired with each other and others known and unknown to the grand jury to knowingly and intentionally distribute and possess with the intent to distribute a mixture or substance containing a detectable amount of cocaine base, or crack cocaine, also a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846. *Id*. at 2.

The third and fourth counts of the indictment charged substantive drug offenses. Count three of the indictment charged that Norman and his codefendants, from on or about January 25, 2003, knowingly and intentionally possessed with the intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). *Id*. Count four charged that Norman and his codefendants, from on or about January 25, 2003, knowingly and intentionally possessed with the intent to distribute a mixture and substance containing a detectable amount of cocaine base, or crack cocaine, also a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). *Id*. at 3.

The indictment also contained a forfeiture allegation related to counts one through four of

the indictment requiring the defendants to forfeit all property constituting or derived from the

proceeds of their drug crimes upon conviction.  *Id*. at 3-4.  At his arraignment on November 13,

2003, Norman, represented by counsel, Bruce A. Maddox, entered a plea of not guilty.

**B.    The Facts From The Suppression Hearing**

There was an appeal in this case to the United States Court of Appeals for the Eleventh

Circuit in which the suppression issues raised were thoroughly addressed.  In its opinion, the

Eleventh Circuit summarized the facts from the suppression hearing as follows:

> On September 25, 2003, an anonymous female tipster telephoned the
> Narcotics Bureau of the Montgomery, Alabama Police Department and informed
> Corporal J.T. Conway ("Conway") that there was drug activity ongoing at 2429
> East Fourth Street in Montgomery.  The tipster advised Conway that a maroon
> vehicle with Florida license plates was present at the residence, and further
> advised Conway that the presence of that vehicle was an indication that drugs
> were at the residence.  The tipster further stated that a black male named
> "Scooter" was at the residence, and in response to an inquiry from Conway,
> provided a phone number for the residence.  Conway was previously aware that
> Norman, a black male, was associated with that area of 4th Street and was
> nicknamed "Scooter."
>
> After receiving the anonymous tip, Conway assembled a group of
> Montgomery police officers to accompany him to the 4th Street residence for
> surveillance purposes.  The officers observed a maroon vehicle backed up beside
> the house.  Conway then asked another officer to call the telephone number that
> had been provided by the anonymous tipster and to tell whomever answered that
> the police were coming to the house.[1]

> [1]There was testimony that this is an investigative tactic sometimes used by
> police to lure individuals suspected to be involved with drug activity out of a residence.

> The other officer informed Conway that the telephone call had been made
> in accordance with Conway's instructions.  However, unbeknownst to the officers
> at the scene, the telephone number that was actually dialed was not the telephone
> number for the residence.[2]  Nevertheless, despite the fact that the wrong number
> was dialed, just after the telephone call was completed, Norman coincidentally
> exited the 4th Street residence.  Norman walked to the street, placed a white
> object into a curbside trash can located on the street in front of the house, and
> returned to the residence.

3

[2]There is evidence in the record that the correct phone number for the 4th Street residence was (334) 264-3277, while the phone number actually dialed during the surveillance was (334) 262-3477.

The officers waited a few additional minutes and observed no further activity. Conway then decided that he would initiate a "knock and talk," which is an investigative technique whereby an officer knocks on the door to a residence and attempts to gather information by explaining to the occupants the reason for the police interest.

Norman and Andrew Kenny James ("James") answered the door. After Conway explained that the police had received a complaint of drug activity at the residence, he asked to search the residence. Norman and James refused this request.

During their discussions with Norman and James, officers observed a young boy located in the front room, visible from where the officers were standing outside the door. Also at this time, despite Conway's instructions to keep his hands out of his pockets, Norman continued to put his hands in his pockets. Accordingly, Conway placed the young boy – who was later identified as Norman's son – behind Conway for the boy's safety; drew his weapon on Norman and James; and conducted a patdown search of Norman. The search of Norman revealed a cell phone and money in Norman's pockets.

After the patdown search, Conway went to the curbside trash can located on the street in front of the house. Inside the trash can, sitting on top of the can's contents, Conway found a wet paper towel with a residue that appeared to be cocaine. Conway field-tested the paper towel, and it tested positive for cocaine. Conway then instructed the other officers to detain Norman and James, and he left to obtain a search warrant for the residence.

While Conway was typing his affidavit in support of the search warrant, he received a call from one of the officers at the scene advising him that the officers had located a third person – Peralte – in the house. Officers apparently heard a noise inside the house, despite having detained Norman and James and despite having sent Norman's son to the care of a neighbor. Officers then entered the house and detained Peralte, and Conway revised his affidavit to include Peralte.

Conway's affidavit in support of the search warrant stated as probable cause for the search, among other things: (1) Conway received a telephone call from a subject "A" advising that drug activity was ongoing at the 4th Street residence; (2) "A" told Conway that drug activity at the residence increased when a black male driving a maroon vehicle arrived at the residence; (3) after A's phone call, Conway saw Norman exit the residence and place an object in the trash can;

4

(4) Conway's subsequent search of the trash can revealed a paper towel containing cocaine residue; and (5) Norman and James were known drug dealers in Montgomery.

Conway brought the affidavit to a Montgomery Municipal Court judge and revised the affidavit (with the judge's permission) to include the vehicles at the residence. The judge then issued a search warrant that incorporated Conway's affidavit, and Conway called the other officers at the scene and instructed them to commence a search of the residence and the maroon vehicle.

In the residence, officers found a digital scale on top of the washing machine. Inside the washing machine, officers located a plastic bag containing commercial packing grease and $2,900 in cash. In the dryer, officers located three solid bricks of cocaine hydrochloride with a total weight of approximately three kilograms. The cocaine bricks were yellow-brown in color and appeared to have been packed in grease but subsequently wiped clean.

Under the living room couch, officers located a package containing approximately one kilogram of cocaine hydrochloride. The cocaine was inside one plastic zip-loc bag, covered with packing grease, and placed inside another zip-loc bag. In the kitchen, officers located a two-gram package of cocaine base ("crack") in a cabinet, along with another digital scale. Officers additionally discovered a hollowed-out bedpost that contained approximately $70,000 in cash, and a handgun in a closet near the front door.

Investigation revealed that the maroon vehicle with Florida license plates belonged to Peralte. The search of the maroon vehicle revealed that the passenger side airbag had been removed in order to create a hidden compartment. In the hidden compartment, officers found a zip-loc bag of the same type that held the cocaine that officers located under the living room couch.

The residue on the paper towel retrieved from the curbside trash can was ultimately determined to be crack residue.

*See* GX Z, *United States v. Norman*, No. 04-15292, 2006 WL 53801, at *1-3 (11th Cir. Jan. 11,

2006), attached to this response.

C.    **The Facts From The Trial**

The 11th Circuit also summarized the facts from the trial in this case, as follows:

At trial, the above circumstances surrounding the surveillance and search

of the 4th Street residence were introduced in evidence. Additionally, James testified that he met Peralte in 1998 and bought large quantities of cocaine from him in the late 1990s, which James in turn sold. The relationship between James and Peralte deteriorated because James "ran off" with some of Peralte's cocaine in 2000 or 2001, and James owed Peralte $12,000 as a result. Nevertheless, according to James, in approximately August 2003, Peralte reinitiated his relationship with James, and directed James to meet him at the 4th Street residence. James went to the 4th Street residence where James wanted to sell Peralte his automobile as a way to get some money and to repay his debt to Peralte, but instead, at Peralte's insistence, James agreed to sell cocaine for Peralte to repay the debt. Peralte was distrustful of James because James "ran off" with Peralte's cocaine in 2000 or 2001, and as a result, Peralte accompanied James on a drive around Montgomery to make the actual cocaine sales. James testified that he sold "about a [kilogram] and a half" of Peralte's cocaine at that time. This occurred approximately six or seven days prior to the police surveillance and search of the 4th Street residence in this case. James also testified that he and Peralte had "made a lot of money together."

Moreover, James testified that he had visited the 4th Street residence on multiple occasions other than the day of his arrest, and that on those occasions, sometimes Norman was present and sometimes, only Norman's girlfriend was present. Detective Chris Wingard ("Wingard") testified that the actual resident of the 4th Street house was a woman named Tammy Montgomery ("Montgomery"), Norman's girlfriend. [Footnote omitted.]

James further testified that Norman and Peralte had "started . . . seeing each other," and "started dealing with each other," and that he believed the 4th Street residence was Norman's residence. Additionally, James testified that because he had "ran off" with some of Peralte's cocaine and owed Peralte money, when James went to the 4th Street residence in the days prior to the search of the residence, both Norman and Peralte were "telling jokes" about snakes. According to James, and taking all inferences in favor of the government, at the 4th Street residence, Norman and Peralte joked that James was like a snake because Peralte was taking another "chance on dealing [drugs] with [James]," despite the fact that "every time" Peralte had previously been engaged in drug activity with James, James had run off with Peralte's money or drugs.

Finally, James testified that Peralte told him that he could "get some money" by get[ting] [Peralte] some sales for some powder cocaine, and that James had "sold a lot of drugs for Peralte."

*Id*. at *3-4.

6

**D.**    <u>**Procedural Facts Concerning The Motions To Suppress**</u>

On November 25, 2003, counsel for Norman filed his first motion to suppress.  *See* GX B

(Doc. 62), attached to this response.  In that motion, counsel for Norman raised the following

issues:

1.    The anonymous tip received by law enforcement officers in this case lacked sufficient indicia of reliability to establish  reasonable suspicion for a *Terry*[1] investigative stop of Norman.

2.    The affidavit in support of the search warrant contained reckless or intentionally false statements, specifically:

    a.    The affidavit stated that the trash can in which the cocaine residue was found was on the street, when, in fact, the trash can was actually in the front yard of the residence;

    b.    The affidavit stated that the police officers had "called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence," when, in fact, the telephone number at the residence searched pursuant to the warrant was not the number the officers actually called; and

    c.    The affidavit failed to disclose that the phone number the anonymous caller had given to the officers and which the officers then called was not the telephone number at 2429 East Fourth Street, but that of James Perryman who resided at 3168 Rolling Road.

3.    There was no probable cause for police officers to search through the trash can in front of the house without a warrant and no exception to the warrant requirement otherwise supported a search of the trash can.

4.    Cleansed of the reckless or intentionally false statements in the affidavit concerning the trash can and the telephone number and call, the affidavit did not establish probable cause.

5.    Even with the statements in the affidavit regarding the trash can and the

---

[1]*Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).

7

telephone number and call, the affidavit did not establish an independent
substantial basis for finding probable cause.

*Id.*  Based on all of these allegations, Norman argued that the information obtained from the

investigatory encounter with him and the search of the residence where the drug distribution

evidence was found was obtained in violation of his Fourth Amendment rights.  *Id.*

Subsequently, on December 4, 2003, counsel for Norman filed an Amended Motion To

Suppress.  *See* GX C (Doc. 64), attached to this response.  In that amended motion to suppress,

counsel for Norman clarified his previous arguments, noting he was objecting to three different

searches that he alleged violated his Fourth Amendment rights:  (1) the search of the garbage can

at 2429 East Second Street; (2) the search of his pockets; and (3) the search of the residence at

2429 East Second Street.  *Id.*  More specifically, counsel for Norman argued:

1.    The anonymous tip received by Montgomery police officer J.T. Conway
        lacked sufficient indicia of reliability to establish reasonable suspicion for
        a *Terry* investigation of Norman.

2.    In searching Norman's pockets and seizing an amount of cash from him:

    a.    law enforcement officers did not have any reasonable suspicion to
            believe that Norman posed a safety threat; and

    b.    the search of Norman's pockets exceeded that needed to check for
            weapons and went beyond such a search into a search for evidence
            of criminal activity.

3.    The affidavit in support of the search warrant contained reckless or
        intentionally false statements, specifically:

    a.    The affidavit stated that the trash can in which the cocaine residue
            was found was on the street, when, in fact, the trash can was
            actually in the front yard of the residence;

    b.    The affidavit stated that the police officers had "called the
            telephone number at the residence and told the subject that

answered the phone that the police were on the way to the
residence," when, in fact, the telephone number at the residence
searched pursuant to the warrant was not the number the officers
actually called; and

c.    The affidavit stated that "Alfonso Norman, Andrew Kenneth James
and Capulco Peralte were inside the residence," but the affidavit
failed to disclose that Peralte's presence in the residence was
unknown to Officer Conway until after Conway left the residence
to find a judge to sign a warrant and was only discovered after
another police officer had gone into the residence without a
warrant and looked around and found Peralte.

4.    Cleansed of the reckless or intentionally false statements in the affidavit
concerning the trash can and the telephone number and call, and the
omission of information about the discovery of Peralte, the affidavit did
not establish probable cause.

5.    Even with the statements in the affidavit regarding the trash can, the
telephone number and call, and the presence of Peralte, the affidavit did
not establish an independent substantial basis for finding probable cause.

*Id*.  Based on all of these allegations, Norman argued that the information obtained from the

investigatory encounter with him, the search of the trash can, and the search of the residence

where the drug distribution evidence was found was obtained in violation of his Fourth

Amendment rights.  *Id*.

The Government filed a Response To Defendants' Motions To Suppress, *see* GX D (Doc.

86), attached to this response, and a hearing on the motions was held before this Court on

January 8, 2004, *see* GX E, a copy of the suppression hearing transcript, attached to this

response.  At that hearing, Norman was represented by counsel, Thomas M. Goggans and Bruce

Maddox.  *See* GX E at 1.  Norman's counsel thoroughly cross-examined all of the Government's

witnesses at that hearing, exploring all of the issues raised in their motion to suppress and

amended motion to suppress.  *Id*. at 4-136.  They also called a witness on Norman's behalf.  *Id*.

9

at 144-53.

Shortly after the suppression hearing, this Court issued a Recommendation Of The Magistrate Judge in which it made findings of fact and conclusions of law, and ultimately recommended denial of the motion to suppress and the amended motion to suppress.  *See* GX F (Doc. 98).  In its recommendation, this Court found and concluded, in relevant part, as follows:

1.  Police Officer J.T. Conway's belief that Norman was armed and presently dangerous to Conway and other agents was reasonable under all of the circumstances.  *Id*. at 9.

2.  The patdown search of Norman's pockets did not exceed the lawful scope of a lawful *Terry* search.  *Id*.

3.  The trash can that was searched by Officer Conway was on the street, not in the yard of the residence.  *Id*. at 10.

4.  It was not clear whether Norman had a reasonable expectation of privacy in the trash can, but even if he did, such an expectation of privacy was objectively unreasonable, and the search of the trash can was not, therefore, constitutionally defective.  *Id*. at 11.

5.  There was no merit to Norman's conclusory argument that, even with the statements regarding the phone call to the residence and about the three defendants being inside the residence, the affidavit did not establish probable cause.  *Id*. at 12 n.8.

6.  As to all of the alleged false statements in the affidavit in support of the warrant, Norman failed in his burden of proof, specifically:

    a.  Officer Conway's statement in the affidavit regarding the phone call to the residence was made in a good faith belief that it was true, and any error, at most, was due to negligence.  *Id*. at 13.

    b.  "No deliberate intention to falsify the phone number in the affidavit has been proved, and the court decline[d] to hold that the failure of an officer to confirm a telephone number offered by a tipster when he is hurrying to respond to a complaint of an offense in progress shows a reckless disregard for the truth."  *Id*.

     c.      As to the statement regarding the three defendants being inside the residence, the Court could not "even conclude that this was a falsehood, much less a deliberate one." *Id*. at 14.

     d.      "Based on its review of the entire affidavit, the court conclude[d] that either with or without any false statements or omissions charged by the defendant, the affidavit would still contain allegations sufficient to support a finding of probable cause, particularly given the positive field test for cocaine residue on the paper towel found in the trash can." *Id*.

As already noted, this Court recommended that the motions to suppress be denied. *Id*. at 17.

Counsel for Norman timely file objections to the Court's recommendation on the motions to suppress in a motion entitled "Alphonso Norman's Objections To Recommendation Of Magistrate Judge And Request For De Novo Hearing." *See* GX G (Doc. 105), attached to this response. In his objections and request for *de novo* hearing, Norman's counsel:

    1.      made a number of objections to the Cour's factual findings;

    2.      asserted that, even if the assertion in the affidavit regarding the phone number and call was not an intentional misrepresentation, it was reckless;

    3.      asserted the Court ignored Norman's witness from the suppression hearing; and

    4.      reasserted his legal arguments from the motion to suppress and the amended motion to suppress.

*Id*. In response to these objections and request, the Court corrected one factfinding that did not affect the outcome of the proceedings or the Court's legal conclusions. *See* GX H (Doc. 108), attached to this response.

Shortly thereafter, counsel for Norman filed a Motion To Re-Open Hearing On Motion To Suppress. *See* GX I (Doc. 112), attached to this response. In that motion, counsel for Norman asserted that there appeared to be discrepancies in the copies of the warrant and affidavit

provided by the Government in discovery and copies of the warrant and affidavit obtained by defense counsel from another source. *Id*. Counsel requested that the hearing on the motions to suppress be re-opened for the purpose of taking testimony on these discrepancies and how they came to occur. *Id*.

One day later, Norman, through new counsel, Leonard Arrington, Sr., filed a Motion To Quash Search Warrant. *See* GX J (Doc. 122), attached to this response. In that motion, counsel for Norman raised some new arguments and renewed others. First, counsel for Norman argued that the search warrant in this case was governed by Alabama law, specifically, Alabama Rule of Criminal Procedure 3.10, because the search warrant was obtained by a Montgomery County police officer and it was issued by a Montgomery County Municipal judge. Rule 3.10 contains requirements for the contents of a search warrant and for the time of its execution. *See* Ala. R. Crim. P. 3.10. With regard to the warrant in this case, Norman argued that the warrant did not reflect the hour or time when the warrant was signed by the magistrate and delivered to Officer Conway for execution. *See* GX J at 1-2. Counsel for Norman argued that there was a "grave discrepancy" in this case as to whether Officer Conway had the search warrant signed by the magistrate judge at the time the search began; Officer Conway knew or should have known about the requirements of the Rule; and that Officer Conway's failure to follow the Rule resulted in a defective warrant. *Id*.

Counsel for Norman also reiterated the allegations made in the Motion To Re-Open Hearing On Motion To Suppress concerning the discrepancies in the copies of the affidavit and warrant provided during discovery and copies of the affidavit and warrant counsel obtained from the Montgomery Municipal Court. *Id*. at 2-3. Counsel for Norman asserted that the magistrate's

signature on the two documents was clearly different and that he needed access to the original

documents so that he could have a handwriting expert review the documents and signatures. *Id*.

at 3-4. In light of these facts, counsel for Norman argued that the Court should either order the

original documents produced for inspection by a handwriting expert or, in the alternative, that the

Court rule the search warrant was invalid on its face and quash it. *Id*. at 4-5.

About six weeks later, another new attorney representing Norman, Donald G. Madison,

filed a Motion For Out Of Time Filing Of Supplement To Motion To Suppress. *See* GX K,

attached to this response. In this motion, counsel for Norman raised the following issues:

1.   Rule 41 of the Federal Rules of Criminal Procedure required suppression
     of the evidence seized in this case because the search warrant was obtained
     by Federal agents in a Federal investigation from a City of Montgomery
     Municipal court judge, and such a municipal court is not a court of record
     as required by the Rule. *Id*. at 1-4. According to the argument presented
     by Norman's counsel, the Federal district court never acquired jurisdiction
     over Norman by reason of the Montgomery city magistrate judge issuing a
     warrant returnable only in State court where the investigation was, at the
     outset, a Federal investigation. *Id*. He concluded that the evidence
     obtained as a result of the search and used to obtain an indictment against
     Norman was therefore illegally obtained. *Id*.

2.   New evidence indicating that fingerprint analysis did not implicate
     Norman's fingerprints were on items of evidence allegedly seized from the
     trash can in front of the residence, along with prior testimony, raised
     doubts about whether probable cause existed to search the trash can, which
     evidence was in turn used to establish probable cause to support the search
     warrant. *Id*. at 4.

3.   The affidavit in support of the search warrant was so lacking in indicia of
     reliability that the *Leon*[2] good-faith analysis should not apply to support
     the search, specifically:

     a.   there was no corroborating investigation done to support the
          conclusory statement of the informant that there were drugs at the

─────────────────────

[2]*United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405 (1984).

residence, *id*. at 5-6, and

    b.    there were no facts presented to establish the credibility or reliability of the confidential informant, *id*.

4.    The affidavit supporting the warrant failed to establish probable cause that Norman was dealing drugs. *Id*. at 5.

5.    The *Leon* good-faith exception was not established because:

    a.    the warrant was so lacking in indicia of probable cause as to render any official belief in its existence entirely unreasonable, and

    b.    the warrant was so facially deficient that the executing officers could not reasonably have presumed it to be valid. *Id*. at 7.

The Government filed its Response To Defendant's Motion for Out Of Time Filing Of Supplement To Motion To Suppress, *see* GX L (Doc. 180), attached to this response, and counsel for Norman filed a Supplement To Motion For Out Of Time Filing Of Supplement To Motion To Suppress, *see* GX M (Doc. 181), attached to this response. In the supplement to the motion for out of time filing, counsel for Norman made the following unsupported, vague allegations:

1.    The handwriting analysis he had performed on the copies of the affidavits and warrants indicated that the signatures on all the copies was that of the magistrate judge, Judge Hayes, but that it appeared that one of the copies was signed at a different time than the others.

2.    There were newly discovered facts in the case.

3.    There was an inference of spoliation that could be inferred from the evidence and opinions of the experts in this case, specifically spoliation could be inferred based on some evidence that there had been a shredded search warrant in the case.

*Id*.

On June 4, 2004, this Court issued another Recommendation Of The Magistrate Judge related to the motions and supplements to the motions to re-open the suppression hearing and

quash the search warrant.  *See* GX N (Doc. 197), attached to this response.  In that

Recommendation, the Court found as follows:

1.  There was no basis on which to reopen the suppression hearing to examine the authenticity of the signatures on copies of the warrant affidavits, and the motions were due to be denied.  *Id*. at 2-3.

2.  The Motion For Immediate Expedited Relief was due to be denied as moot.  *Id*. at 3.

3.  The Motion To Quash The Search Warrant was construed as a motion to suppress and the Court declined to address the claims in that motion because the motion presented only conclusory allegations that the residence was searched without a valid warrant and the fact that Rule 3.10 of the Alabama Rules of Criminal Procedure was not followed proved nothing.  The Court also found the motion was untimely and that Norman had failed to demonstrate cause for the failure to timely file the motion.  *Id*. at 3-5.

4.  The Motion For Out Of Time Filing Of Supplement To Motion To Suppress was due to be denied and, furthermore, the only new issue raised in that motion, the Federal Rule of Criminal Procedure 41 issue regarding the municipal court not being a court of record, was without merit.  *Id*. at 5-8.

5.  The Supplement To Motion For Out Of Time Filing Of Supplement To Motion To Suppress failed to allege facts sufficient to require any additional hearings and it did not present any evidence or argument to demonstrate that the Court should alter its ruling that the motion for filing out of time should be denied.  *Id*. at 8-9.

Thereafter, counsel for Norman filed Objections To Recommendations Of The Magistrate

Judge.  *See* GX O (Doc. 204), attached to this response.  In his objections, counsel for Norman

argued:

1.  Contrary to the Court's findings, the facts were sufficient to re-open the suppression hearing.

2.  Contrary to the Court's findings, the facts were sufficient to support an argument that the search was performed before the warrant arrived at the residence.

15

3.      That Norman had requested that his then-counsel file all appropriate motions before the late motions were filed, and the failure to raise the issues raised in those later motions was through no lack of diligence on Norman's part.

4.      The Rule 41 issue was a novel one so Norman was justified in seeking an untimely filing of that relevant and material issue that went directly to the admissibility of the evidence in this case.

5.      The Court was wrong on the law on the Rule 41 issue.

6.      The Court was wrong in its factual conclusions that the investigation in this case was not a federal investigation involving federal agents.

*Id*. On July 1, 2004, U.S. District Judge Mark E. Fuller, entered two separate orders in which he overruled Norman's objections to the findings of the magistrate judge in her January 16, 2004 Report and Recommendation (Doc. 98) and in her June 4, 2004 Recommendation (Doc. 197); adopted the findings and recommendations of the magistrate judge in the those two orders; and denied the motions to suppress and all related motions. *See* GX P (Doc. 215) and GX Q (Doc. 216), both attached to this response.

The case went to trial before Judge Fuller and a jury on July 12, 2004. *See* GX R (Volumes I, II. and III), a copy of the three-volume trial transcript in this case, attached to this response. During the trial, after testimony about the search had been elicited, counsel for Norman asked the Court to allow him to reopen the suppression issue, but that request was denied. *See* GX R-I at 190. He again tried to have the Court reopen the suppression issue based on the discrepancies in the affidavits, but his request was again denied. *Id*. at 193, 237-55.

At the conclusion of the Government's case, counsel for Norman made an oral motion for judgement of acquittal on the grounds of all arguments he had previously made, including those involving the search in this case, and the Court denied the motion as to counts three and four of

the indictment, but reserved ruling on the motion as to counts one and two of the indictment.  *See* GX R-II at 351-57.  Norman renewed his motion for judgment of acquittal at the close of his codefendant's case, and the Court entered the same ruling.  *Id*. at 383-84.

The jury returned a verdict on July 14, 2004 finding Norman and his codefendant Peralte guilty on all four counts as charged in the indictment.  *See* GX R-III at 433.  After the jury returned its verdict, the Court found that Norman's motion for judgment of acquittal on counts one and two of the indictment were due to be denied as conviction on those two counts was supported by the jury's verdict.  *Id*. at 435.

Norman's Motion Of Acquittal And Motion For Judgment Notwithstanding Verdict And Brief And Memorandum Of Law In Support Thereof, *see* GX S (Doc. 235), attached to this response, was denied by Judge Fuller in a written Memorandum And Order, *see* GX T (Doc. 247), attached to this response.

**E.**    **Facts Concerning Norman's Sentencing**

Before Norman's sentencing hearing, a presentence investigation report was completed on him.  Counsel for Norman stated his objections to that presentence report in a letter to the probation office.  *See* GX U, attached to this response.  Norman's objections were as follows:

1.    He objected to paragraphs 5 and 6 of the presentence report on the grounds they failed to contain relevant facts.  Specifically, counsel argued the presentence report should contain factual statements supporting his contention that, "though there were drugs found at the residence where Defendant Norman was visiting, there was no evidence connecting him to the criminal conduct making up the quantity of cocaine used for purposes of establishing the guidelines."  Furthermore, it should contain facts established at trial that indicated that he did not have the requisite control or nexus between himself and the larger quantity of drugs found at the residence, a residence at which he did not live and over which he had no control.

17

2.      He objected to paragraph 23, arguing that the base offense level should be
        either 6 or no more than 20.  He asserted that the base offense level of 6
        was the correct offense level based on the conviction itself and on the fact
        that he should not be assessed any additional points under U.S.S.G.[3] §§
        2D1.1 (offenses involving drugs) and 1B1.3 (relevant conduct).

3.      He objected to paragraph 24, arguing that he should not be assessed a two-
        point enhancement pursuant to U.S.S.G. § 2D1.1(b) for possessing a
        firearm that was located in the residence during the search.  He also argued
        that application of that Guideline to him in this case would violate *Blakely
        v. Washington*, 124 S. Ct. 2531 (2004), *Apprendi v. New Jersey*, 530 U.S.
        466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).

4.      He objected to paragraph 25, arguing that he should receive a reduction in
        his offense level pursuant to U.S.S.G. § 3B1.2, because his participation in
        the criminal conduct in this case was minimal or minor.

5.      He objected to paragraphs 28 and 31, as far as those paragraphs
        established his offense level as 34, arguing that his base offense level
        should be 6 because there were no other drug quantities that could
        properly be attributed to him.  Alternatively, he argued that, even if the
        Court did determine that some drugs were attributable to him due to his
        presence at the residence, that amount would be for a mere possessory
        interest in the 2.6 grams of crack cocaine, which would result in an offense
        level of 20.

6.      He objected to paragraphs 33, 34, 35, 36, and 37 "for juvenile offense
        adjudications.  There are no records of these adjudications, or the facts
        underlying these adjudications and therefore they should be removed from
        the Presentence Report.  Since there are no facts regarding these offenses
        that would help the Court understand their circumstances, the mere
        presentment of the charge and a conviction is insufficient to address
        mitigating factors that will clearly show that the Criminal History Score
        over-represents the Criminal History in light of the fact that at least five of
        the offenses are juvenile offenses with no details.  The charged offenses
        appear serious but may not be with a review of the underlying information.
        Not having the formal Judgment and Commitment as well as the evidence
        underlying the offense will prejudice the Defendant by the mere presence
        of the labeled charges."

---

[3]"U.S.S.G." refers to the United States Sentencing Guidelines.  In this case, the 2003
edition of the United States Sentencing Guidelines Manual was used to calculate Norman's
sentence and all references in this response are to that version of the Guidelines.

7.   "Paragraph 59:  The Defendant has admitted that he does have a drug problem but this does not make him a drug dealer.  Therefore it is recommended that whatever sentence is imposed, if it exceeds 24 months, that the Defendant be recommended for the Intensive Drug Treatment Program afforded to him through the Bureau of Prisons."

8.   "The Defendant, based upon the aforementioned objections, must object to Paragraph 70 in that the guidelines are more accurately reflected by the aforementioned information."

*Id*.  In addition, counsel for Norman filed an Objection To Pre-Sentence Report Predicated Upon *Blakely v. Washington*.  *See* GX V, attached to this response.  In that objection, relying on the Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004), counsel for Norman objected to those aspects of the presentence report that referenced or assessed additional points based on his alleged possession of a firearm during the offense and on any findings by the Court related to the amount of drugs attributable to him that relied on evidence not submitted to the jury.  *See* GX V.

A sentencing hearing was conducted before Judge Fuller on October 1, 2004.  *See* GX W, the sentencing hearing transcript, attached to this response.  At that hearing, Judge Fuller found that their was no evidence to support a two-point enhancement for possession of a firearm by Norman, and he held that no two-point enhancement would apply.  *See* GX W at 3, 23.  He also heard argument on all of Norman's other objections, *id*. at 5-23, and found as follows:

1.   The objections to paragraphs 36 and 37 of the presentence report, dealing with Norman's previous juvenile convictions were sustained in part.  *Id*. at 13-23.  Because there was no evidentiary support for those previous juvenile convictions, the Court, based on Norman's representations, ordered that the juvenile conviction for first degree robbery contained in paragraph 37 of the presentence report be withdrawn and that the juvenile conviction for first degree robbery contained in paragraph 36 be designated as having an informal disposition.  *Id*. at 23.

2.   The objections based on the forseeability of the codefendants' conduct, the

quantity of drugs, and on constructive possession were denied, based on Judge Fuller's reasoning and findings contained in his Memorandum Opinion And Order on the motion for new trial. *Id*. at 24-25.

3.    The objection based on Norman's assertion that he should have received a reduction in his offense level based on his minor role in the criminal conduct was overruled. *Id*. at 25-28.

Judge Fuller then found that Norman's offense level was 30, his criminal history category was III, resulting in a Sentencing Guidelines range of rom 121 to 151 months in prison, a supervised release period of at least four years, but not more than five years, and a fine range of from $15,000 to $3 million. *Id*. at 29.  After allocution by Norman, Judge Fuller then sentenced Norman to 121 months in prison on each count of the indictment, to be served concurrently. *Id*. at 30-31.  *See also* GX X at 1-2, the judgment of conviction in this case, attached to this response.  He also ordered Norman to pay a special assessment of $400, ordered any fine waived due to Norman's inability to pay, and ordered Norman placed on four years of supervised release on his release from prison, subject to standard and special conditions.  *See* GX W at 30-32; GX X at 3-5.  The forfeiture allegation in the indictment was struck, on motion of the Government.  *See* GX W at 32.  Before the close of the hearing, Norman renewed all previous sentencing objections he had made.  *Id*. at 31.

**F.    Facts  Concerning Norman's Direct Appeal**

A final judgment was entered in Norman's case on October 5, 2004.  *See* GX X.  He timely filed a notice of appeal to the Eleventh Circuit Court of Appeals and counsel for Norman filed a brief on his behalf in that Court.  *See* GX Y, attached to this response.  Norman raised the following issues in that brief to the Eleventh Circuit:

1.    The district court erred in denying Appellant's motion to suppress in violation of Appellant's Fourth Amendment rights.

20

2.      The evidence was insufficient to support a conviction on counts 1, 2, 3, and 4.

3.      The warrant in this case was signed by a magistrate judge and not a Federal magistrate or state court judge in violation of Rule 41 of the Federal Rules of Criminal Procedure.

4.      The district court erred in denying Appellant's motion to be tried separately from his co-defendant.

5.      The district court erred in enhancing the Sentencing Guidelines by two points for possessory interest in a firearm pursuant to U.S.S.G. 2D1.1(b)(2), in attributing all relevant conduct to Appellant, and in not granting reduction for minor/minimal role in violation of the Constitution and <u>Blakely v. Washington</u>, 159 L.Ed. 2d 403, 124 S. Ct. 2531 (2004) and <u>United States v. Booker</u>, 543 U.S. _____ (2005).

*See* GX Y at 1-2.  In his first issue, Norman alleged his Fourth Amendment rights were violated in five different ways:  (1) when the officers relied on an uncorroborated anonymous tip in investigating this case and obtaining a warrant; (2) when he was searched based simply on the uncorroborated anonymous tip, a phone call to a wrong number, and on his throwing something into a trash can in front of the residence that was later searched, because those facts did not support a finding of probable cause; (3)  when the trash can in front of the house was searched because there was no probable cause to support that search and the search was made without a warrant; (4) when the warrant was issued based on an affidavit that did not provide sufficient probable cause for the warrant; and (5) when a search of the residence occurred based on a defective warrant and when there was no probable cause for the search.  *Id*. at 16-37.

The Eleventh Circuit issued a thorough opinion in the case, rejecting all of Norman's allegations of error.  *See* GX Z (*United States v. Norman*, No. 04-15292, 2006 WL 53801, at *6-11 (11th Cir. Jan. 11, 2006)).  Norman filed a Petition For Rehearing *En Banc* in that court in which he raised the following two issues:

1.    Whether the Court of Appeals' decision that the evidence in this case was sufficient to support the conviction was incorrectly analyzed against Eleventh Circuit precedent and the decision creates a conflict in the standard applied to the sufficiency of the evidence review.

2.    Whether a warrant signed by a municipal judge, and not a Federal or state court judge, violates Rule 41 of the Federal Rules of Criminal Procedure when Federal law enforcement officers are involved in the case.

*See* GX AA, attached to this response.  The petition for rehearing *en banc* was denied on March 10, 2006.  *See* GX BB, attached to this response.

Norman filed his Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody on October 1, 2007.  On October 5, 2007, this Court ordered the Government to respond to the motion within 30 days of its order; it later granted the Government two extensions of time within which to file its response, ultimately ordering it to file its response on or before December 5, 2007.  This response follows.

## II.  CLAIMS RAISED IN THE § 2255 MOTION

As far as the Government can discern, Norman raises the following six issues in his § 2255 motion:

1.    His conviction was obtained and his sentence was illegally imposed based on the evidence used at trial and sentencing that was obtained in violation of Norman's Fifth and Fourteenth Amendment Due Process rights.

2.    His pretrial counsel were ineffective for failing to raise in a pretrial motion or to object to the admissibility of evidence at trial or sentencing on the grounds that such evidence was obtained in violation of Norman's Sixth Amendment rights.

3.    The search warrant in Norman's case was in violation of Alabama law in that:

a.    it was issued by a municipal court judge and municipal judges may only issue warrants for violations of state law returnable to state court;

> b.    it was never properly returned to state court;
>
> c.    the property was not properly retained by the officer who effected the search and instead it was turned over to a U.S. Marshal without an order from state court; and
>
> d.    it was not endorsed with the hour of its execution.

4.    His Fifth and Sixth Amendment rights were violated because the district court found as relevant conduct that 3.9 kilograms of cocaine were attributable to Norman when that 3.9 kilograms were not charged in the indictment in violation of Norman's Sixth Amendment rights to notice of the charge against him.

5.    The district court violated his rights in finding his offense level was 30 and in attributing criminal history points to his criminal history category based on a prior 1990 conviction for possession of controlled substance that was obtained in violation of Norman's Sixth Amendment right to notice of the charge.

6.    His counsel was ineffective for not objecting to the additional three points added to his criminal history score that were based on the prior invalid 1990 conviction.

As explained below, none of Norman's claims for relief are timely, because he has filed his § 2255 motion too late.  Furthermore, only Norman's two claims of ineffective assistance of counsel are otherwise properly before this Court; all other claims are barred from this Court's review because they were raised on direct appeal and decided adversely to Norman, or because they could have been raised in that direct appeal, but they were not.  As to Norman's two ineffective assistance of counsel claims, Norman is entitled to no relief from this Court because he has failed, as to both claims, to establish deficient performance or prejudice.

### III.  RESPONSE TO CLAIMS FOR RELIEF

**A.**    **Norman Has Not Met The One-Year Statute Of Limitations Under 28 U.S.C. § 2255 And His § 2255 Motion Must Be Dismissed.**

This Court should dismiss Norman's § 2255 motion, because he has failed to file his

motion in a timely manner under paragraph six of 28 U.S.C. § 2255, which provides a one-year

period of time to seek relief under the rule.  Section 2255 states that a motion, to be timely, must

be filed within one year from

> (1)  the date on which the judgment of conviction becomes final;
>
> (2)  the date on which the impediment to making a motion created by governmental action in violation of the Constitution and laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3)  the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4)  the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255 ¶ 6.  The relevant date for purposes of Norman's § 2255 motion is paragraph

(1), the date on which the judgment of conviction became final.

The final judgment in Norman's criminal case was entered on October 5, 2004.  *See* GX

X (Doc. 252).  He timely filed a notice of appeal (Doc. 256) and appealed to the Eleventh Circuit

Court of Appeals.  The Eleventh Circuit denied all of Norman's allegations in an unpublished

opinion on January 11, 2006.  *See* GX Z.  Norman timely filed for rehearing *en banc* in that

Court, *see* GX AA, which was denied on March 10, 2006, *see* GX BB.  Norman had 90 days

from that denial of rehearing *en banc* in which to file a petition for a writ of certiorari in the

United States Supreme Court, and his conviction and sentence became final for purposes of §

2255 when that 90 days was ended.  *See* Sup.Ct. R. 13(3); *see also Close v. United States*, 336

F.3d 1283, 1284-85 (11th Cir. 2003).  Therefore, Norman's conviction and sentence became final

for purposes of § 2255 on June 8, 2006.  He then had one year from that date – until June 8, 2007

– to file his § 2255 motion in this Court.  Norman did not file his § 2255 motion until October 1,

2007.  Therefore, it is untimely and must be dismissed.

**B.**     **Norman's Issues 1, 3, 4, and 5 Are Procedurally Barred From This Court's Review Because They Either Were Raised And Decided On Direct Appeal Or They Could Have Been Raised And Decided On Direct Appeal, But They Were Not.**

In issues 1, 3, 4, and 5 of his motion, Norman raises substantive, non-ineffective

assistance of counsel claims that were either raised in some form on direct appeal of his

convictions and sentence, or that could have been raised in that direct appeal, but were not.  All

aspects of those four issues are procedurally barred from being raised in this collateral

proceeding.

The following issues are barred from review in this Court because they were either raised

and decided adversely to Norman on direct appeal or because they could have been raised on

direct appeal, but they were not.

1.     His conviction was obtained and his sentence was illegally imposed based on the evidence used at trial and sentencing that was obtained in violation of Norman's Fifth and Fourteenth Amendment Due Process rights.

3.     The search warrant in Norman's case was in violation of Alabama law in that:

a.     it was issued by a municipal court judge and municipal judges may only issue warrants for violations of state law returnable to state court;

b.     it was never properly returned to state court;

c.     the property was not properly retained by the officer who effected the search and instead it was turned over to a U.S. Marshal without an order from state court; and

d.     it was not endorsed with the hour of its execution.

4.    His Fifth and Sixth Amendment rights were violated because the district court found as relevant conduct that 3.9 kilograms of cocaine were attributable to Norman when that 3.9 kilograms were not charged in the indictment in violation of Norman's Sixth Amendment rights to notice of the charge against him.

5.    The district court violated his rights in finding his offense level was 30 and in attributing criminal history points to his criminal history category based on a prior 1990 conviction for possession of controlled substance that was obtained in violation of Norman's Sixth Amendment right to notice of the charge.

While it is not easy to discern from the vague allegations raised by Norman exactly how his Fifth and Fourteenth Amendment rights were violated by the introduction of evidence at his trial, as he alleges in issue 1 of his motion, to the extent he is challenging any of the evidence obtained pursuant to the searches in this case, it appears that the issues surrounding the search of the trash can, the search of Norman's person, and the search of the residence were thoroughly addressed on direct appeal.  And to the extent that issue 1 overlaps with any of those issues previously raised, they are barred from again being reviewed in this collateral proceeding.  As the Eleventh Circuit noted in *United States v. Nyhuis*, "[o]nce a matter has been decided adversely to a defendant on direct appeal it cannot be re-litigated in a collateral attack under section 2255." *See United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000) (internal quotation marks omitted), *citing United States v. Natelli*, 553 F.2d 5, 7 (2d Cir. 1977).

Issues 3, 4, and 5 of Norman's motion also seem to be procedurally barred from re-review in this Court, at least in part, because they were also raised and addressed on direct appeal.  There were objections raised in the trial court and arguments made on appeal regarding the application of state law to the search warrant in this case; to the assessment of additional points to Norman's base offense level, based on the attribution of the 3.9 kilograms of cocaine to him, on the grounds

26

it violated his Sixth Amendment rights; and to the use of his prior convictions to increase his criminal history score where there were no records to support those convictions.  To the extent these issues were previously raised, they are barred from further review.  *Id.*

Furthermore, as to issues 1, 3, 4, and 5, to the extent those issues were *not* previously raised at trial or on direct appeal, but they could have been, they are also barred from review in this collateral proceeding.  A motion under § 2255 cannot be used as a substitute for appeal, *Burke v. United States*, 152 F.3d 1329, 1331 (11th Cir. 1998), and claims not raised on direct appeal that could have been are generally barred from review in § 2255 proceedings, *McCoy v. United States*, 266 F.3d 1245, 1258 (11th Cir. 2001).  In *Mills v. United States*, 36 F.3d 1052 (11th Cir. 1994), the Eleventh Circuit succinctly summarized the law concerning procedural default as follows:

> Generally speaking, an available challenge to a criminal conviction or sentence must be advanced on direct appeal or else it will be considered procedurally barred in a [Section] 2255 proceeding....  A ground of error is usually "available" on direct appeal when its merits can be reviewed without further factual development....  When a defendant fails to pursue an available claim on direct appeal, it will not be considered in a motion for [Section] 2255 relief unless he can establish  cause for the default and actual prejudice resulting from the alleged error....  Alternatively, under the fundamental miscarriage of justice exception, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default....

*Id.* at 1055-56 (internal citations omitted).  *See also McCoy v. United States*, 266 F.3d at 1258 ("A claim not raised on direct appeal is procedurally defaulted unless the petitioner can establish cause and prejudice for his failure to assert his claims on direct appeal.").  The burden of demonstrating cause and prejudice or a miscarriage of justice is on the movant.  *See, e.g.*, *Bousley v. United States*, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally

defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,'... or that he is 'actually innocent[.]' ").

Norman has offered nothing to this Court to support a cause and prejudice or miscarriage of justice argument to overcome his procedural defaults. Therefore, claims 1, 3, 4, and 5, to the degree they raise new claims of error, should be dismissed on procedural grounds.

**C.** **Norman's Two Ineffective Assistance Of Counsel Claims (Issues 2 And 6) Should Also Be Denied Because He Has Failed To Demonstrate the Requisite Deficient Performance And Prejudice As To Those Two Claims.**

Finally, Norman also raises two issues of ineffective assistance of counsel. Those two issues are as follows:

2.      His pretrial counsel were ineffective for failing to raise in a pretrial motion or to object to the admissibility of evidence at trial or sentencing on the grounds that such evidence was obtained in violation of Norman's Sixth Amendment rights.

6.      His counsel was ineffective for not objecting to the additional three points added to his criminal history score that were based on the prior invalid 1990 conviction.

Because Norman has failed to demonstrate that his counsel was deficient in failing to raise these two vague claims, and he has also failed to demonstrate prejudice, this Court should reject his two ineffective assistance of counsel claims without an evidentiary hearing.

**1.      The *Strickland* Test For Ineffective Assistance of Counsel Claims**

To succeed on a claim of ineffective assistance of counsel, a defendant must prove both that his counsel's performance was deficient and that that deficient performance prejudiced his case. *Strickland v. Washington,* 466 U.S. 668, 694 (1984); *see also*, *Bell v. Cone,* 535 U.S. 685, 697-98 (2002) (reaffirming the *Strickland v. Washington* standard for reviewing ineffective

assistance of counsel claims); *Brown v. United States*, No. 07-10219, 2007 WL 2900580, at *3 (11th Cir. Oct. 4, 2007) (applying two-part test of *Strickland v. Washington*).  More specifically, Norman must show that (1) identified acts or omissions of counsel fell below an objective standard of reasonableness, and (2) that his counsel's alleged errors or omissions resulted in prejudice to him to such an extent that, without counsel's alleged errors or omissions, there is a reasonable probability that the outcome of his trial and/or sentencing would have been different. *Yordan v. Dugger,* 909 F.2d 474, 477 (11th Cir. 1990).

In analyzing counsel's performance under the performance prong of *Strickland*, this Court must presume that the conduct of counsel was reasonable, *Yordan v. Dugger,* 909 F.2d at 477. "Counsel is 'strongly presumed' to have rendered adequate assistance and to have exercised reasonable professional judgment," and the "proper measure of attorney performance is 'reasonableness under prevailing professional norms.' "  *Brown v. United States*, 2007 WL 2900580, at *3 (internal citations omitted).  A "[d]efendant must prove deficient performance by a preponderance of competent evidence.  *Gallo-Chamorro v. United States*, 233 F.3d 1298, 1303-04 (11th Cir. 2000)(footnotes omitted).

The Eleventh Circuit has described a defendant's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:
>
>> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ...  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

... Thus, in order to show that counsel's performance was unreasonable, the
petitioner must establish that *no competent counsel would have taken the
action that his counsel did take....*

*Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations omitted).

To succeed on an ineffective assistance of counsel claim, the defendant must show that,
but for counsel's unprofessional errors, the outcome of the proceeding would have been different.
*Brown v. United States*, 2007 WL 2900580, at *3. The Eleventh Circuit has described a
defendant's burden in demonstrating that his counsel's deficient performance prejudiced his case
as "high," noting that it is not enough to show that any errors had some conceivable effect on the
outcome of the proceeding. *Brown v. United States*, 2007 WL 2900580, at *3; *Robinson v.
Moore*, 300 F.3d 1320, 1343-44 (11th Cir. 2002). Moreover, "[a] determination of the prejudice
prong of the *Strickland* analysis is necessarily dependent on a review of the merits of the
underlying claim." *Brown v. United States*, 2007 WL 2900580, at *3. " 'Counsel cannot be
labeled ineffective for failing to raise issues which have no merit.' " *Id.*, *quoting Card v.
Dugger*, 911 F.2d 1494, 1520 (11th Cir. 1990).

Finally, as the Eleventh Circuit has noted, "[i]t is well established that a habeas petitioner
must demonstrate both deficient performance and prejudice, and that a failure to demonstrate
either prong constitutes a failure to demonstrate ineffective assistance of counsel." *Bottoson v.
Moore*, 234 F.3d 526, 532 (11th Cir. 2000); *accord, Robinson v. Moore*, 300 F.3d at 1343.

2.    **The Pretrial Counsel Ineffective Assistance Of Counsel Claim**

In issue 2 of his motion, Norman argues that his pretrial counsel was ineffective for
failing to raise the issue that his 5th and 14th Amendment Due Process rights were violated by
the introduction of certain evidence at his trial. This claim is so vague it is impossible for

counsel to know exactly what evidence Norman argues was not challenged in the district court on Due Process grounds that should have been challenged. It may be that he is alleging the pretrial counsel should have raised the issue concerning the violation of state law in the issuance and execution of the search warrant, as he alleges in issue 3, or it could be some other issue. But regardless of what the exact challenge is, it is certain that Norman has failed to demonstrate deficient performance or prejudice as to the claim.

Norman bears the burden of establishing that certain failures on his attorneys' part prejudiced his case to such an extent that, but for counsels' errors, the outcome of his trial would have been different. If the Due Process issue involves the failure of the warrant to comply with state law, the issue is without merit because the Eleventh Circuit rejected that argument on direct appeal, and attorneys are not required to raise non-meritorious issues. *Brown v. United States*, 2007 WL 2900580, at *3, *quoting Card v. Dugger*, 911 F.2d 1494, 1520 (11th Cir. 1990). If the issue involves something else, Norman has failed to demonstrate how he was prejudiced by counsels' failure to challenge the evidence. Therefore, regardless of the exact nature of this ineffective assistance of counsel claim, it is due to be denied, because Norman has failed in his burden to prove both deficient performance and prejudice.

### 3.    The Ineffective Assistance Of Counsel At Sentencing Claim

In the final issue of his motion, issue 6, Norman argues that his counsel was ineffective at his sentencing because he failed to object to the use of a prior 1990 conviction for possession of a controlled substance that he alleges was obtained in violation of his Sixth Amendment rights to notice of the charge. Norman argues counsel was ineffective in that he did not file an objection to the presentence report on the grounds that use of that conviction violated his Sixth

Amendment rights and for failing to object at the sentencing hearing on the same grounds.

Norman has failed to prove his counsel was ineffective with respect to the prior 1990 conviction.

In fact, Norman's counsel did object to use of his prior 1990 possession of a controlled substance conviction in calculating his criminal history category on the grounds there were no records underlying the adjudications and they should be removed from the presentence report. *See* GX U. Norman argued that, without the Judgment and Commitments for these prior offenses, he was prejudiced in determining if the convictions were appropriately counted against Norman. *Id*. Therefore, counsel did not perform deficiently with respect to that prior conviction.

Moreover, Norman has presented this Court with no evidence to demonstrate he has been prejudiced by any failure on counsel's part. He has not presented this Court with anything from which this Court can determine if he had proper notice of the charge against him in the proceeding surrounding his 1990 conviction. The presentence report indicates that Norman was represented by counsel at the prior proceeding, and that he received a five year sentence, the sentence split and Norman required to serve only two years. On its face, this establishes that the conviction could properly be used in enhancing Norman's sentence. The burden of proving to the contrary is on Norman as he is required to demonstrate he was prejudiced by counsel's failures; he has failed to meet that burden. Therefore, his argument should be rejected.

Norman was represented by experienced and able attorneys at his trial. The lawyers who represented him challenged all aspects of the search in this case in an attempt to keep the evidence obtained in the searches from going before the jury. And they did not give up. They challenged the evidence pretrial, at trial, at sentencing, and on appeal. Counsel for Norman also argued vigorously on Norman's behalf at his sentencing that many aspects of the presentence

report were in error and that Norman deserved a much lower offense level and criminal history category than that indicated in the presentence report.  Norman was ably represented throughout his trial and sentencing, and on appeal.  His counsel simply were not ineffective in their representation of him, despite his dissatisfaction with the outcome of his trial and sentencing.

### IV.  MISCELLANEOUS

Norman's § 2255 motion is due to be dismissed because it is untimely.  Alternatively, even if the motion was timely, he has failed to plead facts or present sufficient evidence or argument demonstrating that he is entitled to an evidentiary hearing, and his claims for relief should be denied without such a hearing.  *See Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991); *United States v. Laetividal-Gonzalez*, 939 F. 2d 1455, 1465 (11th Cir. 1991).  Should this Court determine that Norman has made any arguments not addressed in this response, the Government would request the opportunity to further respond to those arguments.

Any facts not specifically admitted in this response are denied, and the arguments made as to each claim raised are asserted in the alternative.

## V.  CONCLUSION

For the above reasons, Defendant/Movant Alfonso Norman has failed to demonstrate that

he is entitled to any relief from this Court, and his § 2255 motion should be dismissed and denied

without an evidentiary hearing.

Respectfully submitted this 5th day of December, 2007.

LEURA G. CANARY
UNITED STATES ATTORNEY


/s/  Sandra J. Stewart
SANDRA J. STEWART
Assistant United States Attorney
131 Clayton Street
Montgomery, AL  36101-0197
(334) 551-1764
(334) 223-7135

34

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**


ALFONSO NORMAN,       )
                        )
      Petitioner,       )
                        )
      v.                 )      Civil Action No. 2:07cv893-MEF
UNITED STATES OF AMERICA,   )      (CR No.: 2:03-cr-00229)
                        )
      Respondent.     )


**CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2007, I electronically filed the foregoing response and attachments with the Clerk of the Court using the CM/ECF system and mailed, postage prepaid, a copy of this response to the *pro se* Defendant/Movant as follows:

> Alfonso Norman
> Rg. #11288-002
> P. O. Box 34550
> Federal Correctional Institute
> Memphis, TN  38184


Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/  Sandra J. Stewart
SANDRA J. STEWART
Assistant United States Attorney
131 Clayton Street
Montgomery, AL  36101-0197
(334) 551-1764
(334) 223-7135

**FILED**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

OCT 2 9 2003

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 03-229-N |
| | ) | [21 USC 846, |
| ANDREW KENNETH JAMES | ) | 21 USC 841(a)(1)] |
| a/k/a, "Big Kenny," | ) | |
| ALPHONSO NORMAN, | ) | |
| a/k/a, "Scooter," and | ) | |
| CAPULCO PERALTE | ) | INDICTMENT |
| a/k/a, "Cappuccino," | ) | |
| a/k/a, "Black" | ) | |

The Grand Jury charges:

## COUNT 1

From an unknown date and continuing to about the month of September, 2003, the exact

dates being unknown to the Grand Jury, in Montgomery County, Alabama, within the Middle

District of Alabama,

ANDREW KENNETH JAMES
a/k/a, "Big Kenny,"
ALPHONSO NORMAN,
a/k/a, "Scooter," and
CAPULCO PERALTE
a/k/a, "Cappuccino,"
a/k/a, "Black"

defendants herein, did knowingly and willfully combine, conspire, confederate and agree together

with other persons known and unknown to the Grand Jury to knowingly and intentionally distribute

and possess with intent to distribute 500 grams or more of a mixture or substance containing a

detectable amount of cocaine hydrochloride, a Schedule II Controlled Substance, in violation of Title

21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. A

<div align="center">COUNT 2</div>

From an unknown date and continuing to about the month of September, 2003, the exact dates being unknown to the Grand Jury, in Montgomery County, Alabama, within the Middle District of Alabama,

<div align="center">
ANDREW KENNETH JAMES<br>
a/k/a, "Big Kenny,"<br>
ALPHONSO NORMAN,<br>
a/k/a, "Scooter," and<br>
CAPULCO PERALTE<br>
a/k/a, "Cappuccino,"<br>
a/k/a, "Black"
</div>

defendants herein, did knowingly and willfully combine, conspire, confederate and agree together with other persons known and unknown to the Grand Jury to knowingly and intentionally distribute and possess with intent to distribute a mixture or substance containing a detectable amount of cocaine base ("crack"), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

<div align="center">COUNT 3</div>

On or about the 25th day of September, 2003, in Montgomery County, within the Middle District of Alabama, the defendants,

<div align="center">
ANDREW KENNETH JAMES<br>
a/k/a, "Big Kenny,"<br>
ALPHONSO NORMAN,<br>
a/k/a, "Scooter," and<br>
CAPULCO PERALTE<br>
a/k/a, "Cappuccino,"<br>
a/k/a, "Black"
</div>

did knowingly and intentionally possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

<div align="center">2</div>

COUNT 4

On or about the 25th day of September, 2003, in Montgomery County, within the Middle District of Alabama, the defendants,

ANDREW KENNETH JAMES
a/k/a, "Big Kenny,"
ALPHONSO NORMAN,
a/k/a, "Scooter," and
CAPULCO PERALTE
a/k/a, "Cappuccino,"
a/k/a, "Black"

did knowingly and intentionally possess with intent to distribute a mixture or substance containing a detectable amount of cocaine base ("crack"), a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

FORFEITURE ALLEGATION

A.    Counts 1-4 of this indictment are hereby repeated and incorporated herein by reference.

B.    Upon Conviction for violation of Title 21, United States Code, Sections 846 and 841(a)(1) as alleged in Counts 1-4 of this indictment, the defendants:

ANDREW KENNETH JAMES
a/k/a, "Big Kenny,"
ALPHONSO NORMAN,
a/k/a, "Scooter," and
CAPULCO PERALTE
a/k/a, "Cappuccino,"
a/k/a, "Black"

shall forfeit to the United States pursuant to Title 21, United States Code, Section 853, any and all property constituting or derived from any proceeds the said defendant obtained directly or indirectly as a result of the said violation and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of the violation alleged in Counts 1-4 of this Indictment.

3

C.      Substitute Assets

If any forfeitable property, as a result of any act or omission of the defendant:

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the Court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

All in violation of Title 21, United States Code, Sections 841, 846, and 853.

A TRUE BILL:

Foreperson

LEURA GARRETT CANARY
Assistant United States Attorney

JOHN T. HARMON
Assistant United States Attorney

TODD A. BROWN
Assistant United States Attorney

4

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA    )
              )
VS.             )  CASE NO. CC-2003-229-N
              )
ALPHONSO NORMAN        )

## MOTION TO SUPPRESS

Comes now Defendant Alphonso Norman, by and through counsel, and shows as follows:

1.  This motion to suppress relates to searches conducted by government agents on September 25, 2003 at 2429 East Fourth Street in Montgomery, Alabama.

2.  On September 25, 2003, Alphonso Norman's son resided with his mother at 2429 East Fourth Street. Alphonso Norman visited with his son at the residence located at 2429 East Fourth Street on a frequent basis and spent nights at the residence located at 2429 East Fourth Street on a frequent basis.

3.  On September 25, 2003, Alphonso Norman was at the residence located at 2429 East Fourth Street taking care of his son. At the time he was there, he was responsible for the residence and his son.

4.  Montgomery, Alabama police officer J. T. Conway has claimed:

> "On September 25, 2003, [he] received a telephone call from a subject ... "A". "A" advised that he/she knew of drug activity at 2429 East 4th St, Montgomery, Alabama. "A" advised that he/she knew that the drug activity always picked up when a black male subject driving a maroon vehicle arrived at the residence. "A" advised that the vehicle always backed up beside the residence and that he/she was unable to obtain the tag number. "A" advised that the telephone number to the residence was 334-262-3477.



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. B

"[He] and other members of the Special Operations Division went to the residence to investigate. [Another Montgomery police officer] called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence. [He] was parked in a location to watch the residence when the telephone call was made. [He] observed Alfonzo Norman exited [sic] the residence and walked [sic] to the trash can that was placed on the street. Alfonzo placed something in the trash can and returned to the residence.

"[He] and other members of the Narcotics Bureau approached the residence. Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence. [He] told Norman why the officers were at his residence and he became very defensive and said that he wanted a lawyer. [He] walked to the trash can that was placed on the street. After looking in the can, [he] located a paper towel that contained a quantity of what was believed to be crack cocaine. [He] field tested the substance and it field tested positive for cocaine."

5. Pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), "law enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, ir is about to engage in criminal activity." <u>United States v. Powell</u>, 222 F.3d 913, 917 (11th Cir. 2000). In <u>Florida v. J. L.</u>, 529 U.S. 266 (2000), the Supreme Court of the United States held that an anonymous tip containing no predictive information but providing information describing a person's location and appearance and stating that the person was carrying a gun did not give rise to a reasonable suspicion of illegal activity and did not justify a <u>Terry</u> stop. In this case, as in <u>Florida v. J. L.</u> the anonymous tip referenced by Montgomery police officer J. T. Conway lacked sufficient indicia of reliability to establish reasonable suspicion for a <u>Terry</u> investigation of Alphonso Norman.

2

6.  Potentially incriminating evidence was seized by Montgomery police officer J. T. Conway from the trash receptacle located at 2429 East Fourth Street.

7.  Montgomery police officer J. T. Conway got Montgomery Municipal Court Judge Les Hayes, III to issue a warrant to search 2429 East Fourth Street. A copy of the warrant and a copy of the purportedly supporting affidavit are attached to this motion.

8.  Upon execution of the search warrant, incriminating evidence was seized from the residence located at 2429 East Fourth Street.

9.  Warrantless searches "are per se unreasonable under the Fourth Amendment subject to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Whether or not a warrant is issued, probable cause is generally required for a search. Carroll v. United States, 267 U.S. 132, 155-156 (1925). Probable cause has been defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." Beck v. Ohio, 379 U.S. 89, 91 (1964). A search warrant is to be issued only if there is probable cause to believe that contraband or evidence of a crime will be found on the premises to be searched. Carroll v. United States, 267 U.S. 132, 155-156 (1925). Evidence presented in support of an application for a search warrant must provide the issuing authority with a "substantial basis" for determining the existence of probable cause. Illinois v. Gates, 462 U.S. 213, 238-239 (1983). The affidavit submitted must contain sufficient facts and circumstances to enable the issuing authority to make an independent evaluation of probable cause. United States v. Ventresca, 380 U.S. 102 (1965). Warrant

affidavits containing reckless or intentionally false statements by the affiant may be invalidated and any evidence seized pursuant to the warrant suppressed if the affidavit, cleansed of those statements, does not establish probable cause. Franks v. Delaware, 438 U.S. 154, 155-156 (1978). In this case, there were reckless or intentionally false statements contained in the affidavit submitted in support of the search warrant.

10. 2429 East Fourth Street is in a residential area. The house located at 2429 East Fourth Street is small. The front yard of 2429 East Fourth Street is small as well. The trash receptacle searched by Montgomery police officer J. T. Conway is a receptacle for that residence only. It was not actually on the street as stated in the search warrant affidavit, but was in the front yard. This occurred on a Thursday, which was not a trash pick-up day for that neighborhood. There was no probable cause for Montgomery police officer J. T. Conway to search through the trash receptacle. Furthermore, Montgomery police officer J. T. Conway searched the trash receptacle without a warrant and without the existence of any exceptions to the warrant requirement.

11. Montgomery police officer J. T. Conway stated in the search warrant affidavit that another police officer had "called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence. " The telephone number at the residence was not called. The number called was that of a James Perryman who resides at 3168 Rolling Road, Montgomery, Alabama. The identity and address of the person to whom the number called was assigned can be readily determined in a matter of

4

seconds utilizing a reverse telephone look-up service on the internet such as infospace.com. A copy of an infospace.com reverse look-up print-out is attached to this motion. The identity and address of the person to whom the number was assigned was surely just as obtainable by the government agents involved.   It was not disclosed in the affidavit that the number given by "A" and called was not the telephone number of 2429 East Fourth Street but that of a James Perryman who resides at 3168 Rolling Road.

12.  Cleansed of the statements regarding the trash receptacle and the telephone number and call, the affidavit did not establish probable cause.  Other statements such as: "Further probable cause being that Alfonzo Norman and Andrew Kenneth James are known drug dealers in the Montgomery, Alabama are "only sophistry to illustrate an illusion of ongoing cocaine sales from the house," Ex parte Parker, 2003 WL 1333243 (Ala. 2003), and did not contain sufficient facts and circumstances to enable the issuing authority to make an independent evaluation of probable cause.

13.  Even with the statements regarding the trash receptacle and the telephone number and call, the affidavit did not establish an independent, substantial basis for finding probable cause.

14.  Based upon the foregoing, Defendant Alphonso Norman submits that information obtained from the investigatory encounter with Alphonso Norman, the search of the trash receptacle at 2429 East Fourth Street, and the search of the residence located at 2429 East Fourth Street were conducted in violation of the Fourth Amendment.

5

WHEREFORE, Defendant Alphonso Norman moves this Court to set this

motion for a hearing, and upon hearing evidence and arguments, to enter an

order suppressing the fruits of the searches complained of herein.

BRUCE MADDOX
Ala. S.J.I.S. MAD013
Law Offices of Bruce Maddox
6728 Taylor Court
Montgomery AL 36117
PH: 334.244.7333
FX: 334.260-9600

THOMAS M. GOGGANS
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery AL 36106
PH: 334.834.2511
FX: 334.834.2512

Attorneys for Defendant
Alphonso Norman

By: _____

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

Todd A. Brown
Assistant United States Attorney
P.O. Box 197
Montgomery AL 36101

by placing the same in the United States mail, first class postage prepaid and

properly addressed on this the 24 day of November, 2003.

_____
Thomas M. Goggans

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA )
)
VS. ) CASE NO. CR-03-229-N
)
ALPHONSO NORMAN )

## AMENDED MOTION TO SUPPRESS

Comes now Defendant Alphonso Norman, by and through counsel, and

shows as follows:

### Issues Presented

1. This motion to suppress relates to searches conducted by government

agents on September 25, 2003 at 2429 East Fourth Street in Montgomery,

Alabama.

2. This motion involves the following issues:

a. Whether a search of a garbage container at 2429 East Second

Street violated the Fourth Amendment.

b. Whether a search of Alphonso Norman's pockets violated the

Fourth Amendment.

c. Whether a search of the house located at 2429 East Second

Street violated the Fourth Amendment.

### Factual Background and Incorporated Memorandum of Law

3. On September 25, 2003, Alphonso Norman's son resided with his

mother at 2429 East Fourth Street. Alphonso Norman visited with his son at the



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. C

1

residence located at 2429 East Fourth Street on a frequent basis and spent

nights at the residence located at 2429 East Fourth Street on a frequent basis.

4.   On September 25, 2003, Alphonso Norman was at the residence

located at 2429 East Fourth Street taking care of his son.  At the time he was

there, he was responsible for the residence and his son.

5.   Montgomery, Alabama police officer J. T. Conway has claimed:

"On September 25, 2003, [he] received a telephone call from
a subject ... "A". "A" advised that he/she knew of drug activity at
2429 East 4th St, Montgomery, Alabama. "A" advised that he/she
knew that the drug activity always picked up when a black male
subject driving a maroon vehicle arrived at the residence. "A"
advised that the vehicle always backed up beside the residence
and that he/she was unable to obtain the tag number. "A" advised
that the telephone number to the residence was 334-262-3477.

"[He] and other members of the Special Operations Division
went to the residence to investigate. [Another Montgomery police
officer] called the telephone number at the residence and told the
subject that answered the phone that the police were on the way to
the residence. [He] was parked in a location to watch the residence
when the telephone call was made. [He] observed Alfonzo Norman
exited [sic] the residence and walked [sic] to the trash can that was
placed on the street. Alfonzo placed something in the trash can and
returned to the residence.

"[He] and other members of the Narcotics Bureau
approached the residence. Alfonzo Norman, Andrew Kenneth
James and Capolco Peralte were inside the residence. [He] told
Norman why the officers were at his residence and he became very
defensive and said that he wanted a lawyer. [He] walked to the
trash can that was placed on the street. After looking in the can,
[he] located a paper towel that contained a quantity of what was
believed to be crack cocaine. [He] field tested the substance and it
field tested positive for cocaine."

6.   Pursuant to Terry v. Ohio, 392 U.S. 1 (1968), "law enforcement officers

may detain a person briefly for an investigatory stop if they have a reasonable,

articulable suspicion based on objective facts that the person has engaged in, or

is about to engage in criminal activity." United States v. Powell, 222 F.3d 913,

917 (11th Cir. 2000). In Florida v. J. L., 529 U.S. 266 (2000), the Supreme Court

of the United States held that an anonymous tip containing no predictive

information but providing information describing a person's location and

appearance and stating that the person was carrying a gun did not give rise to a

reasonable suspicion of illegal activity and did not justify a Terry stop.

7. A law enforcement agent who makes a proper Terry stop may conduct

a limited pat-down frisk of the subject's outer clothing if he or she has a

reasonable belief that the subject poses a safety threat. Terry, 392 U.S. at 28,

30; Ybarra v. Illinois, 444 U.S. 85, 92-93 (1979). This pat-down must be limited

to a search for weapons and cannot be used to search for evidence of criminal

activity. Terry, 392 U.S. at 29-20.

8. In this case, as in Florida v. J. L., the anonymous tip referenced by

Montgomery police officer J. T. Conway lacked sufficient indicia of reliability to

establish reasonable suspicion for a Terry investigation of Alphonso Norman.

9. In this case, law enforcement agents searched Alphonso Norman's

pockets and seized an amount of cash. (The defense anticipates that the

prosecution will claim this to be incriminating evidence.) In doing so, law

enforcement agents did not have any reasonable belief that Alphonso Norman

posed a safety threat. Further, their search of his pockets exceeded a check for

weapons and went into a search for evidence of criminal activity

10. Montgomery police officer J. T. Conway got Montgomery Municipal

Court Judge Les Hayes, III to issue a warrant to search 2429 East Fourth Street.

A copy of the warrant and a copy of the purportedly supporting affidavit are attached to this motion.

11. Upon execution of the search warrant, incriminating evidence was seized from the residence located at 2429 East Fourth Street.

12. Warrantless searches "are per se unreasonable under the Fourth Amendment subject to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Whether or not a warrant is issued, probable cause is generally required for a search. Carroll v. United States, 267 U.S. 132, 155-156 (1925). Probable cause has been defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." Beck v. Ohio, 379 U.S. 89, 91 (1964). A search warrant is to be issued only if there is probable cause to believe that contraband or evidence of a crime will be found on the premises to be searched. Carroll v. United States, 267 U.S. 132, 155-156 (1925). Evidence presented in support of an application for a search warrant must provide the issuing authority with a "substantial basis" for determining the existence of probable cause. Illinois v. Gates, 462 U.S. 213, 238-239 (1983). The affidavit submitted must contain sufficient facts and circumstances to enable the issuing authority to make an independent evaluation of probable cause. United States v. Ventresca, 380 U.S. 102 (1965). Warrant affidavits containing reckless or intentionally false statements by the affiant may be invalidated and any evidence seized pursuant to the warrant suppressed if the affidavit, cleansed of those statements, does not establish probable cause. Franks v. Delaware, 438 U.S. 154, 155-156 (1978). In this case, there were

reckless or intentionally false statements contained in the affidavit submitted in support of the search warrant.

13. 2429 East Fourth Street is in a residential area. The house located at 2429 East Fourth Street is small. The front yard of 2429 East Fourth Street is small as well. Potentially incriminating evidence was seized by Montgomery police officer J. T. Conway from a trash receptacle located at 2429 East Fourth Street. The trash receptacle searched by Montgomery police officer J. T. Conway is a receptacle for that residence only. It was not actually on the street as stated in the search warrant affidavit, but was in the front yard. This occurred on a Thursday, which was not a trash pick-up day for that neighborhood. There was no probable cause for Montgomery police officer J. T. Conway to search through the trash receptacle. Furthermore, Montgomery police officer J. T. Conway searched the trash receptacle without a warrant and without the existence of any exceptions to the warrant requirement.

14. Montgomery police officer J. T. Conway stated in the search warrant affidavit that another police officer had "called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence." The telephone number at the residence was not called. The number called was that of a James Perryman who resides at 3168 Rolling Road, Montgomery, Alabama. The identity and address of the person to whom the number called was assigned can be readily determined in a matter of seconds utilizing a reverse telephone look-up service on the internet such as infospace.com. (A copy of an infospace.com reverse look-up print-out is

attached to this motion.) The identity and address of the person to whom the number was assigned was surely just as obtainable by the government agents involved. It was not disclosed in the affidavit that the number given by "A" and called was not a telephone number associated with 2429 East Fourth Street but that of a James Perryman who resides at 3168 Rolling Road.

15. The affidavit also stated that "Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence." Peralte's presence inside of the house was unknown to Conway until Conway had left East Fourth Street to find a judge, and another police officer, M. N. Drummond, had gone into the house without a warrant and looked around and had called Conway and told him about Peralte.[1] This was not disclosed in the affidavit.

16. Cleansed of the statements regarding the trash receptacle, the telephone number and call, and Peralte's presence in the house, the affidavit did not establish probable cause. Other statements such as: "Further probable cause being that Alfonzo Norman and Andrew Kenneth James are known drug dealers in the Montgomery, Alabama are "only sophistry to illustrate an illusion of ongoing cocaine sales from the house," Ex parte Parker, 2003 WL 1333243 (Ala. 2003), and did not contain sufficient facts and circumstances to enable the issuing authority to make an independent evaluation of probable cause.

17. Even with the statements regarding the trash receptacle and the telephone number and call, the affidavit did not establish an independent, substantial basis for finding probable cause.

_____

[1] At the time Drummond went into the house, Alphonso Norman and Andrew Kenneth James had been taken away.

18. Based upon the foregoing, Defendant Alphonso Norman submits that information obtained from the investigatory encounter with Alphonso Norman, the search of Alphonso Norman's pockets, and the search of the trash receptacle at 2429 East Fourth Street, and the search of the residence located at 2429 East Fourth Street were conducted in violation of the Fourth Amendment.

WHEREFORE, Defendant Alphonso Norman moves this Court to set this motion for a hearing, and upon hearing evidence and arguments, to enter an order suppressing the fruits of the searches complained of herein.

BRUCE MADDOX
Ala. S.J.I.S. MAD013
Law Offices of Bruce Maddox
6728 Taylor Court
Montgomery AL 36117
PH: 334.244.7333
FX: 334.260-9600

THOMAS M. GOGGANS
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery AL 36106
PH: 334.834.2511
FX: 334.834.2512

Attorneys for Defendant
Alphonso Norman

By: _____

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

Todd A. Brown
Assistant United States Attorney
P.O. Box 197
Montgomery AL 36101

by placing the same in the United States mail, first class postage prepaid and

properly addressed on this the _4_ day of December, 2003.

Thomas M. Goggans

Joint Response



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO.    D

## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

UNITED STATES OF AMERICA    )
    )
    v.    )    CR. NO. 03-0229-N
    )
ALPHONSO NORMAN,    )
CAPULCO PERALTE    )

### RESPONSE TO DEFENDANTS' MOTIONS TO SUPPRESS

**COMES NOW** the United States of America, by and through Leura Garrett Canary, United

States Attorney for the Middle District of Alabama, and files its response to the Motion to Suppress

and the Amended Motion to Suppress filed by Defendant Alphonso Norman ("Norman") on or

about November 24, 2003 and December 4, 2003, respectively, and the Motion to Suppress filed by

Defendant Capulco Peralte ("Peralte") on or about December 10, 2003, as follows:

### FACTS

1.   On September 25, 2003, at approximately 4:00 pm, Montgomery Police Department

("MPD") Corporal J.T. Conway ("Conway") fielded a telephone call from an anonymous black

female. The phone call was placed to MPD's Special Operations Division, rather than the main

MPD phone line or the Emergency 911 ("E-911") system. The caller stated that there was a "bunch

of dope" at the residence located at 2429 East Fourth Street, Montgomery, Alabama. It appeared to

Conway that the caller was a neighbor. The caller told Conway several times that "they can't know

who I am." Among other things, the caller stated that there were three people at the house, and that

one of them went by the nickname "Scooter." Conway recognized "Scooter" as a nickname for

Alphonso Norman. The caller stated that there was a maroon vehicle with Florida license plates

backed up to the house and that whenever this vehicle was at that residence, there would be "keys

[slang for kilograms of drugs] in the house." The caller also gave a phone number for the residence

as 262-3477.[1]  The caller never identified herself.

2.  Conway acted on the tip by gathering at least five separate officers in the narcotics bureau who responded to the residence in separate unmarked police vehicles. Prior to leaving the Special Operations office, Conway gave the phone number, written on a small sheet of paper, to MPD Corporal D. D. Alexander ("Alexander"). The officers then responded to the scene within about 15 minutes of the conclusion of the phone call. Conway parked on the street where he could observe the front door of the residence. Conway directed Alexander to place a phone call to the residence and to tell the occupants of the residence that police officers were on the way to the residence.  Alexander telephoned the number provided by the anonymous caller, forwarded the information, and informed Conway that he had placed the call. Within seconds, Conway observed Norman exit the residence and place something white in a trashcan located in the street in front of the residence. Contrary to Norman's assertion, the trashcan was not in the yard, but in the street, as can be seen in the bottom left photograph shown on Government's Exhibit A (Bates-stamped page 000032), attached. Conway then observed Norman go back into the residence.

3. Conway then decided to conduct what is commonly called a "knock and talk," whereby an officer goes to a residence, knocks on the door, tells the occupant who he is and why he is there, and ultimately asks for consent to search the residence. In the instant cause, Conway did approach the residence.  Norman responded to Conway's knock.  Conway observed Norman on several occasions place his hands into his pants pockets. Based on Conway's training and experience with

---

[1] At the preliminary hearing and detention hearing, held on October 2, 2003, before United States Magistrate Judge Delores R. Boyd, counsel for one or more of the defendants pointed out that the number given by the caller, 262-3477, was not the number for the address at 2429 East Fourth Street. It was not until that moment that agents learned that the number they had been given was not for that address, but for an individual named James Perryman. Subsequent investigation by the agents established that the correct number for the residence at 2429 East Fourth Street was 264-3277. It is unknown whether the caller transposed the 2 and 4 digits when she relayed the information to Conway, or if Conway transposed the numbers when he wrote them down. Further investigation also confirmed that the number, 262-3477, actually called by the agents on that date, belonged to Perryman.

drug dealers, Conway became concerned for his safety and drew his service weapon. It was about this time that codefendant Andrew Kenneth James ("James") came to the door and stood behind Norman. Also at the residence was a young boy, who was later identified as Norman's son. Conway directed Norman's son out into the yard and out of the area of danger. At this point, Conway patted down Norman for weapons. Conway did not locate any weapons during the pat-down, but did locate a cellular telephone and approximately $2,575 in James' pocket.

4. Once satisfied that Norman did not have any weapons on his person, Conway told Norman and James about the drug complaint and asked for consent to search the residence. Norman declined and made statements about calling his lawyer. Norman and James then sat down on the front porch. Conway then went to the trashcan and retrieved a white object (a white paper towel in a plastic bag) he believed to be the object that Norman had previously placed there. Conway field-tested a substance on the paper towel, yielding a positive result for the presence of cocaine. Conway then decided to obtain a search warrant for the residence. In an effort to prevent the destruction of any evidence, Conway directed officers to detain Norman and James until Conway could obtain a search warrant.

5. When Conway left, MPD Lieutenant Bob Caviness ("Caviness") and MPD Sergeant Mike Drummond ("Drummond") maintained observation of Norman and James. Drummond then heard the sound of someone moving in the residence. Because the previous complaint identified three people involved in this drug activity, Drummond entered the residence to secure the person for the officers' safety and to prevent the possible destruction of evidence. Upon entering the residence, Drummond observed from the living room another black male later identified as Capulco Peralte ("Peralte") coming out of the laundry room. Drummond then told Peralte to come outside and join Norman and James. Drummond did not conduct a search of the house and, in fact, never even inadvertently saw any incriminating evidence. After Peralte went outside, Drummond relayed

3

the fact that Peralte had been found to Conway, who was back at the Special Operations office and had begun to type an affidavit in support of the search warrant. Conway included the presence of Norman, James, and Peralte in the text of his affidavit.

6. Conway returned to the residence within approximately an hour with the search warrant. Officers executed the warrant finding more than 3.9 kilograms of cocaine hydrochloride, 2.6 grams of cocaine base, a handgun, two sets of digital scales, packaging, and more than $72,000 in cash secreted in various parts of the residence. A search of the Florida-tagged vehicle, believed to have been driven to Montgomery by Peralte, revealed hidden compartments. This evidence was the basis of a criminal complaint filed on September 26, 2003.

7. Additionally, after learning that the phone number that had been provided by the anonymous caller had been incorrect, Conway and Alexander attempted, unsuccessfully, to locate the scrap of paper with the phone number written on it. It is believed that the paper was either thrown away or misplaced. Unlike E-911 calls, telephone calls to the Special Operations Division are not recorded.

## SEARCH OF GARBAGE CAN

8. Norman claims "the search of a garbage can located at 2429 East Second (sic) Street violated the Fourth Amendment." *Defendant Norman's Amended Mot. to Suppress ("Norman Mot.")*, at ¶ 2(a).

   a. Norman first claims that the trashcan "was not actually on the street as stated in the search warrant affidavit, but was in the front yard." *Norman Mot.*, at ¶ 13. Not only does Conway refute this contention, but the bottom left photograph shown in Government's Exhibit A, attached, provides visual evidence to the contrary. A warrantless search of a garbage can in front of a private house, but outside the curtilage, does not violate the Fourth Amendment. California v. Greenwood, 486 U.S. 35 (1988). "[T]he extent of the curtilage is determined by factors that bear

4

upon whether an individual reasonably may expect that the area in question should be treated as the home itself. [The United States Supreme Court] identified the central component of this inquiry as whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." United States v. Dunn, 480 U.S. 924, 300 (1987) (internal quotations and citations omitted). Curtilage "questions should be resolved with particular reference to four factors: [1] the proximity of the area claimed to be the curtilage of the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by." Id. at 301. In the instant cause, the contraband was thrown into a garbage can, located as far away from the house as possible, so that a third party (the City of Montgomery Sanitation Department) could dispose of it. The contraband was not located within the property's curtilage and there was no expectation of privacy in the contraband that was placed in the garbage can.

b. Norman goes on to state, "Thursday...was not a trash pick-up day for that neighborhood." Norman Mot., at ¶ 13. Such a fact is irrelevant to the instant cause. There can be no expectation of privacy in items thrown in the garbage, regardless of the day it was placed there. See Greenwood, 486 U.S. at 39-41; United States v. Hall, 47 F.3d 1091, 1094-95 (11th Cir. 1995).

c. Norman finally states that there was not "probable cause for...Conway to search through the trash receptacle," and further, "Conway searched the trash receptacle without a warrant and without the existence of any exceptions to the warrant requirement." Norman Mot., at ¶ 13. Probable cause is not a requirement to search garbage that has been abandoned. Greenwood, supra; Hall, supra.

### SEARCH OF NORMAN'S PERSON

9. Norman claims the search of his person by Conway violated the Fourth Amendment. Norman Mot., at ¶ 2(b). Norman specifically contends that "agents did not have any reasonable

belief that Alphonso Norman posed a safety threat." *Norman Mot.*, at ¶ 9. The facts do not support this contention. Based on Conway's experience that drug dealers use firearms as tools of the trade, he felt threatened by Norman plunging his hands into his pockets. Conway was justified in his pat-down search of Norman. Terry v. Ohio, 392 U.S. 1 (1968); United States v. Bonds, 829 F.2d 1072 (11th Cir. 1987) (specific facts supporting a reasonable belief that an officer is in danger may justify a "frisk").

10.    Alternatively, citing Florida v. J.L., 529 U.S. 266 (2000), Norman claims the "anonymous tip referenced by...Conway lacked sufficient indicia of reliability to establish reasonable suspicion for a *Terry* investigation of" Norman. *Norman Mot.*, at ¶ 8. As referenced above, the pat-down search of Norman was based on the furtive movements of Norman, which made Conway feel threatened, and not the information provided by the anonymous caller.

## SEARCH OF THE RESIDENCE

11.    Norman claims the "search of the house located at 2429 East Second (sic) Street violated the Fourth Amendment." *Norman Mot.*, at ¶ 2(c). This search was conducted pursuant to a search warrant issued on September 25, 2003 by Montgomery, Alabama Municipal Judge Les Hayes, III. Norman claims that "there were reckless or intentionally false statements contained in the affidavit submitted in support of the search warrant." *Norman Mot.*, at ¶ 12. Norman's specific claims are addressed below. Norman claims that "[c]leansed of these statements...the affidavit did not establish probable cause." *Norman Mot.*, at ¶ 16.

a.    First, Norman alleges the trashcan was located in the front yard rather than in the street, as stated within the affidavit. The Government addressed this issue at paragraph 8(a), *supra*.

b.    Second, Norman claims that the correct telephone number of the residence was not the number listed in the affidavit. *Norman Mot.*, at ¶ 14. Norman avers the "identity and address of the person to whom the number called was assigned can be readily determined in a matter of

6

seconds utilizing a reverse telephone look-up service on the internet." *Norman Mot.*, at ¶ 14. The Government readily admits the telephone numbers in the instant cause were transposed (262-3477 *versus* 264-3277). Nevertheless, the facts, as stated in the affidavit, were correct to the best of the officers' knowledge. Officers placed a phone call to a number they had reason to believe belonged to the residence in question, and after placing the call, the actions of the parties developed as set forth in the affidavit. While inaccurate, the telephone number was not listed in the affidavit either recklessly or intentionally falsely.

      c. Third, Norman asserts that while the "affidavit also stated that 'Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence," Conway could not have known of Peralte's presence because Conway was not present when Peralte was located. Conway was informed via police radio by Drummond of Peralte's presence while Conway was drafting the warrant. Conway then included the presence of Norman within the text of the affidavit.

      d. Further, and most importantly, the crux of the probable cause for the affidavit is the presence of narcotics in the trashcan which an occupant of the house placed there. "The probable cause element for a [search] may be supplied by information acquired by...officers which corroborates the informant's tip that the arrestees had committed or were in the process of committing a felony, even if the tip alone would not find support a finding of probable cause." United States v. Anderson, 500 F.2d 1311, 1317 (5th Cir. 1974).[2]

## SEARCH OF PERALTE'S VEHICLE

12. Peralte claims that if the evidence seized from the residence is suppressed, then the evidence related to his vehicle should also be suppressed as it was "fruit of the poisonous tree." *Defendant Peralte's Mot. to Suppress ("Peralte Mot.")*, at p. 6. Alternatively, Peralte "contends

---

[2] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

that the search of the vehicle was not contemplated in the warrant" or other circumstances "that developed." *Peralte Mot.*, at p. 4. Taking Peralte's second assertion first, the warrant specifically, in a handwritten addition to Conway's affidavit, which he initialed, contemplates "any vehicles at the residence." Government's Exh. B, attached. Peralte's first claim should be denied based on the legality of the search of Norman's trashcan, his person, and his residence pursuant to a search warrant, as argued *supra*.

13.    Based on the foregoing, the United States respectfully requests this Court deny Defendants' Motions to Suppress.

Respectfully submitted, this the 22nd day of December, 2003.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

TODD A. BROWN
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Todd A. Brown, Assistant United States Attorney, hereby certify that I have served a copy of the foregoing upon Counsel for Defendant, Thomas M. Goggans, Esq., and Susan G. James, Esq., by hand-delivery or by placing a copy of the same in the United States mail, postage prepaid and properly addressed on this the 22nd day of December, 2003.

Assistant United States Attorney

8

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT FOR
 2                 THE MIDDLE DISTRICT OF ALABAMA
 3                        NORTHERN DIVISION
 4
 5
 6   UNITED STATES OF AMERICA
 7
 8         Vs.                 CR. NO. 03-229-N
 9
10   ALPHONSO NORMAN and
11   CAPULCO PERALTE
12
13
14         *    *    *    *    *    *    *    *
15            HEARING ON MOTION TO SUPPRESS
16         *    *    *    *    *    *    *    *
17         Before Hon. Susan Russ Walker,
18         Magistrate Judge, at Montgomery, Alabama,
19         Commencing on January 8, 2004
20         *    *    *    *    *    *    *    *
21   APPEARANCES: For the Government: Todd A. Brown
                                      Assistant U.S. Attorney
22               For the Defendant, Peralte: Susan J. James,
                                      Attorney at Law
23               For the Defendant, Norman: Thomas M. Goggans
                                      and Bruce Maddox,
24                                    Attorneys at Law
25
```

**Page 2**

```
 1                    INDEX OF WITNESSES
 2   Government's Witnesses:                     Page
 3   J.T. CONWAY
 4   Direct Examination by Mr. Brown:              8
     Cross-Examination by Mr. Maddox:             27
 5   Cross-Examination by Ms. James:              55
 6   D.D. ALEXANDER
 7   Direct Examination by Mr. Brown:             91
     Cross-Examination by Mr. Goggans:            94
 8   Cross-Examination by Ms. James:              97
 9   MICHAEL DRUMMOND
10   Direct Examination by Mr. Brown:            104
     Cross-Examination by Mr. Maddox:            110
11   Cross-Examination by Ms. James:             117
12   GENE SISSON
13   Direct Examination by Mr. Brown:            125
     Cross-Examination by Mr. Goggans:           133
14   Cross-Examination by Ms. James:             136
15   GENE SISSON
16   Direct Examination by Mr. Brown:            164
17   Defendant's Witnesses:
18   JAMES R. PERRYMAN
19   Direct Examination by Mr. Goggans:            4
20   SHATOUBRIOUNE HARE
21   Direct Examination by Mr. Goggans:
22   LES HAYES
23   Direct Examination by Ms. James:
24
25
```

GOVERNMENT
EXHIBIT

CASE
NO.  03-229-N

EXHIBIT
NO.  E

**Page 3**

```
 1        (The above case coming on for hearing at Montgomery,
 2   Alabama, January 8, 2004, before Honorable Susan Russ Walker,
 3   Magistrate Judge, the following proceedings were had
 4   commencing at 3:40 p.m.:)
 5        THE COURT: This is United States versus Alphonso
 6   Norman and Capulco Peralte, 03-229-N.  We are here on motions
 7   to suppress. Everybody ready to proceed?
 8        MR. BROWN: The government is ready, Your Honor.
 9        MR. GOGGANS: Defendant Norman is ready, Your Honor.
10        MS. JAMES: Defendant Peralte is ready.
11        THE COURT: I will hear from the government.
12        MR. GOGGANS: Your Honor, I spoke with Mr. Brown
13   prior to the hearing.  The defense has a witness that Mr.
14   Brown at least this end of the defense table has agreed to
15   take out of order if that's permissible with the Court.
16        THE COURT: Any objection to that, Mr. Brown?
17        MR. BROWN: No objection.
18        THE COURT: All right. The defense can call him.
19        MR. GOGGANS: Mr. Perryman. Your Honor, we'd like to
20   invoke the rule.
21        THE COURT: The rule has been invoked, anyone in the
22   courtroom who expects to testify as a witness I need to
23   excuse you until such time as you testify.  I will also rely
24   on the lawyers to let me know who these people are if there's
25   anyone in the courtroom who should not be.
```

**Page 4**

```
 1        THE CLERK: You do solemnly swear or affirm that the
 2   testimony you give in this cause to be the truth, the whole
 3   truth, and nothing but the truth, so help you God.
 4        THE WITNESS: I certainly do.
 5        JAMES R. PERRYMAN, witness for the Defendant,
 6   having been duly sworn or affirmed, testified as follows:
 7               DIRECT EXAMINATION
 8   BY MR. GOGGANS:
 9   Q. State your name, please, sir.
10   A. My name is James R. Perryman, I go by Rich Perryman.
11   Q. Mr. Perryman, where do you live?
12   A. 3168 Rolling Road Circle in McGehee Estates.
13        THE COURT: Can everybody hear him?
14   A. Can you hear me? I live at 3168 Rolling Road Circle in
15   McGehee Estates.
16   Q. That's near Jeff Davis High School in Montgomery?
17   A. Yes, it is.
18        THE COURT: Excuse me, you can bend that mic and
19   lift it up.
20   Q. Did you live there on September 25th of 2003?
21   A. I think so.
22   Q. How long have you lived there?
23   A. I would say about three years now.
24   Q. All right, sir. What is your phone number at that
25   residence?
```

**CondenseIt™**

## Page 5

1 A. 262-3477.

2 Q. Area code 334?

3 A. Yes.

4 Q. In September, in particular on September the 25th of

5 2003 do you remember getting any strange phone calls?

6 A. I don't remember what day it was, it's not -- I have a

7 lot of things going on.

8 Q. Do you remember a strange --

9 A. I remember getting a phone call though, right.

10 Q. Do you remember about what time of day it was?

11 A. I think it might have been in the afternoon but I am not

12 sure.

13 Q. Tell us what was said to you in this strange phone call.

14 A. It was strange. I didn't memorize the exact words, but

15 it went something like this. It went hey, you need to get

16 the drugs and get out of there, the police are on to us and

17 they are coming for us. I can't say anything else, I have got

18 to go. And then there was a hangup, I never said a word.

19 Q. After you got this strange phone call what did you do?

20 A. Well, first thing I did was sat there and think about

21 whether I wanted to get involved in this. And then I thought

22 I wanted to do my civic duty, so I called the police -- I

23 mean because if I remember correctly the number was on my

24 caller ID so I thought it was -- that I should call the

25 police and tell them about it.

## Page 6

1 Q. Did you call the Montgomery police department?

2 A. Yes, I did.

3 Q. And what did you inform the Montgomery police

4 department?

5 A. I just told them the same thing I just told you.

6 Q. All right.

7 A. And I told them what the phone number was.

8 Q. Did you have any other contact with the Montgomery

9 police department that day about this call?

10 A. You know, I have been trying to remember this. It seems

11 like they may have called me back but I am not sure. And I

12 don't remember the content of that phone conversation, but it

13 was insignificant.

14 Q. After you got the strange phone call how long was it

15 before you called the police department?

16 A. It wouldn't have been long. I don't know how long, ten

17 minutes maybe. Five minutes.

18 Q. Mr. Perryman, you are an accountant, are you not?

19 A. I am a CPA, I don't practice any more, we have a

20 business here.

21 Q. Do you know anyone who lives on East 4th Street?

22 A. No.

23 Q. Have you ever --

24 A. I don't even know where East 4th Street is.

25 Q. Have you ever had your telephone forwarded to any

## Page 7

1 residence over on East 4th Street?

2 A. No.

3 Q. The number that you told us showed up on your caller ID,

4 did you give that number to the police when you called them?

5 A. I believe I did. Like I said I didn't memorize this, I

6 was just making a phone call and then I went on to other

7 things so I can't really recall exactly what happened. But I

8 believe that I gave them the phone number.

9 Q. Thank you very much.

10    THE COURT: Any questions?

11    MR. BROWN: No, ma'am.

12    THE COURT: All right. You may step down. Thank

13 you. Can we release this witness?

14    MR. GOGGANS: Yes, ma'am.

15    MR. BROWN: Yes, ma'am.

16    THE COURT: You are excused.

17    THE WITNESS: Thank you.

18    THE COURT: Don't need to come back.

19    MR. GOGGANS: Your Honor, I am going to step out

20 with Mr. Perryman for one second, I will be right back.

21    THE COURT: Sure. All right. Mr. Brown, you want to

22 begin?

23    MR. BROWN: Yes, ma'am. Corporal J.T. Conway.

24    THE CLERK: You do solemnly swear or affirm that the

25 testimony you give in this cause to be the truth, the whole

## Page 8

1 truth, and nothing but the truth, so help you God.

2    THE WITNESS: I do.

3    J.T. CONWAY, witness for the Government, having

4 been duly sworn or affirmed, testified as follows:

5    DIRECT EXAMINATION

6 BY MR. BROWN:

7 Q. Would you state your name, please.

8 A. J.T. Conway.

9 Q. How are you employed?

10 A. Montgomery police department.

11 Q. In what capacity?

12 A. I am assigned to the special operations division, I am a

13 narcotics investigator.

14 Q. Were you employed in that capacity back on September

15 25th of this year?

16 A. Yes, I was.

17 Q. And were you on duty at 4:00 in the afternoon?

18 A. Yes, sir.

19 Q. Where were you on duty?

20 A. I was in the narcotics office.

21 Q. Would you -- did you receive a phone call on that date?

22 A. Yes, sir, I did.

23 Q. Would you explain how that came about.

24 A. I received an anonymous telephone call, which we receive

25 a lot of these calls, people call in and want to give

Page 9

1   information but we don't know who they are. The caller stated
2   that there was a residence on 4th Street I think it was, 5th
3   street, I can't remember the street, what street it was now,
4   what the address is. But the caller stated there was a red
5   car with a Florida tag backed up beside the house.
6   Q. Let me stop you there, did you know who this person was?
7   A. The person that called?
8   Q. Yes.
9   A. No, I do not.
10  Q. Did you ask the person their name?
11  A. I did ask who it was and they wouldn't tell me.
12  Q. Did they make any statements after you asked them?
13  A. They said they can't know who I am. That's all they
14  said.
15  Q. Could you tell if the person was male or female?
16  A. It was a female.
17  Q. Could you tell their -- do you have an opinion what
18  their race or anything else about them?
19  A. It sounded to me like it was a black female.
20  Q. And they called -- you said you were at where again?
21  A. I was at the narcotics office. I was at my desk.
22  Q. And is that at MPD headquarters?
23  A. No, sir.
24  Q. Did they call you on the main Montgomery police
25  department line?

Page 10

1   A. No, sir.
2   Q. Did they call you on the 911 line?
3   A. No, sir.
4   Q. What number did they call you on?
5   A. They called us at the narcotics office number which is
6   241-4700.
7   Q. And this person called and said there was an address on
8   4th or 5th Street?
9   A. They said what the address was and what street, I just
10  went blank when I sat down here.
11  Q. When that person called, you said that they told you
12  about a maroon vehicle?
13  A. Yes, sir.
14  Q. You said it was backed up to a house?
15  A. The caller stated when the car was there and it was
16  backed up beside the house there was keys there, I mean kilos
17  of cocaine, and said the car was there right now.
18  Q. Did they describe what the -- what, if any, kind of
19  license plates the car had?
20  A. Yes, said it had a Florida license plate.
21  Q. What else did this person tell you?
22  A. They also -- they told me -- she said there was a large
23  quantity of cocaine there right at that time.
24  Q. Okay. Did she tell you how many people were -- if any at
25  all, were in the house?

Page 11

1   A. Yes, sir, she said there was three people there.
2   Q. Did she give you the name of one of the individuals?
3   A. She said one of the people there was named, a nickname
4   of Scooter. She didn't know their real name.
5   Q. Did that name ring a bell to you?
6   A. Yes, sir.
7   Q. Why?
8   A. Just being familiar with on the street -- people on the
9   street who goes by the name of Scooter. I knew that would
10  be -- I didn't know it would be, but I knew that Alphonso
11  Norman went by the name of Scooter.
12  Q. Okay. Did the person provide you any other information
13  relating to the residence?
14  A. She gave -- I asked her what the phone number was to the
15  residence and she gave me a telephone number. I can't
16  remember that telephone number right now and I wrote it down
17  on a sheet of paper, a real small note. Like one of those
18  little sticky notes.
19  Q. Did you write anything else on that sticky note other
20  than that phone number?
21  A. I think that's all I wrote. I wrote the phone number and
22  I wrote the address down that she was talking about.
23  Q. Okay.
24      MR. BROWN: May I approach, Your Honor?
25      THE COURT: Yes.

Page 12

1   Q. Corporal Conway, I want to show what you has been marked
2   as Government's Exhibit B and ask if you can identify that?
3   A. Yes, sir. This is the search warrant affidavit that I
4   drafted.
5   Q. Does it list the residence on there?
6   A. Yes, sir.
7   Q. Before you read it --
8   A. It's 2429 east 4th Street, Montgomery, Alabama.
9   Q. Is that the residence you remember from that day?
10  A. Yes.
11  Q. Does that affidavit also have a phone number on there?
12  A. Yes, sir. This is the phone number that we called, it
13  was area code 334, 262-3477.
14  Q. Is that the number that the anonymous caller gave you as
15  being the number for that residence?
16  A. Yes, sir.
17  Q. Did you later find out that that was not the number for
18  that residence?
19  A. Yes, sir.
20  Q. Do you recall when that was?
21  A. It was after the Defendants were arrested and there was
22  some type hearing, maybe their arraignment or something is
23  when it came out. I am not sure, I wasn't here.
24  Q. All right. What did you do after you wrote that
25  information down, did the phone call continue? What

CondenseIt ™

## Page 13

1 happened?
2 A. The piece of paper that I wrote down?
3 Q. Uh-huh.(positive response)
4 A. I wrote it down on a piece of paper. I got up with
5 Corporal Alexander, Sergeant Drummond and a couple of other
6 guys from the office and I said let's go out here and let's
7 check out this house, there's supposed to be a lot of dope
8 there. Cocaine. And so I gave the piece of paper to Corporal
9 Alexander that had the phone number so he would have the
10 phone number in case we wanted to try to call the house. A
11 lot of times we will call the house and tell them the police
12 are coming just in an effort to scare them out of the house,
13 maybe catch them when they are leaving, maybe run out with
14 all the cocaine.
15 Q. You said you gathered up several officers, you mentioned
16 some, did y'all respond in separate vehicles or did you go
17 all together?
18 A. We were all in separate vehicles.
19 Q. You went to that address that's on your affidavit?
20 A. Yes, sir.
21     THE COURT: Can I get the first names of the people
22 you just mentioned?
23     THE WITNESS: Corporal D.D. Alexander, Sergeant Mike
24 Drummond, Lieutenant Bob Caviness, I think Officer Scott
25 Simons, and Brad Bartlett.

## Page 14

1     THE COURT: And is it DeeDee or initials D.D.?
2     THE WITNESS: Yes, ma'am, that's his initials.
3 Q. And he's going to testify later but D.D. actually goes
4 by D.D.?
5 A. That's what he goes by, yes, ma'am. And honestly I don't
6 know his real name.
7 Q. All right. Now, you gave the piece of paper to D.D.
8 Alexander who was to place the phone call if that's what you
9 decided to do; is that right?
10 A. That's correct.
11 Q. What -- where did you position yourself once you got to
12 the scene?
13 A. Okay. Whenever I pulled up the -- this particular house
14 is on the dead end kind of. It's kind of like a cul-de-sac
15 but it dead ends on 4th Street, and you kind of go down the
16 hill if you are heading back towards Ann Street, I guess West
17 Street would be the street you know about. If you are going
18 from West Street headed back east on 4th Street you are kind
19 of up on a hill looking down the hill towards the house kind
20 of, and I stopped on the right side of the road so I could
21 see down to the house.
22 Q. What, if anything, could you see of the house?
23 A. I could see several cars parked in the driveway, I can't
24 remember now what they were. But I did see a maroon car that
25 was backed up beside the house. I couldn't see the tag

## Page 15

1 number or anything. Like I said, it was a maroon car, it was
2 just parked. It was sticking out from the side of the house.
3 Q. What happened next?
4 A. Everybody got in the area, nobody went down by the
5 house, I don't believe. We parked all through the
6 neighborhood. Everybody was parked. At that time I told
7 Corporal Alexander to call the house and tell them that the
8 police were coming and he -- we were making this
9 communication over the radio. He told me he would do it. He
10 called and called me right back and said I made the call.
11 Q. All right. After he called you back and told you he made
12 the call, what happened then?
13 A. Just like seconds after he called me and told me that he
14 had made the call, Mr. Norman walked out the front door of
15 the house. And didn't appear to be in a hurry like he was
16 running or anything like that, but just walked out the front
17 door, he walked out into the street. The City of Montgomery
18 garbage can was sitting in front of the house on the street.
19 It was off the curb sitting in the street. And he opened the
20 lid, he had something white in his hand, it looked like a
21 white bag, I couldn't really tell, I was looking through
22 binoculars. And he threw that in the garbage can and shut
23 the lid and went back in the house.
24     MR. BROWN: Can I approach the witness?
25     THE COURT: Yes.

## Page 16

1 Q. I will show you what has been marked as Government's
2 Exhibit A, do you recognize that?
3 A. Yes.
4 Q. What are those?
5 A. These are pictures that were taken of the residence.
6 Q. I'll ask you to look to the photograph at the bottom
7 left of Government's Exhibit A.
8 A. Yes, sir.
9 Q. Does that accurately reflect the scene as you remember
10 it that day?
11 A. Yes, sir. Other than this is a photocopy, this is not
12 the clearest picture that we took.
13 Q. I understand.
14 A. This is my truck sitting right in front of the house and
15 this is another -- this is another narcotics vehicle and
16 that's the trash can sitting right there in front of my truck
17 in the street.
18 Q. I am going to retrieve that.
19     MR. BROWN: The government moves to admit Exhibit
20 A.
21     THE COURT: Any objection?
22     MR. MADDOX: No objection.
23     THE COURT: It's admitted.
24     MR. BROWN: Your Honor, I have admitted Government's
25 Exhibit A and with consent of counsel I am going to use a

**CondenseIt™**

Page 17

1  clearer picture --
2       THE COURT: All right.
3       MR. BROWN: -- for the Court. Still a little blurry,
4  but that may just be because it's --
5       THE COURT: You might be able to focus.
6       MR. BROWN: I am trying.
7  Q. Okay. Corporal Conway, is this the photograph or another
8  photograph, color version of what you referred to a moment
9  ago?
10 A. This is a copy of the one that you showed me, a copy of
11 this one, yes, sir.
12 Q. Okay. I believe if you touch the screen -- would you
13 touch the screen, touch where your vehicle is. Just tap.
14      THE COURT: I can tell you right now it's probably
15 not working. It works on yours I think.
16 Q. Okay.
17 A. The Ford F-150 is my vehicle.
18 Q. I am going to put a dot on that and ask if you can --
19 A. That's my vehicle.
20 Q. Okay. What is that?
21 A. That's the trash can.
22 Q. Where is it located?
23 A. In the street.
24 Q. Not in the yard?
25 A. No, sir.

Page 18

1  Q. Not beside the house.
2  A. No, sir.
3  Q. Is that where the garbage can was located when you
4  observed the person put the item into the garbage can?
5  A. Yes, sir.
6  Q. What did you do after observing the item being placed in
7  the garbage can?
8  A. We waited just a few minutes thinking maybe they would
9  leave the house, and no one left. That's why I told everyone
10 on the radio, I said let's just approach the house and we
11 will just talk to them and basically do a knock and talk,
12 what we call a knock and talk.
13 Q. Explain to Judge Walker what a knock and talk is.
14 A. Basically that means we will go to the house, knock on
15 the door, identify ourselves, who we are, why we are there,
16 that we received a complaint. If they will give us consent to
17 search their residence we will, if not, we will just, you
18 know, basically tell them why we are there and go from there.
19 Q. Okay. Did you approach the residence?
20 A. Yes, sir.
21 Q. What happened?
22 A. I approached the residence. I stopped my vehicle right
23 there where the picture was. Walked up to the house. The
24 front door was standing open on the house. As I was
25 approaching the front door of the house Mr. Norman came from

Page 19

1  inside the house, in the first room there with a small kid.
2  Approached the front door.
3  Q. Boy or girl?
4  A. It was a little boy I think.
5  Q. Do you have an age?
6  A. I don't know how old he was. He was young, seven or
7  eight years old, ten years old maybe, I don't know, he was
8  young.
9  Q. You said the door was standing open, what kind of door
10 did it have?
11 A. It was just a wooden door but it was open.
12 Q. Do you recall if there was a screen door?
13 A. I don't recall.
14 Q. What happened after Mr. Norman came to the door?
15 A. He approached the door, I told him who I -- identified
16 myself, and that's when he started to put his hands in his
17 pockets and acting real nervous.
18 Q. Okay. What happened after that?
19 A. I told him to take his hands out of his pockets several
20 times. He continued to put his hands in his pockets and
21 that's when I drew my weapon on him and I pulled his son, or
22 the little boy, behind me, because I didn't know what he was
23 reaching in his pockets for.
24 Q. Okay. Let's back up a moment. You called the little boy
25 his son, did you later learn that the little boy could have

Page 20

1  been --
2  A. Somebody out there said that he was his son. I think it
3  could have been him, he could have said that's my son or
4  something.
5  Q. Did anybody else come to the door other than the boy?
6  A. Yes, sir. Andrew Kenny James, call him Big Kenny, he
7  came to the door behind him.
8  Q. Where was he standing in relation to Mr. Norman?
9  A. They were both standing in the door. Mr. Norman never
10 stepped all the way out, he was just standing in front
11 of the door and Mr. James stood right behind him in the
12 doorway.
13 Q. You may have said this but I want to make sure, you
14 moved the boy, why did you do that?
15 A. Well, he kept putting his hands in his pockets and based
16 on years of experience, you know, I didn't know if he had a
17 weapon or something if there was large amounts of cocaine
18 there that they were trying to protect or something, and when
19 I pulled my gun I wanted the kid out of the way in case he
20 did have a gun, I wanted the kid out of the way.
21 Q. Where did he go, the boy?
22 A. The little boy?
23 Q. Right.
24 A. Some lady next door took him away. I just pulled him
25 back with me, which there were other officers there also, and

## Page 21

1   the lady next door, she said I have got him or whatever and
2   he went over next door with the lady.
3       THE COURT: Just so I understand when you say he
4   kept putting his hands in his pockets --
5       THE WITNESS: Yes, ma'am.
6       THE COURT: -- you mean he put them in and left them
7   there?
8       THE WITNESS: No, ma'am. He put his hands in his
9   pockets, I told him to take his hands out of his pockets, and
10  he put them back in his pockets again and he was just
11  fidgeting around. He had real big pockets on his pants so I
12  couldn't really tell what was in his pockets.
13  Q. Do you recall how many times he stuck his hands down in
14  his pockets?
15  A. More than two times I told him to take his hands out of
16  his pockets.
17  Q. What did you do after that?
18  A. At that point he had his hands in his pockets, I turned
19  him around and made him put his hands up against the wall of
20  the house and I patted him down to make sure he didn't have a
21  weapon, and he actually had a cell phone in his pocket.
22  Q. Did he have anything else in his pockets?
23  A. I think he had some money in his pocket also, but I
24  can't remember how much.
25  Q. All right. Did not have a weapon?

## Page 22

1   A. No, he did not have a weapon.
2   Q. Did you pat down Mr. James as well?
3   A. Yes,, sir. He was standing there, we patted him down as
4   well.
5   Q. Did he have a weapon?
6   A. No.
7   Q. What happened after that?
8   A. That's when Mr. Norman started saying he want to call
9   his lawyer, we didn't have any right to be there and all this
10  stuff. That's when I walked back out to the trash can that
11  was in the street, opened the trash can up, looked inside,
12  there's a wadded up paper towel, either in a plastic bag or
13  wadded up in like the cellophane plastic type stuff. And
14  when I opened it up -- I picked it up and it appeared to me
15  that's what he dropped in the trash can looking at it through
16  the binoculars. And I opened it up and it had little
17  shavings of what appeared to be cocaine, and at that time I
18  went back to my truck and I got a field-test kit and I
19  field-tested what was the little substance that was in there
20  and it tested positive for cocaine.
21  Q. Okay. Before you went to the garbage can where were Mr.
22  Norman and Mr. James located?
23  A. They are both set down in two chairs on the front porch.
24  Q. And when Mr. Norman was saying that he was going to call
25  his lawyer, had you asked him anything about why or told him

## Page 23

1   anything about why you were there and ask him for consent or
2   anything?
3   A. I did tell him that we had complaints that there was
4   drug activity there and that there was large quantities of
5   cocaine there.
6   Q. Did he give you consent to search his residence?
7   A. No, sir.
8   Q. After you field-tested the substance and it tested
9   positive for cocaine, what did you do?
10  A. At that point Mr. Norman, I want to say while I was
11  going to the trash can, that he picked his phone up and he
12  actually made a phone call to somebody. He said he was
13  calling his attorney and all this kind of stuff. So I went
14  to the trash can, that's when I found the rag that had what
15  appeared to be crack cocaine, residue from crack cocaine.
16  When I found that I said -- the other officers that were
17  there, I said handcuff them and I am going to get a search
18  warrant for the residence.
19  Q. Why did you want to do that?
20  A. Based on the phone call that we received and finding
21  that rag in the trash can, then I believed there was more
22  cocaine inside the residence.
23  Q. All right. Did you phone in the information to get the
24  search warrant or did you yourself obtain the search warrant?
25  A. I actually drove back to the narcotics office and typed

## Page 24

1   the search warrant myself.
2   Q. While you were typing the search warrant were you still
3   in communication with any of the other officers?
4   A. Yes, sir.
5   Q. Did any of the other officers contact you while you were
6   writing that affidavit?
7   A. Yes, sir, they did.
8   Q. Would you explain who called you and what they stated.
9   A. Sergeant Drummond, Mike Drummond called me on the
10  radio. He told me that while they were sitting there talking
11  to Mr. Norman and Mr. James that they heard someone inside
12  the residence moving around, making a lot noise or whatever,
13  so they walked inside the residence and that's when they
14  found Mr. Peralte, they asked him to come outside.
15  Q. Did you include Mr. Peralte in your affidavit for the
16  search warrant?
17  A. Yes, sir, I did.
18  Q. Based on what?
19  A. Based on Sergeant Drummond calling and telling me he was
20  inside the house.
21  Q. Do you still have in your possession Government's
22  Exhibit B?
23  A. Yes, sir.
24  Q. Which you have identified as the affidavit and the
25  search warrant.

Page 25

1 A. Yes, sir.
2 Q. Is that the search warrant you obtained -- that you
3 talked about that you went to get for that residence?
4 A. Yes, sir.
5     MR. BROWN: Government moves to admit Exhibit B.
6     THE COURT: Any objection?
7     MS. JAMES: No objection.
8     THE COURT: There's none, it's admitted.
9 Q. Let me show you what is page two of the affidavit, it's
10 Bates stamped number 73. There is a handwritten addition
11 within the search warrant.
12 A. Yes, sir.
13 Q. Would you explain that.
14 A. Okay. What happened is after I got to the Judge's office
15 I noticed I left that out, and Judge Hayes said instead of
16 going back to the office and typing that in, he said write it
17 in and initial it. And J.T.C. at the end, that's my
18 initials, and Judge Hayes signed it.
19 Q. Right there where you are talking about?
20 A. That's my initials, yes, sir. And we just added in any
21 vehicles at the residence.
22 Q. Did you return with the search warrant to the residence?
23 A. Yes, sir, I did.
24 Q. And conduct a search there?
25 A. Yes, sir.

Page 26

1 Q. What was located at the residence?
2 A. We located -- I can't remember exactly how it was broken
3 up, I think there was like two kilos of cocaine in the dryer.
4 We located some money in the washing machine. I think we
5 located another kilo of cocaine up under the sofa. I didn't
6 actually locate all this, other officers who were assisting
7 in the search located. I think it all came out to be almost
8 four kilos, three point nine or something. I don't know the
9 exact weight, hasn't come back from the lab yet. We located
10 some crack cocaine, located a weapon which was inside the
11 closet right by the front door, and we located a large amount
12 of currency.
13     MR. BROWN: Thank you. I don't have any further
14 questions for you, the defense lawyers will.
15     THE COURT: Let me just ask you, how much currency?
16     THE WITNESS: It was between 70 and 80 thousand, I
17 don't know exactly.
18     MR. MADDOX: Your Honor, I couldn't understand that
19 question, I was rustling.
20     THE COURT: I asked him how much currency if he
21 knew, and he said between 70 and 80 thousand.
22     MR. MADDOX: I thought maybe you had asked him his
23 salary.
24     THE COURT: I am sure it's much higher.
25

Page 27

1     CROSS-EXAMINATION
2 BY MR. MADDOX:
3 Q. Mr. Conway, are you still a corporal?
4 A. Yes, sir.
5 Q. Okay. Corporal Conway. When you first testified you said
6 that the caller called the narcotics office on High Street;
7 is that right?
8 A. Highland, yes, sir.
9 Q. Highland?
10 A. Yes, sir.
11 Q. The call came in to what kind of phone system?
12 A. Our phones over there is just a regular -- I mean it's a
13 city phone but those lines are not like the 911 phone calls
14 where they are recorded, so they are not recorded.
15 Q. Do they have caller ID?
16 A. They do have caller ID on them, but I do believe
17 whenever I picked the phone up, because when it was
18 transferred, because basically what happens, we have a cadet
19 that answers the phone there, and the cadet will answer the
20 phone and they will put it on hold and they will get on the
21 intercom in the whole building and they will just ask for an
22 investigator to pick up on whatever line they are calling in
23 on. And I picked that phone line up and if I remember
24 correctly it showed private number. And what will happen, it
25 would show private number if people -- they will block the

Page 28

1 call so we don't know where they are calling from.
2 Q. So you think they blocked the number.
3 A. That or either the number is just that way, it just
4 shows private number.
5 Q. Okay. And you said they told you there was narcotics
6 activity going on at that residence?
7 A. Yes, sir.
8 Q. And they said there was a red car there.
9 A. Yes, sir.
10 Q. Okay. And then later you said when the prosecutor
11 corrected you it was a maroon car.
12 A. It was -- I mean it's maroon, red.
13 Q. What did they say?
14 A. The caller I think said it was a maroon car.
15 Q. Maroon car.
16 A. I think I said it was red, yes, sir.
17 Q. You said it was red. What color was it actually?
18 A. Kind of a maroon/red looking color.
19 Q. I see. Now, something that wasn't in your affidavit, you
20 said they told you there was a large quantity of cocaine
21 there.
22 A. She said there's always -- when that car was there there
23 was kilos of cocaine there. And I think she said there was
24 cocaine there right now.
25 Q. Did you ask her how she knew?

**CondenseIt™**

## Page 29

1  A. No, sir.

2  Q. I see. She told you that there were three black males

3  there, one nicknamed Scooter, did she name any of the others?

4  A. No, sir.

5  Q. Did she tell you where they were?

6  A. She just said they were in the house.

7  Q. In the house.

8  A. Yes, sir.

9  Q. All right. Now, I believe you said you asked her if she

10  knew the phone number of that house.

11  A. That's correct.

12  Q. All right. And she gave you a number that you wrote down

13  and you verified that the number I think Mr. Perryman

14  testified about earlier is the number that you wrote down; is

15  that right?

16  A. I didn't hear Mr. Perryman testify.

17  Q. I'm sorry.

18  A. You know, the number that I wrote down was I think

19  262-3477, is what is in my affidavit.  And I could have wrote

20  that down wrong, but that's what I wrote down is that number.

21  Q. Right. You have been a narcotics investigator for how

22  long?

23  A. I started -- I was transferred to narcotics in '93.

24  Q. Okay.

25  A. So --

## Page 30

1  Q. Almost 11 years?

2  A. Close, yes, sir.

3  Q. Close to 11 years. You have investigative techniques for

4  finding out who lives where and what their phone numbers are

5  and who has got the power in that residence and all that sort

6  of thing, don't you?

7  A. Well, you do, but, you know, you have to subpoena a lot

8  of that information as far as finding out who has got the

9  power to places and getting -- you can call the phone company

10  and ask for a telephone number to an address or whatever,

11  they might give it to you, it depends on whether or not it's

12  a non-published number, you know.

13  Q. At the detention hearing before Judge Boyd Mr. Sisson

14  testified that what he normally does is just go to anywho.com

15  and it takes less than a minute to find out whose phone

16  number a number is.

17  A. He could have, I was not there.

18  Q. Do you know how to do that?

19  A. Yes, sir.

20  Q. You didn't do that?

21  A. No, sir.

22  Q. You didn't do anything to find out whose phone number it

23  was?

24  A. No, sir.  I had no reason to think that the person who

25  was on the other end of the line told me the wrong phone

## Page 31

1  number.

2  Q. I'm sorry, tell me that again?

3  A. I had no reason to believe that the number that I wrote

4  down that she gave me, I had no reason to believe that was

5  not the right phone number for that house.

6  Q. Did you have any reason to believe that it was?

7  A. The correct number?

8  Q. Yes, sir.

9  A. Well, she told me the maroon car was there and it was

10  there.

11  Q. You didn't know that until you went out there though,

12  did you?

13  A. That's right, but it's kind of like --

14  Q. You could have checked that phone number immediately

15  before you went out there, couldn't you?

16  A. I could have, but if there was a large amount of cocaine

17  there, it doesn't stay there long, it moves quick, so we had

18  to get out there.

19  Q. Anybody can look at a house or a yard and see that a car

20  is there and call you and tell you that.

21  A. They can, yes, sir.

22  Q. Okay. But this person was telling you about the contents

23  of the house and the activities that were going on and what

24  the phone number was.

25  A. That's right.

## Page 32

1  Q. Now, the only thing you had at that point in time that

2  you could verify the accuracy of was that phone number,

3  wasn't it?

4  A. That's correct.

5  Q. And you didn't do that, did you?

6  A. Like I said again, when there's -- that kind of call and

7  they said there was a large amount of cocaine there, you

8  would not believe the number of times that we receive those

9  calls and you get there and it's gone. So if you are going to

10  act on something you have got to go, you don't have time to

11  sit there and find out who has got power, who pays the bill,

12  what the phone number is, make sure. This person told me this

13  was the phone number for that house, so I went off with that

14  information and I went to this residence.

15  Q. Okay. Why?

16  A. Because the information sounded like it was good

17  information.

18  Q. Okay. Could you have called some other officer while you

19  were driving and asked them to check that phone number for

20  you?

21  A. I could have, but most -- if I am not mistaken all of

22  the officers that were working were with me, there was nobody

23  left in the office but our cadet and our cadet doesn't do

24  some of that stuff for us.

25  Q. The cadet couldn't do that?

Page 33

1  A. No, sir.
2  Q. They don't know how to call the phone company?
3  A. Our cadets don't do that stuff for us, we have somebody
4  in intel that does that.
5  Q. I see. You couldn't call the detective division and ask
6  somebody just to check that for you, couldn't call the
7  dispatcher and ask him to check that, couldn't call the
8  sheriff's department and ask them to check it?
9  A. I guess we could have called anybody, Mr. Maddox, but
10  I'm telling you we didn't, we went by what the lady told me
11  on the phone that that was the phone number to the house and
12  I went out to the house.
13  Q. What did you know about the lady on the phone?
14  A. Nothing.
15  Q. Nothing. What did you have to tell you at the time you
16  went driving over there that anything she told you was true?
17  A. Basically on the way over there I had no reason to
18  believe any of it was true. But --
19  Q. Okay. Thank you. Now, you said you gave that phone
20  number to D.D. Alexander.
21  A. That's right.
22  Q. Okay. When did you do that?
23  A. When we were leaving the office.
24  Q. When you were leaving the office. Why did you give it to
25  him?

Page 34

1  A. Why?
2  Q. Yes, sir.
3  A. Because the people in the residence were supposedly
4  black males, it would seem right that a black male call the
5  house and tell them the police were coming, like he was one
6  of their --
7  Q. Mr. Alexander is black.
8  A. Yes, sir.
9  Q. Okay. So what you did was tell him to call that number
10  and tell them the police were coming.
11  A. Yes, sir.
12  Q. All right. He reported back to you that he did that.
13  A. Yes, sir.
14  Q. Did he tell you that a black male answered the phone
15  when he made the call?
16  A. He told me just like I testified to earlier, that the
17  phone call was made. That's all he said.
18  Q. He didn't tell you that a black male did that.
19  A. No, sir.
20  Q. Did you tell Mr. Sisson that he told you a black male
21  answered the phone when he made the call?
22  A. This was after we had done the search warrant and I
23  talked to D.D. and that's when he told me that a black male
24  answered the phone.
25  Q. I see.

Page 35

1  A. Yes, sir.
2  Q. Okay. Did he tell you how he knew it was a black male
3  that answered the phone?
4  A. No, sir.
5  Q. You said officers went there in separate vehicles and I
6  lost track of the names because I couldn't write as fast as
7  you were saying, but Mike Drummond went, you went, Mr.
8  Alexander went, who else went out there?
9  A. Lieutenant Caviness.
10  Q. Caviness.
11  A. Corporal Simons.
12  Q. Simons.
13  A. And Corporal Bartlett.
14  Q. Six separate vehicles?
15  A. Right.
16  Q. Where did y'all go?
17  A. I'm sorry?
18  Q. Where did you go?
19  A. We went to the residence.
20  Q. Did you go -- just drive right up in front?
21  A. Not until after the phone call was made.  After the
22  phone call was made we drove up to the residence, yes, sir.
23  Q. Did you stop and observe it before?
24  A. Yes, sir.
25  Q. Where did you stop to observed it?

Page 36

1  A. That's where I told you I stopped on 4th Street up on
2  top of the hill looking down at the house.  Everybody else
3  was just scattered out in the neighborhood.
4  Q. Okay. Now, let me see if I can make this system work
5  somewhat here. Can you see that?
6  A. Yes, sir.
7  Q. Is that the street you are talking about?
8  A. It looks like it.
9  Q. Okay. And that house is on a block that is -- has a dead
10  end sort of cul-de-sac little creature down there, doesn't
11  it?
12  A. That's right.
13  Q. Okay. Now, can you tell us which house is the one that
14  you were observing from there?
15  A. Okay. This won't point or anything, but it looks like
16  this is the house.  See the car in the drive right here?
17      MR. BROWN: You have to do it just by touching the
18  screen.
19  A. You see the -- looks like a pickup truck sitting in the
20  street on the left-hand-side there.
21  Q. You are talking about the pickup truck right there?
22      MR. BROWN: Touch it with your finger.
23  A. That's the trash can.  Not this van but the little white
24  car, you can see a little bit of the porch.
25  Q. You are talking about the white car right here? Well, I

Page 37

1  put a thing over it, how do you erase this?
2      MR. BROWN: No, on the screen.
3  Q. Okay. You are talking about right just above that
4  there's a partial white car?
5  A. Not this van.
6      THE COURT: Hold on just a second, don't talk on top
7  of each other.
8  A. I'm sorry.
9  Q. Okay. Does that arrow point sort of behind the van at a
10  white car that we can partially see?
11  A. You see the top.
12  Q. All right.
13  A. It looks -- that car looks like it's in the driveway.
14  Q. Now, that hedge that we see there --
15  A. Yes, sir.
16  Q. -- was it there that day?
17  A. Yes, sir, I am sure it was.
18  Q. Where was this red car you saw sitting up there?
19  A. Okay. The red car was on the other side of this white
20  car but the thing about it is you are sitting in the middle
21  of the street right here when you took this picture, I was
22  against the curb over here, you have got a better angle and
23  you can see.
24  Q. You have got a better angle?
25  A. Yes, sir. And I could see the front of a red car, or

Page 38

1  maroon car, whatever color you want to call it, sitting on
2  that side of the house.
3  Q. Could you see a Florida license plate on it?
4  A. No, sir, you could not, because it was backed in.
5  Q. Okay. Now, while y'all are sitting up there observing is
6  that when the phone call is being made?
7  A. We sat there a few minutes and then that's when the
8  phone call was made, yes, sir.
9  Q. Okay. And you said after Alexander said the phone call
10  is made, something happened at that house.
11  A. Yes, sir.
12  Q. What was that?
13  A. That's when I noticed Mr. Norman walk out the front of
14  the residence there. I could see when he come off the porch
15  area, and he walked out to the trash can which was sitting
16  about where that pickup truck is at the end of the drive.
17  That may be the trash can sitting behind that pickup truck --
18  Q. I didn't get an arrow on that one.
19      THE COURT: Y'all don't talk at the same time,
20  please.
21  Q. That's not the right trash can, is it?
22  A. No, sir, it's the one behind the pickup truck it looks
23  to me like.
24  Q. I have just hit the wrong button. Okay. Now, right
25  there?

Page 39

1  A. Yes, sir.
2  Q. Okay.
3  A. That looks like where the trash can was at, in that
4  area.
5  Q. Now, let me show you another picture. Get that arrow off
6  of there. The one I just had on the screen we have marked for
7  identification purposes as Defendant's Exhibit Number 1. And
8  now I want to show you Number 2 and ask you if that appears
9  to be the same white car and if that appears to be the trash
10  can and a partial picture of the house that we are talking
11  about?
12  A. Yes, sir, it does.
13  Q. Okay. Is that about where the trash can was when he
14  walked out to it?
15  A. The trash can was sitting in the street right here,
16  right by this mailbox, right by where the picture that I took
17  of it where it was sitting.
18  Q. It was in the street, not on the edge of the yard?
19  A. It was in the street, yes, sir.
20  Q. But otherwise it's in approximately the same position?
21  A. I think it was in the street a little closer to the mail
22  box right there.
23  Q. Okay. What did he do when he went there?
24  A. Walked out to the street, walked to the lid of the trash
25  can, had the paper towel or the object in his hand, he opened

Page 40

1  the lid, dropped it in the can, shut the can and walked back
2  inside.
3  Q. What did the object look like?
4  A. Like I told you earlier it was white. I was looking at
5  it through a pair of binoculars, it was just something white
6  in his hand.
7  Q. Something white.
8  A. Yes, sir.
9  Q. Okay. Now, when that phone call was made --
10  A. Yes, sir.
11  Q. -- by Alexander, what did you expect to accomplish with
12  that phone call?
13  A. Well, from doing this in the past we have had people
14  where they will just -- if they have got that much marijuana,
15  cocaine, whatever there, they will throw it in bags, run out,
16  throw it in the trunk of cars to leave the house. And that's
17  kind of what we were hoping to accomplish.
18  Q. I see. From the action you saw -- I take it because you
19  went to get a search warrant, from the action you saw you
20  thought Mr. Norman had put some contraband in that trash can,
21  is that what you are trying to imply?
22  A. I thought he probably dropped some cocaine in the trash
23  can, yes, sir.
24  Q. Okay. Did it appear to be something that could have been
25  a large quantity of cocaine like that caller had told you was

Page 41

1  there?
2  A. No, sir. Not what I saw him put in the trash can, no,
3  sir.
4  Q. Did he look panicked looking up and down the street or
5  anything like that when he did it?
6  A. He was looking around, but he just walked out, dropped
7  it in the trash can and turned around and walk back in the
8  house.
9  Q. Do you know anything about that neighborhood where that
10  house is?
11  A. No, sir.
12  Q. You don't know what is behind the house?
13  A. It's an old train tracks.
14  Q. Old train tracks.
15  A. Yes, sir, that's what the top of this hill is.
16  Q. Okay. Anybody get in cars and hurry off from there?
17  A. No, sir.
18  Q. Okay. So, after you saw that happen, that's when you
19  went down there.
20  A. Yes, sir.
21  Q. Okay. You said for a knock and talk.
22  A. That's correct.
23  Q. You went to the door and he was in the doorway when you
24  got there.
25  A. When I stopped in the street, got out of my vehicle and

Page 42

1  started walking to the front door, he already saw me walking
2  up and he walked to the front door.
3  Q. Okay. And if I understand you correctly you asked him to
4  search or what?
5  A. First I told him who I was, identified myself. After
6  I --
7  Q. Who else went to that door with you?
8  A. I can't remember who walked up to the front door. I mean
9  we were all there, one -- maybe -- I am thinking Corporal
10  Simons and Bartlett I think walked to the side of the house
11  in case somebody ran out the back door when we approached the
12  front, I am thinking Sergeant Drummond, Lieutenant Caviness,
13  myself.
14  Q. So you and Drummond and Caviness went to the front door?
15  A. I think we went to the front door, yes, sir.
16  Q. Okay.
17       THE COURT: Is it Caviness with a B or a V?
18       THE WITNESS: V. C-A-V-I-N-E-S-S.
19       THE COURT: Thank you.
20  Q. Is that -- you introduced yourself, what happened then?
21  A. I told him we had complaints of drug activity at the
22  residence.
23  Q. Uh-huh. (positive response)
24  A. And asked him if he had any problem with us looking
25  through -- if he would give consent to search the residence

Page 43

1  and he said no.
2  Q. What did he say, he said he would not consent?
3  A. He said he would not.
4  Q. I took note you said he was acting nervous putting his
5  hands in his pockets; is that right?
6  A. Yes, sir.
7  Q. Okay. And that he told you that you didn't have a right
8  to be there.
9  A. He said that.
10  Q. And he wanted to call his lawyer.
11  A. Yes, sir.
12  Q. When he said you don't have a right to be there, wasn't
13  he really saying get off the property?
14  A. Yes, sir, he might have, but that's when I --
15  Q. But you stayed.
16  A. No, sir, I actually left the property, I walked to the
17  street and opened the trash can, that's when I found the
18  cocaine.
19  Q. Did the other officers do that?
20  A. No, sir, they stood right there.
21  Q. I am confused, you said when he said that you walked to
22  the street.
23  A. Yes, sir.
24  Q. My question though is more directed to -- is that
25  immediately what happened after he said you don't have a

Page 44

1  right to be here?
2  A. He was telling me all that and that's when I walked out
3  to the street to see what he dropped in the trash can.
4  Q. When did all this stuff about patting him down and all
5  that take place?
6  A. That happened when we first got there.
7  Q. When you first got there.
8  A. That was before he asked for his lawyer.
9  Q. Before he asked for his lawyer.
10  A. Yes, sir.
11  Q. I see. Did you actually reach in his pockets and take
12  the things out of his pockets?
13  A. I patted him down and found that it was a cell phone in
14  his pocket. He didn't have a weapon so I did not take it.
15  Q. How did you find out there was a cell phone in his
16  pocket?
17  A. Because I patted him down.
18  Q. You could feel it.
19  A. Yes, sir.
20  Q. Did you take it out?
21  A. I think I did but I gave it back to him.
22  Q. You gave it back to him.
23  A. I testified earlier while I was looking in the trash can
24  I think he actually sat down in a chair on the front porch
25  and made a phone call.

Page 45

1  Q. That's not my question. My question is this, you said
2  you put him against the wall and you patted him down and you
3  felt some things in his pockets, you said there was a cell
4  phone and some money, did you take those out of his pockets?
5  A. I told you I took the cell phone out of his
6  pocket but I gave it back to him right then.
7  Q. Why did you take the cell phone out of his pocket?
8  A. There was something hard in his pocket, I wanted to see
9  what it was, I wanted to make sure there was no weapon in his
10  pocket.
11  Q. I thought you said you could feel that it was a cell
12  phone in his pocket.
13  A. There was a hard object in his pocket and I was going to
14  see what it was for my safety.
15  Q. You said there was money in his pocket.
16  A. Yes.
17  Q. How do you know there was money in his pocket?
18  A. Money feels a little different.
19  Q. Did you take the money out of his pocket?
20  A. Not at that point I didn't.
21      THE COURT: Y'all slow down, please.
22  Q. At what point did you take the money out of his pocket?
23  A. After we found the cocaine in the trash can that's when
24  Mr. Norman and Mr. James were handcuffed and set on the front
25  porch where they were detained until I could obtain a search

Page 46

1  warrant for the residence.
2  Q. And that's when you took the money out of his pockets?
3  A. Yes, sir, somewhere around that point.
4  Q. Did you take money out of Mr. James' pockets too?
5  A. I can't remember but I do believe he had some money in
6  his pockets too.
7  Q. When you handcuffed them why did you do that?
8  A. For our safety because it was under investigation. We
9  had crack cocaine in the garbage can at that point and Mr.
10  Norman was the one I saw walk to the trash can.
11  Q. Let's talk about what you found there. When you said --
12  I believe you said after he said he wanted a lawyer, said you
13  didn't have a right to be there, implying that y'all should
14  leave, the other officers didn't leave and go in the street
15  with you, did they?
16  A. No, sir.
17  Q. Did they still have guns on them?
18  A. No, sir.
19  Q. Had you put your gun away then?
20  A. Yes, sir.
21  Q. Okay. Now, and all of this took place on his porch?
22  A. Yes, sir.
23  Q. So you go to the trash can and look inside and what all
24  was in there?
25  A. Trash.

Page 47

1  Q. Trash.
2  A. Mostly.
3  Q. And among that trash you found what?
4  A. That paper. As soon as I opened it up, trash bag there,
5  paper towel laying right on top of it, wadded up in the
6  plastic.
7  Q. Earlier if I understood you correctly you referred to it
8  as a rag.
9  A. It was a paper towel, a rag, it was wadded up and it was
10  in that trash can. I opened it up and it had crack cocaine
11  residue in it.
12  Q. Crack cocaine residue?
13  A. Yes, sir, little shavings of crack cocaine.
14  Q. Little shavings, okay.
15  A. Yes, sir.
16  Q. Now, when you got that out I think you said you did a
17  field-test on it?
18  A. Yes, sir.
19  Q. Okay. And did a female officer ever come there and do a
20  test on that?
21  A. Not that I know of. I had a field-test kit in my truck
22  and I tested it right in my truck.
23  Q. I'm sorry, the last thing you said?
24  A. I had a field-test kit in my truck and I field-tested it
25  right there in my truck.

Page 48

1  Q. What does a field-test kit consist of?
2  A. They are purchased kits, they are little small plastic
3  containers or like a little packet. You slide the top off,
4  it's got the little vials inside, tells you which order to
5  break them in. Put the cocaine in, put the top back on, and
6  I broke the vials and agitated it and it turned blue, and
7  blue indicates it has the presence of cocaine.
8  Q. Okay. Now, after that, after you found it and
9  field-tested it, what did you do?
10  A. At that time that's whenever Mr. Norman and Mr. James,
11  who was the only two that I knew were there at that time,
12  they were detained, sat on the front porch and I went back to
13  the office to draft a search warrant for the residence.
14  Q. I am a little confused. Your anonymous caller had said
15  there were three there, didn't you know that?
16  A. They said there was three there, yes, sir.
17  Q. But when you got there it appeared there were only two.
18  A. Well, we never went in the house because Mr. Norman came
19  outside.
20  Q. And it also appeared there were children there, didn't
21  it?
22  A. There was a little boy that was standing at the front
23  door with Mr. Norman, yes, sir.
24  Q. Were there other children there playing?
25  A. There were children everywhere playing in the street,

## Page 49

1 next door, all over, yes, sir.
2 Q. In that yard, were there more children?
3 A. There were more children everywhere, I am not sure where
4 they were.
5 Q. Okay. Now, so you went to get the search warrant.
6 A. Yes, sir.
7 Q. At the point in time you went to get the search warrant
8 I take it you believed that someone in that house had
9 received a phone call saying the police are coming and you
10 better get rid of your stuff.
11 A. That's right.
12 Q. And I take it you believed that perhaps Alphonso Norman
13 had done that by going out and putting it in the trash can.
14 A. That's what I thought, yes, sir.
15 Q. Okay. So you thought the house had been emptied of all
16 contraband, didn't you?
17 A. No, sir, I didn't.
18 Q. Why not?
19 A. I didn't know -- I knew that there was cocaine in the
20 trash can, in that rag, paper towel, whatever. I didn't know
21 what was in the house. We never went inside of the house. I
22 knew he was used to us we could not come inside, we could not
23 search his house.
24 Q. Uh-huh.(positive response) Didn't you actually expect
25 as a result of that phone call for them to get rid of

## Page 50

1 everything the police might find that would incriminate
2 anybody?
3 A. There again, sometimes they have got too much to get rid
4 of, in this case it would have been that way, they had too
5 much to run out there and throw it in the trash can like
6 that.
7 Q. But nobody ran out the back door and out across the
8 train track and tried to get rid of anything?
9 A. No, sir.
10 Q. In fact, what you saw was someone casually walk out the
11 front, put something small in a trash can and casually walk
12 away and leave the front door wide open.
13 A. That's right.
14 Q. And yet you still thought there was a large quantity of
15 cocaine inside such that you went and got a search warrant.
16 A. I didn't know what was inside but I did go get a search
17 warrant, yes, sir.
18 Q. You put an attachment on you ever affidavit about,
19 number one, controlled substances and dangerous substances,
20 related paraphernalia, that's what you were looking for.
21 A. Yes, sir.
22 Q. Books, records, receipts, notes, ledgers and other
23 papers relating to transportation, ordering, purchase and
24 distribution of controlled substances.
25     THE COURT: That's awful fast for the court

## Page 51

1 reporter.
2 Q. I'm sorry. What evidence did you have that you put in
3 this affidavit that there were any books or records there?
4 A. It's common for drug dealers to have that kind of stuff
5 at their house.
6 Q. Yes, sir, but that's not in your affidavit, is it?
7 A. I'm sorry, I don't understand your question.
8 Q. Okay. You also said that you were looking for -- well,
9 the attachment to the affidavit which I believe is Exhibit B
10 for the government, you indicated you wanted to look for all
11 of those things --
12 A. Right.
13 Q. -- by putting this on your affidavit, didn't you?
14 A. Right.
15 Q. Okay. But you had no specific evidence of the existence
16 or presence of any of those things listed back there other
17 than the anonymous caller saying that there were controlled
18 substances there.
19 A. Right.
20     MR. MADDOX: Your Honor, before I forget I would
21 like to offer Defendant's Exhibit 1 and 2, the photographs
22 that we have used in this process.
23     THE COURT: Any objection?
24     MR. BROWN: No objection, Your Honor.
25     THE COURT: They are admitted.

## Page 52

1 Q. Before I put these out there, one more question about
2 Defendant's Exhibit Number 2, which is the photograph of the
3 house and the car. In relation to where that white car is,
4 can you tell me where that red vehicle that was supposed to
5 be beside the house was?
6 A. The white car was further back on the driveway.
7     MR. MADDOX: Your Honor, could he step down here and
8 put a mark on here for me?
9     THE COURT: Sure.
10 Q. Thank you. I think the way this works is you have to
11 touch it with the fleshy part of your finger.
12 A. This white car was sitting right -- the front of it was
13 probably where the back of it is right here. And the front of
14 the white car that's sitting here now, the front of it was
15 about where I have got this arrow. Okay. The red car was
16 backed up right to the side of the house and the front of it
17 was a little closer to the house than that but you could see
18 the front of it sticking out from the side of the house
19 there.
20 Q. Am I understanding you correctly that the arrow on the
21 right here points to where the front of the red vehicle was?
22 A. This arrow on the right closest to the street points to
23 the front of this white car where it was sitting. This white
24 car was at the house the day we done the search warrant, I do
25 believe. The front bumper of this white car was where this

**Page 53**

1  arrow closest to the street is. The front bumper of the
2  maroon or red car was sitting where this arrow closest to the
3  house is. It was backed in beside the house. This arrow
4  closest to the house is a little closer to the house, the
5  arrow should be a little closer to the house, is where the
6  red car was sitting.
7  Q. And you said you saw that red car despite the fact that
8  you were distantly to the left looking down that long street
9  as in Defendant's Exhibit Number -- there it is, Number 1; is
10  that right?
11  A. But there again --
12      MR. BROWN: Excuse me, before we get too far, may I
13  interrupt for Mr. Dickens' benefit, state for the record the
14  arrow on the right was located at the rear portion of the
15  white vehicle that was parked in the driveway, and the arrow
16  on the left was pointed to approximately the very front of
17  the white vehicle that was parked in the driveway.
18      THE COURT: Okay.
19      MR. MADDOX: I think you got that backwards but
20  okay.
21  Q. At any rate --
22      THE COURT: I can recall where the arrows were.
23  Q. Okay. Looking back, I will see if I can make that
24  disappear.
25      MR. BROWN: Pop it where you are doing that.

**Page 54**

1      MR. MADDOX: Magic happens sometimes.
2  Q. Defendant's Exhibit Number 1, you were sitting here and
3  could see that red vehicle even though it would be to the
4  left of where the top of that white vehicle is; is that
5  right?
6  A. No. You took this picture from the middle of the street.
7  Q. Right.
8  A. Over to the left, extremely to the left, okay, and I
9  testified that I was on the right side of the street. This
10  side.
11  Q. It's not a very wide street though, is it?
12  A. I was further to the right. I was over here where the
13  arrow is, I was over closer to the right side. This van right
14  here was not in that driveway, there was no vehicles there. I
15  had a clear shot to the side of that house. Where I parked
16  here I could see that red or maroon vehicle was parked
17  beside the house.
18  Q. You could see it from almost a block away?
19  A. I could see the front of the vehicle, yes, sir.
20  Q. As anybody could.
21  A. If they were sitting where I was sitting and looking
22  they could have seen it, yes, sir.
23  Q. That's great, thank you.
24  A. Yes, sir.
25      THE COURT: Are you through?

**Page 55**

1      MR. MADDOX: I think I am, give me just a minute.
2      THE COURT: If Mr. Goggans comes to the mound a
3  third time I am looking for a new pitcher.
4  Q. Just one other question. On the second page of this
5  affidavit which is in evidence as Government's Exhibit B, I
6  believe you said that the issuing Judge, Judge Hayes, told
7  you to write this into the affidavit?
8  A. Yes, sir. I wrote that in his office in his presence.
9  I wrote that.
10  Q. At his suggestion.
11  A. Yes, sir.
12  Q. Thank you.
13      MS. JAMES: May I proceed?
14      THE COURT: Yes.
15      CROSS-EXAMINATION
16  BY MS. JAMES:
17  Q. Officer Conway, a few moments ago you pointed out your
18  vehicle in this exhibit, I think it's Government's Exhibit --
19      MR. BROWN: A.
20  Q. Can you see that?
21  A. Yes, ma'am.
22  Q. Government's Exhibit A which is a black and white of
23  this color that the government has allowed me to use. The
24  photograph that you see looks like there's a ball or
25  something in the yard?

**Page 56**

1  A. Yes, ma'am.
2  Q. With the vehicles there.
3  A. Yes, ma'am.
4  Q. You identified the truck that is fartherest to the right
5  of that photograph as your vehicle; correct?
6  A. The pickup truck, yes, ma'am.
7  Q. The pickup. All right. When was that photograph taken?
8  A. Like right after we pulled up. This was before I left to
9  go get the search warrant I do believe.
10  Q. So this is after you have seen Mr. Norman go to the
11  trash can.
12  A. Yes, ma'am.
13  Q. This is at a point where you all did not mind if they
14  knew y'all were there; is that correct?
15  A. Yes, ma'am.
16  Q. That's when you were going down there to do your knock
17  and talk.
18  A. It was after we had already done all that and, you know,
19  I want to say when I came back with the search warrant it was
20  almost dark, I am not positive on that. So I want to say
21  it was before I went to get the search warrant but I could be
22  wrong, the picture could have been taken right after I got
23  back.
24  Q. Who had the camera?
25  A. I don't know that.

CondenseIt™

## Page 57

1 Q. But it's clear from the photograph that the picture was
2 taken from up around the front part of the house?
3 A. Yes, ma'am.
4 Q. So we have got your car truck to the far right, whose
5 vehicle is in the middle?
6 A. That would be Corporal Alexander's.
7 Q. That looks like an Expedition or something like that?
8 A. Something like that, yes, ma'am.
9 Q. Okay. Now, the car that's the furtherest to the left,
10 appears to be a dark color, possibly a black car.
11 A. In the driveway?
12 Q. In the driveway.
13 A. Yes, ma'am.
14 Q. That car was there when you were doing your observation
15 from up on the hill; correct?
16 A. Yes, ma'am.
17 Q. And that car appears to be possibly an older model black
18 Jaguar?
19 A. Yes, ma'am.
20 Q. Now, a moment ago when you were talking in response to
21 Mr. Maddox's questions you pointed out a white vehicle that
22 was sitting in the driveway.
23 A. Yes, ma'am.
24 Q. Now, his photograph we don't know, I didn't hear when
25 that was taken, but is it your testimony that that white

## Page 58

1 vehicle was, in fact, in that driveway also?
2 A. The white vehicle was right in front of this black
3 Jaguar, and it was -- they were like -- you notice how the
4 Jag is not all the way out of the street.
5 Q. Right.
6 A. The white car was just right up to the back bumper of
7 it, and then there was a space between. That's what I was
8 saying on the arrows when I said it should be a little closer
9 to the house, the maroon car was in front of the white car.
10 Q. So there were actually three cars in the driveway.
11 A. Yes, ma'am.
12 Q. If you look at the back of the Jaguar it appears that
13 the Jaguar is not really jutting out into the street; is that
14 correct?
15 A. The back end of it, it's barely in the driveway. It's
16 in the driveway but it's sticking out a little bit on the
17 dead end street.
18 Q. So we have that car in the driveway and then we have the
19 white car and it's still your testimony there was yet the
20 maroon car, that you could, in fact, see it from your vantage
21 point.
22 A. Yes, ma'am. But the maroon car, I think the concrete
23 stopped there at the corner of the house where the porch was
24 and it was off -- it wasn't in the drive, you follow what I
25 am saying, it was off the drive on the side of the house.

## Page 59

1  MS. JAMES: May I ask a question?
2  THE COURT: Yes.
3 Q. Now, how much of the maroon car are you saying that you
4 could see from where you were parked?
5 A. That's what I was telling Mr. Maddox, the arrow that I
6 put on there, you can't put that thing exactly where you
7 wanted it. And actually if you have got a picture of that
8 house again, a picture you can put on there, there's a pole
9 on the corner. See the pole here on the -- right just to the
10 front of that vehicle here on the corner of that house there.
11 Q. Are you talking about like a support, like a column,
12 wrought iron?
13 A. The metal column pole. The maroon car I could see it
14 between like where that pole is back. You couldn't see much
15 of the maroon car, you could only see the front of it.
16 Q. So most of the maroon car was actually parallel to the
17 brick part of the house?
18 A. Yes, ma'am. I could only see the very front of the car,
19 that's all I could see.
20 Q. And it was backed in?
21 A. It was backed in so I could not see the tag number.
22 Q. At that point you didn't know whether it had Florida
23 plates or plates at all.
24 A. I didn't know anything, no, ma'am.
25 Q. Okay. Now, we had a detention hearing, there was a

## Page 60

1 detention hearing and preliminary hearing several months ago
2 I believe in October. You didn't come to that, did you?
3 A. No, ma'am, I didn't.
4 Q. Okay. But prior to that hearing you had relayed certain
5 facts and information to Officer Sisson about what transpired
6 on September the 25th, did you not?
7 A. Yes, ma'am.
8 Q. Because he was not actually out there, was he?
9 A. No, ma'am. No, ma'am, he was not.
10 Q. In fact, he is the case agent in this case; is that
11 right?
12 A. Yes, ma'am.
13 Q. Okay. But what happened with regard to the phone call
14 that you received that you have described here, you conveyed
15 that information to him, did you not?
16 A. As far as the phone number?
17 Q. Well, what happened, I mean the fact that you got a call
18 and all the events.
19 A. Yes, ma'am. I thought you meant the phone number that we
20 called. But yes, ma'am, everything that happened I told
21 Corporal Sisson.
22 Q. You have told him and you have done reports as well.
23 A. Yes, ma'am.
24 Q. But you have also verbally told him about receiving the
25 call, about receiving a particular telephone number; correct?

CondenseIt

Page 61

1  A. Yes, ma'am.

2  Q. Okay. Now, you have told us here today under oath that

3  this caller appeared to be a black female; correct?

4  A. Yes, ma'am.

5  Q. Okay. Did you tell Officer Sisson that it was a black

6  male?

7  A. Not -- no, ma'am, I told him it was a black female.

8  Q. You told him it was a black female.

9  A. I never said it was a black male, I know I didn't.

10  Q. You are certain of that?

11  A. Yes, ma'am, I am positive of that.

12  Q. Now, let's talk a minute about time frames. I thought I

13  heard you on direct examination say that it was approximately

14  4:00 o'clock on that day, September 25th when you got the

15  call.

16  A. When I received the call at the office, yes, ma'am.

17  Q. 4:00 o'clock p.m., and you said you wanted to move

18  pretty quickly because if that were true then what was there

19  might be gone; correct?

20  A. Yes, ma'am.

21  Q. So you marshaled all the guys you could get your hands

22  on in the office and said let's go; correct?

23  A. Yes, ma'am.

24  Q. And part of that was because you thought you recognized

25  the name Scooter as someone who you were familiar with in

Page 62

1  your investigative work; is that right?

2  A. Yes, ma'am.

3  Q. Of course, at that point on your way over there you

4  didn't know that for sure, right?

5  A. No, ma'am.

6  Q. Y'all just jumped in your cars respectively and took off

7  out there, right?

8  A. Yes, ma'am.

9  Q. Now, how did you know from your vantage point that that

10  was the address that had been given you on the telephone?

11  A. I believe somebody drove by the house, one of the

12  vehicles, because I drove up and parked and I believe

13  somebody drove by to confirm what house it was but then after

14  they drove by they left the area so they wouldn't see that

15  car again, you see.

16  Q. All right. Now, if the kids are playing in the yard,

17  September 25th, school has already started, would you agree?

18  A. Yes, ma'am.

19  Q. Kids are playing in the yard so we know --

20  A. There were kids in the street, everywhere, as a matter

21  of fact -- yes, ma'am.

22  Q. School age kids?

23  A. Yes, ma'am.

24  Q. Kids were playing in the yard and that. You have

25  described the fact that you see Mr. Norman come out and then

Page 63

1  you approach and while you are approaching him and trying to

2  talk to him that Mr. James comes out; is that correct?

3  A. Yes, ma'am.

4  Q. You haven't seen Mr. Peralte at this point in time?

5  A. I don't think I ever saw Mr. Peralte until after I had

6  returned with the search warrant.

7  Q. Okay.

8  A. I had never saw him at the initial time, I had already

9  left to go get the search warrant whenever they saw him in

10  the house.

11  Q. So if it's 4:00 o'clock, y'all jump in the car, you are

12  going from Jump Street, right?

13  A. Five minutes at the most.

14  Q. That's Highland Avenue?

15  A. Yes, ma'am.

16  Q. You go from Jump Street to 4th, which is close.

17  A. Just a few minutes, yes, ma'am.

18  Q. And y'all go pretty quick.

19  A. I mean we are not flying over there, but we got there as

20  quick as we could, yes, ma'am.

21  Q. You get there, you observe it for how long, five or ten

22  minutes?

23  A. I am not sure. We watched for a little while, I am not

24  sure how long, 15 at the most before we made the phone call.

25  Q. Then you go down to the residence, you do what you

Page 64

1  wanted, your knock and talk, and then you go out to the trash

2  can, you find this item, you go to your car, you field-test

3  it, or your truck and you field-test it; correct?

4  A. Yes, ma'am.

5  Q. And then from there you decide to go get the warrant and

6  you tell them to detain the two individuals that were on the

7  porch; is that correct?

8  A. Yes, ma'am.

9  Q. And they do that as far as you know.

10  A. As far as I know, yes, ma'am.

11  Q. What is your best estimate of the time when you left to

12  go get the warrant?

13  A. I am going to say 4:30, I mean that's just a guess.

14  Q. Okay.

15  A. I didn't look at the time at that point.

16  Q. You go to your -- back to your office; is that right?

17  A. Yes, ma'am.

18  Q. And you actually did the typing and typed up the search

19  warrant and the affidavit; correct?

20  A. Yes, ma'am.

21  Q. Now, how was it that you knew that you were going to

22  find Judge Hayes and how did all that scenario occur?

23  A. Well, what we have to do, we have got a list of all the

24  judges that we use to sign search warrants and you just have

25  to start calling until you could find one.

Page 65

1  Q. When did you make your call?
2  A. After I was almost through. They don't like for us to
3  call and sit there and wait for us, they like for us to be
4  ready when we call. I was almost through and I think I had
5  somebody else call that came into the office while I was
6  there.
7  Q. Do you know who that was?
8  A. I think Corporal Hammil called, if I am not mistaken. I
9  think Corporal Hammil came in when I was typing the affidavit
10 and I was almost through with it and that's when I got him to
11 call Judge Hayes, or find me a judge and he called Judge
12 Hayes.
13 Q. You also have testified that you got the call from
14 Officer Drummond during the time you were typing.
15 A. Yes, ma'am.
16 Q. And he said oh, we found a third suspect in the house
17 and here's his name.
18 A. Yes, ma'am.
19 Q. Did he actually tell you his name?
20 A. Yes, ma'am.
21 Q. Had gathered that information from something he had seen
22 if you know?
23 A. I don't know about that.
24 Q. Okay. So another person in your office contacts Judge
25 Hayes and what, if anything, were you told to do after that

Page 66

1  call was made?
2  A. I had to go to -- I had to go meet Judge Hayes somewhere
3  away from his office.
4  Q. Somewhere away from his office?
5  A. I mean I don't know that Judge Hayes would -- you know.
6      THE COURT: Is it important where he met him?
7      MS. JAMES: Yes, it's very important.
8  Q. Where did you meet him?
9  A. He was with his kids at a -- at the baseball field.
10 Q. What baseball field?
11 A. The Taylor Road, the park on Taylor Road.
12 Q. Did y'all reach him by cell phone if you know?
13 A. I don't know how he got up with him. Like I said Bill
14 Hammil I think is the one that called him.
15 Q. So you go to Taylor Road, he is waiting for you, he is
16 expecting you, right?
17 A. Actually I got there before he did, I had to wait for
18 him.
19 Q. Do you know where his office is?
20 A. Yes, ma'am.
21 Q. Where is his office?
22 A. At Beasley and Allen downtown.
23 Q. In September that's where his office was?
24 A. Yes, ma'am.
25 Q. And you did not go there.

Page 67

1  A. No, ma'am.
2  Q. Now, you take this material, your affidavit and your
3  search warrant and the attachment to the search warrant which
4  is now in evidence as Government's Exhibit B -- I believe
5  it's B, is it?
6      THE CLERK: It is.
7  Q. B. And you went over it with him, right?
8  A. Yes, ma'am.
9  Q. Now, how was it that you came to realize that you had
10 omitted the portion that dealt with vehicles?
11 A. Well, like I said whenever I got to the -- there before
12 Judge Hayes I was reading over my affidavit again and when I
13 got to the bottom I realized I had not put that in there, so
14 when Judge Hayes got there I told him about it and I could
15 have went back to the office and typed it in but he said just
16 write it in and initial it.
17 Q. Okay.
18     MS. JAMES: May I retrieve a document, Your Honor?
19     THE COURT: Yes.
20 Q. When he told you to write that in, he just simply told
21 you to put your initials on there?
22 A. Yes, ma'am.
23 Q. Okay. And there's also attached to Government's Exhibit
24 B the actual search warrant, do you remember that?
25 A. Yes, ma'am.

Page 68

1  Q. Now, in this particular document, have you seen it
2  recently?
3  A. No, ma'am.
4  Q. Okay. All right. This is an attachment to what we have
5  just seen. Okay. I want you to look at this document and I
6  want you to tell me where, if there's any place in that
7  document, that refers to searching any of the vehicles.
8  A. No, ma'am, it's left off there, it sure is.
9  Q. But you took this document with you when you went to
10 meet with Judge Hayes when you had your affidavit; correct?
11 A. Yes, ma'am.
12 Q. So you realized -- it was significant enough for you to
13 realize and to include the handwritten portion on your
14 affidavit; correct?
15 A. Yes, ma'am.
16 Q. And you had this document with you at the same time;
17 correct?
18 A. Yes, ma'am.
19 Q. And the Judge who is going to try to issue a specific
20 detailed search warrant told you to go ahead and hand write
21 the vehicle portion of it on the affidavit; correct?
22 A. Yes, ma'am.
23 Q. And he did not tell you to do it on the search warrant,
24 did he?
25 A. That's probably an oversight on my part.

## Page 69

1  Q. Okay. So there's no question at all that he is the one
2  that told you to write this in.
3  A. Yes.
4  Q. And not on this particular part but on your affidavit;
5  correct?
6  A. Yes. I mean if you are asking if the Judge knew it was
7  written in there, yes, ma'am.
8  Q. And that was done in his presence at Taylor Road.
9  A. Yes, ma'am.
10 Q. Was any of his other staff present when that happened?
11 A. No, ma'am.
12 Q. Okay. Now, you referenced a piece of paper where you
13 wrote down the information that was given to you by the
14 anonymous caller.
15 A. Yes, ma'am.
16 Q. That was what type paper, do you know?
17 A. It was just one of those yellow sticky notes.
18 Q. And you do recall having written down the phone number
19 that you had been given by the person.
20 A. And the address, yes, ma'am.
21 Q. And what did you do with that piece of paper after you
22 took that note?
23 A. I took the note out with me and I gave it to Corporal
24 Alexander.
25 Q. Do you know if he has that note today?

## Page 70

1  A. We couldn't find it. We tried to locate it after we had
2  a problem with the phone number later on, we tried to locate
3  it to make sure we called the right phone number but we could
4  not find it.
5  Q. You could not find it.
6  A. No, ma'am.
7  Q. All right. You went from Taylor -- let me go back from
8  my chronology here. You went from your office on Highland
9  Avenue to Taylor Road, at this point we are talking 5:00
10 o'clockish, right?
11 A. Probably after that because if Judge Hayes -- I am
12 assuming we work until 5:00 o'clock, so probably after that.
13 Q. So it was probably after 5:00 o'clock when you met him.
14 A. Yes, ma'am. I am thinking 5:30.
15 Q. After you met him did you go back to your office or did
16 you go straight to 4th?
17 A. When I left there I went straight back to 4th Street.
18 Q. Did you make a phone call or anything to any of the
19 people on the scene to tell them that you had the warrant?
20 A. Yes, ma'am.
21 Q. Do you know if that allowed them to initiate or begin
22 the search?
23 A. As far as I know if the search warrant is signed like
24 that and I called them on the radio and told them the warrant
25 was signed.

## Page 71

1  Q. Did you tell them to go ahead and start the search?
2  A. You know, I don't think they did start searching until I
3  got there, I am not sure.
4  Q. Are you just simply saying you don't remember?
5  A. I don't remember, no, ma'am.
6  Q. Now, when you got back from having the warrant signed,
7  you go straight from Taylor Road back to 4th Street, got the
8  signed warrant, right?
9  A. Yes, ma'am.
10 Q. It's your recollection they had not begun the search,
11 didn't start until you got back.
12 A. Right.
13 Q. Where were the Defendants at that time?
14 A. I think they were still there on the front porch. They
15 were getting ready to transport pretty quick.
16 Q. Okay. And at this point all you have seen and all you
17 know right then if they are still on the front porch and
18 getting ready to transport was based on this item you say was
19 thrown in the trash can by Mr. Norman, right?
20 A. Yes, ma'am.
21 Q. You didn't see Mr. Peralte out there any time that you
22 were surveilling or on the front porch trying to talk to
23 them.
24 A. No, ma'am.
25 Q. So at that juncture what was the point of taking them

## Page 72

1  somewhere?
2  A. Because we had already -- at that point we had got a
3  search warrant for the house, located the evidence in the
4  garbage can, we were going to search the house and they were
5  being detained at that point. We were carrying them to our
6  office because we have a photo capturing system. We don't
7  take pictures with a regular camera any more, we do what we
8  call a known offender, which is their name and address and
9  all this stuff and that's why they were taken down there.
10 Q. Who took them?
11 A. I don't know.
12 Q. Do you remember what time they took them?
13 A. No, ma'am.
14      THE COURT: You were going to do what?
15      THE WITNESS: A known offender, which is -- it's
16 kind of like a 202 that the DEA would do, personal
17 information, that's all, name, address, phone numbers, date
18 of birth, this sort of thing.
19      THE COURT: In order to identify them because they
20 are being arrested or simply for some other purpose?
21      THE WITNESS: We had already -- we had already
22 located the evidence in the garbage can and we were doing a
23 search warrant on the residence, we had -- it was an
24 investigation at this point. We took them down to question
25 them about the evidence in the garbage can and to do that on

Page 73

1   the offender. And the photo captioning system is on the
2   computer at our office, that's the way the city's system
3   works, pictures of defendants are taken through the computer
4   in a photo capturing system.
5   Q. What time did you all actually execute the search
6   warrant?
7   A. I would have to look at the search warrant to tell you.
8   Q. You would have to look at the search warrant?
9   A. The one that was signed, yes, ma'am.
10      MS. JAMES: May I give it to him?
11      THE COURT: Yes. Usually I try to break in the
12  middle of the afternoon, does anybody need me to or need to?
13      MS. JAMES: Just a minute. May I?
14      THE COURT: Yes.
15  Q. I am going to show you what has just been handed to me,
16  it appears to be an inventory sheet, Officer Conway. It says
17  here time of entry 18 hundred, would that be consistent with
18  your recollection?
19  A. Yes, ma'am.
20  Q. Okay. What is 18 hundred in military -- what time is
21  that in real time?
22  A. That would be 6:00 o'clock. 6:00 p.m., yes, ma'am.
23  Q. So at 6:00 o'clock p.m. you are back and you all don't
24  hesitate once you get back to go in that house; is that
25  right?

Page 74

1   A. I mean the front door was open, we just walked in and
2   start searching.
3   Q. So the Defendants have not been transported, they are
4   still sitting on the porch awaiting transport; is that right?
5   A. I think that's right, yes, ma'am.
6   Q. You said just about everybody in your office had gone
7   with you when y'all took off to go over there, right?
8   A. That was there right then. That's not everybody in our
9   office by no means.
10  Q. Where was Officer Leonard?
11  A. Leonard? He could have been there. I mean he could have
12  come over later, I don't know.
13  Q. You don't know.
14  A. No, ma'am. I don't think he went with us at the very
15  start, I am almost positive of it.
16  Q. Okay. What, if anything, if you know would he have been
17  doing pertinent to this investigation in that time frame?
18  A. He could have been the one that came over and
19  transported them. He could have taken the pictures of them at
20  the office, could have been any number of things. We all kind
21  of help each other when we arrest people.
22  Q. Well, at your office when you get this information on
23  known offenders that you just described --
24  A. Yes, ma'am.
25  Q. -- do you all try to get information about their prior

Page 75

1   criminal histories, is that something you would be interested
2   in?
3   A. We do criminal histories on them, yes, ma'am.
4   Q. Is that where you all send out a request, for instance
5   in Mr. Peralte's case, because you believed at that point he
6   was from Florida, did you not?
7   A. Yes, ma'am.
8   Q. Is that an inquiry you would make in some computer
9   system to go into the Florida network?
10  A. NCIC.
11  Q. NCIC?
12  A. Yes, ma'am.
13  Q. Would y'all do that as a matter of course?
14  A. Yes, ma'am.
15  Q. Do you know if that was done in this case?
16  A. I know it was done but I don't know who done it, I
17  really don't.
18  Q. Okay. I am going to show you what I have marked for
19  identification purposes as Defendant's Exhibit 3 and ask you
20  if you are familiar with this type form?
21  A. Yes, ma'am.
22  Q. And what is this type form?
23  A. This is a NCIC printout, this is a criminal history.
24  Q. Okay. The name there says Peralte, Capulco, does it not?
25  A. Yes, ma'am.

Page 76

1   Q. And the inquiry date says 9/25, 2003; is that right?
2   A. Yes, ma'am.
3   Q. And that would be the date this search occurred; is that
4   correct?
5   A. Yes, ma'am.
6   Q. Does this appear to be an inquiry that was made from
7   your headquarters?
8   A. Yes, ma'am.
9   Q. Okay. And how do you know that, because I wouldn't know.
10  A. I mean it's just -- that's what ours look like at our
11  office. I don't know if that's from our office or not but
12  that's what it look like. That's what our printouts look
13  like.
14  Q. In this particular case at this juncture whenever this
15  was done whoever had the information had Mr. Peralte's name,
16  they had his sex, race, date of birth, height, those things
17  as well as an alias, and Social Security number; correct?
18  A. Yes, well, actually all you have to have is a name, you
19  know, date of birth, and sex and race and basically you can
20  run it.
21  Q. This is the inquiry made from your headquarters as
22  opposed to information received; correct?
23  A. No, this is what you would receive on the NCIC.
24  Q. Okay.
25  A. On your request it's just one screen, put their name,

## Page 77

1  date of birth, race and sex.
2  Q. This was given to us in discovery, there are a number of
3  pages here that deal with I think all of the Defendants.
4  A. Yes, ma'am.
5  Q. But turning to page two of this document, again, a
6  portion that's dealing with Mr. Peralte, I am going to direct
7  your attention up to the very top, you see where I am
8  pointing up here?
9  A. Yes, ma'am.
10  Q. Okay. Now, that appears to say 5:30.
11  A. Yes, ma'am.
12  Q. Does that look like that to you?
13  A. I mean something is cut off the side but that is 5:30.
14  Q. That does look like 5:30?
15  A. Yes, ma'am.
16  Q. And a little bit below that it says of 9/25 at 6:31
17  p.m., do you see that on that same paper?
18  A. Wait a minute.
19  Q. I'm sorry, let me -- yeah, right here. Can you see that?
20  A. Yes, ma'am.
21  Q. Okay. Now, can you explain to me, because you see these
22  forms all the time, what is the significance of the 5:30 time
23  and the 6:31 time with regard to an inquiry and a response? I
24  mean how do you explain the difference in the times, if you
25  know?

## Page 78

1  A. I am not even going to try to explain that. I don't know
2  how NCIC works, that would be something you would have to ask
3  somebody else.
4  Q. Would you agree with me that it appears that some action
5  was initiated with regard to this inquiry with regard to Mr.
6  Peralte at least by 5:30 on 9/25, 2003?
7  A. I mean I am not -- this says as of 6:31 p.m., so I don't
8  know. I really don't know. I am not an NCIC expert. I know I
9  look at it and I can tell what the criminal history is, but
10  other than that, that stuff gets all --
11  Q. Who at your office would know?
12  A. I don't -- I mean as far as being knowledgeable as to
13  exactly what every one of these numbers would mean, I don't
14  know that anybody with the office would know. You would have
15  to talk to somebody at NCIC as to what these numbers meant.
16  And as far as this 5:30, it looks like it's cut off. Up under
17  Leonard there's some numbers before 9/25, 2003 that's cut
18  off, and, you know, if you are speculating on that being 5:30
19  then right here this could be 6:30 and this could be 6:31
20  down here, so I don't know.
21      MR. MADDOX: (complies)
22  Q. Let me show you a better one, apparently I didn't have a
23  good copy.
24  A. Okay.
25  Q. 1530.

## Page 79

1  A. Yes, ma'am.
2  Q. You see that, 1530, 9/25, the 2003.
3  A. Uh-huh. (positive response)
4  Q. If that 1530 has any significance as to when this
5  inquiry was made as to Mr. Peralte by someone at your office,
6  you will agree with me that 1530 would be 3:30 p.m.; is that
7  right?
8  A. Yes, ma'am.
9  Q. And based on your testimony you didn't even receive the
10  call about these suspects at this house on 4th Street until
11  4:00 o'clock p.m.; is that correct?
12  A. That's correct.
13  Q. So it would have had to have been sometime after you had
14  done all those things that you have just testified about,
15  seeing the car, going to the trash can, field-testing and
16  going back to your office, sitting at your desk when you were
17  called and told we found a man inside and his name is Capulco
18  Peralte; correct?
19  A. Right, that's the reason I would say that 6:31 p.m.
20  would be the time this was run, so I don't know what the 1530
21  means.
22  Q. But somebody at your office could explain that to us
23  properly; is that right?
24  A. I honestly don't know if anybody could explain what the
25  1530 is. I mean at 1530 we had never went out there or

## Page 80

1  received a call or anything, so I don't know what the 1530
2  means.
3  Q. Just give me a minute.
4  A. Yes, ma'am.
5      THE COURT: Did you want to add to your answer?
6      THE WITNESS: Yes, ma'am. Could you put back on the
7  screen just a second?
8  Q. And by the way I am going to mark this for
9  identification purposes as Defendant's 4.
10  A. Can you move it over just a little bit? Okay. I would
11  say the 1530 is not going to be the time because the 1530,
12  9/25/03, that would be military time, and it says of 9/25,
13  6:31, they are not using military time down here, so I am
14  going to say it was 6:31 when it was run so it was after they
15  were taken to the office. The 1530, I do not know what those
16  numbers mean.
17      MS. JAMES: I would move for admission of
18  Defendant's 4.
19      THE COURT: Any objection?
20      MR. BROWN: No objection.
21      THE COURT: It's admitted.
22  Q. Let me direct your attention back to this collective set
23  of documents, Mr. James, Mr. Norman, Mr. Peralte, this is
24  marked for identification purposes as Defendant's Exhibit 3,
25  and that second page is the one that I had a portion cut off

Page 81

1   of.
2   A. Okay.
3   Q. And it's now in evidence, that particular page as
4   Defendant's Exhibit 4. But in turning through that document,
5   and I will be happy to hand you the whole document if you
6   need it, but I am just turning to another page in the back,
7   if you will, you see where I am pointing here, you see 1758?
8   A. Yes, ma'am.
9   Q. The end of the document, that's military time, would you
10  agree?
11  A. Yes, ma'am.
12  Q. 9/25, 2003; correct?
13  A. Yes, ma'am.
14  Q. And there are other pages.
15  A. 1715.
16  Q. 1715. And for the most part -- here's another page,
17  1715, 1751 on the next page, you see that?
18  A. Yes, ma'am.
19      MS. JAMES: Judge, may I have one moment to consult?
20  I think it may expedite things.
21      THE COURT: Yes.
22  Q. Now, do you know what happened to the Defendants after
23  they were taken to Jump Street?
24  A. No, ma'am.
25  Q. You do not?

Page 82

1   A. Well, I mean not -- you mean while they were out of my
2   presence?
3   Q. I am just saying in the course of your investigation do
4   you know how long they were at Jump Street?
5   A. You know, honestly I can't remember if they had already
6   been -- seems like they were still there and we transported
7   to the city jail after I got back to the office.
8   Q. Do you know what time that would have been?
9   A. No, ma'am. There should be a form saying what time they
10  were signed into the city jail but I am not sure what time
11  that was. We could check with the city jail and they could
12  tell us what time they were checked in.
13  Q. But you know if they were in the city jail for any period
14  of time before they were actually officially charged with
15  something?
16  A. They went that night and the complaint was done the next
17  morning if I am not mistaken.
18  Q. So they were held?
19  A. Overnight.
20  Q. But they had not been charged with anything at that
21  point? Had you indicated they were going to be arrested?
22  A. They were going to be charged the next mornings with
23  possession with intent to distribute.
24  Q. So would there be any reason when you took them to the
25  jail that the jail would not go ahead and begin the

Page 83

1   processing?
2   A. Would there be any reason why the jail?
3   Q. Yeah, as soon as they walked in that jail door would
4   there be any reason with regard to --
5   A. I am not sure how a federal prisoner works, I think they
6   have to go to the marshals first, don't they?
7   Q. Did you all take them to the marshals?
8   A. The next morning, yes, ma'am.
9   Q. That night you took them to the city jail, were you with
10  them when they took them to the city jail?
11  A. No, ma'am.
12  Q. Do you know who was?
13  A. No, ma'am.
14  Q. All right.
15      MS. JAMES: Just a moment, Judge.
16  Q. Now, when you left from the field-test -- well, you get
17  there about -- the call -- I think we know the call to Mr.
18  Perryman was about 4:22.
19  A. Okay.
20  Q. So y'all were in route based on your testimony when that
21  call was made.
22  A. We were already there.
23  Q. You were already set up there.
24  A. Yes, ma'am.
25  Q. So if the call was made at 4:22 y'all were stationary at

Page 84

1   the 4th Street area.
2   A. We had been there a little while.
3   Q. And after that call is made almost immediately Mr.
4   Norman comes out to the trash can?
5   A. Pretty quick after D.D. Alexander told me the call was
6   made, it was almost seconds.
7   Q. You didn't hesitate, you went on down there pretty quick
8   after you saw that stuff drop in the garbage can.
9   A. He went to the trash can and I think we actually talked
10  on the radio, we didn't like swarm on him. He put it in the
11  trash can and walked back into the house and that's when we
12  pulled down to the house.
13  Q. But it was pretty quick.
14  A. A few minutes.
15  Q. You go down there and you ask him about the search and
16  he says no and at that point you go out and field-test and
17  you go to your office.
18  A. Yes, ma'am.
19  Q. You were at your office and typing this thing up pretty
20  quickly when you get the call about Mr. Peralte; is that
21  right?
22  A. Yes, ma'am.
23  Q. So at least we know from the time they know law
24  enforcement is present, it's at least 4:30?
25  A. Yes, ma'am.

## Page 85

1 Q. So probably somewhere around 4:30, maybe a few minutes
2 after, right?
3 A. Yes, ma'am.
4 Q. And you have time to do all those things, get back to
5 your office and be typing before anyone ever even knows Mr.
6 Peralte is present; correct?
7 A. That's correct.
8 Q. So give me an estimate as to how long you would say that
9 period was that he was just in the house free to do whatever?
10 A. Just an estimate, I would say ten or 15 minutes, maybe
11 even -- yeah, probably at least ten or 15 minutes, could have
12 been more than that.
13 Q. At least ten or 15 minutes.
14 A. At least that much.
15 Q. Because we know travel time was at least five minutes.
16 A. And I was already typing on the search warrant.
17 Q. So at least five or ten minutes?
18 A. I had just sat down and got started whenever Sergeant
19 Drummond called me.
20 Q. But you had made your contact and inquiry with Mr.
21 Norman, gone to the trash can --
22 A. Yes, ma'am.
23 Q. -- and you had gone to your truck and done that.
24 A. From the whole time we were there until the time he was
25 located in the house, he could have been there 30 minutes

## Page 86

1 because he was there for a while before I ever left, yes,
2 ma'am.
3 Q. Now, when all of you went up to the door and you were
4 inquiring of Mr. Norman and Mr. James, anybody in that house
5 if they had been looking would have probably known something
6 was going on at that front door; would you agree?
7 A. If anybody was in the house?
8 Q. Yes.
9 A. Yes, ma'am.
10 Q. And we know based upon what law enforcement found that
11 Mr. Peralte was in the house, right?
12 A. Yes, ma'am.
13 Q. And based on the way this thing unfolds Mr. Peralte is
14 sitting in that house with close to four kilos of cocaine.
15 A. Yes, ma'am.
16 Q. With 30 minutes to spare.
17 A. Yes, ma'am.
18 Q. And y'all don't know what he is doing in the house.
19 A. Right.
20 Q. At that point don't even know he's in there.
21 A. Yes, ma'am.
22 Q. But this phone call that we now know wasn't really made
23 you figure as a law enforcement officer that folks who are
24 sitting on dope who knows the cops are coming are going to
25 try to get rid of it, right?

## Page 87

1 A. Most of the time.
2 Q. Did the house have indoor plumbing that you know of?
3 A. Yes, ma'am.
4 Q. And when Mr. Peralte was removed from the house he was
5 taken outside; correct?
6 A. Yes, ma'am.
7 Q. And he was detained with the other folks, right?
8 A. Yes, ma'am.
9 Q. And it was after he was taken from the house that you
10 all located the drugs inside; correct?
11 A. After the search warrant was executed. He was already
12 out of the house, yes, ma'am.
13     MS. JAMES: If I could just have one moment to ask
14 my client a question, I think I am done, Your Honor.
15     THE COURT: All right.
16     MS. JAMES: That's all the questions I have.
17     THE COURT: Everybody else knows this and I probably
18 should, but first of all did you search the vehicles?
19     THE WITNESS: Yes, ma'am.
20     THE COURT: Or did someone?
21     THE WITNESS: Yes, ma'am. They were searched, yes,
22 ma'am.
23     THE COURT: And was anything found in the vehicles?
24     THE WITNESS: No, ma'am. Not that I know of.
25     MS. JAMES: Judge, it's significant from our point

## Page 88

1 of view because the government contends and I expect will try
2 to offer at trial that this was Mr. Peralte's vehicle and
3 that drugs had been transported in that vehicle because they
4 contend that there was a hidden compartment in the vehicle,
5 and that's the basis of our motion to suppress.
6     THE COURT: Let me ask before I lose him. Did you
7 find a hidden compartment, is it the maroon vehicle?
8     THE WITNESS: Yes, ma'am. I did not find it but I
9 was told there was a hidden compartment.
10     THE COURT: Am I going to hear about that later?
11     MR. BROWN: Corporal Sisson was not there that
12 night, but he has seen the hidden compartment, and we would
13 stipulate that would be something of evidentiary value.
14     THE COURT: In other words that would be part of the
15 government's proof.
16     MR. BROWN: It would be.
17     THE COURT: Okay. Did you think that you had
18 authority to search the vehicle or the -- not just you
19 personally, but that the police department had the authority
20 to search the vehicle based on this warrant?
21     THE WITNESS: Yes, ma'am.
22     THE COURT: Why was that?
23     THE WITNESS: Because I told the Judge -- me and the
24 Judge talked about it and we wrote it on the affidavit, and
25 it was an oversight on my part not to put it on the search

Page 89

1  warrant itself.
2      THE COURT: Anybody want to follow up on that since
3  I am the one who asked?
4      MS. JAMES: I apologize, my client was talking in
5  this ear.
6      THE COURT: I was just asking if he thought he had
7  the authority to search the vehicle and he said yes and I
8  said why.
9      MS. JAMES: And his answer was what?
10     THE WITNESS: I said yes, I did think so because me
11  and the Judge talked about the fact that I had left it off of
12  there and the Judge said it was okay to write it in there, so
13  I did feel like we did have.
14  Q. My only follow-up, if I might, Your Honor, that you had
15  both documents, the search warrant that you had typed.
16  A. Yes, ma'am.
17  Q. You would agree that the vehicles were omitted.
18  A. That was an oversight on my part, I did not write it on
19  the search warrant.
20  Q. But it was in his presence that you all discussed the
21  significance of searching the vehicles, right?
22  A. Yes, ma'am.
23  Q. And he said just write it in and initial it, right?
24  A. Yes, ma'am.
25  Q. You didn't write it in the document that he signed that

Page 90

1  was actually the warrant that was served.
2  A. He signs the affidavit also, so I mean he saw the whole
3  thing, yes, ma'am.
4  Q. But you don't search on the basis of the affidavit.
5  A. That's what gives you the search warrant is the
6  affidavit and he read the affidavit so whenever we talked
7  about it I felt like we did have a right to search the
8  vehicles.
9      MS. JAMES: That's all, Judge.
10     THE COURT: Okay. Any redirect?
11     MR. BROWN: No redirect.
12     THE COURT: You may step down, call your next
13  witness.
14     MR. BROWN: Government calls Corporal D.D.
15  Alexander.
16     THE COURT: We'll take a short recess.
17     (At which time, 4:25 p.m., a recess was had until
18  4:30 p.m., at which time the hearing continued.)
19     THE COURT: Call your next witness.
20     MR. BROWN: Corporal D.D. Alexander.
21     THE CLERK: You do solemnly swear or affirm that the
22  testimony you give in this cause to be the truth, the whole
23  truth, and nothing but the truth, so help you God.
24     THE WITNESS: Yes, ma'am.
25

Page 91

1      D.D. ALEXANDER, witness for the Government,
2  having been duly sworn or affirmed, testified as follows:
3      DIRECT EXAMINATION
4  BY MR. BROWN:
5  Q. Would you state your name, please.
6  A. Corporal D.D. Alexander.
7  Q. How are you employed?
8  A. With the Montgomery police department special operations
9  division.
10  Q. Okay. What particular part of special operations
11  division?
12  A. The narcotics side.
13  Q. Were you working there on September 25th of this year?
14  A. Yes, sir.
15  Q. Were you present at the office when Corporal Conway
16  received an anonymous call on that afternoon?
17  A. Yes, sir, I was.
18  Q. What, if anything, did he do in relation to that with
19  you?
20  A. He came over to -- it was myself and several other
21  officers in the office, he came over and said that he
22  received the phone call of someone possibly having drugs over
23  at a residence.  And at that point he explained that, you
24  know, we were going to go out to the residence but he wanted
25  me to -- he wrote down a number and gave it to me and told me

Page 92

1  that he wanted me to call this number and tell them that, you
2  know, the police was coming to their home.
3  Q. Okay. After you received the number what did you do?
4  A. Once I received the number, at that time I left the
5  office and I went close to around where the residence was, I
6  couldn't actually see the residence, and waited until
7  Corporal Conway advised me to go ahead and shoot the call, or
8  make the phone call. And at that point I made the phone call.
9  Q. Okay. Do you recall the number that you called, that you
10  dialed?
11  A. I believe it was 262-3477.
12  Q. Okay. What happened after you made that phone call?
13  A. Once I called the number, the phone rang for probably
14  three or four times, a subject, a male answered the phone, he
15  said hello, I said hey, the police is coming to your home,
16  you need to get out. He said okay and hung up the phone.
17  Q. Okay. Could you -- or do you have an opinion on the
18  person's race that answered the phone?
19  A. The person sounded like he was black, a black male to
20  me.
21  Q. Okay. Did you come to find out later that the person was
22  not black?
23  A. Yes, sir.
24  Q. Okay. After you made that phone call what did you do?
25  A. Once I made the phone call I contacted Corporal Conway

Condenselt™

Page 93

1  but all the officers could hear me on the overall radio and I
2  advised him that I made the phone call, subject answered the
3  phone, he said that -- he said okay to what I was telling
4  him, hung up the phone, and that was it.
5  Q. Now, the number that you called, you didn't write it
6  down?
7  A. No, sir, Corporal Conway wrote it down.
8  Q. You don't know if he wrote it down correctly?
9  A. I have no idea.
10 Q. You are assuming he got the phone number from the
11 caller.
12 A. Yes, sir.
13 Q. And you don't know if the person forwarded that number
14 correctly?
15 A. No, sir.
16 Q. You just called the number.
17 A. That's all I did was call the number.
18 Q. You were going -- what number were you going to call
19 from?
20 A. I was going to call from one of our undercover cell
21 phones, but when I got out to the area the cell phones
22 wouldn't -- no service with that cell phone so I used my --
23 it's an MPD radio slash cell phone which we use for both. And
24 I called from that number.
25 Q. All right. Do you recall what that number is?

Page 94

1  A. I never call it, but it's 850-8570 I think, or something
2  like that, or 2870.
3  Q. 850, and what was the last four numbers?
4  A. I want to say it was like 2870 or something.
5  Q. 2870.
6  A. I am not really sure, I never call that from my
7  particular cell phone, I never use it.
8  Q. I understand. Thank you, no further questions.
9      THE COURT: Cross-examination?
10         CROSS-EXAMINATION
11 BY MR. GOGGANS:
12 Q. Were you in the same vehicle with Corporal Conway?
13 A. No, sir.
14 Q. So the information you got as to the phone number would
15 have been something that was radioed to you or called in to
16 you; correct?
17 A. He gave it to me at the office.
18 Q. At the office?
19 A. Yes, sir.
20 Q. You say he gave it to you, did he give it to you in
21 writing or tell you?
22 A. Yes, he wrote it down while I was standing there. And
23 he wrote it down, ripped off a sheet of paper and gave it to
24 me and explained to me what to do with it as far as calling
25 the number.

Page 95

1  Q. Did you take that sheet of paper with you?
2  A. Yes, sir.
3  Q. What did you do with the sheet of paper?
4  A. After I made the phone call I really have no idea what
5  happened to the paper. I can't recall what happened to the
6  paper.
7  Q. Did you have it in the car with you?
8  A. Yes, sir.
9  Q. When you called the number was it out in your car or did
10 you get it out of your pocket, where did you retrieve it from
11 at that point?
12 A. I had it in my hand. Once I left the office, once
13 Corporal Conway gave it to me I walked to my car, drove out
14 to the area and it was still in my hand at that point, and I
15 just dialed the number. Once I dialed the number I can't
16 recall what happened to the little sheet of paper but I just
17 dialed the number and that was it.
18 Q. After you dialed the number were you watching the house?
19 A. No, sir.
20 Q. Where were you?
21 A. I was parked I think probably on Forest Avenue or
22 something.
23 Q. So you weren't in eyesight of the house?
24 A. Right, correct.
25 Q. After you made that phone call did you later go to the

Page 96

1  residence on East 4th Street?
2  A. Yes, sir, I did.
3  Q. What time did you get to the residence on East 4th
4  Street?
5  A. After --
6  Q. In terms of time from the phone call as best you
7  remember.
8  A. It was probably about -- I would say about ten, 15
9  minutes after everything actually took place, I came out
10 there at that point.
11 Q. You when you say ten or 15 minutes after everything took
12 place, are you talking about Mr. Norman and Mr. James having
13 been taken off?
14 A. No, once the officers were already out on the scene then
15 I drove up at that point.
16 Q. You drove all the way to the end of the dead end street?
17 A. I drove to the residence, yes, sir.
18 Q. Did you give that sheet of paper back to Corporal
19 Conway?
20 A. No, sir. No, sir, I didn't give it back to him.
21 Q. Did he ask you later on what was that phone number?
22 A. No, sir, I don't think so.
23     MR. GOGGANS: That's all.
24     MS. JAMES: May I?
25     THE COURT: Yes.

**CondenseIt™**

Page 97

1    CROSS-EXAMINATION
2    BY MS. JAMES:
3    Q. Officer Alexander, you say that he came up to you and
4    gave you the number at headquarters before you all went to
5    the scene, right?
6    A. Corporal Conway, yes, ma'am.
7    Q. Came up and y'all hatched the plan for you to make that
8    call while you were at headquarters.
9    A. Yes, ma'am.
10   Q. When he came up and he gave you that number you said a
11   minute ago that he wrote it down on a piece of paper.
12   A. Yes, ma'am.
13   Q. What did the paper -- what color was the paper?
14   A. That I can't recall anything about the color.
15   Q. How big was it?
16   A. It was just a ripped off -- it was a torn piece of
17   paper, wasn't big at all.
18   Q. Are you familiar with like the little stickies that
19   people use?
20   A. Yes, ma'am.
21   Q. Was it a sticky?
22   A. Again, I can't recall. Like I say I made the phone call
23   and that was it. I can't recall about with color the paper
24   was, how it looked, anything.
25   Q. Let me ask you this, you are sure that he wrote it down

Page 98

1    for you.
2    A. Yes, ma'am.
3    Q. Okay. From what did he take the number to write it down?
4    A. From what?
5    Q. Yeah, did he do it from his memory or did he copy it off
6    of something?
7    A. Really I don't know. I just know he wrote it down.
8    Q. Okay. But you are standing there and you are watching
9    him write the number down?
10   A. Uh-huh. (positive response)
11   Q. He says here, make this call and he says here's the
12   number and he actually wrote it in your presence?
13   A. Yes.
14   Q. And you don't know if he was reading it from somewhere
15   else or if he did it from memory?
16   A. I can't recall that, no, ma'am.
17   Q. But there's no question he didn't walk up to you and
18   hand you the thing and say call this number.
19   A. No, ma'am.
20   Q. Okay.
21       MS. JAMES: Judge, I have a couple of questions that
22   are outside the scope, I can call him back.
23       THE COURT: I was going to say you can call him
24   anyway.
25       MS. JAMES: It will speed up the process.

Page 99

1    Q. Did you participate in transporting the Defendants to
2    the city jail?
3    A. Not to the -- yes, ma'am, I did transport one or two to
4    the city jail I think.
5    Q. Okay. Did you participate in transporting them to Jump
6    Street?
7    A. Yes, ma'am, one.
8    Q. Would it have been Mr. Peralte?
9    A. I think it was Norman.
10   Q. Okay. You participated in transporting Norman from the
11   4th Street address to Jump Street?
12   A. Yes, ma'am.
13   Q. Do you know what time of day that was?
14   A. No, ma'am.
15   Q. Do you know how long y'all were at Jump Street?
16   A. No, ma'am.
17   Q. Do you know if you took them to Jump Street before or
18   after the search was executed?
19   A. I really -- I can't recall when.
20   Q. Did you participate in the search?
21   A. No, ma'am.
22   Q. You did not?
23   A. No, ma'am.
24   Q. So if you didn't participate in the search were you
25   present, did you stand outside while they were searching?

Page 100

1    A. No, ma'am. I don't think the search started, but I know
2    that I was told to take the prisoners, or the subjects to our
3    office, or one of the subjects to the office.
4    Q. When you departed the 4th Street location where was
5    Officer Conway?
6    A. I have no idea.
7    Q. He wasn't there though, was he?
8    A. I tell you, I really don't know.
9    Q. Well, who gave you the directive to transport them to
10   Jump Street?
11   A. My supervisor did.
12   Q. Who was that?
13   A. Sergeant Drummond. I want to say Sergeant Drummond.
14   Q. But at that point -- I mean the search would have been
15   important to you, wouldn't it?
16   A. To me?
17   Q. Yeah, that was what y'all were looking for was to go in
18   that house and see if you could find anything, right?
19   A. Like I say, I was just told to make the phone call and
20   transport the prisoner, but the search is important, yes.
21   Q. Whether the search is important or not if somebody goes
22   in that house and they come out with three point -- close to
23   four kilos of cocaine, that would be significant to you,
24   wouldn't it?
25   A. Yes, ma'am.

CondenseIt™

## Page 101

1  Q. And you weren't there when that happened, were you?

2  A. No, ma'am.

3  Q. You were already gone with Mr. Norman in your vehicle,

4  right?

5  A. Yes, ma'am.

6  Q. All right. Now, with regard to transporting from

7  Jump -- you say you don't know how long they were at Jump

8  Street?

9  A. No, ma'am.

10  Q. But did you stay there the entire time they were there?

11  A. Yes, ma'am, I was there at the office.

12  Q. All right, sir. At what point did you all decide to

13  transport them to city jail from Jump Street?

14  A. Meaning time period?

15  Q. Well, yeah, when and why?

16  A. Well, they was being transported to Jump Street

17  because -- I guess for questioning, I don't know. But I know

18  that I was instructed to take one of the subjects to our

19  office.

20  Q. Okay. And you stayed there with that subject while he

21  was at Jump Street.

22  A. Yes, ma'am.

23  Q. And then you picked up another person and took two of

24  them to city jail?

25  A. No. When I transported the one I had to the office, from

## Page 102

1  that point I think -- after I think all three of them came

2  down to the office and once the paperwork was done then at

3  that point I was -- me and another officer, I am not sure who

4  he was, transported them to the headquarters.

5  Q. To city jail.

6  A. Yes.

7  Q. Did you transport all three?

8  A. Yes, ma'am.

9  Q. Do you remember who the other officer was that was with

10  you?

11  A. I can't recall who it was.

12  Q. At the point -- did somebody give you a directive to

13  take them to the city jail?

14  A. Yes, ma'am.

15  Q. Who was that?

16  A. Probably my supervisor as well, probably Sergeant

17  Drummond.

18  Q. At that point were they under arrest?

19  A. When they were taken to the police department?

20  Q. Yes.

21  A. Yes, ma'am.

22  Q. Okay. Do you recall any conversation that you or the

23  other officer may have had with the personnel at the

24  Montgomery city jail about these three folks?

25  A. No, ma'am.

## Page 103

1  Q. Did you take an arrest warrant with you?

2  A. We took an arrest report.

3  Q. At that point you did?

4  A. We have to take an arrest report to the city jail before

5  we turn them over to the city jail.

6  Q. Is it possible that when y'all got them there and you --

7  you are familiar with when you walk into that jail on the

8  left is the warden's office?

9  A. Yes, ma'am.

10  Q. And right past there is an attorney visiting area,

11  right?

12  A. Yes, ma'am.

13  Q. And on the other side of that wall is a little cage, is

14  there not?

15  A. Yes, ma'am.

16  Q. Do you recall you or the other officer walking into the

17  jail, walking in and saying here are three, we need you to

18  hold them?

19  A. Yes, ma'am.

20  Q. You didn't say book them, you said hold them, didn't

21  you?

22  A. Yes, ma'am.

23  Q. Meaning there was other stuff y'all had to do in

24  relation to them; correct?

25  A. Yes, ma'am.

## Page 104

1  Q. Because at that point -- at that point had you been

2  advised that the three plus kilos of cocaine had been found?

3  A. No, ma'am. I think that drugs were found, but how much,

4  I have no idea.

5  Q. Okay. And was that the end of your contact with them on

6  that particular day?

7  A. Yes, ma'am.

8  Q. Them being the Defendants?

9  A. Yes, ma'am.

10      MS. JAMES: That's all I have, Judge, thank you.

11      THE COURT: Any more questions?

12      MR. BROWN: Not from the government.

13      THE COURT: All right. You may step down, thank

14  you. Next witness?

15      MR. BROWN: Sergeant Mike Drummond.

16      THE CLERK: Do you solemnly swear or affirm that the

17  testimony you give in this cause to be the truth, the whole

18  truth, and nothing but the truth, so help you God.

19      THE WITNESS: Yes, ma'am

20      MICHAEL DRUMMOND, witness for the Government,

21  having been duly sworn or affirmed, testified as follows:

22      DIRECT EXAMINATION

23  BY MR. BROWN:

24  Q. Hello. Would you state your name, please.

25  A. My name is Michael Drummond.

**CondenseIt™**

### Page 105

1   Q. How are you employed?
2   A. With the Montgomery police department.
3   Q. In what capacity?
4   A. I am a sergeant in the special operations division,
5   narcotics bureau.
6   Q. Were you employed in that capacity back on September
7   25th of this year?
8   A. Yes, sir.
9   Q. On that date did you respond to a residence on East 4th
10  Street?
11  A. Yes, sir.
12  Q. Cut to the chase, was that pursuant to an anonymous
13  phone call that you had gotten information on through
14  Corporal Conway?
15  A. Yes, sir.
16  Q. When you got to the residence -- I am assuming you went
17  to the residence; is that right?
18  A. Yes, sir, we set up. I was set up around the corner and
19  then we went to the residence.
20  Q. Once you got to the residence what did you do?
21  A. Got there, parked the vehicle, got out, approached the
22  residence with a couple of other officers. One of the
23  Defendants came out of the residence, and then a second one
24  came out. Talked to them for a moment while Detective Conway
25  was talking to them.

### Page 106

1   Q. At some point in time was it your understanding that
2   Corporal Conway left to go get a search warrant for that
3   residence?
4   A. Yes, sir, it was.
5   Q. What did you do from that point on?
6   A. At that time I was standing there talking to two of the
7   Defendants.
8   Q. Which two were they if you recall?
9   A. Mr. Norman and Mr. Kenny. We heard -- or I heard some
10  noises in the house. When I heard noises in the house I
11  looked to Mr. Norman, asked him if there was anybody else in
12  the house, he said that his son was in there. When he said
13  that there was a lady standing next door, said no, his son is
14  over here. So I asked him again who is in the house and he
15  looked away from me and wouldn't say anything.
16  Q. All right. Describe to Judge Walker what the door was
17  like, was it open, closed, what kind of door it was and so
18  forth.
19  A. The best I recall it was a wooden door. It was open and
20  I believe there was a storm door that came to the outside.
21  Q. All right. Do you know if it was open or closed?
22  A. I don't believe it was fully opened. If it was open it
23  was just open an inch or two but the front door, the main
24  door was open.
25  Q. Okay. What did you do after hearing this noise and not

### Page 107

1   getting the second response back about who it was?
2   A. After I didn't get a response, I got a bad feeling about
3   it, I was kind of worried about the officers being out there,
4   there could be somebody that could be harmful to us in there.
5   So I think it was Lieutenant Caviness went in, I went in, saw
6   a subject coming out of a room into another room and I asked
7   him to come up there and come out of the house.
8   Q. Would you mind describing the layout where the person
9   was and your vantage point?
10  A. Walk into the house, it's kind of like a formal living
11  room there, to the right there's a kitchen or a dining room
12  and then a kitchen that attaches to it, and there's a room
13  that backs up to it and there was a laundry room right there
14  to the right.
15  Q. And where was this person in relation to those rooms
16  when you first saw them?
17  A. When I first saw him I just stepped kind of from the
18  dining -- excuse me, the formal area into the dining room
19  looking through that door into the den and he was walking
20  from the laundry room into the den.
21  Q. Did you later identify that person?
22  A. Yes, sir.
23  Q. What was his name?
24  A. I might butcher his name, Capulco Peralte, I believe was
25  his name.

### Page 108

1   Q. When you went into that residence, what did you do with
2   him again?
3   A. Asked him to step outside.
4   Q. Did he comply with that?
5   A. Yes, sir.
6   Q. How far did you go inside that residence?
7   A. I think I got to about the middle of the dining room
8   right there, and he walked to me and then we walked right
9   outside, back out the front door.
10  Q. Did you conduct a search while you were in the
11  residence?
12  A. No, sir.
13  Q. Did you even inadvertently see any what you would
14  describe as evidence in there?
15  A. No, sir.
16  Q. What, if anything, did you do with the identity of the
17  person Mr. Peralte that you found?
18  A. I advised Detective Conway of who was in the house.
19  Q. How did you do that?
20  A. By radio.
21  Q. Could you describe what you heard? I mean what did it
22  sound like?
23  A. The noise I heard in the house? You could hear people
24  banging around, like somebody was trying to move furniture,
25  sounds like that.

**CondenseIt™**

Page 109

1  Q. I think I am correct in asking you this, were you
2  involved in any way in the search of the maroon vehicle that
3  was found at the residence?
4  A. I might have looked in the vehicle, I don't recall
5  exactly. I remember there being a compartment in it that
6  wouldn't normally be in there.
7  Q. Would you describe that?
8  A. It was on the passenger side airbag where the airbag
9  would deploy the airbag was gone and there was an area
10  that looked like it had been molded in there with some kind
11  of carpeting or something, looked like to me that it could be
12  used to conceal something.
13  Q. Okay.
14       MR. BROWN: No further questions.
15       THE COURT: Let me just ask the timing of that, was
16  that -- any look that you had or anybody else had at that
17  compartment, was that after the Defendants were arrested or
18  prior to that or when?
19       THE WITNESS: That was after. That was after we were
20  conducting the search warrant, probably later on in the
21  search warrant, we were almost through.
22       THE COURT: It was during the time you were
23  conducting a search pursuant to the warrant that you saw
24  that?
25       THE WITNESS: Yes, ma'am.

Page 110

1       THE COURT: It wasn't after the vehicle was
2  impounded or something of that kind.
3       THE WITNESS: I believe we saw something there. I
4  can't remember if we actually got it open when we got -- I
5  might be thinking about another case. I think we took that
6  car to the lot later on and were able to get it off.
7       THE COURT: Get the --
8       THE WITNESS: Get the compartment open.
9       THE COURT: Let me just ask counsel, am I looking
10  at -- with regard to this compartment does the government
11  contend there was a search incident to arrest or after the --
12  pursuant to the warrant or pursuant to impoundment?
13       MR. BROWN: Pursuant to the warrant.
14       THE COURT: You want to follow up?
15       MS. JAMES: No, Your Honor.
16       THE COURT: Anybody else have any questions?
17       MR. MADDOX: Yes, ma'am.
18            CROSS-EXAMINATION
19  BY MR. MADDOX:
20  Q. Sergeant Drummond, what would be the way you would
21  describe your duties on that day in regard to the overall
22  actions that took place, were you in command, was somebody
23  else in command, what?
24  A. I would be second in command.
25  Q. And who was in command?

Page 111

1  A. Lieutenant Caviness.
2  Q. All right. We have had testimony from Mr. Conway
3  regarding a phone call he got that led to you all going to
4  that residence, were you familiar with that?
5  A. Yes, sir, he advised me of it.
6  Q. Did he advise all of you as a group as to why you were
7  going over there and what the game plan was, so-to-speak?
8  A. I believe so, yes, sir.
9  Q. Okay. What was the procedure, what were you planning to
10  do?
11  A. We were planning to go to the area, set up on the house,
12  make a phone call and see how they reacted to that phone
13  call.
14  Q. Okay. Have you since found that phone call really didn't
15  take place?
16  A. Yes, sir.
17  Q. Okay. In the affidavit that's in evidence as
18  Government's Exhibit B, Corporal Conway stated I think in the
19  third paragraph of it that Corporal D.D. Alexander called the
20  telephone number at the residence and told the subject that
21  answered the phone the police were on the way. That wasn't
22  true, in fact, was it?
23  A. What he believed at that time, it was true. After the
24  fact it's not, no, sir.
25  Q. It's not true, that's what you are saying?

Page 112

1  A. At the time he believed it to be true but after the
2  fact, no.
3  Q. You are testifying as to what Corporal Conway believed?
4  A. At the time, yes, sir.
5  Q. Okay. Thank you. The actual search warrant, who served
6  it?
7  A. Who served it?
8  Q. Yes, sir.
9  A. Several officers.
10  Q. Well, were you one of them?
11  A. Yes, sir, I was there.
12  Q. Who did you serve it on?
13  A. Do you mean did we hand it to somebody?
14  Q. Yes, sir.
15  A. I don't believe we handed it to somebody, we served it
16  on the house, executed it on the house.
17  Q. In fact, the somebodies that were at the house were
18  already gone when the search warrant got there, weren't they?
19  A. I believe so, yes, sir.
20  Q. Okay. Now, the warrant itself, did you see it?
21  A. I don't know at what time I saw it. I am sure I saw it
22  at some time.
23  Q. It's part of Government's Exhibit B that is already in
24  evidence and it says that Judge Hayes is ordering that
25  certain property be searched for, and then it says if you

## Page 113

1  find the same or any part thereof, bring it forthwith before
2  me at my office in the municipal courts of Montgomery,
3  Alabama or if the warrant is issued for violations of state
4  law return the same to any state court. Were either of those
5  done?
6  A. The return on the search warrant?
7  Q. Well, the way I read it it said to bring all the things
8  seized back to the Judge at the court or to a state court,
9  were either of those done?
10  A. No, sir, I think it went to federal court instead.
11  Q. I see. We have had some evidence here today that there
12  might have been a criminal history run on Mr. Peralte as
13  early as maybe 3:30 that afternoon. Did you have anything to
14  do with that?
15  A. Not that I know of, no, sir.
16  Q. Were the people -- was there an active investigation
17  going on before you went over there and before that alleged
18  phone call took place from an anonymous person, was there an
19  active investigation going on involving Andrew Big Kenny
20  James?
21      MR. BROWN: Objection Your Honor, it's beyond the
22  scope and it may involve other investigations which may not
23  be related to this particular investigation.
24      THE COURT: Let me understand why you want to ask
25  the question here.

## Page 114

1      MR. MADDOX: All right. The issue in part is the
2  veracity of the information that was put into the evidence.
3  And I could go about this a slightly different way perhaps to
4  show you why I am asking this question.
5      THE COURT: Okay.
6  Q. In discovery, sir, we received -- do you know what a
7  DEA-6 is?
8  A. Yes, sir.
9  Q. We received one that indicated that Mr. Sisson who is
10  seated at counsel table along with a task force officer
11  Wingard, you know him, don't you?
12  A. Yes, sir.
13  Q. Spoke in October of 2002, not 2003, 2002, with Kenneth
14  Andrew James at his residence regarding distribution of
15  cocaine and crack cocaine, and that Mr. James indicated he
16  wanted to cooperate and that information was then forwarded
17  to Mr. Brown here. Was Andrew James on that day, in fact,
18  your informant?
19  A. As far as I am aware he's never done anything for us.
20  Q. Was he wearing a wire that day?
21  A. Oh, the day of that?
22  Q. The day that you went into this house.
23  A. Sir, as far as I know, he has never done anything
24  proactive for us.
25  Q. Okay. Did you before Corporal Conway told you about that

## Page 115

1  phone call have knowledge of the activities of Mr. Peralte
2  that day?
3  A. On that day?
4  Q. Yes, sir.
5  A. No, sir.
6  Q. Prior to that day?
7  A. I believe it was several years ago we had information he
8  was bringing large amounts of cocaine into Montgomery.
9  Q. All right, sir. When you first approached that house you
10  were with Mr. Conway or Corporal Conway, were you not?
11  A. We were in separate vehicles, I think we all kind of
12  approached the house together, yes, sir.
13  Q. Well, when you got on foot did you go towards the front
14  door with Mr. Conway?
15  A. I believe so.
16  Q. Did you see his first encounter with Mr. Norman?
17  A. I remember Mr. Norman coming out of the house.
18  Q. Do you remember Mr. Norman saying he wanted to talk to a
19  lawyer?
20  A. I remember him saying something about a lawyer, I don't
21  remember exactly what he was saying.
22  Q. Do you remember him saying that you don't have a right
23  to be here?
24  A. He might have said something like that, I don't
25  remember.

## Page 116

1  Q. Do you remember him saying you can't search the
2  property?
3  A. I believe that Detective Conway had asked for consent
4  and he had refused.
5  Q. All of that took place before you asked him who was in
6  the house, didn't it?
7  A. Yes, sir.
8  Q. Okay. Before you asked him who was in the house had you
9  read him his rights?
10  A. Not that I recall.
11  Q. Was he handcuffed?
12  A. I don't remember if he was or not, sir.
13  Q. Well, when Conway went to get the search warrant you all
14  didn't have him handcuffed?
15  A. I think once we found -- he had found cocaine in the
16  trash can I believe he was handcuffed then.
17  Q. Were you able to see this alleged trip by Mr. Norman to
18  the trash can prior to the time you all drove down the street
19  to the house?
20  A. No, sir. I was sitting around the corner but I was on
21  the radio with Detective Conway when he saw him walk out
22  there and he told me he was walking out to a car, he thought
23  he was walking out to get into a car on the street, and he
24  said no, he just threw something in the garbage can and he is
25  looking around and walking back towards the house.

CondenseIt™

## Page 117

1  Q. I see. Do you know any other officers that saw that
2  other than Conway?
3  A. No, sir, I believe Conway was the only one that was
4  watching the house, we didn't want to stack up right there
5  too close to the house.
6  Q. All right, sir. And it's your testimony that when you
7  first went into that house you didn't have a search warrant?
8  A. First time I stepped into that house was to get whoever
9  it was out of there out for our safety. No, sir, I did not
10  have a search warrant at that time.
11  Q. Thank you for answering my questions.
12  A. You are welcome.
13             CROSS-EXAMINATION
14  BY MS. JAMES:
15  Q. Is it Sergeant Drummond?
16  A. Yes, ma'am.
17  Q. Did you -- you left headquarters and went to the
18  location on 4th Street with all the other officers in
19  separate cars; is that right?
20  A. Yes, ma'am.
21  Q. And did you stay there then consistently, and I am
22  saying you personally, from that point until after the search
23  was completed?
24  A. Yes, ma'am.
25  Q. So you were there the entire time.

## Page 118

1  A. Yes, ma'am.
2  Q. All right, sir. When were the Defendants transported
3  from the location? When were they taken away, at what point
4  in this process?
5  A. I don't recall exactly, I believe it was before
6  Detective Conway got back with the warrant though.
7  Q. Okay. And at that point what was the basis for taking
8  them way?
9  A. The cocaine that was found in the garbage can, we had
10  probable cause to believe that a felony had been committed
11  and they had committed that felony.
12  Q. But at that point no one had indicated Mr. Peralte had
13  done anything other than be in the residence.
14  A. Yes, ma'am, it was still under investigation.
15  Q. He hadn't been out to the trash can.
16  A. Not that I know of, no, ma'am.
17  Q. You say Norman and James were on the porch outside and
18  you heard someone banging as if someone was moving furniture,
19  was that your testimony?
20  A. Yes, ma'am.
21  Q. And you decided for officer safety you would enter the
22  residence and if there was a person in there you would take
23  that person out; correct?
24  A. Yes, ma'am.
25  Q. But you just went far enough to see Mr. Peralte kind of

## Page 119

1  coming up from the back; is that right?
2  A. He was coming up from a laundry room crossing into a
3  den.
4  Q. And at that point you said come here; is that right?
5  A. I asked him to come here, yes.
6  Q. Did you have your weapon drawn at that point?
7  A. No, ma'am, I don't believe so.
8  Q. But you went into the house for the sole purpose of
9  insuring officer safety because there was a person inside
10  that house or you thought there was; correct?
11  A. Correct.
12  Q. You didn't know if the person was armed and dangerous?
13  A. Correct.
14  Q. But you just went in, not knowing who was in there or
15  what they had, and you were walking around without your
16  weapon drawn.
17  A. I had my hand on my weapon on my side and kept it there,
18  I did not pull it out of my holster, no.
19  Q. You didn't know if there was one person or three people
20  in that house, right?
21  A. No, ma'am.
22  Q. And when you saw Mr. Peralte you were satisfied when you
23  motioned him to the front that he was the only person in
24  there?
25  A. That was really an oversight on my part, I should have

## Page 120

1  looked around and see if there was more, but I didn't.
2  Q. You should have if it was for officer safety and there
3  were other people at least taken a view of all the other
4  rooms; would you agree?
5  A. I could have done that, but the information we had there
6  was three subjects in the house and he would have been the
7  third, and that's probably why I quit right then.
8  Q. So you had reason to believe there was a third person in
9  the house based on the information that y'all had received
10  earlier, right?
11  A. At one point there was three is the information we got,
12  yes, ma'am.
13  Q. Okay. How long then was this person, Mr. Peralte, how
14  long would you say he was left in that house alone before you
15  went in there?
16  A. Oh, quite a while.
17  Q. Well, give us an estimate.
18  A. 15, 20 minutes.
19  Q. By himself.
20  A. Yes, ma'am.
21  Q. And you don't know what he was doing in the house while
22  he was in there alone, right?
23  A. No, ma'am.
24  Q. Now, did you have any contact on the 25th of September,
25  2003 after these Defendants were transported away from that

Page 121

1  residence, did you have any further contact with them on that
2  day?
3  A. I might have seen them when we came back to the office,
4  I am not aware, I don't remember talking to any one of them
5  specifically.
6      MS. JAMES: Judge, again this is outside the scope.
7      THE COURT: Go ahead.
8  Q. You have been in vice and narcotics for many years,
9  haven't you?
10  A. Yes, ma'am.
11  Q. How many, ten plus, more?
12  A. Give or take, nine, between nine and ten years.
13  Q. And you have certainly had many occasions to run an NCIC
14  on suspects, haven't you?
15  A. Yes, ma'am.
16  Q. Y'all have that capability at your headquarters on Jump
17  Street, don't you?
18  A. Yes, ma'am.
19  Q. And tell me the process, do you basically key in the
20  person's name if you have that and something pops up to tell
21  you what the computer has or knows about him?
22  A. Yes, ma'am, basically.
23  Q. And does everyone have access to that that works down
24  there?
25  A. Not -- usually a cadet will run it for us, they have

Page 122

1  access. I can't remember if this -- only one computer in our
2  office will run NCIC and I don't recall if everyone in the
3  office has a password to get on to that computer so sometimes
4  they will use a supervisor's password or somebody else that
5  has a password to get on to that computer.
6  Q. When you make the inquiry and you put the person's name
7  in or the identifying features in that computer to pull up
8  the information, it gives a time that you go into -- the time
9  when you start, doesn't it?
10  A. I believe so, yes, ma'am.
11  Q. And then you have to wait sometimes for that information
12  to come back to you, don't you?
13  A. If NCIC is up it usually comes back immediately, within
14  a few seconds. If it's down it won't come back at all.
15  Q. Can it come back later if it's down?
16  A. I don't know. If its down I turn it off and go do
17  something else.
18  Q. Okay.
19  A. But you punch it in there it should come up within five
20  seconds or so.
21      MS. JAMES: Okay. I don't think I have anything
22  further, Your Honor.
23      THE COURT: Okay.
24      MS. JAMES: I'm sorry. One more question.
25  Q. You say the cadet, that's someone that's in training or

Page 123

1  someone in addition, not a full-fledged police officer?
2  A. Civilian employee, yes, ma'am.
3  Q. And you are saying that person normally does these
4  checks for you; correct?
5  A. And they have -- yes, ma'am, a lot of times they do, and
6  they have access.
7  Q. Typically you have some cadet that's competent enough to
8  get on the computer and make an inquiry?
9  A. Some of them are competent.
10  Q. And if they were competent enough to do that, assuming
11  you had someone from the 25th to do that --
12  A. I am not sure who ran it, I mean I don't know.
13  Q. Would those people have the capacity to make an inquiry
14  of the telephone company or the computer to check a phone
15  number?
16  A. The cadets?
17  Q. Yes.
18  A. They have never been taught to do any of that stuff. I
19  mean I don't try to get them to do anything like that.
20  Q. So they have limited knowledge of computers is what you
21  are saying.
22  A. Yes, ma'am.
23  Q. All right. And where -- on that particular day where was
24  Mr. Leonard? And I am saying that day, September 25th, was he
25  in the search party?

Page 124

1  A. I don't recall if he was or not.
2  Q. He does work with you though, doesn't he?
3  A. Did he up until a week or two ago.
4      MR. GOGGANS: Come to the dugout, please.
5  Q. Do y'all have the internet?
6  A. Yes, ma'am.
7  Q. And can you do reverse searches?
8  A. I am a computer idiot, trust me, I don't know anything
9  about those things.
10      THE COURT: If y'all do any more of these I am going
11  to make you tag each time.
12      MS. JAMES: That's it, thank you.
13      THE COURT: Any other questions?
14      MR. BROWN: No redirect, Your Honor.
15      THE COURT: No redirect.
16      MR. BROWN: No redirect.
17      THE COURT: You may step down. Any other witnesses
18  for the government?
19      MR. BROWN: One more.
20      THE COURT: All right. Y'all mind staying a little
21  bit and finishing this up? The correct answer is no.
22      MS. JAMES: The correct answer is I have no problem
23  with that but I have a matter that I need to take up that
24  might impact, something I might need to share with the Court
25  in-camera about my defense.

Page 125

1    THE COURT: After?
2        MS. JAMES: I might have to with the Court's
3    permission address it first thing in the morning.
4        THE COURT: It all depends on how long the court
5    reporter and the clerk can stay.
6        MR. MADDOX: Your Honor, informationally we have
7    witnesses to call also.
8        THE COURT: How many?
9        MR. MADDOX: Probably two.
10       THE COURT: Can everybody stay until 6:00? It's
11   quarter after 5:00. All right. Let's go to 6:00 at least and
12   see what we can get done.
13       MR. BROWN: The government calls Corporal Gene
14   Sisson.
15       THE CLERK: You do solemnly swear or affirm that the
16   testimony you give in this cause to be the truth, the whole
17   truth, and nothing but the truth, so help you God.
18       THE WITNESS: I do.
19       GENE SISSON, witness for the Government, having
20   been duly sworn or affirmed, testified as follows:
21               DIRECT EXAMINATION
22   BY MR. BROWN:
23   Q. State your name, please.
24   A. Gene Sisson, S-I-S-S-O-N.
25   Q. How are you employed?

Page 126

1    A. With the Montgomery police department.
2    Q. In what capacity?
3    A. I am a narcotics detective in the special operations
4    division and also assigned to the high intensity drug
5    trafficking area task force in Montgomery.
6    Q. Let me ask you this, are you the case agent in this
7    case?
8    A. No, sir. Not exactly.
9    Q. Who is?
10   A. Chris Wingard is the case agent that has done most of
11   the paperwork.
12   Q. And you are working with him in sort of a co-case agent
13   capacity in this case?
14   A. Yes, sir.
15   Q. Did you testify at a preliminary hearing and a detention
16   hearing held back on October 2nd, 2003 in this case?
17   A. Yes, sir.
18   Q. During the course of that hearing did you learn that the
19   telephone number that was supposed to have been called,
20   supposed to have belonged to that residence on 4th Street
21   actually did not belong to that residence?
22   A. I learned while I was on the stand, yes, sir.
23   Q. You didn't know before?
24   A. No, sir.
25   Q. What did you do after learning that, if anything, as it

Page 127

1    relates to the phone numbers and who they belong to?
2    A. Very first thing I did was go back to the office and do
3    the same thing Mr. Maddox did and did anywho.com for myself
4    and got the same information that he showed me and then
5    issued subpoenas to Bell South for subscriber information for
6    that number. And as a matter of fact I also ordered I think
7    about 30 days worth of incoming and outgoing calls for Mr.
8    Perryman's number.
9    Q. Okay.
10       MR. BROWN: May I approach, Your Honor?
11       THE COURT: Yes.
12   Q. I am going to show you what has been marked as
13   Government's Exhibits C, D and E and ask if you can identify
14   those.
15   A. These are going to be responses to three different
16   subpoenas that I issued, two of which to Bell South and one
17   to The Southern Company which is the carrier for Corporal
18   Alexander's Southern Link radio.
19   Q. Okay. Specifically what is C, or what does C relate to?
20   A. C is a subpoena to Bell South requesting subscriber
21   information to 262-3477.
22   Q. Who did it -- well, okay. And is that the information
23   that you received back from your subpoena?
24   A. That's correct.
25   Q. All right. How about D?

Page 128

1    A. D is the -- it's a request for phone calls that Corporal
2    Alexander made or received on his Southern Link phone call on
3    9/25, 2003. If I am not mistaken I was speaking directly to a
4    Southern Link representative while they had the subpoena in
5    their hands telling them exactly, you know, when I was
6    looking for and it turns out there wasn't but two phone calls
7    made that day anyway and he had said earlier he doesn't use
8    his telephone, Southern Link very much.
9    Q. And Government's Exhibit E, what does that relate to?
10   A. This is a subpoena response from Bell South where I
11   asked them to give me the phone number for 2429 East 4th
12   Street and who it belonged to, if any.
13   Q. Okay. And you received each of those in response to
14   subpoenas that you had issued.
15   A. After the detention hearing, yes, sir.
16       MR. BROWN: The government offers C, D and E, Your
17   Honor.
18       THE COURT: Any objection?
19       MR. GOGGANS: No, ma'am.
20       THE COURT: Those are admitted.
21   Q. Now, Government's Exhibit C, and I don't think anyone
22   disputes, is the phone number that was listed in the
23   affidavit, belongs to Mr. Perryman who testified earlier; is
24   that correct?
25   A. That's correct.

**CondenseIt™**

Page 129

1  Q. And this particular response, in fact, confirms that.
2  A. Yes, sir.
3  Q. The number for the residence is what you received in
4  response to Government's Exhibit -- listed on Government's
5  Exhibit E.
6  A. Yes, sir.
7  Q. Is that correct?
8  A. Yes, sir.
9  Q. Who does it list as the listed subscriber?
10 A. Richard Carwell.
11 Q. And what is the address listed there?
12 A. 2429 East 4th Street.
13 Q. Now, I want to show you both C and E together, with C
14 being on the bottom, E being on the top, what are the
15 differences in those telephone numbers?
16 A. It appears that two numbers have been transposed.
17 Specifically the third number and the fifth number.
18 Q. I am going to show you now Government's Exhibit D, I may
19 have to zoom out some. Can you still read that?
20 A. Yes, sir.
21 Q. What is the incoming -- well, the first line, what
22 information can you develop from the first line?
23 A. The first line is an outgoing call made from Corporal
24 Alexander's Southern Link cellular phone at 4:22 in the
25 afternoon.

Page 130

1  Q. What is his telephone number?
2  A. His cell phone number is 850-2870.
3  Q. And the called number is which number?
4  A. The number he dialed was 262-3477.
5  Q. And that's Mr. Perryman's phone number.
6  A. That's correct.
7  Q. All right. I have some general cleanup questions to ask
8  you and I think we will be done. Is it against the laws of
9  the State of Alabama or federal law to the best of your
10 knowledge to possess any amounts of cocaine?
11 A. Any amount, yes, sir.
12 Q. Including residue.
13 A. Including residue.
14 Q. I am going to show you what has been marked as
15 Defendant's Exhibit 4. You were in court a moment ago when
16 testimony was elicited regarding this 1530 number, were you
17 not?
18 A. Yes, sir.
19 Q. Is it your belief that that number is a time?
20 A. No, sir.
21 Q. I am going to show you this identifier that I am
22 pointing to here that has at least part of it at dot A-L and
23 some digits after that, do you recognize that number?
24 A. Yes, sir. Most of that number is the Montgomery police
25 department O-R-I, and I am really not sure what O period R

Page 131

1  period I stands for, but it's an agency designator that goes
2  on all our reports. But our O.R.I. for Montgomery is 0030100,
3  and it appears that this is going to be a designator for a
4  particular computer to let someone know where this inquiry
5  was made.
6  Q. Okay. After the hearing but -- the previous hearing you
7  said the first thing you went to do was go look at the
8  computer and see if you could identify the -- I guess the
9  subscriber for the number that was listed in the affidavit;
10 is that correct?
11 A. Yes, sir.
12 Q. One of the first things?
13 A. Yes, sir. It was the first thing.
14 Q. Did you ever contact the officers to locate the piece of
15 paper that had the number on it?
16 A. Yes, sir.
17 Q. Could they locate that piece of paper?
18 A. No, sir.
19 Q. Mr. Maddox was asking a question about some contact that
20 you had made with the third co-Defendant in this case,
21 Kenneth James.
22 A. Yes, sir.
23 Q. That occurred sometime back in late 2002.
24 A. Yes, sir.
25 Q. Relate your discussion with him on that date, what he

Page 132

1  was going to do or what he would be willing to do generally.
2  A. Generally tell what I told him?
3  Q. Right.
4  A. We had made controlled purchases of cocaine from Andrew
5  Kenneth James -- I say we, the HIDTA task force, Chris
6  Wingard specifically being the controlling agent, and it was
7  at a point in that investigation when we wanted to approach
8  Mr. James to determine if he would be willing to assist us in
9  helping us make cases against his supplier. And Detective
10 Wingard and I went to Mr. James' residence in Sturbridge for
11 that reason. And he did not tell us that he did not want to
12 help us and he did not say that he would help us but he did
13 call later that morning and agree to meet us at Oak Park to
14 discuss it a little further.
15 Q. Did you meet there?
16 A. Yes, sir.
17 Q. What happened?
18 A. It was pretty much a continuation of the conversation
19 that we had at Sturbridge. He ended up saying that he wanted
20 to talk to his attorney and we never heard from him again.
21 Q. Being that you never heard from him, specifically has he
22 cooperated with y'all past October of 2002?
23 A. No, sir, he was not done anything for us.
24 Q. Was he wearing a wire or anything on that day?
25 A. He wasn't for us and nobody found it when they searched

Page 133

1  him at the jail, no, sir.
2  Q. He wasn't the informant that called.
3  A. Not -- no, sir.
4  Q. Thank you, that's all the questions I have.
5        CROSS-EXAMINATION
6  BY MR. GOGGANS:
7  Q. The main entrance to Oak Park is on Forest Avenue, is it
8  not?
9  A. Yes, sir.
10 Q. Which is near East 4th Street?
11 A. Yes, sir.
12 Q. During the time of the encounter with the three
13 Defendants on East 4th Street and the later execution of the
14 warrant, where were you?
15 A. I don't remember specifically. It's very possible that I
16 wasn't even at work that day.
17 Q. But you were not there?
18 A. No, sir.
19 Q. Could you have been at your office that day?
20 A. Had I been -- I would not necessarily have been at the
21 office that everybody else was there, I would have been at my
22 task force office, and had I been there I would have heard
23 the traffic on the radio and would have gone to help, so
24 that's why I think I wasn't working that day.
25 Q. You mentioned that after the detention hearing you went

Page 134

1  back to your office and checked a reverse search on the
2  telephone number; is that correct?
3  A. Went to my task force office, yes, sir.
4  Q. You have internet at the task force office?
5  A. Very fast internet, yes, sir.
6  Q. Pardon me?
7  A. Very fast internet.
8  Q. And you punched in anywhere -- anywho.com; is that
9  correct?
10 A. Yes, sir.
11 Q. There are other search engines similar in nature; is
12 that correct?
13 A. Yes, sir.
14 Q. InfoSpace.com, switchboard.com; is that correct?
15 A. Yes, sir.
16 Q. And of these search engines to do a reverse search, in
17 other words you have a phone number and you want to find out
18 a name or address that goes with it, what is it that you do?
19 A. I'm sorry? I have got a phone number and I want a name?
20 Q. You want a name and address to go with it, what do you
21 do?
22 A. If I want to use the internet services?
23 Q. Correct.
24 A. Then I will do a reverse lookup and type in the phone
25 number.

Page 135

1  Q. And you hit enter or hit go and another screen comes up
2  and tells you this number belongs to so and so at this
3  address; is that correct?
4  A. Sometimes, yes, sir.
5  Q. Sometimes it comes up no match; is that correct?
6  A. Usually it comes up no match for me.
7  Q. But in this instance it came up with the phone for James
8  R. Perryman on Rolling Road, didn't it?
9  A. Yes, sir.
10 Q. That didn't take you long to do that, did it?
11 A. Not from the task force office, no, sir.
12 Q. You mentioned just a second ago in doing a reverse
13 search you said if you are going to use the internet. There
14 are other ways you can get a name to go with a phone number;
15 correct?
16 A. If you have the luxury of time, yes, sir.
17 Q. Or if you have the luxury of knowing somebody that will
18 just give it to you; correct?
19 A. No, sir.
20 Q. You are not the only one at the HIDTA office that knows
21 how to use the internet to find out stuff, are you?
22 A. No, sir.
23 Q. Okay. Other people there know how to do that?
24 A. Yes, sir.
25 Q. Would it be fair to say that most any trained officer

Page 136

1  there would be at least literate with the internet like you
2  were describing just now?
3  A. At my task force office, it's a different animal at the
4  Montgomery PD narcotics office, I can't get on the internet
5  there.
6  Q. Your phone number is not secret from the Montgomery
7  police department, is it?
8  A. No, sir.
9        MR. GOGGANS: That's all I have.
10       CROSS-EXAMINATION
11 BY MS. JAMES:
12 Q. Corporal Sisson, you have been present today when
13 everyone testified about the events of September the 25th,
14 2003; correct?
15 A. Yes, ma'am.
16 Q. And you heard the testimony of I guess it's officer
17 Alexander with regard to how he got the phone number to make
18 the call, you remember that?
19 A. Yes, ma'am.
20 Q. And he said he actually was standing there and Officer
21 Conway wrote out the phone number, did you hear him say that?
22 A. Yes, ma'am.
23 Q. You were also present when you heard Officer Conway say
24 that he handed him the number, right?
25 A. Yes, ma'am.

CondenseIt™

| Page 137 | Page 139 |
|---|---|

**Page 137**

1  Q. Regardless of which one or which one of those we want to
2  follow, it would at least appear based on the testimony of
3  Alexander that there were two pieces of paper that had
4  numbers, would you agree with that?
5  A. No, ma'am.
6  Q. Okay. And the reason why is? He says he wrote the number
7  down, Conway said he had the number written down, he wrote it
8  down when he took the message, do you remember that?
9  A. Yes, ma'am. But even in those two series of questions
10 you said the same thing that Corporal Conway said, or your
11 interpretation of what he said two different ways. When you
12 said that Corporal Alexander watched him write the number
13 down and then you said Corporal Conway handed him the note
14 and the second time you asked that you said it a different
15 way too.
16 Q. What I am saying is Conway said he took the note on a
17 yellow sticky when he got the message from the anonymous
18 caller.
19 A. Yes, ma'am.
20 Q. Wrote the number down.
21 A. Yes, ma'am.
22 Q. Took the sticky and handed it to Alexander, you remember
23 that?
24 A. Yes, ma'am.
25 Q. Alexander says he didn't hand him a sticky, he wrote

**Page 138**

1  down the number. You remember that?
2  A. He also admitted that Corporal Conway had to have handed
3  him the number for him to leave with it.
4  Q. But he saw him write it down.
5  A. Right.
6  Q. It sounded to me like there might be two pieces of paper
7  that would have the number on it.
8  A. That's not what I got out of it, no, ma'am.
9  Q. So you think there's no question that there's just one
10 piece of paper and that's the piece of paper that's lost?
11 A. And that Corporal Alexander was standing there when
12 Corporal Conway wrote it down for him.
13 Q. But we don't know that Corporal Alexander was standing
14 there when the tip came in.
15 A. It almost sounds like it to me.
16 Q. But that's not what he said.
17 A. I don't remember specifically.
18 Q. Okay. Now, where did you -- let me back up a minute. You
19 weren't there the day any of these things happened but you
20 have kind of inherited this job as being the backup case
21 agent, is that what I took your testimony to say?
22 A. Yes, ma'am.
23 Q. But you came in and testified at both the detention
24 hearing and the preliminary hearing, didn't you?
25 A. Yes, ma'am.

**Page 139**

1  Q. And you testified about things that you had learned from
2  these other officers about the events of September the 25th
3  of 2003.
4  A. Yes, ma'am.
5  Q. And when you came in here and took the oath and
6  testified you pretty much were relaying what you thought was
7  truthful and accurate information; correct?
8  A. Yes, ma'am.
9  Q. Well, do you remember testifying that these three
10 Defendants were, in fact, detained at the 4th Street
11 residence until after the search was executed and after the
12 drugs were found?
13 A. I don't remember saying that, but I am not --
14     MS. JAMES: May I hand him his testimony, Your
15 Honor?
16     THE COURT: Yes.
17 Q. I will direct you to the page. (complies) This is the
18 testimony of those two hearings, and I would direct your
19 attention to page 11, top of the page.
20 A. Yes, ma'am.
21 Q. Well, let me back up to page ten, the bottom of page
22 ten. Do you remember being asked all right, now, after
23 obtaining the search warrant what, if anything, happened
24 relative to this investigation? Do you remember your answer,
25 well, prior to the actual search warrant being -- that

**Page 140**

1  signed, it was determined that Mr. Peralte was inside. While
2  Mr. Norman and Mr. James were outside with the officers they
3  found out that Mr. Peralte was inside. Do you remember having
4  testified to that?
5  A. I am not disputing, I don't remember that specifically,
6  but I --
7  Q. All right. And then Mr. Feaga asked you what happened
8  after that and do you remember that you testified that
9  everyone was secured, everyone was secured to secure the
10 residence, to secure the evidence, while the search warrant
11 was being obtained. And once that was signed, then entry to
12 the house was made.
13 A. Yes, ma'am.
14 Q. Okay. Now, where were -- based on what you learned
15 because we know you weren't there, but where were these three
16 Defendants when that search warrant was executed?
17 A. I have learned specifically today that they were on
18 their way to special operations.
19 Q. Okay. Well, directing your attention to page 11 when you
20 were asked the question, all right -- this is back on October
21 the 2nd of 2003 -- all right, and what, if anything, happened
22 after entry now, this entry to the house? It was made after
23 the warrant was obtained. And your answer was that's
24 correct. Do you see that?
25 A. Yes, ma'am.

Page 141

1 Q. And then the question was put to you, where were the
2 three Defendants when entry was made into the house? And your
3 response was, on the front porch.
4 A. Yes, ma'am.
5 Q. Now, who gave you -- you are saying now you believe that
6 that information that you testified to was false.
7 A. It's not the same, no, ma'am.
8 Q. I mean the question is where the Defendants on that
9 day, you were asked that question before.
10 A. Yes, ma'am.
11 Q. On October the 2nd, and you said they were on the front
12 porch when the search was being conducted.
13 A. Yes, ma'am.
14 Q. And you got that information from someone but when I
15 alluded to it earlier you said I have just learned today,
16 that says to me that you have learned today that maybe it's
17 not correct.
18 A. I am more clear on the time line of how things
19 transpired that evening.
20 Q. Well, who gave you that specific information that you
21 came in here and testified to on October the 2nd of 2003?
22 A. That's from me listening to Chris Wingard, Corporal
23 Wingard and Corporal Conway discussing the case.
24 Q. Okay. Now, directing your attention -- well, let me back
25 up for a minute. The anonymous tipster, was the anonymous

Page 142

1 tipster if you know a male or a female?
2 A. I have heard that it was a female.
3 Q. You have heard that it was a female.
4 A. Yes, ma'am.
5 Q. Well, do you remember having testified on October the
6 2nd of 2003 to something different than that?
7 A. No, ma'am, I don't.
8 Q. I'm going to direct your attention to page 20 of your
9 testimony on October the 2nd, and actually page 19, where you
10 are talking about the -- you are actually talking about
11 somebody identified as N, would that be the confidential --
12 the anonymous tipster?
13 A. Yes, ma'am.
14 Q. When you use those, like N and that, y'all typically use
15 that for an informant whose identity you are trying to keep
16 secret, don't you?
17 A. With some people, yes, ma'am.
18 Q. So your referring here to N as the informant, that
19 wasn't really necessary because y'all didn't know who the
20 informant was anyway; is that correct?
21 A. That's correct.
22 Q. And with regard to those questions, the series of
23 questions about this informant, the question was asked to you
24 he didn't know where it he was, where he was calling from,
25 that's Mr. Feaga asking you a question, correct, about the

Page 143

1 informant.
2 A. Correct.
3 Q. He is using he, as if it's a male; correct?
4 A. Yes, ma'am.
5 Q. Because he is talking about he, Conway, gets a call,
6 didn't know where he, the source of information, was calling
7 from; would you agree?
8 A. That's correct.
9 Q. And then the question is when I say where, the actual
10 physical location, your answer is that's correct, and the
11 question, whether it was in Montgomery, and your answer, and
12 this is on 20, he did not know where he was calling from.
13 Correct?
14 A. That's correct.
15 Q. When you say he, you meant it was a male tipster;
16 correct?
17 A. Not necessarily, no, ma'am. I don't get into the whole
18 he/she when I am typing, it's he for the most part. I mean I
19 am not trying to say that this is definitely a male.
20 Q. So if you refer -- if the questions that are asked are
21 about he is the informant and your response is he as to the
22 informant, it didn't matter, is that what you are saying,
23 whether it was a he or a she?
24 A. It's anonymous to me, and I am just thinking the
25 universal, Trinity English, I'm sorry.

Page 144

1      MS. JAMES: I don't think I have anything else,
2 Judge, just let me check with my client one second please.
3 Nothing further.
4      THE COURT: Any other questions for this witness?
5      MR. BROWN: No redirect, Your Honor.
6      THE COURT: You may step down, thank you.
7      MR. BROWN: No further witnesses, Your Honor.
8      THE COURT: Any witnesses for the Defendant? We will
9 start with Mr. Norman.
10      MR. GOGGANS: I am going outside to get her.
11      THE CLERK: You do solemnly swear or affirm that the
12 testimony you give in this cause to be the truth, the whole
13 truth, and nothing but the truth, so help you God.
14      THE WITNESS: Yes.
15      SHATOUBRIOUNE HARE, witness for the Defendant,
16 having been duly sworn or affirmed, testified as follows:
17           DIRECT EXAMINATION
18 BY MR. GOGGANS:
19 Q. State your name, please, ma'am.
20 A. Shatoubrioune Hare.
21      THE COURT: Spell it.
22 A. S-H-A-T-O-U-B-R-I-O-U-N-E, last name Hare, H-A-R-E.
23 Q. Where do you live, Ms. Hare?
24 A. I live at 2424 East 5th street.
25 Q. Do you know anyone who lives on East 4th Street?

## Page 145

1  A. Yes, my mama lives on East 4th Street.
2  Q. East 4th Street is in Montgomery not far off of Mulberry
3  Street?
4  A. Correct.
5  Q. Forest Avenue; is that correct?
6  A. Correct.
7  Q. You were subpoenaed to be here; is that correct?
8  A. Yes, sir.
9  Q. Ms. Hare, were you at your mother's house on East 4th
10  Street back on September the 25th of 2003 late in the
11  afternoon?
12  A. Yes, sir.
13  Q. Do you remember some police officers being over there
14  that day?
15  A. Yes, sir.
16  Q. Were you outside the latter part of that afternoon?
17  A. Yes, sir.
18  Q. Where outside were you?
19  A. I was sitting on my mama's front porch.
20  Q. Where is your mother's house -- well, let me ask this,
21  do you know anybody else who lives on that end of 4th Street,
22  East 4th Street?
23  A. Yes, sir, my mama's neighbor Tammy, Tammy Montgomery,
24  she lives on the other side of my mama.
25  Q. Do you know her street number?

## Page 146

1  A. No, sir. My mama's is 2423, so I assume hers might be
2  2425.
3  Q. This is a dead end street; is that correct?
4  A. Correct.
5  Q. I am going to show you what has been marked and is
6  introduced as Defendant's Exhibit Number 1, do you recognize
7  that street right there?
8  A. Yes, sir.
9  Q. Does that appear to you to be looking down towards the
10  end of East 4th Street?
11  A. Yes, sir.
12  Q. If you were looking -- standing there looking down
13  towards the end of East 4th Street which side of the dead end
14  would your mother's house be on?
15  A. She stays on the left side where the Ford Explorer is.
16  Q. Okay. Where is -- you mentioned Tammy's house, where is
17  her house?
18  A. Where the white Honda Accord is.
19  Q. All right. Now, that afternoon why were you outside on
20  your mother's porch?
21  A. I have two little girls and my oldest daughter and
22  Tammy's daughter are friends. They were in the yard playing
23  and my two year old was in my mother's yard and I was out
24  there watching her.
25  Q. Were there a number of children out there playing that

## Page 147

1  day?
2  A. No, sir. Just those.
3  Q. Okay. Is that the reason you were outside?
4  A. Yes, sir.
5  Q. Do you know Alphonso Norman?
6  A. Yes, sir.
7  Q. Do you know him in any way to be connected to Tammy who
8  lives at the house at the end of East 4th?
9  A. I know that he's Tammy's boyfriend.
10  Q. Do you see him over there sometimes?
11  A. Yes, sir.
12  Q. Did he spend the night there sometimes and spend time
13  there?
14  A. Yes, sir.
15  Q. Did you see the police at all that afternoon?
16  A. The police as in the police in a police car?
17  Q. Yes, ma'am. Like a black and white car, did you ever see
18  a marked black and white car?
19  A. Yes, sir.
20  Q. Where did you see a marked black and white car that
21  afternoon?
22  A. It came down the street and turned around in the circle
23  and went back up the street.
24  Q. Turned around at the dead end portion of East 4th?
25  A. Correct.

## Page 148

1  Q. Did you see any other police officers later that
2  afternoon?
3  A. Yes, sir.
4  Q. Did you see Alphonso Norman that afternoon?
5  A. Yes, sir.
6  Q. Where did you see Mr. Norman that afternoon?
7  A. Alphonso and one of his friends were sitting on Tammy's
8  front porch also.
9  Q. Were your children or was your child playing in an area
10  close to the house where he was?
11  A. Yes, sir.
12  Q. All right. Were you keeping an eye on your children?
13  A. Yes, sir.
14  Q. Did you see any people who appeared to be police
15  officers come later and talk to Mr. Norman?
16  A. Yes, sir.
17  Q. Where did you see them talking? Where were they when you
18  saw them talking?
19  A. They drove down the street and they got out of the car
20  and they went to the front door and they called him outside.
21  Q. Did you see them standing anywhere talking, sitting
22  anywhere talking, where were they?
23  A. I am not understanding your question.
24  Q. Were you watching this?
25  A. Yes, sir. I was on my front porch.

Page 149

1  Q. And you saw Norman out earlier; is that correct?
2  A. Yes, sir.
3  Q. When you saw Norman out earlier did you see him go to a
4  trash can?
5  A. No, sir, I don't recall that.
6  Q. Let me again show you Defendant's Exhibit Number 1.
7  There -- it appears there are a number of trash cans out on
8  the curb, do you see that?
9  A. Yes, sir.
10 Q. What are the trash pickup days in that neighborhood?
11 A. Tuesdays and Fridays.
12 Q. You live on East 5th, is that just one block over?
13 A. Correct.
14 Q. The garbage cans in that neighborhood around East 3rd,
15 East 4th, East 5th, where do folks normally keep them?
16 A. We usually put them on the end of the grass like they
17 are in the picture, and then the way the city people just
18 pull them off and empty them and put them right back there.
19 Q. Is that every day or just trash pickup day?
20 A. At my mama's house we put them out like on Monday night
21 because we might be running late, and Thursday evening.
22 Q. Do other folks just leave them out all the time?
23 A. A lot of folks do leave them out there all the time.
24 Q. Do you remember seeing a trash can in front of Tammy's
25 house that day?

Page 150

1  A. Yes, sir, I did see the trash can once the police
2  officer went to it.
3  Q. I am going to show what you is marked and introduced as
4  Defendant's Exhibit Number 2. Does that appear to you to be
5  the corner of Tammy's house and her car?
6  A. Yes.
7  Q. Do you see a trash can in that picture?
8  A. Yes.
9  Q. Now, I will represent to you this picture was not taken
10 on September the 25th, but on September the 25th about where
11 was the garbage can that day?
12 A. Probably right there. And she also has another little
13 black trash can that's usually out there by that trash can.
14 Q. But was the trash can up on the curb like it is in this
15 picture, Defendant's Exhibit 2?
16 A. I can't recall that from that day.
17 Q. But it looks about like the same position it was then?
18 A. Right.
19 Q. Did you ever see Mr. Norman go to that trash can?
20 A. I don't remember him going to the trash, no.
21 Q. After the police got there and you were watching them
22 did you see them take Mr. Norman or take anybody else
23 anywhere?
24 A. Yeah, they took them to jail. They handcuffed them and
25 put them in the car and took them to jail.

Page 151

1  Q. Did any police officers come back later?
2  A. Yes, I saw a lady came back and she took a kit out of
3  her -- off the back seat.
4  Q. What did she do after she took the kit out?
5  A. They went over to the back of a car and I guess whatever
6  they had got out of the trash can is what they took the kit
7  to. That's what they took the kit to.
8  Q. Did they do something with whatever it was they had in
9  this kit?
10 A. I assume, I couldn't see around them.
11 Q. Was this before or after Mr. Norman and the other folks
12 had been taken off in handcuffs?
13 A. After.
14 Q. You are sure about that.
15 A. Yes, sir.
16 Q. When you saw the police first get in and you saw them
17 first go up and talk with Mr. Norman, did you watch what they
18 were doing?
19 A. When they first got there I remember a man getting out
20 and going to the door and I asked him -- when I saw them with
21 the guns and stuff I made my kids come home and I asked could
22 I get the other kids, and while they are pulling Alphonso out
23 I saw somebody else out at the trash can.
24 Q. All right. Now, you mentioned you saw them with guns
25 pulled and pulling Alphonso out, how quickly did that happen?

Page 152

1  A. That happened quick, you know. They were -- Shawn is
2  Tammy's little boy, he was in the door and he was like on the
3  side of this man and he was like behind -- you know, pointing
4  the gun behind Shawn telling Alphonso and them to come
5  outside, and once they came outside they went to the garbage
6  can at the same time they were on the porch.
7  Q. You saw that gun you went to get your child, right?
8  A. Right. I am like halfway between the yards where the
9  drainage ditch meets.
10 Q. So you were keeping an eye on them?
11 A. Yes, sir.
12 Q. Did you see them do anything with Mr. Norman?
13 A. Patting, cell phones and money. I only saw two guys,
14 which was Alphonso and one of his friends. They took the
15 phone and the money and they put them on the car and they put
16 them in an unmarked car and took them to jail.
17 Q. How soon after they met up -- after they came face to
18 face was it that they started getting stuff out of his
19 pockets?
20 A. Immediately, once they brought him out the door.
21 Q. How long after that was it before they took them off to
22 jail or took them off to wherever they went?
23 A. They handcuffed them and put them in the car and took
24 them off to jail.
25 Q. So there wasn't any sitting around that you recall?

CondenseIt™

| Page 153 |
|---|
| 1  A. No, sir. |
| 2      MR. GOGGANS: That's all. |
| 3      THE COURT: Any questions, Ms. James? |
| 4      MS. JAMES: No questions. |
| 5      MR. BROWN: No cross. |
| 6      THE COURT: You may step down, thank you. |
| 7      THE WITNESS: Thank you. |
| 8      THE COURT: Any other witnesses for Defendant? |
| 9      MR. GOGGANS: One second. |
| 10     THE COURT: For Mr. Norman. |
| 11     MR. GOGGANS: That's all the witnesses for Defendant |
| 12 Norman. |
| 13     THE COURT: Any witnesses for your client? |
| 14     MS. JAMES: May I take the matter up in chambers? I |
| 15 don't have any here. |
| 16     THE COURT: You don't have any here. |
| 17     MS. JAMES: But I don't want to rest until I speak |
| 18 with the Court. |
| 19     THE COURT: When you say in-camera, you mean in |
| 20 chambers just with me? |
| 21     MS. JAMES: Yes. |
| 22     THE COURT: Y'all wait here. |
| 23     MS. JAMES: I don't care. |
| 24     MR. BROWN: Your Honor, I will step out if that will |
| 25 make it easier. |

| Page 155 |
|---|
| 1      MS. JAMES: No, I did not. |
| 2      THE COURT: Ms. James, let me just say this for the |
| 3 record, if I do get information from you that you do not wish |
| 4 to call that witness, then I will consider the record closed |
| 5 and this hearing ended without having to reconvene court. |
| 6      MS. JAMES: Yes, ma'am. |
| 7      (At which time, 6:08 p.m., the hearing was continued |
| 8 until January 9, 2003 commencing at 2:05 p.m.) |
| 9      THE COURT: This is United States versus Alphonso |
| 10 Norman and Capulco Peralte, 03-0229-N. I hope this will go |
| 11 quickly, I know that some of you, the government in |
| 12 particular is working on briefs, and we just have to get this |
| 13 over with so this can be done in time for this term, but I |
| 14 appreciate y'all coming in. I will tell everybody that a |
| 15 short time ago I asked my law clerk to call the government to |
| 16 let them know that they might want to have a rebuttal |
| 17 witness, the witness who had actually obtained this warrant |
| 18 because I realize Mr. Brown did not know what this was about |
| 19 and that probably his witnesses were gone and my |
| 20 understanding is you were not actually able to get him. |
| 21     MR. BROWN: Right, he is not at work today. |
| 22     THE COURT: I will leave it up to you whether you |
| 23 think you have to to have him, but obviously this discussion |
| 24 was in-camera, you weren't aware whom to bring today. So |
| 25 that said let's go ahead and proceed. Call your witness. |

| Page 154 |
|---|
| 1      THE COURT: There's a courtroom full of people, do |
| 2 you want to do it in front of everybody here? |
| 3      MS. JAMES: No, Your Honor. |
| 4      (At which time an ex-parte hearing was conducted in |
| 5 chambers, after which, following occurred in open court:) |
| 6      THE COURT: Our conversation in-camera had to do |
| 7 with another potential defense witness who was under |
| 8 subpoena, is not present, and who Ms. James thinks she may |
| 9 need to call. On the other hand she may not need to call him. |
| 10 We tried to reach this individual who was not available, and |
| 11 what I am going to do under these circumstances is simply |
| 12 hold the record open. She has not rested, everyone else has, |
| 13 except for rebuttal. And she is going to let me know tomorrow |
| 14 whether she actually wants to call him or not. It may be that |
| 15 this is a moot point. If she does then I will get y'all on |
| 16 the phone by conference call and we will figure out when we |
| 17 can hear that testimony. Briefly, let me ask, was there any |
| 18 rebuttal? |
| 19     MR. BROWN: I don't intend to but I certainly don't |
| 20 know what this witness -- |
| 21     THE COURT: You can reserve rebuttal in that regard. |
| 22 So under those circumstances let me let y'all go home. We |
| 23 will be in recess. |
| 24     MR. BROWN: Thank you, Your Honor. |
| 25     THE CLERK: Ms. James, you never admitted 3. |

| Page 156 |
|---|
| 1      MS. JAMES: We call Les Hayes. |
| 2      THE COURT: Okay, I think it's Judge Hayes for this |
| 3 purpose. |
| 4      MS. JAMES: Excuse me, for this purpose, Judge |
| 5 Hayes. |
| 6      THE CLERK: You do solemnly swear or affirm that the |
| 7 testimony you give in this cause to be the truth, the whole |
| 8 truth, and nothing but the truth, so help you God. |
| 9      THE WITNESS: I do. |
| 10     MS. JAMES: May I proceed? |
| 11     THE COURT: Yes. |
| 12     LES HAYES, witness for the Defendant, having |
| 13 been duly sworn or affirmed, testified as follows: |
| 14 |
| 15          DIRECT EXAMINATION |
| 16 BY MS. JAMES: |
| 17 Q. Would you state your name, please. |
| 18 A. Les Hayes. |
| 19 Q. And Mr. Hayes, how are you employed? |
| 20 A. I am an attorney here in Montgomery. |
| 21 Q. Do you have other duties that are -- or other jobs? |
| 22 A. I am -- yes, ma'am, I am a presiding Municipal Judge for |
| 23 the City of Montgomery. |
| 24 Q. How long have you been a practicing attorney? |
| 25 A. 18 years. |

CondenseIt™

## Page 157

1  Q. And how long have you been a City Judge?
2  A. Around four years.
3  Q. Okay. When we say City Judge for purposes of the record
4  are we talking about a Judge that would handle municipal City
5  of Montgomery matters?
6  A. Yes, ma'am, misdemeanors, traffic citations, things of
7  that nature.
8  Q. As part of your responsibilities as a Municipal Judge do
9  you on occasion consider and authorize search warrants?
10 A. Yes, ma'am, very often.
11 Q. Are those typically presented to you by members of the
12 Montgomery police department?
13 A. Yes, ma'am.
14 Q. And do they typically deal with matters of interest in
15 the City of Montgomery?
16 A. Yes, ma'am.
17 Q. Okay. I want to direct -- and I realize probably in four
18 years you have probably signed a number of these; would that
19 be a fair statement?
20 A. Yes, ma'am.
21    MS. JAMES: Judge, may I approach the witness?
22    THE COURT: Yes.
23 Q. I am going to show you what is already in evidence as
24 Government's Exhibit B and ask you if this document looks
25 familiar to you?

## Page 158

1  A. Yes, ma'am, that appears to be my signature on pages
2  0073 and 75.
3  Q. Okay. And is that a document that I have recently
4  provided for your review?
5  A. Yes, ma'am.
6  Q. Okay. Does that appear to be your signature on both of
7  those -- the affidavit as well as the search warrant?
8  A. Yes, ma'am.
9  Q. Now, there -- a question has kind of come up in this
10 case with regard to certain handwritten notes or handwritten
11 statement that I believe is contained on page two of the
12 affidavit in support of the search warrant. Do you see that?
13 A. Yes, ma'am.
14 Q. That handwritten, I guess sentence, it's been previously
15 testified that that was, in fact, made by Officer Conway in
16 your presence, and I believe it has initials J.T.C. there,
17 what, if anything, do you remember about that happening? I
18 know you have had a recent opportunity to look at this.
19 A. Yes.
20 Q. But in terms of what, if anything, you recall back in
21 September of 2003 with regard to this specific application
22 and search warrant.
23 A. Let me just preface may remarks first by saying that
24 obviously as you mentioned, counselor, I have signed a lot of
25 search warrants, at my office, in court, during recess, I

## Page 159

1  have signed I think more than one on the baseball field and
2  in between baseball games. I do not specifically recall this
3  particular search warrant, I have no specific recollection of
4  it. I can say that I recall a meeting with an officer to sign
5  a warrant at my office, and I want to say that something
6  similar to this or this particular matter was discussed
7  wherein the words were written in and I did approve the
8  warrant, but my practice would be certainly not to sign
9  anything -- only to sign whatever is presented to me and not
10 to sign anything after the fact.
11 Q. Okay. So what you are saying is it's possible that this
12 was done in -- I mean more than likely it was done in your
13 presence, is that what you are saying?
14 A. I would hope so.
15 Q. Okay. But you don't have any independent recollection as
16 to whether it was or it wasn't?
17 A. Correct, one way or the other, no, ma'am.
18 Q. So what I think I am hearing you say is that you do
19 recall on one occasion, and possibly this occasion, having a
20 conversation with an officer that presented a warrant to you
21 about actually writing something additional in.
22 A. I do recall an occasion where that occurred, yes, ma'am.
23 Q. Okay.
24 A. Now, whether this was the particular incident, I can't
25 say one way or the other.

## Page 160

1  Q. But you recall that occasion at your office.
2  A. Yes, ma'am.
3  Q. Would it have been possible that anyone else could have
4  been present when you had that discussion, if, in fact, this
5  is the discussion with this officer with this warrant, is it
6  possible that your secretary may have been present as well?
7  A. She could have been there as well, yes, ma'am.
8  Q. Okay.
9  A. Not necessarily in the room but certainly within ear
10 range to overhear.
11 Q. Do you -- I think I may have already asked you this but
12 let me ask you, do you have any logbook or anything of that
13 nature that would tell you that you signed four warrants on
14 the 25th or something like that?
15 A. No, ma'am.
16 Q. Okay. How is it that -- and I don't want you to breach
17 any sort of security issue here, I am asking something I
18 don't know the answer to and they tell me that's not a good
19 thing, but how is it that these officers get in touch with
20 you if it's after hours or if you are somewhere other than
21 say your office?
22 A. They have my home telephone number, my understanding is
23 they can go to the court clerk and if necessary he can get in
24 touch with me on my cell phone, and certainly they have my
25 office number.

## Page 161

1  Q. Okay. Are your office hours pretty consistent, your
2  office is open from 8:00 until 5:00 or something like that?
3  A. Yes, ma'am. Probably a little bit later than 5:00.
4      MS. JAMES: May I have one moment, Judge?
5      THE COURT: Yes.
6      (Pause)
7      MS. JAMES: I don't have any further questions of
8  this witness, if you will answer Mr. Brown's.
9  A. Yes, ma'am.
10     THE COURT: Cross-examination? I'm sorry, nothing
11 from any other Defendant?
12     MR. GOGGANS: No questions.
13     MR. BROWN: No cross-examination. Thank you, Judge.
14     MS. JAMES: Judge, may he be excused?
15     THE COURT: Yes. Thank you very much for coming,
16 sorry to trouble you.
17     THE WITNESS: Good to see you.
18     MS. JAMES: Judge, I need about two minutes.
19     THE COURT: Okay.
20     (Pause)
21     MS. JAMES: Your Honor, I do not have any additional
22 witnesses and at this time I would rest.
23     THE COURT: Okay. The purpose of this was -- just so
24 I understand -- was impeachment of Officer Conway by
25 suggesting it is possible that the warrant was not signed --

## Page 162

1  well.
2      MS. JAMES: That the alteration or the additional
3  information may not have been done in the presence of the
4  Judge. He says it's possible. But in addition to that,
5  Judge, the purpose is that he was adamant if you will
6  remember, Mr. Conway was -- did not want to reveal where he
7  had had the warrant signed.
8      THE COURT: Right, the location is what you are
9  talking about now, right?
10     MS. JAMES: Right. And he was ad -- he said it was
11 the ball field, and I would suggest to the Court that even
12 though Mr. -- Judge Hayes said he has signed them on the ball
13 field he did not say that he remembered the combination of
14 the addition to the affidavit and the ball field.
15     THE COURT: But you have no other witness other than
16 the one I have just heard on this matter.
17     MS. JAMES: Right.
18     THE COURT: Any rebuttal from the government?
19     MR. BROWN: Could we have five minutes? We don't
20 even have to leave.
21     THE COURT: Five minutes to talk or five minutes to
22 put somebody on the stand?
23     MR. BROWN: Five minutes. Officer Sisson is checking
24 on something that he believes to be true and he is trying to
25 get that confirmed.

## Page 163

1      THE COURT: You can, just because you have not
2  really had notice of this -- well, you have had notice of the
3  proceeding but not what it concerned, so if it relates to
4  that you can take five minutes.
5      MR. BROWN: It should, and we don't even need to
6  leave the courtroom.
7      THE COURT: Just waiting for a call back?
8      MR. BROWN: Right.
9      THE COURT: We can all sit here and look at each
10 other.
11     (Pause)
12     MR. BROWN: Judge, I think we are ready, it should
13 be pretty brief.
14     THE COURT: Do we have everybody? Ms. James is here?
15     MR. BROWN: The government calls Corporal Gene
16 Sisson.
17     THE CLERK: You want me to swear him in again? You
18 do solemnly swear or affirm that the testimony you give in
19 this cause to be the truth, the whole truth, and nothing but
20 the truth, so help you God.
21     THE WITNESS: I do.
22
23     GENE SISSON, witness for the Government, having
24 been duly sworn or affirmed, testified as follows:
25

## Page 164

1                    DIRECT EXAMINATION
2  BY MR. BROWN:
3  Q. Agent Sisson, you were present a moment ago to hear the
4  testimony of Judge Hayes; is that correct?
5  A. Yes, sir.
6  Q. Prior to the testimony by Judge Hayes had you and I
7  discussed a previous occasion where you and in Judge Hayes'
8  presence had made a handwritten change to a search warrant?
9  A. That's correct.
10 Q. Would you explain how that happened and what happened to
11 Judge Walker.
12 A. On this particular occasion when Judge Hayes was
13 reviewing one of my affidavits he noticed my lack of wording
14 or lack of qualification for the confidential source that I
15 used to develop this probable cause, that I didn't make a
16 notation that the source had proven themselves to be
17 reliable. I just mentioned that they were a confidential
18 source, and verbally said to him that the source was reliable
19 and he instructed me or told me that I could just make the
20 handwritten addition to that affidavit saying and reliable
21 following the confidential. And I think it was October 8th
22 that that happened on.
23 Q. October 8th of this year?
24 A. Of '03.
25 Q. Where did that particular occasion occur?

| Page 165 | Page 167 |
|---|---|

**Page 165**

1  A. In his -- at his law office at Union Station.
2  Q. After you added that handwritten addendum to your
3  affidavit did you -- did you initial that addition?
4  A. That's what I was checking on right there, neither one
5  of us initialed it.
6  Q. Neither you nor the Judge initialed that addition.
7  A. That's correct.
8  Q. He didn't instruct you to initial that addition?
9  A. If he had I would have right then.
10  Q. Okay.
11      MR. BROWN: No further questions.
12      THE COURT: Cross-examination?
13      MS. JAMES: No, Your Honor.
14      THE COURT: All right. You may step down. I may have
15  missed the significance of that, what is the argument with
16  regard to the initial?
17      MR. BROWN: I thought the defense's contention was
18  that perhaps Officer Conway had added that particular
19  language on his own and I wanted to show that it might be a
20  normal practice to add that language in a handwritten manner
21  and either not be initialed or be initialed only by the
22  officer.
23      THE COURT: Oh, I see, okay. Anything else?
24      MS. JAMES: No. I do have one matter, Judge,
25  yesterday I marked for identification Defendant's Exhibit 3,

**Page 166**

1  and I did not offer it, and I told the clerk I didn't plan to
2  offer it but I would like to as part of the -- it's just a
3  continuation of what I offered as 4, but I think the Court
4  might benefit from looking at the whole document thing.
5      THE COURT: Any objection?
6      MS. JAMES: It's your computer printout that you
7  gave me.
8      MR. BROWN: No objection.
9      THE COURT: All right. It's admitted.
10      MS. JAMES: Are you going to hear from us at all?
11      THE COURT: I have your motions, I have heard the
12  testimony, is there something you want to add? If so it needs
13  to be brief.
14      MS. JAMES: We'll let it go.
15      THE COURT: All right. Thank you. Everybody rests,
16  we will conclude this.
17      MR. BROWN: Thank you, Your Honor, have a good
18  weekend.
19      THE COURT: Thank you.
20      THE CLERK: Court is recessed.
21      (At which time, 2:25 p.m., the hearing was
22  adjourned.)
23
24          *   *   *   *   *
25

**Page 167**

1      I certify that the foregoing is a correct transcript
2  from the record of proceedings in the above-entitled matter.
3  This the 29th day of January, 2003.
4
5                          Official Court Reporter

**FILED**

JAN 1 6 2004

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA )
)
)
v. )     CR. NO. 03-229-N
)
ALPHONSO NORMAN )
CAPULCO PERALTE )   '

## RECOMMENDATION OF THE MAGISTRATE JUDGE

This case is before the court on motions to suppress filed by defendants Alphonso

Norman (Doc. ## 62, 64) and Capulco Peralte (Doc. # 73). The government filed a response

(Doc. # 86), and the court heard evidence on the motions on January 8-9, 2004. Defendant

Norman's motion asks the court to suppress evidence found on September 25, 2003 at 2429

East 4th Street in Montgomery when officers searched the following areas: (1) Norman's

pockets, where they found a cell phone and a quantity of money; (2) a garbage container,

where they discovered residue on a paper towel in a plastic bag which field tested positive

for cocaine; and (3) the residence at that address, where, according to the government's

response, they seized more than 3.9 kilograms of powder cocaine, 2.6 grams of crack

cocaine, a handgun, two sets of digital scales, packaging, and more than $72,000 in cash.

Defendant Peralte asks the court to suppress any evidence concerning a maroon

vehicle with Florida tags parked at the residence on 2429 East Second Street, which was

found to have a hidden compartment. He contends that the search of the car was illegal

1

GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. F

because it was not authorized by the search warrant, and also because it was the "fruit of the poisonous tree," since the searches of the garbage can and residence were illegal. For the reasons set out below, the motions are due to be denied.

## Facts[1]

On the afternoon of September 25, 2003, Montgomery Police Department (MPD) Corporal J. T. Conway answered an anonymous call placed to the MPD's narcotics office. The caller, whom Conway believed to be a black female, said that there was a red or maroon car with a Florida tag backed up beside a house at 2429 East 4th Street. According to Conway, the caller said that "when the car was there and it was backed up beside the house there was keys there, I mean kilos of cocaine, and said the car was there right now." She reported that there were three people in the house, one of whom was nicknamed Scooter, and that there was a large quantity of cocaine there at that moment. Conway knew that defendant Alphonso Norman, with whom he was familiar from other investigative work,[2] goes by the name of Scooter. Conway asked for the phone number of the residence, and wrote down what he believed to be the number the caller gave him.

---

[1] To some extent, the facts in this case are disputed. The factual narrative provided here represents the court's findings of fact based on its evaluation of the testimony provided by the witnesses and its observation of their demeanor.

[2] The search warrant affidavit submitted to the municipal judge stated that "Alfonzo Norman and Andrew Kenneth James are known drug dealers in the Montgomery, Alabama ..." Police had previously made controlled buys of narcotics from defendant James, who was also found at the residence.

2

Conway gathered other officers – Corporal D. D. Anderson, Sergeant Mike Drummond, Lieutenant Bob Caviness, and Officers Scott Simons and Brad Bartlett – from the station, and they drove immediately to the area near the house on East 4th Street, parking in different parts of the neighborhood. Conway stationed his car at a spot from which he could observe the residence. He saw a maroon car backed up beside the house, although he could not see the tag. He radioed Anderson, to whom he had given the phone number of the residence prior to leaving headquarters, and directed Anderson to call the number. As Conway explained, "A lot of times we will call the house and tell them the police are coming just in an effort to scare them out of the house, maybe catch them when they are leaving, maybe run out with all the cocaine."

Anderson dialed 262-3477, and a man answered. Anderson said, "Hey, the police is coming to your home, you need to get out." The man said "o.k.," and hung up the telephone. Anderson radioed Conway to say that he had completed the call. Seconds later, Conway saw defendant Norman walk out the front door of the house to a City of Montgomery garbage can sitting on the street at the curb near the driveway.[3] He had something white in his hand that looked to Conway, who was using binoculars, like a white bag. Norman deposited the item in the trash can and returned to the house.

---

[3] Norman did not appear to be in a hurry when he walked out of the house. However, he was "looking around,"and he exited the residence seconds after the telephone call was placed. The court finds that it was reasonable for the officers to believe that Norman left the house and walked to the trash can in response to the call, and that "he had probably dropped some cocaine in the trash can."

3

The officers waited a few minutes to see if anyone would leave the house. When no-one did, they decided to approach the house, knock on the door, and try to talk to the occupants.[4] Conway and the other officers drove to the residence and parked their cars. Conway, accompanied by Drummond and Caviness, walked up to the house. The front door was open and, as the officers approached, Norman came to the door with a young boy, later identified as his son. Defendant Andrew Kenny James appeared at the door behind them.

Conway identified himself and told Norman that he had complaints of drug activity at the residence, and asked whether Norman would give consent to search the home. Norman said that he would not consent. Conway noticed that Norman was reaching his hands into his pockets. The pockets were "real big," and Conway could not tell what was in them. He told Norman to take his hands out of his pockets, but Norman put them back in and was "just fidgeting around." Conway told Norman again to take his hands out of his pockets. When he did not comply, Conway drew his weapon and pulled Norman's son behind him. Conway did not know what Norman was reaching in his pockets for and, in case Norman had a gun, Conway "wanted the kid out of the way." Conway turned Norman around, made him put his hands up against the wall of the house, and patted him down to ensure that he did not have any weapons. The officers also patted down James, while the boy went next door to a neighbor. Conway found "something hard" in Norman's pocket, which he removed to make

---

[4] The officers call this strategy a "knock and talk." As Conway described it, officers "go to the house, knock on the door, identify ourselves, who we are, why we are there, that we received a complaint. If they will give us consent to search their residence, we will[;] if not, we will just, you know, basically tell them why we are there and go from there."

4

sure that it was not a weapon. The object was a cell phone, which Conway then returned to

Norman. Conway also felt money in Norman's pocket, but did not remove it at that time.[5]

Norman told the officers that they did not have a right to be there, and that he wanted

to call his lawyer. Conway left the porch and walked to the street while the other officers

remained on the porch and Norman made a call on his cell phone. Conway opened the trash

can and found a "wadded up paper towel, either in a plastic bag or wadded up in like the

cellophane plastic type stuff." It looked like what he had seen Norman drop in the garbage

can earlier. Conway opened it and found "little shavings of what appeared to be cocaine."

He field-tested the substance and it tested positive for cocaine. When Conway received the

result of the test, he told the other officers to handcuff Norman and James while he went to

get a search warrant for the residence.

Conway drove back to the narcotics office and began typing the affidavit and warrant.

Meanwhile, the remaining officers heard noise in the house. Drummond asked Norman if

there were anybody else in the house. Norman replied that his son was there, but a woman

standing next door said that the boy was with her. Drummond asked Norman again who was

in the house, and Norman looked away and would not say anything. Drummond then "got

a bad feeling about it, I was kind of worried about the officers being out there, there could

be somebody that could be harmful to us in there." Drummond and Caviness went in the

house, and Drummond saw defendant Peralte walking from the laundry room into the den.

---

[5] Officers removed the money later when they handcuffed and detained Norman after
finding cocaine residue in the trash can.

Drummond asked Peralte to step outside, and they all exited the house. Drummond advised Conway by radio the identity of the person whom they had found in the house.

When Conway finished typing the affidavit and warrant, he took it to Municipal Judge Les Hayes for approval.[6] The typewritten portion of the affidavit explains that it is "made for the purpose of securing a search warrant for 2429 East 4th Street, Montgomery, Alabama ..."; to which Conway added in his own handwriting, with Judge Hayes' approval, "and any vehicles at the residence." Government's Exhibit B. Conway returned to the residence and began the search. He and the other remaining officers found approximately four kilos of cocaine in the dryer and under the sofa, some crack cocaine, between 70 and 80 thousand dollars in currency, and a firearm. They also searched the vehicle pursuant to the warrant, discovering that on the passenger side of the car the air bag was missing. It appeared to the officers that the air bag compartment could be used to conceal drugs. All three defendants were transported to the MPD office for processing prior to the time that Conway arrived at the residence with the search warrant.

The telephone number called by Corporal Anderson, 262-3477, in fact did not belong to the house on East 4th Street, but instead to James Perryman, a resident on Rolling Road Circle in McGhee Estates. Perryman answered the telephone call from Anderson – which

---

[6] Conway initially testified that he met Judge Hayes at his office, then said that the meeting was at the ball park. Judge Hayes did not specifically remember this affidavit and warrant, though he recalled that something similar was presented to him at his office. He also recalled having signed warrants at the ball park. The court concludes that it need not decide the location of the meeting to resolve the motions before it.

he found understandably puzzling – and called the police to report it. Conway did not learn

of the error until he was on the witness stand during a detention hearing in this case, well

after the arrest of the defendants. According to information obtained by the government

through a subpoena to BellSouth, the phone number at the residence at East 4ᵗʰ Street is 264-

3277.

<div align="center">Discussion</div>

The Search of Norman's Pockets

Defendant Norman contends that Conway's search of his pockets violated the Fourth

Amendment to the United States Constitution. Specifically, Norman maintains that the

anonymous tip did not justify a Terry stop, that officers did not have a reasonable belief that

Norman posed a safety threat, and that the search of his pockets exceeded a check for

weapons and became a check for criminal activity

"Searches and seizures conducted outside the judicial process, without prior approval

by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only

to a few specifically established and well delineated exceptions." Minnesota v. Dickerson,

508 U.S. 366, 372 (1993) (citations and internal quotation marks omitted). "One such

exception was recognized in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889

(1968), which held that 'where a police officer observes unusual conduct which leads him

reasonably to conclude in light of his experience that criminal activity may be afoot...,' the

officer may briefly stop the suspicious person and make 'reasonable inquiries' aimed at

confirming or dispelling his suspicions." Id. at 372-73. "Terry further held that '[w]hen an

<div align="center">7</div>

officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'" Id. at 373 (citation omitted). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence....'" Id. (citation omitted).

Norman's contention, relying on Florida v. J.L., 529 U.S. 266 (2000), that the anonymous tip did not justify a Terry stop is unavailing. J.L. involved an uncorroborated anonymous tip that an individual was armed. The Court determined that this tip, which indicated only that an individual matching the defendant's description and location was carrying a gun, did not have sufficient indicia of reliability to provide reasonable suspicion for officers to make an investigatory stop of the suspect. In the instant case, the anonymous tip did not relate to whether Norman had a weapon, but to drug activity occurring at the East 4th Street residence. Although the tip may have been a factor in Conway's decision to conduct a Terry search for weapons, it was not the primary one. Here, Conway's personal observation that Norman repeatedly reached into his pocket, which was large enough to conceal a weapon – and did not desist when he was asked to do so at least twice – caused Conway to conduct the search. See United States v. Harris, 313 F.3d 1228, 1236 (10th Cir. 2002) (When defendant did not comply with the officer's instruction to remove his hands from his pockets, officer was reasonably justified in believing that defendant might be armed and dangerous.). The tip – along with the fact that Norman left the house with a white

8

package right after the phone call (which Conway did not at that time know to have been placed to the wrong number), and the fact that he knew Norman from earlier investigative activity – simply provided additional context and reason for Conway's suspicions. The court finds Conway's belief that Norman was armed and presently dangerous to Conway or to others to be reasonable under the circumstances.

Norman's contention that the search of his pockets exceeded a check for weapons and became a check for criminal activity is also without merit. "[A] protective search – permitted without a warrant and on the basis of reasonable suspicion less than probable cause – must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.' If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed." Dickerson, 508 U.S. at 373 (citations omitted). Here, Conway removed Norman's cell phone from his pocket to make sure that it was not a weapon. It was reasonable for Conway to make a brief examination of the cell phone to ascertain what it was and to determine that Norman was not armed. There is no allegation that Conway turned the phone on or examined any information contained in the phone; instead, he returned it immediately. The money retrieved from Norman's pocket was not taken until after he had been arrested. Thus, the court cannot conclude that the patdown search of Norman's pockets in this case exceeded the scope of a lawful Terry search.

The Search of the Trash Can

9

Norman contends that there was no probable cause for the search of the trash can in front of the house.[7] "[A] party alleging an unconstitutional search under the Fourth Amendment must establish both a subjective and an objective expectation of privacy to succeed. The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the [privacy] expectation be one that society is prepared to recognize as reasonable." United States v. Robinson, 62 F.3d 1325, 1328 (11th Cir. 1995) (citations and internal quotations omitted). Even assuming that Norman demonstrated a subjective expectation of privacy in the garbage can, "he also would have to establish the objective component of the ... two-part test." Id. "Under the objective prong, the proper inquiry is whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment." Id. at 1329. Therefore, Norman would have to demonstrate that his privacy expectation in the trash can "would be accepted by society as objectively reasonable." Id.

It is not clear in this case that Norman manifested a subjective expectation of privacy in the trash container. Although the container was opaque, it was located on the street, and Norman disposed of the paper towel in broad daylight when he could be (and was) readily observed. The object itself was not concealed from view but was wrapped in cellophane or a clear plastic bag. Even if Norman did harbor a subjective expectation of privacy in the trash can, the court concludes that Norman exposed his garbage to the public sufficiently to render

---

[7] He also maintains that the garbage can was in the yard rather than on the street. The court has concluded otherwise. See Government Exhibit A (photograph of trash can).

10

such an expectation of privacy objectively unreasonable. See California v. Greenwood, 486 U.S. 35 (1988) (holding that a warrantless search and seizure of garbage left in a plastic bag on the curb in front of, but outside the curtilage of, a private house did not violate the Fourth Amendment.); see also United States v. Hall, 47 F.3d 1091, 1094 (11th Cir. 1995). As in Greenwood, Norman's trash was placed on the street for collection at a fixed time (although not that day, which was not a collection day), and the garbage collector was expected to pick it up, mingle it with the trash of others, and deposit it at the garbage dump. Norman's placement of the paper towel in the City of Montgomery garbage can on the street exposed it to the public sufficiently to defeat his claim to Fourth Amendment protection, since such trash is readily accessible to children, scavengers, snoops, and other members of the public. See Greenwood, 486 U.S. at 40. "Moreover, [Norman] placed [his] refuse at the curb for the express purpose of conveying it to a third party, the trash collector, who might himself have sorted through [Norman's] trash or permitted others, such as the police, to do so." Id. Accordingly, having deposited his garbage "in an area particularly suited for public inspection and, in a manner of speaking, public consumption, for the express purpose of having strangers take it, [Norman] could have had no reasonable expectation of privacy in the inculpatory items that [he] discarded." Id. at 40-41 (citation and internal quotation marks omitted). Conway's search of the trash can was not constitutionally defective.

The Search of the Residence

Norman argues that reckless or intentionally false statements were contained in the affidavit submitted in support of the search warrant which authorized police to search the

11

East 4th Street residence.  Those statements were: (1) that Anderson "called the telephone number at the residence and told the subject that answered the phone that the police were on their way to the residence," and (2) that "Alfonzo Norman, Andrew Kenneth James, and Capolco Peralte were inside the residence" when Conway and other officers approached the house. Defendant contends that the former statement was false because Corporal Anderson actually called the telephone number at a different residence, and that the latter statement was false because Peralte's presence at the house "was unknown to Conway until Conway had left East Fourth Street to find a judge, and another police officer, M. N. Drummond, had gone into the house without a warrant and looked around and called Conway and told him about Peralte.  This was not disclosed in the affidavit."  Norman contends that absent these statements, the warrant affidavit did not establish probable cause.[8]

Norman's claim must be evaluated under the standard set out in Franks v. Delaware, 438 U.S. 154 (1978).  In Franks, the Court held that if an officer makes a false statement knowingly and intentionally or with reckless disregard for the truth in an affidavit supporting a warrant, the false statement must be disregarded in determining whether the affidavit is sufficient to support a finding of probable cause. Id. at 171-72. Before a defendant is entitled to an evidentiary hearing on a Franks motion, he must first make a proper threshold showing.

> "[T]he challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be

---

[8] Norman also makes the conclusory assertion in his motion that even with the two challenged statements included in the warrant affidavit, it did not show probable cause. This claim is without merit.

12

allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

United States v. Haimowitz, 706 F.2d 1549, 1555-56 (11th Cir. 1983).

Norman has not made the necessary showing in this case. Conway – the affiant whose statements the court must examine – reported that Anderson called the telephone number at the East 4th Street residence in the good faith belief that this was true. He himself might not even have been responsible for the error concerning the telephone number: either the tipster or Corporal Anderson could have transposed the digits. Further, even if Conway were the one who made the mistake, it was at worst an error due to negligence. No deliberate intention to falsify the phone number in the affidavit has been proved, and the court declines to hold that the failure of an officer to confirm a telephone number offered by a tipster when he is hurrying to respond to a complaint of an offense in progress shows a reckless disregard for the truth. As Conway testified, "[W]hen there's – that kind of call and they said there was a large amount of cocaine there, you would not believe the number of times that we receive those calls and you get there and it's gone. So if you are going to act on something you have got to go, you don't have time to find out ... what the phone number is, make sure."

13

Further, although Conway perhaps could have asked someone else to check the telephone number and radio the result to him, the court finds that Conway was sufficiently busy traveling to and observing the residence prior to the call to justify any failure to check the subscriber.

With regard to the statement in the affidavit that "Alfonzo Norman, Andrew Kenneth James, and Capolco Peralte were inside the residence" when Conway and other officers approached the house, the court cannot even conclude that this was a falsehood, much less a deliberate one. Although Conway did not see Peralte himself, he was informed by Drummond before he completed the affidavit that Peralte had been discovered in the house. Thus, it was reasonable for Conway to conclude that Peralte was there when the officers arrived. Nor does Conway's failure to state in the affidavit that he was not actually present when Peralte was found constitute a material omission which, had this information been included, would have changed the result in any respect. Based on its review of the entire affidavit, the court concludes that either with or without any false statements or omissions charged by the defendant, the affidavit would still contain allegations sufficient to support a finding of probable cause, particularly given the positive field test for cocaine residue on the paper towel found in the trash can.

The Search of the Car

14

Defendant Peralte contends that the search of the maroon vehicle was not authorized by the search warrant.[9] He is correct that the warrant itself does not specifically list the automobile as an object of the search. The warrant generally authorized search of "the premises of: 2429 East 4th Street, Montgomery, Alabama." Government Exhibit B. However, the warrant affidavit, which was attached to and expressly incorporated by reference in the warrant, did contemplate, in Conway's handwritten notation, search of "any vehicles at the residence."[10] Conway testified that his failure to amend the warrant itself to reflect this change was an oversight.

This error is not fatal to the search. "Generally, a 'search warrant authorizing a search of a certain premises ... includes any vehicles located within its curtilage if the objects of the

---

[9] Peralte also maintains that if the searches of the trash can and residence were illegal, then so was the search of the car, which he argues would be the "fruit of the poisonous tree." For the reasons set out above, the court concludes that the searches of the trash can and residence were lawful.

[10] "The question of whether a defective description in the warrant may be saved by an adequate description in the affidavit arises with some frequency. As stated in Bloom v. State: 'There is a fundamental distinction between a search warrant and the underlying or supporting affidavit, and the affidavit is not necessarily either part of the warrant nor available for defining the scope of the warrant....Therefore, even if the affidavit which supported the warrant was sufficiently detailed, it would not cure the defect in the search warrant consisting of a failure to describe items to be seized with particularity, since specificity is required in the search warrant so that the discretion of the officer executing the search warrant is limited....' *Some decisions, however, have permitted an affidavit to cure a defective search warrant where the affidavit and the search warrant are such that they can be reasonably said to constitute one document. Two requirements must be satisfied to reach this result: first, the affidavit and search warrant must be physically connected so that they constitute one document; and second, the search warrant must expressly refer to the affidavit and incorporate it by reference using suitable words of reference.*" LaFave, 2 Search & Seizure § 4.6 (3d Ed.) (emphasis added). The Eleventh Circuit has adopted a flexible approach in deciding whether to consider an affidavit together with a warrant. United States v. Wuagneux, 683 F.2d 1343, 1351 n. 6 (11th Cir. 1982).

15

search might be located therein.'" United States v. Borno, 946 F. Supp. 972, 976 (M.D. Fla.

1996) (citing United States v. Gottschalk, 915 F.2d 1459, 1461 (10th Cir.1990)); see also,

e.g., United States v. Dahlman, 13 F.3d 1391, 1394 (10th Cir. 1993) ("[W]e have ruled that

a warrant authorizing the search of a certain premises that is otherwise adequately described

permits officers to search vehicles located on the curtilage when the objects of the search

might be located in those vehicles, even though the warrant does not specifically authorize

the search of vehicles."); United States v. Singer, 970 F.2d 1414, 1418 (5th Cir.1992) ("This

court has consistently held that a warrant authorizing a search of 'the premises' includes

vehicles parked on the premises."). Although the Eleventh Circuit has not spoken directly

to this question in recent years, "[t]here is binding precedent in this circuit holding that a

search of the premises includes vehicles parked on the premises." United States v. Ridolf,

76 F. Supp.2d 1305, 1311 (M.D. Ala. 1999) (citing United States v. Napoli, 530 F.2d 1198,

1200 (5th Cir. 1976); see also United States v. Cole, 628 F.2d 897 (5th Cir. 1980). In this

case, there is no dispute that the car was within the curtilage of the residence. The court finds

that the officers acted reasonably in assuming that the vehicle was owned or controlled by

the owner or another known occupant of the house at that time. Accordingly, the warrant's

reference to "the premises of: 2429 East 4th Street, Montgomery, Alabama" was sufficient

to embrace the vehicle parked in the driveway on those premises.[11]

---

[11] Even if the warrant were not sufficient under these cases to authorize search of the
vehicle, the court concludes that the officers acted in reasonable reliance on the warrant and
affidavit, and that the warrant was not so facially deficient, when read in combination with the
affidavit, that the executing officers could not reasonably presume it to be valid for the search of

16

## Conclusion

For the foregoing reasons, it is the RECOMMENDATION of the Magistrate Judge that motions to suppress filed by defendants Alphonso Norman (Doc. ## 62, 64) and Capulco Peralte (Doc. # 73) be DENIED.

Done this *16th* day of January, 2004.

_____
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

---

the vehicle. The purpose of the exclusionary rule to deter unlawful police conduct would not be served, and the rule should not be applied, when an officer relies in good faith on a warrant which he has inadvertently omitted to correct, where he previously made the intended correction to the attached warrant affidavit.

17



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA )
)
VS. ) CASE NO. CR-03-229-N
)
ALPHONSO NORMAN )

## ALPHONSO NORMAN'S OBJECTIONS TO RECOMMENDATION OF MAGISTRATE JUDGE AND REQUEST FOR DE NOVO HEARING

### Issues Presented

These objections relate to the Magistrate Judge's recommendation that

Alphonso Norman's motion to suppress be denied.  The motion to suppress

relates to searches conducted by government agents on September 25, 2003 at

2429 East Fourth Street in Montgomery, Alabama.   The following issues are

presented in the motion to suppress:

a.  Whether a search of a garbage container at 2429 East Fourth Street

violated the Fourth Amendment.

b.  Whether a search of Alphonso Norman's pockets violated the Fourth

Amendment.

c.  Whether a search of the house located at 2429 East Fourth Street

violated the Fourth Amendment.

### Factual Background and Incorporated Memorandum of Law

Alphonso Norman's son resides with his mother at 2429 East Fourth

Street.  2429 East Fourth Street is in a residential area.  The house located at

2429 East Fourth Street is small.  The front yard of 2429 East Fourth Street is

small as well.  Alphonso Norman visited with his son at the residence located

GOVERNMENT EXHIBIT

CASE NO. 03-229-N

EXHIBIT NO. G

1

2429 East Fourth Street on a frequent basis and spent nights at the residence located at 2429 East Fourth Street on a frequent basis.  On September 25, 2003, Alphonso Norman was at the residence located at 2429 East Fourth Street with his son.

Warrantless searches "are per se unreasonable under the Fourth Amendment subject to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967).  Whether or not a warrant is issued, probable cause is generally required for a search.  Carroll v. United States, 267 U.S. 132, 155-156 (1925).  Probable cause has been defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." Beck v. Ohio, 379 U.S. 89, 91 (1964).  A search warrant is to be issued only if there is probable cause to believe that contraband or evidence of a crime will be found on the premises to be searched.  Carroll v. United States, 267 U.S. 132, 155-156 (1925).  Evidence presented in support of an application for a search warrant must provide the issuing authority with a "substantial basis" for determining the existence of probable cause.  Illinois v. Gates, 462 U.S. 213, 238-239 (1983).  The affidavit submitted must contain sufficient facts and circumstances to enable the issuing authority to make an independent evaluation of probable cause.  United States v. Ventresca, 380 U.S. 102 (1965).  Warrant affidavits containing reckless or intentionally false statements by the affiant may be invalidated and any evidence seized pursuant to the warrant suppressed if the affidavit, cleansed of those statements, does not establish probable cause. Franks v. Delaware, 438 U.S. 154, 155-156 (1978).

Montgomery police officer J. T. Conway got Montgomery Municipal Court Judge Les Hayes, III to issue a warrant to search 2429 East Fourth Street. Upon execution of the search warrant, incriminating evidence was seized from the residence located at 2429 East Fourth Street. There were reckless or intentionally false statements contained in the affidavit submitted in support of the search warrant. Conway claimed in the search warrant affidavit:

> "On September 25, 2003, [he] received a telephone call from a subject … "A". "A" advised that he/she knew of drug activity at 2429 East 4th St, Montgomery, Alabama. "A" advised that he/she knew that the drug activity always picked up when a black male subject driving a maroon vehicle arrived at the residence. "A" advised that the vehicle always backed up beside the residence and that he/she was unable to obtain the tag number. "A" advised that the telephone number to the residence was 334-262-3477.

> "[He] and other members of the Special Operations Division went to the residence to investigate. [Another Montgomery police officer] called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence. [He] was parked in a location to watch the residence when the telephone call was made. [He] observed Alfonzo Norman exited [sic] the residence and walked [sic] to the trash can that was placed on the street. Alfonzo placed something in the trash can and returned to the residence.

> "[He] and other members of the Narcotics Bureau approached the residence. Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence. [He] told Norman why the officers were at his residence and he became very defensive and said that he wanted a lawyer. [He] walked to the trash can that was placed on the street. After looking in the can, [he] located a paper towel that contained a quantity of what was believed to be crack cocaine. [He] field tested the substance and it field tested positive for cocaine."

In her recommendation, the Magistrate Judge noted that "the search warrant affidavit submitted to the municipal judge stated that 'Alphonso Norman and Andrew Kenneth James are known drug dealers in the Montgomery,

Alabama ...' (Recommendation of the Magistrate Judge, p. 2). However, the affidavit stated nothing to indicate how Conway supposedly knew them to be drug dealers. The Magistrate Judge also noted that "police had previously made controlled buys of narcotics from Defendant James, who was also found at the residence." (Recommendation of the Magistrate Judge, p. 2). This did come out in the suppression hearing. However, the affidavit stated nothing about that.

Conway stated in the affidavit that another police officer had "called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence." The telephone number at the residence was not called. The number called was that of a James Perryman who resides at 3168 Rolling Road, Montgomery, Alabama. It was not disclosed in the affidavit that the number was not a telephone number associated with 2429 East Fourth Street but that of an accountant, James Perryman, who resides at 3168 Rolling Road.

The Magistrate Judge stated that Conway "wrote down what he believed to be the number the caller gave him." [1] (Recommendation of the Magistrate Judge, p. 2). The Magistrate Judge wrote: "The telephone number called by Corporal Anderson, 262-3477, in fact did not belong to the house on East Fourth Street, but instead to James Perryman, a resident on Rolling Road Circle in McGehee Estates. Perryman answered the telephone call from Anderson – which he found understandably puzzling – and called the police to report it. Conway did not learn of the error until he was on the witness stand during a

---

[1] The testimony of the police officers at the suppression hearing was that the paper the number was written upon has disappeared.

detention hearing in this case, well after the arrest of the defendants. According to the information obtained by the government through a subpoena to BellSouth, the phone number at the residence at East Fourth Street is 264-3277." (Recommendation of the Magistrate Judge, pp. 6-7). As to this difference between the assertions in the affidavit and the actual facts, the Magistrate Judge concluded: "Conway – the affiant whose statements the court must examine – reported that Anderson called the telephone number at the East Fourth Street residence in the good faith belief that this was true. He himself might not even have been responsible for error concerning the telephone number: either the tipster or Corporal Anderson could have transposed the digits.[2] Further, even if Conway were the one who made the mistake, it was at worst an error due to negligence. No deliberate intention to falsify the phone number in the affidavit has been proved and the court declines to hold that the failure of an officer to confirm a telephone number offered by a tipster when he is hurrying to respond to a complaint of an offense in progress shows a reckless disregard for the truth... Further, although Conway perhaps could have asked someone to check the telephone number and radio the result to them, the Court finds that Conway was sufficiently busy traveling to and observing the residence prior to the call to justify any failure check the subscriber." (Recommendation of the Magistrate Judge, pp. 13-14).

---

[2] The number dialed is the same number Conway listed in his search warrant affidavit. Thus, a simple transposition by Conway or Anderson seems unlikely.

It is clear from the evidence at the suppression hearing that the telephone number could have been checked by way of a reverse search on internet web pages or by other readily available means in a matter of seconds. However, police did nothing to check the number – nothing was done before the police went onto the property and nothing was done after Perryman called the police about the call to him and before Conway presented his affidavit to the municipal judge. This is not too much to ask when constitutional rights are at stake. Even if the assertion in the affidavit were not deemed to be an intentional misrepresentation, it certainly must be deemed reckless.

The Magistrate Judge stated: "Conway stationed his car at a spot from which he could observe the residence." (Recommendation of the Magistrate Judge, p. 3). However, a photograph introduced into evidence at the suppression hearing depicted an obstructed view of the residence from the area where Conway said he had parked.[3]

What Conway supposedly expected to observe is reflected in the Magistrate Judge's quote of Conway's explanation at the suppression hearing of the reason for the phoning residences: "A lot of times we will call the house and tell them the police are coming just in an effort to scare the out of the house, maybe catch them when they are leaving, maybe run out with all the cocaine." (Recommendation of the Magistrate Judge, p. 3)(Emphasis added.) If Conway observed anything, it did not fit that expectation. The Magistrate Judge noted

---

[3] Conway did state that he was over to the side of intersection shown in the photograph and could see better from there.

that: "Norman did not appear to be in a hurry when he walked out of the house."
(Recommendation of the Magistrate Judge, p. 3).

The Magistrate Judge stated that when Norman walked out of the front
door of the house "he had something white in his hand that looked to Conway,
who was using binoculars, like a white bag." (Recommendation of the Magistrate
Judge, p. 3). She also stated in her recommendation "Conway opened the trash
can and found a 'wadded up paper towel, either in a plastic bag or wadded up in
like the cellophane plastic type stuff.' (Recommendation of the Magistrate Judge,
p. 5). However, the affidavit merely stated that Norman had placed "something"
in the trash can and went on to state that, later, a paper towel had been retrieved
from the trash. The Recommendation of the Magistrate Judge made no mention
at all about the testimony of a neighbor who was outside observing the area
because her child was playing with Norman's child that she did not see Norman
place anything into the trash can.

Conway confronted Norman at the front door of the residence. The
Magistrate Judge found: "Conway identified himself and told Norman that he had
complaints of drug activity at the residence, and asked whether Norman would
give consent to search the home. Norman said that he would not consent."
(Recommendation of the Magistrate Judge, p. 4). The Magistrate Judge went on
to state the following with respect to this: "Conway told Norman again to take his
hands out of his pockets When he did not comply. Conway drew his weapon and
pulled Norman's son behind him . . . .Conway turned Norman around, made him
put his hands up against the wall of the house, and patted him down to ensure

that he did not have any weapons." (Recommendation of the Magistrate Judge, p. 4). "Although the tip may have been a factor in Conway's decision to conduct a <u>Terry</u> search for weapons, it was not the primary one. Here, Conway's personal observation that Norman repeatedly reached into his pockets, which were large enough to conceal a weapon – and did not desist when he was asked to do so at least twice – caused Conway to conduct a search. ... The tip – along with the fact that Norman left the house with a white package right after the phone call (which Norman did not at that time know to have been placed to a wrong number), and the fact that he knew Norman from earlier investigative activities – simply provided additional context and reason for Conway's suspicions. The Court finds Conway's belief that Norman was armed and presently dangerous to Conway to others to be reasonable under the circumstances." (Recommendation of the Magistrate Judge, p. 8).

Pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), "law enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in criminal activity." <u>United States v. Powell</u>, 222 F.3d 913, 917 (11th Cir. 2000). In <u>Florida v. J. L.</u>, 529 U.S. 266 (2000), the Supreme Court of the United States held that an anonymous tip containing no predictive information but providing information describing a person's location and appearance and stating that the person was carrying a gun did not give rise to a reasonable suspicion of illegal activity and did not justify a <u>Terry</u> stop.

A law enforcement agent who makes a proper <u>Terry</u> stop may conduct a limited pat-down frisk of the subject's outer clothing if he or she has a reasonable belief that the subject poses a safety threat. <u>Terry</u>, 392 U.S. at 28, 30; <u>Ybarra v. Illinois</u>, 444 U.S. 85, 92-93 (1979). This pat-down must be limited to a search for weapons and cannot be used to search for evidence of criminal activity. <u>Terry</u>, 392 U.S. at 29-20.

In this case, as in <u>Florida v. J. L.</u>, the anonymous tip referenced by Montgomery police officer J. T. Conway lacked sufficient indicia of reliability to establish reasonable suspicion for a <u>Terry</u> investigation of Alphonso Norman.

In this case, law enforcement agents searched Alphonso Norman's pockets and seized an amount of cash. (The defense anticipates that the prosecution will claim this to be incriminating evidence.) In doing so, law enforcement agents did not have any reasonable belief that Alphonso Norman posed a safety threat. Further, their search of his pockets exceeded a check for weapons and went into a search for evidence of criminal activity.

Potentially incriminating evidence was seized by Conway from a trash receptacle located at 2429 East Fourth Street. There was no probable cause for Conway to search through the trash receptacle. Furthermore, Conway searched the trash receptacle without a warrant and without the existence of any exceptions to the warrant requirement.

The affidavit stated that "Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence." Peralte's presence inside of the house was unknown to Conway until Conway had left East Fourth Street to find a

9

judge, and another police officer, M. N. Drummond, had gone into the house without a warrant and looked around and had called Conway and told him about Peralte. The Magistrate Judge stated: "Conway drove back to the Narcotics office and began typing the affidavit and warrant. Meanwhile, the remaining officers heard noise in the house. Drummond asked Norman if there were anybody else in the house. Norman replied that his son was there. But a woman standing next door said that the boy was with her. Drummond asked Norman again who was in the house, and Norman looked away and would not say anything. Drummond then 'got a bad feeling about it, I was kind of worried about the officers being out there, there could be somebody that could be harmful to us in there.' Drummond and Caviness went in the house and Drummond saw Defendant Peralte walking from the laundry room into the den. Drummond asked Peralte to step outside. They all exited the house. Drummond advised Conway by radio the identity of the person whom they have found in the house." [4] [5] (Recommendation of the Magistrate Judge, pp. 5-6). The affidavit made no mention of Drummond's venture into the house.

Cleansed of the statements regarding the trash receptacle, the telephone number and call, and Peralte's presence in the house, the affidavit did not establish probable cause. Other statements such as: "Further probable cause being that Alfonzo Norman and Andrew Kenneth James are known drug dealers

---

[4] At the suppression hearing, though Drummond claimed he had entered the house for safety reasons, he said that he did not have his weapon drawn.

[5] There was evidence at the suppression hearing that by the time Drummond went into the house, Alphonso Norman and Andrew Kenneth James had been taken away.

in the Montgomery, Alabama are "only sophistry to illustrate an illusion of ongoing cocaine sales from the house," Ex parte Parker, 2003 WL 1333243 (Ala. 2003), and did not contain sufficient facts and circumstances to enable the issuing authority to make an independent evaluation of probable cause.

Even with the statements regarding the trash receptacle and the telephone number and call, the affidavit did not establish an independent, substantial basis for finding probable cause.

Based upon the foregoing, Defendant Alphonso Norman submits that information obtained from the investigatory encounter with Alphonso Norman, the search of Alphonso Norman's pockets, and the search of the trash receptacle at 2429 East Fourth Street, and the search of the residence located at 2429 East Fourth Street were conducted in violation of the Fourth Amendment.

WHEREFORE, Defendant Alphonso Norman moves this Court reject the recommendation of the Magistrate Judge in this matter and to hear the motion de novo.

BRUCE MADDOX
Ala. S.J.I.S. MAD013
Law Offices of Bruce Maddox
6728 Taylor Court
Montgomery AL 36117
PH: 334.244.7333
FX: 334.260-9600

THOMAS M. GOGGANS
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery AL 36106
PH: 334.834.2511
FX: 334.834.2512

Attorneys for Defendant
Alphonso Norman

By:

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

Todd A. Brown
Assistant United States Attorney
P.O. Box 197
Montgomery AL 36101

by placing the same in the United States mail, first class postage prepaid and

properly addressed on this the 29th day of January, 2004.

Thomas M. Goggans

12

03 0064
7AB

**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FEB - 3 2004

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CR. NO. 03-229-N |
| | ) | |
| ALPHONSO NORMAN | ) | |
| CAPULCO PERALTE | ) | |

## ORDER

The undersigned filed a recommendation concerning the pending suppression motions in this case on January 16, 2004. In his objection filed January 22, 2004, defendant Capulco Peralte points out that on page 7 paragraph one of the Recommendation the Court incorrectly stated that Corporal J. T. Conway learned of a transposition error in a telephone number when he was on the witness stand during a detention hearing held in this case.

Accordingly, and for good cause, it is

ORDERED that the sentence beginning "Conway did not learn ..." at lines 1-3 on page 7 of the Recommendation be CORRECTED to read as follows: "Conway did not learn of the error until after Detective Gene Sisson was confronted with the mistake when Sisson was on the witness stand in a detention hearing in this case, well after the arrest of the defendants."



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. H

Done this 32d day of February, 2004.

SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

03 0064
TAB

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
VS.                               )   CASE NO. CR-03-229-N
                                  )
ALPHONSO NORMAN                   )

### MOTION TO RE-OPEN HEARING ON MOTION TO SUPPRESS

Comes now Defendant Alphonso Norman, by and through counsel, and shows as follows:

1.  During the hearing on Alphonso Norman's motion to suppress, questions were raised as to the time and place that a search warrant purported to authorize a search of 2429 East Fourth Street in Montgomery, Alabama was signed.

2.  During the course of discovery, counsel for the government produced a copy of an affidavit purported to support the issue of a warrant to search 2429 East Fourth Street and a warrant to search 2429 East Fourth Street.  A copy of that affidavit is attached as Exhibit A.  A copy of that warrant is attached as Exhibit B.

3.  On February 3, 2004, counsel noticed that a copy of an affidavit and a copy of a warrant relating to 2429 East Fourth Street produced from a different source were different from those produced by counsel for the government.  The signatures and written inserts on these appear to be different.  A copy of this affidavit is attached as Exhibit C.  A copy of this warrant is attached as Exhibit D.

1

GOVERNMENT
EXHIBIT

CASE
NO.   03-229-N

EXHIBIT
NO.   I

UNDER THESE CIRCUMSTANCES, Defendant Alphonso Norman moves this Court to re-open the suppression hearing so that evidence can be taken as to this discrepancy and further moves this Court to order that the originals of the affidavit(s) and warrant(s) be produced.

BRUCE MADDOX
Ala. S.J.I.S. MAD013
Law Offices of Bruce Maddox
6728 Taylor Court
Montgomery AL 36117
PH: 334.244.7333
FX: 334.260-9600

THOMAS M. GOGGANS
Ala. S.J.I.S. GOG001
2030 East Second Street
Montgomery AL 36106
PH: 334.834.2511
FX: 334.834.2512

Attorneys for Defendant
Alphonso Norman

By

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

Todd A. Brown
Assistant United States Attorney
P.O. Box 197
Montgomery AL 36101

by placing the same in the United States mail, first class postage prepaid and properly addressed on this the 4th day of February, 2004.

Thomas M. Goggans

2

# AFFIDAVIT IN SUPPORT OF A
# SEARCH WARRANT
# KNOCK SEARCH WARRANT

CITY OF MONTGOMERY
COUNTY OF MONTGOMERY
STATE OF ALABAMA

KI-00-0075

I, Corporal J. T. Conway, state the following is true and correct:

I am a duly authorized Police Officer for the City of Montgomery. I have been employed as a Police Officer for 14 years and have spent the last 9 years in the Narcotics Bureau. I have reason to believe and do believe that controlled substances, are being kept, stored and/or sold from within 2429 East 4th Street, Montgomery, Alabama. The controlled substances are possibly being kept, stored and/or sold by a black male Alfonzo Norman, DOB . This is in violation of the Code of Alabama 1975, Section 13A-12-211, 212 and 231. Probable cause for this search warrant is as follows:

On September 25, 2003, Corporal J. T. Conway received a telephone call from a subject who will hereinafter be referred to as "A". "A" advised that he/she knew of drug activity at 2429 East 4th Street, Montgomery, Alabama. "A" advised that he/she knew that the drug activity always picked up when a black male subject driving a maroon vehicle arrived at the residence. "A" advised that the vehicle always backed up beside the residence and that he/she was unable to obtain the tag number. "A" advised that the telephone number to the residence was 334-262-3477.

Corporal J. T. Conway and other members of the Special Operations Division went to the residence to investigate. Corporal D. D. Alexander called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence. Corporal Conway was parked in a location to watch the residence when the telephone call was made. Corporal Conway observed Alfonzo Norman exited the residence and walked to the trash can that was placed on the street. Alfonzo placed something in the trash can and returned to the residence.

Corporal Conway and other members of the Narcotics Bureau approached the residence. Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence. Corporal Conway told Norman why the officers were at his residence and he became very defensive and said that he wanted a lawyer. Corporal Conway walked to the trash

can that was placed on the street. After looking in the can, Corporal Conway located a paper towel that contained a quantity of what was believed to be crack cocaine. Corporal Conway field tested the substance and it field tested positive for cocaine.

Further probable cause being that Alfonzo Norman and Andrew Kenneth James are known drug dealers in the Montgomery, Alabama area.

This information is based on my experience and the experience and assistance of other law enforcement officers and is made for the purpose of securing a search warrant for 2429 East 4th Street, Montgomery, Alabama, for cocaine and any other controlled substances, to include: precursors, drug paraphernalia, drug buy money, drug monies, documents, and any items listed in attachment I. AND ANY VEHICLES AT THE RESIDENCE. JTC.

Sworn before and subscribed to by me _Sept 25 Les Hayes_, Judge of the Municipal Court of Montgomery, Alabama on September 25, 2003.

Corporal J. T. Conway, ID #258
Montgomery Police Department
Montgomery, Alabama

Municipal Court Judge
Municipal Court
Montgomery, Alabama

# SEARCH WARRANT

STATE OF ALABAMA )
COUNTY OF MONTGOMERY )
CITY OF MONTGOMERY )

## TO ANY SHERIFF, DEPUTY, MUNICIPAL OFFICER OR CHIEF OF POLICE:

Proof of affidavits which are attached hereto and incorporated by reference, having been made this day before me, by Corporal J. T. Conway with the Special Operations Division, Narcotics and Intelligence Bureau of the Montgomery Police Department, Montgomery, Alabama. You are hereby commanded to make immediate search of the premises of:

**2429 East 4th Street, Montgomery, Alabama.**

For the following property: controlled substances, controlled substance paraphernalia, drug related documents, monies, drug records, and any items listed in Attachment I. If you find the same or any part thereof, to bring it forthwith before me, at my office at Municipal Court, Montgomery County, Alabama; or if the said warrant is issued for violations of a state law, return the same to any State Court.

Dated this ___25___ day of ___Sept._____, 2003.

_____

Judge, Municipal Court
City of Montgomery
Montgomery, Alabama

EXHIBIT B

## AFFIDAVIT IN SUPPORT OF A
## SEARCH WARRANT
## KNOCK SEARCH WARRANT

CITY OF MONTGOMERY
COUNTY OF MONTGOMERY
STATE OF ALABAMA

I, Corporal J. T. Conway, state the following is true and correct:

I am a duly authorized Police Officer for the City of Montgomery. I have been employed as a Police Officer for 14 years and have spent the last 9 years in the Narcotics Bureau. I have reason to believe and do believe that controlled substances, are being kept, stored and/or sold from within 2429 East 4th Street, Montgomery, Alabama. The controlled substances are possibly being kept, stored and/or sold by a black male Alfonzo Norman, DOB. This is in violation of the Code of Alabama 1975, Section 13A-12-211, 212 and 231. Probable cause for this search warrant is as follows:

On September 25, 2003, Corporal J. T. Conway received a telephone call from a subject who will hereinafter be referred to as "A". "A" advised that he/she knew of drug activity at 2429 East 4th Street, Montgomery, Alabama. "A" advised that he/she knew that the drug activity always picked up when a black male subject driving a maroon vehicle arrived at the residence. "A" advised that the vehicle always backed up beside the residence and that he/she was unable to obtain the tag number. "A" advised that the telephone number to the residence was 334-262-3477.

Corporal J. T. Conway and other members of the Special Operations Division went to the residence to investigate. Corporal D. D. Alexander called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence. Corporal Conway was parked in a location to watch the residence when the telephone call was made. Corporal Conway observed Alfonzo Norman exited the residence and walked to the trash can that was placed on the street. Alfonzo placed something in the trash can and returned to the residence.

Corporal Conway and other members of the Narcotics Bureau approached the residence. Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence. Corporal Conway told Norman why the officers were at his residence and he became very defensive and said that he wanted a lawyer. Corporal Conway walked to the trash

EXHIBIT C

can that was placed on the street. After looking in the can, Corporal Conway located a paper towel that contained a quantity of what was believed to be crack cocaine. Corporal Conway field tested the substance and it field tested positive for cocaine.

Further probable cause being that Alfonzo Norman and Andrew Kenneth James are known drug dealers in the Montgomery, Alabama area.

This information is based on my experience and the experience and assistance of other law enforcement officers and is made for the purpose of securing a search warrant for 2429 East 4th Street, Montgomery, Alabama, for cocaine and any other controlled substances, to include: precursors, drug paraphernalia, drug buy money, drug monies, documents, and any items listed in attachment I. AND ANY VEHICLES AT THE RESIDENCE. JR

Sworn before and subscribed to by me _Les Hayes III_ , Judge of the Municipal Court of Montgomery, Alabama on September 25, 2003.

Corporal J. T. Conway, ID #258
Montgomery Police Department
Montgomery, Alabama

Municipal Court Judge
Municipal Court
Montgomery, Alabama

# SEARCH WARRANT

STATE OF ALABAMA          )
COUNTY OF MONTGOMERY )
CITY OF MONTGOMERY      )

## TO ANY SHERIFF, DEPUTY, MUNICIPAL OFFICER OR CHIEF OF POLICE:

Proof of affidavits which are attached hereto and incorporated by reference, having been made this day before me, by Corporal J T Conway with the Special Operations Division Narcotics and Intelligence Bureau of the Montgomery Police Department, Montgomery, Alabama. You are hereby commanded to make immediate search of the premises of

**2429 East 4th Street, Montgomery, Alabama.**

For the following property   controlled substances, controlled substance paraphernalia, drug related documents, monies, drug records, and any items listed in Attachment I. If you find the same or any part thereof, to bring it forthwith before me, at my office at Municipal Court, Montgomery County, Alabama; or if the said warrant is issued for violations of a state law, return the same to any State Court

Dated this __25__ day of __Sept.__ _____, 2003.

_____
Judge, Municipal Court
City of Montgomery
Montgomery, Alabama

RECEIVED **IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
2004 FEB -6 P 1: 29        **NORTHERN DIVISION**

UNITED STATES OF AMERICA          )
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA
VS                                )    CASE NO. CR-03-229-N

ALPHONSO NORMAN                   )

## MOTION TO QUASH SEARCH WARRANT

COMES NOW the Defendant Alphonso Norman by and through his co-counsel,

Leonard Arrington, submits this Motion to Quash Search Warrant and for grounds says as

follows:

1. On or about September 25, 2003, a search warrant and affidavit was allegedly

executed by Officer Conway and a Municipal Judge.

2. The alleged search warrant and affidavit were drafted by a Montgomery

County police officer and allegedly executed by a Montgomery County Municipal Judge.

3. The forms and rules regarding the search warrant and affidavit are governed

by the State law of Alabama.  Rule 3.10 <u>ARCP</u> states as follows:

Rule 3.10 <u>Contents of Search Warrants</u>
<u>Time of Execution</u>

The Search Warrant shall be directed to and served by a law
enforcement officer as defined by Rule 1.4(p).  It **shall**
command such officer to search, within a specified period of
time not to exceed (10) ten days, the person or place named
for the property specified and to bring an inventory of said
property before the court issuing the warrant.  The warrant **shall**
designate the Judge or Magistrate to whom an inventory of the
property specified shall be returned.  The Judge or Magistrate **shall**
endorse the warrant, showing the hour, date and the name of the
law enforcement officer to whom the warrant was delivered for
execution.

1

GOVERNMENT
EXHIBIT

CASE
NO.  O3-229-N

EXHIBIT
NO.      5

4. A cursory review of the affidavit and arrest warrant reveals that Detective Conway did not follow the rules as set out in Rule 3.10 ARCP. There was no **hour/time** shown when the warrant was signed by the Magistrate and delivered back to Conway for execution. The legislative intent for requiring that the Judge or Magistrate issuing the Search Warrant place an **hour (time)** on the warrant was to **prevent** the very same issue presented in the case of Alphonso Norman. There is a grave discrepancy as to whether Detective Conway had a Search Warrant signed by a Judge or Magistrate at the time the search began at the residence.

5. Detective Conway testified that he is a seasoned officer, and being a seasoned officer, Detective Conway knew or should have known the provisions set out in the Alabama Rules of Criminal Procedure regarding search warrants and affidavits. Detective Conway should have been aware of Form 15. Search Warrant which is a blank form found in ARCP which outlines the format for a search warrant. **See Ex. (A) attached hereto.**

6. During the detention hearing of Defendant Norman, at Page 63 starting at line 1 through 16, the following colloquy occurred:

MR. MADDOX: Mere presence. That's right, Your Honor.

THE COURT: All right. Those are all the circumstances that will weigh into the Court's consideration of all the evidence. The Court, however, will not conduct a trial today for the purposes of determining whether or not a phone call was made, as alleged.

MR. MADDOX: May –

2

THE COURT: In essence, I **overrule** any request for the **search warrant** used at the municipal court to secure the search warrant for this residence on September 25.

MR. MADDOX: Will the Court take custody to make a part of the court file, sealed, the affidavit that he has in his custody?

THE COURT: The Court will take that under advisement. At this point, the ruling is no.

MR. MADDOX: All right. Thank you, Your Honor.

7. The attorney for Defendant Norman was unable to acquire or review the original affidavit and search warrant. The attorney utilized his secretary to get a copy of the search warrant and affidavit from the Municipal Court under the Freedom of Information Act.

8. The Defendant Norman's attorney was provided a copy of the alleged warrant and affidavit through discovery. **See Ex. (B) attached hereto.**

9. The secretary for Norman's attorney acquired a copy of the search warrant and affidavit from the City of Montgomery under the Freedom of Information Act. **See Ex. (C) attached hereto.**

10. A cursory review of the signature pages of the (2) two documents marked as Exhibits B & C, clearly shows that the signatures allegedly made by the **Magistrate** are not the same. The Defendant does not have access to the original search warrant, however, the Court has the power to issue an Order that the original affidavits be

presented to a handwriting expert of the Court's choice and a report be made to the Court of the findings.

11. The Defendant Norman contends that the residence was searched prior to the execution/signing of the search warrant by the Magistrate, therefore the timeline is very important to the defense in that if the Magistrate/Judge had placed a time on the search warrant when it was issued there would be no question as to whether the search of the residence began prior to the signing.

12. As to whether the same individuals signed the (2) two search warrants and affidavits attached hereto as exhibits.

13. In reviewing the two documents attached hereto, it appears on its face that Mr. Norman has **suffered** a **grave injustice** due to the fact that the documents clearly show that the signatures on the documents in question are "strange" to say the least.

**WHEREFORE THE AFOREMENTIONED CONSIDERED,** the Defendant Alpfonso Norman prays that this Honorable court will review the attached documents and Order the following:

a). That the Government produce the originals of the attached documents to be reviewed *in camera* by the Court.

b). That the Court appoint/select a handwriting expert to make a determination on the signatures on the documents.

c). That in the alternative the Court rules that the Search Warrant is invalid on its face and thus should be quashed.

d). That this Honorable Court order that the search warrant in question be

**quashed** on its face, or in the alternative, that an immediate hearing be set on the

Defendant's **Motion to Quash** the Search Warrant.


**RESPECTFULLY SUBMITTED** this the 6th day of February, 2004.

LEONARD ARRINGTON, SR. (ARR002)
517 Rosa L. Parks Avenue
Montgomery, AL 36108
PH: 334.262.2020
FX: 334.262.2047

Cc: Bruce Maddox, Attorney for Defendant
    Thomas M. Goggans, Attorney for Defendant

5

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing upon:

    Todd A. Brown
    Assistant United States Attorney
    P. O. Box 197
    Montgomery, AL 36101

by placing the same in the United States Mail, first class postage prepaid and properly

addressed on this the 6th day of February, 2004.

Leonard Arrington, Sr.

APPENDIX OF FORMS          Form 15

Affiant shows that based on the above and foregoing facts and information, affiant has probable cause to believe that the above described property is concealed upon the aforesaid (premises) (person) (vehicle) and is subject to seizure and makes this affidavit so that a warrant may issue to search the said (premises) (person) (vehicle).

_____
Signature of Affiant

_____
Agency and Title

Sworn to and Subscribed before
me this the _____ day of
_____, 19___.

_____

Judge/Magistrate

Rule 3.9

## FORM 15.  SEARCH WARRANT

[  ] State of Alabama

[  ] Municipality of
_____

                v.
_____
        Defendant

_____
Warrant Number
_____
Case Number

STATE OF ALABAMA
In the _____ Court
of _____ County
[The City/Town of
_____]

TO ANY LAW ENFORCEMENT OFFICER WITHIN THE STATE OF ALABAMA:

Affidavit in support of application for a search warrant having been made before me, and the Court's finding that grounds for the issuance exist or that is probable cause to believe that they exist, pursuant to Rule 3.8, Alabama Rules of Criminal Procedure, you are hereby ordered and authorized to forthwith search:

THE FOLLOWING PERSON OR PLACE: _____

_____

_____

605



Form 15          RULES OF CRIMINAL PROCEDURE

FOR THE FOLLOWING PROPERTY: _____
_____
_____
_____

and make return of this warrant and an inventory of all property seized thereunder before me within _____ (____) days [not to exceed ten (10) days] as required by law.

[  ] This warrant may only be executed
    [   ] in the daytime between the hours of
        _____ ___.M., and
        _____ ___.M.
[  ] The Court finds probable cause to believe that a nighttime search is necessary, and this warrant may be executed at any time of the day or night.

ISSUED TO: _____ (name and agency of officer) at _____ o'clock, ___.M., this _____ day of _____, 19___.

_____
Judge (Magistrate *)

* If authorized to practice law in the State of Alabama
(Back of Search Warrant)

Return and Inventory

I certify that I executed the foregoing Search Warrant as directed therein by searching the person or place therein described at _____ o'clock ___.M., _____, 19___, and:

[  ] Did not find and seize any property located thereon.

or:

[  ] Found and seized the following-described property and made return of same to the Court at _____ o'clock ___.M., _____, 19___:
_____
_____
_____
_____

[  ] Copy of warrant and endorsed copy of inventory left in accord- ance with Rule 3.11(a), Ala.Rules of Crim.Proc.

Date: _____          _____
                            Signature of Law Enforcement Officer

                            _____
                            Title and Agency

606

## AFFIDAVIT IN SUPPORT OF A
## SEARCH WARRANT
## KNOCK SEARCH WARRANT

CITY OF MONTGOMERY
COUNTY OF MONTGOMERY
STATE OF ALABAMA

KI-00-0075

I, Corporal J. T. Conway, state the following is true and correct:

I am a duly authorized Police Officer for the City of Montgomery. I have been employed as a Police Officer for 14 years and have spent the last 9 years in the Narcotics Bureau. I have reason to believe and do believe that controlled substances are being kept, stored and/or sold from within 2429 East 4th Street, Montgomery, Alabama. The controlled substances are possibly being kept, stored and/or sold by a black male Alfonzo Norman, DOB . This is in violation of the Code of Alabama 1975, Section 13A-12-211, 212 and 231. Probable cause for this search warrant is as follows:

On September 25, 2003, Corporal J. T. Conway received a telephone call from a subject who will hereinafter be referred to as "A". "A" advised that he/she knew of drug activity at 2429 East 4th Street, Montgomery, Alabama. "A" advised that he/she knew that the drug activity always picked up when a black male subject driving a maroon vehicle arrived at the residence. "A" advised that the vehicle always backed up beside the residence and that he/she was unable to obtain the tag number. "A" advised that the telephone number to the residence was 334-262-3477.

Corporal J. T. Conway and other members of the Special Operations Division went to the residence to investigate. Corporal D. D. Alexander called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence. Corporal Conway was parked in a location to watch the residence when the telephone call was made. Corporal Conway observed Alfonzo Norman exited the residence and walked to the trash can that was placed on the street. Alfonzo placed something in the trash can and returned to the residence.

Corporal Conway and other members of the Narcotics Bureau approached the residence. Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence. Corporal Conway told Norman why the officers were at his residence and he became very defensive and said that he wanted a lawyer. Corporal Conway walked to the trash

GOVERNMENT
EXHIBIT
B

DEFENDANT
EXHIBIT
B

000072

can that was placed on the street. After looking in the can, Corporal Conway located a paper towel that contained a quantity of what was believed to be crack cocaine. Corporal Conway field tested the substance and it field tested positive for cocaine.

Further probable cause being that Alfonzo Norman and Andrew Kenneth James are known drug dealers in the Montgomery, Alabama area.

This information is based on my experience and the experience and assistance of other law enforcement officers and is made for the purpose of securing a search warrant for 2429 East 4th Street, Montgomery, Alabama, for cocaine and any other controlled substances, to include: precursors, drug paraphernalia, drug buy money, drug monies, documents, and any items listed in attachment I. *AND ANY VEHICLES AT THE RESIDENCE. JTC.*

Sworn before and subscribed to by me _Sept 25 Les Hay___, Judge of the Municipal Court of Montgomery, Alabama on September 25, 2003.

Corporal J. T. Conway, ID #258
Montgomery Police Department
Montgomery, Alabama

Municipal Court Judge
Municipal Court
Montgomery, Alabama

000073

# SEARCH WARRANT

STATE OF ALABAMA          )
COUNTY OF MONTGOMERY )
CITY OF MONTGOMERY      )

**TO ANY SHERIFF, DEPUTY, MUNICIPAL OFFICER OR CHIEF OF POLICE:**

Proof of affidavits which are attached hereto and incorporated by reference, having been made this day before me, by Corporal J. T. Conway with the Special Operations Division, Narcotics and Intelligence Bureau of the Montgomery Police Department, Montgomery, Alabama. You are hereby commanded to make immediate search of the premises of:

**2429 East 4th Street, Montgomery, Alabama.**

For the following property: controlled substances, controlled substance paraphernalia, drug related documents, monies, drug records, and any items listed in Attachment I. If you find the same or any part thereof, to bring it forthwith before me, at my office at Municipal Court, Montgomery County, Alabama; or if the said warrant is issued for violations of a state law, return the same to any State Court.

Dated this ___25___ day of ___Sept._____, 2003.

_____

Judge, Municipal Court
City of Montgomery
Montgomery, Alabama

## AFFIDAVIT IN SUPPORT OF A
## SEARCH WARRANT
## KNOCK SEARCH WARRANT

### CITY OF MONTGOMERY
### COUNTY OF MONTGOMERY
### STATE OF ALABAMA

I, Corporal J. T. Conway, state the following is true and correct:

I am a duly authorized Police Officer for the City of Montgomery. I have been employed as a Police Officer for 14 years and have spent the last 9 years in the Narcotics Bureau. I have reason to believe and do believe that controlled substances, are being kept, stored and/or sold from within 2429 East 4th Street, Montgomery, Alabama. The controlled substances are possibly being kept, stored and/or sold by a black male Alfonzo Norman, DOB . This is in violation of the Code of Alabama 1975, Section 13A-12-211, 212 and 231. Probable cause for this search warrant is as follows:

On September 25, 2003, Corporal J. T. Conway received a telephone call from a subject who will hereinafter be referred to as "A". "A" advised that he/she knew of drug activity at 2429 East 4th Street, Montgomery, Alabama. "A" advised that he/she knew that the drug activity always picked up when a black male subject driving a maroon vehicle arrived at the residence. "A" advised that the vehicle always backed up beside the residence and that he/she was unable to obtain the tag number. "A" advised that the telephone number to the residence was 334-262-3477.

Corporal J. T. Conway and other members of the Special Operations Division went to the residence to investigate. Corporal D. D. Alexander called the telephone number at the residence and told the subject that answered the phone that the police were on the way to the residence. Corporal Conway was parked in a location to watch the residence when the telephone call was made. Corporal Conway observed Alfonzo Norman exited the residence and walked to the trash can that was placed on the street. Alfonzo placed something in the trash can and returned to the residence.

Corporal Conway and other members of the Narcotics Bureau approached the residence. Alfonzo Norman, Andrew Kenneth James and Capolco Peralte were inside the residence. Corporal Conway told Norman why the officers were at his residence and he became very defensive and said that he wanted a lawyer. Corporal Conway walked to the trash

DEFENDANT
EXHIBIT
C

can that was placed on the street. After looking in the can, Corporal Conway located a paper towel that contained a quantity of what was believed to be crack cocaine. Corporal Conway field tested the substance and it field tested positive for cocaine.

Further probable cause being that Alfonzo Norman and Andrew Kenneth James are known drug dealers in the Montgomery, Alabama area.

This information is based on my experience and the experience and assistance of other law enforcement officers and is made for the purpose of securing a search warrant for 2429 East 4th Street, Montgomery, Alabama, for cocaine and any other controlled substances, to include: precursors, drug paraphernalia, drug buy money, drug monies, documents, and any items listed in attachment I. *AND ANY VEHICLES AT THE RESIDENCE. JTC*

Sworn before and subscribed to by me *Les Hayes III*, Judge of the Municipal Court of Montgomery, Alabama on September 25, 2003.


Corporal J. T. Conway, ID #258
Montgomery Police Department
Montgomery, Alabama

Municipal Court Judge
Municipal Court
Montgomery, Alabama

# SEARCH WARRANT

STATE OF ALABAMA      )
COUNTY OF MONTGOMERY )
CITY OF MONTGOMERY     )

TO ANY SHERIFF, DEPUTY, MUNICIPAL OFFICER OR CHIEF OF POLICE:

Proof of affidavits which are attached hereto and incorporated by reference, having been made this day before me, by Corporal J. T. Conway with the Special Operations Division, Narcotics and Intelligence Bureau of the Montgomery Police Department, Montgomery, Alabama. You are hereby commanded to make immediate search of the premises of:

**2429 East 4th Street, Montgomery, Alabama.**

For the following property: controlled substances, controlled substance paraphernalia, drug related documents, monies, drug records, and any items listed in Attachment I. If you find the same or any part thereof, to bring it forthwith before me, at my office at Municipal Court, Montgomery County, Alabama; or if the said warrant is issued for violations of a state law, return the same to any State Court.

Dated this ___25___ day of ___Sept.___ , 2003.

_____

Judge, Municipal Court
City of Montgomery
Montgomery, Alabama

03.0064
JCB 3-24-04
TAB

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
vs                             )      CR NO. 03-229-N
                               )
ALPHONSO NORMAN                )
ANDREW K. JAMES                )
CAPULCO PERALTE                )

### MOTION FOR OUT OF TIME FILING OF
### SUPPLEMENT TO MOTION TO SUPPRESS

COMES NOW the Defendant Alphonso Norman (hereinafter referred to as Norman), by and

through counsel, and submits this Motion for Out of Time Filing of Supplement to Motion to

Suppress. As grounds hereof, Norman would show unto the Court that:

1.     An issue as to suppression may have been inadvertently omitted previously. Counsel

believes that Rule 41 of the *Federal Rules of Criminal Procedure* requires suppression in a Federal

prosecution of items seized in a Federal investigation where a City of Montgomery magistrate judge

(which is not a court of record) issued the search warrant. The District Court never acquired

jurisdiction over Norman by reason of the Montgomery city magistrate issuing a warrant returnable

only in State court where the investigation was, at its outset, a Federal investigation.

The Montgomery city magistrate did not have jurisdiction to issue a warrant underlying a

Federal charge. The Government, therefore, impermissibly used Norman's evidence against him in

obtaining the Indictment. Rule 41, entitled Search and Seizure, as amended, states as follows:



**GOVERNMENT
EXHIBIT**

CASE
NO.  03-229-N

EXHIBIT
NO.  K

## "RULE 41.  SEARCH AND SEIZURE

(b)    **Authority to Issue Warrant.**  At the request of a federal law enforcement officer or an attorney for the government:

(1)    a magistrate judge with authority in the district - or if none is reasonably available, a judge of a state court of record in the district has authority to issue a warrant to search for and seize a person or property within the district . . .

. . . (d) **Obtaining a Warrant**.

(1)    Probable cause.  After receiving an affidavit or other information, a magistrate judge or a judge of a state court of record must issue the warrant if there is probable cause to search for and seize a person or property under Rule 41(c)."

Rule 41 emphasizes in at least two provisions that the issuing authority has to be either a federal magistrate or a state judge of a state court of record. *Blacks Law Dictionary*, Fifth Edition, defines "court of record" as follows:

". . .*Court of record.*  A court that is required to keep a record of its proceedings, and that may fine or imprison.  Such record imports verity and cannot be collaterally impeached."

This was a federally involved investigation, initiated by the Federal State Task Force (HIDTA).  All forms and statements were used by HIDTA Task Force with the reports on the initial file opening the case and subsequent reports being maintained on "The U.S. Department of Justice Drug Enforcement Administration Form" (DEA Form 6, Revised August 6, 1994). (See bates-stamped documents 0096-00139).  In support of the facts showing the Federal nature of this investigation, the forensic testing of illegally seized drugs was performed by DEA laboratories in Texas by the respective Federal agents and/or employees.

Since a City of Montgomery magistrate judge, who was not a judge of a court of record,

2

executed the search warrant utilized in this case; and since this investigation was purely a Federal investigation from its inception, Rule 41, *F.R.CR.P.*, precluded the use of the Search Warrant and its inventory obtained in this case.

> "(C)   This Court decided in *Navarro v United States*, 5 Cir. 1968, 400 F.2d 315, in applying Rule 41(a), that a valid search warrant for a federal search which culminates in a federal prosecution may, if issued by a state court, be issued only by a state court of record. That decision is binding upon this panel in this appeal.
>
> . . . Under *Navarro, supra,* the question of whether or not a state court satisfies the "court of record" requirements of Rule 41(a) must be determined by reference to state law and not be attempted federal interpretation of the language of Rule 41(a).
>
> [5]   Evidence obtained in a federal search pursuant to a search warrant issued by a state court not a court of record under state law is inadmissible in a federal prosecution.
>
> The judgments of conviction appealed from are Reversed."
>
> *U.S. v Hanson*, 469 F.2d 1375, 1376, 1377 (1972 5thCir.C.A.)
>
> See also the following:
>
> "There is relatively little case law on the question how far the failure of a warrant to conform to provisions of Rule 41 other than those concerned with the constitutional requirements of description will trigger the exclusionary rule.   While *Navarro* applied the exclusionary rule, the defect there was basic; since the issuing judge was not of "a state court of record", there was in effect no warrant at all for federal purposes."
>
> *U.S. v Burke*, 517 F.2d 377, 385 (1975)

While other circuits have agreed and disagreed with the above-posted opinion, the Eleventh Circuit is still bound under the dictates of *Ex Parte Bonner v. City of Prichard*, 661 F.2d 1206 (11thCir. 1981), to this decision until the cases are overruled.   Counsel has not discovered any new

3

case law of the Eleventh Circuit overruling those prior decisions under which this Circuit is bound.

2.    Additionally, based upon new evidence being presented, as well as testimony provided previously which raises doubts about probable cause as to the trash can search upon which the Government alleged probable cause, Norman respectfully requests that additional testimony be taken on the suppression issues. Norman submits that the warrant was so fatally lacking in any indicia of reliability to pass the *Leon* test. There was no probable cause to have been at the residence in the first place. The affidavit recites, in a conclusory fashion, that an anonymous confidential informant stated that when a maroon car was at the residence that drug activity increased. The affidavit recites no corroborating investigation to support the conclusory statement that drugs were at the residence. The affidavit sets forth no facts to establish the credibility or reliability of the confidential informant. The affidavit contains none of the usual statements concerning the officer's experience with this informant, the reliability of past information and corroboration of the informant's information. The affidavit fails to set forth any information concerning how the informant knows Norman; how the informant knows Norman is distributing cocaine; and fails to establish the relationship between Norman and the residence in so far as any illegal activity carried on or engaged in there by Norman. The statement of the anonymous confidential informant that drug activity picks up when a maroon car is present is insufficient to establish probable cause because the affidavit contains no facts to demonstrate the veracity of the confidential informant, nor how this knowledge was acquired. "If an informant is mentioned in the affidavit, the affidavit should also demonstrate the informant's "veracity" and "basis of knowledge." *United States v. Martin,* 297 F.3d 1308, 1314 (11th Cir. 2002).

The affidavit recites the conclusory statement by the confidential informant that drug activity

4

picks up when a maroon car was at the premises. The affidavit does not detail the evidence on which the confidential informant bases his or her conclusion. The affidavit does not recite any facts which would indicate that the confidential informant personally observed the driver of the maroon car distributing cocaine nor does the affidavit recite any facts which would support a conclusion that there was cocaine or drug trafficking occurring in the residence whenever the maroon car was present. There was no correlation provided that the driver of the maroon car was in any way connected to drug activity, particularly in connection with any nexus to the residence when the search occurred. There is nothing in the warrant which shows any connection between Norman, the residence and the objects of the search, nor Norman, the maroon car or the driver of the maroon car.

Additionally, the Government, while arguing probable cause arose from Norman allegedly throwing (discarding) something in the trash, have testified that they did not know what Norman discarded. The fingerprint analysis does not implicate Norman's prints on the item allegedly seized from the trash.

The affidavit supporting the warrant fails to establish probable cause that Norman was dealing in drugs. In the absence of probable cause that Norman is trafficking narcotics, there is no basis to conclude that illegal contraband would be found in the home where the mother of his child resided. There are no facts stated to establish probable cause that there existed a fair probability that contraband or evidence of a crime would be found on Norman or at the residence. The Government simply failed to establish in the affidavit any nexus between Norman, the residence, any criminal activities and the presence of the maroon car and/or the driver thereof.

Norman respectfully submits that there did not exist a good faith exception established in *United States v. Leon*, 468 U.S. 897 (1984). In *Leon*, the Supreme Court recognized a good faith

exception to the exclusionary rule for searches conducted pursuant to warrants. Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Court found that this purpose would not be served, and the rule should not be applied, when officers engage in "objectively reasonable law enforcement activity." 468 U.S. at 918-19. In particular, the Court held that the suppression of evidence would have no deterrent effect "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* At 920. Under *Leon,* searches conducted pursuant to warrants will rarely require suppression; however, the *Leon* court did identify four situations in which suppression would still be appropriate. *Id.* At 923. These situations are (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," (2) "where the issuing magistrate wholly abandoned his judicial role," (3) where the "warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,' " and (4) where "a warrant [is] so facially deficient. . . that the executing officers cannot reasonably presume it to be valid." *Id.* (Citations omitted). The *Leon* limitations set out in 3 and 4 as to the warrant are applicable here, as the warrant is based on an affidavit so lacking in any indicia of probable cause as to render official belief in its existence entirely unreasonable. Furthermore, this supports a finding that the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid. The invalidity of the warrant rests on its failure to establish a nexus between Norman's girlfriend's (and child's mother's) residence, Norman and any illegal activities. Under the facts of this case it cannot be said that the officer's belief in the existence of probable cause concerning the residence was reasonable.

6

The proper test focuses not on the officer but on whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. *United States v. Taxacher*, 902 F.2d 867 (11th Cir. 1990). The "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . .may be considered." *Leon*, 468 U.S. at 922 n. 23.

Norman submits that this Honorable Court must conclude that the affidavit supporting the warrant was so lacking in indicia of probable cause as to render official belief in the existence of probable cause entirely unreasonable. At the time Conway sought authority to Norman's residence, the affidavit contains no facts which would show in any reasonable manner that Norman was involved in illegal drug distribution or that any illegal activity had taken place at Norman's residence.

3.    Additionally, and based upon newly discovered facts and/or discrepancies in testimony, the prior Suppression Hearing before the Honorable Susan Russ Walker, Magistrate Judge, may be re-opened. Upon such event, revisiting the suppression issues would be appropriate and non-prejudicial.

WHEREFORE, THE PREMISES CONSIDERED, Norman, by and through counsel, respectfully Moves to allow an amendment to be made to Norman's Motion to Suppress.

Respectfully submitted,

*Donald G. Madison*
DONALD G. MADISON (MAD 008)
Counsel for Defendant Alphonso Norman

7

OF COUNSEL:
DONALD G. MADISON
418 Scott Street
Montgomery, Alabama 36104
Telephone (334) 263-4800
Facsimile (334) 265-8511

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon the following parties, by depositing a copy of the same in the United States mail, postage prepaid, on this the _23ra_ day of March 2004:

Honorable Todd A. Brown
Assistant United States Attorney
Office of the United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197

Honorable Susan James
*JAMES & ASSOCIATES*
Post Office Box 198
Montgomery, Alabama 36101-0198

Honorable Michael Petersen
631 South Perry Street
Montgomery, Alabama   36104-5819

_Donald L. Madison_
OF COUNSEL

8

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 2:03-CR-0229-F |
| | ) | |
| ALPHONSO NORMAN | ) | |

### RESPONSE TO DEFENDANT'S MOTION FOR OUT OF TIME FILING OF SUPPLEMENT TO MOTION TO SUPPRESS

**COMES NOW** the United States of America, by and through Leura Garrett Canary, United States Attorney for the Middle District of Alabama, and files the instant Response to Defendant Alphonso Norman's ("Norman's") Motion for Out of Time Filing of Supplement to Motion to Suppress, filed on or about March 24, 2004, and this Court's Order of April 7, 2004. In support thereof, the Government offers:

1. On March 24, 2004, Norman filed the instant motion. The Government assumes, although Norman does not actually move for it, that Norman is asking for leave to file the instant motion out of time. The United States objects to consideration of the motion as it was filed long after the original deadline of December 10, 2003. Further, previous counsel filed a thorough motion to suppress, upon which this Court conducted a lengthy hearing. Norman states no reason as to why the motion is being filed out of time. Norman provides no showing of prejudice as to why his motion should be considered. Thus, the United States respectfully requests the motion be denied as untimely.

2. Nevertheless, Norman's motion is without merit. Norman claims that he cannot be indicted federally because a City of Montgomery, Alabama municipal court judge issued a search warrant executed in this cause. Norman claims execution of that warrant violates Rule 41, Fed. R. Crim. P., and that Rule 41 requires suppression of the evidence seized pursuant to



CASE NO. 03-229-N

EXHIBIT NO. L

that warrant.

3.  First, the seminal case cited by Norman, <u>United States v. Navarro</u>, 400 F.2d 315 (5th Cir. 1968), is no longer valid law.  <u>United States v. McKeever</u>, 905 F.2d 929, 833 (5th Cir. 1990). In overruling *Navarro*, the Fifth Circuit held that Rule 41 "only applies to warrants issued 'upon the request of a federal law enforcement officer or an attorney for the government'" based on a 1972 amendment to Rule 41 adding that language.  <u>McKeever</u>, 905 F.2d at 833.  In the instant cause, as the requesting officer (Corporal J. T. Conway) was not a federal officer, Norman's claim is without merit.

4.  Second, this case was not, contrary to Norman's assertion, initiated as a federal investigation.  In fact, as the testimony from the previous suppression hearing establishes, the case began as an investigation by the Montgomery Police Department of an anonymous tip.  It was not until the large quantity of drugs was located, after the warrant in question had been executed, that the decision was made to prosecute the case pursuant to federal law.

5.  Third, a municipal judge of the City of Montgomery, Alabama, is authorized to issue search warrants. Ala. Code § 12-14-32 (1975).  Evidence obtained by this "court of record" may be used in federal prosecutions.  Rule 41(d)(1), Fed. R. Crim. P.; <u>see also</u> <u>United States v. Martin</u>, 297 F.3d 1308, 1311 (11th Cir. 2002) (Georgia municipal judge issuing search warrant acceptable); <u>United States v. Sturgeon</u>, 501 F.2d 1270 (8th Cir. 1974) (municipal court judge authorized by state law to issue search warrants, thus no violation of pre-1972 Rule 41, Fed. R. Crim. P.).

6.  Finally, Norman asks for the suppression hearing in this matter be reopened.  The United States objects to reopening the suppression hearing as the only evidence that could be

2

elicited from Norman (that the search warrant was issued by a City of Montgomery municipal judge obtained by a Montgomery Police officer) is already part of the record.

7.    Based on the foregoing, the Government respectfully requests this Court deny Defendant's motion without a hearing.

Respectfully submitted, this the 9th day of April, 2004.

LEURA GARRETT CANARY
UNITED STATES ATTORNEY


s/Todd A. Brown
TODD A. BROWN
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax: (334)223-7135
E-mail: todd.brown@usdoj.gov
ASB-1901-O64T

3

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **CR. NO. 2:03-CR-0229-F** |
| | ) | |
| **ALPHONSO NORMAN** | ) | |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 9, 2004, I electronically filed the foregoing with the Clerk

of the Court using the CM/EFC system which will send notification of such filing to the

following:  Donald G. Madison, Esquire.

Respectfully submitted,

s/Todd A. Brown
TODD A. BROWN
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax: (334)223-7135
E-mail: <u>todd.brown@usdoj.gov</u>
ASB-1901-O64T

4

03 0064
TAB

TAB
4-12-04

**RECEIVED**       IN THE UNITED STATES DISTRICT COURT
                     FOR THE MIDDLE DISTRICT OF ALABAMA
2004 APR -9 P 2: 42        NORTHERN DIVISION

DEBRA P. HACKETT. CLK
   U.S. DISTRICT COURT
UNITED STATES OF AMERICA,          )
MIDDLE DISTRICT ALA
                                   )
vs                                 )    CR NO. 03-229-N
                                   )
ALPHONSO NORMAN                    )
ANDREW K. JAMES                    )
CAPULCO PERALTE                    )

### SUPPLEMENT TO MOTION FOR OUT OF TIME FILING OF SUPPLEMENT TO MOTION TO SUPPRESS

COMES NOW the Defendant Alphonso Norman (hereinafter referred to as Norman), by and

through counsel, and submits this Supplement to Motion for Out of Time Filing of Supplement to

Motion to Suppress. As grounds herefor, Norman would show unto the Court that:

1.      That at the prior Status Conference conducted in this case on or about March 16,

2004, there was discussion regarding one of the issues pertaining to various defense counsels'

contentions concerning certain issues alleged in support of a re-hearing on suppression in this case,

one of which was the handwriting analysis of the expert hired by the defendant Norman, Mr. Richard

E. Roper, as to whether the signatures appearing on the original search warrant issued in this case

were those of City of Montgomery Magistrate Judge, Honorable Les Hayes, III.

2.      The Defendant Norman, at the time of the above referenced Status Conference,

advised this Court (Honorable Judge Fuller, U.S. District Judge) that the original analysis of the

handwriting analysis performed by Mr. Richard Roper did not prove that the signature of Judge

Hayes was one other than Judge Hayes.



**GOVERNMENT EXHIBIT**

CASE NO. 03-229-N

EXHIBIT NO. M

4/4/04

3.    Counsel for the Defendant Norman only informed this Court as to the issue whether the signature was that of Judge Hayes on the search warrants as counsel was not then aware of any other pertinent issues arising from the handwriting analysis.

4.    That the Defendant Norman has retained an additional handwriting expert, Mr. Farrell C. Shiver, a Forensic Document Examiner, with the firm of Shiver and Nelson, of Woodstock, Georgia, whom also reviewed the handwriting analysis provided. Mr. Shiver, for the most part, confirms the result that the signatures are those of Judge Hayes; **however,** Mr. Shiver also expresses an opinion that, based upon his review of the documents (and without having the benefit of the original search warrant which the testimony stated was shredded), it is his opinion that one of the documents that he (Mr. Shiver) reviewed was signed at a different time than the other search warrants/documents (See Report attached hereto).

Mr. Shiver also stated that, in his opinion, that the certified copy provided of the search warrant in the City magistrate's file was different than the original provided for review in the Municipal Court, courtroom, at the time the examination of said documents was performed by the defendant's other expert, Mr. Richard Roper.

5.    That these new opinions represent newly discovered facts which could not have been provided previously until the handwriting experts were retained and provided an opportunity to examine the documents; perform their analysis and set out their opinions, which have only been recently received.

6.    That based upon the issues already existing surrounding the possible conflicting testimony and/or differing facts and the fact that evidence in this case was destroyed (i.e. the shredded search warrant), an inference of spoliation may be inferred from the evidence and opinions

2

of the experts in this case. Therefore, counsel for Norman respectfully submits that these issues and the newly discovered evidence and opinions require a re-hearing/re-visiting of the suppression hearing in this case.

WHEREFORE, THE PREMISES CONSIDERED, the Defendant Norman, by and through counsel, respectfully Moves this Court, to not only allow an amendment to be made to Norman's Motion to Suppress previously filed; but also to permit this Supplement thereto and that this Court, as a result, issue an Order setting a rehearing on the issue of suppression of the original search warrant issued in this case.

Respectfully submitted,

DONALD G. MADISON (MAD 008)
Counsel for Defendant Alphonso Norman

OF COUNSEL:
DONALD G. MADISON
418 Scott Street
Montgomery, Alabama 36104
Telephone (334) 263-4800
Facsimile (334) 265-8511

3

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served upon the following parties, by depositing a copy of the same in the United States mail, postage prepaid, on this the 9th day of April, 2004:

Honorable Todd A. Brown
Assistant United States Attorney
Office of the United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197

Honorable Susan James
*JAMES & ASSOCIATES*
Post Office Box 198
Montgomery, Alabama 36101-0198

Honorable Michael Petersen
631 South Perry Street
Montgomery, Alabama   36104-5819

OF COUNSEL

4

03/26/2004  11:08   6734949283          SHIVER & NELSON                    PAGE   02

# Shiver & Nelson
## Document Investigation Laboratory, Inc.

1903 Lilac Ridge Drive
Woodstock, GA 30189
770-517-6008
Fax: 678-494-9283

# Forensic Document Examination Report
## Laboratory File No. 04-1496

Prepared For:

Mr. Leonard Arrington
Arrington & Arrington
Attorneys At Law
517 Rosa Parks Avenue
Montgomery, AL 36108

Re: State of Alabama v. Alphonso Norman

**A. Documents Submitted for Examination:**

**Questioned Documents:**

Q1 – Machine copy of the signature page of an affidavit, and digital images of the handwriting on the page, purportedly signed by Judge Les Hayes, dated September 25, 2003.  The copy is marked with the number 000073.

Q2a – Machine copy of the signature page of an affidavit, and digital images of the handwriting on the page, purportedly signed by Judge Les Hayes, dated September 25, 2003.

Q2b – Machine copy of a Search Warrant for 2429 East 4th Street, Montgomery, AL, and digital images of the handwriting on the warrant, dated September 25, 2003.

Q3 – Machine copy of the signature page of an affidavit, and digital images of the handwriting on the page, purportedly signed by Judge Les Hayes, dated September 25, 2003.

Q4 – Digital images of the lower half of a signature page of an affidavit purportedly signed by Judge Les Hayes, dated September 25, 2003.

Q5 – Machine copy of a Search Warrant for 2429 East 4th Street, Montgomery, AL, and digital images of the handwriting on the warrant, dated September 25, 2003.  The copy is marked with the number 000075.

Shiver & Nelson Document Investigation Laboratory, Inc.
Report to: Mr. Leonard Arrington
Lab. File No. 04-1496
Page 2 of 4 Pages

Q6 – Digital image of the signature portion of a search warrant dated September 25 (no year visible).

Note: The numbering system above, particularly the use of Q1, Q2a and Q2b, Q3 and Q4, was used in an effort to conform to the numbering system of the digital images.

**Known writing of Judge Les Hayes III:**

K1 – Machine copy of a Certificate of Service, pertaining to Stacy M. Blackman, dated February 23, 2004.

K2 – Machine copy of a Certificate of Service, pertaining to Brynda Rodriguez Insley, dated February 23, 2004.

K3(1-4) – Machine copy of an Affidavit in Support of Search Warrant and a Search Warrant, marked 000307, 000308, 000310, 000315, dated July 25, 2001.

K4(1-15) – Handwriting exemplars on index cards, undated.

**B. Determinations Requested:**

It was requested that I attempt to determine whether Judge Hayes wrote the Les Hayes signatures on Documents Q1 through Q6.

**C. Opinions:**

1. My examinations disclosed no evidence that demonstrates that Judge Hayes was not the writer of the questioned signatures. Judge Hayes' signatures are abbreviated and highly variable. While some of the features in the questioned writing could not be found in the known samples, there is a strong likelihood that these apparent differences are the result of natural variation not represented in the known writing. These discrepancies may be resolved through the examination of additional known writing.

2. Based on my examinations using the known writing provided, it is my professional opinion that it is highly probable that Judge Hayes wrote the questioned signatures and associated writing on Documents Q2a, Q3, Q4, Q5, and Q6. He is the probable writer of the signatures and associated writing on Documents Q1 and Q2b.

Shiver & Nelson Document Investigation Laboratory, Inc.
Report to: Mr. Leonard Arrington
Lab. File No. 04-1496
Page 3 of 4 Pages

3.  There is evidence which indicates that the Les Hayes signatures, and associated writing, on Document Q1 may have been prepared at a different time than the corresponding entries on Documents Q2a, Q3, and Q4.

## D. Observations:

1.  The questioned documents submitted for examination included machine copies and digital images.  While it is always preferable to have original documents for examination, the quality of the images was deemed acceptable for comparison purposes.

2.  Examination of the known samples disclosed a high degree of variation in Judge Hayes' signature habits.  In cases like this, it is often necessary to obtain a large number of signature samples to fully evaluate the writer's range of variation.

3.  Comparison of the questioned signatures and associated writing to the known samples by Judge Hayes' disclosed numerous significant similarities.  While I was not able to account for all of the features in the questioned writing, there is a strong likelihood that these apparent differences are the result of natural variation not represented in the known writing.  The submission of additional known samples of Judge Hayes may result in more definitive opinions.

4.  It has been alleged that Documents Q1, Q2a, Q3 and Q4 were prepared at the same time.  Intercomparison of Documents Q1, Q2a, Q3 and Q4 were made.  Strong similarities were found between Documents Q2a, Q3 and Q4 in terms of the signature, printing of the name "Les Hayes", and CPL Conway's notation concerning vehicles at the residence.  On Document Q1, however, the formatting of CPL Conway's notation differs.  The information in the final paragraph differs in that on Document Q1 it contains a date and a signature, while on the other documents it only contains the printed words "Les Hayes".  There is also a much higher degree of variation in Judge Hayes' signature on Document Q1 when compared to the other affidavits.  While the evidence indicates that Judge Hayes wrote the entries attributed to him on Document Q1, the evidence also indicates that the writing may have occurred at a different time than the entries on Documents Q2a, Q3, and Q4.  It would have been useful to conduct ink and paper comparisons of Document Q1 to Documents Q2a, Q3, and Q4; however, I have been informed that Document Q1 has been shredded.  Differences in the ink and/or the paper would have been additional evidence that Document Q1 was not prepared at the same time as Documents Q2a, Q3, and Q4.

Shiver & Nelson Document Investigation Laboratory, Inc.
Report to: Mr. Leonard Arrington
Lab. File No. 04-1496
Page 4 of 4 Pages

## E. Notes:

1. The documents submitted for examination were returned with this report.

2. My *curriculum vitae* accompanies this report.


Completed this ___25th___ day of ___March_____, 2004.


Farrell C. Shiver
Forensic Document Examiner

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA    )
                            )
                            )
v.                          )    CR. NO. 2:03CR0229-F
                            )
ALPHONSO NORMAN, et al.,    )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the court are a number of pretrial motions filed by defendant Alphonso

Norman: (1) Motion to Re-open Hearing on Motion to Suppress (Doc. # 112); (2) Motion for

Immediate Expedited Relief (Doc. # 121); (3) Motion to Quash Search Warrant (Doc. # 122);

(4) Motion for Out-of-Time Filing of Supplement to Motion to Suppress (Doc. # 175); and

Supplement to Motion for Out of Time Filing of Supplement to Motion to Suppress (Doc.

# 181). Defendant Capulco Peralte has also filed a Motion to Re-open Hearing on Motion

to Suppress (Doc. # 126). The government has filed two responses to the motions. See

Response to Motion to Reopen Hearing on Motions to Suppress (Doc. # 138); Response to

Defendant's Motion for Out of Time Filing of Supplement to Motion to Suppress (Doc. #

180).

The motions filed by Norman and Peralte relate to a warrant affidavit prepared by

Montgomery Police Department Corporal J. T. Conway, and a search warrant issued by

Municipal Court Judge Les Hayes which authorized city police officers to search the

residence at 2429 East 4th Street, Montgomery, Alabama, where they seized more than 3.9

1



GOVERNMENT
EXHIBIT

CASE
NO. 03-229- N

EXHIBIT
NO.    N

kilograms of powder cocaine, 2.6 grams of crack cocaine, a handgun, two digital scales, packaging, and more than $72,000 in cash. The search in question was the subject of motions to suppress which the court heard on January 8-9, 2004, prior to the filing of the pending motions. All of the pending motions were filed well after the December 10, 2003 deadline for filing pretrial motions in this case.

Upon consideration of the motions, and for good cause, the undersigned recommends that the motions be GRANTED in part and DENIED in part as follows:

1.    **Motion to Re-open Hearing on Motion to Suppress** (Doc. # 112) (Norman); **Motion to Re-open Hearing on Motion to Suppress** (Doc. # 126) (Peralte).

Norman's motion asks the court to reopen the suppression hearing so that a "discrepancy" in the signatures of Municipal Judge Les Hayes appearing on different copies of the warrant affidavit and warrant can be examined further.[1] Peralte's motion requests that the suppression hearing be reopened on similar grounds. The defendants maintain that they did not discover the discrepancy until after the deadline for motions passed. The government has responded that the copies of these documents contain slightly different signatures because agents normally prepare several copies for the judge's signature since, many times, a copy machine is not available at the place of signing. The government also contends that the information contained within each of the copies is identical, and there is no evidence that – even if they look somewhat different – the signatures are not valid.

---

[1]  The motion also asked the court to order the originals of the documents to be produced. It is the court's understanding that the government has provided defendants the opportunity to view all such originals in existence and, thus, this portion of the motion is moot.

Subsequent filings in this case indicate that Norman consulted two handwriting experts after his original motion was filed, and neither expert (Richard Roper and Farrell Shiver) concluded that "the signature of Judge Hayes was one other than Judge Hayes." See Supplement to Motion for Out of Time Filing of Supplement to Motion to Suppress.  In addition, Judge Hays testified at the hearing that the signatures on the warrant affidavit (which contains, at page 000073, the signature that differs from the others, and is hereinafter referred to as "the questioned document"), and the warrant contained in Government's Exhibit B, both appear to be his.  Accordingly – absent any expert opinion to the contrary, which all defendants have had ample opportunity to produce – the court finds no basis on which to reopen the suppression hearing to examine the authenticity of the signatures, and concludes that the motions are due to be denied in this respect.

2.     **Motion for Immediate Expedited Relief** (Doc. # 121) (Norman).

This motion, filed on Norman's behalf by counsel retained after Norman's motion to reopen the suppression hearing was filed, asserts again that the signatures of the municipal judge on two of the search documents are "questionable," and seeks an "immediate ruling" on a motion to quash the search warrant filed simultaneously by Norman (see *infra*), in light of the impending trial date of February 16, 2004.  This motion is due to be denied as moot, as the trial was continued from the February term.

3.     **Motion to Quash Search Warrant** (Doc. # 122) (Norman).

Norman's motion to quash the search warrant, which the court construes as a motion

3

to suppress,[2] contends that the residence was searched prior to the time that the warrant was signed.[3] The only fact offered by defendant in support of this contention is his statement that the search warrant did not include a notation of the time at which it was signed as required by the Alabama Rules of Criminal Procedure[4] – a point which, without additional evidence, proves nothing regarding whether the warrant was signed before or after the search.  Thus, defendant's motion presents only a conclusory allegation that the residence was searched without a warrant, unsupported by any facts, and the court declines to address this claim.  <u>See</u> <u>United States v. Richardson</u>, 764 F.2d 1514, 1527 (11th Cir. 1985) (Trial court properly exercised its discretion in refusing to grant suppression motions where defendants failed to make factual allegations which could form the basis for exclusion of evidence.); <u>see also</u> <u>Order on Arraignment</u> ("Motions to suppress must allege specific facts which, if proven, would provide a basis of relief.  This Court will summarily dismiss suppression motions

---

[2] "There is no express procedure to quash a search warrant after its execution other than a motion to suppress under Fed.R.Crim.P. 12 or a motion for return of property under Fed.R.Crim.P. 41(e)." <u>In re Search of Florilli Corp.</u>, 33 F.Supp.2d 799, 801 (S.D. Ohio 1998).

[3] The motion also asks the court to order production of the originals of the documents in question and also to appoint a handwriting expert to "make a determination on the signatures on the documents." As noted above, the originals have been produced by the government, and defendant – who is represented by retained counsel, and does not contend that he is indigent – has hired experts of his own since the motion was filed.

[4] See <u>Money v. State</u>, 717 So.2d 38, 44 (Ala. Crim App. 1998) ("[T]he requirement in Rule 3.10 that the search warrant be endorsed with the hour of its issuance is ministerial or directory in nature. An omission with respect to this particular provision will not, absent a showing of prejudice, necessitate the exclusion or suppression of evidence seized pursuant to execution of the search warrant.").

4

which are supported only by general conclusory assertions founded on mere suspicion or conjecture. *All grounds upon which the defendant relies must be specifically stated in the motion ... .*") (emphasis in original).

In addition, the court notes that the fact that the search warrant did not include the hour at which it was signed should have been apparent to defendant from the face of the warrant prior to the December 10, 2003 deadline for filing pretrial motions. Thus, the motion to quash – which was filed on February 6, 2004 – is untimely, and defendant has not shown cause for his failure to file a timely motion. See United States v. Smith, 918 F.2d 1501, 1509 (11th Cir. 1990) ("The district court has the authority to establish a schedule of deadlines for defendants to file motions and requests prior to trial under Rule 12(c) of the Federal Rules of Criminal Procedure. By failing to file his motion within the deadlines set by the court a defendant waives his right to assert this motion. Fed.R.Crim.P. 12(f). The court may grant relief from such a waiver upon a showing of cause. Id.").

4.    **Motion for Out-of-Time Filing of Supplement to Motion to Suppress** (Doc. # 175) (Norman).

Defendant Norman, acting through yet another new counsel, filed a motion for out of time filing of a supplement to his motion to suppress on March 24, 2004, more than three months after the expiration of the deadline for filing pretrial motions. Defendant asserts no cause for the late filing, explaining only that "[a]n issue as to suppression may have been inadvertently omitted previously." Much of the motion argues issues that should have been raised prior to the lengthy suppression hearing in this case: for example, whether there was

5

probable cause for police to have gone to the residence initially; whether the warrant affidavit failed to demonstrate probable cause, and whether any good faith exception to the warrant requirement applied. Absent cause for defendant's failure to raise such issues (which, in fact, were addressed to some extent in earlier motions, in the suppression hearing, and in the court's Recommendation), the court will enforce its deadlines. The fact that new counsel would perhaps like "another bite at the apple" is insufficient reason to re-litigate these issues. The motion for out of time filing is due to be denied on this ground alone.

In addition, the only genuinely new issue raised in the motion – defendant's assertion that the warrant was not issued by a state court of record as required by Fed. R. Crim. P. 41(b)(1) and, thus, the evidence seized should be suppressed – is without merit. Rule 41 provides that "[a]t the request of a federal law enforcement officer or an attorney for the government ... a magistrate judge with authority in the district – or if none is reasonably available, *a judge of a state court of record in the district* – has authority to issue a warrant to search for and seize a person or property located within the district." Fed. R. Crim. P. 41(b)(1) (emphasis added). It is true that, in Alabama, "[u]nlike circuit courts and district courts, municipal courts are not courts of record." Ex parte Maye, 799 So.2d 944, 947 (Ala. 2001). Further, under the old version of Rule 41, the former Fifth Circuit "held that evidence was inadmissible in a federal prosecution if it had been seized in a federal search, pursuant to a state search warrant issued by a judge of a state court that was not a court of record." United States v. McKeever, 905 F.2d 829, 831 (5th Cir. 1990) (citing Navarro v. United States, 400 F.2d 315 (5th Cir. 1968)).

6

However, Navarro was overruled by the Fifth Circuit in McKeever. Although, strictly speaking, McKeever does not bind this court, neither does Navarro control this case since it addressed the application of Rule 41 prior to the 1972 amendment.[5] As the McKeever Court held, "the 1972 amendment to Rule 41 reflects a Congressional intent that none of Rule 41's requirements apply to state warrants. ... [T]he plain language of the amendment limits the application of Rule 41(a) to warrants requested by federal officers. The Rule states that designated persons may issue 'a search warrant authorized by th[e] rule ... upon the request of a federal law enforcement officer or an attorney for the government.' If the warrant is not issued upon the request of a designated person it is not authorized by Rule 41 and, hence, not covered by the rule." McKeever, 905 F.2d at 832. This court agrees with and adopts the Fifth Circuit's interpretation of the amended rule. See also United States v. Smith, 1996 WL 735569, 4 (N.D.Ga. 1996) (adopting the holding of McKeever).

Rule 41 does not govern the search warrant in question in this case because the warrant was issued at the request of an officer of the Montgomery Police Department, not a federal law enforcement officer. In addition, the warrant was issued by a state court. Although the offenses alleged in the warrant would certainly violate federal law, they also violate state law. Finally, testimony at the suppression hearing established that the officers who executed the search and recovered the evidence were Montgomery police officers; there was no evidence suggesting that they acted with the participation of any federal agents.

---

[5] Navarro also applied specifically to a federal search. The search in question in this case meets the criteria for a state search, as noted below.

Accordingly, Rule 41(a)'s requirement that the warrant be issued by a state court of record does not apply to this case, and the evidence seized is not due to be suppressed on this ground. Thus, the Motion for Out of Time Filing of Supplement to Motion to Suppress should be denied on the grounds of futility, as well as untimeliness.

5.    **Supplement to Motion for Out of Time Filing of Supplement to Motion to Suppress** (Doc. # 181) (Norman).

In this "supplement," Norman reports that he has retained an additional handwriting expert (Farrell Shiver) who has formed the opinion that Judge Hayes' signature on the questioned document (also referred to as Q1 or 000073) was signed at a different time from the other documents. He also believes that "the certified copy provided of the search warrant in the City magistrate's file was different than the original provided for review in the Municipal Court []courtroom" to defendant's other expert. Defendant contends that these opinions, in addition to the fact that the "original" search warrant was shredded, warrant an "inference of spoliation" and require the suppression hearing to be reopened.

Defendant's "supplement" does not explain how the possibility that Judge Hays signed the questioned document at an unspecified time different from the time at which the other documents were signed, or the fact that one copy of the warrant may have been different from one of the warrant originals, proves anything relevant to this case. Nor – to the extent that the motion alleges "spoilation" of evidence – does it indicate what "inference" defendant urges. To the extent that defendant claims a violation of due process and/or a discovery violation from the shredding of the document, he has not alleged facts sufficient

8

to require further hearing. See <u>United States v. Brown</u>, 9 F.3d 907, 910 (11th Cir. 1993) ("In

order to show that the loss of evidence by the government constitutes a denial of due process,

the defendant must show that the evidence was likely to significantly contribute to his

defense. ... To meet this standard of constitutional materiality, evidence must both possess

an exculpatory value that was apparent before the evidence was destroyed, and be of such

a nature that the defendant would be unable to obtain comparable evidence by other

reasonably available means. ... In addition, the loss of potentially useful evidence by the

government does not constitute a denial of due process unless the defendant can show that

the police acted in bad faith.") (Citations and internal quotation marks omitted). Accordingly,

the "supplement" does not alter the court's conclusion that defendant's Motion for Out-of-

Time Filing of Supplement to Motion to Suppress should be denied.

### Conclusion

Accordingly, for the foregoing reasons, the Magistrate Judge recommends that the

Motion to Re-open Hearing on Motion to Suppress (Doc. # 112), Motion for Immediate

Expedited Relief (Doc. # 121), Motion to Quash Search Warrant (Doc. # 122), Motion to Re-

open Hearing on Motion to Suppress (Doc. # 126), Motion for Out-of-Time Filing of

Supplement to Motion to Suppress (Doc. # 175), and Supplement to Motion for Out of Time

Filing of Supplement to Motion to Suppress (Doc. # 181), be DENIED.<sup>6</sup>  It is further

ORDERED that the parties are DIRECTED to file any objections to the said

_____

<sup>6</sup> This recommendation is without prejudice to the presentation of evidence concerning the
warrant documents as appropriate at trial.

Recommendation within a period of thirteen days from the date of mailing to them. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. Nettles v. Wainwright, 677 F.2d 404 (5th Cir. 1982). See Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982). See also Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981, en banc), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

DONE, this 4th day of June, 2004.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
UNITED STATES MAGISTRATE JUDGE

10

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES of AMERICA | ) | |
| | ) | |
| vs | ) | **CASE NO. M-03-48-N** |
| | ) | |
| ALPHONSO NORMAN | ) | |

<u>**OBJECTIONS TO RECOMMENDATIONS OF THE MAGISTRATE JUDGE**</u>

COMES NOW the Defendant Alphonso Norman (hereinafter referred to as the Defendant Norman), by and through counsel, and submits this Objections to Recommendations of the Magistrate Judge in the above-entitled case. As grounds for said objections, the Defendant Norman would show unto this Honorable Court the following.

1.    As to paragraphs 1, 3, and 5 of the Recommendation of the Magistrate Judge, Norman submits the following objection:

(A)    Paragraphs 1 and 5.

Norman's handwriting experts made preliminary findings that the signatures were more than likely Judge Hayes' on the Affidavit and Search Warrant (one stated he needed additional examples to conclusively establish this fact (see report of Mr. Ferrell).

However, sufficient facts were submitted to the Magistrate concerning discrepancies as to where the Search Warrant was signed (baseball field vs. office); the addition of handwritten notations on the Search Warrant (adding vehicular search); the fact that Norman's expert stated that he felt as though the documents were signed at different times; the fact that one of the warrants was shredded indicating possible spoliation of evidence all set forth sufficient factual basis for the



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. O

Defendant's request to re-open the suppression hearing.

Therefore, with all due respect to Judge Walker, Norman respectfully objects to Judge Walker's finding that there was an insufficient factual basis for re-opening the hearing.

(B)    As to paragraph 3, facts were submitted as to not only signing of the affidavits and warrants, but also to whether Officer Conway had gotten back to the residence prior to the search commencing. There were conflicting reports given in the Detention Hearing conducted before Judge Boyd on October 2, 2003, and the Suppression Hearing before Judge Walker on January 8, 2004.

The discrepancies involved whether the Defendants had already been taken to Highland Avenue when Conway got back or not; the time was omitted on the Search Warrant; the substantial distance and time involved in Conway's leaving the Fourth Street (place of search) address; his traveling to headquarters to type the document; his traveling to Taylor Road to have the Search Warrant signed by Judge Hayes at the baseball field; and the return to the Fourth Street address.

Therefore, sufficient facts were provided to support an argument that the search was performed prior to the return of the Warrant.

2.    As to the Court's finding of untimeliness of the filing of various motions, Judge Walker stated in paragraph 3 of her Recommendation that the Motion to Quash was untimely filed (after the December 10, 2003, deadline).

Norman submits that he had requested then-counsel to file all appropriate motions before time. Said failure was not a result of Norman's own lack of diligence.

3.    As to paragraph 4.

The issue raised which Norman's subsequent counsel denoted (and to which Judge Walker alluded at page 5 of her Recommendation) as an issue inadvertently omitted. Norman's counsel

2

submits that said argument is a novel issue in this Circuit and, therefore, not an argument of such recognition as to have been raised by previous counsel before the December 10, 2003, deadline.

Norman's current counsel, the undersigned, raised this issue in another case in this District where the Honorable Judge Fuller denied the same. However, on appeal, the Eleventh Circuit has granted oral argument with the *Navarro* issue possibly being addressed therein.

Therefore, as a result of the novel nature of the issue, and according to the dictates of justice, Norman was justified in seeking an untimely filing of a relevant and material issue going to the evidence (suppression thereof) in this case.

With all due respect, Judge Walker held, at Page 6, Paragraph 4, that *Navarro v. U.S.*, 400 F.2d 315 (5thCir. 1968), cited by Norman, was overruled by the Fifth Circuit in *U.S. v. McKeever*, 905 F.2d 829 (5thCir. 1990). Judge Walker further stated that *Navarro v. U.S. id*, did not bind this Court. The last statement runs contrary to the law of this Circuit. See *Bonner v. Prichard*, 661 F.2d 206, 1209 (11thCir. 1981) where the Eleventh Circuit adopted as binding precedent all of the decisions of the Fifth Circuit handed down prior to September 30, 1981.

Norman submits that the Fifth Circuit, with all due respect, erred in its interpretation of Rule 41 *U.S. v. McKeever, id.*, as well as in limiting its interpretation of *Fed R Crim P.* 41 (a). The Court therein, at page 833, held:

> "[3] We conclude that Fed. R. Crim. P. 41 only applies to warrants issued upon the request of a federal law enforcement officer or an attorney for the government." To the extent that *Navarro*, 400 F.2d 315; *Somers*, 483 F. 2d 37; and *Martin*, 600 F. 20 1175, indicate to the contrary they are overruled. The "State Court of record" requirement of Rule 41, therefore has no application to the warrant issued in this case. . ."

In the paragraphs that precede the above quoted portions of *U.S. v. McKeever, id.* the Court,

3

in reaching its conclusion, characterized its interpretation of the 1972 amendment to Rule 41 as "the more feasible interpretation of Rule 41(a)." Page 833 *supra*.

In the paragraph that immediately follows, the Fifth Circuit then noted that, "No issue of collusion between state and federal officers in procuring the warrant to avoid Rule 41 is implicated in this case. We intimate no opinion in this regard. . ."

On page 831 of the *McKeever* Opinion, the Fifth Circuit agreed that the search was performed by State officers, alleged violation of State law, and is, therefore, a State rather than Federal search.

The Court limited its analysis to a finding that if the search was requested by a Federal officer or attorney for the United States and that did not apply to State agents by supporting the conclusion by stating that, "There is no legislative history to suggest a different meaning." (Page 832.)

The Fifth Circuit then found in *McKeever* that because subsection (c,) of Rule 41 directed the warrant to a civil officer of the United States that, "These provisions suggest that a state court warrant issued at the request of state officers, and based upon a probable cause showing of a state law violation, is not intended to be governed by the provisions of Rule 41. . ."

The Fifth Circuit engaged in construction and interpretation of Rule 41 which contained no ambiguity.

Rule 41 (a)(2)(c), *Fed.RCrim.Pro.* defines a federal law enforcement officer as:

"(c) "Federal Law Enforcement Officer" means a government agent (other than an attorney for the government) who is engaged in the enforcing of criminal laws and is within the category of officers authorized by the Attorney General to request a search warrant."

Rule 1 of the *F.R.Crim.P.* states that the *Federal Rules of Criminal Procedure* "govern the

4

procedure for all criminal proceedings in the Courts of the United States. Therefore <u>every</u> federal prosecution is subject to the requirements of the rules."

Rule 41(a) states any criminal prosecution in Federal Court has to arise from a search warrant issued by a Federal magistrate or by a State Court. This is not ambiguous and, therefore, does not require looking into legislative intent as the *McKeever* Court did. The *McKeever* Court was overreaching as indicated by their use of the term "more feasible interpretation" or that "the provisions suggest" in attempting to reach the conclusion.

This argument is as basic as quoted from the Second Circuit's decision in *United States v Burke*, 517 F.2d 377 (1975) decided after the 1972 Amendment to Rule 41 upon which the Fifth Circuit predicates its Opinion in *McKeever*. In *U.S. v Burke* at 517 F2d page 389, the Court held,

> "There is relatively little case law on the question how for the failure of a warrant to conform to the provisions of Rule 41 other than those concerned with the constitutional requirements of probable cause and particularity of description will trigger the exclusionary rule, the defect there was basic since the issuing judge was not of a <u>**"State Court of record,"**</u>

**There was in effect no warrant at all for federal purposes.**

Norman submits that this is the simple, clear and concise dictates of Rule 41. A municipal judge cannot issue a search warrant in a Federal case, prosecution of Federal law violation.

B.      Notwithstanding and alternatively, the search in this case is a Federal search performed by Federal agents.

Rule 41 applies to any warrant obtained by a Federal agent. Officers of the HIDTA Task Force, although having Montgomery Police Department (MPD) members, engage in prosecutions of Federal drug law violations.

5

Officer Gene Sisson, whom testified at the Detention Hearing on October 2, 2003, before the Honorable Delores L. Boyd, Magistrate Judge (Judge Boyd), stated, at page one of the transcript the following:

"A.    Name is Howard E. Sisson, S-I-S-S-O-N, Jr., and I'm a narcotics investigator with the Montgomery Police Department. . ."

"Q.    . . . and what are your duties and responsibilities at the MPD as a narcotics officer?"

**"A    Well, for the past four years in that capacity, I've been investigating federal-- violations of federal laws."**

Officer Sisson is a member of the Federal Drug Task Force, HIDTA. Officer Wingard also participated. Officer Sisson testified, at page 28 of the transcript, that when questioned about Officer Wingard, "A. Yes, sir. He's a task force agent like I am."

Officer Sisson testified before the Honorable Susan Russ Walker, Magistrate Judge (Judge Walker) on January 8, 2004, the following (at page 126),

"A:    I am a narcotics detective in the special operations division and also assigned to the high intensity drug trafficking area task force in Montgomery. This is HIDTA."

Sisson also testified at page 126,

"A. Chris Wingard is the case agent, that has done most of the paperwork.

Q.    And you are working with him in sort of a co-case agent capacity in this case?

A.    Yes, sir."

It is undisputed that the search warrant was issued in connection with a Federal investigation, by Federal agents (MPD officers serving on Federal Drug Task Force) investigating and prosecuting violations of Federal laws. Therefore, Rule 41's requirements of a Federal Magistrate or Judge of

6

State Court of record executing the search warrant was not complied with. The Rule further

provided clear and undisputed requirement of failure of compliance with the Rule in 41(f). The Rule

states that a motion to suppress may be filed.

Respectfully submitted,

S/DONALD G. MADISON
DONALD G. MADISON
Bar Number:  ASB-5199-M68D
Attorney for Defendant Alphonso Norman
418 Scott Street
Montgomery, Alabama 36104
Telephone (334) 263-4800
Facsimile  (334) 265-8511
E-mail dmadison@bellsouth.net

CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2004, I electronically filed the foregoing with the Clerk of
the Court using the CM/ECF system which will send notification of such filing to the following:

Honorable Todd A. Brown
Assistant United States Attorney
Middle District of Alabama

Honorable Susan James
*James & Associates*
600 South McDonough Street
Montgomery, Alabama 36104

Honorable Michael Petersen
631 South Perry Street
Montgomery, Alabama 36104

Honorable Leonard Arrington

S/DONALD G. MADISON
DONALD G. MADISON
Bar Number:  ASB-5199-M68D
Attorney for Defendant Alphonso Norman
418 Scott Street

7

Montgomery, Alabama 36104
Telephone (334) 263-4800
Facsimile  (334) 265-8511
E-mail dmadison@bellsouth.net

8

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
v.                                 )          CASE NO.  03-CR-229-F
                                   )
ALPHONSO NORMAN                    )
CAPULCO PERALTE                    )

## ORDER

After an independent review of the file, it is the ORDER, JUDGMENT and DECREE

of the court that:

(1)     The objections filed by defendants Alphonso Norman (Doc. # 105) and

        Capulco Peralte (Doc. # 101) are overruled;

(2)     The recommendation of the United States Magistrate Judge entered on January

        16, 2004 (Doc. # 98) is adopted; and

(3)     The motions to suppress filed by defendants Alphonso Norman (Docs. # 62,

        64) and Capulco Peralte (Doc. # 73) are DENIED.

DONE this 1st day of July, 2004.


                        _____/s/ Mark E. Fuller_____
                        CHIEF UNITED STATES DISTRICT JUDGE



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. P

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )    CASE NO. 2:03-CR-229-F |
| | ) |
| ALPHONSO NORMAN | ) |
| CAPULCO PERALTE | ) |

## **ORDER**

After an independent review of the file, it is the ORDER, JUDGMENT and DECREE

of the court that:

(1)     The objections filed by defendants Alphonso Norman (Doc. # 204) and

          Capulco Peralte (Doc. # 200) are overruled;

(2)     The recommendation of the United States Magistrate Judge entered on June

          4, 2004 (Doc. # 197) is adopted; and

(3)     The Motion to Re-open Hearing on Motion to Suppress (Doc. # 112), Motion

          for Immediate Expedited Relief (Doc. # 121), Motion to Quash Search

          Warrant (Doc. # 122), Motion to Re-open Hearing on Motion to Suppress

          (Doc. # 126), Motion for Out-of-Time Filing of Supplement to Motion to

          Suppress (Doc. # 175), and Supplement to Motion for Out of Time Filing of

          Supplement to Motion to Suppress (Doc. # 181) are DENIED.

DONE this 1st day of July, 2004.

                                       /s/ Mark E. Fuller
                        CHIEF UNITED STATES DISTRICT JUDG



GOVERNMENT
EXHIBIT

CASE
NO. *03-229-N*

EXHIBIT
NO. *Q*



Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT FOR

 2              THE MIDDLE DISTRICT OF ALABAMA

 3                   NORTHERN DIVISION

 4

 5

 6   UNITED STATES OF AMERICA

 7

 8        Vs.              CR. NO. 03-229-N

 9

10   ALPHONSO NORMAN and

11   CAPULCO PERALTE

12

13      *    *    *    *    *    *    *    *

14        Before Hon. Mark E. Fuller, Judge,

15        and a Jury, at Montgomery, Alabama,

16        Commencing on July 12, 2004

17      *    *    *    *    *    *    *    *

18            VOL. I (July 12, 2004)

19   APPEARANCES: For the Government: Todd A. Brown,

20                           Assistant U.S. Attorney

21      For the Defendant, Norman: Donald G. Madison

22                      and Leonard Arrington,

23                      Attorneys at Law

24      For the Defendant, Peralte:  Susan G. James,

25                      Attorney at Law
```

Page 2

INDEX OF WITNESSES

Government's Witnesses:                          Page

TOMMY CONWAY
Direct Examination by Mr. Brown:                  45
Cross-Examination by Ms. James:                   57
Cross-Examination by Mr. Madison:                 70
Recross-Examination by Ms. James:                 98

MICHAEL DRUMMOND
Direct Examination by Mr. Brown:                 101
Cross-Examination by Ms. James:                  117
Cross-Examination by Mr. Madison:                135
Recross-Examination by Ms. James:                165

CLYDE NORWOOD
Direct Examination by Mr. Brown:                 167
Cross-Examination by Ms. James:                  174
Cross-Examination by Mr. Madison:                177
Redirect Examination by Mr. Brown:               180
Recross-Examination by Mr. Madison:              180

BRAD BARTLETT
Direct Examination by Mr. Brown:                 197
Cross-Examination by Ms. James:                  208
Cross-Examination by Mr. Madison:                222
Redirect Examination by Mr. Brown:               232
Recross-Examination by Mr. Madison:              234

ANDREW K. JAMES
Direct Examination by Mr. Brown:                 258
Cross-Examination by Ms. James:                  269
Redirect Examination by Mr. Brown:               300
Recross-Examination by Ms. James:                302

CHRIS WINGARD
Direct Examination by Mr. Brown:                 306
Cross-Examination by Ms. James:                  314
Cross-Examination by Mr. Madison:                336
Redirect Examination by Mr. Brown:
Recross-Examination by Ms. James:

Defendant's Witnesses:

ANDREW K. JAMES
Direct Examination by Ms. James:
Cross-Examination by Mr. Brown:

GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO.  R-1

Page 3

INDEX OF WITNESSES (cont'd)

Defendant's Witnesses:                          Page

BILLY SMITH
Direct Examination by Ms. James:                 370
Cross-Examination by Mr. Brown:                  376

CHRIS WINGARD
Direct Examination by Ms. James:                 378

Jury Charge:                                     400

Verdicts Read:                                   431

Reporter's Certificate:                          440

Page 4

```
 1        (The above case coming on for trial at Montgomery,

 2   Alabama, July 12, 2004, before Honorable Mark E. Fuller,

 3   Judge, and a Jury, the following proceedings were had outside

 4   the presence of the jury on July 12, 2004 commencing at 9:00

 5   a.m.:)

 6        THE COURT: call the case of United States of

 7   America versus Alphonso Norman and Capulco Peralte. Is the

 8   government ready to proceed?

 9        MR. BROWN: The government is ready, Your Honor. We

10   did file some motions on Friday out of time.

11        THE COURT: Counsel for Mr. Peralte ready to

12   proceed?

13        MS. JAMES: Yes, Your Honor.

14        THE COURT: For Mr. Norman ready to proceed?

15        MR. MADISON: Yes, Your Honor.

16        THE COURT: we have several issues that I want to

17   take up once we are out of the presence of the jury as we are

18   now. Included in the things I wish for us to take up are the

19   motions in limine that have been filed. We will begin with

20   the government's motion in limine that was filed Friday. For

21   the record the motion for leave to file out of time motion,

22   accompanied by the motion in limine filed by Mr. Brown on

23   July the 9th, the motion to file out of time motions is

24   granted. Let's take up the motion in limine, Mr. Brown.

25        MR. BROWN: Yes, sir. The motion really is in two
```

Page 5

1  parts. First of all as it relates to witnesses identified by
2  Mr. Norman's counsel at -- during voir dire and jury
3  selection. Mr. Norman's attorney indicated that he intended
4  to call two witnesses, one of which is a Municipal Judge in
5  this city, Les Hayes, who issued a search warrant in this
6  particular case. The second witness is a Mr. Ferrell Shiver.
7  Mr. Shiver is a handwriting analyst. Both of these witnesses
8  the government believes that it appears that the only reason
9  that these witnesses would be called would be to call into
10 question some of the handwriting that may have been in the
11 search warrants. Those particular issues have already been
12 covered in the Defendant's motion in limine and objections to
13 the recommendation of the Magistrate Judge. Those have been
14 ruled on by the Magistrate Judge and by this Court. And the
15 government contends that relitigation of the suppression
16 issue is not proper in this forum and that the proper forum
17 for litigation of this issue would be on appeal should the
18 Defendants be convicted. The second --
19      THE COURT: Let's take them up one at a time, Mr.
20 Brown.
21      MR. BROWN: Yes, sir.
22      THE COURT: Let me hear from defense counsel in
23 whichever order you wish to proceed. Let me ask the question
24 first, is there any additional evidence concerning the
25 issuance of the search warrants, the issues that have been

Page 6

1  raised in the motions to suppress filed both by Mr. Norman,
2  which is document number 62 and document number 64, and Mr.
3  Peralte, which is document number 73, as well as in the
4  motion to reopen the hearing on the motion to suppress,
5  document number 112, the motion for immediate expedited
6  relief, document number 121, motion to quash the search
7  warrant, document number 122, motion to reopen the hearing on
8  the motion to suppress, document number 126, motion for out
9  of time filing of supplemental motion to suppress, document
10 number 175, and the supplement to the motion for out of time
11 filing of the supplement to the motion to suppress, document
12 number 181. From either Defendant, is there any additional
13 evidence other than the evidence that has been presented in
14 these hearings?
15      MS. JAMES: Not on behalf of Mr. Peralte.
16      MR. MADISON: And Judge, just with respect to -- I
17 don't believe we intend on calling Judge Hayes but with
18 respect to Mr. Ferrell Shiver, we did intend to call Mr.
19 Shiver as a witness in this case, not as to the authenticity
20 of the handwriting but as to the possible fact of the search
21 warrants being signed on -- his opinion testimony is that
22 they may have been signed at different times. We believe that
23 goes to the credibility of the witnesses in this case with
24 respect to their testimony. The Court is well aware that one
25 of the affidavits was destroyed. There are four search

Page 7

1  warrants but only three affidavits. The question is why is
2  there a fourth search warrant if the other affidavit was
3  destroyed and the other -- fourth warrant is still available.
4      THE COURT: Let me stop you if I could. Mr. Madison,
5  is there any dispute that the search warrant that was served
6  on Mr. Norman's residence was obtained prior to the search on
7  the night of September 25th, 2003?
8      MR. MADISON: No, sir. I believe the issue is going
9  to be from our standpoint is the timing, whether or not the
10 search began prior to the time that the Judge signed the
11 warrant. We think that Mr. Shiver's testimony may have some
12 bearing in conjunction with other evidence that we intend to
13 offer in this case.
14      THE COURT: Is there any evidence that the search
15 began -- or is there going to be any evidence that the search
16 began before Lieutenant Conway returned back to the residence
17 located at 2429 East 4th Street with the executed search
18 warrant?
19      MR. MADISON: We fully intend to try to establish
20 time lines with respect to that particular issue.
21      THE COURT: I will reserve ruling on whether or not
22 Mr. Shiver will be able to testify, but unless there is some
23 evidence that the search began before Lieutenant Conway
24 returned back to the residence, I will not allow either Mr.
25 Shiver or Judge Hayes to testify on issues that have already

Page 8

1  been covered in the matters before the Magistrate Judge
2  before this Court. And unless there is additional information
3  which has not been covered in either of these, or any of
4  these hearings before Magistrate Judge Walker, about whether
5  or not the search warrants were signed at different times,
6  whether or not there were multiple copies signed with
7  different pens, whatever the facts may be, unless there is
8  some information that would indicate that the scope of the
9  search should have been limited or would call into question
10 the constitutionality of the ability to have obtained the
11 search warrant to begin with, I would not allow that
12 testimony at trial and find that the testimony would both be
13 irrelevant under Rule 401 and confusing to the jury under
14 Rule 403. But I will reserve you being allowed to call Mr.
15 Shiver based upon what is testified to about when the search
16 warrants arrived at the house and when the search actually
17 began.
18      MR. MADISON: Thank you, Your Honor.
19      THE COURT: Your second part, Mr. Brown, about Mr.
20 Thomas' testimony.
21      MR. BROWN: Yes, sir. The second prong of the
22 government's motion in limine is as it relates to Mr. Thomas.
23 The government is aware just based on previous cases,
24 including one case that was tried with Ms. James as well,
25 about Mr. Thomas and his views regarding drug prosecutions

Page 9

1  brought in Federal Court. I spoke with Ms. James this
2  morning, she indicates that Mr. Thomas, if called, would be a
3  fact witness related to some issue as to Mr. Peralte's
4  employment or work that he had done for Mr. Thomas. If that
5  is the gist of the testimony of Mr. Thomas the government
6  obviously would not object to that, but the government would
7  still move in limine to limit that testimony to relevant fact
8  issues and not opinions that he may have regarding the things
9  that are set forth in the motion.
10      THE COURT: Is this witness expected to be called
11  and be asked any opinion testimony, Ms. James?
12      MS. JAMES: Absolutely not.
13      THE COURT: Make your objection, Mr. Brown, and we
14  will cover it as the testimony comes up.
15      MS. JAMES: I don't plan to elicit that but in
16  fairness to everyone here he does have some very fixed
17  opinions about the United States Attorney's office and that,
18  so we probably would need to caution him before he testifies
19  that he is not to go into any of that. I have no intention to
20  do it.
21      THE COURT: Ms. James, make sure you cover that with
22  your witness before he testifies. To the extent that Mr.
23  Thomas may give any opinion testimony, the Court will grant
24  the government's motion in limine. As to any other evidence,
25  Mr. Brown, make your objection at trial and we will cover it

Page 10

1  there.
2      MR. BROWN: Yes, Your Honor.
3      THE COURT: Next let's take up Mr. Norman's motion
4  in limine to prevent the government from introducing any
5  testimony about Mr. Norman's refusal to consent to the search
6  at the time that Lieutenant Conway approached him at his
7  residence, or any testimony from any witness on behalf of the
8  government that Mr. Norman wanted to call his lawyer after
9  having been approached by Lieutenant Conway. Is that an
10  accurate description of what you are asking for, Mr. Madison?
11      MR. MADISON: Yes, Your Honor.
12      THE COURT: Any further argument other than what we
13  have heard?
14      MR. MADISON: None, Your Honor, other than the fact
15  that should Mr. Norman not take the stand that would be
16  hearsay and inadmissible.
17      THE COURT: Mr. Brown, any response?
18      MR. BROWN: We don't intend to elicit that
19  testimony, Your Honor.
20      THE COURT: You don't intend to elicit testimony of
21  either of those facts?
22      MR. BROWN: That's correct, Your Honor.
23      THE COURT: Without objection, the Defendant
24  Norman's motion in limine is granted. Have the parties
25  discussed whether or not the indictment should be redacted as

Page 11

1  a part of the evidence that goes to the jury in this case
2  should the evidence go that far?
3      MR. BROWN: We have not discussed it, Your Honor.
4      THE COURT: The indictment contains the name of Mr.
5  James who I understand has pled guilty before trial. Mr.
6  Brown, does the government intend on introducing as part of
7  the evidence that the jury considers in this case the
8  indictment and allow the jury to a review that in the jury
9  room?
10      MR. BROWN: I think it's normal practice for them to
11  take that back to the jury room, there would be no objection
12  by the government.
13      THE COURT: I am not asking you for any objection, I
14  am asking you about having redacted -- having the indictment
15  redacted to remove Mr. James' name, is there any discussion
16  that needs to take place about that?
17      MR. BROWN: I had not intended to redact that unless
18  the Court required it.
19      THE COURT: I am not going to require it unless
20  either of the Defendants object to Mr. James' name being
21  included on the indictment. All I am saying is I will make
22  that as a requirement for the government if either of the
23  Defendants require Mr. James' name to be removed from the
24  indictment, I will ask the government to make the redaction.
25  But counsel is instructed to confer with one another before

Page 12

1  this case goes to the jury, if it should go to the jury.
2      MR. MADISON: Judge, just concerning that issue,
3  there was the forfeiture provision that was in the indictment
4  that the Court has dealt with, but not withstanding the
5  co-conspirators' names that are set forth therein, so the --
6  we would ask that that be redacted.
7      THE COURT: As to your client?
8      MR. MADISON: Yes, sir.
9      THE COURT: That brings me to the next issue that I
10  needed to cover. The forfeiture allegation is still pending
11  against Mr. Peralte, what are we going to do about the trial
12  of that issue, Mr. Brown?
13      MR. BROWN: Judge, if I can check at lunchtime to
14  see if that has been administratively handled already then we
15  will file a motion to strike forfeiture allegation in its
16  entirety at that time, but I do need to check with our
17  forfeiture division that that is the case first.
18      THE COURT: Don't refer to anything involving the
19  forfeiture of any assets of Mr. Peralte. Any objection to
20  that, Ms. James, until we hear back?
21      MS. JAMES: No, sir.
22      THE COURT: Prior to the trial of this matter and
23  the jury being selected on July the 7th, counsel for the
24  defense notified the Court of their desire to object to the
25  racial makeup of the venire. We took up those issues prior to

| Page 13 | Page 15 |
|---|---|

**Page 13**

1  jury selection, and I provided counsel with a copy of the
2  recommendation and order in the last challenge to the venire
3  that had been made in May of 2003. Has defense counsel
4  reviewed the recommendation and order from the District
5  Judges in the Middle District of Alabama regarding this
6  issue?
7      MR. MADISON: Yes, Your Honor. May I speak to that?
8      THE COURT: Yes. Mr. Madison, have you reviewed this
9  order?
10      MR. MADISON: Judge, with all due respect I have not
11  yet, I thought we had ten days in order to respond to that. I
12  have been preparing for trial rather than worrying about an
13  objection.
14      THE COURT: Ms. James, let me hear from you.
15      MS. JAMES: Judge, I was provided a copy and it did
16  refresh my recollection. I was counsel for Mr. Reese in that
17  particular case. And I did want to address it this morning.
18  On behalf of Mr. Peralte I do not think there's any need to
19  brief the issue. However, I would like to allow my objection
20  to remain in the record. I believe that we met the first two
21  prongs. The third one we have not been able to establish at
22  this point and that would be that there's systemic exclusion
23  of the group in the jury selection process. And the reason
24  that I make that is when the Clay decision came out that was
25  kind of the predecessor to this with regard to the Jury

**Page 14**

1  Selection Act there were many people that assumed that there
2  was some problem with jury selection but did not know what it
3  is, did not make an objection, and then were barred later for
4  relief because they had not made the objection, so the
5  investigation was done after the fact. And while it's
6  speculative it could be that at some juncture from here
7  forward that some investigation be done and that we get the
8  answer to that, that there could be systemic problems in the
9  process. So having said that I would request that my
10  objection remain in the record and ask that the Court excuse
11  me from filing a brief based on my review of this particular
12  case.
13      THE COURT: As to both of the Defendants here's my
14  ruling. I will allow counsel for each Defendant to file a
15  motion with a brief and any legal support concerning the
16  requirements as set forth in the United States versus Butler
17  decision, which has been adopted by this Court concerning the
18  racial makeup of our jury selection process. Your brief must
19  be submitted within seven days after the trial of this case,
20  and I will allow the government seven days to file any
21  response. Any failure to file any properly supported motion
22  will be deemed by this Court as your waiver of that issue. I
23  cannot permit you to have some unaddressed objection that
24  just preserves the record indefinitely without pursuing the
25  objection one way or the other.

**Page 15**

1      MS. JAMES: Well, Judge, I don't disagree with the
2  findings that the Magistrate Judge has made. That's why I am
3  thinking a brief would be futile because I am not disagreeing
4  with that, I am simply saying there's an under-representation
5  of minorities in this venire as there were when we had the
6  Reese trial back in 2003. And sometimes it's hard to fight
7  something you can't see. I don't in this case --
8      THE COURT: I don't know whether there were or there
9  were not, I know there is statistical evidence that you can
10  investigate to make that determination and I know that the
11  jury venire wheel is available for inspection and
12  computation. I know that the demographics of the Middle
13  District of Alabama is open for review and if you make that
14  determination and the procedural discrepancy exceeds ten
15  percent I know that you have met the prima facie showing of
16  the requirements as set forth in the Magistrate Judge's
17  opinion. But unless you do that all you are going to have is
18  some open-ended objection that I think based upon your saying
19  you would like to preserve from now until eternity in case
20  you wish to raise it in the future, and I am not going to
21  allow that to happen without some evidence -- on behalf of
22  the Defendant without having something that you are even
23  asking for.
24      MS. JAMES: Yes, sir, I will accept the Court's
25  ruling, obviously.

**Page 16**

1      THE COURT: If you want to pursue it, I am giving
2  you seven days after this trial to make any motion --
3  properly filed motion with your brief and legal supplement
4  and I will give the government seven days to respond.
5  Anything else we need to take up before we bring the jury in?
6      MS. JAMES: Judge, I did have one matter.
7      THE COURT: Okay.
8      MS. JAMES: The Court is aware that I had filed, and
9  I believe Mr. Norman's counsel, the prior counsel filed a
10  motion to sever in this case and this Court by order of March
11  the 19th of 2004 denied the request for severance. Just last
12  week when we selected the jury my client made me aware of
13  conversations he had had with Mr. Norman indicating that the
14  strategy of Mr. Norman's defense may well be to put the blame
15  on Mr. Peralte. I questioned Mr. Madison about that when we
16  were here last in court and he did not deny that may be
17  the approach that they take. And, of course, our argument in
18  the motion to sever was that they were antagonistic defenses
19  that if advanced by both Defendants, at least on Mr.
20  Peralte's behalf, would deny him a fair trial.
21      I believe that if that is, in fact, the case, I
22  realize by the very nature of some of the evidence that comes
23  out it leaves the jury with the idea well, did he do this or
24  did he do that, but to actually get up and try to
25  affirmatively place the blame on Mr. Peralte I believe would

Page 13 - Page 16

Page 17

1 deny him his right to a fair trial. I know the Court in its
2 order indicated that some of these problems can be handled by
3 way of curative instructions and telling the jury that what
4 the lawyers say is not evidence.
5     I would ask the Court, renewing my motion for
6 severance based on those two additional facts, the
7 representations made to Mr. Peralte by Mr. Norman and my
8 conversation with Mr. Madison, that if the Court is not
9 inclined to grant my renewed motion to sever, I would move in
10 limine to preclude Mr. Madison from making any references in
11 opening to what he believes or his theory that it was him.
12 And if it comes out factually we have to live with that, but
13 I don't believe that that would be proper argument by counsel
14 either in opening or closing.
15     THE COURT: Mr. Madison?
16     MR. MADISON: Just with response to what Ms. James
17 said, she asked me and I -- she asked me what we intended to
18 do and I told her I really didn't know at this point, so I
19 don't think there's any representation that I made to her. I
20 said there could be a possibility of finger pointing, I think
21 were my exact words, which is inherent with any prosecution
22 when you have got multiple criminal Defendants involved. And,
23 you know, however the facts unfold is how we are going to try
24 the case.
25     MS. JAMES: Judge, I don't disagree that that's what

Page 18

1 he said, and in response to that I did tell him if he did
2 that I would certainly be -- and if permitted by the Court,
3 it would be all fair game. But I would not agree that that's
4 inherent in all multi-Defendant litigation. I have been
5 doing this for about 20 years and I don't recall that being
6 an affirmative defense in any case that I have handled in
7 this Court.
8     THE COURT: Certainly the Court is not privy to what
9 the testimony is going to be. I may have some idea of what
10 the testimony might be based upon other proceedings that have
11 been before this Court, but I will not enter any order that
12 would limit Mr. Madison's strategy to defend his client as he
13 sees fit. And I certainly will keep in mind any prejudice
14 that might attach to your client, Ms. James, after the
15 evidence is presented, and we can cure whatever concerns that
16 you may have through limiting instructions. And I would
17 rather address it that way. Your renewed motion to sever is
18 denied. How much time does counsel wish for opening
19 statements?
20     MS. JAMES: 15 minutes.
21     MR. MADISON: Probably a third of that time, Your
22 Honor.
23     MR. BROWN: 15 or 20 minutes from the government,
24 Your Honor.
25     THE COURT: I will allow each side 20 minutes that

Page 19

1 you can divide between the two Defendants. The government --
2 each side will have 20 minutes respectively. Y'all see if you
3 can keep it within that time.
4     MS. JAMES: Your Honor, may I just comment on the
5 Court's ruling with regards to the matter with Mr. Madison?
6     THE COURT: Your renewed motion to sever?
7     MS. JAMES: Yes, sir. Judge, I think that when you
8 know going in that your curative instruction based on your
9 order would be that what the lawyers say is not evidence and
10 things of that nature, I think that the prejudice of leaving
11 it wide open for him to come in and say this was all about
12 this man from Florida in his opening, knowing that that's
13 going to draw objections from me, knowing that the Court is
14 going to give that curative instruction, I think that that
15 part of what I have requested of the Court would not be
16 hindering his defense because we know -- I think we can
17 foresee what will happen in that scenario.
18     And while I think it would be extremely prejudicial
19 to go into this trial knowing that that's going to happen and
20 we are going to have to go through those hurdles or those
21 hoops, I think that's a different situation. And I think that
22 with regard to the Court's original ruling we had speculation
23 that this might happen or that might happen and now we know
24 for sure and I think that heightens my arguments that the
25 defenses are antagonistic. It's one thing to have to defend

Page 20

1 the case against the government, it's another thing to have
2 to defend it against a co-Defendant, and I think that
3 supports the motion for severance in this case, not in all
4 multi-Defendant cases.
5     THE COURT: The motion to sever is denied. Prepared
6 to move forward?
7     MS. JAMES: Would that be the same with regard to my
8 motion in limine on his opening?
9     THE COURT: Your motion to limine is both untimely
10 and is without merit under the circumstances. I don't know
11 what Mr. Madison is going to say. I am very remiss to say to
12 Mr. Madison I am going to tell you how you are going to
13 defend your client. I am not going to do that. I would
14 encourage Mr. Madison not to wander off of any evidence, or
15 into any argument that the evidence will not support. But I
16 am not going to tell Mr. Madison how he can or can not try
17 his case. If there's any representation made that the
18 evidence does not support by Mr. Madison, then we will cure
19 that by some curative instruction. And Mr. Madison, I would
20 strongly encourage you not to make any representations that
21 the facts aren't going to support.
22     MS. JAMES: Judge, with regard to the timeliness,
23 just so the record is clear, I did learn this for the first
24 time when we were here in jury selection. That was from Mr.
25 Peralte. I did not have an opportunity to speak to Mr.

**Condenselt™**

1  Madison until we were concluded that day or close to that. So
2  that I hope will justify the delay.
3        MR. MADISON: Judge, I would like to respond too,
4  just with respect to the fact that Ms. James seems to be
5  trying to put a little monkey on my back. She could have
6  asked that question a long time ago. I have been involved in
7  this case a pretty good period of time now, so the question
8  wasn't asked until last Wednesday or whatever it was she
9  asked the question. I wanted to bring another point --
10       THE COURT: The Court's ruling is what it is. Is
11  there anything now you need to bring up?
12       MR. MADISON: Yes, sir. Mr. Arrington and I may be
13  interchangeably in questioning witnesses. He may be handling
14  opening. I just want to advise the Court of that, he is
15  co-counsel in this case.
16       THE COURT: I recognize him as being co-counsel,
17  he's free to make any arguments as far as any opening
18  statement or closing statement or question any witness. Now,
19  the Court's rule is that the person who objects is the person
20  who is going to question the witness, so be very cautious
21  about how you are going to handle that.
22       MR. BROWN: Judge, the government has one matter
23  that I hope won't last too long, but I think it is
24  appropriate to bring it up. I think the Court is aware, as
25  are both counsel, anybody practicing criminal law in the

1  federal community, that on June 24th the Supreme Court issued
2  in a case -- in the Blakely case, what appears to be at least
3  a question as to the constitutionality of the sentencing
4  guidelines. While I think it probably is premature to discuss
5  sentencing issues, specifically in this case, there does seem
6  to be an opportunity, I guess, based on this particular case
7  that was -- an opinion that was released just on Friday from
8  the 7th Circuit where they found that Blakely did apply to
9  the Federal Sentencing Guidelines, and that a number of
10  different issues may result from that ruling.
11       Now, granted, the 11th Circuit hasn't done that and
12  Sanchez, which is the law of this Circuit, would indicate
13  that the Federal Sentencing Guidelines aren't disturbed by
14  the Blakely ruling. Never the less, based on the Booker
15  ruling out of the 7th Circuit it appears that a number of
16  issues could exist, one of which is that the indictment
17  itself might be flawed in that it addresses the statutory
18  range of the offenses in this case as opposed to any
19  guidelines range, as well as any other sentencing factors
20  that may enhance the Defendants in this case.
21       I also think that at a minimum there is some
22  question as to what the special verdict form should look
23  like. And again, I know we will handle that when we get
24  closer to the -- to doing the jury charges and so forth. But
25  it may be that the government or the defense or the Court

1  would even have to propound a different form than we normally
2  might, and it might include such things as relevant conduct
3  on that form.
4        Now, I am cautious about that because I know that --
5  well, first, it's the government's position both from in this
6  District and from the Department of Justice that Blakely did
7  not disturb those sentencing guidelines, never the less I
8  think probably the Court is aware, and certainly these
9  opinions address a memorandum issued by the Department of
10  Justice on how to, in the meantime, handle certain issues,
11  one of which is stuff like jury instructions and special
12  verdict forms, indictments, as well as possibly even a
13  sentencing hearing as such. And I just felt as though it
14  might be something that we need to talk about prior --
15  because some of these things may have to come out either
16  in -- at some point to the jury, whether it be at trial or in
17  some sort of hearing after trial as it relates to sentencing.
18  And quite frankly --
19       THE COURT: Does the government foresee any evidence
20  that would be presented in case that would affect sentencing
21  such as relevant conduct, any other issues other than weight
22  of the drugs involved through any type of possession, be it
23  constructive or actual, or any other issues that you think
24  would affect either of these Defendants' sentence should they
25  be convicted and the opinion that came out in Blakely versus

1  Washington?
2        MR. BROWN: Yes, sir. There are a couple. And again,
3  I don't mean to address the 7th Circuit case as though it
4  were law in this Circuit, I understand that it's not, but one
5  of the things that they raised was if it is an issue of say
6  drug amount or amount of loss for a bank robbery or anything
7  like that, that it would be a requirement to find a specific
8  fact by the jury beyond a reasonable doubt as to that
9  particular range. So that would be the first part, although I
10  don't think that is the hardest one to handle. I think we can
11  fashion something to handle drug quantity, because we have
12  been for previous purposes, and I think if we did it out of
13  caution and did some other more extensive analysis on the
14  verdict form as it relates to drug quantity, I think we can
15  handle that.
16       There are in almost all drug conspiracy cases the
17  opportunity, and probation has found through their
18  investigation in the past, and courts have and have not
19  granted enhancements, and for that matter reductions or
20  downward departures based on a Defendant's role in the
21  offense, including a minimal role or minor role or a
22  leadership role. So that is a potential.
23       In this particular instance there was also a firearm
24  present at the scene. While that firearm was not charged,
25  often times probation in doing their investigation will find

1 that a firearm was not charged, still being present at the
2 scene warrants a two level enhancement for the guidelines
3 level, the total guidelines level. Those are the only two
4 potential ones that I see.
5     Never the less, I do recognize that those may be
6 there. And if the 11th Circuit took the position of the 7th
7 Circuit, or if the U.S. Supreme Court took that position then
8 the government would be required to prove those three
9 particular things, the drug quantity, the role enhancement
10 and the firearm to the jury and have them make a finding
11 beyond a reasonable doubt as to whether those apply.
12     One other issue before I forget, and I know this is
13 an unsettled area. Almost all of the opinions, either at the
14 District Court level or at the 7th Circuit level, address the
15 Court at sentencing issuing an alternative sentencing --
16 alternative sentence, should the guidelines be found to be
17 unconstitutional. I think that particular issue can be
18 handled at sentencing and there's no need to go into that
19 now, but that is a possibility, and before I forgot it I did
20 want to say to the Court that.
21     THE COURT: Ms. James?
22     MS. JAMES: Yes, sir. Mr. Brown's argument would be
23 better if he had superseded his indictment to charge these
24 specific sentencing enhancements, which he has not done,
25 despite the fact that Blakely came out two weeks ago. The

1 jury has been selected, we are about to begin trial and
2 there's nothing at this point that he can do I think to come
3 into -- I think he would lead the Court into error to try to
4 present any evidence of those facts for sentencing purposes
5 to the jury because they were not charged in the indictment.
6 And my reading of Blakely, and I think what the courts are
7 holding all over is that not only do these factors have to be
8 proven to a jury beyond a reasonable doubt, but they, in
9 fact, have to be charged in the indictment.
10     And one need look not much further than Justice
11 O'Conner's dissent and Justice Breyer, both of them say that,
12 and that was their concern about the Blakely opinion. So I
13 think his argument might work in another case that might be
14 coming up down the road but I think at this juncture he fails
15 to simply not charge in the indictment, so role in the
16 offense, firearm, any of your potential enhancements that
17 might be considered at this point or later I don't believe
18 would be appropriate.
19     THE COURT: Drug quantity, since it is alleged five
20 hundred grams or more.
21     MS. JAMES: That would have to be.
22     THE COURT: Would be, and the Court is intending if
23 the case were to go to the jury, would make that as a
24 specific finding by the jury based upon the evidence as
25 presented.

1     MS. JAMES: I think whatever is in their indictment
2 is fair game for them but I think anything else would be a
3 violation of Blakely. So I think that we are jumping the gun
4 to talk about special interrogatories to the jury and things
5 of that nature in this case. That may come up tomorrow in
6 another case but not in this one because of where this case
7 falls as we begin the trial.
8     THE COURT: Mr. Madison?
9     MR. MADISON: Judge, I agree with Ms. James on that
10 issue. I don't think it's curative at this point either. I
11 think once the jury was empaneled jeopardy attached. In my
12 reading of the cases, I'd think it's more than the 7th
13 District, another District has come up out with an opinion as
14 well. If it's not pled in the indictment then it's gone, and
15 they can't plead and prove it to a jury. So I think at this
16 point in time the enhancements are gone other than the one
17 with respect to the amount.
18     THE COURT: The amount of drugs involved?
19     MR. MADISON: Yes, sir, the one that was alleged in
20 the indictment. So, you know, the gun charge, any attempt
21 later by the probation office or the government to try to say
22 if there is a finding of guilt in this case to try to
23 attribute to any of the Defendants a gun or weapon I think is
24 lost by the fact that they haven't been re-indicted for that,
25 it's not pled in the indictment.

1     THE COURT: What about the role enhancement or the
2 role of mitigation because that could work to the Defendant's
3 benefit at sentencing? Are you saying that the failure of the
4 Defendants to raise that at any point prior to trial
5 precludes you from submitting that as a specific finding of
6 fact to the jury so they could not come back and say we find
7 that either of these Defendants played a mitigating role in
8 the conspiracy?
9     MR. MADISON: I imagine that might be what the
10 government would argue, that's not something I would argue,
11 Your Honor.
12     THE COURT: The Court doesn't think you can have
13 your cake and eat it too, so-to-speak.
14     MR. MADISON: I understand that, I am just going to
15 say that's not what I would advance upon the Court. Just with
16 respect to that, I would assume I would have to maintain a
17 consistent position in this because you are not supposed to
18 take an inconsistent position in one case or litigation, so
19 we might be barred by something like that. But the bottom
20 line is I don't think under the recent case law that they are
21 entitled to argue these enhancements if it's not pled in the
22 indictment.
23     MS. JAMES: Judge, I do have one other thought with
24 regard to Mr. Peralte. This is a possibility, and under our

Page 29

1  pre-Blakely approach, that the government would seek and the
2  probation office would suggest the possibility of a career
3  offender enhancement for Mr. Peralte based upon prior
4  convictions. I believe that the same argument would apply
5  with regard to that, in that it's not charged in the
6  indictment, has not been proven or it will not be proven to a
7  jury beyond a reasonable doubt. If that were to be an issue
8  that were in this case or a future case then I think clearly
9  that is one that would call for a bifurcated trial because
10 you would not want the evidence before the jury that he had
11 prior convictions with regard to guilt or innocence in this
12 case. So if that were something the government were going to
13 try to prove up that would clearly require bifurcation.
14       I anticipate the government's argument, and I have
15 got this matter that will be before Judge Thompson in a
16 couple of weeks and he wants a brief on it, but with regard
17 to prior convictions that create armed career offender
18 enhancements and career offender enhancements, that I think
19 the government will argue that under the Cortez case that if
20 those are -- that prior convictions provide the exception to
21 that. In other words, that, you know, Apprendi and Blakely
22 apply except if you have a prior conviction. But it appears
23 to me that the Cortez case, the prior conviction was
24 encompassed within the statute that was charged, where, of
25 course, these sentencing enhancements would not be. They are

Page 30

1  just simply sentencing enhancements that sort of bootstrap a
2  prior conviction.
3        So I have the same objection. I anticipate that.
4  That was not addressed by Mr. Brown but I can see that
5  surfacing later so I have the same objection, it was not
6  charged in the indictment. I think that would put to rest
7  the rest of that argument as to whether or not it could be
8  proven to a jury and that kind of thing.
9        THE COURT: Whether or not it could be introduced to
10 the jury I think is a matter separate and apart from a
11 sentencing enhancement. The Court is not aware of Apprendi
12 even requiring as an additional portion of proof any prior
13 conviction that the Defendant has. My understanding of the
14 Apprendi decision involved -- and in Blakely as well, if it
15 applies to the Federal Sentencing Guidelines, is that issues
16 of proof which would affect sentencing must be proved to a
17 jury beyond a reasonable doubt, with the exception of prior
18 convictions.
19       Now, if counsel has any ideas that that would not
20 apply certainly this may not be the proper forum because this
21 may not even apply and would only apply subject to a
22 conviction in this case. But as to the issues that have been
23 identified for the Court, those being drug quantity, I feel
24 like the indictment has covered that and that issue will be
25 submitted to the jury specifically as a finding of fact.

Page 31

1        The role enhancement or mitigation, as it would
2  affect sentencing, if there's going to be any enhancement
3  sought or mitigation sought, counsel may wish to present that
4  to the jury in the form of some type of interrogatory. The
5  presence of the firearm and what affect it would have in the
6  sentencing should either of these Defendants be convicted,
7  and be in possession of a firearm, I would preclude the
8  government from introducing any evidence for the purpose of
9  enhancing their sentence at this time, and we can discuss
10 that further as we proceed with the trial.
11       MS. JAMES: Your Honor?
12       THE COURT: Yes, ma'am.
13       MS. JAMES: Am I hearing the Court say that should
14 the defense seek at some later time application of a
15 mitigating sentencing factor then it would be upon the
16 defense to submit that in a special interrogatory to the
17 jury? I am assuming since we can't charge in the indictment
18 it can't be a matter that we could have brought up.
19       THE COURT: Repeat that for me, Ms. James.
20       MS. JAMES: I am sensing in your ruling that you are
21 saying should the defense decide to request any mitigating
22 sentencing factor, role departure, and I think there are some
23 others, there would be safety valve and things of that
24 nature, that it would be incumbent upon the defense to make
25 that request to the Court through some special interrogatory.

Page 32

1  If I am correct on that I am assuming that's because we would
2  have no way to -- it's not a matter of us charging it in the
3  indictment since that's the government, that would be the
4  only way we would be able to seek factors that would be in
5  compliance with what Blakely says.
6        THE COURT: I am not suggesting that at all, I am
7  just merely saying that as an intellectual discussion here,
8  if you are stating that the government can't offer certain
9  items of evidence because it would affect sentencing and
10 because they haven't alleged it they can't raise it or they
11 can't ask the jury to consider it, my question back to
12 defense counsel is what about those beneficial portions of the
13 sentencing guidelines such as role reduction that would
14 benefit the Defendant because of some minor participatory
15 role they have as opposed to an aggravating participatory
16 role, is that something that should be submitted to the jury
17 based on the Blakely decision now two weeks old and the
18 prodigy of cases we have had since then. Is that an issue
19 that if the case should go to the jury that the jury should
20 make that as a finding of fact? I am just merely asking you
21 that as a hypothetical.
22       MR. MADISON: And just thinking about that, while we
23 are kicking it around, a negative fact against the Defendant
24 would involve possible due process problems for the
25 government, whereas a positive fact in favor of Defendant is

Page 29 - Page 32

## Page 33

1  not going to involve a due process violation of a Defendant I
2  don't believe. So, in that regard, having thought about it
3  for a little bit here, if there's no adverse consequence
4  concerning a positive enhancement or mitigating factor for a
5  Defendant, then I am not sure I understand what the Court was
6  asking with respect to it being a negative thing for the
7  government, but it's not a negative thing for the Defendant
8  and there's no constitutional violation involved.
9      THE COURT: Okay. All of these issues I think that
10  we have discussed are going to be fully addressed by either
11  the Supreme Court or the 11th Circuit in the near future and
12  I would anticipate that we would be able to work through
13  these issues as we go through the trial of this case. Are we
14  prepared other than what we have discussed, Mr. Brown, to go
15  forward? I don't have any ruling I can give you on the issues
16  you have raise regarding the concerns about the effect of the
17  Blakely opinion on the facts of this case, but I can
18  certainly understand how we would consider those issues
19  before a verdict is submitted to the jury for their
20  consideration and we will have an opportunity to discuss that
21  at our charge conference.
22      MR. BROWN: Yes, sir.
23      THE COURT: Outside of that is there anything else
24  we need to discuss?
25      MR. BROWN: No, sir, not from the government.

## Page 34

1      MS. JAMES: No, sir.
2      THE COURT: Why don't we take about a ten minute
3  recess, because we will get started this morning and we will
4  not take our morning recess for the expediency of the trial
5  that we have, and we will begin with opening statements at
6  10:00 o'clock. Be in recess until 10:00.
7      THE CLERK: Court is in recess.
8      (At which time, 9:50 a.m., a recess was had until
9  10:00 a.m., at which time, with the jury in the box, the
10  trial continued.)
11      THE COURT: Members of the jury, I welcome you to
12  the trial of this case today. I apologize for our slight
13  delay in getting started, I assure you we have been taking up
14  matters outside of your presence and hopefully that will
15  expedite the testimony and the trial as it proceeds over the
16  next few days. You have now been sworn as the jury to try
17  this case -- stand, please, and be sworn.
18      THE CLERK: You, and each of you, do solemnly swear
19  or affirm that you will well and truly try, and true
20  deliverance make between the United States of America and the
21  Defendants, and true verdicts render, according to the
22  evidence and the law as made known to you by the Court, so
23  help you got.
24      JURORS: (in unison) I do.
25      THE CLERK: Be seated.

## Page 35

1      THE COURT: Now you have been sworn. The problem we
2  have when more than one jury is selected at the time. I
3  apologize. You have now been sworn as the jury to try this
4  case. By your verdict, you will decide the disputed issues of
5  fact. I will decide all questions of law that arise during
6  the trial, and before you retire to deliberate together and
7  decide the case at the end of the trial, I will instruct you
8  on the rules of law that you must apply and you must follow
9  in reaching your decision. Because you will be called upon to
10  decide the facts of the case, you should give careful
11  attention to the testimony and evidence presented for your
12  consideration during the trial. But you should keep an open
13  mind and should not form or state any opinion about the case,
14  one way or the other, until you have heard all of the
15  evidence and have had the benefit of the closing arguments of
16  the lawyers as well as my instructions to you on the
17  applicable law.
18      During the trial you must not discuss the case in
19  any manner among yourselves or with anyone else. And you must
20  not permit anyone to attempt to discuss it with you or in
21  your presence. And, insofar as the lawyers are concerned, as
22  well as others to whom you may come to recognize as having
23  some connection with the case, you are instructed that in
24  order to avoid even the appearance of impropriety you should
25  have no conversation whatever with those persons while you

## Page 36

1  are serving on this jury. You must also avoid reading any
2  newspaper articles that might be published about the case now
3  that the trial has begun. You must also avoid listening to or
4  observing any broadcast news program on either television or
5  radio because of the possibility that some mention might be
6  made of this case during the broadcast now that this case has
7  begun.
8      The reason for those cautions, of course, lie in the
9  fact that it will be your duty to decide this case only on
10  the basis of the testimony and evidence presented during the
11  trial, without consideration of any other matter what so
12  ever.
13      Now, in order that you might better understand the
14  beginning of the case, the nature of the decisions that you
15  will be asked to make, and how you should go forward in
16  making them, I would like to give you some preliminary
17  instructions at this time concerning some of the rules of law
18  that will apply. Of course, the preliminary instructions I
19  give you now will not cover all of the rules of law
20  applicable to this case. As stated before, I will instruct
21  you fully at the end of the trial just before you retire to
22  deliberate upon your verdict, and will probably restate at
23  that time some of the rules I want to tell you about at this
24  time. In any event, you should not single out any one
25  instruction alone as stating the law, but should consider all

Page 37

1  of my instructions as a whole.
2      As I were told during the process of your selection,
3  an indictment in a criminal case is merely an accusatory
4  paper which states the charges to be determined at trial. But
5  it is not evidence against the Defendant, or the Defendants
6  in this case, or anyone else. Indeed, the Defendants have
7  entered a plea of not guilty and are presumed by the law to
8  be innocent. The government has the burden of proving the
9  Defendants guilty beyond a reasonable doubt, and if it fails
10  to do so you must find the Defendants not guilty.
11      Proof beyond a reasonable doubt is proof of such a
12  convincing character that you would be willing to rely and
13  act upon it without hesitation in the most important of your
14  own affairs. Because the government has the burden of proof,
15  it will go forward and present its testimony and evidence
16  first. After the government rests, or finishes its case in
17  chief, the defense may call witnesses and present evidence if
18  they wish to do so. However, you will remember that the law
19  does not require any Defendant to produce any evidence or to
20  produce any testimony, and no adverse inference what so ever
21  may be drawn from the election of the Defendant not to
22  testify in the event he or she should so elect.
23      As you listen to the testimony you should remember
24  that you will be the sole judges of the credibility or the
25  believability of each witness and the weight to be given to

Page 38

1  his or her testimony. In deciding whether you believe or
2  disbelieve any witness, you should consider his or her
3  relationship to the government or to the Defendants, the
4  interest, if any, of the witnesses in the outcome of this
5  case, his or her manner of testifying, the opportunity of the
6  witness to observe or acquire knowledge concerning the facts
7  about which he or she testifies, the candor, fairness and
8  intelligence of the witness, and the extent to which the
9  witness has been supported or contradicted by other credible
10  evidence. You may, in short, accept or reject the testimony
11  of any witness, in whole or in part.
12      You will notice that a court reporter is making a
13  complete stenographic record of all that is said during this
14  trial, including the testimony of the witnesses, in case it
15  should become necessary at a future date to prepare printed
16  transcripts of any portion of the trial proceedings. Such
17  transcripts, however, if prepared at all, will not be printed
18  in sufficient time or appropriate form for your review during
19  your deliberations and you should not expect to receive any
20  transcripts. You will be required to rely upon your own
21  independent, individual and collective memory concerning what
22  the testimony was.
23      On the other hand, any papers and other tangible
24  exhibits received in evidence during the trial will be
25  available to you for study during your deliberations. On some

Page 39

1  occasions during the trial exhibits may be handed to you for
2  brief inspection there in the jury box. Others will not be
3  shown to you. But do not be concerned because, as I said, you
4  will get to see and inspect at the end of the case all of the
5  exhibits that are received in evidence.
6      Note taking. You will be permitted to take notes
7  during the trial if you want to do so, and the clerk has
8  provided notebooks and pens or pencils for each of you. On
9  the other hand, of course, you are not required to take notes
10  if you choose not to do so. That will be left up to you
11  individually. If you decide to take notes be careful not to
12  get so involved in note taking that you become distracted
13  from the ongoing proceedings. Don't try to summarize all of
14  the testimony. Instead, limit your note taking to specific
15  items of information that might be difficult to remember
16  later, such as dates, times, amounts, measurements or
17  identities and relationships. But remember that you must
18  decide upon the credibility or believability of each witness,
19  and you must therefore observe the demeanor and appearance of
20  each witness while he or she is testifying. Note taking must
21  not distract you from that task.
22      I would ask that if you would at this time to write
23  your name at the top of your note pad so that you can have it
24  identified only for your use as this case progresses. I will
25  give you instructions about what you are to do with your note

Page 40

1  pad as you break from the courtroom during each session of
2  the Court proceedings. Your notes should be used only as an
3  aid to your memory, and whether you take notes or not you
4  should rely upon your own independent recollection or memory
5  of what the testimony was and should not be unduly influenced
6  by the notes of other jurors. Notes are not entitled to any
7  greater weight than the recollection or impression of each
8  juror as to what the testimony was.
9      As you know from the explanation I gave you during
10  the course of the jury selection it is charged in this case,
11  among other things, that the Defendants engaged in an
12  unlawful conspiracy to commit certain offenses, namely, that
13  they conspired to distribute and possessed with intent to
14  distribute two controlled substances. Under the law, a
15  conspiracy is a combination or agreement of two or more
16  persons to join together to attempt to accomplish some
17  unlawful purpose. It is a kind of partnership in criminal
18  purposes, and wilful participation in such a scheme or
19  agreement is sufficient to complete the offense of the
20  conspiracy itself even though the criminal element of the
21  conspiracy is not carried out.
22      In order to establish the offense of conspiracy the
23  government must prove beyond a reasonable doubt each of the
24  following specific facts: First, that two or more persons in
25  some way or manner came to a mutual understanding to try to

Page 37 - Page 40

Page 41

1  accomplish a common and unlawful plan as charged in the
2  indictment. And, second, that the Defendants, Alphonso Norman
3  and Capulco Peralte, knowing the unlawful purpose of the
4  plan, wilfully joined in it.
5       The indictment charges certain so-called substantive
6  offenses, namely that on two occasions Defendant Alphonso
7  Norman and Capulco Peralte possessed a controlled substance
8  with intent to distribute it. In order to establish the
9  substantive offenses charged in the indictment the government
10 must prove beyond a reasonable doubt each of the following
11 essential elements: First, that the Defendants, Alphonso
12 Norman and Capulco Peralte, knowingly and wilfully possessed
13 the controlled substances as charged in the indictment; and,
14 second, that the Defendants, Alphonso Norman and Capulco
15 Peralte, possessed the substances with intent to distribute
16 it.
17      Cocaine hydrochloride and cocaine base, which is
18 commonly referred to as crack cocaine, the substances charged
19 in the indictment, are controlled substances within the
20 meaning of the law. The word knowingly, as that term has been
21 used in these instructions, means that the act was done
22 voluntarily and intentionally, and not because of some
23 mistake or accident. The word wilfully, as that term has been
24 used in these instructions, means that the act was committed
25 voluntarily and purposefully, with the specific intent to do

Page 42

1  something that the law forbids, that is to say, with bad
2  purpose, either to disobey or disregard the law.
3       From time to time during the trial I may be called
4  upon to make rulings of law on motions or objections made by
5  the lawyers. You should not infer or conclude from any ruling
6  I may make that I have an opinion on the merits of the case
7  favoring one side or the other. I do not. And if I sustain an
8  objection to a question that goes unanswered by the
9  witnesses, you should not speculate on what answer might have
10 been given, nor should you draw any inference or conclusions
11 from the question itself.
12      During the trial it may be necessary for me to
13 confer with the attorneys from time to time out of your
14 hearing concerning questions of law or procedure that require
15 consideration by the Court alone. On some occasions you may
16 be excused from the courtroom as a convenience to you and to
17 us while I discuss such matters with the attorneys. I will
18 try to limit such interruptions as much as possible, but you
19 should remember at all times the importance of the matter you
20 are here to determine, and should be patient even though the
21 case may seem to go slowly.
22      We will now begin by affording the attorneys for
23 each side an opportunity to make opening statements to you in
24 which they may explain the issues in the case and summarize
25 the facts as they expect that the evidence will show. After

Page 43

1  all of the testimony and evidence has been presented, the
2  attorneys will be given another opportunity to address you at
3  the conclusion of the trial and to make their summations or
4  final arguments in the case.
5       The statements that the lawyers make now, as well as
6  the arguments they present at the end of the trial, are not
7  to be considered by you either as evidence in this case,
8  which will only come from the witness stand and the exhibits
9  that are received in evidence, or as instructions to you on
10 what the law is, which will only come from me. Never the
11 less, these statements and arguments are intended to help you
12 to understand the issues and the evidence as it comes in, as
13 well as the positions taken by both sides.
14      I now ask that you give your close and undivided
15 attention to the attorneys as I recognize each of them for
16 the purpose of making their opening statements. Is the
17 government prepared for its opening statement?
18      MR. BROWN: Yes, Your Honor.
19      THE COURT: You may proceed.
20      MR. BROWN: Thank you.
21      (At which time opening statements were presented by
22 counsel for the Government and counsel for each Defendant,
23 after which, the following occurred:)
24      THE COURT: You may call your first witness, Mr.
25 Brown.

Page 44

1      MR. BROWN: Thank you, Your Honor. The government
2  calls Corporal Tommy Conway.
3      MR. MADISON: Judge, may we approach on something
4  just very quickly?
5      THE COURT: Yes. You want this on the record?
6      MR. MADISON: Yes, sir. It doesn't need to be.
7      THE COURT: Either it is or it isn't.
8      MR. MADISON: No, sir.
9      (At which time a side-bar conference was had between
10 the Court and counsel, which conference was not attended by
11 the court reporter.)
12      (At which time the following occurred at side-bar:)
13      THE COURT: The Court will invoke the rule for
14 exclusion of witnesses in this case. I will require each
15 attorney to insure that your witnesses are outside the
16 courtroom if they wish to testify.
17      MR. MADISON: Thank you.
18      (At which time the following occurred in open
19 court:)
20      THE CLERK: You do solemnly swear or affirm that the
21 testimony you give in the trial of this cause to be the
22 truth, the whole truth, and nothing but the truth, so help
23 you God.
24      THE WITNESS: I do.
25

| Page 45 | Page 47 |
|---|---|
| 1  J.T. CONWAY, witness for the Government, having | 1  A. She gave me a telephone number that she said was the |
| 2  been duly sworn or affirmed, testified as follows: | 2  telephone number to that residence. |
| 3     DIRECT EXAMINATION | 3  Q. What happened after that? |
| 4  BY MR. BROWN: | 4  A. I got a few more people together, we went out to the |
| 5  Q. Good morning, sir. Will you state your name, please. | 5  house to see what was going on. The house is at the end of |
| 6  A. I am Corporal J.T. Conway. | 6  4th Street kind of in a cul-de-sac but if you are going |
| 7  Q. How are you employed? | 7  towards the house you are going downhill so you can kind of |
| 8  A. Montgomery police department. | 8  park in the street and see down to the house. And from where |
| 9  Q. Are you with any specific bureau or division? | 9  I parked I could see that maroon vehicle that she was talking |
| 10  A. I am with the special operations division, assigned to | 10  about backed up beside the house. I couldn't tell if it had a |
| 11  the narcotics bureau. | 11  Florida tag, like I said, it was backed in, and there were |
| 12  Q. Were you employed in that capacity back in September of | 12  several more vehicles at the house. |
| 13  2003? | 13  Q. Could you see them, them being the vehicles, with just |
| 14  A. Yes, sir. | 14  the naked eye or did you use any other equipment or what? |
| 15  Q. Specifically on September 25th. | 15  A. I was using binoculars because I was parked way back up |
| 16  A. Yes, sir. | 16  the street. |
| 17  Q. Do you recall the events of that day? | 17  Q. Okay. How many blocks away would you say you were? |
| 18  A. Yes, sir. | 18  A. I mean I wasn't several blocks, I was like -- I was |
| 19  Q. Would you describe to the jury where you were that day | 19  probably, I am just guessing, three hundred yards from the |
| 20  and what happened. | 20  house, somewhere like that. |
| 21  A. Well, before -- starting when I received the telephone | 21  Q. Other than the cars did you observe anything else? |
| 22  call? | 22  A. When I first got there? |
| 23  Q. Right. Where were you when you received the telephone | 23  Q. Right. |
| 24  call? | 24  A. That was it right then. |
| 25  A. Around 4:00 o'clock that afternoon I received a | 25  Q. Okay. What, if anything, did you do after that? |

| Page 46 | Page 48 |
|---|---|
| 1  telephone call at the office, at the narcotics office, from a | 1  A. After that I got a call on the radio and asked Corporal |
| 2  female subject, she didn't say who she was. | 2  D.D. Alexander, I asked him to use that telephone number -- |
| 3  Q. The narcotics office, is it the same office as the main | 3  and what we will do sometimes is we will call the house if we |
| 4  headquarters of the Montgomery police department? | 4  get a complaint like that and there's supposed to be a lot of |
| 5  A. No, sir. Our office is at another location. | 5  drugs in the house, we will call the phone number to that |
| 6  Q. The phone number that comes into your office, is that | 6  house and we will tell them hey, the police are on the way to |
| 7  the same 911 phone number or is it a different phone number? | 7  your house. And what it does, is a lot of times it will scare |
| 8  A. It's a different phone number, it's not a recorded line | 8  them out of the house with a lot of drugs and when they leave |
| 9  like the 911 is at headquarters. | 9  in the street we will pull them over and there it is. So |
| 10  Q. What did the female state to you? | 10  Corporal Alexander called the house, and a short time -- you |
| 11  A. She told me that there was a residence on East 4th | 11  want me to continue? |
| 12  Street, I believe the address was 2429 East 4th Street, that | 12  Q. Sure. |
| 13  there was a vehicle, a maroon vehicle there, with a Florida | 13  A. Right after the phone call was made Mr. Norman walked |
| 14  tag. She said when the vehicle was there there were usually | 14  out of the residence to his trash can, the City of Montgomery |
| 15  drugs in the residence. | 15  trash can, green trash can that was sitting in the street. |
| 16  Q. What did you do after you received that information? | 16  Opened the trash can and threw something in the trash can. I |
| 17  A. Well, that wasn't the only thing she told me. She also | 17  was watching this in the binoculars. And walked back in the |
| 18  gave me the telephone number to the house and she told me | 18  house. Didn't appear to be running or scared, he was just |
| 19  that a black male, Al -- excuse me, Scooter was at the | 19  looking around, and went back in the house. |
| 20  residence. | 20  Q. You gestured a minute ago, do you see the person that |
| 21  Q. Did you recognize the nickname Scooter? | 21  you identified as being the person who dropped the object in |
| 22  A. I knew that Scooter was -- there was a black male on the | 22  the can? |
| 23  street that went by Scooter and that was Alphonso Norman, but | 23  A. Mr. Norman sitting right over there. (indicating) |
| 24  she didn't say Alphonso, she just said Scooter. | 24  Q. Would you describe what he is wearing to the jury. |
| 25  Q. And she gave you a phone number? | 25  A. Tan, olive coat. |

## Page 49

1  Q. After Mr. Norman walked away from the garbage can, what
2  happened?
3  A. He walked back to the house. We sat there a few minutes,
4  not very long, nothing happened. So at that point I got on
5  the radio and told everybody let's just go to the house, we
6  will talk to them and see who they are and just more or less
7  tell them we are getting complaints from the residents and
8  this sort of thing. So we approached the house at that time.
9  Q. And what is that technique called when you approach a
10  house like that?
11  A. We call it a knock and talk, where you basically knock
12  on the door and tell them who you are and what you are doing.
13  Q. So you did that in this case?
14  A. Yes, sir.
15  Q. Who did you make contact with and what happened after
16  that?
17  A. When we arrived, we pulled in front of the house, walked
18  to the front door. Mr. Norman and a child, I think it was
19  his son, and Andrew Kenny James, who goes by Big Kenny on the
20  street, I'm familiar with that subject also, they both walked
21  to the front door of the house. The door was open on the
22  house when we got there, they saw us walking up in their
23  front yard.
24  Q. What did you do after that?
25  A. I told Mr. Norman why we were there. Told him who I was,

## Page 50

1  why we were there. And he just -- he wasn't being very
2  cooperative at all at that point.
3  Q. Now, where was everyone located that you just described
4  a moment ago?
5  A. Mr. Norman and Mr. James were both standing sort of in
6  the doorway on the front porch. It's a little small front
7  porch on the front of the house and they were both standing
8  there in the doorway.
9  Q. Did you direct them to move to some other location at
10  some point?
11  A. At first I just stood there and talked to them. That's
12  when Mr. Norman kept putting his hands in his pockets. He
13  was wearing baggie pants and putting his hands in his
14  pockets. I told him a couple of times not to put his hands
15  in his pockets for my safety and everyone else, and he
16  continued to put his hands in his pockets again after I told
17  him the second time not to. And at that point he wasn't, you
18  know, responding, by saying not to do that, I pulled my
19  weapon on him and I pulled the little boy out of the way,
20  pulled the little boy behind me because I didn't know what he
21  was reaching for in his pants, in his pockets.
22  Q. Did you do anything to find out what was in his pants?
23  A. I patted him down after that. I told him to put his
24  hands against the wall of the house. I patted him down. He
25  had a cell phone in his pocket with a bunch of money.

## Page 51

1  Q. When you say a bunch of money, do you recall how much?
2  A. I can't recall how much,
3  Q. What happened after you conducted that pat-down of Mr.
4  Norman?
5  A. Like I said Mr. Norman, they were not being very
6  cooperative at all, so at that point I walked to the trash
7  can to see what it was that he threw in the trash can.
8  Q. What did you find?
9  A. I found a paper towel, it was wet, laying on top of the
10  trash can and it had residue in it had appeared to be
11  cocaine. I took it back to my truck, took a field-test and
12  field-tested it and it tested positive for cocaine.
13      MR. BROWN: May I approach, Your Honor?
14      THE COURT: Yes.
15  Q. Detective Conway, I am going to show you what have been
16  marked as Government's Exhibits 1, 2 and 3. Specifically
17  Exhibits 1 and 2, do you recognize those?
18  A. Yes, sir.
19  Q. What are they?
20  A. This is where the trash can was sitting at the house.
21  Q. That's Exhibit 1?
22  A. Yes, sir.
23  Q. And that's a photograph of that?
24  A. Yes, sir.
25  Q. What is Exhibit 2?

## Page 52

1  A. That's the paper towel that had the cocaine residue in
2  it.
3  Q. Do those -- both of those photographs fairly and
4  accurately depict the items that are in it as they were that
5  day?
6  A. Yes, sir.
7      MR. BROWN: The government moves to admit Exhibits 1
8  and 2.
9      THE COURT: Any objection, Ms. James?
10     MS. JAMES: No, sir.
11     THE COURT: Any objection?
12     MS. JAMES: I just wanted to see what photographs it
13  was, Judge, he didn't show them to us before he presented
14  them to the witness.
15     MR. BROWN: (complies)
16     THE COURT: Any objections, Mr. Madison or Mr.
17  Arrington?
18     MR. MADISON: No Your Honor.
19     THE COURT: Without objection, Government's Exhibits
20  Number 1 and 2 are admitted.
21  Q. Let me show you what has been admitted -- or marked as
22  Government's Exhibit 3 and ask if you recognize that exhibit?
23  A. This is the paper towel that was in the trash can.
24  Q. Okay. Now, is that in the same or substantially the same
25  condition as it was in on that day?

Page 53

1  A. I mean it's still the same paper towel. This paper towel
2  was wet, it was completely -- I mean it was soaking wet and
3  had cocaine residue in it.
4  Q. Aside from that is it in the same --
5  A. Other than that it's the same.
6        MR. BROWN: The government moves to admit Exhibit 3.
7        THE COURT: Any objection, Ms. James?
8        MS. JAMES: No, sir.
9        THE COURT: Any objection, Mr. Madison, Mr.
10 Arrington?
11       MR. MADISON: No, sir.
12       THE COURT: For the record who is going to cross-
13 examine this witness?
14       MR. MADISON: I am.
15       THE COURT: Mr. Madison.
16       MR. BROWN: I'm going to try to put this on this
17 projector. Kelli, do you mind? Sometimes the light comes
18 through there too much but I think we can see this.
19 Q. Corporal Conway, you can touch that screen and it will
20 make a mark. Would you make a mark as to the garbage can that
21 you described earlier?
22 A. That's the garbage can right there. (indicating)
23 Q. What are the vehicles that are surrounding that
24 particular garbage can?
25 A. This is my vehicle here. (indicating)

Page 54

1  Q. You are pointing to the truck on the right?
2  A. I am sorry?
3  Q. The truck on the right?
4  A. This truck right here, this is mine. This is another one
5  of our vehicles.
6  Q. By our vehicles you mean the police department?
7  A. Police vehicles, right. And I am not positive, I believe
8  that's one of ours. I can't tell by the picture but I believe
9  that's one of ours over there.
10 Q. Is that the location where the garbage can was when you
11 observed something being put into it?
12 A. Yes. We never moved the garbage can, that's exactly
13 where it was sitting.
14 Q. Was the lid open when you approached it or had it been
15 closed?
16 A. This picture was taken after I had opened it. I opened
17 the lid on it, the lid was closed.
18 Q. Government's Exhibit 2 you indicated was what again?
19 A. That's the paper towel that was in the garbage can.
20 Q. After you did the field-test on the item, the paper
21 towel that was in the garbage can, what did you do then?
22 A. At that point I told the other officers that were there
23 to detain Mr. Norman and Mr. James, that I was going to get a
24 search warrant for the residence.
25 Q. Did you do that? Did you have to leave, did you stay

Page 55

1  there?
2  A. I left at that point to go back to our office to type
3  the search warrant up.
4  Q. During you typing up your search warrant did you get any
5  communications from any other officers?
6  A. Yes, sir.
7  Q. What, if anything, did you learn?
8  A. Sergeant Drummond, he called on the radio and told me
9  while they were at the residence with Mr. James and Mr.
10 Norman that they heard someone inside the residence and that
11 it turned out it was Mr. Peralte.
12 Q. Did you include that information in your search warrant
13 affidavit as well?
14 A. Yes, I did.
15 Q. What did you do after you typed that affidavit up?
16 A. After the affidavit was typed I had to go meet with the
17 Judge and get the search warrant signed.
18 Q. You did that?
19 A. Yes, I did.
20 Q. Who was the Judge?
21 A. Judge Hayes.
22 Q. After you got the warrant signed by Judge Hayes what did
23 you do?
24 A. After I got the warrant signed by Judge Hayes I returned
25 to the residence and we executed the search warrant on the

Page 56

1  residence.
2  Q. You had said it was about 4:00 o'clock when you got the
3  first phone call; is that right?
4  A. That's right.
5  Q. About what time was it that you got back to the
6  residence with the search warrant?
7  A. I can't remember. I am going to say it had to be 6:00
8  o'clock or after. It took a little while, you know, to go to
9  the house the first time, go back to get the search warrant
10 signed and come back. It was at least 6:00, I am not
11 positive. The time of the search would be on the search
12 warrant, that would be the right time.
13 Q. When you went back with the search warrant what did you
14 do at that point?
15 A. We started searching the residence.
16 Q. Who were the other officers there if you know that
17 assisted in that?
18 A. On the whole time or during the search of the residence?
19 Q. At the search, during the search.
20 A. I know Sergeant Drummond was there, Corporal Bartlett
21 was there, I think Lieutenant Cabiness was there, Corporal
22 Simons, Scott Simons. And then myself. I think that's all.
23 There might have been a couple more officers there, I am not
24 positive, but I think that was it.
25 Q. After the search was conducted and the case moved on,

Page 57

1 did you later learn that the phone number that you had had
2 Corporal Alexander call actually was not the number for that
3 residence?
4 A. Yes, sir, I did.
5 Q. Do you recall who the number belonged to by any chance?
6 A. No, sir, I don't.
7 Q. Thank you, Corporal Conway, I don't have any further
8 questions for you at this time, the defense lawyers may.
9       THE COURT: Ms. James, Mr. Madison, which order do
10 you desire to go in?
11       MS. JAMES: He said I could go first, Judge.
12       CROSS-EXAMINATION
13 BY MS. JAMES:
14 Q. Good morning.
15 A. Good morning.
16 Q. I represent Mr. Peralte. Susan James. How are you?
17 A. Okay.
18 Q. This was -- this all happened within a period of what,
19 just a few hours that you actually got the call until the
20 time that the search was completed?
21 A. Yes, ma'am.
22 Q. And you were at your desk I believe and you received
23 this anonymous call from a person that you did not know; is
24 that right?
25 A. Yes, ma'am.

Page 58

1 Q. Now, the person on the other end of the line I believe
2 you said here sounded like a female; is that right?
3 A. Yes, ma'am.
4 Q. In fact, it was -- to you, you heard it to be a black
5 female or someone you believed to be a black female; correct?
6 A. It sounded like it, yes, ma'am.
7 Q. And this person gave you some details of course you were
8 interested in in your line of work because it involved some
9 criminal activities, specifically drugs, right?
10 A. Yes, ma'am.
11 Q. And the person who gave you information that there were
12 three people that had actually been seen there talking on the
13 porch, right?
14 A. Yes, ma'am.
15 Q. Now, when we have labeled this anonymous that means you
16 had not one clue who the person was; is that right?
17 A. That's right.
18 Q. And did you ask the person who it was?
19 A. I did ask but the lady would not tell me what her name
20 was.
21 Q. Okay. Have you had occasion either prior to September
22 the 25th, 2003 or subsequently to talk to a female, a black
23 female by the name of Tammy Montgomery, have you interviewed
24 her?
25 A. No, ma'am, not that I know of. I haven't interviewed,

Page 59

1 no, ma'am.
2 Q. So having given that answer it would be fair to say you
3 wouldn't know what her voice sounded like; correct?
4 A. No, ma'am, I would not.
5 Q. Now, when you heard this, and this person gave you this
6 phone number that we now know was either the wrong number or
7 you transposed the number incorrectly, right?
8 A. Right.
9 Q. Okay. But never the less, you got a phone number, you
10 got together a group of other law enforcement officers and
11 you all went over to set up surveillance, right?
12 A. Yes, ma'am.
13 Q. And at that point you were parked with your binoculars
14 so you could at least see the residence; correct?
15 A. That's right.
16       MS. JAMES: Your Honor, may I approach?
17       THE COURT: Yes.
18 Q. Showing you what is now in evidence as Government's
19 Exhibit 1, you have just -- you identified that a few months
20 ago, did you not?
21 A. Yes, ma'am.
22 Q. Now, the car here, I guess I am putting my finger on it,
23 that's actually in the driveway?
24 A. The one in the driveway here?
25 Q. Right, the one in the driveway. Is it a Jaguar, an older

Page 60

1 model Jaguar?
2 A. Yes, ma'am.
3 Q. Have you been able to identify that as being a vehicle
4 associated with Mr. James?
5 A. I can't recall whose vehicle it was.
6 Q. Okay. Does that mean that you didn't make an inquiry to
7 see whose it was?
8 A. Right now I can't remember, no, ma'am.
9 Q. Okay. All right. Well, but you have identified also
10 there your vehicle, that would be the green one, kind of a
11 blazer-looking-type?
12 A. No, ma'am, mine is the F-150 sitting here.
13 Q. Whose is the green?
14 A. This is going to be Corporal Alexander's vehicle.
15 Q. Okay. Now, Corporal Alexander was the law enforcement
16 officer that you actually asked to make this call to the
17 residence or the number purportedly belonging to the
18 residence.
19 A. Yes, ma'am.
20 Q. And when he -- he reported back to you that the call
21 had, in fact, been made, right?
22 A. Yes, ma'am.
23 Q. And at that point you were surveilling the residence
24 from a short distance away with binoculars.
25 A. Yes, ma'am.

Page 61

1  Q. And almost instantaneous to his radio to you the call is
2  complete, Mr. Norman exited the residence; is that right?
3  A. That's right.
4  Q. Now, your purpose as a law enforcement officer I think
5  you have testified here today in doing that is sometimes you
6  can -- I guess for lack of a better term if people have
7  controlled substances in a house and they think the police
8  are coming it's only normal that they might try to get out of
9  there, would you agree?
10 A. That's right.
11 Q. And that was your hope in this case, wasn't it, if there
12 were drugs or any quantity of drugs there, that the occupants
13 of this residence knowing that the police were coming, or
14 believing that, would scoop up the controlled substances and
15 take off; is that right?
16 A. That's right.
17 Q. Sometimes if they know the police are coming they might
18 also try to destroy the evidence; is that right?
19 A. That's right.
20 Q. But your guess or your hunch in this case would be that
21 after the call that the people in the residence, if they were
22 involved with something illegal, would take it and leave,
23 right?
24 A. Yes, ma'am. It doesn't work that way every time, but
25 sometimes they don't know --

Page 62

1  Q. That was your plan.
2  A. Yes, ma'am, that was our plan.
3  Q. And in this case, we know now from I guess what
4  developed in the investigation that that didn't happen,
5  right?
6  A. Right.
7  Q. We also know that Mr. Norman's exit of the house, that
8  really had nothing to do with the telephone call.
9  A. That's right.
10 Q. Right? We do know, however, that when you went up and
11 you did your knock and talk, Mr. Norman, he was actually
12 turned around from this trash can that you have identified
13 and heading back into the residence, wasn't he?
14 A. Actually he was already back inside the house when we
15 approached the house, he came from inside.
16 Q. You said the door was open?
17 A. Yes, ma'am.
18 Q. Did you actually knock?
19 A. As we were walking up to the front of the house, they
20 saw us walking up, Mr. Norman walked to the door.
21 Q. Were you in plain clothes?
22 A. Yes, ma'am.
23 Q. Were there other officers behind you that were also
24 visible to Mr. Norman?
25 A. Yes, ma'am.

Page 63

1  Q. And would any of those have been in a uniform, black and
2  white, either units or in uniforms?
3  A. There were no black and whites there but we wear
4  bulletproof vests that have -- they are not just a vest, they
5  have police written across the front and back of them.
6  Q. So if Mr. Norman were inside the residence and Mr.
7  Peralte and Mr. James or anyone else that might have been in
8  that residence, it would not have been difficult, would it,
9  for them to look out and see that you and others there with
10 you were associated with law enforcement or police.
11 A. That's right.
12 Q. So Mr. Norman comes out of the house, and at that point
13 you begin to engage him in conversation?
14 A. Yes, ma'am.
15 Q. All right. After you begin to do that, Mr. James
16 actually came out of the residence, didn't he?
17 A. Actually they kind of approached at the same time, when
18 we walked up.
19 Q. And at that point Mr. James -- or at some point shortly
20 thereafter Mr. James and Mr. Norman are on the front porch
21 and you have engaged at least Mr. Norman in conversation.
22 A. That's right.
23 Q. And at some point it became necessary you said for you
24 to draw your revolver and move the child from the immediate
25 area; is that right?

Page 64

1  A. Yes, ma'am.
2  Q. And from that point on Mr. Norman and Mr. James were
3  pretty much in a custodial situation, I mean, they were there
4  while you were talking with them and not free to go back in
5  the house.
6  A. That's right.
7  Q. Is that right? And it was sometime thereafter that you
8  went to the trash can, retrieved this -- this is a big trash
9  can, right, like the kind you roll out to the curb?
10 A. The one you saw in the picture, that's right.
11 Q. And that would be a large trash can. In fact, it's
12 actually in the picture, isn't it?
13 A. Yes, ma'am.
14 Q. That would be the trash can right there. (indicating)
15 A. That's right.
16 Q. Okay. And that trash can, of course, you don't know when
17 the trash can got there.
18 A. No, ma'am.
19 Q. Don't know who put the trash can there, right?
20 A. No, ma'am.
21 Q. And were there other things in the trash can?
22 A. Yes, ma'am.
23 Q. Now, you go sometime -- from what I hear you saying, you
24 go sometime over to the can, you retrieve something out of
25 the can and you perform a field-test; is that right?

Page 65

1  A. That's right.
2  Q. And your field-test satisfied you there was the
3  existence of some residues of a controlled substance?
4  A. That's right.
5  Q. And from that point you decided that you would go and
6  seek a search warrant, right?
7  A. Right.
8  Q. So you didn't go in the residence at that time; correct?
9  A. No, ma'am.
10  Q. In fact, you were back at your office typing up the
11  information for the search warrant when you were radioed by
12  Mr. Drummond who is another officer that was there with you;
13  correct?
14  A. That's correct.
15  Q. And Mr. Drummond told you we found another person inside
16  the residence.
17  A. Yes, ma'am.
18  Q. In fact, he told you that there were loud noises in
19  there as if someone was moving furniture; is that right?
20  A. He said they heard someone inside the residence and they
21  went in and Mr. Peralte was inside the residence, that's
22  basically it.
23  Q. So there's no question that when you went and left to go
24  to the station you didn't know that anyone else necessarily
25  was in the residence.

Page 66

1  A. Right. As far as I knew that the three people -- that
2  the little boy and Mr. James and Mr. Norman were the only
3  ones there.
4  Q. Okay. So it's safe to say if you didn't know anyone was
5  in the residence you certainly didn't know Mr. Peralte was in
6  there.
7  A. Right. Right.
8  Q. But while you were at the station and you were typing up
9  the search warrant you at that point knew Mr. Norman's name
10  and you knew Mr. James' name because you had inquired, right?
11  A. Right.
12  Q. Did not know Mr. Peralte's name.
13  A. Right.
14  Q. But Mr. Drummond radioed you and he says I found someone
15  in the house, and this person is named Capulco Peralte.
16  A. Right.
17  Q. And at that point becoming aware of that name you typed
18  it into your search warrant as well, right?
19  A. Yes, ma'am.
20  Q. So Mr. Drummond, of course, had to provide you that
21  information, he had to know or have been given the name or
22  find it through another method, that this was, in fact, his
23  name, right?
24  A. Right.
25  Q. All right. Now, subsequent to your obtaining the search

Page 67

1  warrant you returned to the residence; is that right?
2  A. Yes, ma'am.
3  Q. And at that point you decided that it was okay or you
4  knew it was okay to go on into the residence and to search,
5  right?
6  A. Right.
7  Q. Now, we have been shown here through government exhibits
8  certain photographs that bear -- well, actually you -- let me
9  withdraw that. Did you participate in the search of the
10  entire residence?
11  A. Yes, ma'am.
12  Q. Did you actually, you yourself, personally locate any of
13  the controlled substances that form the basis for the charges
14  in this case?
15  A. I think Sergeant Drummond located most of that. I did
16  not.
17  Q. You didn't find any of it?
18  A. No, ma'am.
19  Q. Do you have any independent knowledge as to where it was
20  found?
21  A. I know some of it was found in the dryer, in the laundry
22  room, and then some of it was found up under one of the sofas
23  in like the back den or something, in the back of the house.
24  Q. Okay. With regard to what, you know, Mr. Drummond, and
25  your going to get the search warrant and that, and in

Page 68

1  relation to when Mr. Peralte was located in the residence,
2  you will agree with me that there was some 20 to 30 minutes
3  period that Mr. Peralte was in the house alone.
4  A. Probably at least 15 or 20 minutes, yes, ma'am. Maybe
5  not quite 30 minutes I wouldn't think.
6  Q. Well, do you remember testifying in another proceeding
7  relating to this case?
8  A. Yes, ma'am.
9  Q. And agreeing with me that Peralte was in the house for
10  30 minutes to spare?
11  A. I couldn't remember. It's been a long time. I don't
12  know. He was in the house when I left, he was in the house
13  while I was typing the search warrant, Sergeant Drummond
14  called and said he was in the house. You know, so as far as
15  the time goes I am not sure.
16  Q. Okay. Well, let me ask you this, when you left -- okay,
17  so you went straight from the 4th Street location to your
18  office to type the search warrant.
19  A. Yes, ma'am.
20  Q. Okay. All right. Now, at this point the officers that
21  were present at the front of the house were you -- and I am
22  saying before you departed to go get the search warrant --
23  were you, Officer Drummond, Officer Alexander and who else
24  was there?
25  A. Lieutenant Cabiness was there I think.

Page 69

1  Q. Okay. So that would have been what, four of you total?
2  A. Yes, ma'am, I think so.
3  Q. Four of you total. You departed to go get the search
4  warrant, and assuming that the others were there to secure
5  these -- Norman and Mr. James until the warrant could be
6  executed?
7  A. Right.
8  Q. Okay. And so no backups, black and whites or anything
9  had been called at that point.
10  A. No.
11  Q. All right. And, of course, at that point y'all didn't
12  have any particular reason to think that someone else was in
13  the house or you would have gone in the house earlier on to
14  secure the residence, would you not?
15  A. Right. We talked to Mr. Norman and Mr. James, they told
16  us they were the only ones in the house, so, you know, we can
17  just assume there was no one else in the house.
18  Q. Okay.
19      MS. JAMES: May I have one moment, Judge?
20      THE COURT: Yes.
21      (pause)
22      MS. JAMES: Your Honor, I have no further questions.
23      THE COURT: Mr. Madison.
24      MR. MADISON: Ladies and gentlemen, I am Don Madison
25  again, y'all met me when we had the striking of the jury last

Page 70

1  week.
2          CROSS-EXAMINATION
3  BY MR. MADISON:
4  Q. Mr. Conway, this whole ordeal began premised upon an
5  incorrect assumption, did it not?
6  A. I wouldn't say that.
7  Q. Well, you assumed that Mr. Norman placed an item in the
8  garbage can which you claimed to be was drugs seized in this
9  case; isn't that correct?
10  A. I don't think I understand your question.
11  Q. You obtained a search warrant based upon what reason?
12  A. I obtained the search warrant because I saw Mr. Norman
13  place something in the garbage can. When I looked in the
14  garbage can from that residence, right in front of it at the
15  end of the driveway, there was a paper towel that had cocaine
16  residue in it that field-tested positive for cocaine.
17  Q. But you assumed Mr. Norman placed that in the garbage
18  can because of the phone call.
19  A. I know Mr. Norman put that in the garbage can.
20  Q. But you don't know that Mr. Norman put those drugs in
21  the garbage can, do you?
22  A. I don't understand what you are asking me. I watched Mr.
23  Norman walk to the garbage can and put something in the
24  garbage can, and this paper towel was laying right on top of
25  the garbage.

Page 71

1  Q. But you don't know what he put in that trash can as we
2  sit here today, do you?
3  A. No, sir.
4  Q. Okay. And you don't know if somebody else driving down
5  the street might have placed something in that trash can.
6  A. No.
7  Q. You basically assumed because you made a phone call to
8  that residence that somebody inside that residence was going
9  to discard drugs because y'all called them and said hey, the
10  police are coming; isn't that correct?
11  A. Right.
12  Q. But that's not true as we sit here today, is it?
13  A. There was drugs in the garbage can and there were drugs
14  inside the house.
15  Q. But the phone call wasn't made, was it?
16  A. The phone call was made, yes, sir.
17  Q. But it wasn't made to that residence.
18  A. No, sir.
19  Q. So that was an incorrect assumption on your part; is
20  that correct?
21  A. I still don't understand what you are asking. We made a
22  phone call. The assumption was there was drugs in the house,
23  and after we executed the search warrant there were drugs in
24  the house, a large amount of drugs.
25  Q. But you premised that search warrant based upon facts

Page 72

1  that you assumed at the time of the incident.
2  A. I based the search warrant on the information that the
3  anonymous caller gave me. I based the search warrant on the
4  fact that we watched the residence, Mr. Norman walked out of
5  the residence and I watched with the binoculars and he put
6  something in the trash can, and whenever I looked inside the
7  trash can, which was sitting in the street, there was a paper
8  towel that had cocaine residue on it. That's what the search
9  warrant was based on.
10  Q. When you obtained the search warrant did you tell the
11  issuing Magistrate that you found that in the garbage can but
12  that you weren't aware whether it was Mr. Norman's or whether
13  it wasn't Mr. Norman's?
14  A. No, sir, I just told him that it was in the affidavit,
15  you know, it was located in the trash can.
16  Q. Now, you stated I believe and testified you were with
17  the special operations division of the Montgomery police
18  department; is that correct?
19  A. That's right.
20  Q. What are your duties in connection with your employment
21  with the Montgomery police department?
22  A. I investigate drug offenses. Basically we do all drug
23  offenses but I don't usually do, you know, pharmaceutical
24  drugs, all I do is street drugs, cocaine, marijuana, ecstasy,
25  meth, that sort of thing, any kind of drugs.

## Page 73

1  Q. You are familiar with the HIDTA task force, are you not?

2  A. The what now?

3  Q. HIDTA, H-I-D-T-A?

4  A. Yes, sir.

5  Q. What is the HIDTA task force?

6  A. It's a task force with the Montgomery police department,

7  ABI, Montgomery County sheriff's department, there's several

8  other agencies, along with the United States Drug Enforcement

9  Administration.

10  Q. Were any members of the -- the police officers that went

11  to the residence on 4th Street that day, were any of you

12  members of the HIDTA task force?

13  A. I don't think so.

14  Q. Okay. Now, Mr. Wingard sitting here, is he a member of

15  the HIDTA task force?

16  A. At that time he was, yes, sir.

17  Q. He is no longer a member then.

18  A. No, sir.

19  Q. You testified earlier that you were looking down the

20  hill I believe; is that correct?

21  A. That's right.

22  Q. And you were approximately three hundred yards away from

23  the residence.

24  A. That was a guess, yes, sir. Might not have been quite

25  that far.

## Page 74

1  Q. You look a little bit younger than me but as I stand

2  here my eyes are getting a little bad on me at my age, what

3  power were the binoculars that you were using?

4  A. They were eight by 42, Carl Zeiss binoculars, they are

5  real good binoculars.

6  Q. And as to your knowledge as to the power of that

7  particular brand of binoculars, how does it make something --

8  or what is the distances that are encompassed under that?

9  A. I can't tell you. I am not an expert, all I can tell you

10  is when I look through those binoculars it makes it a whole

11  lot clearer than looking through my eyes.

12  Q. There were several vehicles at the residence there that

13  day, were there not?

14  A. There were three or four, I can't remember exactly.

15  Q. And you say we are looking at the residence, we are

16  looking down the hill; is that correct?

17  A. Yes, sir.

18  Q. And you are looking three hundred yards down that hill

19  towards this residence, according to your testimony?

20  A. Right.

21  Q. Okay. Now, say if you used -- looking down the hill as

22  the north position of the residence, would the driveway of

23  that residence have been on the north side of the house?

24  A. If I was looking north would the driveway be on the

25  north side? I don't understand what you are asking.

## Page 75

1  Q. I am trying to give you an example, I may not be doing a

2  good example, but if you are looking down that street, this

3  is north, this is south, east and west.

4  A. Okay.

5  Q. The driveway was situated on the north side of that

6  residence, was it not, using my example?

7  A. I see what you are saying. If you were facing the front

8  of the house, the driveway was to the right side of the

9  house. If you went off the end of the driveway you didn't hit

10  the house, you went right beside the house.

11  Q. I apologize, I think you misunderstood. My example was

12  facing down the street. We will use your example then. If

13  you are standing facing the house then the driveway would

14  have been on the east side of the house; is that correct?

15  A. That's right.

16  Q. Okay. Now, what three vehicles were located in the

17  driveway of that house?

18  A. Mr. Peralte's vehicle, a red, I think it was a Ford

19  Crown Vic or something like that. It was back up beside the

20  house.

21      MS. JAMES: Objection, Your Honor, to the

22  characterization it was Mr. Peralte's vehicle.

23      THE COURT: Sustained.

24  A. Okay. There was a maroon Ford, it was backed up beside

25  the house, but it was not backed all the way up side the

## Page 76

1  house. If you were looking down the street at the house, the

2  house would be on the left side, you could still see the

3  front of the car like from the front passenger's door towards

4  the front of the car next to the door, it wasn't backed all

5  the way up side the house. There was either a Nissan or Honda

6  or something in front of it and there was a black Jaguar in

7  the driveway. And I can't remember if there was another one,

8  seems like there was another one in the street right there at

9  the Jaguar.

10  Q. The vehicle sitting there at the street is one of the

11  vehicles I am interested in, do you recall one in the street?

12  A. It seems like there was one behind the Jaguar.

13  Q. I noticed that there was an Expedition behind the

14  Jaguar, I didn't see any others other than the police

15  vehicles.

16  A. Have you got that picture? I will show you.

17  Q. (complies)

18  A. As far as this picture goes, see, you can't tell the way

19  we pulled up here. This is the Jaguar I am talking about

20  right here, and in front of this vehicle parked against the

21  curb, this curb here, there's a -- I think there was another

22  vehicle parked on the street there, but it would have been on

23  the other side of the driveway from this vehicle here.

24  Q. That's what I am trying to get at, what side of the

25  driveway are you testifying to that the other vehicle was on?

| Page 77 |
|---|
| 1 A. This side over here. (indicating) |
| 2 Q. And it would have been behind your truck; is that right? |
| 3 A. This is my truck over here. |
| 4 Q. Right. |
| 5 A. I said over here. |
| 6 Q. Okay. I'm sorry, I misunderstood you. Were there any |
| 7 other vehicles though located behind your truck? |
| 8 A. I don't think so. |
| 9 Q. What obstructions were there with respect to your view |
| 10 of that trash can? |
| 11 A. There was none. I was parked on the right side of the |
| 12 road. Back up the street behind where my truck was sitting on |
| 13 the picture here, I was sitting on the right side of the |
| 14 street and you could look -- I could see straight down the |
| 15 street to it. |
| 16 Q. Were you long enough -- or had you arrived at the |
| 17 residence long enough to determine the time that the other |
| 18 vehicles arrived other than the maroon vehicle that the |
| 19 caller informed you about? |
| 20 A. No, sir. |
| 21 Q. So you have no idea then what time the white vehicle |
| 22 arrived in the driveway? |
| 23 A. No, sir. |
| 24 Q. None with respect to the time that the black, I guess |
| 25 black or green Jaguar? |

| Page 78 |
|---|
| 1 A. No, sir. |
| 2 Q. Okay, and with respect to the vehicle that may have been |
| 3 in the road you weren't even aware whether or not that was |
| 4 associated with the residence or not, were you? |
| 5 A. Right. |
| 6 Q. Now, I understood that two calls were made, I believe, |
| 7 during the investigation or during your time involved in the |
| 8 search; is that correct? Two calls were made, one to you |
| 9 while you were in the office, and another call was made to |
| 10 the residence, or you thought to the residence. |
| 11 A. No, sir. When we went out there to start with a phone |
| 12 call was made to the residence. Mr. Norman walked out of the |
| 13 residence and walked to the trash can and put something in |
| 14 the trash can. After all this we approached the house. After |
| 15 talking to Mr. Norman, retrieving the drugs out of the trash |
| 16 can and going back to the office, that's when I received a |
| 17 call on the radio from Sergeant Drummond saying Mr. Peralte |
| 18 was inside the house. There was only one phone call, that was |
| 19 before we ever approached the house. |
| 20 Q. Well, how was the -- and that's what I am trying to get. |
| 21 The phone call or the call that was made to the 262 number, |
| 22 how was that phone call made? |
| 23 A. On the telephone. |
| 24 Q. What kind of a telephone was utilized to make that phone |
| 25 call? |

| Page 79 |
|---|
| 1 A. A cell phone. |
| 2 Q. Was that your cell phone that was used? |
| 3 A. D.D. Alexander made the phone call. |
| 4 Q. I'm sorry, I didn't understand you. |
| 5 A. Corporal D.D. Alexander made the phone call, he used his |
| 6 phone. |
| 7 Q. The phone call that was made back to the office, how was |
| 8 it made? |
| 9 A. On the radio. |
| 10 Q. And what sort of radio was utilized? |
| 11 A. Sergeant Drummond called me on his Southern Linc radio. |
| 12 Q. And that's what I was trying to ask you the question. I |
| 13 am going to show you -- |
| 14     MR. MADISON: If I may approach the witness, Your |
| 15 Honor? |
| 16     THE COURT: Yes. |
| 17 Q. (complies) I marked that exhibit Defendant's Exhibit 2, |
| 18 are you familiar with that exhibit? |
| 19 A. No, sir. |
| 20     THE COURT: Let's identify them because of the two |
| 21 Defendants in the case. That will be Defendant Norman's |
| 22 Exhibit 2? |
| 23     MR. MADISON: Yes, sir. I apologize, Judge. |
| 24     THE COURT: No problem, we will just make sure we |
| 25 don't confuse the jury. So that will be Defendant Norman's |

| Page 80 |
|---|
| 1 exhibit and then any exhibit Ms. James presents will be |
| 2 Defendant Peralte's exhibit. Proceed. |
| 3 Q. Are you aware of this document as it's been given to us |
| 4 by the prosecution in this case? |
| 5 A. No, sir. |
| 6 Q. Okay. You don't know anything about that document then? |
| 7 A. No, sir. |
| 8 Q. Have you talked to Officer Sisson about the issuance of |
| 9 that subpoena? |
| 10 A. No, sir. |
| 11     MR. MADISON: If I may approach the witness again, |
| 12 Your Honor? |
| 13     THE COURT: Yes. |
| 14 Q. And I marked it Defendant's Exhibit 3 but as the Judge |
| 15 has just stated we need to identify whether or not they are |
| 16 Mr. Norman's or Mr. Peralte's exhibits, so this would be the |
| 17 Defendant Norman's Exhibit 3. (complies) Have you seen that |
| 18 document before? |
| 19 A. No, sir. |
| 20 Q. And have you discussed with Mr. Sisson the issuance of |
| 21 that particular document or subpoena to obtain records in |
| 22 connection with that exhibit? |
| 23 A. No, sir. |
| 24 Q. Okay. Do you know what the Southern Linc number that was |
| 25 assigned to the officers that day? |

## Page 81

1  A. I know what my phone number is, I don't know what his
2  is.
3  Q. What was your phone number?
4  A. Mine is 850-2874.
5      MR. MADISON: If I may approach the witness again,
6  Your Honor?
7      THE COURT: Yes.
8  Q. I am going to show you what should be marked Defendant
9  Norman's Exhibit Number 4. Have you seen that document
10 before?
11 A. No, sir.
12 Q. And you are not aware that the prosecution provided us
13 that document.
14 A. No, sir.
15 Q. So you don't know anything about that, to providing
16 testimony --
17 A. No, sir.
18 Q. I want to talk about the time line of the incident that
19 day, and approximately what time was it when you received the
20 phone call from the female caller, the anonymous caller?
21 A. Around 4:00 o'clock.
22 Q. Okay. And before that date you had never had any
23 conversation with that particular caller or didn't know who
24 she was.
25 A. Right.

## Page 82

1  Q. So you had no opportunity to verify how that person knew
2  that there might be drugs at the residence that day.
3  A. That's right.
4  Q. Did you perform any prior surveillance before September
5  the 25th of 2003 on that particular residence?
6  A. No, sir.
7  Q. Okay. So how did you ascertain -- or you have means --I
8  talk a little bit loud sometimes, I apologize -- but do you
9  have means to verify the owners of an address before you go
10 to that address, do you not?
11 A. Sometimes. Some places you can, some you can't, it just
12 depends.
13 Q. And how did you -- or did you do any sort of an
14 investigation that day to determine whose residence that was
15 that you were going to?
16 A. No, sir.
17 Q. And about September the 25th, 2003 you didn't know
18 whether this was Mr. Norman's residence?
19 A. No, I didn't.
20 Q. You didn't know whether it was Mr. Peralte's residence?
21 A. No idea.
22 Q. You didn't know whether it was Mr. James' residence?
23 A. Anybody, you could live there, I don't know. I didn't
24 know.
25 Q. Well, it could have been somebody else's residence too,

## Page 83

1  could it not?
2  A. That's right.
3  Q. Did you ever -- or did you learn whether or not Mr.
4  Norman had any child living at that residence?
5  A. I don't know, I think he said that was his son that was
6  at the house that day.
7  Q. Okay. So --
8  A. I don't know if he lives there or not.
9  Q. Without admitting that I don't think that's correct, but
10 if Mr. Norman did have any child living at that residence
11 then he would have -- or had he been visiting that house he
12 would have been there properly, would he not?
13 A. That's right.
14 Q. Are you divorced?
15 A. Am I?
16 Q. Yes, sir.
17 A. Right now, no, sir.
18 Q. Have you ever been divorced?
19 A. Yes.
20 Q. Do you have children from that prior marriage?
21 A. Yes.
22 Q. Do you have to go to the mother's house or does that
23 mother have custody?
24     MR. BROWN: Objection to relevancy, Your Honor.
25     THE COURT: Sustained. Move on.

## Page 84

1  Q. You have to go visit with the child, do you not?
2      MR. BROWN: Objection, Your Honor.
3      THE COURT: Sustained. Move on.
4  Q. Back to the time line again, Officer Conway. And I use
5  officer as a generic term, I forget y'all's rank so I may get
6  them wrong if I refer to each one of you by your rank. And I
7  don't mean that derogatorily, I understand officers might be
8  a patrol level. But so the lady called at 4:00 o'clock.
9  A. Right.
10 Q. The anonymous caller. And how long did it take you to
11 gather up your people and travel to the 4th Street residence?
12 A. Just a few minutes.
13 Q. And when you say just a few minutes, the time line is
14 very important, I want you to tell me.
15 A. 15 minutes at the very most. It's just like -- the 4th
16 Street address is real close to our office.
17 Q. And how long did you sit in observation of that
18 residence after you arrived at the 4th Street location?
19 A. Maybe five or ten minutes.
20 Q. And was that five or ten minutes before the phone call
21 was made or you had just looked at it for five or ten minutes
22 before you went down to the house?
23 A. Before the phone call was made. After the phone call was
24 made two or three minutes before we approached the house
25 after Mr. Norman exited the house and went back in.

Page 85

1 Q. So 15 minutes to get there, another ten or 15 minutes to
2 watch and then the phone call is made, right?
3 A. Around 4:30 we were at the residence talking to Mr.
4 Norman.
5 Q. Again, you stated you did not identify what it is Mr.
6 Norman put in the trash can that day, did you?
7 A. That's right.
8 Q. Okay. You did say it was wet though. The paper towel was
9 wet I believe?
10 A. The paper towel we found in the trash can was wet.
11 Q. Did you determine why that paper towel was wet?
12 A. No, sir.
13 Q. So if a drink or anything like that had been thrown in
14 the trash can that might have gotten moisture on the paper
15 towel or anything else.
16 A. Could have.
17 Q. Now, so you see Mr. Norman walk out there and you have
18 already assumed he walked out there because of the phone
19 call, we now know that's not true.
20 A. The phone call did not go to that residence, right.
21 Q. That's not why he walked out there.
22 A. Right.
23 Q. Then he walks back to the house and you go up to the
24 house at that point in time and what is it that -- first,
25 when Mr. Norman walked back to the house could you see him

Page 86

1 standing in the doorway?
2 A. I could see -- he wasn't standing in the doorway, he was
3 in -- the first room of that house is the living room, the
4 front living room. It's just a small house and when I
5 approached the house he was coming out of the house about as
6 close as from me to this first lady right here, he was coming
7 out of that room.
8 Q. He was coming out with a child, wasn't it?
9 A. He was standing in there.
10 Q. With Mr. Norman?
11 A. Right.
12 Q. Where was the other --
13 A. They both approached the door together.
14 Q. How long did you sit there and have a discussion or
15 conversation with Mr. Norman?
16 A. Just a few minutes, not very long.
17 Q. But you did pull a gun on Mr. Norman?
18 A. I did.
19 Q. And you pulled a gun on him because you thought he might
20 have been responsible for the drugs in that trash can, did
21 you not?
22 A. At that point I had not been to the trash can yet.
23 Q. You pulled a gun on him because he had his hands in his
24 pockets.
25 A. After I had told him over and over to stop putting his

Page 87

1 hands in his pocket, he kept putting his hands in his pocket,
2 it made me nervous.
3 Q. But you didn't find anything in his pocket when you
4 searched it?
5 A. A cell phone and some money.
6 Q. You didn't find any weapons.
7 A. No.
8 Q. Now, you talked to him after you have gone to the
9 garbage can, how long was it again that you sat there and
10 conversed with Mr. James and Mr. Norman?
11 A. Just a few minutes.
12 Q. What did you then do after you conversed with those two
13 gentlemen?
14 A. Went to the trash can.
15 Q. And approximately how long then after you walked up to
16 the porch was it that you conversed with them and then went
17 to the trash can?
18 A. Just a couple of minutes.
19 Q. Then I believe your testimony was that you went to the
20 trash can and pulled an item out of there?
21 A. That's right.
22 Q. How did you test the item? I believe you testified
23 there was a field-test performed?
24 A. That's right.
25 Q. What is a field-test?

Page 88

1 A. We have field-test kits. What they are, it's cobalt and
2 vinegar, and whenever -- if it's crack cocaine you put the
3 vinegar on it and break the crack, break it down, and the
4 cobalt, the reaction will turn blue if it's got the presence
5 of cocaine in it.
6 Q. And I thought I saw it on something but I didn't think
7 you could use either vinegar or cobalt when you are testing
8 crack cocaine.
9 A. That's what we always use.
10 Q. Did you use a different field-test kit for powder
11 cocaine?
12 A. For powder cocaine you don't have to use the vinegar,
13 all you use is the cobalt. The cobalt will turn blue. But if
14 you used the vinegar with powder cocaine you still get the
15 same reaction, it still turns blue. Vinegar doesn't do
16 anything but break the crack down, so the cobalt will still
17 turn blue.
18 Q. Where did you performed that field-test?
19 A. Right there at the trash can.
20 Q. So you carried the field kit?
21 A. I have got it --
22 Q. On your person?
23 A. I have got them in my vehicle.
24 Q. When you -- I guess -- did you take the kit with you
25 when you went up to the porch then?

Page 89

1 A. I went back to my truck. My truck was sitting right in
2 front of the trash can.
3 Q. So you then went to the truck and got the kit out and
4 then performed the test.
5 A. That's right.
6 Q. Now, I understand that the indications of that -- first
7 of all what did you denote on the paper towel?
8 A. It was residue, and it tested positive for cocaine.
9 Q. When you characterize something as residue, what are we
10 talking about?
11 A. It looked like crack cocaine to me, only the paper
12 towel, it looked like crack residue. But it was definitely
13 cocaine, field-test said.
14 Q. Why was it characterized as residue?
15 A. It wasn't a lot of it on there. It wasn't like a big
16 pile of cocaine on a paper towel, it was just residue.
17 Q. Then after field-testing that what did you do?
18 A. That's when I returned to the office and typed a search
19 warrant.
20 Q. You didn't go back to the porch and discuss anything
21 with your other officers?
22 A. I told Sergeant Drummond from the street when I was
23 returning to my vehicle to detain the two on the porch and I
24 was going back to the office to obtain a search warrant.
25 Q. You told him to detain those two not withstanding the

Page 90

1 fact that one of them put that substance in the trash can
2 that day?
3 A. I knew Mr. Norman had put something in the trash can.
4 Q. You didn't know he had put the cocaine, did you?
5 A. Right.
6 Q. How did you advise the other officers you were going
7 back to your office?
8 A. I told them I am going back to the office.
9 Q. Verbally or via radio?
10 A. I was as close as me to you, I told them I was going to
11 the office to get a search warrant.
12 Q. So you were that close to the street?
13 A. The house was right there on the street, as close as
14 from me to you, maybe a little bit further, not a lot.
15 Q. So you then went back to your office to type the search
16 warrant at that time.
17 A. Right.
18 Q. How do you type out those search warrants, how are they
19 done?
20 A. On the commuter.
21 Q. And how proficient are you at typing?
22 A. Not very. It takes me a little while to type stuff
23 sometimes.
24 Q. Are you a hunt and peck?
25 A. No, I can type but I am not a speed-typer of any kind.

Page 91

1 Q. Do you have any estimate of the length of time it took
2 you to type that search warrant that day?
3 A. It probably took me 30 minutes, 45 minutes to type it
4 up.
5 Q. So we have gone from the time line now that I guess
6 would be around 4:30 to take you back to the office to type
7 that, which would add another 30 minutes to that time line;
8 is that correct?
9 A. 4:30, you said add 30 minutes, I just said 45 minutes,
10 that would be 45 minutes added to it.
11 Q. So you are now then?
12 A. Around 5:15, 5:30, somewhere around in there.
13 Q. And when you ceased typing that search warrant what were
14 you then going to do with it?
15 A. After we type the search warrant we have to call the
16 Judge and you have to -- you know, sometimes it's not very
17 easy to get ahold of a Judge, and when you do find one you
18 have to go meet him when it's convenient for him and where
19 it's convenient for him, so that's what I did. I had to find
20 a Judge. So I got on the phone, called a Judge, and went and
21 met the Judge and he read it and then signed it.
22 Q. And that's all that he did, he just read the search
23 warrant, then he signed it?
24 A. We had to do one thing. On the search warrant I didn't
25 put on there the -- that we wanted to search the vehicles

Page 92

1 that were at the residence, so while I was with the Judge I
2 told the Judge I forgot to do this and he said to hand write
3 it on there, and I told him about it, so I wrote it on the
4 affidavit and he signed it.
5 Q. I believe -- what was the Judge -- where did you locate
6 the Judge for him to sign that search warrant?
7 A. I think I actually had to meet the Judge at a baseball
8 field, his kids were playing baseball.
9 Q. Okay. And did you actually go onto the field or did you
10 meet at the field?
11 A. We met in the parking lot.
12 Q. Was he coaching -- or you met him in the parking lot,
13 I'm sorry.
14 A. It was before he walked out.
15 Q. How long did it take you to travel from where you typed
16 that search warrant to where the Judge was located?
17 A. I can't remember. It was -- say that was around 5:15,
18 5:30, so traffic was crazy in Montgomery at that time, it
19 probably took me 30 minutes to get out there to where he was
20 at.
21 Q. Which ball field was he?
22 A. He was on Taylor Road.
23 Q. Taylor Road, is that right there just after you get
24 off --
25 A. Just past EastChase, when you get off the interstate, on

Page 93

1  the left.
2  Q. The big Church of Christ back in there I believe?
3  A. I think that's right. It's a big baseball, softball
4  complex out there, city park.
5  Q. Okay. Are you positive that it was at a baseball field
6  where the warrant was signed?
7  A. I am positive. Could have been a softball field but
8  that's a technicality. That's where I met him at.
9  Q. Can you tell my why he was out there at a baseball field
10  during the middle of football season?
11  A. I don't know, that's where I met the Judge at.
12  Q. All right. So then how long did you sit there and have
13  the Judge sign, do all that with the search warrant?
14  A. I was there -- actually got there before he did and I
15  had to sit there and wait on him for just a few minutes and
16  after he got there we talked about it and he read it and
17  signed it.
18  Q. The -- and then you had to go back to the residence to
19  execute the warrant; is that correct?
20  A. That's right.
21  Q. How long did it take you to get from that field back to
22  the residence?
23  A. 15 or 20 minutes, maybe a little bit longer, I don't
24  know.
25  Q. Now, when you -- did you get on the phone or however you

Page 94

1  communicated with your other officers, did they begin the
2  search prior to your arriving at the residence with the
3  executed search warrant signed by the Judge?
4  A. I can't remember. I called and told them that the search
5  warrant was signed and I can't remember, I don't know if they
6  started before that or not.
7  Q. When you arrived back at the residence were any of the
8  Defendants still there?
9  A. I can't remember.
10  Q. What is the procedure when you search a residence?
11  A. I don't think I understand what you are asking.
12  Q. Are you supposed to give the search warrant to the home
13  owner or to somebody?
14  A. No, what we do is, when we search a residence we go in
15  and we will search the whole residence and there's an
16  inventory made of everything that's taken out of the
17  residence. And it's a carbon copy, so what we do is we leave
18  a copy of that search warrant signed by the Judge and we
19  leave a carbon copy of everything that was taken out of the
20  house and we will leave it at the residence for the home
21  owner, whoever.
22  Q. Was there a home owner there that day to give it to?
23  A. When we left the residence there was no one there. We
24  locked the door, pulled the door to before we left.
25  Q. And you don't recall trying to track down the owner

Page 95

1  prior to entering the residence.
2  A. No, sir.
3  Q. Have you since learned who owned that residence?
4  A. No, sir.
5  Q. How long did the search take?
6  A. I am not sure. I would have to look at that search
7  warrant. We had a time of entry and time we left out of the
8  house. That's all I could tell you. I can't remember how long
9  we were there.
10  Q. Did you say you put that information on the search
11  warrant?
12  A. It's on there.
13  Q. On the inventory or the search warrant itself?
14  A. It will be on the search warrant where you execute it
15  and also be on the inventory.
16  Q. Did you contact any of the members of the HIDTA task
17  force at the time you were performing that search?
18  A. I think at that time we called for Corporal Sisson, he
19  was on HIDTA at that time. I am not sure. No, I think I
20  called Wingard, Corporal Wingard, I think is who I called.
21  Q. Officer Wingard that's sitting here. Did he come over to
22  where y'all were?
23  A. I can't recall.
24  Q. Did any other member of the HIDTA task force come over
25  to the residence that day that you are aware of?

Page 96

1  A. No, not that I am aware of.
2  Q. And I believe that the only evidence that you had any
3  direct knowledge of was the Exhibit 2 earlier; is that
4  correct?
5  A. I was there when all the other evidence was located in
6  the house but I didn't actually locate it, the other officers
7  located it.
8  Q. But as far as the other officers and the other exhibits
9  that can be elicited through the testimony of another officer
10  who will testify, you haven't testified to those other drugs
11  yet, have you?
12  A. No, sir.
13  Q. Has Mr. James ever worked as an informant for your
14  police department previously?
15  A. I don't think he has ever worked as an informant, no,
16  sir.
17  Q. Are you aware as to whether he has ever worked as an
18  informant for any other law enforcement agency?
19  A. I wouldn't know that.
20  Q. And you, before that date, had not had Mr. Norman under
21  surveillance?
22  A. I don't know if I understand your question.
23  Q. I mean you had not had Mr. Norman under surveillance to
24  verify whether he was in that residence on that date.
25  A. On this case or for another case?

## Page 97

1 Q. On this case.

2 A. Not for this case.

3 Q. Well, I thought I had asked you earlier had you ever

4 surveilled that particular residence before.

5 A. That's right, but you didn't ask me if I had surveilled

6 Mr. Norman, and I have surveilled Mr. Norman in other cases.

7 Q. Was Mr. Norman employed?

8 A. I don't know.

9 Q. Well, if you surveilled him I would have thought you

10 would have learned whether he was going somewhere to work?

11 A. I think you are confused on surveilling someone and

12 investigating someone. I assisted on another case and we --

13 where we done surveillance on Mr. Norman, where we followed

14 him around, kept him under surveillance.

15 Q. Did he go to any place of employment that you are aware

16 of?

17 A. Not that I am aware of.

18 Q. You just -- you have not learned through any

19 investigation whether Mr. Norman was working at the time or

20 was employed at the time of this incident?

21 A. No, sir, I haven't.

22 Q. And you don't know what businesses he had any interest

23 in or where he worked.

24 A. No, sir.

25    MR. MADISON: I believe that's it, Judge, if I may

## Page 98

1 have just a second. I don't have any further questions of

2 this witness, Your Honor.

3    MR. BROWN: No redirect, Your Honor.

4    MS. JAMES: Judge, I have a question based on the

5 questions he asked.

6    THE COURT: Proceed.

7    RECROSS-EXAMINATION

8 BY MS. JAMES:

9 Q. Officer Conway, or Corporal Conway, Mr. Madison asked

10 you a question about when these Defendants were taken into

11 custody, do you remember that question?

12 A. Yes, ma'am.

13 Q. When you returned for execution of the search warrant do

14 you recall that they were not there, do you not?

15 A. That's what I was saying, I can't remember if they were

16 there or not. I don't think they were, I can't remember.

17 Q. So at that point, at least with regards to Mr. Peralte,

18 if, in fact, he wasn't there, you are saying you don't think

19 he was, but assuming --

20 A. I am not positive.

21 Q. -- but assuming another officer says he was gone.

22 A. Right.

23 Q. At that point with regard to Mr. Peralte you had not

24 seized any drugs in connection to him at that point that you

25 executed your warrant.

## Page 99

1 A. If he was gone when I returned to the residence, I -- on

2 that particular day I had not seen Mr. Peralte.

3 Q. Yeah, that's what I am saying. If he were -- you haven't

4 found anything but what you purportedly found in the trash

5 can at that point?

6 A. At that point.

7 Q. So if Mr. Peralte was not there --

8 A. Then the only thing I had found at that point was what

9 was in the trash can.

10 Q. That you had supposedly seen Mr. Norman drop in.

11 A. Right.

12 Q. You didn't know Mr. Peralte was there.

13 A. I didn't know he was there.

14 Q. Okay. Thank you.

15    THE COURT: Anything further, Mr. Brown?

16    MR. BROWN: No, Your Honor.

17    THE COURT: Anything further --

18    MR. MADISON: No, sir, Your Honor.

19    THE COURT: -- Mr. Madison? You may step down. Call

20 your next witness and we will have them sworn before we break

21 for lunch.

22    MR. BROWN: May Corporal Conway be released?

23    THE COURT: Any objection from him being released

24 from his subpoena?

25    MS. JAMES: No, sir.

## Page 100

1    THE COURT: Any objection, Mr. Madison?

2    MR. MADISON: No, sir.

3    THE COURT: You are free to go and you are released

4 from your subpoena. Call your next witness.

5    MR. BROWN: Corporal Mike Drummond.

6    THE CLERK: You do solemnly swear or affirm that the

7 testimony you give in the trial of this cause to be the

8 truth, the whole truth, and nothing but the truth, so help

9 you God.

10    THE WITNESS: Yes, ma'am.

11    THE COURT: Have a seat. Ladies and gentlemen, let's

12 take our lunch recess at this time. We will pick back up with

13 this witness' testimony when we return from lunch. I remind

14 you of the instructions that I gave you, do not have any

15 discussions among yourselves or anyone that you come to

16 recognize as having presence -- or connection with this trial

17 or allow anyone to discuss the case in your presence. Please

18 leave your note pad either face down on the rail in front of

19 you or face down in your chair and they will be preserved for

20 your use and your use only. You will be excused for lunch

21 until 1:15. If you will assemble in the jury assembly room on

22 the first floor shortly before 1:15 we will try to begin

23 promptly back at 1:15. You will be in recess. If everyone

24 will remain while the jury exits.

25    (At which time, 11:56 a.m., the jury left the

Page 101

1    courtroom.)
2         THE COURT: We will be in recess until 1:15.
3         (At which time, 11:57 a.m., a recess was had until
4    1:20 p.m., at which time, with the jury in the box, the trial
5    continued.)
6         THE COURT: Mr. Brown, you may proceed.
7         MR. BROWN: Thank, Your Honor.
8         MICHAEL DRUMMOND, witness for the Government,
9    having been previously duly sworn or affirmed, testified as
10   follows:
11             DIRECT EXAMINATION
12   BY MR. BROWN:
13   Q. Good afternoon. Would you state your name, please.
14   A. My name is Michael Drummond.
15   Q. How are you employed?
16   A. I am a sergeant with the Montgomery police department,
17   especially the special operations division of the narcotics
18   bureau.
19   Q. Sergeant Drummond, you were sworn prior to lunch today;
20   is that correct?
21   A. Yes, sir.
22   Q. So you realize you are still under oath.
23   A. Yes, sir.
24   Q. Were you employed with the Montgomery police department
25   back on September 25th of last year?

Page 102

1    A. Yes, sir.
2    Q. On that date did you assist in the execution of a search
3    warrant?
4    A. Yes, sir, I did.
5    Q. Do you recall where that was?
6    A. I believe it was 2429 East 4th Street.
7    Q. Would you explain to the ladies and gentlemen of the
8    jury what you did on that day relating to that search
9    warrant.
10   A. I went over there with Detective Conway and some other
11   officers and we were talking to the Defendants and waited on
12   a search warrant. Once we had the search warrant I went in
13   and was assigned to search the residence.
14   Q. Prior to the actual search warrant being executed did
15   you accompany Corporal Conway to get the warrant itself?
16   A. No, sir, I did not. I stayed at the residence.
17   Q. Did anything occur at the residence while Corporal
18   Conway was gone as it relates to this case?
19   A. Yes, sir. We were in the front of the house talking to
20   two subjects. While we were standing outside on the front
21   porch I could hear somebody inside the house moving around. I
22   asked one of the Defendants, Mr. Norman, who was in the
23   house. He told me that it was his son. There's a little
24   hedgerow next to the house right there and I had seen a small
25   child out there earlier while we were standing there talking

Page 103

1    and a female said no, your son is over here with me. At that
2    time I asked him again who is in the house. He didn't
3    respond to me, he just looked away. When he did so, I went
4    into the house to clear it to make sure there was nobody else
5    in the house and found Mr. Peralte.
6    Q. Where did you find him exactly?
7    A. As I came into the living room it kind of leans into --
8    excuse me, kind of leads to a kitchen area, it's kind of an
9    eat-in kitchen or dining area, and through there was a
10   doorway into the den, he passed that doorway into the den.
11   Q. What did you do at that time, if anything?
12   A. He came directly to me and I asked him to step outside
13   the house.
14   Q. Did you relay that information to Corporal Conway?
15   A. Yes, sir, I did.
16   Q. How did you do that?
17   A. By radio.
18   Q. At some point were you contacted by Corporal Conway that
19   he had, in fact, secured a search warrant for that residence?
20   A. Yes, sir.
21   Q. Did y'all begin searching the residence at that point or
22   did you wait until he physically got back?
23   A. I think we started after we were -- he conveyed to us
24   that the warrant had been signed.
25   Q. You stated earlier that you were assigned certain areas,

Page 104

1    were you assigned an area around the laundry room?
2    A. Yes, sir. I went to the back area of the house, it was a
3    den and laundry area that looked like it was an addition to
4    the house.
5         MR. BROWN: May I approach, Your Honor?
6         THE COURT: Yes.
7    Q. (complies) Sergeant Drummond, I am going to show you
8    some photographs, Government's Exhibits 4, 6 and 8; do you
9    recognize those exhibits?
10   A. Yes, sir.
11   Q. What are they of?
12   A. Four is a digital scale that was located on the washing
13   machine. That's where it was found when I walked back there
14   into the laundry area. Six is a plastic bag that had some
15   type of a grease or some kind of -- it was a grease or some
16   kind of commercial packing grease that was in the washing
17   machine. And also a bundle of money, of cash.
18   Q. And the picture of cash is Exhibit 8?
19   A. Yes, sir, that's eight, I'm sorry.
20   Q. Do those photographs, 6 -- I'm sorry, 4, 6 and 8, do
21   those fairly and accurately depict the scene as you remember
22   it that day?
23   A. Yes, sir.
24        MR. BROWN: The government moves to admit
25   Government's Exhibits 4, 6 and 8.

| Page 105 | Page 107 |
|---|---|

**Page 105**

1　THE COURT: Any objection?

2　MS. JAMES: No objection.

3　MR. MADISON: No objection, Your Honor.

4　THE COURT: Government's Exhibits 4, 6 and 8 are

5　admitted.

6　Q. Sergeant Drummond, I am going to show you what has been

7　marked as Government's Exhibit 5, do you recognize that?

8　A. Yes, sir.

9　Q. What is that?

10　A. It's the Slimline digital scale that I located.

11　Q. Is that in the same or substantially the same location

12　as when you located it?

13　A. Yes, sir.

14　MR. BROWN: The government moves to admit Exhibit 5.

15　THE COURT: Any objection from Peralte?

16　MS. JAMES: No, Your Honor.

17　THE COURT: From Norman?

18　MR. MADISON: No objection.

19　THE COURT: Without objection Government's Exhibit 5

20　is admitted.

21　Q. I am going to show you what have been marked as

22　Government's Exhibits 9, 10 and 11, do you recognize those?

23　A. Yes, sir. Nine is the drug evidence that was located in

24　the dryer. It was three solid bricks ended up being of

25　cocaine hydrochloride, and a plastic bag that was also there

**Page 106**

1　that contained the cocaine. Ten is just another picture of

2　it closer up. And 11 was some loose cocaine that was in the

3　washing machine.

4　Q. Do 9, 10 and 11 accurately depict the scene as you

5　remember it that day?

6　A. Yes, sir, they do.

7　MR. BROWN: The government moves to admit

8　Government's Exhibits 9, 10 and 11.

9　THE COURT: Any objection from Peralte?

10　MS. JAMES: No, sir.

11　THE COURT: Any objection from Norman?

12　MR. MADISON: None, Your Honor.

13　THE COURT: Government's Exhibits 9, 10 and 11 are

14　admitted.

15　Q. And let me show you Government's Exhibit 7. Do you

16　recognize that?

17　A. Yes, sir.

18　Q. What is that?

19　A. It's the bags that the cocaine was packaged in.

20　Q. Okay. And Government's Exhibits 12, do you recognize

21　that?

22　A. Yes, sir, it's an outer wrapping that the cocaine was in

23　and the cocaine itself.

24　Q. Okay. Aside from them not being in their original

25　packaging does Government's Exhibit 7 and 12, are they in the

**Page 107**

1　same or substantially the same condition as they were that

2　day?

3　A. Yes, sir, just being out of the packaging.

4　MR. BROWN: The government moves to admit Exhibits 7

5　and 12.

6　THE COURT: Any objection to the admission of --

7　let's take them one at a time, Government's Exhibit 7 first?

8　MR. MADISON: May I see that, Your Honor?

9　THE COURT: Yes. You may approach to review the

10　evidence.

11　MR. BROWN: (complies)

12　(At which time an off-the-record discussion was had

13　between counsel.)

14　MR. MADISON: Thank you.

15　THE COURT: On behalf of Mr. Peralte is there any

16　objection to the admission of Government's Exhibit 7?

17　MS. JAMES: No.

18　THE COURT: Government's Exhibit 12?

19　MS. JAMES: No, sir.

20　THE COURT: Mr. Norman, same question, Government's

21　Exhibit 7?

22　MR. MADISON: None, Your Honor.

23　THE COURT: Or 12?

24　MR. MADISON: No, sir.

25　THE COURT: Without objection Government's Exhibits

**Page 108**

1　Number 7 and 12 are admitted.

2　Q. Sergeant Drummond, that is Government's Exhibit 4, the

3　photograph. What, if anything, do you see in that photograph

4　that you collected as evidence?

5　A. It was the digital scale that was collected.

6　Q. If you touch the screen it will make a mark on there,

7　although I think the mark is black, but --

8　A. You want me to put a circle around it?

9　Q. Sure.

10　A. Try to. (complies)

11　Q. Government's Exhibit 6, would you indicate to the jury

12　again what that is?

13　A. That was a plastic bag that contained the packing grease

14　or some kind of commercial grease in it.

15　Q. And eight.

16　A. Yes, sir, that was the money that was located in the

17　washing machine.

18　Q. Do you recall how much money it was?

19　A. I think it was 29 hundred dollars, give or take a dollar

20　or two here or there.

21　Q. Number 9?

22　A. That was the -- it's approximately three kilos of

23　cocaine located in the dryer. It was three individual bricks

24　and one of them had been broken up and one was in a plastic

25　bag in there.

## Page 109

1  Q. All right. Can you, looking at that one, show where the
2  plastic bag was that's not one of the bigger bundles?
3  A. Yes, sir, it's right here. (indicating)
4  Q. And 11, that was what again?
5  A. Just some loose cocaine that was in there -- in the
6  dryer that had come out of one of the bundles.
7  Q. Now, the three large packages, those represent what was
8  in Government's Exhibit 12; is that right?
9  A. Yes, sir.
10 Q. Did you also search the living room area?
11 A. The den area, yes, sir.
12 Q. Did you locate anything in there?
13 A. Yes, sir. Found another bundle, approximately a kilo of
14 cocaine under a couch in there.
15 Q. All right. How about the kitchen area, did you find
16 anything in the kitchen?
17 A. Yes, sir. Looked through the cabinets and found another
18 small amount of cocaine base in the cabinet.
19     MR. BROWN: May I approach, Your Honor?
20     THE COURT: Yes.
21 Q. (complies) Sergeant Drummond, I am going to show you
22 Government's Exhibit 13, do you recognize that?
23 A. Yes, sir. That's the package of cocaine, approximately
24 a kilo, that was under the couch.
25 Q. Does that fairly and accurately depict the scene as you

## Page 110

1  remember it that day?
2  A. Yes, sir.
3  Q. Let me show you Government's Exhibits 15 and 17
4  (complies) and ask you to identify those for me, please.
5  A. Yes, sir. 15 is the kitchen, up over the stove, it was
6  another digital scale that was located on the shelf. 17 is a
7  picture of one of the shelves behind -- in the cabinet shelf
8  in the kitchen, had a small amount of cocaine base laying
9  there.
10 Q. Okay. Do those fairly and accurately depict the scene as
11 you remember it that day?
12 A. Yes, sir.
13     MR. BROWN: The government moves to admit Exhibits
14 13, 15 and 17.
15     THE COURT: Any objection on behalf of Mr. Peralte?
16     MS. JAMES: No.
17     THE COURT: Any objection on behalf of Mr. Norman?
18     MR. MADISON: None, Your Honor.
19     THE COURT: Without objections Government's Exhibits
20 13, 15 and 17 are admitted.
21 Q. Sergeant Drummond, that's Government's Exhibit 16 that I
22 am handing you now. (complies) Do you recognize that item?
23 A. Yes, sir, it's the scale that was located in the kitchen
24 cabinet.
25 Q. Is it in the same or substantially the same condition as

## Page 111

1  it was when you found it?
2  A. Yes, sir.
3     MR. BROWN: The government moves to admit Exhibit
4  16.
5     THE COURT: Any objection on behalf of Mr. Peralte?
6     MS. JAMES: No, sir.
7     THE COURT: On behalf of Mr. Norman?
8     MR. MADISON: No, sir, Your Honor.
9     THE COURT: Without objection Government's Exhibit
10 16 is admitted.
11 Q. Sergeant Drummond, I am going to show you what has been
12 marked as Government's Exhibit 18 and ask if you can identify
13 that? (complies)
14 A. Yes, sir. It's the cocaine that was located in the
15 kitchen.
16 Q. And is it in the same or substantially the same
17 condition as it was when you recovered it?
18 A. Yes, sir, it's just broken up more now.
19     MR. BROWN: The government moves to admit Exhibit
20 18.
21     THE COURT: On behalf of Mr. Peralte, any
22 objections?
23     MS. JAMES: No, sir.
24     THE COURT: Mr. Norman, any objection?
25     MR. MADISON: No, sir.

## Page 112

1     THE COURT: Without objection Government's Exhibit
2  18 is admitted.
3  Q. Sergeant Drummond, before I take that back away from
4  you, Government's Exhibit 18 you said it's the same except
5  it's been broken up a bit, would you explain that to the
6  jury, please?
7  A. Well, cocaine base is just -- comes from cocaine
8  hydrochloride, it's just put into -- all impurities are
9  cooked out and it goes into a solid form so that's what makes
10 the cocaine base. If it's shaken around or beaten or knocked
11 around it will break apart and gets into more finer substance
12 than being solid.
13 Q. And cocaine base, does it have a nickname that it goes
14 by?
15 A. Crack.
16 Q. Sergeant Drummond, if you would, please, that's
17 Government's Exhibit 17 there that you indicated you found
18 some evidence, would you explain to the jury once again now
19 that they can see the photograph where this is and what you
20 found?
21 A. Yes, sir. It was a solid little piece of cocaine base or
22 crack cocaine that was sitting on the shelf.
23 Q. And that's the same as the crack cocaine that was
24 Government's Exhibit 18?
25 A. Yes, sir.

Page 113

1  Q. Government's Exhibit 15, is that the scale that we just
2  looked at as Government's Exhibit 16 I believe?
3  A. Yes, sir, it is.
4  Q. And where was that located again, what are we looking
5  at?
6  A. In a cabinet in the kitchen.
7  Q. All right. Did you while you were there have the
8  opportunity to observe a vehicle that was at the residence?
9  A. Yes, sir.
10  Q. Or a number of vehicles.
11  A. Yes, sir, a number of vehicles.
12  Q. Was there one in particular that had a --
13      MS. JAMES: Objection to the leading, Your Honor.
14      THE COURT: Overruled.
15  Q. Was there one that had a set of Florida license plates
16  on it?
17  A. Yes, sir, it did.
18  Q. What, if anything, did y'all do with that vehicle?
19  A. We searched the vehicle there on the scene and impounded
20  it and after being impounded we located a false compartment
21  on the driver's -- excuse me, the passenger side airbag.
22      MR. BROWN: May I approach once more, Your Honor?
23      THE COURT: Yes.
24  Q. Sergeant Drummond, this is Government's Exhibits 19, 20
25  and 21, ask if you can identify those items?

Page 114

1  A. Yes, sir. It was the vehicle that we took during the
2  search warrant. It's a Mercury Marquis. 19 is a picture of
3  the back of the vehicle with a tag. 10 is the empty airbag
4  compartment where the passenger side airbag should be and
5  there was a plastic zip-loc bag that was the same type
6  zip-loc bag that we found in the residence that had the
7  cocaine in it. And a picture, 21 is the bag itself pulled out
8  just laying on the seat.
9  Q. Do all of these photographs, Government's Exhibits 19,
10  20 and 21, fairly and accurately depict the scene as you
11  remember it that day?
12  A. Yes, sir.
13      MR. BROWN: Move to admit Government's 19, 20 and
14  21.
15      THE COURT: Any objection on behalf of Mr. Peralte?
16      MS. JAMES: No objection.
17      THE COURT: Mr. Norman?
18      MR. MADISON: None, Your Honor.
19      THE COURT: Without objections, Government's
20  Exhibits 19, 20 and 21 are admitted.
21      MR. BROWN: I think I left off one more, if I may
22  approach, Your Honor.
23  Q. (complies) Sergeant Drummond, that's Government's
24  Exhibit 22, do you recognize that?
25  A. Yes, sir. It's plastic bags that were taken out of the

Page 115

1  vehicle.
2  Q. Are those bags in the same or substantially the same
3  condition as the day that you recovered them?
4  A. Yes, sir.
5      MR. BROWN: Move to admit Government's Exhibit 22.
6      MS. JAMES: No objection.
7      THE COURT: Any objection?
8      MR. MADISON: No objection.
9      THE COURT: Without objection, Government's Exhibit
10  22 is admitted.
11  Q. Again this is 19, that's the vehicle that you saw that
12  day?
13  A. Yes, sir, it was parked, it was backed up to the right
14  side of the house, with the plates against the house.
15  Q. 20, what is significant in that photograph?
16  A. That's the -- where the passenger side airbag should
17  have been, but it wasn't there, it was -- had been converted
18  into a hidden compartment and had the plastic bag inside of
19  it.
20  Q. Okay. Were you able to determine whether the compartment
21  was able to open it manually or how would you open that?
22  A. We weren't able to figure out how to open it. I believe
23  we had to pry it open. But no, sir, we couldn't figure it
24  out.
25  Q. Finally, that's Government's Exhibit 21, do you

Page 116

1  recognize that?
2  A. Yes, sir, it's the zip-loc bags inside -- that were
3  inside that compartment.
4  Q. Those are photographs of what is Government's Exhibit
5  22?
6  A. Yes, sir.
7  Q. Is there anything significant about the type of bag this
8  is?
9  A. Just they were consistent, the same type bags that the
10  cocaine was located in.
11  Q. I think I inadvertently left -- I forgot to show you
12  Government's Exhibit 14. (complies) Do you recognize that?
13  A. Yes, sir. This is the packaging that contained another
14  kilogram -- approximately a kilogram of cocaine hydrochloride
15  that was inside this other zip-loc bag that had the packing
16  grease in it. This was under the couch in the den of the
17  residence.
18  Q. Government's Exhibit 14, is it in the same or
19  substantially the same condition as it was?
20  A. Yes, sir, just outside the package.
21      MR. BROWN: Move to admit Government's Exhibit 14,
22  Your Honor.
23      MS. JAMES: No objection.
24      THE COURT: Any objection from Peralte?
25      MS. JAMES: No, sir.

CondenseIt™

Page 117

1    THE COURT: From Norman?
2    MR. MADISON: No, sir, Your Honor.
3    THE COURT: Government's Exhibit 14 is admitted.
4    Q. Now, Sergeant Drummond, as it related to the drug
5    exhibits in this case, the ones that were found in the dryer,
6    the ones that were found in the kitchen and the one that was
7    found underneath the couch, what did you do with those items
8    after you recovered them?
9    A. I turned them over to the evidence officer which in this
10   case was Detective Bartlett.
11   Q. Thank you, Sergeant Drummond, that's all the questions I
12   have for you, defense counsel may have some questions.
13   MS. JAMES: Your Honor, may I retrieve the exhibits?
14   THE COURT: I'm sorry?
15   MS. JAMES: May I retrieve the exhibits?
16   THE COURT: Yes.
17   CROSS-EXAMINATION
18   BY MS. JAMES:
19   Q. Good afternoon.
20   A. How you doing, ma'am?
21   Q. Fine. Showing you what is in evidence, sir, as
22   Government's 21, you have just identified that as a zip-loc
23   bag that you found in this maroon vehicle, is that what your
24   testimony was?
25   A. Yes, ma'am.

Page 118

1    Q. And that zip-loc bag you say is consistent with the bags
2    that the drug evidence was located in; is that correct?
3    A. Yes, ma'am.
4    Q. That zip-loc bag there would also probably be consistent
5    with zip-loc bags you might have in your home or I might have
6    in my home; is that correct?
7    A. That's correct.
8    Q. There's nothing particularly unique about a zip-loc bag,
9    just different brands; is that correct?
10   A. Yes, ma'am.
11   Q. Okay. And you have also described a compartment -- I am
12   showing you now what is in evidence as Government's Exhibit
13   20 -- and you have testified that this was a compartment
14   located in this maroon vehicle that appeared to be a hidden
15   compartment; is that right?
16   A. Yes, ma'am.
17   Q. All right. Now, that would be a compartment that at
18   some point contained an airbag, would you agree?
19   A. Yes, ma'am.
20   Q. It's not a glove compartment, it would be the
21   compartment above the glove compartment?
22   A. Yes, sir.
23   Q. And with regard to the -- well, did you personally
24   search the vehicle?
25   A. Yes, ma'am, I assisted.

Page 119

1    Q. Okay. And how was it that you all knew when you were
2    poking and trying to pry it open that there wasn't an airbag
3    in there?
4    A. I think the -- you could see a little bit of -- through
5    the seals that there wasn't anything back there.
6    Q. Okay. So you all weren't concerned that it might deploy
7    an airbag?
8    A. It could have happened.
9    Q. Okay.
10   A. But they were saying they didn't think there was one
11   back there, they could see light through it.
12   Q. Okay. Now, would you agree with me that if there's an
13   accident, some sort of accident that was sufficient impact to
14   deploy the airbag, those airbags, you don't just tuck them
15   back in and stick them back in the car, do you?
16   A. No, ma'am, you don't.
17   Q. In fact, if you don't get your car fixed or if you don't
18   replace it then that airbag would no longer be functional if,
19   in fact, it had been deployed at some point.
20   A. That's correct.
21   Q. And this particular compartment that is depicted in
22   Government's Exhibit 20, you would agree with me it's about
23   the same width and depth of what would be below it as the
24   glove compartment, maybe a little bit deeper than the glove
25   compartment?

Page 120

1    A. Approximately.
2    Q. Now, did you all have occasion to utilize the services
3    of one of your K-9 units when you were searching this
4    vehicle?
5    A. I don't recall if we did. I don't remember having one
6    there.
7    Q. When I say K-9 units, you all have access to trained
8    drug dogs, don't you?
9    A. At that time I don't know if we had one or not.
10   Q. Okay. Well, the City of Montgomery has them, there's
11   some that are there all the time, aren't there?
12   A. They work -- they have one that works third shift from
13   10:00 to 3:00 in the morning or 10:00 to 5:00 in the morning,
14   we would have had to call them out, at the time we didn't
15   have one in the bureau.
16   Q. But it's not some undoable thing, that if you needed one
17   and needed to ascertain at some point in time that this
18   vehicle had drugs in there that a dog could alert to, you
19   could have done that?
20   A. Yes, ma'am.
21   Q. And the City of Montgomery, you are familiar with
22   Officer Burch, aren't you, that has the K-9 dog?
23   A. Yes, ma'am, I know him.
24   Q. And you know there are other drug dogs that are
25   available?

CondenseIt ™

## Page 121

1  A. There are dogs out there.
2  Q. But you didn't do that in this case, right?
3  A. No, ma'am.
4  Q. So with the exception of the zip-loc bag -- well, let me
5  move over to the --
6      MS. JAMES: May I again approach?
7      THE COURT: Yes.
8  Q. So that we are clear on this, I understand that this
9  is -- that a good bit of this is drug evidence that would be
10  what you believe to be cocaine; correct?
11  A. Yes, ma'am.
12  Q. And this, for instance, Government's Exhibit 7, this
13  is -- it looks like some sort of grease, is that your
14  understanding?
15  A. Yes, ma'am.
16  Q. Now, help me with this because I am not sure I am
17  following you. Was the drug evidence contained within a bag
18  contained within a bag that had this, what you have referred
19  to as packing grease?
20  A. Three of them were outside of it, and that one was
21  empty. Didn't have any drug evidence in it. There was another
22  one that did have one kilo inside of it.
23  Q. Okay. So would the way that would have been done, it
24  would have been kind of an insulated bag that would have gone
25  around the drug evidence, right?

## Page 122

1  A. Yes, ma'am.
2  Q. And I am assuming that the purpose of that would be to
3  disguise the odor or something of that nature?
4  A. Well, to keep the grease from getting on everything.
5  Q. I'm sorry, to use the grease?
6  A. Yes, ma'am. I guess they use it to I guess throw off a
7  dog.
8  Q. Okay. So it wouldn't have been where it would get on
9  your hands if you went into the bag to get the drug evidence,
10  it wouldn't have gotten all over you.
11  A. Yes, ma'am, it would.
12  Q. It would have if it had been opened?
13  A. Yes, ma'am.
14  Q. Okay. Now, how big, because the drug evidence has not
15  been opened yet, would these be gallon zip-loc bags, for
16  instance, that's contained here in Government's Exhibit 7?
17  A. Yes, ma'am, I think they are gallon size.
18  Q. All right. Then does that mean that the drug evidence
19  would have had to have been in a bag that would have been
20  smaller quantity or smaller dimensions? In other words, are
21  you suggesting that they put a gallon zip-loc bag with a kilo
22  in a gallon zip-lock bag with the packing gel?
23  A. No, ma'am, what they did is smear the grease all over
24  the kilo bag and put it inside the zip-loc bag.
25  Q. So it's all contained within one zip-loc bag?

## Page 123

1  A. Yes, ma'am.
2  Q. It's just that the kilo is wrapped in some separate
3  wrapping?
4  A. Yes, ma'am, it's in that kind of brownish tape.
5  Q. Okay. Now, when you located --
6      MS. JAMES: May I again approach, Your Honor?
7      THE COURT: Yes.
8  Q. When you located what you have now testified to as the
9  drug evidence, the larger package here being Government's
10  Exhibit 12, that would be the purported three kilos that were
11  found in the dryer?
12  A. Yes, ma'am.
13  Q. In the laundry room.
14  A. Yes, ma'am.
15  Q. And then what is in evidence as Government's Exhibit 14
16  would be the kilo or approximate kilo that you found under
17  the couch.
18  A. Yes, ma'am.
19  Q. The three that were found in the dryer, were those all
20  wrapped in the same fashion you have just described?
21  A. No, ma'am, they were outside. They were not in a zip-loc
22  bag.
23  Q. They appear to be yellow in color.
24  A. Yes, ma'am.
25  Q. Does that mean they had the packing grease around them?

## Page 124

1  A. They were -- looked like they had been cleaned off but
2  the tape is yellow-brown color.
3  Q. All right. How about the one at the couch, under the
4  couch?
5  A. No, it was still in the zip-loc bag with the packing
6  grease around it.
7  Q. Okay. So you are telling me then that the ones that were
8  in the dryer appeared to have been removed from a zip-loc bag
9  but were still greasy?
10  A. They had been cleaned off, yes, ma'am.
11  Q. They had been cleaned off, okay. What, if anything, did
12  you find in or about that area where those substances were
13  located that would have indicated to you that maybe it's an
14  article that had been used to clean them?
15  A. I didn't find an article, I just found the empty zip-loc
16  bags that had grease in them that were empty.
17  Q. When you actually approached Mr. Peralte or called him
18  to the front of the house did you have occasion to handcuff
19  him?
20  A. Somebody did eventually, I don't know who did.
21  Q. Okay. Well, you actually were the one that physically
22  led him out of the house to be taken into custody; correct?
23  A. Yes, ma'am.
24  Q. Okay. You have been in law enforcement for what, well
25  over ten years I know.

Page 121 - Page 124

Page 125

1 A. Yes, ma'am.

2 Q. And when you were dealing with Mr. Peralte you didn't
3 notice that he had that cooking grease on his hands, did you?

4 A. I don't recall. I don't remember it, no, ma'am.

5 Q. Well, let me ask you this, if he had, in fact, had this
6 grease on his hands when you approached him it would probably
7 have been significant to you, would it not?

8 A. Probably would have been.

9 Q. And the same thing with regard to your search of this
10 vehicle, did you all search the Jaguar and the other vehicles
11 that were in the driveway?

12 A. Yes, ma'am.

13 Q. And did you search them on the same day?

14 A. Yes, ma'am.

15 Q. Did you search them incident to the search warrant?

16 A. Yes, ma'am.

17 Q. And did you also take them into custody and search them
18 later at some other location as you did the maroon vehicle?

19 A. No, ma'am.

20 Q. Okay. So other than your cursory inspection, I would
21 say, of those other vehicles on the scene, you didn't inspect
22 them to see if there were hidden compartments, did you?

23 A. We inspected them, I don't think we saw any is why we
24 didn't take them in.

25 Q. And you didn't do -- let me ask you if you will agree

Page 126

1 with this, you did not do as thorough a search on those
2 vehicles as you did on the maroon vehicle?

3 A. We did a thorough search on them.

4 Q. You didn't take the vehicles somewhere else and actually
5 begin to dismantle some portions of them; correct?

6 A. No, we did not take them somewhere else.

7 Q. You would agree with me that many vehicles that are used
8 to transport hidden narcotics have places hidden in various
9 other places in cars, do they not?

10 A. Yes, ma'am, that's correct.

11 Q. Sometimes there are false bottoms, false -- all kinds of
12 creative ways to transport drugs; would you agree with that?

13 A. Yes, ma'am.

14 Q. So without specifically checking those vehicles for
15 false compartments you wouldn't know just from looking on the
16 inside of the car or a cursory review outside whether it
17 contained a false compartment, would you?

18 A. No, ma'am, they were local vehicles, that's why we had
19 no reason to believe they were tracking narcotics long
20 distance.

21 Q. Were you aware of Mr. Kenny James' prior conviction in
22 Florida for drug trafficking?

23 A. I knew he had convictions.

24 Q. In Florida?

25 A. I am not sure where it was, I didn't know where it was.

Page 127

1 Q. And you are not suggesting today that it would be
2 improbable that someone could travel from Montgomery to
3 Florida or to Mexico or somewhere else in a car with a
4 Montgomery tag and acquire illegal drugs, are you?

5 A. I am sure it happens every day.

6 Q. Now, I am going to show you --

7      MS. JAMES: Judge, may I approach the witness?

8      THE COURT: Yes.

9 Q. Sergeant Drummond, I am going to show you what I have
10 marked for identification purposes as Defendant Peralte's
11 Exhibit 1 and ask you if you are familiar with this series of
12 photographs?

13 A. Yes, ma'am.

14 Q. And for the record this is Bates stamped 297 indicating
15 it was given to us by the government.

16 A. All right.

17 Q. Okay. And this pretty much has other photographs that
18 you have identified, correct, just kind of a composite?

19 A. Yes, ma'am.

20 Q. This being the scale that you found in the kitchen.

21 A. Yes, ma'am.

22 Q. And there is the top left-hand-corner. And I will tell
23 you, may I -- but you do recognize these photographs, right?

24 A. Some of them, yes, ma'am.

25      MS. JAMES: Judge, may I return and show him this up

Page 128

1 here?

2      THE COURT: Yes.

3 Q. I am going to show you now on the screen --

4      THE COURT: Let's get them admitted before you

5 publish.

6      MS. JAMES: I'm sorry, I move for admission of

7 Peralte's Exhibit 1.

8      MR. BROWN: No objection.

9      MR. MADISON: No objection.

10      THE COURT: Without objection Defendant Peralte's

11 Exhibit 1 is admitted and may publish it to the jury.

12 Q. Directing your attention to the left-hand-corner where
13 my pen is, would that be a view of the kitchen cabinet where
14 a Slimline scale was found?

15 A. Yes, ma'am.

16 Q. And I am assuming that this Slimline scale would be one
17 of the two in evidence as Defendant's 16 and Defendant's 5?

18 A. Tomelia I believe is the name, the Slimline was in the
19 laundry room.

20 Q. I'm sorry, Government's Exhibit. So the Slimline was in
21 the laundry room in the washer?

22 A. Yes, ma'am.

23 Q. So the other one would be this one is Government's
24 Exhibit 16?

25 A. I believe so.

## Page 129

1 Q. So that would be depicted in the top left-hand-corner of
2 that photograph; correct?
3 A. Yes, ma'am.
4 Q. And the picture below that, I am assuming that we have a
5 shelf right here, that's just a kitchen shelf?
6 A. Yes, ma'am.
7 Q. Okay. And then this would be what was under it. Would
8 the bottom picture also be just a different angle of that
9 same shelf and that same scene?
10 A. Yes, ma'am.
11 Q. Okay. And the other photograph, top right here, I think
12 is already in evidence and you have testified that there was
13 a small amount of crack cocaine located there?
14 A. Yes, ma'am.
15 Q. And these other pictures, you recognize them as just
16 other pictures that were part of the scene at the residence?
17 A. Yes, ma'am.
18 Q. In fact, the last, the bottom-right-hand-corner if you
19 will, would just be a collective -- this one right here where
20 the Bates stamp is, would be a collective scene of what was
21 seized; is that correct?
22 A. Yes, ma'am.
23 Q. All right. Now, with regard to your entry into the
24 laundry room, you say that was your assigned area, the
25 laundry room is part of where you were to search; is that

## Page 130

1 right?
2 A. Yes, ma'am, the area I took to search.
3 Q. All right. Well, when you went into the laundry room
4 area to conduct your search was the washer open or closed?
5 A. It was closed.
6 Q. And the washer would have been a top-opening washer;
7 correct?
8 A. Yes, ma'am.
9 Q. And the dryer, that was closed also, wasn't it?
10 A. Yes, ma'am.
11 Q. And that would be a side door open?
12 A. Front door, yes, ma'am.
13 Q. Front door, I'm sorry, front door open. Now, you have
14 testified that when you went into the house you had actually
15 heard enough noise to think somebody might be moving
16 furniture; correct?
17 A. Yes, ma'am.
18 Q. And that alerted you to the fact that somebody might be
19 in the residence?
20 A. Yes, ma'am.
21 Q. At that point you and Officer Conway, Officer Alexander
22 and I think Mr. Cabiness were all there at the scene; is that
23 right?
24 A. No, ma'am, Detective Conway had left.
25 Q. Okay. How many were there left when Conway left?

## Page 131

1 A. I believe there was five of us.
2 Q. That would be you, Alexander, Cabiness, do you remember
3 who else?
4 A. I believe Simons and I am not sure besides that.
5 Q. But you all were pretty much focused on the two
6 Defendants that you had on the front porch; correct?
7 A. Yes, ma'am.
8 Q. And you didn't want to go in the house obviously until
9 you had your search warrant.
10 A. Yes, ma'am.
11 Q. So you all were out on the front porch with Mr. James
12 and Mr. Norman at the time that you heard the noise and you
13 and Cabiness actually entered the residence for what you
14 would say officer safety, right?
15 A. Yes, ma'am.
16 Q. At that point you didn't draw your service revolver, did
17 you?
18 A. No, ma'am, I didn't draw it.
19 Q. You saw Mr. Peralte I think you said in a hallway or
20 having just come out of this laundry area; is that right?
21 A. I saw him come out of a room to the right headed left
22 past the doorway.
23 Q. And when you saw him you simply motioned come here and
24 he did without incident; is that right?
25 A. I told him to.

## Page 132

1 Q. And he came to you.
2 A. Yes, ma'am.
3 Q. And at that point you took him out to the porch, and at
4 that point he told you his name?
5 A. I believe so.
6 Q. Well, isn't it true that as soon as you got to the porch
7 with him that you radioed Officer Conway and told him that
8 you had identified a subject as Capulco Peralte?
9 A. I believe so.
10 Q. Okay. Because you know from being involved in this case
11 that based on your information he actually typed the name of
12 Mr. Peralte into the search warrant.
13 A. Yes, ma'am.
14 Q. So if you didn't search the house and you simply in a
15 very quick and showing motion called him out of the house
16 before the search was done, you had to know his name from
17 what he told you.
18 A. Yes, ma'am.
19 Q. Now, you don't know -- well, let me back up a minute.
20 Mr. Peralte -- there was a period of some 20 to 30 minutes
21 that -- before -- after those -- Norman and James were on the
22 porch, before you actually ever entered the house; isn't that
23 right?
24 A. It was approximately 15, 20 minutes, in that area.
25 Q. Okay. And at that point Mr. Peralte, he was the only

Condenselt ™

## Page 133

1  other person you located in the house, right?
2  A. Yes, ma'am.
3  Q. And he had been in that house to do whatever he wanted
4  to do for that 15 to -- we have some evidence that it could
5  have been up to 30 minutes, but that period of time that he
6  was left in that house, right?
7  A. Yes, ma'am.
8  Q. And were you involved in the scenario that was kind of
9  designed to try to flush out folks in the house if drugs were
10  there by the phone call?
11  A. Yes, ma'am.
12  Q. And, in fact, we now know that that phone call was not
13  made to that residence, right?
14  A. Yes, ma'am.
15  Q. But there's no question, is there, that when you were on
16  the front porch you were wearing one of those police vests
17  that say police, bulletproof vests, right?
18  A. I believe I was.
19  Q. As well as the other officers; correct?
20  A. Yes, ma'am.
21  Q. So people in the neighborhood or people in that house
22  wouldn't have had much problem with knowing that law
23  enforcement was there involved in some activity; correct?
24  A. Correct.
25  Q. Okay. And with regard to Mr. Peralte, you have no idea

## Page 134

1  how long he may have been in any particular -- the room that
2  you have described as him having come out of, right?
3  A. No, ma'am, I don't know how long he was in there.
4  Q. And you have no knowledge of who else may have been in
5  that room before Mr. Peralte; correct?
6  A. No, ma'am, I do not.
7  Q. Or what anyone else might have done in that room.
8  A. Yes, ma'am.
9  Q. And with regard to the vehicles that were in the
10  driveway, those vehicles were all in that driveway when you
11  all arrived, weren't they?
12  A. Yes, ma'am.
13  Q. So you don't have any personal knowledge of having seen
14  who drove any of those vehicles into the particular location
15  where they were parked when you conducted your search.
16  A. Yes, ma'am.
17  MS. JAMES: Judge, may I have a moment?
18  THE COURT: Yes, ma'am.
19  (pause)
20  Q. Did you search Mr. Peralte after you took him outside?
21  A. I am sure I patted him down for weapons.
22  Q. Okay. And you didn't find any on him, right?
23  A. No, ma'am.
24  Q. And were you involved in actually any kind of inventory
25  of his person to see if he had any cash on him?

## Page 135

1  A. Not that I can recall.
2  Q. Okay.
3  MS. JAMES: I don't have any further questions of
4  this witness, Your Honor. May I return these exhibits?
5  THE COURT: Yes.
6  MR. MADISON: (complies)
7  CROSS-EXAMINATION
8  BY MR. MADISON:
9  Q. Officer Drummond, did you determine who owned the maroon
10  car which was seized?
11  A. I can say who I believe it came back to, I can't say
12  with a hundred percent certainty.
13  MS. JAMES: Objection to speculation, unless he
14  knows.
15  THE COURT: If your next question is going to be who
16  does he think owned it, objection sustained.
17  Q. Have you ever met Mr. Norman previously?
18  A. Yes, sir.
19  Q. And where did you meet Mr. Norman?
20  A. I have seen him on many occasions.
21  Q. Okay. As a matter of fact you met Mr. Norman one time at
22  the Oasis Supper Club, did you not?
23  A. Yes, sir, I have met him there before.
24  Q. And you knew Mr. Norman was employed at the Oasis Supper
25  Club?

## Page 136

1  A. Yes, sir, I believe he was the owner at one time.
2  Q. What type of establishment was the Oasis Supper Club?
3  A. I think like a dinner club, nightclub, slash something
4  in between.
5  Q. It was a nice, upscale establishment, wasn't it?
6  A. I wouldn't go that far.
7  Q. Well, how would you characterize the amount of business
8  that was done there?
9  A. A lot of business, mostly kind of the people you don't
10  want to have dinner with, got a lot of criminal types.
11  Q. Bottom line though is the business did well from the
12  standpoint of having customers attending the business, did it
13  not?
14  A. There was a lot of people there, yes, sir.
15  Q. Right. And most of those people, regardless of your
16  characterization, were there to either eat supper or to have
17  drinks or to enjoy the premises where they were; isn't that
18  correct?
19  A. I can't testify what they were there for. There were
20  people there.
21  Q. You testified a few minutes ago you thought they were
22  there for criminal activities?
23  A. That's what I am saying.
24  Q. Did you go inside the establishment when you were there?
25  A. One occasion I was inside.

## Page 137

1 Q. Okay. And what did you observe when you were inside the
2 premises?
3 A. Only made it just through the front door and the place
4 was empty at that time and had a large line outside.
5 Q. Okay. But there were tables, in fact, set up for serving
6 customers as far as food and drink and that sort of thing?
7 A. I was in a lobby area with doors, I really couldn't say,
8 it was a large building.
9 Q. What about other business interests, are you aware of
10 Mr. Norman with other business interests?
11 A. I don't know, if you remind me I might remember.
12 Q. The Gambler, do you remember any association that he had
13 with The Gambler?
14 A. No, sir.
15 Q. But you do know that he was operating a legitimate
16 business premises with a business license issued by the City
17 of Montgomery here in Montgomery?
18 A. At one time before it was revoked, yes, sir.
19 Q. Was that a yes?
20 A. I said yes, sir, until it was revoked, yes.
21 Q. And again, your participation in the search that day,
22 was that limited or strictly to searching the residence?
23 A. I searched the residence and I think I might have went
24 through one or two of the vehicles to assist on that.
25 Q. Did you identify any vehicles that you associated with

## Page 138

1 Mr. Norman?
2 A. Mr. Norman? Once I think a girlfriend or might have been
3 a white Honda and a green Escort, I can't be exactly sure
4 about --
5 Q. Did you inquire of anyone there at the premises as to
6 which car belonged to whom?
7 A. I believe we did.
8 Q. And did you get a response?
9 A. I believe Mr. Norman, I'm sorry, yes, said that those
10 were his vehicles, I believe --
11    MS. JAMES: Objection to potential hearsay, Judge.
12    THE COURT: Sustained.
13 Q. Now, where did you first see Mr. Peralte when you
14 entered the residence?
15 A. He was coming out of what later I found out to be the
16 laundry room into the den.
17 Q. Okay. And is that the area where a substantial amount of
18 the drugs were recovered?
19 A. Both areas, the laundry room and the den.
20 Q. Okay. Did you see Mr. Norman near those areas at any
21 time while you were there searching the house that day?
22 A. No, sir.
23 Q. Where was Mr. Norman when you first arrived on the
24 premises that day?
25 A. Coming out the front door.

## Page 139

1 Q. Where were you located when you saw Mr. Norman coming
2 out the front door?
3 A. Walking up to the front door.
4 Q. Okay. At what point in time during the search did you
5 see Mr. Norman walking out -- I'm sorry, at what time during
6 the -- what time was it that you saw Mr. Norman walking out
7 of the door as it relates to the time that y'all first got
8 there and everything?
9 A. We pulled up, parked our vehicles, walked up to the
10 house, as we were walking up to the house I think we got
11 right up to the porch and that's when he was coming out the
12 front door.
13 Q. Did you ever see Mr. Norman go to the garbage can?
14 A. No, sir, I personally didn't.
15 Q. Where was your car parked that day?
16 A. I was on up 4th Street and I can't recall the name of
17 that street, but it was probably two houses down. Go up 4th
18 Street, take a left and I was about two houses down. I was
19 not -- did not have a view of the house.
20 Q. Were you in communication with the other officers on the
21 scene?
22 A. Yes, sir.
23 Q. Okay. And what are the procedures, or what are the
24 available procedures to you when you are discussing the
25 obtaining of a search warrant as far as finding out who the

## Page 140

1 owner of a residence is?
2 A. As far as the actual owner of the residence, we don't
3 need to have that to get a search warrant.
4 Q. Okay. But typically don't you think it's important for
5 the issuing Judge to determine who the occupant of the house
6 is that you are going to be searching?
7 A. Well, occupant and owner is not always the same thing.
8 Q. Don't you think it's important that you give the Judge
9 who the occupant of the house is?
10 A. You could let him know who you believe the occupant of
11 the house is, yes, sir.
12 Q. And there are different ways to learn as to whom the
13 occupant of the house is, are there not?
14 A. Yes, sir.
15 Q. And those ways are means that you can obtain rather
16 quickly when you are trying to determine whether or not you
17 want to search a residence.
18 A. There's ways to find out, but sometimes no matter what
19 you do you can't determine who the occupant is.
20 Q. How many of those different ways did you utilize before
21 you obtained the search warrant on this particular occasion?
22 A. I couldn't say because I was out there at the residence,
23 I didn't go back to the office.
24 Q. Well, didn't you leave the office to go over there?
25 A. Yes, sir.

## Page 141

1 Q. Okay. Well, at the time that the phone call was received
2 in the office with whom did you have a discussion with
3 respect to your going to the 4th Street residence?
4 A. Let my lieutenant know, talked to some of the other
5 officers and we headed out to the residence.
6 Q. Did any of them tell you yeah, we have determined whose
7 residence that is that we are going to?
8 A. Not that I recall. I recall a couple of months earlier
9 being out with another lieutenant of mine, Ed Rogers, and he
10 informed me that Scooter, Mr. Norman, was staying there now,
11 he had gotten word of that.
12 Q. And that was somebody else?
13 A. Another lieutenant of mine.
14 Q. And that's hearsay?
15 A. You said if there was information about the house, I'm
16 giving you the information.
17 Q. Okay. Well, what I was asking was with respect to public
18 records, there are public records that you can use in order
19 to try to determine who the occupant of that house is.
20 A. There are public records.
21 Q. You can call the power company, can't you?
22 A. I don't know the power company's key name.
23 Q. Can't you?
24 A. If it was in his name, but most drug dealers don't put
25 houses or power or water in their name, usually have a

## Page 142

1 girlfriend or a mother or sister or aunt or uncle, they don't
2 usually put it in their name.
3 Q. Did I understand your earlier testimony to be that you
4 had contacted Officer Conway once you found Mr. Peralte?
5 A. Yes, sir, I did.
6 Q. Okay. What is your -- what was your phone number at the
7 time?
8 A. Pardon?
9 Q. Was that -- first let me ask, would that be a Southern
10 Linc or was that what method of communication?
11 A. It was through our Southern Linc, yes, sir.
12 Q. And you are also the person who made the phone call to
13 the phone number that y'all believed to be was the phone
14 number of the residence.
15 A. No, sir, I was not. That was the officer -- Detective
16 Alexander did that.
17 Q. Well, when you called the office, or did you call the
18 office?
19 A. I called him directly on the radio.
20 Q. Okay. And when you say you called him, you contacted
21 Officer Conway; is that correct?
22 A. Yes, sir, Detective Conway.
23 Q. Now, did he -- you can use a Southern Linc to call at a
24 land line, can you not?
25 A. Yes, sir, you can. You can use it as a telephone.

## Page 143

1 Q. Did you call a land line or did you call the Southern
2 Linc?
3 A. Called it private, not using the land line, in the
4 private mode. You just go radio to radio.
5 Q. And how does that show up or would it show up if
6 somebody were to review your bills?
7 A. That's beyond me.
8    MR. MADISON: May I approach the witness, Your
9 Honor?
10    THE COURT: Yes.
11 Q. I would like to show you what has been marked as
12 Defendants Norman's Exhibit Number 4. Can you identify that
13 document?
14 A. It's something to do with Six Feet Deep, LLC, Montgomery
15 County, gives the Defendant's address on Old Creek.
16 Q. Okay. And what address is listed on there for the
17 Defendant?
18 A. 2209 Old Creek Road.
19 Q. And that's Mr. Norman?
20 A. It says Alphonso Norman, yes, sir.
21 Q. Can you show me the date of that inquiry?
22 A. September 15th, 2003.
23 Q. Okay. That's before the search commenced that day, isn't
24 it?
25 A. Yes, sir.

## Page 144

1 Q. Ten days before that.
2 A. Yes, sir.
3    MR. MADISON: I would like to offer Defendant's
4 Exhibit 4.
5    THE COURT: Any objection?
6    MR. BROWN: It's not been authenticated but there's
7 no objection.
8    THE COURT: Any objection on behalf of Mr. Peralte?
9    MS. JAMES: No, sir.
10    THE COURT: Without objection Defendant Norman's
11 Exhibit 4, is that right, Mr. Madison?
12    MR. MADISON: Yes, Your Honor.
13    THE COURT: Defendant Norman's Exhibit 4 is
14 admitted.
15    MR. MADISON: And Judge, just for identification
16 purposes when I used the exhibit stickers I just put
17 defendant's exhibits on there, as the Court has noticed, we
18 need to distinguish, I am going to write Defendant Norman if
19 that would be okay.
20    THE COURT: That would be fine.
21 Q. Now, Officer Drummond, I believe I heard you say that
22 the search commenced before Officer Conway arrived back at
23 the residence with the search warrant; is that correct?
24 A. Yes, sir.
25 Q. Did -- who had a conversation with Officer Conway to let

Page 145

1 y'all know he had gotten a search warrant?
2 A. It was myself.
3 Q. How did you contact Officer Conway regarding that fact
4 or who contacted whom?
5 A. I believe he contacted me to let me know that the search
6 warrant had been signed.
7 Q. Did he tell you where he was located at the time that he
8 obtained that warrant?
9 A. He might have but I don't recall.
10 Q. Did he tell you where he had to go to meet with the
11 Judge to have the warrant signed?
12 A. He might have, like I say I don't remember if he did or
13 not.
14 Q. Are you aware that earlier today that he testified that
15 the search warrant did not commence until he delivered the
16 search warrant to the residence?
17 A. No, sir, I am not aware of his testimony.
18 Q. Well, if he testified to that then how would you
19 characterize his testimony as it pertains to your testimony
20 today?
21        MR. BROWN: Objection.
22        THE COURT: Sustained.
23        MR. MADISON: Are the government exhibits up there,
24 the pictures?
25        MR. BROWN: I believe so.

Page 146

1        MR. MADISON: May I approach?
2        THE COURT: Yes.
3        MR. MADISON: And Judge, the government has already
4 admitted some of these exhibits so rather than me just
5 introducing the same exhibits I am going to use the
6 government's exhibits.
7        THE COURT: Certainly.
8 Q. Now, you have got Defendant's Exhibit 1 located there,
9 can you see that? I don't have the whole exhibit shown on the
10 screen.
11 A. I can see some of the pictures, yes, sir.
12 Q. I need to lower it just a little bit. The upper right
13 hand picture there, I believe you identified that as a small
14 or little amount of crack, did you not?
15 A. Yes, sir.
16 Q. And concerning the amount involved with that particular
17 drug, would you typically characterize that as something that
18 was held for distribution or something held for personal use?
19 A. Distribution.
20 Q. And how much was that there that you are saying was held
21 for distribution?
22 A. I couldn't say exactly, I don't remember the exact
23 weight on it.
24 Q. It's approximately two grams?
25 A. It might have been in that area. I don't recall the

Page 147

1 exact weight on it.
2 Q. And your testimony here today is approximately two grams
3 of cocaine would be held for distribution and not typically
4 held for possession or possessory use?
5 A. No, sir, typically somebody using crack buys a rock,
6 maybe two rocks, maybe three rocks, they don't usually buy
7 two grams at a time unless they are going to sell it.
8 Q. Did you find any chemicals to make crack cocaine there
9 that day?
10 A. You don't make crack cocaine, what you do is you cook it
11 down, you just reduce it and with some water or pan and some
12 kind of cooking vessel and some baking soda, that's all you
13 do.
14 Q. Did you find any baking soda when you searched the
15 house?
16 A. I don't recall whether we did or not.
17 Q. Did you seize any baking soda?
18 A. I don't recall.
19 Q. Did you list any on your inventory sheet that you
20 seized?
21 A. Not that I recall.
22 Q. Now, the left hand picture there with the three bricks,
23 you were asked questions about that earlier, did you testify
24 that those had been in the grease-wrapped package?
25 A. I couldn't swear that they were in that grease-wrapped

Page 148

1 package. I believe that's where they came from, that they
2 were in that grease-wrapped package.
3 Q. Were they all contained in similar packages with regards
4 to use of the zip-loc bag?
5 A. They were all packaged as you see them there. Only one
6 of them, the one under the couch was still in a zip-loc bag,
7 these were not in zip-loc bags.
8 Q. Now, Defendant's Exhibit 4, what was -- can you identify
9 that again?
10 A. That was a Slimline digital scale that was on the
11 washing machine.
12 Q. When you say on the washing machine, I believe your
13 testimony was earlier it was closed?
14 A. It was closed or open, I remember the dryer was closed.
15 Q. Did you find that inside or sitting on top?
16 A. I believe that was sitting on top.
17 Q. So it was not inside the washing machine then.
18 A. Yes, sir.
19 Q. What was inside the washing machine?
20 A. There was another plastic bag that contained -- zip-loc
21 bags with the packing grease in it and I believe it was 29
22 hundred dollars in currency.
23 Q. The drug evidence that was located, were there any items
24 other than drug evidence located in the washing machine that
25 day?

Page 145 - Page 148

Page 149

1 A. No, sir, there was no drug evidence found inside the
2 washing machine, it was in the dryer.
3 Q. I'm sorry. Were there non-drug items in the washing
4 machine?
5 A. Yes, sir, in currency.
6 Q. What non-drug items were located in the washing machine?
7 A. The currency and the zip-loc bags containing the grease.
8 Q. Were there any clothes in the washing machine?
9 A. Yes, sir.
10 Q. That's what a washing machine is typically used for to
11 wash clothes, is it not?
12 A. Yes, sir.
13 Q. And when you were there and you looked in the washing
14 machine, do you recall whether the clothes had already been
15 rinsed or whether they were being prepared to be washed?
16 A. I couldn't say sir, I don't recall.
17 Q. And the bag with the -- I believe your testimony was the
18 zip-loc bag that contained the grease was also located in
19 there with the clothes.
20 A. Yes, sir.
21 Q. Okay. Now, is it consistent for a home owner or an
22 occupier of a residence to put something with grease in a
23 washing machine where they are going to be washing their
24 clothes?
25 A. I wouldn't do it with my clothes, no, sir.

Page 150

1 Q. Now, the Government's Exhibit 10, I thought I understood
2 your testimony earlier was that apparently all that had been
3 packaged together but it appeared as though it had been taken
4 apart; is that correct?
5 A. The three bricks of cocaine were sitting -- they were in
6 their own individual packages, they weren't in zip-loc bags
7 any more, and there was some other cocaine that was in a bag
8 next to it.
9 Q. Now, the cocaine that was in the bag next to it, was it
10 unsealed or opened or how did it appear as it lay there in
11 the dryer?
12 A. It was sealed in a plastic bag but there was also some
13 loose at the back of the dryer, because one of the kilos had
14 been broken open and it looked like -- appeared that the
15 cocaine in the bags had been pulled off of that kilo and
16 maybe somebody threw it in the dryer and that's when the
17 loose cocaine came out, spilled out.
18 Q. But the general appearance of the location of each of
19 these items appears as though somebody was throwing that
20 throughout the house, does it not?
21 A. Looks like they could have thrown it in there and one
22 was in a different place, yes, sir.
23 Q. Government's Exhibit 20, and I got a little confused
24 when I was listening to your testimony earlier, what led you
25 to search this car with respect to the airbag unit and not

Page 151

1 the other three vehicles that were located there at the
2 residence?
3 A. The prior information that we had about Mr. Peralte
4 being a drug driver.
5     MS. JAMES: Objection, and move for a mistrial.
6     THE COURT: Approach.
7     (At which time the following occurred at side-bar:)
8     THE COURT: The record will reflect that we are in
9 the presence but outside of the hearing of the jury. State
10 your objection.
11     MS. JAMES: Your Honor, at this time I would move
12 for a mistrial. Based on the question, I don't know that Mr.
13 Madison knew specifically that that was the answer that he
14 was going to give. We have not been provided any notice of
15 404(b) evidence and anything with regard to any prior
16 information about him being a drug trafficker could only come
17 from information that arguably could be 404(b) evidence or
18 inappropriately a prior drug conviction that he has. This
19 officer has been testifying for the government for well over
20 ten years, probably longer, and he knew exactly -- he knows
21 exactly what he can and can not do, and I say it's a backdoor
22 way to either get in improper 404(b) evidence or to get in
23 inadmissible evidence of a prior conviction unless this
24 Defendant testifies. I don't think there's any curative
25 instruction that can erase that from the mind of the jury and

Page 152

1 I think that the only remedy is a mistrial.
2     THE COURT: Response from the government?
3     MR. BROWN: Your Honor, on the one hand I would not
4 say that this information was not provided to the defense, we
5 provided quit a bit of information to the defense about other
6 investigations involving Mr. Peralte and Mr. Norman. Never
7 the less, we did not intend to introduce that, that was -- as
8 far as the government is aware that's the correct answer to
9 the question that Mr. Madison asked.
10     MR. MADISON: Judge, may I say something?
11     THE COURT: Read the question and the response that
12 was made before the objection was made.
13     (At which time the referred to question and answer
14 were read by the reporter.)
15     THE COURT: Mr. Madison?
16     MR. MADISON: I just want to state that the reason I
17 asked the question was I thought that he had said that they
18 shined the light through there or something earlier which to
19 me I was trying to get a response to maybe they did that to
20 the other cars which is why they didn't think that those cars
21 needed to be -- or airbag area needed to be searched, not
22 that I had any reason to believe that Mr. Peralte had been
23 engaging in prior drug activity.
24     MS. JAMES: Your Honor, the appropriate answer to
25 the question, if you follow the direct examination as well as

## Page 153

1  the cross-examination that I did, the appropriate answer was
2  that he had heard from the anonymous tipster that the maroon
3  vehicle and the maroon vehicle was there large quantities of
4  drugs were there, irrespective of Mr. Peralte or whatever, he
5  had already testified to that on direct, he goes in and says
6  I am confused.
7      THE COURT: This witness never testified that he had
8  any conversation with the anonymous tipster.
9      MS. JAMES: Then maybe it was Conway. I would have
10 to go back, I thought it might have been him, because I know
11 somebody answered it was based on the information given by
12 the tipster that when the maroon car was there there were
13 drugs there.
14     THE COURT: That was in response to the question
15 what was the basis for you obtaining a search warrant and
16 that was one of the reasons.
17     MS. JAMES: For the vehicle.
18     THE COURT: That Corporal Conway testified.
19     MS. JAMES: Okay. Maybe so, but here's the thing,
20 404(b) evidence, they gave us several DEA-6s that contained
21 information about alleged involvement with Mr. Peralte and
22 other drug activity, however --
23     THE COURT: Let me cut you off here. Did you
24 provide any notice there was going to be any 404(b) evidence
25 offered at trial?

## Page 154

1      MR. BROWN: No, sir. And we did not intend to offer
2  any.
3      THE COURT: To the extent that there's an effort to
4  offer 404(b) evidence, I would sustain your objection. I am
5  going to deny your request for a mistrial but I am going to
6  instruct the jury to disregard any reference that this
7  witness just gave as to why he searched this car as opposed
8  to any of the other cars there, but allow the questioning to
9  be redirected through the permissible reasons such as the
10 void behind the passenger side of the dashboard that they saw
11 with a light or whatever, however they could have seen around
12 the seal.
13     MS. JAMES: Judge, in all due respect, I
14 respectfully disagree with the Court's ruling on the
15 mistrial. However, given that ruling, then my request to the
16 Court is for a stronger curative instruction, stronger being
17 first that I make a motion to strike the testimony. I think
18 it's important for the jury to hear you say that that
19 testimony is stricken. I think it's important that you tell
20 the jury that they are to disregard his answer in total, that
21 it was non-responsive to the question. And I don't know what
22 else can be done. If you can think of anything stronger,
23 it's very damaging, because I have been very careful and will
24 be very careful for that not to happen, and whether or not
25 Mr. Madison stumbled up on that problem or did it

## Page 155

1  intentionally, I am not making a call on that, I still submit
2  Agent Drummond knew exactly what he was doing. And it's kind
3  of like when you are playing tennis and you see that ball
4  coming and you want to slam it over the net, that's exactly
5  what he did.
6      MR. MADISON: I'm going to object to any
7  reference --
8      THE COURT: The court reporter can only get one
9  person talking at a time.
10     MR. MADISON: I stated the reason why I asked the
11 question and I object to counsel's implying that I may have
12 asked that question intentionally, I did not.
13     THE COURT: Let's move on from that point, you are
14 not making any points with me.
15     MR. BROWN: Okay. Obviously the government is
16 concerned about the administration of justice. It would be
17 more appropriate in the government's opinion for defense
18 counsel to ask specific leading questions since we are on
19 cross so that if counsel wants to know if they shined a light
20 in another car he can just ask that question and not open-
21 ended questions that require the witnesses of the government
22 to read the mind of defense counsel.
23     MR. MADISON: Interjecting from the witness either.
24 It's just he's interjected a few things, I don't think I
25 asked yes or no questions.

## Page 156

1      THE COURT: I am not going to give counsel
2  instructions about how they are to question their witnesses,
3  I will caution all counsel to limit their questions about
4  open-ended -- that would provoke open-ended responses that
5  would lead to these objections. The Court has ruled on the
6  motion for a mistrial, I will give a curative instruction to
7  the jury. Is there anything else?
8      MS. JAMES: I'm just thinking quickly. It would
9  seem to me that what he was offering, at least to the degree
10 that what -- the answer he gave, would be hearsay as well. I
11 mean he's not --
12     THE COURT: I have ruled and I will give a curative
13 instruction and instruct the jury to disregard the last
14 response from the witness.
15     MS. JAMES: May I move to strike or something? I
16 think that's important.
17     THE COURT: I would grant your request to strike for
18 whatever --
19     MS. JAMES: That answer.
20     THE COURT: -- for whatever purpose that has, that
21 portion of the response that this witness gave in relation to
22 why he was directed to search this car over the other cars
23 that were present.
24     MS. JAMES: And my objection on mistrial is still
25 valid.

**Page 157**

1 THE COURT: It's still there.
2 (At which time the following occurred in open
3 court:)
4 THE COURT: Ladies and gentlemen, I instruct you, as
5 I will do in other parts of this trial, that there are times
6 when we will take matters up out of your hearing for the
7 benefit of the Court and yourself. We have just had one of
8 those times. And I am instructing you at this time to
9 disregard the comment that the witness just gave as to any
10 reasons why he searched the red vehicle contained in the
11 photographs, Government's Exhibit 19, Government's Exhibit
12 20, and that portion of Government's Exhibit 21. That portion
13 of this witness' testimony concerning his response to that
14 question from Mr. Madison is stricken. And again, as to that
15 portion of this witness' testimony that you just heard, you
16 are to disregard that testimony in making any decision about
17 either of the Defendants in this case. You may proceed.
18 BY MR. MADISON:
19 Q. How did you determine that the other three vehicles did
20 have airbags in them?
21 A. Just kind of prying on them a little bit and looking at
22 them.
23 Q. Were the vehicles locked, the other vehicles?
24 A. I don't recall if they were locked or open.
25 Q. Did you personally search the other vehicles?

**Page 158**

1 A. I might have looked through them a little bit but I
2 didn't take a main interest, I mean I wasn't the main officer
3 searching the vehicle, no, sir.
4 Q. Were other officers searching the vehicles?
5 A. Yes, sir.
6 MR. MADISON: May I approach the witness, Your
7 Honor?
8 THE COURT: Yes.
9 Q. Can you identify what has been marked as Defendant
10 Norman's Exhibit Number 8?
11 A. Sir, it's a group of photographs that were taken at the
12 scene.
13 Q. And were those photographs introduced with the
14 government's exhibits earlier?
15 A. These exact photographs, no, sir, I don't recall seeing
16 them.
17 Q. Okay. But what do those photographs portray there?
18 A. One of them is the same, one of them is the zip-loc bag
19 that contained the grease and the kilo of cocaine. One of
20 them is the bed post that had I think it was approximately 70
21 thousand dollars in currency stuffed in it, and shows more
22 currency and then a wallet that was found in the den in a
23 fake tree. And a set of keys.
24 Q. These items were items seized at the same time as the
25 search; is that correct?

**Page 159**

1 A. Yes, sir. It was during the search, yes, sir.
2 Q. Did you ascertain the contents of the billfold that was
3 in the plant?
4 MR. BROWN: Your Honor, before we go into publishing
5 these to the jury they probably should be offered first.
6 THE COURT: Mark the exhibit before you show it to
7 them. I don't know that there would be any objection, but
8 just so we can maintain our record clearly, mark it for
9 purposes of identification and admission if that's going to
10 be your purpose.
11 MR. MADISON: Yes, sir, I'm sorry, I offer Defendant
12 Norman's Exhibit Number 8.
13 MR. BROWN: No objection from the government.
14 THE COURT: Any objection from Mr. Peralte?
15 MS. JAMES: Judge, yes, based on the matters that we
16 discussed pretrial earlier this morning with regard to some
17 pretrial matters.
18 THE COURT: Bring the exhibit and approach.
19 MR. MADISON: (complies)
20 (At which time the following occurred at side-bar:)
21 THE COURT: The record will reflect we are in the
22 presence but outside the hearing of the jury. The Court has
23 what has been marked for identification as Defendant's
24 Exhibit 8. It is a computer-generated photograph or a copy of
25 eight photographs with Bates stamp number 000298 at the

**Page 160**

1 bottom. Ms. James, your objection.
2 MS. JAMES: Just so that the record is clear, this
3 is Norman's Exhibit 8, the collective photograph which
4 includes a photograph -- one of the photographs is a wallet
5 that I believe would be identified to Mr. Peralte with his
6 driver's license in the picture. I am not sure exactly what
7 other purpose, but at this juncture the government has not
8 elicited any material with regard to this wallet and might
9 not, and my concern is that Mr. Madison is attempting to
10 offer inculpatory evidence either directly or indirectly
11 against Mr. Peralte, which I don't want to agree to his
12 admission of evidence that's harmful to my client based on my
13 request for severance. It might be admissible for some other
14 reason but if, in fact, he is going to say whose wallet is
15 this and whose room was it in and yadda, then I have an
16 objection to that. Obviously if Mr. Brown were offering it it
17 would be a different story, but all of this goes to my
18 initial and renewed request for severance. So given that this
19 may happen, continue to happen throughout the trial I don't
20 want to stand up and say it goes to my motion for severance,
21 but when these things do happen if I could simply say based
22 on the matter we took up pretrial and then unless it was
23 something other than severance --
24 THE COURT: We took up a lot of things pretrial, one
25 of which was the issue of Blakely versus Washington.

Page 157 - Page 160

## Page 161

1    MS. JAMES: How about if I just go to the rule, is
2    it 16 or 14? I think it's 14, Judge.
3    THE COURT: 14 is severance.
4    MS. JAMES: Maybe if I just object based on the Rule
5    14 matter.
6    THE COURT: Okay.
7    MS. JAMES: And that will trigger it.
8    THE COURT: That would -- I would allow you to
9    preserve your objection based upon that reference and your
10   objection. If you would articulate at this point what
11   objecting pursuant to a Rule 14 matter would mean.
12   MS. JAMES: Okay.
13   THE COURT: Tell us what you mean by that.
14   MS. JAMES: If I object pursuant to Rule 14 that
15   would mean I am objecting to the introduction of evidence
16   offered by Mr. Madison on behalf of Mr. Norman that would
17   support my motion to sever and my renewed motion to sever. In
18   other words, that he's offering inculpatory evidence. The
19   fact that I am put to trial with him given that fact is
20   unduly prejudicial to Mr. Peralte.
21   THE COURT: Any response from the government?
22   MR. BROWN: No, sir.
23   THE COURT: All right. Mr. Madison, what is your
24   response?
25   MR. MADISON: My response is it's also exculpatory

## Page 162

1    of my client. We have already had a person testify that it
2    appeared somebody was throwing drug things around and this
3    appears to support this evidence that somebody is throwing
4    this stuff, and it's not my client that's doing that.
5    MS. JAMES: And just may I, Judge? Are you
6    thinking?
7    THE COURT: I am thinking. Do you have any further
8    response about its admissibility?
9    MS. JAMES: Well, I have a further response, and the
10   reason at least with regard to this particular piece of
11   evidence, I hate to do it in front of the government but it's
12   pretty obvious, this witness has testified that no search was
13   conducted of the house when he went in to get Mr. Peralte. He
14   simply motioned and he came out, no search was conducted.
15   Before they ever went in he knew Mr. Peralte's identity
16   because what Mr. Peralte told him, I am Capulco Peralte. He
17   called Mr. Conway, Conway types it in, that's how he got the
18   search warrant. So you can't say -- he can't say he was
19   throwing it around to try to hide his identity or whatever
20   because that would be inconsistent with what has been
21   testified to. And I think all of this leads to confusion
22   and, you know, I honest to goodness -- I have never really --
23   I just don't take that tact, but -- and I hate to just roll
24   up our sleeves but it may come to that, and Todd can probably
25   go home.

## Page 163

1    THE COURT: As to Defendant Norman's Exhibit 8, have
2    any of the photographs that are collectively contained in
3    this exhibit been admitted into the trial of this case thus
4    far?
5    MR. MADISON: No, sir.
6    MR. BROWN: Maybe that one, bottom left.
7    THE COURT: We are referring to the bottom left
8    photograph. Any other photographs that have been either
9    identified by this witness or admitted through this witness
10   or the previous witness in the trial of this case?
11   MR. BROWN: No, sir, I don't believe so.
12   THE COURT: I find that there is not a proper
13   predicate that has been laid for the admissibility of
14   Defendant Norman's Exhibit 8, and until the proper predicate
15   is laid as to any of the photographs with the exception of
16   the bottom left photograph which has already been admitted,
17   objection is sustained.
18   (At which time the following occurred in open
19   court:)
20   BY MR. MADISON:
21   Q. I want to show you a copy of Government's Exhibit 8, in
22   which I believe was admitted into evidence earlier.
23   THE COURT: Government's Exhibit 8?
24   MR. MADISON: Yes, sir.
25   Q. Can you see that on your screen there?

## Page 164

1    A. Yes, sir.
2    Q. What sort of clothes do you see located in the washing
3    machine there?
4    A. I see a red, something blue, and I can't see the other
5    side real well. Mainly what I see is the currency sitting on
6    something red but I can't tell if it's a blouse or shorts or
7    anything like that.
8    Q. It's like a pink dress maybe?
9    A. Could be, I couldn't say, sir.
10   Q. Children's clothes?
11   A. Could be that too.
12   Q. Did you take the items out of the washing machine at the
13   time you conducted your inventory?
14   A. No, sir, I pulled -- or moved them around to search in
15   there, I don't know if I pulled them all out.
16   Q. Did you see any adult male's clothing in there?
17   A. I can't say, sir.
18   MR. MADISON: If I may have just a minute, Your
19   Honor, I want to return these before I get them mixed up with
20   mine.
21   THE COURT: Certainly.
22   (Pause)
23   MR. MADISON: I don't have any further questions of
24   this witness, Your Honor.
25   THE COURT: Redirect, Mr. Brown?

Condense It™

## Page 165

1    MR. BROWN: No, Your Honor.
2    MS. JAMES: I just have one question for him.
3        RECROSS-EXAMINATION
4    BY MS. JAMES:
5    Q. Sergeant Drummond, when you approached the house, and I
6    am taking you back to when you all were surveilling and then
7    there was something thrown in the trash can and then there
8    was the knock and talk.
9    A. Yes, ma'am.
10   Q. Were you out in front of the house throughout that whole
11   period?
12   A. Yes, ma'am.
13   Q. All right. Tell me in relation to when Mr. Norman was
14   confronted there at the front door how long it was before Mr.
15   James was out on the front porch?
16   A. I don't think it was maybe a minute maybe, if it was
17   that long. I don't think it was --
18   Q. He came out basically just to see what was going on?
19   A. Yes, ma'am.
20   Q. Okay. All right. And with regard to when Mr. Norman
21   walked out to the trash can or you all purportedly walked out
22   to the trash can, Mr. James was not outside the house at that
23   time, was he?
24   A. No, ma'am.
25   Q. So based on your visual observation Mr. Norman exited

## Page 166

1    the house and walked to the street; is that correct?
2    A. That was Detective Conway, I did not visually see him
3    walk out to the street.
4    Q. Okay. But do you agree with me Mr. James was in the
5    house during the period of time Mr. Norman was outside
6    walking to the street?
7    A. Probably so, I am sure Detective Conway --
8    Q. You don't have any evidence that Mr. James walked out to
9    the street?
10   A. No, ma'am.
11       MS. JAMES: That's all I have. Thank you.
12       THE COURT: Anything further, Mr. Madison?
13       MR. MADISON: No, sir, Your Honor.
14       THE COURT: Mr. Brown?
15       MR. BROWN: No, sir.
16       THE COURT: You may step down.
17       MR. BROWN: May he be excused, Your Honor.
18       THE COURT: Any reason this witness can not be
19   excused from his subpoena, Ms. James?
20       MS. JAMES: No, sir.
21       THE COURT: Mr. Madison?
22       MR. MADISON: No, sir.
23       THE COURT: He may be released. Call your next
24   witness.
25       MR. BROWN: Clyde Norwood.

## Page 167

1        THE CLERK: You do solemnly swear or affirm that the
2    testimony you give in the trial of this cause to be the
3    truth, the whole truth, and nothing but the truth, so help
4    you God.
5        THE WITNESS: Yes, I do.
6        THE COURT: Mr. Brown, how long do you anticipate
7    this witness' testimony being?
8        MR. BROWN: I don't anticipate asking him very many
9    questions at all, Your Honor.
10       THE COURT: Would it be convenient for us to take a
11   recess at this point? The jury has been going a little over
12   an hour and a half. Do you think you can finish him up in
13   ten or 15 minutes?
14       MR. BROWN: I can.
15       THE COURT: Proceed.
16       CLYDE NORWOOD, witness for the Government,
17   having been duly sworn or affirmed, testified as follows:
18       DIRECT EXAMINATION
19   BY MR. BROWN:
20   Q. Good afternoon. Would you state your name, please.
21   A. My name is Clyde Norwood.
22   Q. Would you mind spelling your last name for the court
23   reporter?
24   A. N-O-R-W-O-O-D.
25   Q. Thank you, sir. How are you employed?

## Page 168

1    A. I am a forensic chemist with the Drug Enforcement
2    Administration working out of the South Central Lab in
3    Dallas, Texas.
4    Q. Would you explain if you would, please, your duties
5    there.
6    A. As a forensic chemist my primary responsibility is to
7    identify and determine what, if any, controlled substances
8    are present in the evidence, and in what concentration.
9    Q. You said you worked in Dallas; is that correct?
10   A. Yes, sir, that's correct.
11   Q. Do you analyze items for controlled substances from
12   certain areas?
13   A. The DEA has a responsibility for the states of Oklahoma,
14   Arkansas, Louisiana, Alabama, New Mexico and Texas, so our
15   caseload is derived from those states.
16   Q. What is your educational background that leads to you
17   being able to do your job?
18   A. In 1976 I graduated with a BS Degree in chemistry from
19   the University of Texas at Arlington. My professional
20   background includes 17 years of industrial chemistry with
21   such Fortune 500 companies as Dresswell Industries, Johnson
22   and Johnson, and the Army Corps of Engineers. When I hired
23   onto the DEA with the DEA I received nine months of training
24   and a -- it was a four week course of instruction in
25   Washington, D.C.

Page 169

1  Q. Do you undergo routine training to keep your
2  proficiencies up?
3  A. Yes, sir. We have unknown samples that cross our desk
4  that have been previously analyzed by other chemists within
5  the system. We have other regional laboratories, and then we
6  have samples that come in from outside of the DEA.
7  Q. Mr. Norwood, did you have an occasion as part of your
8  job to analyze some substances for the presence of controlled
9  substances in a case identified as case number KI-00-0075?
10  A. Yes, sir, I did.
11  Q. How many substances did you test? How many exhibits did
12  you test?
13  A. There were DEA Exhibits 4, 5, 6 and 8.
14  Q. Mr. Norwood, I have a report here, and we will get into
15  that report in a moment, but it refers to some re-analysis of
16  these particular exhibits that you have identified. Could you
17  explain that for the jury?
18  A. Yes, I can. The original analyst unfortunately suffered
19  a heart attack and was unable to come to trial for this case,
20  and so I was asked to re-analyze. We opened up the evidence
21  and re-analyzed it for purposes of court.
22  Q. Thank you.
23      MR. BROWN: May I approach the witness, Your Honor?
24      THE COURT: Yes.
25  Q. (complies) Mr. Norwood, I am going to show you what has

Page 170

1  already been admitted as Government's Exhibit 3, which is DEA
2  Exhibit 4, Government's Exhibit 18, which is DEA Exhibit 8,
3  Government's Exhibit 14, which is DEA Exhibit 6, and
4  Government's Exhibit 12, which is DEA Exhibit 5, and ask if
5  you can recognize those items.
6  A. Government's Exhibit 3 has my identifying mark on one of
7  the heat-seals, the heat-seal that I analyzed for control
8  substances. I believe the second heat-seal was for
9  fingerprint analysis. Government's Exhibit 12, again, I
10  recognize the heat-seal containing controlled substances
11  because of my identifying mark on the chain of custody
12  sticker. Again, there's two heat-seals involved, and the
13  heat-seal that I didn't open was for fingerprints.
14  Government's Exhibit 14 has two heat-seals. I opened up the
15  heat-seal containing the controlled substances. And
16  there's -- the second heat-seal I didn't open because it was
17  for fingerprints. And the final exhibit, Government's Exhibit
18  18, again, has my identifying mark on the heat-seal and which
19  I opened for the purpose of analyzing the controlled
20  substances.
21  Q. Did you, in fact, analyze the controlled substances that
22  are in each of those four exhibits?
23  A. Yes, I did.
24  Q. After doing so did you generate a report?
25  A. Yes, I did.

Page 171

1  Q. I am going to show you what has been marked as
2  Government's Exhibit 32 and ask if you recognize that report?
3  A. Yes, I do. Again, my signature appears at the bottom of
4  the report, which I signed.
5  Q. And does your report accurately reflect the results of
6  your analysis in this case?
7  A. Yes, it does.
8      MR. BROWN: The government moves to admit
9  Government's Exhibit 32.
10      THE COURT: Any objection on behalf of Mr. Peralte?
11      MS. JAMES: No, sir.
12      THE COURT: On behalf of Mr. Norman?
13      MR. MADISON: No, sir.
14      THE COURT: Government's Exhibit 32 is admitted
15  without objection.
16  Q. Mr. Norwood, if you would, what is identified as Exhibit
17  4 which actually is Government's Exhibit 3, what was the
18  result of your analysis on that particular item? And would
19  you hold that particular item up if you wouldn't mind.
20  A. Government's Exhibit 3, DEA Exhibit 4, contained cocaine
21  base, caffeine, and procaine.
22  Q. And the net weight of that particular item?
23  A. The net weight is something that we call residue.
24  Q. All right. Would you do the same for Government's
25  Exhibit 12, which is DEA Exhibit 5.

Page 172

1  A. Government's Exhibit 5, DEA Exhibit -- pardon me,
2  Government's Exhibit 12, DEA Exhibit 5, contained cocaine
3  hydrochloride, procaine and caffeine.
4  Q. And the net weight on that?
5  A. Yes, sir. The net weight was two thousand nine hundred
6  and 50 grams.
7  Q. And just for those of us who may not do math
8  particularly well, that would be roughly a little under three
9  kilograms; is that correct?
10  A. That's correct.
11  Q. Would you do the same for Government's Exhibit 14 which
12  is DEA Exhibit 6.
13  A. Government's Exhibit 14, DEA Exhibit 6, contained again
14  cocaine hydrochloride, procaine and caffeine.
15  Q. And the net weight on that particular item?
16  A. The net weight for this exhibit was nine hundred and 81
17  point eight grams.
18  Q. And finally, Government's Exhibit 18, which would be DEA
19  Exhibit 8.
20  A. Government's Exhibit 18, DEA Exhibit 8, contained
21  cocaine base, procaine and caffeine.
22  Q. And the net weight on that item?
23  A. The net weight was two point one grams.
24  Q. Now, you identified cocaine base and cocaine
25  hydrochloride in some of the -- depending on which exhibit it

## Page 173

1  is, on some of these exhibits and then some other items
2  caffeine and procaine. Would you tell the ladies and
3  gentlemen of the jury what the presence of those particular
4  substances are for.
5  A. Often times adulterants are added to cocaine as a means
6  of cutting it. In this case procaine since it's an
7  anesthetic, misleads anyone involved in that cutting has
8  taken place because you touch the powder to your tongue, the
9  procaine is an anesthetic, it's going to have a numbing
10  action much like cocaine would since cocaine is also an
11  anesthetic. Caffeine is a -- was added to impart a little bit
12  of buzz to it, if you would. We have two types of agents that
13  are added to cocaine, something that are called diluents and
14  some that are called adulterants, and the distinction between
15  the two are if you can think of a lemonade stand, the water
16  being added to lemonade is a diluent and it serves to extend
17  the quantity that the individual is trying to sell. And
18  adulterant is something that you would add to the lemonade to
19  give it more of a buzz, for example, vodka. So that's the
20  difference between an adulterant and diluent, and procaine
21  and caffeine would fall under adulterants.
22  Q. Thank you, Mr. Norwood, I don't have any further
23  questions for you, the defense counsel may.
24       THE COURT: Ms. James, do you expect your cross to
25  be very long?

## Page 174

1       MS. JAMES: No, sir.
2              CROSS-EXAMINATION
3  BY MS. JAMES:
4  Q. Mr. Norwood, my name is Susan James, I represent Mr.
5  Peralte, I have a few questions for you.
6  A. Yes, ma'am.
7  Q. In your analysis do you make a determination as to the
8  purity of the drugs?
9  A. Yes, I do.
10  Q. Okay. And would you tell us the purity of those
11  respective packages.
12  A. Yes, ma'am. Do you want me to hold them up?
13  Q. No, just whatever is convenient, you can just identify
14  them by Government's Exhibit or DEA Exhibit or both.
15  A. Government's Exhibit 18, DEA Exhibit 8, which contained
16  cocaine base, had a purity of 78 percent. Government's
17  Exhibit 12, DEA Exhibit 5, which contained cocaine
18  hydrochloride, had a purity of 65 percent. Government's
19  Exhibit 3, DEA Exhibit 4, which contained cocaine base, there
20  was no purity done, the quantity was insufficient.
21  Government's Exhibit 14, DEA Exhibit 6, which contained
22  cocaine hydrochloride, had a purity of 64 percent.
23  Q. Thank you. Now, you would agree with me, would you not,
24  that collectively there with regard to the cocaine, the
25  hydrochloride, which would be the powder, that the purity

## Page 175

1  levels were certainly not of the highest quality.
2  A. Yes, ma'am, that's correct. Usually when cocaine bricks
3  are cut they have a percentage range -- percentage range from
4  70 to 85 percent.
5  Q. Okay. And with regard to the hydrochloride here we don't
6  have anything higher than 65 percent; correct?
7  A. Yes, ma'am, 65 percent of the hydrochloride is the
8  highest.
9  Q. Okay. And would you agree with me that the more the
10  substance is cut or these things are added to it as you have
11  just described that that tends to lessen or reduce the purity
12  level?
13  A. Yes, ma'am. That's correct.
14  Q. Because what you are trying to do is expand the product
15  by adding things to it that are substances other than the
16  drugs.
17  A. Yes, ma'am.
18  Q. And you have been doing this with the DEA for how long?
19  A. I have been employed with DEA since February of 1998.
20  Q. Okay. And you have had an opportunity to examine
21  thousands of samples, haven't you?
22  A. I have analyzed over two thousand exhibits.
23  Q. Okay. And in examining those you are aware, are you not,
24  of at least the city that the substance has been seized in.
25  A. Yes, ma'am, that's on the DEA-7.

## Page 176

1  Q. Because if it was Dallas it would have on there that it
2  was seized in Dallas, or if it were in Montgomery it would
3  have some identifier that would indicate to you where it was
4  seized; is that correct?
5  A. That's correct.
6  Q. And would it be your experience -- I am assuming you
7  have examined cocaine hydrochloride that's come from Belize
8  or some foreign country, haven't you? I am not saying seized
9  there, and it may be an unfair question, but I am saying have
10  you had occasion to examine any that's come right over the
11  border?
12  A. The cocaine originates from out of the country.
13  Q. So it all comes from out of the country, but my question
14  to you is in that stage do you ever have occasion to test
15  some that comes over the border at Brownsville, for instance?
16  A. I have received exhibits from Brownsville.
17  Q. And possibly have you had occasion to receive exhibits
18  from Miami and things of that nature?
19  A. No, ma'am, in the region, the South Central Lab that we
20  have responsibility over, our responsibilities don't extend
21  into Florida.
22  Q. Okay. Well, let me ask you this if you know, if you
23  don't I understand, but would it be reasonable to say that
24  the cocaine hydrochloride is typically the most pure the
25  closer it is to the source city?

Page 177

1  A. I -- some of the cocaine bricks when they are extracted
2  from the coca plant in South America, they are cut there. A
3  quarter of the bricks that are pressed -- a quarter of the
4  exhibits or the bricks that are pressed into a brick form
5  even before they leave South America are cut.
6  Q. Okay. So what you are saying is then that -- would they
7  be cut 60 percent, or 65 percent?
8  A. Well, as I testified earlier, a cut brick usually has a
9  range of 70 to 85 percent.
10 Q. Okay. So these -- under any circumstances these would be
11 a bit lower than the average cut brick.
12 A. Yes, ma'am.
13 Q. All right. Final question. In examining those
14 particular exhibits for your purposes of determining what the
15 substance is and the purity, you have no way of knowing when
16 you examine that who has handled it or to whom it belonged;
17 correct?
18 A. No, ma'am, I do not.
19 Q. Okay. Thank you.
20     MS. JAMES: No further questions.
21         CROSS-EXAMINATION
22 BY MR. MADISON:
23 Q. How you doing?
24 A. Just fine.
25 Q. Exhibit Number 4 again, I believe you testified that was

Page 178

1  cocaine base; is that correct?
2  A. DEA Exhibit 4?
3  Q. Yes, sir.
4  A. Yes, sir, that's correct.
5  Q. Okay. And on the report there's no strength given there,
6  can you tell me why there's no strength attributed to that
7  particular exhibit?
8  A. If I understood you correctly you are asking about
9  fingerprints?
10 Q. Strength, I'm sorry.
11 A. Oh, the strength. Yes, may I consult my notes? Yes, sir.
12 Exhibit -- DEA Exhibit 4, when I received it, contained two
13 paper towels with a dry white powder residue, and a small
14 zip-loc plastic bag with a white powder residue. And
15 residues -- in a residue situation there's just not enough
16 there to determine a quantification number, you can't --
17 there's not enough to work with to do a quantum.
18 Q. Would the fact that it was a white powder possibly lead
19 you to believe that it was a powder cocaine as opposed to
20 cocaine base?
21 A. Well, both cocaine base and cocaine hydrochloride exist
22 as a powder.
23 Q. So you are not able to test it I guess because of the
24 lack of an amount to determine the strength of the --
25 A. Yes, sir. For example, when we do a quantum we will

Page 179

1  typically weigh five hundred milligrams into a vessel for my
2  quantification, and all I had here was a -- just the very
3  minimum amount to work with. It was just some dried white
4  powder on some paper towels.
5  Q. So are you familiar with the field-test that officers
6  perform to try to analyze drugs?
7  A. Yes, sir.
8  Q. Was there a sufficient amount of drug there in order for
9  an officer to perform a field-test on that particular
10 exhibit?
11 A. Yes, sir. You could flake it off and it would be enough
12 to give a field-test positive.
13 Q. What sort of a field-test would be utilized to determine
14 that particular type of drug?
15 A. It's something that we call cobalt thiocyanate.
16 Q. Is there anything utilized with that or do you use a
17 different one for cocaine powder as opposed to cocaine base?
18 A. Well, it's -- you use the same in the laboratory, we use
19 the same reagent for both cocaine base and cocaine
20 hydrochloride, but when you are dealing with the base there's
21 a slight modification to the reagent that you have to make.
22 In my particular example though, it's just in analyzing these
23 exhibits, I never referred to a color test at all.
24 Q. Would vinegar be a chemical that would be mixed with the
25 cobalt in order to field-test the drug?

Page 180

1  A. No, sir.
2  Q. Thank you.
3      THE COURT: Anything else, Mr. Brown?
4      MR. BROWN: Just one quick question.
5          REDIRECT EXAMINATION
6  BY MR. BROWN:
7  Q. Mr. Norwood, if you had to break down the cocaine from
8  its solid form might you use vinegar to do that in a
9  field-test?
10 A. Well, vinegar is an acid, and cocaine is a soluble, and
11 cocaine base is soluble in acids, so it would break the
12 solution, yes, sir.
13     MR. BROWN: Thank you, no further questions.
14     THE COURT: Ms. James, anything on behalf of Mr.
15 Peralte?
16     MS. JAMES: No, sir.
17     MR. MADISON: I forgot to ask a question if I may
18 indulge the Court.
19     THE COURT: You may.
20         RECROSS-EXAMINATION
21 BY MR. MADISON:
22 Q. Sir, on each one of those exhibits were there boxes
23 marked requesting fingerprint analysis be performed on the
24 drug receipts that y'all had?
25 A. Yes, sir, I happened to notice that on the DEA-7s,

Page 181

1    fingerprints were requested on those exhibits.
2    Q. Do you know what the outcome of those requests were?
3    A. No, sir, I do not.
4    Q. And I thought I heard you -- your testimony earlier was
5    some of the exhibits you didn't open because of fingerprint
6    requests?
7    A. Yes, sir. Whenever I went to the vault to check out my
8    evidence they check out to me those exhibits that had
9    controlled substances, withholding the exhibits that required
10   fingerprints.
11   Q. Okay. But you still have those exhibits there.
12   A. Yes, sir, I see them here now for the first time.
13   Q. And the chain of custody on those exhibits that you did
14   not analyze which were the ones requesting the fingerprints,
15   do you note that they were, in fact, delivered to a
16   fingerprint person or analyst, fingerprint analyst for
17   review?
18   A. On my paperwork from -- the DEA paperwork, there's a
19   phrase that the original analysis made -- original analyst
20   made saying those exhibits that required fingerprints, that a
21   requested item submitted for fingerprint examination, a
22   separate report will follow.
23   Q. Yes, sir. And I saw that too, my question was I thought
24   earlier you testified that there was a chain of custody
25   notation on those envelopes?

Page 182

1    A. Yes, sir, there is, it's just not mine.
2    Q. Okay. Well, that's what I was asking.
3    A. Okay.
4    Q. Yes, sir. Is there a notation on there where those were,
5    in fact, sent to a fingerprint analyst working within your
6    division?
7    A. For example, Government's Exhibit 14, DEA Exhibit 6,
8    there's a heat-seal for fingerprints. And it has a DEA
9    chemist's signature on one of the heat-seals, and inside the
10   bag is a wrapper that bears a -- the initials of the
11   fingerprint technician.
12   Q. And that's all I was asking. It is reflected on the
13   exhibit that it was given to a person for analysis and that
14   analysis was, in fact, performed.
15   A. Yes, sir.
16   Q. And it's just that there were no fingerprints found as
17   your notation --
18   A. Well, I don't know the results of the fingerprint
19   examination. I don't know if they have -- I don't have those
20   with me.
21   Q. Have you ever done any fingerprint analysis or does your
22   background include fingerprint analysis work?
23   A. No, sir, it does not.
24       MR. MADISON: I don't have any further questions,
25   Your Honor.

Page 183

1       MR. BROWN: No, sir.
2       THE COURT: Ms. James?
3       MS. JAMES: No, sir.
4       THE COURT: Any reason this witness can't be
5    released from any subpoena he might be under?
6       MS. JAMES: No, sir.
7       THE COURT: Mr. Madison?
8       MR. MADISON: No, sir.
9       MR. BROWN: No, sir.
10      THE COURT: You may step down. You are free to go.
11      THE WITNESS: Thank you, Your Honor.
12      THE COURT: Ladies and gentlemen, we have been going
13   a little over two hours and we do need to take a recess. I
14   instruct you at this time to take your afternoon recess and
15   if you have been taking notes please leave your notes either
16   on the rail in front of you for those on the front row or on
17   your chair for those of you otherwise. Do not discuss the case
18   among yourselves or allow anyone to discuss the case with
19   you. We will be in recess for approximately 15 minutes so
20   make sure you take advantage of the facilities and we will
21   reconvene when you are ready, but hopefully within 15
22   minutes. Everyone else will remain while the jury leaves.
23      (At which time, 3:25 p.m., the jury left the
24   courtroom.)
25      THE COURT: Mr. Brown, make sure that we have

Page 184

1    Government's Exhibit 32 before your witness leaves. We will
2    be in recess for approximately 15 minutes.
3       THE CLERK: Court is in recess.
4       (At which time, 3:25 p.m., a recess was had until
5    3:50 p.m., at which time, outside the presence of the jury,
6    the trial continued.)
7       THE COURT: The record will reflect that we are
8    outside of the presence and the hearing of the jury. We
9    covered one issue this morning, I want to offer some
10   clarification. Before we got started, Mr. Brown brought up
11   the possibility that this case may raise some issues which
12   the Blakely versus Washington opinion that has been recently
13   released by the United States Supreme Court may affect
14   sentencing if that opinion is extended to the Federal
15   Sentencing Guidelines. One of the issues particularly is the
16   involvement of any firearm that may be introduced and may be
17   by definition of a dangerous weapon to include a firearm
18   being possessed by either of the Defendants should they be
19   convicted in this case.
20      I would certainly not preclude the government from
21   introducing evidence of the recovery of a firearm or any
22   other evidence that was properly recovered and secured as
23   evidence in this case, but to the extent that the firearm
24   would be used to increase any sentence that either of these
25   Defendants may ultimately receive should the jury return a

Page 181 - Page 184

| Page 185 | Page 187 |
|---|---|

**Page 185**

1  conviction in this case, I would want counsel to understand
2  that the Court is considering how it would affect the
3  relationship of the gun and/or present that issue to the jury
4  for their consideration. It is my feeling at this time that
5  the possession of the gun and the connection between the gun
6  being possessed by either of the Defendants in this case
7  would be a matter that I would require the jury to return
8  with a finding of fact after the guilt phase had been
9  determined.
10      But I'm certainly open for suggestion, and because
11  this case is not going to end today I ask that counsel
12  discuss that before we get to that portion of the trial
13  because that would affect things such as jury instructions
14  and so forth. It would be my intention not to instruct the
15  jury on the effect of the possession of a firearm at the
16  instruction phase of the trial, but to do that only in the
17  event if they were to return a verdict of guilty against
18  either of the Defendants on trial. Ms. James?
19      MS. JAMES: I may not have heard you correctly, are
20  you saying that the government can offer evidence of what was
21  seized, which would include the gun, but make nothing of that
22  until we have a determination of guilt or innocence?
23      THE COURT: They can make nothing more of that than
24  of any other evidence that was recovered and not use that for
25  the jury to make any finding of guilt as to the possession of

**Page 186**

1  any illegal drugs as charged in the indictment. And to the
2  extent that the gun would be possessed by either of these
3  Defendants illegally as part of any drug crime that they have
4  been charged with, after the guilt phase, if the jury were to
5  return a verdict of guilty against either of these
6  Defendants, it would be the Court's recommendation at this
7  time that the jury then retire to consider whether or not
8  possession of this firearm was associated in violation of the
9  United States Sentencing Guidelines after the jury is
10  properly instructed on what those definitions mean.
11      MS. JAMES: I realize you are not trying to reach a
12  firm conclusion at this point, you are suggesting, but I
13  still think that we would have a major problem with regard to
14  it not having been charged in the indictment, and I don't
15  think, no matter what research I do, that our position would
16  change on that.
17      THE COURT: I understand. And that's why I want us
18  to have this discussion outside the presence of the jury.
19  And I would not want that to be an issue until after the
20  guilt phase has been established. If the jury returns a
21  verdict of not guilty the issue would be moot. If they
22  return a verdict of guilty against either or both of these
23  Defendants then we can consider how they are to make a
24  determination on any -- factual determination of the
25  possession of any firearm should one be introduced in this

**Page 187**

1  case.
2      MS. JAMES: I was telling -- this doesn't need to be
3  on the record.
4      THE COURT: Before we go off the record, Mr.
5  Madison, do you have anything to offer other than what I just
6  openly suggested that we do? And I want counsel to discuss
7  this outside of the Court's presence and if there's any,
8  either by agreement, facts that would change what the Court's
9  suggestion would be, we will take that up before the closing
10  instructions.
11      MR. MADISON: And Judge, I guess my position is the
12  same as Ms. James and that is the fact that it wasn't pled in
13  the indictment, you know, precludes the offering of that
14  evidence period.
15      THE COURT: As we sit here during this trial there
16  are opinions being released that are affecting Blakely so I
17  don't think we are going to reach any conclusion that we can
18  absolutely be sure is not erroneous until after the Supreme
19  Court or Congress passes on that, but to the extent we can do
20  the best we can, that's what I am trying to offer.
21      MR. BROWN: Might I offer one other suggestion, just
22  to throw something out there. The sentencing in this matter
23  if there's a conviction wouldn't be for another 70 or 80 or
24  so days. At that point, and by that point we would have had
25  some other sentencings that would have had similar issues and

**Page 188**

1  perhaps other sentencing juries come in to do that. It may be
2  that in the meantime the 11th Circuit and/or the Supreme
3  Court might give guidance otherwise. It may be that it's
4  something that we don't have to do immediately following the
5  verdicts in this case, but at a later date.
6      THE COURT: It's only the determination as to the
7  finding of fact concerning any firearm that would affect
8  sentencing. And the same would be true if there were any
9  other relevant conduct dealing with other drugs not
10  specifically charged in the indictment or anything else that
11  would affect sentencing but would not affect guilt or
12  innocence that I am concerned with. And as you articulated
13  earlier today the only thing that you are aware of at this
14  point would be things such as mitigating and aggravating
15  circumstances, and to answer that question I have no idea how
16  we are going to establish any jury determination of a
17  mitigating or an aggravating circumstance. And the effect of
18  any firearm that the jury may find or that the Court up until
19  Blakely would have found by a preponderance of the evidence
20  that in my mind is now an issue that the jury would need to
21  make as a finding of fact by a verdict after the guilt phase,
22  and that's my suggestion at this point, but I wanted us to be
23  in a position where we could discuss that further without
24  prejudicing either side.
25      MS. JAMES: Judge, the only thing I was going to

## Page 189

1　add, I was telling Mr. Brown earlier today when we took the
2　lunch break I was advised by my office that the 11th Circuit
3　had called this morning on a case I had pending that I filed
4　over the weekend a supplemental brief by FedEx and so it had
5　not gotten there, it was a case out of this court, Judge
6　Thompson, a 922(g) case.  They set it for oral argument on
7　the 13th of August, which is a bit unusual, because usually
8　we have a lot of advanced notice, so they may be looking at a
9　lot of questions, but they sent specific questions they want
10　addressed in a brief, but most of which indicate to me that
11　they are going to deal with this fairly quickly and some
12　specific questions about remedies, if Blakely is applicable,
13　and various remedies and things of that nature.  So, you
14　know, the 7th Circuit in reading that Booker opinion, I read
15　that at lunch as well and they -- it clearly indicated in the
16　opinion they wanted to rule as quickly as possible.  And so I
17　don't know, the 11th Circuit may have something beforehand,
18　before this case, but this is the Reese case that was the
19　subject of the opinion that we discussed earlier.
20　　　　THE COURT:  Just for purposes of the counsel's
21　overnight reading, the 5th Circuit has released an opinion
22　today, United States versus Pineiro, in which they have held
23　that the sentencing guidelines do not violate the Sixth
24　Amendment and that the 7th Circuit was wrong.
25　　　　MS. JAMES:  What is the case, Judge?

## Page 190

1　　　　THE COURT:  United States versus Francisco B.
2　Pineiro, I can get you the WestLaw cite, I am sure it's case
3　number 03-30437.
4　　　　MS. JAMES:  Pineiro, is that P-I-N-E-R-O?
5　　　　THE COURT:  Yes.  You can come take a look at it.
6　Mr. Brown, how many witnesses do you have left that you can
7　call today? In approximately an hour that we have left?
8　　　　MR. BROWN:  I would have said both, or two of the
9　three remaining ones, although based on the -- after this
10　discussion it may be that we can only get one more in,
11　although I don't think that that would take us up to 5:00,
12　but it would probably be 4:30, 4:45.
13　　　　THE COURT:  Let's see how far we can get.  I would
14　rather not get in the middle of a witness and break overnight
15　if we can avoid it.
16　　　　MR. BROWN:  That's what I foresee happening because
17　the second witness is the co-Defendant and I expect there
18　would be a pretty good amount of cross-examination.
19　　　　MR. MADISON:  And Judge, my expert is on standby and
20　you had sort of taken a wait and see attitude about whether
21　that person's testimony was going to be allowed.  I wanted to
22　submit to the Court based upon the revelations in the court
23　by their expert with the ability to analyze through a
24　field-test the residue, that was Officer Conway I believe
25　testified he had field-tested using cobalt and vinegar,

## Page 191

1　together with the time schedules that we went through, which
2　I think took everything beyond 6:00 o'clock which was the
3　time that Officer Conway also I believe testified that the
4　search warrant was executed, I wanted to ask two things,
5　number one, that we be allowed to bring that expert in to
6　testify with respect to those issues, and secondly to ask the
7　Court's indulgence in possibly reopening the suppression
8　issues.
9　　　　THE COURT:  As to your second question, that issue
10　has been properly preserved.  I am confident that any error
11　that this Court has made has been articulated and preserved
12　for the record so that the 11th Circuit can take that up in
13　total. That request is denied. As to the first question, you
14　are asking if the Court is going to allow the witness to
15　testify about whether or not there could be a test of the
16　residue found in the paper towel?
17　　　　MR. MADISON:  No, sir, that's what I understood the
18　DEA expert said is that you could not utilize the test which
19　the -- Corporal Conway stated he utilized to obtain the
20　field-test results, that he stated he used.
21　　　　THE COURT:  I didn't hear the witness say that.
22　　　　MR. MADISON:  Well, I asked him if Corporal Conway
23　testified, this is what I thought he said, that he used a
24　cobalt and vinegar solution in order to obtain a positive
25　result on the residue that was tested at the scene, I

## Page 192

1　specifically asked him whether or not the --
2　　　　THE COURT:  You are talking about you specifically
3　asked Mr. Norwood or Mr. Conway?
4　　　　MR. MADISON:  I first asked Mr. Conway what the
5　solution was in preparation -- I had seen where one person
6　said you couldn't use vinegar with respect to a certain type
7　of cocaine and whether you could use cobalt and vinegar,
8　that's why I specifically asked Mr. Conway what was the test
9　that he used and he said cobalt and vinegar.  That's why I
10　asked the DEA expert whether or not the field-test could be
11　utilized to obtain a positive result utilizing vinegar and my
12　understanding of what his answer was no, a field-test could
13　not be conducted to obtain that positive result using
14　vinegar. I may have misconstrued his answer but I thought
15　other people heard the same thing.
16　　　　THE COURT:  I thought I heard him say acid --
17　vinegar was an acid and it would dissolve the cocaine into a
18　solution.
19　　　　MR. MADISON:  I thought I asked him can you use
20　vinegar in a field-test to test cocaine and he said no.
21　　　　THE COURT:  Whether I heard or did not hear as I
22　have indicated, what is the purpose of your bringing a
23　witness on that you referred to, and I presume that's the
24　fingerprint expert?
25　　　　MR. MADISON:  Yes, sir.

| Page 193 | Page 195 |
|---|---|
| 1   THE COURT: I am sorry, handwriting? | 1   towards the issue of spoilation. If that one was done -- if |
| 2   MR. MADISON: Yes, sir. And basically it dealt with | 2   this expert can come in and say I have got an opinion that |
| 3   the fact that we had three affidavits, search warrant | 3   suggests that maybe it was signed at a different time that |
| 4   affidavits that were still available. There were four at one | 4   might be a stronger inference of spoilation that occurred in |
| 5   time issued, one of the four search warrant affidavits I | 5   connection with this evidence. |
| 6   believe is no longer accounted for. I believe the testimony | 6   THE COURT: And the Court is confident that those |
| 7   was it was destroyed, but there are four warrants I believe. | 7   issues have been preserved in your motion to suppress and the |
| 8   And the expert in the report that we presented with the | 8   motion to reopen the hearing on a motion to supplement the |
| 9   supplemental suppression issue for motion for out of time | 9   motion to suppress, all of those that we articulated this |
| 10   asking the Court to look at that, he said in his report that | 10   morning for the record. But is there anything that you are |
| 11   it's his opinion in viewing that evidence that one of the | 11   aware of that the evidence is going to show that would |
| 12   affidavits may have been, and I characterize may, may have | 12   indicate that the search was conducted prior to the execution |
| 13   been signed, or his opinion it may have been signed at | 13   of the search warrant by Judge Hayes himself, anything to |
| 14   different times than the others. | 14   that issue? |
| 15   And the reason why I said that's important is | 15   MR. MADISON: Other than the time lines, Judge, and |
| 16   because we have been trying to establish time lines and all | 16   that's why I was interested in the time lines in trying to |
| 17   that in connection with his testimony and if we have somebody | 17   determine how long they were at certain places and how long |
| 18   who can testify it may go to the credibility of their | 18   they took to get here because the testimony was I believe the |
| 19   witnesses. You know, why would they have three and not four? | 19   inventory sheet shows that the warrant or the search began at |
| 20   Why would they have four warrants and not three if they | 20   6:00 o'clock. Now, I thought that I walked Officer Conway |
| 21   supposedly destroyed the one they didn't need? Why wouldn't | 21   through and by the time we got through with him he was beyond |
| 22   they destroy the warrant as well. Some of those things we | 22   6:00 o'clock with respect to the time he met Judge Hayes and |
| 23   feel are important for the jury to hear. | 23   got the warrant signed. I may be mistaken, but if anybody |
| 24   THE COURT: Is the government required to get more | 24   else around here -- I recall Corporal Conway, or Officer |
| 25   than one search warrant? | 25   Conway specifically stating when I asked him one question |

| Page 194 | Page 196 |
|---|---|
| 1   MR. MADISON: From what I recall the testimony in | 1   about did that take you up to 5:00 or something, and he said |
| 2   this case -- | 2   beyond that, I can't recall. |
| 3   THE COURT: I am just asking you from a legal | 3   THE COURT: I think Corporal Conway, according to my |
| 4   standpoint under the 6th Amendment or the 4th Amendment are | 4   notes, indicated that it was approximately 5:15 or 5:30 when |
| 5   they required to get more than one search warrant? | 5   he finished preparing his affidavit to obtain the search |
| 6   MR. MADISON: Are they required to get more than | 6   warrant. And then he testified it took him 30 minutes to |
| 7   one? | 7   drive to the ball field because of the traffic that time of |
| 8   THE COURT: You made reference to the fact that | 8   day in Montgomery. |
| 9   there were possibly as many as four at one time and I asked | 9   MR. MADISON: I thought he said 45, Your Honor, it |
| 10   early on is there any representation in any of the other | 10   took him 30 to get back. |
| 11   warrants or any of the other affidavits that supported a | 11   THE COURT: I think he said it took him 15 to 20 |
| 12   search warrant that limited either what could be searched or | 12   minutes to drive back, according to my notes. But at this |
| 13   the scope of any type of search that was conducted or the | 13   point, let's don't keep the jury out any longer than we have |
| 14   duration of the search, was there anything in any of those | 14   to talking about things that may be. I will rule on whether |
| 15   search warrants that limited the effect of what the | 15   or not your witness can testify, but at this time I have not |
| 16   Montgomery police department was able to do on the afternoon | 16   heard anything that would not be in reiteration of the |
| 17   or the evening of September 25th, 2003? | 17   motions to suppress that you have already argued before |
| 18   MR. MADISON: I don't think there was a time stated | 18   Magistrate Judge Walker and has been before this Court on |
| 19   in the warrants, but to answer your specific question about | 19   review. |
| 20   whether or not there's only -- any requirement dealing with | 20   MR. MADISON: The only reason I was sort of pushing |
| 21   one warrant, I don't know of any such requirement, that there | 21   the issues, he is out of Atlanta, and I would like to -- I |
| 22   only be one warrant. It was my understanding from earlier | 22   don't know when Mr. Brown is going to be finished. If he |
| 23   testimony that the procedure here in the Middle District was | 23   finishes up tomorrow I would sort of need to be telling this |
| 24   they got warrants executed and four counterparts. The reason | 24   guy to be here tomorrow afternoon or something. |
| 25   I was interested and my client was interested is going | 25   THE COURT: I would suggest you communicate with Mr. |

## Page 197

1 Brown today, but the longer we talk about it the longer it's
2 going to get to that point. But as I have said I have not
3 heard anything that would allow him to testify about that has
4 not been heard in your motion to suppress or motion for
5 rehearing on the motion to suppress. Let's bring the jury
6 back.
7     (At which time, 4:10 p.m., the jury entered the
8 courtroom.)
9     THE COURT: You can be seated. Mr. Brown, call your
10 next witness.
11     MR. BROWN: The government calls Brad Bartlett.
12     THE CLERK: You do solemnly swear or affirm that the
13 testimony you give in the trial of this cause to be the
14 truth, the whole truth, and nothing but the truth, so help
15 you God.
16     THE WITNESS: Yes, ma'am, I do.
17     BRAD BARTLETT, witness for the Government,
18 having been duly sworn or affirmed, testified as follows:
19     DIRECT EXAMINATION
20 BY MR. BROWN:
21 Q. Good afternoon, sir. Would you state your name for the
22 jury, please.
23 A. Brad Bartlett.
24 Q. Would you mind spelling your last name.
25 A. B-A-R-T-L-E-T-T.

## Page 198

1 Q. Mr. Bartlett, how are you employed?
2 A. With the Montgomery police department, narcotics.
3 Q. Were you employed in that capacity back on September
4 25th of last year?
5 A. Yes, sir, I was.
6 Q. Did you participate in a search warrant execution at a
7 residence on that date?
8 A. I did.
9 Q. Do you recall the address at that residence?
10 A. 2924 East 4th, I believe.
11 Q. It was on East 4th?
12 A. Yes, sir.
13 Q. And here in Montgomery.
14 A. Yes, sir.
15 Q. On that date did you have any particular duties?
16 A. I did, I was the evidence officer.
17 Q. If you wouldn't mind just describe to the jury what an
18 evidence officer during a search warrant, what are the duties
19 of somebody that's acting in that capacity?
20 A. My job actually is to take custody of the evidence that
21 is found at the residence. I keep a log of the time that we
22 found it.
23 Q. I want to show you --
24     MR. BROWN: May I approach, Your Honor?
25     THE COURT: Yes.

## Page 199

1 Q. I am going to show you four exhibits that have already
2 been admitted into evidence, and just for purposes of
3 clearing up any chain of custody issues, if you wouldn't mind
4 locating Government's Exhibit 3.
5 A. Okay.
6 Q. Do you recognize that item?
7 A. I do.
8 Q. If you could recall where you got that item from and who
9 you turned it over to?
10 A. I got this from Corporal Conway, and this was the
11 evidence that was procured out of the trash can on the
12 street.
13 Q. Okay. Who did you turn it over to?
14 A. Detective Wingard.
15 Q. If you wouldn't mind doing the same thing with
16 Government's Exhibit 12.
17 A. I believe this -- Sergeant Drummond found this in the
18 wash -- in the laundry room and I turned this over to
19 Detective Wingard also.
20 Q. So you got it from Sergeant Drummond and turned it over
21 to Detective Wingard?
22 A. Yes, I believe so.
23 Q. Have you seen a DEA-6 relating to this particular case?
24 A. I have.
25 Q. Would it help to confirm your memory if you saw that?

## Page 200

1 A. It would.
2     MR. BROWN: May I approach, Your Honor?
3     THE COURT: Yes.
4 Q. Detective, if you will just read those paragraphs or
5 browse them to yourself, don't read them out loud. (complies)
6 A. Okay. I am with you, okay.
7 Q. Now, just referring to that report, does that refresh
8 your recollection?
9 A. Yes, it does.
10 Q. Again, if you will look at Government's Exhibit 12,
11 which corresponds to DEA Exhibit 5.
12 A. Okay.
13 Q. If you could, tell us again who you got that from and
14 who you turned it over to?
15 A. I got it from Sergeant Drummond and turned it over to
16 Detective Wingard.
17 Q. Government's Exhibit 14, which corresponds to DEA
18 Exhibit 6?
19 A. Got it.
20 Q. Who did you get that from?
21 A. Sergeant Drummond.
22 Q. And turned it over to who?
23 A. Detective Wingard.
24 Q. And finally, Government's Exhibit 18 corresponds to DEA
25 Exhibit 8, who did you get that from?

Page 201

1  A. Sergeant Drummond.
2  Q. And turned it over to who?
3  A. Detective Wingard.
4  Q. All right. Now that we have gotten those housekeeping
5  matters out of the way, did you yourself also assist in
6  conducting the search of that residence?
7  A. Yes, sir, I did.
8      MR. BROWN: May I approach once again, Your Honor?
9      THE COURT: Yes.
10 Q. Detective, I want to show you what have been marked as
11 Government's Exhibits 23 and 24 and ask if you can identify
12 those items?
13 A. Yes.
14 Q. What is Government's Exhibit 23?
15 A. It's a receipt from an auto auction here in Montgomery.
16 Q. Is that an item that you recovered during the course of
17 the search?
18 A. Yes, sir.
19 Q. Is it in the same or substantially the same condition as
20 it was when you recovered it?
21 A. Yes, sir.
22 Q. What is Government's Exhibit 24?
23 A. This is a receipt, a driver's license receipt for a
24 Peralte, Capulco Peralte.
25 Q. And is it in -- did you recover that item?

Page 202

1  A. Yes.
2  Q. Is it in the same or substantially the same condition as
3  it was when you recovered it?
4  A. It is.
5      MR. BROWN: The government moves to admit Exhibits
6  23 and 24.
7      MS. JAMES: No objection.
8      THE COURT: Any objection on behalf of Mr. Norman?
9      MR. MADISON: No objection, Your Honor.
10     THE COURT: Without objections Government's Exhibits
11 23 and 24 are admitted.
12 Q. Detective, I am going to show you what have been marked
13 as Government's Exhibits 25, 26, 27 and 28, ask if you can
14 identify those items?
15 A. Yes, these are pictures of a bed post where
16 approximately 70 thousand dollars was located.
17 Q. Let's take them one at a time. Government's Exhibit 25,
18 is a what?
19 A. It's a bed post on the left-hand-side on the headboard.
20 Q. Government's Exhibit 26?
21 A. This is a picture showing where the headboard was
22 hollowed out and there's a sum of money in the bed post.
23 Q. 27?
24 A. It's a picture of the bed post after we pulled it apart.
25 Q. And 28?

Page 203

1  A. It's a handgun, chrome and black.
2  Q. Pardon?
3  A. Chrome and black semiautomatic handgun.
4  Q. Where was that photograph taken?
5  A. This was in a closet near the front door.
6  Q. Do all of those photographs fairly and accurately depict
7  the scene as you remember it that day?
8  A. Yes, sir.
9      MR. BROWN: The government moves to admit Exhibits
10 25, 26, 27 and 28.
11     THE COURT: On behalf of Mr. Peralte any objection?
12     MS. JAMES: No, sir.
13     THE COURT: Mr. Norman?
14     MR. MADISON: No, Your Honor.
15     THE COURT: Government's Exhibits 25, 26, 27 and 28
16 are admitted.
17     MR. MADISON: Judge, may I change my objection to a
18 qualified based upon -- may we approach?
19     THE COURT: Yes.
20     (At which time the following occurred at side-bar:)
21     THE COURT: The record will reflect we are in the
22 presence but outside of the hearing of the jury. Mr. Madison?
23     MR. MADISON: By them submitting the picture of the
24 pistol I do not want it to be construed as waiving the
25 argument that we have submitted to the Court outside the

Page 204

1  presence of the jury already concerning our arguments
2  pertaining to that.
3      THE COURT: The Blakely versus Washington issue?
4      MR. MADISON: Yes, sir. I do not want to waive that
5  by not objecting to the introduction of the picture of the
6  pistol.
7      THE COURT: I will allow that to be a continuing
8  objection as to the photograph or any other item of evidence
9  concerning the handgun in question.
10     MS. JAMES: I would adopt that. I guess I should
11 withdraw my -- I'd like to make the same objection, for those
12 purposes, not for the purposes that you said you would allow
13 it.
14     THE COURT: The parties are allowed to reserve their
15 objection to the photograph of the handgun, assuming there
16 was only one found.
17     MR. BROWN: There was.
18     THE COURT: And any handgun that may be introduced
19 in later proceedings in this trial if it is established by
20 all other proper aspects to be a properly piece of admitted
21 evidence without having to articulate actually the reasons as
22 we have stated here. And to -- based upon the ruling of the
23 Court as to the way we are proposing to address the effect of
24 any handgun should either of these Defendants be convicted,
25 the objections individually and collectively are overruled.

## Page 205

1    MR. MADISON: Thank you.
2         THE COURT: If you would, Ms. James, if there's
3    going to be other items of evidence that you wish to preserve
4    your objection to, I ask that you specifically make the
5    objection on things that would affect sentencing. I have
6    allowed you to reserve your objection -- both Defendants to
7    reserve their objection as to the handgun, but if there are
8    any other items of evidence articulate the objection at the
9    time that we get to the evidence.
10        MR. MADISON: Do you want us to do that outside the
11   jury's presence?
12        THE COURT: You can approach and we will take those
13   issues up outside the presence of the jury if you wish them
14   to be taken up outside the presence.
15        (At which time the following occurred in open
16   court:)
17        THE COURT: You may proceed, Mr. Brown.
18        MR. BROWN: Thank you, Your Honor.
19   Q. Detective Bartlett, I am going to show you what has been
20   marked as Government's Exhibit -- or entered into evidence as
21   Government's Exhibit 23. I am going to attempt to make that a
22   little clearer for us, a portion of it. First of all,
23   Detective, where was this item found?
24   A. I collected quite a bit of paperwork in the residence, I
25   am not sure -- exactly sure where it was, I would have to

## Page 206

1    look at my log to see.
2    Q. Would that same report that you had earlier, would that
3    refresh your recollection?
4    A. Yes.
5    Q. (complies) If you will take a look at paragraph three
6    there, read that to yourself. Does that refresh your
7    recollection?
8    A. Yes.
9    Q. Where did you locate this exhibit?
10   A. On top of the living room cabinet.
11   Q. And annotated on the signature line can you read that
12   signature for the jury?
13   A. It looks like Alphonso Norman.
14   Q. Government's Exhibit 24, was it found in the same
15   location?
16   A. It was.
17   Q. And this is going to be a little bit harder to read but
18   I think we can make it work. You identified that as being
19   some sort of receipt for a driver's license; is that correct?
20   A. That is correct.
21   Q. And again, the name for the jury that's on that?
22   A. Capulco Peralte.
23   Q. Detective, this is Government's Exhibit 25, and would
24   you point out for the jury -- you can actually touch your
25   screen and make a circle around anything that you found of

## Page 207

1    significance that you testified to a moment ago. Would you do
2    that for the jury, please.
3    A. (complies)
4    Q. And what is significant about that?
5    A. That's the bed post that was hollowed out.
6    Q. Would you describe Government's Exhibit 26 for the jury.
7    A. This is if you are looking -- I am standing on top of
8    the mattress, you can look down in the bed post there and it
9    was hollowed out and the money was placed at the bottom of
10   the bed post.
11   Q. And 27.
12   A. That's just where we separated the bed post here so we
13   could retrieve the money.
14   Q. All right. And you did retrieve the money?
15   A. Yes.
16   Q. How much money was there again?
17   A. It's approximately 70 thousand dollars.
18   Q. Finally 28, you indicated that photograph was taken in a
19   front closet?
20   A. Yes.
21   Q. And any item of interest there?
22   A. It's a black and chrome semiautomatic handgun.
23   Q. Did you recover that handgun as well?
24   A. I believe Detective Simons recovered it.  I took the
25   picture before he recovered it.

## Page 208

1    Q. And then did he turn it over to you as evidence
2    technician?
3    A. He did.
4         MR. BROWN: If I may have just a minute, Your Honor.
5         THE COURT: Yes.
6         MR. BROWN: Let me double-check one thing. Thank
7    you, Detective, I don't have any further questions for you,
8    defense counsel may.
9         MS. JAMES: May I have one moment, Judge?
10        THE COURT: Yes.
11        CROSS-EXAMINATION
12   BY MS. JAMES:
13   Q. Good afternoon, I am Susan James, I represent Mr.
14   Peralte. As I understand it there were a number of documents
15   that were seized; is that right, from --
16   A. I don't know about seized, I know there was a number of
17   documents that we went through at the house.
18   Q. Okay. And you put those together and identified them as
19   DEA Exhibit N-5; is that right?
20   A. I don't know what DEA exhibit they were, but all I did
21   was document it into my inventory and I turned them over to
22   Detective Wingard, I didn't document --
23   Q. But you were collecting documents all over the house.
24   A. Yes, ma'am.
25   Q. And as many documents as you collected you are pretty

| Page 209 | Page 211 |
|---|---|

**Page 209**

1  much kind of guessing which ones you picked out of what room,
2  aren't you?
3  A. I am not understanding what you mean.
4  Q. For instance --
5      MS. JAMES: May I approach the witness?
6      THE COURT: Yes.
7      MS. JAMES: Actually I don't need to approach. How
8  do I get this thing to zoom? May I just approach?
9      THE COURT: You can try to pull the lamps up on the
10  sides, I think they will raise up and it will make the
11  illumination a little better.
12      MS. JAMES: Okay.
13      THE COURT: Those arms will articulate.
14      MS. JAMES: That's good right there, thank you.
15  Q. This is already in evidence as Government's Exhibit 24.
16  A. Yes, ma'am.
17  Q. Now, this was part of that big group of documents,
18  wasn't it, that you testified about having taken into
19  custody?
20  A. Yes, ma'am.
21  Q. And this was one of a number of documents that you
22  actually collected from around the house, right?
23  A. Yes, ma'am.
24  Q. And you don't have an inventory sheet specifically that
25  says this piece of paper came off the coffee table or came

**Page 210**

1  out of the bedroom or came out of anywhere, do you?
2  A. Well, we have it saying that it came off the top of
3  the -- there's a china cabinet, so-to-speak, and the
4  paperwork was up there.
5  Q. Okay. And all of the paperwork that you got?
6  A. Yes. Well, there's a lot of paperwork on -- of
7  importance. Why I remember that is because it had their names
8  on it and I remember there being other paperwork throughout
9  the house that we may have not collected because we didn't
10  deem it necessary.
11  Q. So you only picked out the stuff that you thought was
12  important to your case.
13  A. That's correct.
14  Q. And at that point this was after the search warrant had
15  been signed; is that right?
16  A. Yes, ma'am.
17  Q. How soon did you get there in terms of the afternoon,
18  you weren't with the initial team that went there and did the
19  knock and talk, were you?
20  A. I was.
21  Q. You were, so you were there from the beginning until the
22  end?
23  A. Yes, ma'am.
24  Q. Okay. And when -- where were you when Mr. Peralte was
25  actually discovered in the residence?

**Page 211**

1  A. I don't recall. I remember -- I was at the back of the
2  house, the back of the residence most of the time.
3  Q. Inside the residence?
4  A. No, the rear of the residence. There's a gate that you
5  can enter the back yard and there's also a back door right
6  there and I was standing right there most of the time.
7  Q. Where were you if you weren't standing there?
8  A. I mean I was pretty much standing back there securing
9  the back of the house.
10  Q. When you got there and the initial -- you were out and
11  not really seen initially when Mr. Conway was surveilling; is
12  that right?
13  A. Right.
14  Q. You weren't anywhere on the premises at that time.
15  A. Do what now?
16  Q. Well, when you all came up initially you didn't want to
17  be seen, right?
18  A. My understanding once we placed the call Detective
19  Conway saw the residence, we communicated by radios, he is
20  telling us what he is seeing.
21  Q. What did he tell you he saw?
22  A. A black male come and throw something away in the trash
23  can and that's when he gave the word to move in.
24  Q. Gave the order what?
25  A. To move in.

**Page 212**

1  Q. Okay. And so what happened when he gave that order, what
2  did y'all do?
3  A. I went to the rear of the residence.
4  Q. Okay. Immediately?
5  A. Yes.
6  Q. Okay. Well, did you -- did you see him engage Mr. Norman
7  in any conversation?
8  A. I don't remember, it happened pretty quick.
9  Q. Let me ask you this, how did you know that you were to
10  go to the rear of the residence?
11  A. Somebody needs to and I usually, in case somebody runs.
12  Q. Okay. Well, he sees somebody go to the trash can and
13  drop something in the trash can and he immediately radios and
14  says move in.
15  A. I don't remember what his words were.
16  Q. Something to that effect?
17  A. Yes, ma'am.
18  Q. It was an order that you knew as a law enforcement
19  officer meant for you to go on to secure the residence,
20  right?
21  A. Yes.
22  Q. And that's exactly what you did.
23  A. When I say secure the residence, I don't mean go inside.
24  Q. I understand that.
25  A. In case anybody runs out or tries to flee.

Page 213

1  Q. But you went and fulfilled what you deemed to be your
2  obligation and that was to secure the perimeter of the
3  residence.
4  A. That's correct.
5  Q. And at that point that was before any sort of
6  conversation had happened between Mr. Conway and Mr. Norman;
7  correct?
8  A. I can't testify to what -- I mean I don't remember if he
9  was talking to them or not.
10  Q. Let me ask you this, where were you in reference to the
11  location to the residence when you got the order to move in?
12  A. Their house is located on a dead end street, I was
13  probably -- I was around the corner on the other street.  I
14  believe it was -- I am not sure what that street is, but I
15  wasn't on 4th Street, I was around the corner, probably a
16  block away.
17  Q. Okay. Did you come in your vehicle then?
18  A. I did.
19  Q. All right. In terms -- in relation to the front of the
20  house, okay, the front of the house on 4th Street, the
21  subject of this search, where did you pull your car?
22  A. In front of the residence.
23  Q. Okay. What kind of car were you driving?
24  A. A white Infinity.
25  Q. All right. When you pulled up did you park in front of

Page 214

1  the house?
2  A. I did.
3  Q. Did all the officers converge at the same time?
4  A. Within a few seconds of each other.
5  Q. Okay. Everybody gets there in front of the house, do you
6  jump out of your vehicle at that time?
7  A. I was one of the first ones there.
8  Q. Okay. Did you jump out and go in a slow pace?
9  A. No. It was pretty rapid.
10  Q. You went rapid. So you pull up --
11     MS. JAMES:  May I approach, Judge?
12     THE COURT:  Yes.
13  Q. I am going to show you what is now in evidence as
14  Government's Exhibit 1. And this has been described in prior
15  testimony as to the front of the residence. In other words,
16  from the front door looking out.
17  A. Right.
18  Q. Do you agree with that?
19  A. Yes, ma'am.
20  Q. The black car that I am pointing to with the pen is said
21  to be parked in the driveway of the residence.
22  A. That's right.
23  Q. The vehicle here, this truck, is purported -- or has
24  been testified to be the truck that Corporal Conway was
25  driving.

Page 215

1  A. That's right.
2  Q. Do you know whose green vehicle this is?
3  A. I believe that's black, and I believe Detective
4  Alexander was driving it that day.
5  Q. Okay. Where was your car pulled in relation to these
6  cars?
7  A. It was either behind Detective Conway's truck or on the
8  other side of it.
9  Q. Okay. So if it was behind or on the side of Conway's
10  truck it would give the appearance then that you came in
11  behind Conway, right?
12  A. Right.
13  Q. Okay. Would that also be true that you came in behind
14  Alexander or did his car just get past yours?
15  A. That, I don't know.
16  Q. But your white Infinity is somewhere in the vicinity of
17  it, is obscured by either that truck or --
18  A. Yes, ma'am.
19  Q. -- or you are behind there, right?
20  A. Yes, ma'am.
21  Q. Okay. So you get the call, it's radioed in, Conway is in
22  first and then you come in you say pretty close behind him,
23  right?
24  A. Yes, ma'am.
25  Q. Okay. You get out and at that point you have got on your

Page 216

1  police bulletproof vest, right?
2  A. Yes, ma'am.
3  Q. Weapon drawn?
4  A. I don't remember.
5  Q. Well, would it be routine when you are given a directive
6  to move in by a supervisor that you would at least draw your
7  weapon?
8  A. Well, I mean I may have drawn it approaching the
9  residence, but I doubt it when I got out of the car.
10  Q. But you are saying when you approached the residence you
11  may have?
12  A. Yeah.
13  Q. That would be routine, wouldn't it?
14  A. Yes, ma'am.
15  Q. And are you saying -- you have been on I guess a number
16  of these scenarios with the same officers, right?
17  A. Well, this one, I had only been over there a few months
18  so I wouldn't say a lot.
19  Q. So you hadn't worked with them a bunch?
20  A. No, ma'am.
21  Q. I am assuming everybody had a function, I am trying to
22  decide how you automatically knew to go to the back of the
23  house?
24  A. Habit I guess.  Search warrants, I am usually the one
25  assigned to catch any runners.

Page 217

1  Q. Okay. So at the point you are given the sign to move in,
2  you exit your vehicle moving at a fairly fast pace and you go
3  around to the back. Now, where was Officer Conway at that
4  point?
5  A. I don't know.
6  Q. You don't know if any suspects or subjects or anything
7  were actually being talked to or in custody at that point?
8  A. I mean I think he may have been in the front yard or
9  front porch, I don't know.
10  Q. Okay. Well, at what point did you understand that he
11  began conversation with any of the Defendants in this case?
12  A. At what point? I mean compared to what?
13  Q. From the time you got out of your car, did you ever
14  learn he had any conversation with any of these Defendants?
15  A. Yeah, I eventually heard them talking. Once we got the
16  house secured, I could hear people talking.
17  Q. Tell us what you heard, if anything.
18  A. I couldn't make them out, I just heard. And once I -- we
19  thought we had the house secured, you know, I walked up to
20  the front porch.
21  Q. You walked to the front porch?
22  A. Yes, ma'am.
23  Q. Okay. And what was going on when you walked up to the
24  front porch?
25  A. There was -- they had two subjects they were talking to.

Page 218

1  Q. Okay. Who stayed in the back?
2  A. Detective Simons was back there also.
3  Q. Did he come around to the front with you?
4  A. I don't remember if he came back with me or not.
5  Q. All right. What was the reason you went around to the
6  front?
7  A. Well, apparently they had asked if there was anybody
8  else inside and they said nobody else was inside so we
9  thought there was nobody else inside.
10  Q. So both of you went around to the front.
11  A. I don't remember what he did.
12  Q. Okay. But you left your perimeter post at some point to
13  go around to the front.
14  A. That's correct.
15  Q. Okay. And later, of course, you learned that after you
16  had abandoned that post there was, in fact, someone else in
17  the house, right?
18  A. Yes.
19  Q. Okay. Now, give me if you can a time frame from the
20  time -- so that I understand the scenario it was your job to
21  secure the residence and then they have two suspects on the
22  front porch and you all assume that those are the two people
23  that were in the house, right?
24  A. I think we assumed that because -- I can't testify to
25  what we assumed, I mean -- I understood that there was --

Page 219

1  they had been asked if there was anybody else in the house
2  and they said no, that's why we assumed they were the two in
3  the house.
4  Q. But I am saying your first order of business was to make
5  sure the perimeter of the house was secured. Yours.
6  A. Yeah.
7  Q. Okay. And then after you believed that they had the two
8  people that were in the house you abandoned your post and
9  went around to the front of the house, right?
10  A. Right.
11  Q. And you don't know for certain what Mr. Simons did,
12  right?
13  A. Right.
14  Q. But at that point you were operating under the
15  assumption that there were two people in the house and those
16  two people were on the front porch, right?
17  A. Right.
18  Q. You go around to the front porch and Mr. James and Mr.
19  Norman are on the front porch, right?
20  A. Yes, ma'am.
21  Q. They are in the presence of which officers?
22  A. Detective Conway, Sergeant Drummond, I believe Detective
23  Alexander was also out there.
24  Q. Okay. What happened then in relation to this overall
25  search at that point?

Page 220

1  A. I went over to the garbage can with Detective Conway to
2  see what was thrown away. He found a plastic bag with a paper
3  towel in it and that's when he field-tested it.
4  Q. Okay. And then what happened?
5  A. At some point he left to do the -- get the search
6  warrant signed to go in the house.
7  Q. And then what did you do?
8  A. I did go over and I got their -- took the suspects'
9  information and ran warrant checks on them.
10  Q. Okay. After you did that what did you and the other
11  officers do?
12  A. Waited on Detective Conway to get the search warrant
13  signed.
14  Q. Okay. How long was it before anything surfaced about Mr.
15  Peralte being in the house?
16  A. It wasn't long, five, ten minutes, I don't know.
17  Q. All right, sir. What happened in relation to that?
18  Where were you when that surfaced?
19  A. I was caddie-cornered to the house, probably by the
20  cars, running the warrant checks.
21  Q. All right. What transpired to let someone know that
22  there might be someone else in the house?
23  A. I don't know, I heard Sergeant Drummond ask who is in
24  the house. And I believe Mr. Norman said that was his son and
25  they went next door. I think there was kids in the house and

Page 221

1  we got the kids out and took them to the neighbor's house.
2  And I think that we went over there and asked if that was his
3  son and they said it was, and we determined that his son was
4  not in the house, the one in the house.
5  Q. So you are saying you went next door to verify?
6  A. I did not but somebody did.
7  Q. Okay. And then at that point did you or any of the other
8  law enforcement officers make entry into the residence?
9  A. I don't know if they went in and got him or not or if he
10 came out.
11 Q. You are not sure?
12 A. I am not sure.
13 Q. Where were you at that point?
14 A. I was in front of the house but I mean I don't remember
15 if he came out or if they went in and got him.
16 Q. But you do know he came out?
17 A. Yeah, one way or the other.
18 Q. And when did the search begin?
19 A. When Detective Conway got the search warrant signed.
20 Q. Okay. And you all waited until he got back?
21 A. I don't know if he was back or if he told us he had it
22 signed. I don't know.
23 Q. You don't remember?
24 A. Huh-uh. (negative response)
25 you.

Page 222

1  Q. When were the suspects taken away from the residence?
2  A. Sometime in between when we got there and when we left.
3  Q. My question is was it before or after you all learned
4  that the search warrant had been signed?
5  A. I think it was before.
6  Q. That they were taken into custody?
7  A. Yes, ma'am.
8  Q. And at that point you all didn't have any knowledge of
9  the money in the house or the controlled substances in the
10 house, did you?
11 A. No, ma'am.
12 Q. And with regard to Mr. Peralte, at the point you took
13 him into custody you hadn't seen him do anything wrong, had
14 you?
15 A. No, ma'am.
16 Q. Other than just simply being in the house where you all
17 suspected contraband might be kept; correct?
18 A. That's correct.
19 Q. Thank you, I have nothing further.
20     THE COURT: Any cross-examination, Mr. Madison?
21         CROSS-EXAMINATION
22 BY MR. MADISON:
23 Q. Government's Exhibit 24, did you fold it up like that?
24 A. No, sir.
25 Q. Was it folded up when it was received?

Page 223

1  A. I don't remember the condition it was in when we
2  retrieved it.
3  Q. But it had a lot it creases in it, does it not?
4  A. Yes, sir it does.
5  Q. And it appears it was folded up to fit a small area.
6  A. Yeah. I mean yeah, I guess.
7  Q. Okay. I mean are you the person who found that?
8  A. Yes, sir.
9  Q. You found this particular item?
10 A. Yes, sir.
11 Q. And where did you say you found it?
12 A. On top of a living room cabinet.
13 Q. You don't recall whether you waited until Officer Conway
14 arrived back at the house with a search warrant as to whether
15 or not the search commenced or not, do you?
16 A. Whether he was there with the search warrant?
17 Q. Right.
18 A. I mean I don't know.
19 Q. Well, isn't the search warrant the document that y'all
20 have to look at to know the parameters of the search, that
21 tells you what you can search and what you can't search,
22 doesn't it?
23 A. Yes, sir.
24 Q. Okay. And the search warrant -- well, it's important to
25 have the search warrant in hand so that you know what areas

Page 224

1  you can and can not search, isn't it?
2  A. I wouldn't necessarily say that.
3  Q. How do you know where you can go then?
4  A. Well, okay.
5  Q. I'm sorry, you said okay, I am asking --
6  A. It's common knowledge that when we get search warrants
7  it's for the residence and the curtilage.
8  Q. That's common practice is what you are saying.
9  A. Yes, sir.
10 Q. Okay. But still until you receive that search warrant
11 back in your hands and you look at that search warrant you
12 can't identify what area that Judge has authorized you to
13 search.
14 A. No, sir, but the case agent can, the one that gets it
15 signed.
16 Q. Say the vehicles on the street, vehicles on the street
17 would not be considered within the curtilage, would they?
18 A. That's right.
19 Q. If they searched vehicles on the street then would that
20 be an impermissible search according to your practices?
21     MR. BROWN: Objection, Your Honor, calls for a legal
22 conclusion.
23     MR. MADISON: With respect to that, he has already
24 testified as to the -- what the common practice was.
25     THE COURT: He can testify to what he understands

Page 225

1  the common practice to be. Overruled.
2  A. What was your question?
3  Q. I believe my question was does the search of the
4  curtilage include the search of the vehicles located in the
5  streets?
6  A. No, sir.
7  Q. So the curtilage then is defined as what area as far as
8  your common practices?
9  A. It would be the yard.
10 Q. Do you know what time that the vehicles were searched?
11 Or first of all let me back up, were the vehicles searched
12 while you were present?
13 A. Yes, sir.
14 Q. Is that a yes? I'm sorry.
15 A. Yes, sir.
16 Q. And which vehicles were searched to your knowledge?
17 A. I believe all of them. I mean I don't know, I didn't
18 search them, but I mean I don't -- I don't know.
19 Q. Were you present during the search?
20 A. Yes, sir. I was inside.
21 Q. I'm sorry, the search of the vehicles.
22 A. I was inside the residence.
23 Q. Who searched the vehicles?
24 A. I don't know.
25 Q. And do you know whether or not the vehicles were

Page 226

1  searched prior to Officer Conway arriving back at the
2  premises?
3  A. No, sir, I don't.
4  Q. Why did you give the seized items to Mr. Wingard?
5  A. Because he is the DEA task force agent and he submits
6  all the evidence, he is the case agent.
7  Q. I'm sorry, my wife says I am hard of hearing, can you
8  speak up for me, I can't hear what you are --
9  A. I'm sorry. The reason I turned everything over to
10 Detective Wingard, he's on the HIDTA task force, he took
11 custody of all of the evidence.
12 Q. Can you tell me why all the evidence was given to Mr.
13 Wingard as opposed to taking it down to the City of
14 Montgomery police department inventory room?
15 A. The inventory room, what are you referring to?
16 Q. The -- you have state prosecutions when you keep
17 evidence where when somebody prosecutes somebody solely in
18 the state court where you maintain that evidence.
19 A. We have drug lockers, yes, sir.
20 Q. And where are those drug lockers located?
21 A. In our office.
22 Q. And where is your office located?
23 A. 1514 Highland Avenue.
24 Q. Okay. So is Detective Wingard's office located in your
25 office at 1514 Highland Avenue?

Page 227

1  A. Yes, sir.
2  Q. So then the HIDTA headquarters or members of the HIDTA
3  task force also then share offices with you at the 1514
4  Highland Avenue address.
5  A. Yes, sir.
6  Q. Was Officer Wingard -- or did Officer Wingard
7  participate in the search?
8  A. He was there, I don't know if he was actually searching,
9  I don't know.
10 Q. And how is it that you know he was there?
11 A. I saw him there.
12 Q. Were any other members of the HIDTA task force there
13 with you?
14 A. I believe he was the only one.
15 Q. Did you discover any utility bills while you were
16 looking at these other documents that you failed to seize?
17 A. I don't remember.
18 Q. Did you notice the name of the occupant or owner of the
19 house through any of the documents that you haven't produced
20 today?
21 A. I don't remember.
22 Q. Are you the person that moved the trash can to the
23 street?
24 A. I didn't move a trash can, no, sir.
25 Q. Do you know if any other officer moved the trash can to

Page 228

1  the street?
2  A. No, sir.
3  MR. MADISON: May I approach, Your Honor?
4  THE COURT: Yes.
5  MR. MADISON: I need to grab an exhibit. If I may
6  approach the witness as well?
7  THE COURT: Yes.
8  Q. Can you identify Government's Exhibit 32?
9  A. It's a report of drug property collected, purchased or
10 seized form, DEA form.
11 Q. Is that the form that when you testified earlier you got
12 with Officer Wingard I believe and you turned the evidence
13 over, is that how y'all document the evidence is on those
14 forms?
15 A. He handled the form, I don't know what paperwork he has
16 to do.
17 Q. How does he know which one of these forms to put down
18 where all those items were seized from the residence?
19 A. Like I said, I don't know what he has to do with his
20 paperwork, I am not a HIDTA task force agent.
21 Q. Well, you are aware though that the government
22 produced -- you may not be aware -- the government produced
23 to us multiple exhibits pertaining to what was recovered on
24 the premises on these forms.
25 A. Okay. Yes, sir.

Page 229

1  Q. Okay. Well, how does the information get transposed from
2  what you found onto a form that Officer Wingard has, or fills
3  out?
4  A. How does he get the forms to -- the DEA forms?
5  Q. How does he know how to fill in those forms?
6  A. I don't know how he knows. I have no idea what HIDTA
7  paperwork -- what he has to do.
8  Q. Well, you documented the seizure of the drugs; is that
9  correct?
10 A. Yes, sir.
11 Q. And on this form.
12     MR. MADISON: If I may approach again.
13     THE COURT: Yes.
14 Q. If I am being impolite and point, do you see the items
15 listed there on that exhibit?
16 A. Yes, sir.
17 Q. And are those some of the items that were seized from
18 the residence?
19 A. It looks like the drug evidence, yes, sir.
20 Q. Okay. And that's the same drug evidence that you -- you
21 were responsible for inventorying; isn't that correct?
22 A. That's correct.
23 Q. My question is, that's not your sheet, you didn't fill
24 that out, did you?
25 A. That's right.

Page 230

1  Q. How does it get from your form to a form that is Mr.
2  Wingard's form?
3  A. Well, I mean I turn it over to him. Once I collect it
4  from the residence I turn it over to him directly and he
5  takes custody of it. And then he sends it off to the DEA lab
6  to get it tested.
7  Q. But Officer Wingard wasn't walking through the house
8  with you, every time you find something he wasn't there to
9  transpose the location of where that evidence was placed on
10 these forms, was he?
11 A. I can't testify to what he was doing. I mean I was busy
12 collecting evidence, I don't know what he was doing.
13 Q. Can you tell me who Jawana Robinson is? Is that who
14 owned the house?
15 A. I don't remember. I don't know who it is.
16     MR. BROWN: Your Honor, may we have a moment?
17     THE COURT: Yes.
18     (At which time an off-the-record discussion was had
19 between counsel.)
20     MR. MADISON: I think we resolved that, I apologize
21 to the jury for us acting up. We are going to clarify
22 something that's on a report that apparently is not on some
23 of the other reports, Judge, after we recess today. So I am
24 going to withdraw that question, I don't believe this witness
25 knows the answer anyway according to Mr. Brown. If I may have

Page 231

1  just a minute.
2     THE COURT: Yes.
3     MR. MADISON: If I may approach the witness again,
4  Your Honor.
5     THE COURT: Yes.
6  Q. I believe you identified Government's Exhibit 23
7  earlier?
8  A. Yes, sir.
9  Q. And that appears to me to be a receipt for an automobile
10 purchase. Was that automobile any of the automobiles that
11 were present on the scene that day that you are aware of?
12 A. I don't believe it was.
13 Q. What action did you take to ascertain the owner or
14 occupant's name of the premises before you went to the
15 premises that day?
16 A. I didn't do any of that.
17 Q. Do you think it's important to know who the owner or
18 occupant is at the time you obtain a search warrant?
19 A. You can find that out but I didn't get the search
20 warrant.
21 Q. I'm sorry?
22 A. I didn't get the search warrant.
23 Q. I know you didn't but don't you feel that's some
24 important information that the Judge needs to know at the
25 time you obtain a warrant?

Page 232

1  A. You can get -- if time permits you can get it, yes, sir.
2  Q. I'm sorry, I am having trouble hearing you.
3  A. If time permits you can get it, yes, sir.
4  Q. When you are going to search a home isn't that something
5  that a Judge wants to know more than anything else is who is
6  the owner or occupant of that house?
7  A. I can't speak for what the Judge wants, as long as
8  there's probable cause to get that search warrant signed.
9     MR. MADISON: If I may have just a minute, Your
10 Honor, I believe that's going to be about it.
11     THE COURT: Anything else, Mr. Madison?
12     MR. MADISON: I am asking, Your Honor.
13     (pause)
14     MR. MADISON: I don't have any further questions,
15 Your Honor.
16     THE COURT: Mr. Brown?
17     MR. BROWN: One briefly, on redirect. May I approach
18 the witness, Your Honor?
19     THE COURT: Yes.
20     REDIRECT EXAMINATION
21 BY MR. BROWN:
22 Q. Detective, I am going to show what you has been marked
23 as Government's Exhibit 33, do you recognize that?
24 A. I sure do.
25 Q. What is that?

| Page 233 |
|---|
| 1   A. That is our evidence inventory sheet. |
| 2   Q. Is that the sheet that you filled out? |
| 3   A. That's correct. |
| 4   Q. Is it in the same or substantially the same condition as |
| 5   it was when you filled it out? |
| 6   A. Yes, sir. |
| 7     MR. BROWN: The government moves to admit |
| 8   Government's Exhibit 33. |
| 9     THE COURT: Any objection to Government's Exhibit 33 |
| 10   from Mr. Peralte? |
| 11     MS. JAMES: No, sir. |
| 12     THE COURT: From Mr. Norman? |
| 13     MR. MADISON: No objection, Your Honor. |
| 14     THE COURT: Without objection Government's Exhibit |
| 15   33 is admitted. |
| 16   Q. Detective Bartlett, do you remember Mr. Madison asking |
| 17   you how Detective Wingard would know where different items |
| 18   are located, do you recall him asking you that? |
| 19   A. I misunderstood the question, but yeah, I do. |
| 20   Q. That's what I thought, that's why I wanted to clear it |
| 21   up. |
| 22   A. Yes. |
| 23   Q. Does this document -- did you fill out this document? |
| 24   A. I did. |
| 25   Q. During the course of the search? |

| Page 234 |
|---|
| 1   A. I did. |
| 2   Q. Does this document that you filled out list where |
| 3   different items are located? |
| 4   A. It does. |
| 5   Q. And would -- we won't be able to read it all but is that |
| 6   the column there? |
| 7   A. Yes. |
| 8   Q. And you turned this over as part of your paperwork. |
| 9   A. Yes, I did. |
| 10     MR. BROWN: No further questions. |
| 11     MS. JAMES: Nothing further. |
| 12     THE COURT: Ms. James? |
| 13     MS. JAMES: Nothing further. |
| 14     MR. MADISON: Yes, sir, Judge, I think I have a |
| 15   follow-up on that. I don't think that was in evidence a while |
| 16   ago. |
| 17      RECROSS-EXAMINATION |
| 18   BY MR. MADISON: |
| 19     MR. MADISON: May I approach, Your Honor? |
| 20     THE COURT: Yes. |
| 21   Q. You have on there item number nine, assorted paper |
| 22   documents. |
| 23   A. Yes. |
| 24   Q. And you are stating that that's where you retrieved each |
| 25   one of those particular items. |

| Page 235 |
|---|
| 1   A. Yes, sir. |
| 2   Q. Were there any paper documents that you retrieved that |
| 3   were located at a place other than that particular area that |
| 4   you note on Exhibit 9? |
| 5   A. No, sir. |
| 6   Q. Okay. And that was a driver's license receipt, was it |
| 7   not? |
| 8   A. Yes, sir. |
| 9   Q. Can you look at item number 11, I'm sorry. |
| 10   A. Yes, sir. |
| 11   Q. What does item number 11 reflect? |
| 12   A. It's one wallet containing six $50 bills found in the |
| 13   bag ten under flower pot. |
| 14   Q. What else did you find in that wallet other than money? |
| 15   A. An ID card. |
| 16   Q. Were there other related documents? |
| 17   A. It doesn't say here. |
| 18   Q. Did you determine who the wallet belonged to? |
| 19   A. I believe we did. |
| 20   Q. And whose wallet was it? |
| 21   A. Mr. Peralte's. |
| 22   Q. All right. And in connection -- I'm sorry, in connection |
| 23   with one of the documents you now state you found at the |
| 24   living room cabinet, was that also the driver's license |
| 25   receipt that should have gone in that wallet? |

| Page 236 |
|---|
| 1   A. I can't answer that. |
| 2   Q. And that's why I was asking about it being folded up |
| 3   earlier, it was folded up into a small piece like something |
| 4   that would fit into a wallet, was it not? |
| 5   A. It probably would fit into a wallet. |
| 6     MR. MADISON: I don't have any further questions. |
| 7     THE COURT: Anything further, Mr. Madison? |
| 8     MR. MADISON: No, sir, Your Honor, I'm sorry. |
| 9     THE COURT: Mr. Brown, anything else? |
| 10     MR. BROWN: No, sir. |
| 11     THE COURT: Ms. James? |
| 12     MS. JAMES: No, sir. |
| 13     THE COURT: Ladies and gentlemen -- if you will |
| 14   remain where you are, Officer Bartlett. Ladies and gentlemen, |
| 15   we are going to recess for the evening. It's past the |
| 16   5:00 o'clock hour and I would like to make a point of keeping |
| 17   you on time for lunch and dismissing you in the evenings. If |
| 18   you will recall my instructions, particularly the |
| 19   instructions not to discuss this case among yourselves or |
| 20   allow anyone to discuss the case with you. If you will leave |
| 21   your note pads either on the rail in front of you or in your |
| 22   seats face down, and we will make sure that the pencils are |
| 23   sharpened and the pads are returned for your use. If you will |
| 24   be in recess -- would 9:00 o'clock to start back in the |
| 25   morning be an undue hardship for anyone on the jury? If it |

## Page 237

1 would would you raise your hand. If it will not we will try
2 to start back promptly at 9:00. If you will assemble in the
3 first floor jury assembly room before 9:00 o'clock we will
4 try to start back promptly at 9:00 in the morning, and with
5 that I will dismiss you for the evening.
6       (At which time, 5:12 p.m., the jury left the
7 courtroom.)
8       THE COURT: officer Bartlett, you may step down. Is
9 there anything we need to take up before we adjourn the trial
10 tonight?
11       MR. BROWN: No, Your Honor.
12       THE COURT: Anything from the government?
13       MR. BROWN: No, Your Honor.
14       THE COURT: Anything from Mr. Norman?
15       MS. JAMES: Peralte, no, sir.
16       THE COURT: Anything for Mr. Norman?
17       MR. MADISON: No, sir, Judge. I would like some idea
18 from Todd about how long he thinks his witnesses are going to
19 take tomorrow.
20       MR. BROWN: How long I am going to take tomorrow?
21       MR. MADISON: I am trying to determine about this
22 expert. If the Court is inclined to tell me I am not going to
23 be allowed to call this witness, that's going to call it
24 pretty easily, but I need to let him know tonight.
25       THE COURT: Again, I am not going to be put into a

## Page 238

1 position to make a ruling about evidence I haven't heard. I
2 haven't heard anything yet to lead me to believe that the
3 expert on when these documents might have been signed by
4 Judge Hayes would be anything other than a regurgitation of
5 the motion to suppress, so until I hear something different
6 on that I am not going to give you a ruling. If there's going
7 to be a witness that says anything that would provide
8 additional evidence other than what has been presented to
9 Magistrate Judge Walker and to this Court -- I don't feel
10 like what we are going to get into with that witness is going
11 to be anything other than reconsideration of the motion to
12 suppress.
13       MR. MADISON: And Judge, I don't anticipate any of
14 their witnesses volunteering any information that the warrant
15 was served or executed before 6:00. I guess it is a --
16       THE COURT: Why don't you talk to Mr. Brown, Mr.
17 Madison, and if there's anything you can elicit from the
18 government as to what any of their witnesses may testify to
19 that you are not aware of, you understand the Court's
20 position, and I am not going to make a ruling about evidence
21 that I haven't heard or arguments I haven't heard regarding
22 that evidence.
23       MR. MADISON: I understand that, and I understand
24 what the Court is telling me as far as not going back into
25 the suppression issues. And again, with all due respect I

## Page 239

1 thought the Court had incorrectly denoted the time that Mr.
2 Conway testified to as far as what time -- the time it took
3 him to get out to the baseball park and I thought all that
4 took him outside the 6:00 o'clock time frame. And I may be
5 the one, that's why I say with all due respect, I may have
6 misunderstood him.
7       THE COURT: Certainly.
8       MR. MADISON: But in that respect I thought we may
9 have opened the door that may have led to a reconsideration
10 of some of that.
11       THE COURT: Unless the parties can show me where I
12 may have misunderstood, the only witness other than the last
13 exhibit that this last witness testified that he prepared
14 which indicates on the report itself that entry into that
15 residence began at 6:00 o'clock, I believe, in non-military
16 time, my understanding from the prior testimony, particularly
17 that of Corporal Conway, is that the search warrant was
18 executed by Judge Hayes between 5:45 and 6:00 o'clock.
19       MR. MADISON: Yes, sir.
20       THE COURT: That's all that I have and that's what I
21 am using to base my ruling on. If the evidence was not as I
22 have recalled it, I would encourage the parties to bring that
23 to the Court's attention so that I can evaluate that evidence
24 as well as your request to call this expert on those matters
25 that you have described.

## Page 240

1       MR. ARRINGTON: Judge, may I briefly say something
2 on that? Mr. Norman have requested we have Judge Hayes and
3 the expert from Atlanta, and you ruled that we could not have
4 Judge Hayes, and we -- more or less that issue has been
5 resolved. But I mean all parties know -- I don't know
6 whether they recall it or not, but I think Todd should
7 realize this, I mean as far as calling -- we can't call Judge
8 Hayes now, but now all the testimony and all this stuff in
9 the transcript when it goes back, they said it didn't happen
10 at the ball field. We can't bring Judge Hayes in to say it
11 happened at his office, he didn't see it at no ball field.
12 That's just generally -- it came to a conclusion it didn't
13 happen there, in front of Brown, everybody knows it. It just
14 didn't happen at the ball field. The guy testified it did
15 happen at the ball field. I am saying it's a question of
16 fact, he testified it happened at the ball field, we all know
17 it's not, but we are not able to bring Hayes in to say hey,
18 it didn't happen at the ball field.
19       Now we have got another dilemma just to say it
20 happened at a different time. Only thing we are trying to say
21 is as far as his expert opinion that some of these things
22 were signed at a different time. I don't know what difference
23 it's going to make, I don't think it's going to sway a jury
24 one way or another, but just as the Magistrate put it,
25 different bites at the apple, we are trying to get second

Page 241

1  bites at the apple. Our client have requested to bring the
2  guy in, I don't really -- I realize -- I don't second-guess
3  the Judge, but it's not that much going to get up here as far
4  as the --
5      THE COURT: Didn't Mr. Shiver, your expert, didn't
6  he give an opinion that was consistent with another defense
7  expert witness and both of the opinions said that the -- all
8  of the signatures on all of the documents that they examined
9  were the signature of Judge Les Hayes the Third?
10     MR. ARRINGTON: That's correct.
11     MR. MADISON: Yes, sir.
12     THE COURT: The only additional fact that Mr. Shiver
13 has testified to is an examination of one of the documents
14 that indicated it could have been or it may have been or it
15 was signed at a time different from the -- some of the other
16 documents that he examined, and wasn't that based upon a pen
17 color?
18     MR. ARRINGTON: No, not the pen color.
19     MR. MADISON: I think there was some added wording
20 on that particular -- instead of just saying September 23rd
21 or 25th, it also said September 25th, Les Hayes. Les Hayes
22 the Third. And I think that was part of the -- his opinion.
23 And I don't want the Court to think that we are
24 misrepresenting the facts too.
25     THE COURT: I want to make sure we understand what

Page 242

1  the argued facts are. And if the facts are that the police
2  officer went to Judge Hayes' location, wherever that was,
3  prior to entry into that house, and took four different
4  original copies of an affidavit and search warrant and Judge
5  Hayes sat there and signed each of them differently, how does
6  that fact make anything that the Montgomery police department
7  did in searching this house unconstitutional?
8      MR. MADISON: There were some questions, Your Honor,
9  regarding I think the adding of some language on the search
10 warrant and some other items as well where supposedly --
11     THE COURT: Unless the language that was added
12 limited the scope of the search, or limited the time of the
13 search or changed what the officers could do at the house,
14 other than just being surplusage, what difference does it
15 make?
16     MR. MADISON: I think it's the vehicles, to search
17 the vehicles. This last officer testified had been omitted
18 with respect to the curtilage, searching the curtilage.
19 Typically the search warrant in the four corners of the
20 search warrant defines unless it's on Exhibit A what areas
21 that the Court designates are the appropriate areas for the
22 search to be conducted in, and I think in this particular
23 case there was testimony that the vehicles had been omitted.
24 Now, that, you know, if --
25     THE COURT: Well, whether they are omitted or they

Page 243

1  aren't omitted, that doesn't make the fact that the
2  government can search the vehicles that is part of the
3  curtilage of the execution of the search warrant in and of
4  itself unconstitutional; would you agree with that?
5      MR. MADISON: Unless it was signed at a different
6  time and that fact has been hidden from the defense.
7      THE COURT: This case though has already been argued
8  for two days before Magistrate Judge Walker. Judge Hayes has
9  already testified once, and to my knowledge there's not been
10 any testimony that indicated that he signed that search
11 warrant after that search warrant was executed or he signed
12 any copy of that search warrant after the search warrant was
13 executed. Is that accurate?
14     MR. MADISON: That's what I understand the testimony
15 to be, Your Honor. Now, I mean other than --
16     THE COURT: Do you expect him to change his mind
17 when he comes back and testifies if the Court allows him to
18 come back?
19     MR. MADISON: No, sir, I wasn't planning on calling
20 Judge Hayes, the only thing I thought the expert might bear
21 some witness or credibility on is they may have been signed
22 at different times which may cast some doubt on the
23 credibility of the testimony that the government's witnesses
24 have given.
25     THE COURT: That issue has been resolved. Now, to

Page 244

1  the extent that this Court may have misconstrued any of the
2  legal arguments made in support of either position on that
3  issue, those issues have been well preserved for further
4  review if need be. So, unless there's some other evidence
5  that would change what has already been presented before
6  Magistrate Judge Walker on both occasions that she has
7  reviewed this, and the testimony that has been presented
8  today, the government's motion in limine will remain as ruled
9  on by this Court this morning and Mr. Shiver will not
10 testify.
11     MS. JAMES: Judge?
12     THE COURT: Yes.
13     MS. JAMES: There was some discrepancy with regard
14 to whether -- Judge Hayes really couldn't remember whether he
15 signed at his office, in fact, he initially said he did sign
16 at his office, I believe, as opposed to the ball field, and I
17 know we thought -- it was different counsel for Mr. Norman at
18 this time and we thought that was significant because if
19 somebody comes into the ballpark and you are coaching your kids
20 you would probably remember that. And we didn't pick up on
21 it until we had gotten well into the case because the warrant
22 and application that we got -- the warrant and affidavit that
23 we got in discovery really didn't raise much suspicion of
24 anything. However, Mr. Maddox had gone down to the city and
25 gotten a copy, what he thought was a copy, and it was

Page 245

1  actually the clients in the city jail that realized that
2  there appeared to be a discrepancy and the discrepancy was
3  that these portions that were handwritten in were different,
4  said virtually the same thing but they were different in
5  terms of the way they were written. Any observer can look at
6  them and say they are different. It was our impression that
7  they had -- how could that have happened? You know, they
8  should have been xeroxed. In other words, they should have
9  been the same even with the add-in.
10  THE COURT: If they were xeroxed, I would agree they
11  would be the same, but if they were handwritten in on
12  duplicate copies and written in by the Judge, which is what I
13  understand the testimony to be at the suppression hearing,
14  that would account for any differences in the handwriting.
15  MS. JAMES: That's what Officer Conway testified, we
16  don't have xerox copies out there and we take these extra
17  copies. And Judge Hayes says I think I recall telling him he
18  could write that in or whatever. Well, we were still -- we
19  weren't satisfied with that because Judge Hayes did so many
20  of them. And there was another matter, and I think just to
21  refresh the Court, when we asked Officer Conway just
22  routinely and not thinking anything sinister, where was Judge
23  Hayes and he immediately looked at Judge Walker and says do I
24  have to answer this? And we were like what difference would
25  that make? So you see all these things cumulatively added to

Page 246

1  our suspicion that something was up. And the Judge said yes,
2  and he said the ball field. Why would you be reluctant to say
3  he was at the ball field with his kids?
4  But never the less, when we started looking at these
5  various documents there were supposedly four affidavits and
6  four warrants all having been done that way. But the next
7  problem tells from the fact that one of those affidavits, and
8  we felt that to have a complete review here one of them was
9  gone, it's still not in existence, we are told it was
10  destroyed because this case started out as a city case and
11  then it became a federal case, therefore they didn't need to
12  keep it or something of that nature. There was some
13  explanation in that regard.
14  So there's been a lot of things that have given the
15  appearance of being questionable in the manner in which this
16  was handled. And so I don't want to waive anything on behalf
17  of Mr. Peralte because we still felt that we had an issue.
18  However, I did -- after Mr. Roper examined the documents, I
19  essentially said if he says it's his signature, he is an
20  expert, I am not, I am going to have to accept that. But it
21  could -- and I would agree with Mr. Madison, that whether it
22  was signed at 6:00 o'clock or it was signed at a different
23  time or a different day, when you add up these other factors
24  in then it could have some relevance to the credibility I
25  think of the officer that testified. Not Judge Hayes, but the

Page 247

1  officer.
2  THE COURT: Well, if Judge Hayes has testified that
3  the signatures were his, and that he signed them after being
4  presented the documents by Mr. Conway or Corporal Conway, and
5  Corporal Conway testified that he received the executed
6  search warrant before he radioed the officers and no one
7  entered that house to search the residence until after the
8  search warrant was signed, I fail to see how the fact that
9  there may have been four copies or three copies or a dozen
10  copies of those search warrants signed with different
11  identical notations made on the warrant itself or in the
12  affidavit by handwritten entry by Judge Hayes relevant to
13  the issues that this jury is going to decide outside of what
14  has already been presented in the motion to suppress and
15  motion to reopen the evidence or a rehearing on the motion to
16  suppress.
17  MS. JAMES: Judge, I probably would not disagree,
18  but I think that when you look at this case, because I really
19  realized something today, and that was when Mr. Madison
20  introduced the document, and I don't remember the exhibit
21  number, but there's testimony they were investigating Mr.
22  Norman some days before this anonymous tip came in, which
23  certainly perked my ears, because then we have the anonymous
24  tip with the wrong phone number that miraculously causes Mr.
25  Norman to walk out and throw this in the trash, the

Page 248

1  substance. And I am looking at discovery a minute ago and it
2  was reported on one of the DEA-6s that what was thrown in the
3  trash was like 31 grams of cocaine base. I saw that on the
4  document. I was going to point it out to them, yet this
5  expert from Dallas says there was such a small amount on
6  there it couldn't even be quantified, which there's a big
7  difference in 31 grams and unquantifiable.
8  So I think while the suppression issue obviously
9  needs to be put to rest, if they have a witness that could
10  add something to the defense with regards to on the overall
11  credibility, not to suppression, but the overall credibility
12  of Officer Conway, I think that when you put that together
13  with the other things I think we are talking about apples and
14  oranges. I know it appears to flow from the suppression
15  because that's what he was hired for, but what if we hadn't
16  even done the suppression and we went on and sought an expert
17  because we didn't think he was truthful, and the expert says
18  I can show right here based on this handwriting this guy is
19  not shooting straight. I think it's different for that
20  purpose.
21  I'm sorry we have traveled down the road. This is
22  kind of a continuation of the suppression because I couldn't
23  understand the Court's ruling. I don't agree but I can
24  accept it. But I think that essentially it would -- and I am
25  getting the residual benefit, we didn't hire him or pay for

Page 249

1  him or whatever, but I think it would hinder -- I don't know
2  that there's -- it's no surprise to the government, they have
3  known it, they have had his report. I don't see that it's
4  particularly confusing to the jury because it just simply
5  goes to his credibility.
6      THE COURT: And if there's evidence that would be
7  presented to the Court that would bring in that credibility
8  issue I will re-examine on the point. I don't think there's any dispute in
9  testimony on the point. I don't think there's any dispute in
10  what Mr. Shiver is going to say, I think he is going to say
11  what you have indicated, those are the signature and those
12  are collectively the signatures of the same person. In this
13  particular case it's undisputed that it would be Les Hayes.
14  He can't say when it was signed.
15      Unfortunately, the affidavit and the search warrant
16  are not timed as I recall it and the only evidence that we
17  have is the testimony of Mr. Conway that -- or Corporal
18  Conway that says it was signed before 6:00 o'clock, and his
19  last exhibit that says entry into the house for purposes of
20  executing the search warrant began at 6:00 o'clock. So if
21  there's other evidence that's going to be presented or that
22  would be brought to the Court's attention, I will re-examine
23  my initial opinion about the testimony of Mr. Shiver at that
24  time, but I am not going to tell the defense counsel two days
25  before you think you may need a witness there's no way you

Page 250

1  are going to be able to use this witness and then the
2  testimony turn out differently and I would have allowed him
3  to testify. But at this point in time to help you out in
4  preparing your defense, I haven't heard anything that would
5  bring that issue into question.
6      MS. JAMES: Judge, I am not trying to suggest to
7  them how they run their case but it would seem to me that if
8  the Court would entertain it, that their witness should be
9  brought and at least outside the presence of the jury we be
10  allowed to examine him as to what his testimony would be,
11  because otherwise we don't have a complete record anyway.
12      THE COURT: We don't have a written report from this
13  expert? Hasn't this witness already testified?
14      MR. MADISON: This is the problem, Your Honor, he
15  didn't testify at the suppression hearing, and from what I
16  recall the sequence of events were that Judge Walker issued
17  this ruling on the suppression. At that point in time the
18  objections were filed to the ruling that Judge Walker made.
19  Well, it was after that time that the issue as to the search
20  warrants and the signatures came up.
21      THE COURT: And that's why I referred this back to
22  Judge Walker on the renewed motion to reopen the suppression
23  hearing.
24      MR. MADISON: But we never had another hearing on
25  it, Your Honor.

Page 251

1      THE COURT: But there was a report. And haven't you
2  stipulated the report is going to say what the witness is
3  going to testify to?
4      MR. MADISON: I will stipulate, yes, sir, that's
5  what the witness is going to say. But Judge Walker, with
6  respect to Your Honor's having reviewed what she did on that,
7  I understood her order saying I submitted that through an out
8  of time filing and that in that out of time filing she stated
9  it was filed out of time but she still alluded to the fact in
10  the order but I am not sure she considered that in her
11  recommendation. So even though she alluded to it, the fact
12  that it was out of time, I don't know that she took that into
13  consideration on -- whether she took that into consideration
14  on revisiting the suppression issue. And Judge, I thought we
15  were going to have a hearing, after all that came up and
16  after all the conflict came up and you had held one of Bruce
17  Maddox's motions as moot on an objection he had filed, a
18  motion to quash, he thought and I thought at that point in
19  time Judge Walker was going to have another hearing on it and
20  we never got that additional hearing.
21      THE COURT: I made no reference to requiring that
22  she conduct a hearing, I just referred the motions to her to
23  review in light of the hearing she already had over a two day
24  period.
25      MR. MADISON: Yes, sir, I understand that. But

Page 252

1  that's probably where I thought since it had been referred
2  back, I thought Ms. James was under the same impression, I
3  can't speak for her, but we had talked and we were under the
4  impression that because of all the conflicts there may be a
5  different hearing, but there was no guarantee because as you
6  say there was no order to that effect.
7      THE COURT: I am looking at the recommendation that
8  was entered by Magistrate Judge Walker on June the 4th, and
9  that was adopted by this Court on July 1st. Particularly on
10  pages five and afterwards, the recommendation discusses the
11  effect of the motions filed out of time and then goes on to
12  substantively discuss the requirement of there being a time
13  on the search warrant and a substantive ruling on the motion
14  to suppress for those reasons as you have discussed
15  concerning the possibility that the warrants were signed at
16  times different from one another.
17      MR. BROWN: Your Honor, if I may, on page three as
18  well as the first paragraph also addresses that, both that
19  expert and the first expert that was hired.
20      THE COURT: The first paragraph on page three
21  indicates that both expert's testimony is to the same issue,
22  and they are consistent, is my understanding.
23      MR. MADISON: And Judge, with all due respect, that
24  was as to the signatures' authenticity, not as to the
25  different times that the search warrant may have been signed,

Page 253

1  or the expert's reference to the fact that the warrants may
2  have been -- we stipulated and I will stipulate today both
3  experts said based upon the number of handwriting exemplars
4  that were provided they could not determine that was any
5  signatures other than Mr. Hayes, although he signed
6  everything different. The issue, the remaining point then was
7  the fact that our expert had also proved the fact that there
8  may be a -- something dealing with his reading of those
9  affidavits and the fact that they may have been signed
10 differently.
11      THE COURT: Subject to there being any evidence
12 which would bring into question the credibility of Corporal
13 Conway in addition to the bases that I have already cited in
14 my rulings, it would be my continued ruling that the
15 prejudicial effect and the possibility of confusion would
16 outweigh any probative value, that that testimony about
17 whether or not they were signed or could have been signed at
18 a time as you have argued, and that's an additional bases of
19 my ruling.
20      MR. MADISON: Thank you, Your Honor. Sorry we have
21 wasted the time.
22      THE COURT: This is not a waste of anybody's time.
23      MR. MADISON: That's what I was going to say, sorry
24 we have taken so much time.
25      THE COURT: We are going to move ahead, and while we

Page 254

1  are on that topic, Mr. Brown, how many witnesses do you have
2  remaining?
3      MR. BROWN: Two, Your Honor.
4      THE COURT: Two additional witnesses?
5      MR. BROWN: Yes, sir.
6      THE COURT: Do you have any idea, Ms. James, how
7  many witnesses you are going to call on your client's behalf?
8      MS. JAMES: Two brief witnesses, probably take less
9  than an hour.
10     THE COURT: Mr. Arrington or Mr. Madison, do you
11 have any idea how many witnesses you may call?
12     MR. MADISON: Two maybe. Might take two hours.
13     THE COURT: Also want to cover with your clients
14 individually outside of the presence of the jury their
15 decision to testify, so just make sure that we factor that
16 into whatever arrangements we make as far as witnesses.
17 Anything else that we need to discuss? And I would encourage
18 counsel to talk about the issue of the firearm and that
19 question before the jury, if it gets that far. But is there
20 anything else we need to discuss before we adjourn today?
21     MR. MADISON: Not with the Court, Your Honor, I
22 needed to see Mr. Brown and Ms. James if possible to discuss
23 what is on that exhibit.
24     THE COURT: Anything further, Ms. James?
25     MS. JAMES: No, sir.

Page 255

1      THE COURT: Mr. Brown?
2      MR. BROWN: No, sir, Your Honor.
3      THE COURT: We will be in recess until 9:00 in the
4  morning.
5      (At which time, 5:41 p.m., a recess was had until the
6  following day.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 256

```
 1              IN THE UNITED STATES DISTRICT COURT FOR

 2                  THE MIDDLE DISTRICT OF ALABAMA

 3                         NORTHERN DIVISION

 4

 5

 6   UNITED STATES OF AMERICA

 7

 8          Vs.                    CR. NO. 03-229-N

 9

10   ALPHONSO NORMAN and

11   CAPULCO PERALTE

12

13          *   *   *   *   *   *   *   *

14            Before Hon. Mark E. Fuller, Judge,

15            and a Jury, at Montgomery, Alabama,

16            Commencing on July 12, 2004

17          *   *   *   *   *   *   *   *

18               VOL. II (July 13, 2004)

19   APPEARANCES: For the Government: Todd A. Brown,

20                       Assistant U.S. Attorney

21        For the Defendant, Norman: Donald G. Madison

22                       and Leonard Arrington,

23                       Attorneys at Law

24        For the Defendant, Peralte:  Susan G. James,

25                       Attorney at Law
```

## Page 257

1  (The above case coming on for trial at Montgomery,
2  Alabama, July 12, 2004, before Honorable Mark E. Fuller,
3  Judge, and a Jury, the following proceedings were had outside
4  the presence of the jury on July 13, 2004 commencing at 9:00
5  a.m.:)
6      THE COURT: Mr. Brown, are we ready to proceed this
7  morning?
8      MR. BROWN: The government is ready, Your Honor.
9      THE COURT: Are Mr. Norman and Mr. Peralte ready to
10 proceed?
11     MS. JAMES: Yes, Your Honor.
12     MR. MADISON: Yes, Your Honor.
13     THE COURT: Let's bring the jury in.
14     (At which time, 9:01 a.m., the jury entered the
15 courtroom.)
16     THE COURT: The government may call its next
17 witness.
18     MR. BROWN: The government calls Andrew Kenneth
19 James.
20     THE CLERK: You do solemnly swear or affirm that the
21 testimony you give in the trial of this cause to be the
22 truth, the whole truth, and nothing but the truth, so help
23 you God.
24     THE WITNESS: I do.
25

CASE
NO.  03-229-N

EXHIBIT
NO.  R-II

## Page 258

1      ANDREW K. JAMES, witness for the Government,
2  having been duly sworn or affirmed, testified as follows:
3              DIRECT EXAMINATION
4  BY MR. BROWN:
5  Q. I need for you to pull yourself up a little closer to
6  the microphone, you don't need to speak directly into it.
7  Would you state your name for the jury, please.
8  A. Andrew K. James.
9  Q. Do you go by any nicknames?
10 A. They call me Big Kenny.
11 Q. Mr. James, you are currently incarcerated; is that
12 correct?
13 A. Yes, sir.
14 Q. Why is that?
15 A. For this charge here.
16 Q. By this charge you mean federal conspiracy charge,
17 federal narcotics conspiracy charge?
18 A. Yes, sir.
19 Q. You pled guilty to that offense; is that correct?
20 A. Yes, sir.
21 Q. And you did that pursuant to a plea agreement with the
22 government; is that correct?
23 A. Yes, sir.
24 Q. The plea agreement in this case requires you to
25 cooperate with the government; is that right?

## Page 259

1  A. Yes, sir.
2  Q. And in exchange for that you are --
3      MS. JAMES: Your Honor, I am going to object to the
4  leading, testifying for him.
5      THE COURT: Overruled to the extent that we can
6  establish some predicate without getting into the substance.
7  Mr. Brown, don't lead substantively after you get past the
8  arrangements of why he's here.
9      MR. BROWN: Yes, Your Honor.
10 Q. Mr. James, you had indicated that you -- your plea
11 agreement calls for you to cooperate with the government; is
12 that correct?
13 A. Yes, sir.
14 Q. And what do you expect in exchange for that cooperation?
15 A. A less time.
16 Q. Less time on your sentence, is that what you are talking
17 about?
18 A. Yes, sir.
19 Q. But your plea agreement does require you to do what in
20 this case?
21 A. Tell the truth.
22 Q. All right, sir. And you are going to do that today?
23 A. Yes, sir.
24 Q. You and I have talked previously; is that correct?
25 A. Yes, sir.

## Page 260

1  Q. Do you know the Defendants in this case, Capulco Peralte
2  and Alphonso Norman?
3  A. Yes, sir.
4  Q. Do you know Capulco Peralte by any other name, nickname?
5  A. Yeah, Black.
6  Q. Do you know Alphonso Norman by any nickname?
7  A. Yeah, Scooter.
8  Q. When did you meet Mr. Peralte?
9  A. In '98.
10 Q. Would you tell the jury how that came about.
11 A. We met at -- by coincidence, a dude named Bayrock
12 Germaine had called on my cell phone, and he called on my
13 cell phone and he called back to check with them and once he
14 called back to check with them I answered the phone and we
15 set up a meeting and we met.
16 Q. What did you do at that meeting?
17 A. We talked. We searched either other to make sure that he
18 didn't have a wire and I didn't have a wire.
19 Q. What do you mean by a wire?
20 A. That he wasn't a police or I wasn't a police.
21 Q. After you checked each other for some type of recording
22 device what did you do?
23 A. Well, he followed me to my house and I bought a quarter
24 key of powder from him.
25 Q. By powder what are you talking about?

## Page 261

1  A. Cocaine.
2  Q. How much if you recall did you pay for the quarter key
3  of cocaine?
4  A. I don't know, maybe five or six thousand dollars. I
5  don't remember, it's been a while ago.
6  Q. And that was back in '98 as well?
7  A. Yeah.
8  Q. Did you have any other dealings with Capulco Peralte
9  after that first occasion?
10 A. Yeah, we started dealing with each other.
11 Q. And by dealing with each other what do you mean by that?
12 A. Just, you know, he started coming up, I started holding
13 his product for him, his cocaine or whatever.
14 Q. Do you recall how often that that would occur?
15 A. Like once, maybe twice a month, something like that. I
16 don't really recall but I know it was once or twice a month.
17 Q. Do you recall -- you said you bought a quarter kilogram
18 the first time, do you recall how much you would buy after
19 that first occasion?
20 A. Yeah, he would bring in a couple of keys, once or twice
21 a month.
22 Q. All right. Now, the cocaine that you got from Capulco
23 Peralte, did you sell that cocaine yourself?
24 A. Yeah. I sold it to other guys.
25 Q. In what form would you sell it?

## Page 262

1  A. Sometimes powder, sometimes crack.
2  Q. Explain to the jury if you would, please, the difference
3  between powder and crack cocaine.
4  A. Powder is -- um. It's like soft or something like that
5  and crack is hard.
6  Q. Do you take them different ways? Do you use them
7  different ways?
8  A. Yeah, you -- yeah, you cook the powder and -- and it
9  turn into the crack.
10 Q. And how would -- how might a person use powder cocaine?
11 A. Well, most people that use powder they snort the powder,
12 but crack, you smoke the crack. You take the powder and cook
13 the powder.
14 Q. Now, you said you started dealing with Capulco Peralte
15 back in 1998, how long did that relationship last?
16 A. A couple of years.
17 Q. Until 2000?
18 A. Yeah, about 2000 or 2001.
19 Q. What, if anything, happened that caused you not to deal
20 with Capulco Peralte any longer?
21 A. We fell out because his product wasn't really good.
22 Q. What do you mean by that?
23 A. He had a lot of garbage. Well, the product wasn't -- I
24 had a lot of complaints about the product.
25 Q. And when you say it had a lot of garbage in it do you

## Page 263

1  mean it wasn't as pure as it needs to be?
2  A. Right.
3  MS. JAMES: Objection to the leading, Your Honor.
4  THE COURT: Sustained.
5  Q. What problem was caused by not -- it having this extra
6  garbage in it?
7  A. Guys didn't want to buy it because it wouldn't get hard.
8  Q. What do you mean by --
9  A. Okay. When I sell the powder I had complaints because
10 the powder was cut and it would be complaining about it
11 saying it won't get heart, it will stay soft.
12 Q. Now, sometime later did you meet back up with Capulco
13 Peralte?
14 A. Yeah, he had called me when I was in Atlanta and asked
15 me what was up and I had told him, I said nothing too much.
16 He said holler at me, so I came to Montgomery.
17 Q. Who directed you to come to Montgomery?
18 A. Black.
19 Q. Did he tell you where to come?
20 A. No, he didn't tell me at first where to come, he told me
21 he would call me back. Then he called me back and he told me
22 to come on 4th Street.
23 Q. All right. You did that?
24 A. Yeah.
25 Q. When you got to 4th Street what happened?

## Page 264

1  A. He asked me did I have any sales, and I told him not
2  right now.
3  Q. By sales what do you mean?
4  A. I am assuming that he had --
5      MS. JAMES: Objection to what he assumes.
6  Q. What did you take that to mean?
7      MS. JAMES: I still object.
8      THE COURT: Overruled.
9  Q. What did you take that to mean?
10  A. Did I have any sales for any cocaine.
11  Q. Okay. Why were you required -- what happened that
12  required you to have sales with the cocaine?
13  A. Because I had ran off with some of his product I think
14  probably in 2001 or 2000, I had ran off with some of his
15  product and he didn't trust me any more.
16  Q. Did you ever pay him back for that?
17  A. I paid him six thousand dollars at a club named Rolex in
18  Miami, Florida.
19  Q. But how much did the cocaine --
20  A. I owed him 12 thousand dollars.
21  Q. So you only paid him for half when you met him in Miami?
22  A. Right. So he didn't want to deal with me any more
23  because I wasn't, you know, paying him. So he didn't trust me
24  any more.
25  Q. All right. Now, Mr. Alphonso Norman, how long have you

## Page 265

1  known him?
2  A. I have known him quite a while.
3  Q. Earlier than 1998?
4  A. Yeah, I had been knowing him, I don't know exactly but I
5  have known him before '98.
6  Q. What, if anything -- what, if any, is your relationship
7  with Mr. Norman?
8  A. He is a good friend. I mean I know him well.
9  Q. Did you ever have any drug dealings with Mr. Norman?
10  A. Alphonso Norman didn't sell me any drugs but Alphonso
11  Norman used to work for me a long time ago.
12  Q. All right. So how long ago would that be?
13  A. I think it was like in -- when he was in high school I
14  think, and then I don't -- I think it was in the 90s, yeah,
15  in the 90s, like early 90s. But after he got his business and
16  stuff established he didn't want to deal with me.
17  Q. So you said he was buying it from you, you supplied him
18  with cocaine in the earlier time?
19  A. Yeah.
20      MR. MADISON: Judge, I am going to object.
21      THE COURT: What is your basis?
22      MR. MADISON: I believe he is talking about a period
23  of time which is substantially way outside of the time of the
24  alleged conspiracy in this came case, number one, and
25  secondly, I think he is talking about acts that if, in fact,

## Page 266

1  they did occur, which we deny, would have happened while I
2  think he said the person was in high school which he would
3  have been a juvenile at that point in time.
4      THE COURT: Do you intend to get into any of those
5  specific acts, Mr. Brown?
6      MR. BROWN: No, Your Honor.
7      THE COURT: Objection sustained.
8  Q. So afterwards you were at the location on 4th Street; is
9  that correct?
10  A. Yes, sir.
11  Q. Prior to that, are you aware of any relationship with
12  Mr. Peralte and Mr. Norman --
13  A. I had fired Peralte because he had bad product and I am
14  assuming that Alphonso Norman.
15      MR. MADISON: I am going to object to any assumption
16  that he is going to try to testify to.
17      THE COURT: Sustained.
18  Q. Don't need you to assume, I want you to tell us what you
19  know, okay.
20  A. Well, I know that him and Black, you know, started, you
21  know, seeing each other. I don't know what they was doing but
22  I know they started dealing with each other. I didn't see
23  firsthand what they was doing but I am assuming that they --
24      MS. JAMES: Objection, Your Honor, move to strike,
25  he is just clearly speculating.

## Page 267

1      THE COURT: Don't tell us what you assume, only tell
2  us what you know, Mr. James. Objection sustained.
3  Q. As it relates to -- you were present on the day of the
4  search warrant; is that correct?
5  A. Yes, sir.
6  Q. Prior to that, in the week or so prior to that, had you
7  had any dealings with Mr. Peralte directly?
8  A. Yeah. About six or seven days before then I came over,
9  talked to Peralte and I wanted to sell him my BMW. And he
10  said no, I didn't have to sell my BMW, he said I had to get
11  some sales, get him some sales for some powder that it would
12  be okay, I could get some money like that, because I was dead
13  broke.
14  Q. Did you do that?
15  A. Yeah, I did that. I sold the product, about a key and a
16  half, a key or something like that.
17  Q. How did that happen? Where were you in relation to Mr.
18  Peralte?
19  A. We was on the east side of Montgomery.
20  Q. Okay. I guess what I am asking is, were you at a
21  residence?
22  A. Yeah, we was in Alphonso Norman's residence.
23  Q. Afterwards did you have an opportunity to talk with Mr.
24  Peralte about the drugs that were found in that residence on
25  4th Street?

## Page 268

1  A. We went back to -- when we got arrested I said if you
2  had four keys, because I was assuming that it was his dope,
3  why didn't you flush it.
4      MS. JAMES: Objection again, Your Honor, he is still
5  assuming.
6      THE COURT: Mr. James, don't tell us what you
7  assume. Objection sustained.
8  A. I can't say for certain that it was his drugs, but I am
9  thinking that it's his drugs.
10     MS. JAMES: Objection.
11     THE COURT: Objection sustained.
12 Q. Let me ask you the question and you answer the
13 questions, okay. You had arranged with Mr. Peralte --
14     MS. JAMES: Objection to the leading, now he is
15 telling him the answer.
16     THE COURT: Overruled.
17 Q. You stated that you had arranged with Mr. Peralte to
18 line up customers with cocaine, right?
19 A. Right.
20 Q. You were present on the day of the search warrant; is
21 that correct?
22 A. Right.
23 Q. Now, did you have any discussions -- not what you
24 assumed, did you have any discussion?
25 A. Yeah, we had a discussion. He asked me did I have any

## Page 269

1  sales and I told him not right now.
2  Q. Did you have any discussions about the location of the
3  cocaine?
4  A. Did what now?
5  Q. Did you have any discussions about the location of the
6  cocaine at the house?
7  A. Oh, no, he didn't tell me that he had any drugs there,
8  but when we got back to the jail, because he had called me
9  from Atlanta, I asked him why he didn't flush the drugs.
10 Q. Thank you, Mr. James, I don't have any further questions
11 for you, the defense lawyers might.
12     CROSS-EXAMINATION
13 BY MS. JAMES:
14 Q. Mr. James, my name is Susan James and I represent Mr.
15 Peralte. I have a few questions for you. Now, as I
16 understand it you say that you and Mr. Peralte had a falling
17 out sometime around 2000 or 2001 because he deemed you to be
18 untrustworthy?
19 A. Yes, ma'am.
20 Q. In fact, you have not only been untrustworthy to people
21 you know, you have been untrustworthy to courts before,
22 haven't you?
23 A. Why would you say that?
24 Q. Well, you have a felony conviction from Orange County,
25 Florida, don't you?

## Page 270

1  A. Yes, ma'am.
2  Q. For trafficking in cocaine in excess of 28 grams, right?
3  A. Yes, ma'am.
4  Q. And in February of 1995 you were placed on probation
5  there, weren't you?
6  A. Yes, ma'am.
7  Q. And you stood there before a Judge down in Florida and
8  you told him what you did and you said you had been involved
9  in drug dealing, right?
10 A. Yes, ma'am.
11 Q. And you said you would do whatever the Court would allow
12 you do if they would put you on probation, right? Didn't you
13 get probation?
14 A. Yes, ma'am.
15 Q. And there were certain conditions of that probation that
16 you were to comply with, right?
17 A. Yes, ma'am.
18 Q. And you signed an agreement with the Court indicating
19 that you would do what the Court wanted you to do.
20 A. Yes, ma'am.
21 Q. But you didn't do that, did you?
22 A. I guess if you say I didn't, I didn't.
23 Q. Well, did the Court tell you that you wouldn't commit
24 any crimes --
25 A. Yeah.

## Page 271

1  Q. -- while you were on probation?
2  A. Yeah.
3  Q. And in November of 1996 while you were still on that
4  Florida probation you got caught running from the police up
5  here with a gun, didn't you?
6  A. Yeah.
7  Q. So that was an a violation of your probation, right?
8  A. Right.
9  Q. So what you promised to do to that court down there in
10 Florida, you didn't do.
11 A. I think I was off probation. I am not certain, because
12 I didn't stay on probation that long, but if I wasn't, no, I
13 didn't do what they say.
14 Q. And certainly based on what your testimony is here today
15 you continued to be involved in drugs pretty much from the
16 point of 1995 on, haven't you?
17 A. Yes.
18 Q. Because that's how you made your living, right?
19 A. Yes.
20 Q. No job.
21 A. No.
22 Q. No taxes.
23 A. No.
24 Q. And you remember -- you know Mr. Wingard over here,
25 don't you, this fellow sitting right here with the task

## Page 272

1  force?
2  A. Yes, ma'am.
3  Q. You remember him knocking on your door in 2002, July of
4  2002?
5  A. Yes, ma'am.
6  Q. Telling you they had information you had been selling
7  drugs to undercover people?
8  A. Yes.
9  Q. And at that time in 2002 you told this man let me call
10 my lawyer, I want to cooperate with you, didn't you?
11 A. Yes, ma'am.
12 Q. But instead of cooperating with them you continued to
13 sell drugs.
14 A. No, I didn't. No, I didn't continue to sell drugs. They
15 scared me, I stopped selling drugs.
16 Q. Well, you say here today that you continued -- or you
17 met Mr. Peralte sometime ago back September or August of 2003
18 and that you went around town selling drugs with him, didn't
19 you?
20 A. Yeah. I was broke, yeah. But I am saying I had stopped.
21 I did stop selling drugs. They scared me, I stopped selling
22 drugs. I only started back selling drugs when I didn't have
23 any more money.
24 Q. Well, what did you do -- when he came in July of
25 2002 -- what did you do from July of 2002 until August of

## Page 273

1  2003 for work?
2  A. I had a car lot.
3  Q. You had a car lot?
4  A. Yeah, and I was collecting money off my cars.
5  Q. Where was your car lot?
6  A. On the corner of Mount Meigs and Madison Avenue.
7  Q. What was the name of it?
8  A. Kenny's Cars.
9  Q. Where did you get the money to run that car lot?
10 A. You already know the answer.
11 Q. Drugs?
12 A. Yeah.
13 Q. All right. So you are saying that you were working in
14 the car business during that period of time and you went
15 broke in the car business?
16 A. Yeah, I went broke in the car business.
17 Q. So it's your testimony here today under oath that from
18 July of 2002 until you ran into Mr. Peralte that you were not
19 involved with drugs.
20 A. As far as my knowledge, yeah.
21 Q. As far as your knowledge, that means you are not sure,
22 right?
23 A. I don't know, I am waiting to see what you are fixing to
24 ask me.
25 Q. Is that so you can try to figure out an answer?

## Page 274

1  A. I don't know. I mean, I dibble and dabble here and
2  there, but I am saying for the most part I stopped selling
3  drugs. I wasn't in it like on a day-to-day basis trying to
4  get this money and that money and this money. I basically
5  shut down all operations, I wasn't really selling every day.
6  Q. You were selling some but not every day?
7  A. I probably -- where I was selling every day I went from
8  selling every day to probably once every now and then, yeah.
9  Q. So Mr. Wingard scared you to the point that you decided
10 you might be looking at being prosecuted, right?
11 A. Right.
12 Q. So you decided you better let things cool off, right?
13 A. Right.
14 Q. Now, as I understand it based on your testimony, and I
15 am a bit confused about it because you said at first Mr.
16 Peralte was selling you bad product.
17 A. Right.
18 Q. And you fired him because he was selling you bad
19 product, right?
20 A. Right.
21 Q. Now, at the same time you say you were in to him for 12
22 thousand dollars, in essence that you had cheated him out of
23 money, right?
24 A. Right.
25 Q. So on one hand you are firing him and on the other hand

## Page 275

1  you are in conflict with him because you owe him money.
2  A. Right.
3  Q. Okay. So the poor quality of the cocaine didn't matter
4  to you, did it?
5  A. Yeah, it mattered to me because guys was like arguing
6  about the product. Yeah, it mattered to me. That's why I had
7  ran off with the product because I felt like he owed me.
8  Q. All right. Well, give me some time frames, will you, in
9  relation to when you fired him, based on your words, you
10 fired him. And when this was that you cheated him or ran off
11 with his product? How close were those things in time?
12 A. I fired him first, I ran off second.
13 Q. So what year would it be that you fired him?
14 A. I don't know exactly what year, Ms. James, I really
15 don't. I know it was in 2001 or the end -- or beginning of
16 2001 to somewhere in there, but I know I had stopped dealing
17 with him when I had opened up the car lot, I had stopped
18 dealing with him, I wasn't dealing with him, I didn't have no
19 reason to deal with him.
20 Q. All right. You say you fired him first, that was poor
21 quality?
22 A. Yeah,.
23 Q. That's 2000, 2001, your best estimate, right?
24 A. Right.
25 Q. When was it then that you had another dealing with him

## Page 276

1 to run off with the, quote, product?
2 A. He called me shortly after that in 2001 and he brought
3 some product by the house and I paid him one time, the second
4 time he brought it by and I ran off. I was going to Miami to
5 buy my own product and that's where I bumped into him at.
6 Q. Because you had connections in Miami that you could go
7 to to buy.
8 A. I never said I was innocent. Yeah, I had connections in
9 Miami too.
10 Q. What you are saying is even though you fired him because
11 you were having problems with your customers that you
12 continued to get product, is that what you are saying?
13 A. From him, no I didn't continue. When I fired him I
14 didn't get any product from him. It just so happened we ran
15 into each other and he said he was going to give me another
16 chance and he gave me another chance and I took advantage of
17 it.
18 Q. Well, you took advantage of it to the extent that you
19 were still selling this bad stuff around town to the people
20 that wouldn't buy it from you before?
21 A. He didn't have bad product all the time, he had bad
22 product at certain points in time.
23 Q. All right. What about -- you say that you didn't have
24 any dealings with him then from 2000 or 2001 until September
25 of 2003, right?

## Page 277

1 A. Right.
2 Q. And you are saying that just out of the blue --
3 A. Not out of the blue. I got in touch with him in some
4 form or fashion. I forgot exactly how but we got in touch
5 with each other and I was trying to sell him my BMW and he
6 said he didn't want my car. I said okay, cool. He didn't
7 want my car. He said get him some sales and I will give you
8 some money. That's exactly what he said.
9 Q. So you are suggesting that he is a source of drugs,
10 source of cocaine, and are you suggesting to me it's that
11 hard to sell drugs in this city, that he has got to come to
12 you to get help?
13 A. Don't get me wrong, Black or Peralte, he liked me so
14 that's why he gave me a chance to -- again.
15 Q. He liked you?
16 A. He knew I was broke so he took a chance on giving me
17 some more drugs.
18 Q. He liked you after you fired him?
19 A. Right.
20 Q. He liked you after you cheated him?
21 A. After I fired him it took a while for him to deal with
22 me, he wouldn't deal with me for a long period of time. Then
23 he took a chance on dealing with me and I ran off with the
24 money so he said -- that's why he was telling jokes, you
25 know, when I had came over there, because he was like every

## Page 278

1 time I give you a chance or feed you, he told a snake joke.
2 Q. At that point, if we are to believe you, you still owed
3 him six thousand dollars.
4 A. Right.
5 Q. So he comes to you again, calls you in Atlanta, and I am
6 confused because at first you said that he called you while
7 you were in Atlanta and then you said --
8 A. I never said anything different. I am saying he called
9 me on my cell phone while I was in Atlanta, Georgia.
10 Q. I thought you said a few moments ago that he was in
11 Atlanta, you are saying it was a phone call?
12 A. No, I was in Atlanta.
13 Q. And you are totally broke, what were you doing in
14 Atlanta?
15 A. I had just left the night before a club called Strokers,
16 it's a strip club. I left there, went to a hotel, after I
17 went out to the hotel, fixing to leave the hotel he called
18 me, asked me what's happening.
19 Q. How many cocaine sources did you ever in Atlanta in your
20 hayday?
21 A. I mean, a hundred percent right, whatever you are
22 saying, I am a drug dealer, you are right.
23 Q. My question was a specific question, did you have
24 cocaine sources in Atlanta?
25 A. I have had cocaine sources in Atlanta, but this

## Page 279

1 particular time, no, I didn't. If you are trying to lead to
2 my buying drugs, no, I did not.
3     MS. JAMES: Your Honor, I would ask that you ask him
4 to stop arguing with me.
5     THE COURT: Mr. James, please listen to the
6 questions and answer the questions that she asks.
7 Q. So at times you have had drug sources in Atlanta.
8 A. Once or twice I have had a couple of connections in
9 Atlanta.
10 Q. So you are totally broke, you have gone broke in the car
11 business.
12 A. Right.
13 Q. And you have just taken a little vacation over to
14 Atlanta when you were at the strip club?
15 A. No, I was staying there, I had been there probably about
16 three months.
17 Q. So who were you living with in Atlanta?
18 A. I was living with a girl named Melissa, staying in
19 hotels too.
20 Q. If you were totally broke who was paying for your
21 hotels?
22 A. When I am saying broke, I mean I don't have a lot of
23 money, I have just got enough money just to live. But as you
24 know in the drug business you have plenty of money but I
25 didn't have plenty of money any more, so I just had a little

Page 280

1  bit of money, just to live on.
2  Q. Three months in hotels in Atlanta?
3  A. Well, I was staying in hotels and I was staying at
4  Melissa's house.
5  Q. But not selling any drugs?
6  A. No, I wasn't selling any drugs.
7  Q. All right. So then out of the blue he calls you, says he
8  wants to help you, right?
9  A. Right.
10  Q. And at that point he comes to -- you leave Atlanta and
11  come to Montgomery, how does that work?
12  A. When he called me he told me he was going -- to beep him
13  when I get to Montgomery, but when I got on the east side of
14  Montgomery he had called me back.
15  Q. Who did you sell to on the east side of Montgomery?
16      MR. BROWN: Objection to relevance, Your Honor.
17      MS. JAMES: I think it goes to his credibility, he
18  has tried to implicate Mr. Peralte in drug sales that he
19  hooked up, I think it's pertinent.
20      THE COURT: Overruled.
21  Q. You can answer.
22  A. I didn't sell any drugs on the east side. I said when I
23  got on the east side he had called me. And when he called me
24  he said where are you at? I said on the east side. I lived
25  on the east side anyway.

Page 281

1  Q. Where did you live?
2  A. I lived on Plantation Crossing.
3  Q. Okay. Plantation Crossing, where is that?
4  A. That's in Sturbridge Plantation.
5  Q. At that point in September of 2003 you were living in
6  Sturbridge?
7  A. No, I was staying in a hotel then, but I am saying I
8  lived on the east side.
9  Q. Oh, you used to live in Sturbridge?
10  A. But I was staying in a hotel on the east side still. But
11  you are misunderstanding me, when I got into Montgomery I was
12  on the east side of Montgomery driving, he asked me where are
13  you, and I said on the east side. He said come to the west
14  side.
15  Q. I don't care which side you were on, east or west, tell
16  me who you hooked up with to sell drugs to that you contend
17  Mr. Peralte brought to town, let me have a name.
18  A. Me and him -- me and Peralte went around and sold drugs
19  to various people. I really don't recall their names but we
20  rode around.
21  Q. Mr. James, this is important because you said that Mr.
22  Peralte had to come to you to get some sales to be able to
23  push his product.
24  A. He didn't have to come to me to get sales, he could have
25  sold the drugs on his own.

Page 282

1  Q. Excuse me, sir, let me finish my question, please.
2      THE COURT: Let him answer, Ms. James.
3  Q. Go ahead.
4  A. He didn't have to come to me to sell any drugs, he could
5  have sold the drugs on his own because he had been doing good
6  selling drugs by hisself. He came to me because he was trying
7  to do me a favor to help me get some money in my pocket. And
8  he stated that, he said, you know, I am going to look out for
9  you, you are broke, don't run off, you know, but he wouldn't
10  let me sell the drugs by myself.
11  Q. Okay.
12  A. So he would go with me to various places on the west
13  side.
14  Q. All right. Okay. Tell me where you went on the west
15  side. These are people you knew, these were customers you
16  had; correct?
17  A. Right.
18  Q. Tell us who they are.
19  A. We started out with a dude named Curt.
20  Q. Curt?
21  A. Curt basically did all the dealing for us.
22  Q. Where does Curt live?
23  A. He was living at some address, I don't know exactly
24  where he live now, I have been locked up ten months.
25  Q. Where was he living then?

Page 283

1  A. He was living on the west side off of something, I don't
2  know. I don't know exactly what the name of the street.
3  Q. Mr. James, didn't you grow up in Montgomery?
4  A. Yeah, but I don't know. I don't know the name of the
5  street for real. I can't think of the name of the street.
6  It's right off of the -- I can't think of the name of the
7  street. It's right off of the interstate.
8  Q. Well, when you debriefed with Mr. Wingard and you
9  talked --
10  A. He didn't ask me the name of the street, he already knew
11  the name of the street.
12  Q. So he knows who Curt is?
13  A. Yeah, he knows who Curt is.
14  Q. So if we ask him he can tell us Curt's full name and
15  where Curt lives?
16  A. Yeah.
17  Q. When you were interviewed by him back some months ago,
18  by Mr. Wingard, you specifically told him about Curt, right?
19  A. Yeah, I told him about Curt.
20  Q. And you told him generally where to find Curt?
21  A. Yeah. He already knew where to find Curt.
22  Q. What is Curt's street name?
23  A. Curt.
24  Q. That's all they call him?
25  A. Yeah.

Page 284

1  Q. And how long have you known Curt?
2  A. I have known him quite a while.
3  Q. How long is quite a while?
4  A. Probably about ten years.
5  Q. And you don't know his last name?
6  A. I mean I know his last name, his name is Curtis Carter.
7  Q. Car?
8  A. Carter.
9  Q. Carter?
10 A. Yeah.
11 Q. Where is Mr. Carter today?
12 A. I don't know.
13 Q. You figure he's still around Montgomery?
14 A. Yeah.
15 Q. Okay. So rather than going around all over town you just
16 went to Curt and said here, how about selling this stuff for
17 us, right?
18 A. Basically.
19 Q. So Mr. Peralte was concerned about your dishonesty and
20 he didn't want to give you any drugs on the front, right?
21 A. Right.
22 Q. Tell the jury what the front means.
23 A. On consignment.
24 Q. All right. But you are suggesting today, or you are
25 saying today that he allowed you to front his drugs to Curt?

Page 285

1  A. While he was there.
2  Q. I'm sorry?
3  A. While he was there and present, yeah.
4  Q. So he doesn't know Curt, right?
5  A. Yeah.
6  Q. He knows you.
7  A. He knows Curt too.
8  Q. Then why did he need you to take him and introduce him
9  to Curt?
10 A. Because he tried to have a limited involvement with less
11 peoples as possible.
12 Q. So he didn't want Curt to know he was selling drugs but
13 yet he went with you?
14 A. Curt knew him because he knew him from our past
15 relationship.
16 Q. What I am trying to get to is you are saying he didn't
17 want to be exposed, he wanted to keep his involvement with
18 drugs confidential, right?
19 A. Somewhat, but he still was out there on Front Street,
20 but he tried.
21 Q. Well, he went to Curt with you if you are telling the
22 truth.
23 A. Yeah, he did.
24 Q. And he wouldn't front you drugs but he fronted Curt
25 drugs after you took him over there?

Page 286

1  A. No, Curt bought some of the drugs and sold some here and
2  there, and whatever I said he basically did.
3  Q. Okay. So how did it go that you all got the money back
4  from Curt?
5  A. I got the money back. Ms. James, me and -- I have sold a
6  lot of drugs for Peralte, me and him had established a good
7  relationship on making money so we made a lot of money
8  together. So the little money that I beat him out of, it
9  really didn't matter.
10 Q. Okay. My question to you is, how did you and Mr. Peralte
11 collect the money from the drugs that were sold by Curt?
12 A. I collected the money.
13 Q. You collected it?
14 A. Yeah.
15 Q. When was that?
16 A. The following -- whenever he left, the following day
17 whenever Curt called me I got the money.
18 Q. And what did you do with the money?
19 A. If I gave it to him I gave it to him, if I didn't I kept
20 it.
21 Q. So what you mean is you may not have given Mr. Peralte
22 the money you got from Curt?
23 A. Maybe or maybe not. But the money that initially that he
24 bought the drugs with, I paid him with it, yeah. I gave him
25 the majority of it.

Page 287

1  Q. So you are saying then that there was yet another loss,
2  that you beat Mr. Peralte out of money back again in
3  September or August of 2003, is that what you are saying?
4  A. No, I am not. Yeah, I probably was at a loss because I
5  probably owed him about 12 thousand dollars that I didn't pay
6  him, if you want to ask, yeah, okay, cool.
7  Q. Based on your testimony, just what you said here today,
8  on September --
9  A. After you are busted --
10 Q. Please --
11       THE COURT: Mr. James, listen to the question, then
12 you can answer.
13 Q. My question to you is based on your testimony today,
14 that on the day of the arrest, on September the 25th of 2003,
15 on East 4th Street --
16 A. Right.
17 Q. -- that you are over there with four kilos of cocaine or
18 close to four kilos of cocaine and you owe this man at that
19 point 18 thousand dollars?
20 A. I didn't say that.
21 Q. Well, you said you owed him still six thousand from the
22 deal in 2001.
23 A. He told me don't even worry about that.
24 Q. And he told you that day don't worry but the 12
25 thousand?

Page 284 - Page 287

## Page 288

1   A. He told me --

2   Q. Excuse me, sir, I am trying to finish the question,

3   please let me finish. You just said you probably beat him out

4   of 12 thousand on the Curt transaction; correct?

5   A. Right.

6   Q. So if you take the six thousand from the 2001 deal and

7   you multiply -- or you add that to the 12 thousand, would you

8   agree that would be 18 thousand?

9   A. Yeah.

10   Q. So on the day of the arrest when you all are over there

11   at 4th Street, you owe this man 18 thousand dollars.

12   A. Yeah. Yeah, yeah.

13   Q. Did Mr. Peralte make that call to you in Atlanta on the

14   cell phone?

15   A. Yes. I am assuming, yes, he did.

16   Q. No, I am saying were you using a cell phone?

17   A. Yeah.

18   Q. And you hadn't had contact with him at that point you

19   said from 2001 until sometime around --

20   A. The previous six or seven days we had contact, I tried

21   to sell him my BMW. That's when we got all the numbers, he

22   got my number, I got his beeper number. That's when we got

23   in contact with each other. I never had his cell phone but

24   he always had my cell number. I only had a beeper number to

25   get in touch with him.

## Page 289

1   Q. So you had the same cell number since 2000?

2   A. No, I mean my cell number changed from here to there.

3   Q. Well, your cell number changed, how was it that if you

4   didn't have contact with Mr. Peralte from 2001 until 2003 he

5   got your new cell number?

6   A. I don't know where he got it from. He have his ways, ask

7   him how he got it, I don't know.

8   Q. Let's talk for a minute about your agreement with the

9   government. You were arrested on September the 25th of 2003;

10   is that right?

11   A. Yeah.

12   Q. And by October, less than a month, you were

13   contemplating and working out a possible agreement with the

14   government, weren't you?

15   A. Yeah.

16   Q. You remember that they provided your lawyer a proffer

17   letter?

18   A. Yeah.

19        MS. JAMES: Judge, may I approach?

20        THE COURT: Yes.

21        MS. JAMES: Judge, may I approach the witness?

22        THE COURT: Yes.

23   Q. Mr. James, I am going to show you what I have marked for

24   identification purposes as Defendant Peralte's Exhibit 2 and

25   ask if you can identify this?

## Page 290

1   A. You want me to just look at it or read it all?

2   Q. Does it appear to be a letter to you?

3   A. Yeah.

4   Q. And does it appear to bear your signature and that of

5   your lawyer?

6   A. Yeah.

7        MS. JAMES: At this time I would move for admission

8   of Peralte's 2, the proffer letter.

9        MR. MADISON: May I see that?

10        MR. BROWN: No objection from the government, Your

11   Honor.

12        MR. MADISON: No objection.

13        MS. JAMES: Your Honor, may I publish it?

14        THE COURT: Without objection Defendant Peralte's

15   Exhibit Number 2 is admitted.

16   Q. I am going to direct your attention to the screen, Mr.

17   James. This appears to be a letter, or it is a letter to you

18   from the United States Attorney's office directed to you

19   through your lawyer, Mr. Petersen, right?

20   A. Right.

21   Q. And that's Mr. Petersen that's sitting back here in the

22   back of the courtroom, right?

23   A. Right.

24   Q. He is your lawyer in this case; correct?

25   A. Yes, ma'am.

## Page 291

1   Q. Now, this letter set forth some conditions under which

2   you could cooperate with the government, did it not?

3   A. I hadn't read the letter yet, so I don't know what the

4   letter says. I mean only thing I can go by is what you are

5   telling me because I didn't read the letter.

6   Q. But you signed it?

7   A. Yeah, but my lawyer told me to sign it, it was okay to

8   sign it, I signed it.

9   Q. Did you understand that you could sit down with the

10   government based on this letter and this agreement, you could

11   sit down with Mr. Wingard, with Mr. Brown and you could tell

12   them anything about your drug activity or anybody else's that

13   you contend that you were involved with and that that

14   couldn't be used against you in your case unless you violated

15   the agreement?

16   A. Oh, okay.

17   Q. You understand that?

18   A. Yeah.

19   Q. So if you told them you were involved with a thousand

20   kilos a week, that wasn't going to be used against you if you

21   didn't breach your agreement.

22   A. I wouldn't do that.

23   Q. You could have done that though.

24   A. But I wouldn't do that.

25   Q. But you agree you could have, you had the protection.

Condense It™

Page 292

1  A. Yeah, but I wouldn't do that though.
2  Q. Okay. Now, that was in October. You again let the
3  government kind of know October of 2003 that you wanted to
4  cooperate kind of like you did back in July -- excuse me --
5  A. July, 2002.
6  Q. Actually October of 2002 is when you told them you
7  wanted to cooperate, I misstated that earlier, they came to
8  you in July.
9  A. But the reason why I did that, I am not the kind of
10 person that would want to be on this -- be in this position,
11 I don't want to be in this position. I don't want to be
12 testifying on anybody.
13 Q. All right.
14 A. I never testified before now on anyone, and I don't like
15 doing it.
16 Q. All right. In October of 2002 that's when you told them
17 you wanted to cooperate, right?
18 A. When they came to my house and told me I was going to be
19 in a hundred to two hundred key conspiracy it scared me, I
20 said hey, I am not trying to fight with you.
21 Q. Well, a hundred to a two hundred key conspiracy at that
22 time you understood that to mean life in the penitentiary
23 without parole, right?
24 A. Right.
25 Q. Dead men walking, right?

Page 293

1  A. Right.
2  Q. So a year later your worst nightmare, you are sitting in
3  the jail having been arrested for being over at 5th Street --
4  4th Street on September 25th, 2003, right?
5  A. Right.
6  Q. And at that point, October, a year later, you said hum,
7  maybe I will cooperate. You thought about it again, didn't
8  you?
9  A. Well, I thought about taking it to trial. I talked to a
10 lot of guys in the cell, talked to my lawyer, the lawyer told
11 me I had a 35 percent chance of winning.
12 Q. Well --
13 A. So I said well, I would rather go on a P-I and try to
14 get as less time as possible.
15 Q. Because you didn't want to get life without parole.
16 A. I wasn't facing life, I was facing I think the Judge
17 told me ten to life.
18 Q. Ten to life?
19 A. I think that's what he said.
20 Q. You understand, Mr. James, having the prior conviction
21 for a drug felony that if the government so chose they could
22 have charged you under Title 21 U.S.C. Section 851, you knew
23 that, that was that prior offense category that could bump
24 you up to life without?
25 A. No, I didn't know that.

Page 294

1  Q. You didn't. But you haven't been charged with that, have
2  you?
3  A. I hope not.
4  Q. And you also understood that under the guidelines -- you
5  know what the sentencing guidelines are, don't you?
6  A. Yeah.
7  Q. Under the sentencing guidelines based on your prior
8  arrest history that you could have been considered a career
9  offender, did you know that?
10 A. I only got one felony, so that's the only felony I ever
11 had, I had it nine and a half years ago so I didn't have no
12 idea I could be a career felony.
13 Q. So you understood the sentencing guidelines enough to
14 know you didn't qualify for a career offender, is that what
15 you are saying?
16 A. I didn't think I would be a career felony.
17 Q. Now, the plea agreement --
18       MS. JAMES: Judge, may I approach the witness?
19       THE COURT: Yes.
20 Q. I am going to show you what I have marked for
21 identification purposes as Peralte's Exhibit 3 and ask you if
22 that document is one that you recognize?
23 A. Yeah.
24 Q. That appear to be your plea agreement?
25 A. Yeah.

Page 295

1  Q. And at the back of that agreement does it bear your
2  signature and that of your lawyers?
3  A. Yes, ma'am.
4  Q. And it was dated June 21st, 2004; is that correct?
5  A. Yes, ma'am.
6  Q. So that's the day you entered your plea agreement with
7  the government?
8  A. Yes, ma'am.
9       MS. JAMES: At this time, Your Honor, I would move
10 for admission of Peralte's 3.
11      MR. BROWN: No objection from the government.
12      MR. MADISON: No objection, Your Honor.
13      THE COURT: Without objection Defendant Peralte's
14 Exhibit 3 is admitted.
15      MS. JAMES: May I publish it, Your Honor?
16      THE COURT: Yes.
17 Q. I would like to go over some of the agreement that you
18 have with the government, Mr. James.
19 A. Yes, ma'am.
20 Q. Specifically on page three of this agreement, paragraph
21 C, can you see that on your screen where it starts with
22 paragraph C right there?
23 A. It says the parties stipulate the drug quantity.
24 Q. Reread it so they can understand it.
25 A. The parties stipulate that the drug quantity for which

## Page 296

1  the Defendant, and I can't see anything else. And then says
2  responsible for nine hundred 83 grams of -- of cocaine
3  hydrochloride, and you have got it too far over.
4  Q. I'm sorry.
5  A. And two point six grams of cocaine base.
6  Q. All right. So do you understand that there was in excess
7  of three kilos at that house that day?
8  A. Yeah.
9  Q. And do you understand that you being charged in this
10  conspiracy that the government could have put down there in
11  excess of three thousand grams.
12  A. Yeah.
13  Q. But instead, you and your lawyer, in exchange for you
14  coming up here and testifying for the government, limited
15  your cocaine quantity to nine hundred and 83 point one grams,
16  didn't they?
17  A. Yes.
18  Q. And that's because by limiting it, it probably will help
19  you at your sentencing.
20  A. Yes.
21  Q. Because that's the reason you do that, right?
22  A. Yeah, that's the reason why I did it, yeah.
23  Q. And the two point six grams of cocaine base you just
24  pled to that just because, didn't you?
25  A. Yes.

## Page 297

1  Q. Because you didn't even know it was up there on that
2  shelf, did you?
3  A. I didn't know the four keys was in the house to be
4  honest with you. I didn't know anything was there. I mean I
5  didn't know anything. But I pled to it to get lesser time,
6  yeah.
7  Q. All right. So you pled guilty to something you didn't
8  do, is that what you are saying?
9  A. In a sense. When I talked to everybody that I talked
10  to, they said if you went over there to get something you are
11  guilty, so I went over there to get some so I said I was
12  guilty.
13  Q. Now, in that agreement with the government, if you get a
14  sentence that you are not satisfied with you don't have an
15  opportunity to appeal, do you?
16  A. No. Well, it says in the plea agreement if they over
17  sentence I can appeal, yeah.
18  Q. If the Judge were to upward depart?
19  A. Yeah. I could appeal, yeah.
20  Q. But if the Judge gives you something within that
21  guideline range you can't appeal, right?
22  A. Right.
23  Q. And you can't do a 2255, a collateral attack either, can
24  you?
25  A. I don't know what a 2255 is.

## Page 298

1  Q. Let me direct your attention to page five of that
2  agreement, it says Defendant waives appeal and collateral
3  attack.
4  A. Oh, okay.
5  Q. And I believe it takes out as an exception ineffective
6  assistance of counsel or prosecutorial misconduct, but other
7  than that you can't challenge your conviction after it
8  becomes final, do you understand that?
9  A. Yes, ma'am.
10  Q. So your future and your time in the penitentiary is
11  going to be dependent upon the government's evaluation of
12  your cooperation, correct?
13  A. Yes, I guess, if that's what you are saying.
14  Q. In other words, if the government thinks that you do a
15  good job in trying to convict these two fellows over here and
16  they ask the Judge to reward you for that, that's what you
17  are going to have to live with, isn't it?
18  A. Yes, but I came to court -- when I came to court I came
19  to court to tell the truth. I am not trying to hurt nobody,
20  but at the same time I am trying to get less time out of this
21  situation as possible.
22  Q. And I understand why you are here.
23  A. I didn't come to lie or make up no stories on anyone, I
24  wish I wasn't even in this situation.
25  Q. Well, you knew when you came here that your job today

## Page 299

1  was to give information that would be negative as to these
2  two folks sitting over here, right?
3  A. I came to tell the truth.
4  Q. But you knew that they were on trial.
5  A. I was hoping that they didn't go to trial.
6  Q. They didn't ask you to come in and talk about Curt
7  today, did they?
8  A. No.
9  Q. All right. Now, did -- I mean you understand that if
10  the government doesn't think that you are doing what you have
11  agreed to do that they could prosecute you for all sorts of
12  things, including the things that you have told them about.
13  A. Well, that's what happened, that's what happened.
14  Q. But you understand that, the government is the only one
15  that can file a motion with the Court to get your sentence
16  reduced; do you understand that?
17  A. Yeah.
18  Q. It's in their sole discretion. Mr. Brown, it's in his
19  discretion as an Assistant U.S. Attorney to give you a score
20  or rate you in terms of how good or how bad you did today,
21  right?
22  A. Right.
23  Q. And then it's your hope that he will take that
24  information, he will put it in a motion and he will file it
25  with the Court and then it will be up to the Judge to

## Page 300

1 sentence you to whatever.
2 A. Right.
3     MS. JAMES: Judge, may I have just a minute?
4 (pause)
5     MS. JAMES: Your Honor, that's all the questions I
6 have.
7     THE COURT: Mr. Madison, Mr. Arrington?
8     MR. MADISON: We have no questions, Your Honor, for
9 this witness.
10     THE COURT: Any questions, Mr. Brown?
11     MR. BROWN: Just a couple, Your Honor.
12     REDIRECT EXAMINATION
13 BY MR. BROWN:
14 Q. Mr. James, Ms. James, Mr. Peralte's counsel was talking
15 about how -- at least the way she put it, you had to do a
16 good job against these two guys; is that accurate how she put
17 it to you?
18 A. Yeah, that's how she put it.
19 Q. Would you look at paragraph six right there and just
20 find anywhere in that paragraph that says you have to do
21 anything against anybody specifically?
22 A. What I read there, it says Defendant agrees to cooperate
23 fully and testify truthfully, and that's what you and Mr.
24 Wingard told me to do is just tell the truth. And I didn't
25 have to tell any stories, just tell the truth. If I don't

## Page 301

1 know, say I don't know.
2 Q. Ms. James also talked to you about the proffer letter in
3 this case. If we can see it here. Can you read that?
4 A. It say your decision to grant this or these interviews
5 is entirely voluntary and not result of coerce or threats or
6 intimidation of any kind. Y'all didn't threaten me, y'all
7 didn't intimidate me, I did it on my own.
8 Q. Does it in paragraph four say that you have no promises
9 that you won't be prosecuted?
10 A. Yeah. It say you have no -- you have been informed and
11 understand there have been, and are absolutely no promises
12 that you will be prosecuted or that will receive any form of
13 immunity from prosecution, that you will receive a motion for
14 a downward departure or motion for reduction of sentence.
15 Yeah.
16 Q. Ms. James also asked you about a car lot. Do you recall
17 that?
18 A. Yes, sir.
19 Q. Did you ever sell a car to Mr. Peralte?
20 A. Yes, sir.
21 Q. Mr. James, that's what has been admitted as Government's
22 Exhibit 19, do you recognize that vehicle?
23 A. Yeah, that's my Grand Marquis.
24 Q. And who did you sell that car to?
25 A. Peralte.

## Page 302

1 Q. Thank you, Mr. James, I don't have any further
2 questions.
3     MS. JAMES: May I have a couple of follow-ups,
4 Judge?
5     THE COURT: Yes.
6     RECROSS-EXAMINATION
7 BY MS. JAMES:
8 Q. What year is that Grand Marquis, Mr. James?
9 A. A '98.
10 Q. 1998?
11 A. Yes, sir -- yes, ma'am.
12 Q. And when was it that you sold that to Mr. Peralte?
13 A. I don't know exactly what year I sold it to him but I
14 sold him that car and I sold him another car too.
15 Q. Tell me when. Did your business -- did you have a city
16 license for your business?
17 A. I had all the license for the business.
18 Q. Okay. And was it incorporated?
19 A. Yeah.
20 Q. And that was Kenny's Cars on Mount Meigs Road.
21 A. Right.
22 Q. And where was it that -- where did you buy the car?
23 A. I bought it from the auction in Montgomery, on the Troy
24 Highway.
25 Q. Okay. And what year was that?

## Page 303

1 A. I don't know, it was probably -- I don't want to exactly
2 say, it was in 2000 or -- I think it was in 2000.
3 Q. All right. If we were to obtain a copy of your business
4 license when would it say you started that business?
5 A. I don't know. I don't know exactly when, I know I got
6 license -- I was in the car business from '98 until 2003, or
7 2000 -- yeah, 2003.
8 Q. All right. I thought you said you got out of the drug
9 business in July of 2002 when Mr. Wingard came to you and you
10 were scared so you went to the car business?
11 A. No, I was always selling cars. I always sold cars. I
12 always did that.
13 Q. Okay. So you just quit selling drugs and just focused on
14 your car business?
15 A. Right.
16 Q. All right. But you believe that you had a business
17 license in '98?
18 A. I don't know if I did or I didn't. I know I had -- I got
19 license, I mean I don't know if I did or I didn't have it. I
20 didn't buy the car in '98, I bought the car in 2000. I know I
21 had a license in 2000.
22 Q. Okay. Did you buy the car from the auction when you were
23 actually located on Mount Meigs Road?
24 A. Yeah.
25 Q. All right. And --

## Page 304

1  A. Yeah, I believe I did.

2  Q. Did you take the title in your name?

3  A. No, I left it in my dealership name.

4  Q. So there should be a title, a title trace on that car

5  some way to say that it came from Kenny's Cars?

6  A. Yeah, it is.

7  Q. And for what price did you sell the car?

8  A. Probably about five thousand, 45 hundred, five thousand.

9  Q. All right. And that was in you think 1998?

10  A. No, I know it wasn't in '98, it was in 2000.

11  Q. Okay.

12  A. Or 2001, somewhere along in there is when I sold the

13  car.

14  Q. And what would you estimate the mileage was on the car

15  when you sold it?

16  A. I don't know. I don't really know. I don't have no idea.

17  Q. Did you actually do a bill of sale for the car?

18  A. No, I didn't.

19  Q. Well, how did you then sell it to Mr. Peralte?

20  A. He just got the title.

21  Q. Oh, okay. So you just got the money and you gave him the

22  title.

23  A. Right.

24  Q. And just left it up to him to do whatever he needed to

25  do?

## Page 305

1  A. That's it.

2  Q. You didn't do anything with regard to the State or

3  Alabama motor vehicle or anything.

4  A. No, I didn't.

5  Q. Was that common practice for you?

6  A. No, my sister, basically she handled all my paperwork,

7  but at that particular sale I just let him handle it.

8  Q. You just let him handle it?

9  A. Right.

10  Q. So in this one case you handled your business

11  differently than in most of your cases, right?

12  A. Right.

13  Q. So it would be difficult, would you agree, for us to

14  track that down?

15  A. No, it shouldn't be, all you have to do is just pull it

16  up. You can go to the auction of Montgomery and just ask for

17  the sales, how many sales of cars I bought and that car would

18  appear, that serial number would appear easily. It wouldn't

19  be no problem at all. And it will appear under Kenny's Cars.

20  Q. How many cars would you estimate you sold in your car

21  business?

22  A. A bunch of them.

23  Q. More than a hundred?

24  A. Not quite a hundred, but probably about 50, maybe 60.

25  MS. JAMES: Judge, may I have one moment?

## Page 306

1  THE COURT: Yes.

2  A. I might be wrong about that figure but I sold a bunch of

3  them.

4  (pause)

5  MS. JAMES: No further questions.

6  THE COURT: Mr. Madison?

7  MR. MADISON: No further questions, Your Honor.

8  THE COURT: Mr. Brown?

9  MR. BROWN: No, sir.

10  THE COURT: Mr. James, you may step down.

11  THE COURT: Mr. Brown, call your next witness.

12  MR. BROWN: The government calls Detective Chris

13  Wingard.

14  THE CLERK: You do solemnly swear or affirm that the

15  testimony you give in the trial of this cause to be the

16  truth, the whole truth, and nothing but the truth, so help

17  you God.

18  THE WITNESS: I do.

19  C.A. WINGARD, witness for the Government, having

20  been duly sworn or affirmed, testified as follows:

21  DIRECT EXAMINATION

22  BY MR. BROWN:

23  Q. Good morning, sir. Will you state your name, please.

24  A. Detective C.A. Wingard.

25  Q. Will you spell your last name?

## Page 307

1  A. W-I-N-G-A-R-D.

2  Q. How are you employed, sir?

3  A. Montgomery police department, narcotics bureau.

4  Q. Back on September 25th of last year how were you

5  employed?

6  A. With the Montgomery police department narcotics bureau

7  and also assigned as a task force agent with the HIDTA DEA

8  task force.

9  Q. What is the HIDTA DEA task force?

10  A. Stands for High Intensity Drug Trafficking Area, and

11  it's a DEA program set up for smaller agencies, and through

12  HIDTA we utilize money to purchase large amounts of drugs.

13  It's primarily used to investigate mid to high level drug

14  organizations.

15  Q. Are you familiar with the Defendants in this matter,

16  Alphonso Norman and Capulco Peralte?

17  A. Correct.

18  Q. As well as Kenny James?

19  A. Correct.

20  Q. Are you the case agent in this particular case?

21  A. That's correct.

22  Q. Have you always been the case agent in this particular

23  case?

24  A. That's correct.

25  Q. What are your duties as case agent?

## Page 308

1  A. Well, from the onset of this situation I collected all
2  the evidence from the evidence officer with the police
3  department, which was Brad Bartlett. At that point once I
4  collect that evidence and all the reports I turn that
5  evidence over to DEA, conduct DEA paperwork which is
6  different from paperwork conducted at the police department.
7  That drug evidence is at that point sent to Dallas, the
8  regional lab, as you heard the chemist testify. That drug
9  evidence is sent to the regional lab, not the state drug lab
10  here in Montgomery. The paperwork again is turned over into
11  DEA paperwork, it no longer bears Montgomery police
12  department's signature or letterhead or anything of that
13  nature. Anything that's non-drug-related is stored at the
14  HIDTA office, not the City of Montgomery police department.
15      MR. BROWN: May I approach the witness, Your Honor?
16      THE COURT: Yes.
17  Q. You are familiar with the term chain of custody; is that
18  correct?
19  A. Yes, sir.
20  Q. Would you explain that to the jury?
21  A. Well, it simply states you keep a record of the time
22  that a piece of drug evidence or non-drug evidence is
23  collected through every hand that it went through. There's a
24  chain, and at no point is that chain broken. So you can
25  always come back and say who had possession of that drug

## Page 309

1  evidence or that non-drug evidence.
2  Q. Detective Wingard, I have handed you what has already
3  been admitted as Government's Exhibit 3 which is DEA Exhibit
4  4, Government's Exhibit 12, which is DEA Exhibit 5,
5  Government's Exhibit 14, which is DEA -- I'm sorry,
6  Government's Exhibit 14 which is DEA Exhibit 6, and
7  Government's Exhibit 18 which is DEA Exhibit 8. Do you
8  recognize those items?
9  A. That's correct.
10  Q. Who did you get those items from?
11  A. From Detective Bartlett.
12  Q. Did you get it from him when?
13  A. The same day that he received it.
14  Q. And what did you do with it after that?
15  A. Well, with the drugs, I put them in these bags that they
16  are in, with my initials on them, and also a witnessing
17  agent's initials, and then the drugs were sent to Dallas, the
18  regional lab, like I spoke of earlier. With the non-drug --
19  of course, all this is just drug evidence. But all this was
20  sent to the DEA regional lab.
21  Q. Now that we have got that chain of custody housekeeping
22  stuff out of the way, I would like to talk about September
23  25th. Were y'all on the scene on September 25th initially?
24  A. No, I wasn't.
25  Q. How did you come to be at the scene?

## Page 310

1  A. I was actually on my way home and heard Andrew Kenneth
2  James' name being ran across the radio by Detective Bartlett
3  checking to see if he had any warrants on him. And at that
4  time I contacted either Detective Bartlett or Corporal Conway
5  to determine what was going on with Andrew Kenneth James. At
6  that point they advised me that they were over on East 4th
7  Street and that's the time that I responded over to that
8  location.
9  Q. What did you do when you got to the location?
10  A. Pretty much I just stood around because at that time
11  when I got there Corporal Conway had already left the
12  residence to get a search warrant. So once I got there I
13  pretty much found out from Sergeant Drummond and some of the
14  other people that were there what was actually going on. And
15  just stood around until after a search warrant was signed.
16  Q. Okay. Did you participate in the execution of the search
17  warrant?
18  A. That's correct.
19  Q. And did you later find out whose -- well, not whose
20  residence, but who was the occupant of the residence?
21  A. Correct.
22  Q. Who was that?
23  A. Ms. Montgomery.
24      MR. BROWN: May I approach, Your Honor?
25      THE COURT: Yes.

## Page 311

1  Q. (complies) Detective, I am going to hand you what has
2  been marked as Government's Exhibit 29, 30, 31 and 34 and ask
3  you if you can identify those items.
4  A. Exhibit 29 is a picture of a -- looks like a flower, a
5  wicker flower pot for an artificial tree that has a wallet
6  lying inside of it. And 30 is a better picture of the wallet
7  opened that came out of the wicker flower pot. This exhibit
8  is -- Exhibit 31 is a Bryco 38 .380 semiautomatic handgun,
9  silver and black in color.
10  Q. I'm sorry, is that 31?
11  A. Correction, 34.
12  Q. Where was that located?
13  A. In the closet, in like the front room of the residence.
14  Q. And who turned -- did you collect that or was it turned
15  over to you as case agent?
16  A. Actually it was turned over to me by Detective Bartlett,
17  but we don't store weapons at the HIDTA office, so I advised
18  Bartlett to impound this weapon at the police department,
19  which he did.
20  Q. Where -- well, did you recover the firearm during the
21  course of preparing for this trial?
22  A. Yes.
23  Q. Where did you recover it from?
24  A. From the Montgomery police department, impound.
25  Q. All right. And 31?

## Page 312

1 A. And 31 is the wallet, Louis Vatton wallet that was
2 actually found inside the flower pot.
3 Q. Government's Exhibits 29 and 30 are the photographs;
4 correct?
5 A. Correct.
6 Q. Do those photographs fairly and accurately depict the
7 scene as you remember it that day?
8 A. Yes, sir.
9     MR. BROWN: The government moves to admit
10 Government's Exhibits 29 and 30.
11     MS. JAMES: No objection.
12     THE COURT: Any objection, Mr. Madison?
13     MR. MADISON: No objection, Your Honor.
14     THE COURT: Government's Exhibits 29 and 30 are
15 admitted without objection.
16 Q. Government's Exhibits 31 and 34, are those items in the
17 same or substantially the same condition as they were in when
18 you located them?
19 A. That's correct.
20     MR. BROWN: The government moves to admit Exhibits
21 31 and 34.
22     MR. MADISON: Object to 34 based upon continuing
23 objection discussed with the Court previously.
24     MS. JAMES: That would be the Blakely objection.
25     THE COURT: Yes, ma'am. Any other objection as to

## Page 313

1 either 31 or 34?
2     MS. JAMES: No, sir.
3     THE COURT: Mr. Madison?
4     MR. MADISON: No, Your Honor, I'm sorry.
5     THE COURT: Government's Exhibits Number 31 and 34
6 are admitted.
7 Q. Detective Wingard, what, if anything, was located inside
8 the wallet?
9 A. Various credit cards and I believe a driver's license, I
10 can't remember whether it was expired or not, but Mr. Capulco
11 Peralte.
12 Q. Was there any currency in the wallet?
13 A. Yes. I believe either three or four hundred dollars,
14 which was also impounded at the Montgomery police department.
15 Q. I will show you one of the items that was found within
16 the wallet. Is that the driver's license that you recall
17 being in there?
18 A. That's correct.
19 Q. Is this another form of identification that was also
20 located in the wallet?
21 A. That's correct.
22 Q. And you said there were various credit cards, I don't
23 need to go through each one of them but is that one of the
24 cards?
25 A. That's correct.

## Page 314

1 Q. Can you identify for the jury who is the name of on the
2 card?
3 A. Yes, it's Capulco Peralte.
4 Q. Thank you, Detective, I don't have any further questions
5 for you, defense counsel may.
6     THE COURT: Any questions, Ms. James?
7     MS. JAMES: Yes, sir.
8         CROSS-EXAMINATION
9 BY MS. JAMES:
10     MS. JAMES: May I approach, Your Honor?
11     THE COURT: Yes.
12     MS. JAMES: Your Honor, may I approach the witness?
13     THE COURT: Yes.
14 Q. Mr. Wingard, in addition to -- is it Officer? What is
15 your title?
16 A. It doesn't matter, whichever one.
17 Q. Okay. You have testified here about several things that
18 were found in the wallet, including a credit card. In fact,
19 there are more credit cards, aren't there?
20 A. Several.
21 Q. Bank One, Mr. Peralte's name, Capital One, there's an
22 insurance card, is there not?
23 A. Yes, ma'am.
24 Q. Sears credit card.
25 A. Yes, ma'am.

## Page 315

1 Q. Sam's Club.
2 A. Yes, ma'am.
3 Q. Blockbusters?
4 A. Yes, ma'am.
5 Q. Wachovia, check card.
6 A. Yes, ma'am.
7 Q. Now, this was in a wallet, did you locate the wallet?
8 A. Yes, ma'am, I did.
9 Q. And you say it was sitting in a flower pot, right?
10 A. Yes, ma'am, behind the television, a big screen
11 television, wicker flower basket with an artificial tree
12 inside of it.
13 Q. All right. Well, were you aware of the fact that Mr.
14 Peralte gave his correct name to Mr. Drummond when he was
15 asked to exit the residence?
16 A. Was I aware of that?
17 Q. Uh-huh (positive response)
18 A. Hadn't even thought about it, Ms. James, to be honest
19 with you.
20 Q. But you heard me ask yesterday.
21 A. Yes, ma'am.
22 Q. And the reason being if the law didn't go in and begin a
23 search Mr. Peralte's wallet being in a basket wouldn't make
24 much difference, would it, if he was going to volunteer his
25 name?

Page 316

1  A. I guess not.
2  Q. And you had occasion to interview Mr. James on a couple
3  of occasions, didn't you?
4  A. Yes, ma'am.
5  Q. In fact, your first contact with him was back in July of
6  2000 when you went to him and told him he was probably going
7  to be charged in a large drug conspiracy; is that correct?
8  A. That's correct.
9  Q. And at that point he told you he wanted to cooperate
10 with the government, right?
11 A. That's correct, but he didn't.
12 Q. But he didn't.
13 A. Exactly.
14 Q. He continued to be involved in drugs; correct?
15 A. I guess.
16 Q. Well, when you interviewed him just recently, just a few
17 days ago on July the 6th I guess or sometime around then, he
18 didn't mention to you this fellow named Curt, did he?
19 A. Well, we discussed -- what we discussed on the last
20 interview was what we discussed on the first interview, and
21 on the first interview that individual's name did come up.
22 Q. But you didn't put it in your report, did you?
23 A. No, ma'am, because it had no relevance in mind to this
24 situation.
25     MS. JAMES: May I approach the witness, Judge?

Page 317

1      THE COURT: Yes.
2  Q. Let me show you -- I am not going to offer it but I will
3  do it just for identification. I am going to show you just
4  what I have marked for identification purposes as Peralte's
5  Exhibit 4 and ask you if this is your report that you
6  prepared in relation to your interviews of Mr. James?
7  A. Yes, ma'am, that appears to be.
8  Q. And would this form be known as a DEA-6?
9  A. Yes, ma'am.
10 Q. And I am going to show you, direct your attention to the
11 second page and ask you to read that paragraph to yourself
12 and see now if that would change your opinion about the
13 relevance of who he contends he sold drugs to.
14 A. James stated that ten or 11 days --
15 Q. I am not asking you to read it.
16     THE COURT: Read it to yourself, Detective Wingard.
17 A. Oh, I'm sorry. You just wanted me to read the one where
18 you have highlighted, right?
19 Q. Right, to yourself. You just said Curt's name wasn't
20 relevant to this investigation; correct?
21 A. Yes, ma'am.
22 Q. But you will agree with me now after having read that
23 particular highlighted portion of your report that that was
24 pertinent to -- who those drugs were sold to was pertinent
25 enough for you to include it in your report; correct?

Page 318

1  A. Well, Ms. James, in the paragraph there that you wanted
2  me to read it doesn't mention a name.
3  Q. That's right. You said various individuals.
4  A. Okay. Yeah. In the report, yes, ma'am.
5  Q. Various individuals based on what Mr. James said today
6  would include Curt, would it not?
7  A. If Mr. James testified to that Mr. Curt was one of the
8  individuals, yes, ma'am, it would.
9  Q. Okay. So what I am trying to say is it was relevant who
10 he sold drugs to on this purported day that he was riding
11 around town with Mr. Peralte, the fact that he sold drugs to
12 others was relevant to you; correct?
13 A. Yes.
14 Q. And you put in there various individuals, you didn't put
15 the name Curt.
16 A. Correct.
17 Q. Okay. Now, he didn't limit it when he talked to you, he
18 didn't limit it just to Curt, did he?
19 A. No, he mentioned -- throughout that interview he
20 mentioned a few names. I don't know if those names he
21 mentioned were names that he was associating with this
22 particular day though, I can't remember that.
23 Q. Well, did you take some handwritten notes that you might
24 have in your file that would be contemporaneous with the
25 conversation that you had with him?

Page 319

1  A. I don't have any handwritten notes here.
2  Q. Did you take some?
3  A. That day, yes, ma'am, I did.
4  Q. So if he listed -- he told you other names and told you
5  Curt's name that would be in that report, wouldn't it?
6  A. Yes, ma'am.
7      MS. JAMES: Your Honor, I am going to ask possibly
8  at a break if he would try to review those notes and be
9  subject to me calling him back. May I do that?
10     THE COURT: We will discuss that outside the
11 presence of the jury.
12     MS. JAMES: Thank you.
13 Q. Now, you sat here -- you sat here through the entire
14 trial and you have heard everybody testify, right?
15 A. Yes, ma'am.
16 Q. And Mr. James, you heard him say that on the day of
17 September 25th, 2003 he agreed with me that he owed Mr.
18 Peralte 18 thousand dollars.
19 A. I believe so.
20 Q. All right. Well, he didn't mention to you -- he
21 mentioned to you this six to 12 thousand dollars debt that he
22 had some years earlier, right?
23 A. The money that he ran off with, and the six thousand
24 dollars that he paid him down in Miami at the night club,
25 yes, ma'am.

Page 316 - Page 319

Condenselt™

## Page 320

1 Q. Several years ago?

2 A. Yes, ma'am.

3 Q. But what he contends happened here in the Middle

4 District of Alabama in September of 2003, he didn't mention

5 that the day of September 25th he owed Mr. Peralte 12

6 thousand dollars, did he?

7 A. No, ma'am, he didn't mention that to me.

8 Q. Because if he had that would have been significant and

9 you would have put it in your report, wouldn't you?

10 A. I would have written it down, yes, ma'am.

11 Q. What, if anything, have you done to investigate Curt?

12     MR. BROWN: Objection to relevance, Your Honor.

13     MS. JAMES: Judge, I am concerned that Curt may not

14 be a real person. I want to know if he exists.

15     THE COURT: I will allow you to inquire as to

16 whether or not he was able to verify any of the information

17 about Curt that Mr. James has testified about, but subject to

18 that, let's try to keep our questions limited to verifying

19 what James told him.

20 Q. I am not asking you about an investigation, that was

21 probably a bad question. What I am asking you about is did

22 you verify that Curt is a real person?

23 A. Yes, ma'am. He is a real person.

24 Q. What is Curt's last name?

25 A. Carter.

## Page 321

1 Q. All right. And so you have confirmed that that is, in

2 fact, a person, right?

3 A. Yes, ma'am.

4 Q. And have you -- well, I won't go there. Now, you heard

5 Mr. Brown ask the question of Mr. James if he had recognized

6 this red car in the picture, and he said yeah, he sold it to

7 Mr. Peralte, you remember that?

8 A. Yes, ma'am.

9 Q. But he didn't tell you that before, did he?

10 A. He did tell us that he sold the car to Mr. Peralte.

11 Q. He did?

12 A. He told us that on the 6th.

13 Q. But you didn't include it in your report, did you?

14 A. I may or may not have. I am not sure. I don't have that

15 report in front of me. Is this it?

16 Q. That's the only report that we have been given.

17 A. No, ma'am, it's not in here.

18 Q. Okay. Now, the purpose -- you have been a law

19 enforcement officer for quite a while, haven't you?

20 A. About seven years, a little more than seven years.

21 Q. And the reason you all do those reports is to help you

22 remember what was said, right?

23 A. That's correct.

24 Q. And to provide them to the lawyers in cases like this so

25 we kind of know what witnesses are going to say, right?

## Page 322

1 A. Yes, ma'am.

2 Q. And you know that every time you do one of those reports

3 you might be called upon to come before a court and a jury

4 and -- to talk about details that you had obtained in those

5 interviews.

6 A. Yes, ma'am.

7 Q. And you will agree with me it's important to put down as

8 much detail as possible when it's going to be used in a case.

9 A. Yes, ma'am, it is.

10 Q. Okay. Now --

11     MS. JAMES: May I retrieve the report, Your Honor?

12     THE COURT: Yes, ma'am.

13 Q. Were you -- you have testified that you came up on the

14 scene of the 4th Street scenario the day of the search, is

15 that consistent?

16 A. That's correct.

17 Q. And that you just kind of hung around until they got the

18 search warrant?

19 A. That's correct.

20 Q. Who was it that actually took Mr. Peralte and Mr. James

21 and Mr. Norman to jail?

22 A. That I don't know. They were already gone after I got

23 there.

24 Q. They were gone before you got there?

25 A. I'm sorry, yes, ma'am, they were gone, I apologize, they

## Page 323

1 were gone before I got to the house.

2 Q. And you got there before a search was conducted, right?

3 A. That's correct.

4 Q. And so at that point this drug evidence you have

5 testified about here was not in law enforcement hands.

6 A. No, ma'am.

7 Q. Okay.

8     MS. JAMES: Judge, may we approach?

9     THE COURT: Yes.

10     (At which time the following occurred at side-bar:)

11     THE COURT: All right. The record will reflect we

12 are in the presence but outside the hearing of the jury.

13     MS. JAMES: Judge, a situation may develop with

14 additional questions that I want to inquire. I guess it was

15 on the direct examination, Mr. James said that he was a very

16 good friend of Mr. Norman's, he didn't want to be here. He

17 said that repeatedly, and he was very careful to limit his

18 testimony about Mr. Norman to things that happened back when

19 Mr. Norman was in high school. If you will remember that drew

20 an objection from Mr. Madison.

21     THE COURT: Right.

22     MS. JAMES: Basically he has kind of left the jury

23 with the idea that well, there were drugs there, I didn't

24 really know how they got there. Peralte and Norman were there

25 and I haven't dealt drugs with Mr. Norman, he just worked for

Page 324

1 me back in high school, which is outside the scope of the
2 time frames of the conspiracy. Well, in his statement to Mr.
3 Wingard he talked about --
4    THE COURT: whose statement?
5    MS. JAMES: Mr. James' statement. We have got a
6 DEA-6.
7    THE COURT: This is Peralte's Exhibit 4?
8    MS. JAMES: I am not going to offer it.
9    THE COURT: But for purposes of identification, make
10 sure I understand what you are talking about.
11    MS. JAMES: Yes, sir. And it says it was prepared
12 on 7/6, 2004 by Wingard regarding his interviews. There are
13 two, he says, with James. He goes into much more detail here
14 about his involvement with Norman.
15    THE COURT: Kenny James does.
16    MS. JAMES: Yes, James does. He says back in 2001
17 Peralte is bringing drugs up here and he is getting some of
18 Peralte's cocaine but he is getting it from Norman. Okay.
19 James further stated that when Norman started dealing with
20 Peralte directly he, Norman, did not want to sell him any
21 cocaine but did on occasions. Now, I feel like -- and this
22 gets back to our severance problem -- I feel like in order to
23 impeach Mr. James further that I need to show his bias. In
24 other words, it's clear to me that he was trying to limit --
25 he was trying not to hurt Mr. Norman and dump it on Peralte

Page 325

1 and he still satisfies his obligation to the government.
2    I don't want to offer it for the purpose of Norman
3 being involved in drugs, I have no interest in helping
4 convict Mr. Norman, but I think it's important because it's a
5 pertinent fact of him being selective of who he wants to
6 implicate and who he does not. He doesn't want to hurt Curt,
7 that was obvious by his pause up there, and here he has
8 clearly made inculpatory statements about Mr. Norman in high
9 school -- not in high school but within the last couple of
10 years, and he omitted that from his testimony, although he
11 was specifically asked by Mr. Brown. We are going -- if I go
12 into it we are going to draw an objection from them, but we
13 didn't ask to go to trial with them, we fought diligently not
14 to do that, so I wanted to give everybody a heads-up where we
15 were going with that.
16    MR. MADISON: And we will object, Your Honor.
17    THE COURT: what issues are you suggesting that you
18 will go into that would be objectionable?
19    MS. JAMES: That paragraph. Essentially my question
20 would be something like this: In your two interviews with Mr.
21 James he actually provided you with different information
22 with regard to Mr. Norman than he did today. And he is going
23 to say I am not sure what you mean by that. And I would say
24 well, today he testified that his involvement in any kind of
25 drug activity with Mr. Norman was back when Mr. Norman was in

Page 326

1 high school.
2    MR. MADISON: And Judge --
3    MS. JAMES: Excuse me.
4    THE COURT: Go ahead.
5    MS. JAMES: And, in fact, when you interviewed him
6 on these two previous occasions he told you that he was
7 getting drugs from Mr. Norman, that Mr. Norman was getting
8 from Mr. Peralte as recent as 2001. Now, if we were not in a
9 joint trial I would be fully authorized to do that. And I
10 hate to do it but I cannot forego my obligation to Mr.
11 Peralte to try to help them.
12    THE COURT: Assuming that Ms. James were to get into
13 that, what would be the response?
14    MR. MADISON: My objection would be that this report
15 is hearsay, number one. And I think case law pretty much
16 states that reports prepared by law enforcement officers are
17 absolute hearsay and it's not admissible. Secondly --
18    THE COURT: I don't think she is saying she wants to
19 offer the report, she just wants to elicit information from
20 this witness about what another witness who has already
21 testified is going to say.
22    MR. MADISON: But the information is from a report.
23 The witness whom she is trying to elicit that information
24 from or about whom this report supposedly quoted has already
25 taken the stand, that person has already testified. And this

Page 327

1 would be an inconsistent statement, I guess with respect to
2 what he testified to, but this would be -- this is a
3 statement of Mr. Wingard, it's not a statement of him. She
4 had the ability to cross-examine Mr. Norman when -- I'm
5 sorry, Mr. --
6    THE COURT: James.
7    MR. MADISON: -- James when he was on the stand and
8 she failed to examine him on the stand.
9    THE COURT: Let's get all of the objections from one
10 side before going to the other.
11    MR. MADISON: It's a self-serving statement put in
12 there by Mr. Wingard because obviously the testimony was not
13 to the same effect as the statement. But I mean if we are
14 going to start getting into that, it also states who put the
15 drugs in the dryer, if she wants to get into that.
16    MS. JAMES: He has testified to that. James
17 testified to that.
18    MR. MADISON: But the bottom line is she had the
19 opportunity to question him about any statements he made at
20 the time that he testified and she failed to do that so I
21 think she waived that. It's totally hearsay.
22    THE COURT: Any response from the government thus
23 far?
24    MR. BROWN: The only response the government would
25 have would be that that statement would be admissible as a

prior inconsistent statement under 801(c). We won't object to it necessarily on those grounds, I think it's permissible if the defense wants to go into it.

MS. JAMES: My concern, in response to him, I could not have impeached Mr. James with the statement of Mr. Wingard. I will do it I believe the right way, and I am using his statement because it is his statement. He's identified it as his statement and it's his statement made from contemporaneous notes that he took on another document.

THE COURT: when you say he?

MS. JAMES: Mr. Wingard.

THE COURT: The statement you are referring to is a report that Detective Wingard prepared following his interview with Mr. James who has just testified.

MS. JAMES: Interviews.

THE COURT: This is a summary of the interviews with Kenny James; is that accurate? Since I have never seen this report.

MS. JAMES: Let me say this, and maybe this could help. I don't have any problem with the Court giving the jury a limiting instruction to say that I am not offering it for the truth -- that James was telling the truth, I don't care, I am just offering it to show James has given an inconsistent statement. That he limited -- because he specifically asked him what his dealings were with Norman and he said I haven't



had any but back in school he worked for him when he was back in high school, and this is 2001.

MR. MADISON: Judge, she could have asked, Judge, if he made any statements to Detective Wingard. She could have asked that question to Mr. James and that question was not asked I don't think with respect to my client. And with respect to the fact that it's a prior inconsistent statement there's nothing to show that my client -- I'm sorry, Mr. James adopted any belief that the statement made by Mr. Wingard had any accuracy. So I think in order for it to qualify as a prior inconsistent statement the author would have to adopt the statement, and I don't think that's been done.

MR. BROWN: That would not be required if it were not offered for the truth of the matter asserted. If it were an 801(d)(2) --

THE COURT: Two.

MR. BROWN: -- statement it would be.

MR. MADISON: But it's not a matter against interest either.

MR. ARRINGTON: He wants to get it in because it goes against Norman, he ain't got no objection.

THE COURT: why don't we do this. We are at a point I think that the jury needs to take a break, and what we can do is let me look at something briefly after we take a



recess, I will give you a ruling on whatever direction you can take with asking this witness about that question.

MS. JAMES: Okay. Thank you.

(At which time the following occurred in open court:)

THE COURT: Ladies and gentlemen, rather than have you sit here and wonder what we are taking up outside of your presence I think it would be a convenient time for us to take a recess. We have been going a little over an hour and a half. Let's take our mid-morning recess, and I instruct you not to discuss the case among yourselves at this time or allow anyone to discuss the case with you. Leave your notes on the rail in front of you or face down in your chair. We will be in recess about 15 minutes, and make your accommodations, so we will be in recess until you are all assembled back in the jury room with the marshal.

(At which time, 10:35 a.m., the jury left the courtroom.)

THE COURT: we will be in recess, and let me see the attorneys briefly back in the robing room.

(At which time, 10:35 a.m., a recess was had until 11:00 a.m., at which time, outside the presence of the jury, the trial continued.)

THE COURT: The record will reflect that we are outside both the presence and the hearing of the jury.



Counsel for Mr. Peralte has brought to the Court's attention her desire at this time to question Detective Wingard about certain statements that Mr. Kenny James had given to him after September the 25th regarding some alleged activity in the drug business of Mr. Norman. It's my understanding the purpose of that is to establish bias; is that correct, Ms. James? Between Mr. James, Kenny James, and Mr. Norman, the accused in this case, along with your client.

MS. JAMES: Yes. That's not the only reason.

THE COURT: State your reasons that you feel like that would be admissible while we are on the record here.

MS. JAMES: Well, I think it was apparent from Mr. James' testimony he was selective about who he chooses to testify against. And I think that that kind of bootstraps into his credibility in general because he is under an obligation to cooperate with the government. He said repeatedly truthfully, truthfully, truthfully, yet asked on cross-examination by Mr. Brown his involvement with Mr. Norman he limited it to days back in high school when Mr. Norman allegedly worked for him. I think that bias is something that I can show through cross-examination of this witness based on a prior statement that was given to him. I believe that it also -- by Mr. James. And I believe that it also is evidence of an inconsistent statement given his testimony on direct and given the summary of his testimony

Page 332

1  that's contained within Defendant's Exhibit 4 which was
2  marked but not offered which is a DEA-6. And I believe that
3  it is proper impeachment and that it goes to his credibility
4  as a cooperating witness.
5      THE COURT: Are you offering any statements that Mr.
6  James may have given to Detective Wingard as an exception to
7  hearsay under 801(d), or are you saying that the statements
8  by Kenny James to Officer Wingard are offered for the truth
9  of the matter asserted?
10     MS. JAMES: I am not offering them for the truth of
11 the matter, I don't care whether Mr. Norman was involved with
12 drugs or not, it's simply offered to show that Mr. James is
13 not credible.
14     THE COURT: Mr. Madison, let me hear your response.
15     MR. MADISON: Judge, the response to that was the --
16 first of all the statement could have been inquired of the
17 witness while the witness was on the stand. Secondly, it's my
18 understanding that the status of the law is that any report
19 prepared by a police officer is hearsay and absolutely
20 inadmissible. Third, I think there are certain conditions to
21 admission or to a statement to achieve the level of a prior
22 inconsistent statement, and I think one of those being that
23 it had to be a prior statement made under oath, and there's
24 nothing to indicate that any statement Mr. James supposedly
25 made to Officer Wingard was made under oath at the time it

Page 333

1  was made. Therefore -- well, I don't think it would qualify
2  as a statement, I think it's pure hearsay and inadmissible. I
3  don't think there's any doubt. I ran across it the other day,
4  I don't recall the cite but I think the 11th Circuit has held
5  that reports of police officers are hearsay.
6      THE COURT: Is Mr. James still here in the
7  courthouse or has he been transferred?
8      THE MARSHAL: He is still here, Judge.
9      THE COURT: At this time I find that there has not
10 been a proper predicate laid for the impeachment of Mr. James
11 through the statement that he gave to this officer. I will
12 require that Mr. James be made available if Mr. Peralte's
13 counsel wishes to call him to inquire further about the
14 specifics of any statement that is contained within Defendant
15 Peralte Exhibit Number 4, and if a proper predicate is laid
16 we will revisit whether or not this witness can testify about
17 the content of Defendant Peralte's Exhibit 4 at that time.
18     MS. JAMES: Okay. Well, I can let the Court know now
19 that I do desire to bring Mr. James in and I would ask for
20 permission to recall Mr. Wingard given the testimony that
21 would be provided by Mr. James.
22     THE COURT: I will certainly allow you to do that.
23 Are we prepared to go forward with the jury?
24     MS. JAMES: Judge, excuse me, but I mean we are --
25 probably should deal with -- we are going to have the same

Page 334

1  problem when we put Mr. James on, you understand, that I am
2  getting into an area that implicates Mr. Norman.
3      THE COURT: I understand.
4      MS. JAMES: And it could be more involved by putting
5  Mr. James up there in terms of the questions and answers than
6  it is in this Number 4.
7      THE COURT: I understand.
8      MS. JAMES: I think it could be a bigger problem,
9  but that's their problem.
10     MR. MADISON: Just with respect to the last
11 statement made by counsel, that's our problem, I don't know
12 that there's going to be any problem by recalling Mr. James
13 to the stand, so I object to the characterization of that
14 statement.
15     THE COURT: I can't speculate as to what the
16 testimony may or may not be, let's just take it as it comes.
17 Let's get started back and we will continue with the
18 testimony of Detective Wingard.
19     (At which time, 11:08 a.m., the jury entered the
20 courtroom.)
21     THE COURT: You may continue, Ms. James.
22     MS. JAMES: I have no further questions of this
23 witness, subject to the matter we discussed at the break.
24     THE COURT: Any cross, Mr. Madison?
25

Page 335

1              CROSS-EXAMINATION
2  BY MR. MADISON:
3  Q. How you doing, Officer Wingard?
4  A. How you are, sir?
5  Q. Your testimony was that you are no longer a member of
6  the HIDTA task force; is that correct?
7  A. That's correct.
8  Q. When did your, not membership, association with the
9  HIDTA task force cease?
10 A. Approximately three weeks ago.
11 Q. And I believe there was a co-case agent in this case who
12 was also a HIDTA task force member; is that correct?
13 A. It was never really assigned a co-case agent. If you
14 are talking about Detective Sisson?
15 Q. That's correct.
16 A. We never really assigned a co-case agent, he was just
17 assisting me with the paperwork.
18 Q. Okay. So Officer Sisson then never actively took part in
19 the search or any of the seizure of the evidence or anything
20 like that.
21 A. I don't remember if he was out there at the house or
22 not, but he did assist me in the paperwork, into converting
23 the Montgomery police department paperwork into HIDTA
24 paperwork, he did assist me in that. So with respect to
25 that, if you want to call him a co-case agent, then maybe he

Page 336

1  was, yes, sir.
2  Q. Okay. As an associate of the HIDTA task force what were
3  your responsibilities and job duties in conjunction with the
4  HIDTA task force?
5  A. Again, to investigate mid-level to upper-level drug
6  organizations.
7  Q. And that was primarily for federal prosecutions, was it
8  not?
9  A. Yes, sir.
10 Q. Okay. So you didn't have -- as a part or member of the
11 HIDTA task force you had no dealings what so ever with state
12 court prosecutions.
13 A. I did through my own cases, I still had to maintain
14 cases at the other office, but through the actual HIDTA
15 offices none of the cases we investigated there were
16 initially intended to go state. Now, sometimes that did
17 happen because of certain circumstances that a case that we
18 initiated through HIDTA intended to go federal but ended up
19 going state because of certain circumstances.
20 Q. But primarily the cases prosecuted by the HIDTA
21 investigations were federal prosecutions.
22 A. That's correct.
23 Q. And I believe there was some testimony in an earlier
24 hearing where Mr. Sisson may have testified that he had been
25 engaging in primarily federal prosecutions for approximately

Page 337

1  four years at that time, would that be consistent with his
2  position with HIDTA?
3  A. As to what he testified to, I am not sure, but he has
4  been on HIDTA longer than I have. I was put on HIDTA I
5  believe in 2001 and he was there a few years before I was put
6  on.
7  Q. And the evidence in this case, if it were a state
8  prosecution where would that evidence go?
9  A. It would be maintained at our office. The non-drug
10 evidence, is that what you are inquiring about, or the drug
11 evidence also?
12 Q. Any -- the drug evidence, any physical drug evidence
13 which would be utilized by a HIDTA -- I'm sorry, a state
14 prosecution, not a HIDTA prosecution.
15 A. The drug evidence would be sent to the department of
16 forensics here in Montgomery. The drug evidence would be
17 maintained by that individual officer in an assigned locker
18 to that individual officer. He would maintain it in his
19 locker until trial.
20 Q. So it's fair to say then that the preparation of reports
21 concerning that evidence on DEA forms is because that was a
22 federal prosecution.
23 A. Correct.
24 Q. Okay. Separate forms would be utilized for a state court
25 prosecution.

Page 338

1  A. Correct.
2       MR. MADISON: If I may approach the witness, Your
3  Honor..
4       THE COURT: Yes.
5  Q. I didn't put Norman on there but I am going to show you
6  what has been marked as Defendant Norman's Exhibit 2. Are
7  you familiar with that document?
8  A. I think I have seen this yesterday here in the court, I
9  think when you passed them out yesterday.
10 Q. Okay. Now, concerning -- well, are you familiar with
11 that document?
12 A. With this specific document or what this is?
13 Q. Well, first of all what it is.
14 A. It looks like a subpoena for maybe some phone records.
15 Q. Right. But you tell me.
16 A. It says Bell South and I think all they do is telephone,
17 so yes, sir, I think it's going to be a subpoena for phone
18 records by Detective Sisson.
19 Q. And Detective Sisson was the same person you were
20 testifying to as serving on the HIDTA task force?
21 A. That's correct.
22 Q. And that was concerning this case, was it not?
23 A. This document, yes, sir.
24 Q. And what were those records seeking to find out, or that
25 request -- what was that request seeking to find out?

Page 339

1  A. Just upon looking at the face of it I am not sure what
2  it was trying to do. I don't know whose number was being
3  subpoenaed here. If it's this number that's -- I am not sure
4  about what number is being actually subpoenaed here. But
5  normally phone records are subpoenaed to determine who has
6  been talking to who.
7  Q. Okay. You just turned to the last page of the records,
8  does that identify the address for which that subpoena was
9  issued to determine whose phone records those were?
10 A. It says 2429 East 4th Street, Montgomery, Alabama, is
11 who is listed here.
12 Q. And who is identified as having the utilities there in
13 that person's name?
14 A. Under the billing section it says Richard Caldwell at
15 2429 East 4th Street.
16 Q. Is that not the same address as the address of where the
17 search warrant was executed?
18 A. That's correct.
19      MR. MADISON: I would like to offer Defendant
20 Norman's Exhibit 2.
21      MR. BROWN: No objection.
22      THE COURT: Any objection, Ms. James?
23      MS. JAMES: What is that?
24      MR. MADISON: (complies)
25      MS. JAMES: May we approach? I have an objection. Or

Page 340

1  we just need to resolve one matter.
2      THE COURT: You want this on the record?
3      MS. JAMES: Yes, sir.
4      (At which time the following occurred at side-bar:)
5      MS. JAMES: Judge, I don't have a problem with the
6  information, I have a problem with the subpoena and the
7  language in the subpoena. It talks about -- particularly this
8  paragraph. Of course, I don't like all this about the
9  Patriot Act. It says it's only an investigation. Our
10  subscriber -- in order to avoid -- however, to avoid
11  compromising this investigation which could allow individuals
12  who are selling and manufacturing illegal drugs to do so in
13  our community we request that your company not disclose this
14  request to the subscriber. And I think that that would be --
15  should be barred under 403. I just think it gives a
16  suggestion that they are selling drugs in the community and
17  hey, they may be innocent but --
18      MR. MADISON: Can we redact that?
19      MS. JAMES: I'm fine with that, just take it out.
20      THE COURT: First of all let me make sure the record
21  is clear, I understand what we are talking about. Defendant
22  Norman's Exhibit 2 is a composite exhibit.
23      MR. MADISON: The second page of that exhibit,
24  Judge, is where she is talking about.
25      THE COURT: Six pages in length. Is the last page,

Page 341

1  the last information that you asked the detective about the
2  billing person?
3      MR. MADISON: Yes, sir.
4      THE COURT: And Ms. James, you are objecting
5  specifically to the content of the subpoena.
6      MS. JAMES: Yes.
7      THE COURT: Which is contained on pages two and four
8  of this composite exhibit.
9      MS. JAMES: Yes.
10      THE COURT: Bates stamp number 141 and 144. I will
11  grant your objection -- or sustain your objection. I find
12  that the prejudicial effect would outweigh the probative
13  value as to the content of those pages, and order that they
14  be redacted before they be admitted and published to the
15  jury.
16      MS. JAMES: Given that I have no objection.
17      MR. BROWN: While we are here on that matter, the
18  government is not going to object to whose house it is, what
19  phone numbers belong to whom or anything along those lines,
20  but the proper foundation was not laid for this document. It
21  continues to be the case. And we could avoid these types of
22  objections if the proper foundation would be laid for the
23  documents in the future.
24      THE COURT: If you don't have any objection -- the
25  Court certainly agrees that the proper foundation was not

Page 342

1  laid with this witness, but if by stipulation y'all can agree
2  what can be admissible without bringing executives from Bell
3  South or whomever, maybe the records keepers that could
4  properly lay the foundation of admissibility of that
5  information, we can move this trial along.
6      (At which time the following occurred in open
7  court:)
8      MR. MADISON: May I have just a minute, Your Honor?
9      THE COURT: Yes.
10      MR. MADISON: Judge, I don't have any further
11  questions.
12      THE COURT: Redirect, Mr. Brown?
13      MR. BROWN: Briefly, Your Honor.
14          REDIRECT EXAMINATION
15  BY MR. BROWN:
16  Q. Detective Wingard, you were asked some questions about a
17  number of financial -- or I guess money for lack of better
18  terms. During the course of your role as case agent did you
19  inventory quantities of currency in this matter?
20  A. Yes.
21  Q. Do you recall where you locate -- or not necessarily
22  where you located, but as case agent where money was located
23  that was turned over to you?
24  A. According to the money, I believe approximately two
25  thousand five hundred and 75 dollars was located on Mr.

Page 343

1  Norman's person, be it in his pocket or somewhere on his
2  person. Two thousand nine hundred and one dollars was found
3  in the washing machine. Approximately 70 thousand seven
4  hundred plus dollars was found inside what I believe is the
5  master bedroom, in the bed post, the hollowed out bed post.
6  Q. That was the bed post that Detective Bartlett was
7  speaking of earlier yesterday?
8  A. That's correct.
9  Q. Because you said approximately, I just want to make
10  sure, you know, we have covered things specifically here.
11  Have you had the opportunity to view the DEA Form 6 that was
12  prepared on October 1st, 2003?
13  A. That's correct.
14  Q. If you saw that would it refresh your recollection as to
15  the exact amount?
16  A. Yes, sir.
17      MR. BROWN: May I approach the witness, Your Honor?
18      THE COURT: Yes.
19  Q. (complies) I will ask you to look at paragraphs six,
20  seven and eight and read those to yourself, please.
21  A. Yes, sir.
22  Q. Did reading that refresh your recollection as to the
23  exact amounts?
24  A. Correct.
25  Q. Would you state then for the jury the exact amount that

| Page 344 | Page 346 |
|---|---|

**Page 344**

1 was found on Mr. Norman's person on that date?
2 A. 2,575.
3 Q. And the amount found in the washing machine?
4 A. Two thousand nine hundred and one.
5 Q. And the amount found in the bed post?
6 A. 70 thousand 782.
7 MR. BROWN: No further redirect, Your Honor.
8 THE COURT: Anything else, Ms. James?
9 MS. JAMES: Yes, sir, I just have one question.
10 RECROSS-EXAMINATION
11 BY MS. JAMES:
12 Q. Mr. Wingard, you were asked about the person that was
13 actually the occupant of the residence at 4th Street.
14 A. Yes, ma'am.
15 Q. And you said that was a Ms. Montgomery?
16 A. Yes, ma'am.
17 Q. And have you determined any relationship that she has
18 with either of the Defendants in this case?
19 MR. MADISON: To the extent that that requires a
20 response premised upon hearsay then I would object.
21 THE COURT: Overruled.
22 A. Give me your question again, Ms. James.
23 Q. Have you made any determination through your
24 investigation as to any connection or relationship that Ms.
25 Montgomery might have with any of the Defendants in this

**Page 345**

1 case?
2 A. As far as paper document, as far as checking the records
3 or anything of that nature, no, ma'am, I haven't.
4 Q. Okay. So you don't know if she knew either one of them?
5 A. If Ms. Montgomery knew either one of the Defendants?
6 Q. Uh-huh.(positive response)
7 A. To my knowledge -- through paper documents, no, ma'am.
8 If I do answer that it's going to be what was told to me.
9 Q. Well, the Judge overruled the objection so I believe you
10 can say that.
11 MR. MADISON: I believe at that time -- I don't
12 believe he has testified to what was said, and now if he's
13 testifying it is, in fact, hearsay I would object.
14 THE COURT: Ask your question and make your
15 objection. If you will wait until the objection is made
16 before you answer, Detective Wingard.
17 Q. Are you case agent in this case?
18 A. Yes, ma'am.
19 Q. You said today you are the only case agent?
20 A. Yes, ma'am.
21 Q. And as case agent it's your responsibility to assimilate
22 information that would be pertinent to this prosecution; is
23 that right?
24 A. Yes, ma'am.
25 Q. And have you done that in this case?

**Page 346**

1 A. To the extent that we presented here today, yes, ma'am.
2 Q. All right. Well, you have inquired -- or you testified a
3 moment ago that the occupant of the residence is a person by
4 the name of Tammy, I believe Ms. Montgomery, you said?
5 A. Ms. Montgomery is what I stated, yes, ma'am.
6 Q. And in terms of your investigation have you interviewed
7 people relative to this case?
8 A. Yes.
9 Q. Okay. And have you had occasion to interview or speak
10 with anyone with regard to Ms. Montgomery's involvement, if
11 any, with either of these two individuals?
12 A. I didn't, no, ma'am.
13 Q. Okay. Has anyone done that in the course of this
14 investigation?
15 A. I believe someone did, but it wasn't me.
16 Q. All right. But in response to that, did someone else's
17 investigation -- has that information been provided to you as
18 part of the case file in this case?
19 A. That's correct.
20 Q. Okay. Now, back to the question. What, if any, relation
21 have you determined Ms. Montgomery has with either of these
22 Defendants?
23 MR. MADISON: Judge, I am going to again object.
24 THE COURT: What is your basis?
25 MR. MADISON: Based upon the fact he has just

**Page 347**

1 testified he has no personal knowledge of any matter dealing
2 with that person's relationship with any of the Defendants,
3 number one. And secondly, he's already testified that
4 anything that might have been told to him was told by someone
5 else. I mean it's at a minimum hearsay and possibly double
6 hearsay and maybe triple hearsay.
7 THE COURT: Overruled. You may answer.
8 A. Attorney Brown showed me a document that --
9 MR. MADISON: Judge, I am going to object based upon
10 a document that was shown to him.
11 MS. JAMES: If it was a document it wouldn't be
12 hearsay.
13 THE COURT: Overruled.
14 A. And I can't remember the exact verbiage of the document,
15 but it was showing that -- stated that Ms. Montgomery
16 and Alphonso Norman had a child together.
17 MS. JAMES: That's all, thank you. I believe --
18 thank you, no further questions.
19 THE COURT: Mr. Madison?
20 MR. MADISON: No further questions of this -- well,
21 no, no further questions, Your Honor.
22 THE COURT: Mr. Brown?
23 MR. BROWN: No redirect, Your Honor.
24 THE COURT: You may step down. Call your next
25 witness.

## Page 348

1    MR. BROWN: May I approach the clerk, Your Honor?

2    THE COURT: Yes.

3    MR. BROWN: Your Honor, at this time the government

4    has reviewed the evidence list or the exhibit list with the

5    deputy clerk and is satisfied that Exhibits 1 through 34 have

6    been entered and at this time the government would rest.

7    THE COURT: Ladies and gentlemen, we are to the

8    point in the trial as I have indicated to you earlier which

9    it would be necessary for us to take up certain matters

10    outside of your presence. Because we are close enough to the

11    noon hour I will include that in our lunch break for today,

12    and I will instruct you that you are not to discuss the case

13    at this time among yourselves or allow anyone to discuss the

14    case with you. Recall the other instructions that I gave you

15    during our preliminary instructions yesterday. We will be in

16    recess until 1:00 o'clock. If you could, leave your notes in

17    the courtroom and make sure you have an opportunity to break

18    for lunch. If you will assemble back in the jury assembly

19    room on the first floor shortly before 1:00 and be prepared

20    to start promptly at 1:00 o'clock.

21    (At which time, 11:30 a.m., the jury left the

22    courtroom.)

23    THE COURT: You may be seated. Any motions on behalf

24    of Mr. Peralte?

25    MS. JAMES: Yes, Your Honor. At this time on behalf

## Page 349

1    of Mr. Peralte I would move for Judgment of Acquittal as to

2    count one of the indictment. The government has failed to

3    prove a prima facie case. The government, even when you

4    consider the evidence in the light most favorable to the

5    government, they have not established a conspiracy. At most

6    you would have a buyer/seller relationship given the

7    testimony of Mr. James, which I am not giving any sort of

8    credence to that testimony. I think that he was -- his

9    testimony was incredible as a matter of law. But I don't

10    think that there's been any agreement shown, and I don't

11    believe they have proven the elements required for

12    conspiracy. You want me to make arguments as to each one and

13    then you will rule or you want to rule as I go?

14    THE COURT: Let me hear all of your objections.

15    MS. JAMES: With regard to count two, move for

16    Judgment of Acquittal as to Mr. Peralte. It's my contention

17    that the government has failed to prove a prima facie case.

18    This is with regard to the crack cocaine. There's absolutely

19    no evidence that's been presented to this jury that Mr.

20    Peralte had anything to do with any crack cocaine. And that's

21    taken from the testimony of all the witnesses. In fact, the

22    evidence is that this small quantity of crack cocaine was

23    found in the -- on a kitchen shelf of a residence that Mr.

24    Peralte has not been tied to in any way other than merely

25    being present on that particular day. Mr. James didn't

## Page 350

1    testify with regard to any agreement pertaining to crack

2    cocaine, he merely said that he cooked it or he had -- he

3    bought powder and had it made into crack, but he didn't -- I

4    don't think he gave sufficient evidence for that to go to the

5    jury.

6    With regard to count three, this would be the

7    possession count, again, we move for Judgement of Acquittal

8    as to -- and I'm sorry, count two was the conspiracy count

9    with regard to crack that I just argued about, Your Honor.

10    Count three being the substantive count, possession of more

11    than five hundred grams. I would move for Judgment of

12    Acquittal as to that count, the contention being that the

13    government failed to prove a prima facie case. At the most

14    we have mere presence in the residence.

15    And with regard to count four, that would be the

16    substantive count of possession of a small quantity of crack

17    cocaine that was located in the residence. And again, I

18    don't think the government has established any connection

19    between Mr. Peralte and that substance other than him being

20    in the residence and in a different part of the house at the

21    time. Not even -- they don't even make that connection that

22    he was in that particular area. I believe that was found in

23    a kitchen cabinet.

24    THE COURT: Response, Mr. Brown?

25    MR. BROWN: Your Honor, the government's position is

## Page 351

1    that the evidence is sufficient based upon the phone calls

2    that were made between Mr. James and Mr. Peralte relating to

3    coming back to Montgomery, the testimony -- further testimony

4    of Mr. James, the evidence seized at the residence, that is

5    sufficient for the jury to be able to find that there existed

6    an agreement, that that agreement was to distribute

7    quantities of cocaine and crack cocaine. And that the

8    evidence seized at the residence which make up counts three

9    and four would support the possession that is listed within

10    those counts.

11    THE COURT: Defendant's motion for Judgment of

12    Acquittal pursuant to Rule 29 as to each count individually

13    and collectively is denied. Mr. Brown, what is the

14    government's position as to the forfeiture allegation?

15    MR. BROWN: Your Honor, we did check yesterday and I

16    just failed to mention the fact that we did check yesterday.

17    The forfeiture allegation in its entirety was stricken.

18    Although the style of the case just listed Mr. Norman's name,

19    based upon that I have prepared several -- a half dozen or so

20    copies of the -- of a redacted indictment that we can use

21    that does not have the forfeiture allegation.

22    THE COURT: Any motions on behalf of Mr. Norman?

23    MR. MADISON: Yes, sir, Your Honor. Defendant Norman

24    likewise moves for Judgment of Acquittal. There's absolutely

25    no evidence of any probative value that has been admitted in

Page 352

1  this proceeding thus far that connects Mr. Norman to any drug
2  activity, much less a conspiracy with respect to count one of
3  the indictment. The only -- there's no testimony, period,
4  that I recall that anybody has provided that he had anything
5  to do with the drugs in question. I believe Mr. James'
6  testimony was concentrated with a co-Defendant and had
7  nothing to do with Mr. Norman.
8      The government has failed to prove any possessory
9  interest that Mr. Norman had in the house where the drugs
10 were located. The fact of failure to prove that possessory
11 interest then there could be no implication I don't think of
12 any constructive notice that might attach as a result of the
13 government's failure to bring forward the proof that Mr.
14 Norman had any possessory interest in that residence.
15     The only testimony given with respect to any
16 relationship between Mr. Norman and Ms. Montgomery was that
17 she was the mother of his child. All reasonable inferences of
18 doubt are to be resolved in favor of the Defendant. There's
19 no proof of any causal connection to my client, Mr. Norman,
20 and the drugs at issue in this case. The government hasn't
21 carried their burden, Your Honor, to carry this case beyond
22 or to require us to submit a defense.
23     As to the conspiracy, there's just absolutely -- I
24 heard no evidence in any manner which would indicate that Mr.
25 Norman had anything what so ever to do with the drugs which

Page 353

1  were found in the residence. Nothing what so ever. I don't
2  think that they can premise any of the counts of the
3  indictment on any of the evidence that's been presented in
4  this case. There's a fatal variance between the indictment,
5  the allegations made therein, and the proof offered at trial,
6  therefore I think a dismissal is required at this point, or a
7  Judgment of Acquittal granted.
8      THE COURT: What is the fatal variance in the
9  indictment?
10     MR. MADISON: Well, the fact it alleges he is a
11 willing conspirator and the fact that there's been no proof
12 that they offered to substantiate that allegation. There's
13 just an absolute failure of proof, Your Honor. I have
14 never -- I probably have -- I hate to say this, because it's
15 bad to make a general statement like that -- but we didn't
16 even have to ask the questions of the co-Defendant, Mr.
17 James, because there was absolutely no implication through
18 his testimony as to my client in this case. I don't recall a
19 single piece of evidence being offered that would indicate
20 that Mr. Norman had anything to do with any drugs in this
21 case, much less any drug conspiracy in this case.
22     And I would therefore move not only count one but
23 the other counts as well because there's been no evidence
24 submitted to infer that Mr. Norman had anything to do with
25 the allegations of a conspiracy in count two being the

Page 354

1  distribution of crack cocaine. I don't even think the
2  government presented a case that the amount of crack cocaine
3  that was seized arose to a level of a distribution level
4  anyway. I think that the final analysis done was a one point
5  something grams.
6      There's been no testimony that any powder -- and I
7  understand that most of the powder that was seized was
8  converted to crack, particularly concerning my client, Mr.
9  Norman. There's absolutely no proof offered as to any person
10 that Mr. Norman may have sold drugs to. There's no evidence
11 in this case that Mr. Norman acquired any drugs. There's no
12 evidence in this case that Mr. Norman paid for any drugs.
13     So, the argument that I am advancing with respect to
14 the lack of evidence and the total lack of evidence would be
15 as to each count set forth in the indictment where my client
16 is named as a co-conspirator or as a co-possessor of any of
17 the drugs in this case. There's just a total failure of proof
18 that in our opinion does not require the submission of this
19 case to the jury as to the Defendant Norman.
20     THE COURT: Response?
21     MR. BROWN: Your Honor, I want to address a couple
22 of those points. Defense counsel incorrectly stated the
23 burden at this stage of the matter that the evidence would be
24 most favorable, in the light most favorable to the
25 government, not to the Defendant.

Page 355

1      As it relates to defense counsel's assertion that
2  the two point six grams which was the actual amount of
3  cocaine base that was seized at the residence, in his opinion
4  that was not for distribution, Sergeant Drummond
5  testified on cross-examination to questions posed by Mr.
6  Madison that it was, in fact, a quantity that could be
7  considered for distribution. As it relates to whether there
8  was any possessory interest in the residence or not, that is
9  not required. There's no element of proof that requires that
10 the government show that the person at the residence owned
11 the residence, otherwise none of the three individuals in the
12 residence would be charged in this case. However, the
13 Defendant was present at the residence and was observed with
14 an item that later turned out to be crack cocaine that he
15 placed in the garbage can. And that, combined with the other
16 evidence previously stated by the government, provides
17 sufficient evidence that the jury could find -- could find a
18 verdict of guilty.
19     MR. MADISON: Judge, may I respond?
20     THE COURT: Briefly.
21     MR. MADISON: Judge, just with respect to that,
22 there was absolutely no evidence presented in this case to
23 support the element of intent or knowledge under one of the
24 elements of conspiracy. There's nothing. There was -- no
25 evidence what so ever was presented to show that Mr. Norman

Condensit™

| Page 356 |
|---|
| 1   had any knowledge of anything pertaining to any of the drugs |
| 2   in that residence, so it's a total failure of proof with |
| 3   respect to that element of the conspiracy. And I may have |
| 4   misstated the amount on that, I was giving an estimation. |
| 5   But with respect to that, Your Honor, there's no intent, no |
| 6   knowledge. The elements just are lacking and the government |
| 7   has failed to carry its burden of moving the case forward to |
| 8   the jury in that regard. |
| 9       THE COURT: The Court has considered the Defendant |
| 10  Norman's Motion for Judgment of Acquittal as to each count. |
| 11  The Court reserves ruling on the Defendant's motion for |
| 12  Judgment of Acquittal as to count one and count two. |
| 13  Defendant's Motion for Judgment of Acquittal as to count |
| 14  three and count four are each denied. We will be in recess |
| 15  until 1:00 o'clock. |
| 16      (At which time, 11:45 a.m., a recess was had until |
| 17  1:00 p.m., at which time, outside the presence of the jury, |
| 18  the trial continued.) |
| 19      THE COURT: Mr. Madison, I understand you need to |
| 20  take something up outside the presence of the jury? |
| 21      MR. MADISON: Yes, sir. Just because of the fact |
| 22  that I limited the Motion for Judgment of Acquittal to the |
| 23  reasons set forth therein I also wanted to advise the Court |
| 24  that we weren't waiving any of the prior rulings on motions |
| 25  or anything else by not specifically alluding to those |

| Page 357 |
|---|
| 1   rulings in the Motion for Judgment of Acquittal that we made |
| 2   at the close of the government's evidence. I wanted to make |
| 3   the record clear that we incorporated any of those prior |
| 4   arguments that we asserted without setting forth each one |
| 5   individually unless the Court wants us to do that. |
| 6       THE COURT: I think you have got -- whatever |
| 7   objections you stated should be preserved for the record. |
| 8       MR. MADISON: I just wanted to make sure that by not |
| 9   stating those in the Judgment of Acquittal we weren't waiving |
| 10  those. |
| 11      THE COURT: Particularly what are you referring to, |
| 12  the Blakely issues or the severance issues? |
| 13      MR. MADISON: All those, and the Morrow issues, the |
| 14  suppression issues, all the rulings on all the motions that |
| 15  have been filed where we have filed objections to those |
| 16  rulings and so forth. |
| 17      THE COURT: You have your objections. |
| 18      MR. MADISON: Yes, sir, thank you. |
| 19      THE COURT: Are you ready to proceed, Ms. James? |
| 20      MS. JAMES: Judge, I believe they are bringing Mr. |
| 21  James up now and it was going to just take a minute or so |
| 22  they said and then we will be ready to proceed. And if I |
| 23  might just step outside so that I can get my other witnesses |
| 24  lined up. Won't take me but a minute. |
| 25      (pause) |

| Page 358 |
|---|
| 1       THE COURT: Let's bring the jury back. |
| 2       (At which time, 1:10 p.m., the jury entered the |
| 3   courtroom.) |
| 4       THE COURT: Mr. James, I remind you that you are |
| 5   under oath. Ms. James, you may proceed. |
| 6       ANDREW K. JAMES, witness recalled by the |
| 7   Defendant, having been previously duly sworn or affirmed, |
| 8   testified as follows: |
| 9           DIRECT EXAMINATION |
| 10  BY MS. JAMES: |
| 11  Q. Mr. James, you were here before lunch and there are a |
| 12  couple of things I need to clear up. |
| 13  A. Yes, ma'am. |
| 14  Q. Tell me your best recollection of when you remember |
| 15  having spoken with Mr. Wingard here -- |
| 16      MS. JAMES: Excuse me, Judge, I have got a witness |
| 17  that has come in the door, I may I ask him to step out? |
| 18      THE COURT: Yes. |
| 19      MS. JAMES: Step in that little room. |
| 20  Q. Excuse me. When is the best you can recall you spoke |
| 21  with Mr. Wingard? |
| 22  A. 21 days I think after I got locked up. |
| 23  Q. So that would have been in October probably? |
| 24  A. It's exactly 21 days after I got locked up, whatever |
| 25  month that falls. |

| Page 359 |
|---|
| 1   Q. And how about -- did you speak with him recently, in the |
| 2   past couple of weeks? |
| 3   A. Yeah, I spoke to him the other day. |
| 4   Q. Okay. When you spoke with him did he take notes of your |
| 5   conversation? |
| 6   A. The first time, yes. The second time, I guess, I don't |
| 7   know. |
| 8   Q. Okay. You were making an effort to tell him what you |
| 9   knew about drug activity, is that what your goal was? |
| 10  A. Yes, ma'am. |
| 11  Q. And do you remember having made a statement to him -- |
| 12  well, let me back up just a minute. On your direct |
| 13  examination when Mr. Brown asked you about your involvement |
| 14  with Mr. Norman in any kind of drug activity, you said that |
| 15  you were involved with him back when he was in high school; |
| 16  do you remember that? |
| 17  A. Yes, ma'am. |
| 18  Q. And he worked for you in high school? |
| 19  A. Yes, ma'am. |
| 20  Q. In the drug trade. |
| 21  A. Yes, ma'am. |
| 22  Q. And that was pretty much the extent of your testimony |
| 23  with regard to that question. |
| 24  A. Yes, ma'am. |
| 25  Q. Would you agree? |

## Page 360

1  A. Yes, ma'am.

2  Q. Now, do you remember having spoken to Mr. Wingard on one

3  or two of those occasions, those two occasions where you have

4  talked to him and telling him something a bit different about

5  Mr. Norman?

6  A. He had brought me a piece of paper in yesterday with

7  that testimony on it, and I told him I didn't recollect that.

8  I didn't know if I had said that or not, but I didn't recall

9  that.

10  Q. All right. Are you saying where it says in this form --

11  he showed you the form?

12  A. Yeah, I saw the form yesterday.

13  Q. Okay.

14      MS. JAMES: Judge, may I approach the witness?

15      THE COURT: Yes.

16  Q. I am going to show you what you has been marked for

17  identification purposes as Defendant's Exhibit 4 and ask you,

18  Mr. James, if this is the form that you saw?

19  A. Yes, ma'am.

20  Q. Okay. And did you understand this to be notes of

21  conversations that he had had with you?

22  A. Yes, ma'am.

23  Q. And specifically here where it says James stated --

24      MR. MADISON: I am going to object to her reading

25  out loud, I would rather him read it himself first, because

## Page 361

1  he says he hadn't --

2      THE COURT: sustained. Let him read it and you can

3  ask whether he recalls making that statement.

4  Q. Let me have you read that particular two sentences as

5  well as that paragraph right there. Read it to yourself.

6  A. I already had read the two statements. There was two

7  things on this piece of paper that I had told Mr. Wingard

8  when I read it yesterday, I said I didn't recall saying. But

9  it would have to come from Norman -- drugs would have to come

10  from Norman. I told him I didn't remember. I waited and I

11  tried to think and I tried to recollect, tried to recall, and

12  I didn't recall saying that. He said well, you said it. I

13  said I don't recall saying it. He said only thing I want you

14  to do, Mr. James, is tell the truth. I said I don't remember

15  telling you that. And he said well, if you don't remember me

16  telling you that, only say the truth. Then he came down here

17  and he said about --

18      THE COURT: Read it to yourself, Mr. James.

19  A. Okay. Where he said about the dryer, I saw Mr. Capulco

20  put it in the dryer, I said I didn't say that. He said that's

21  what I wrote down that you said. I said I didn't say that.

22  When we got over to the jail I asked him why didn't he flush

23  the dope, that's what I said. Those are the two things I had

24  a question about when he asked me about that document.

25  Q. So what your testimony is here today that you have no

## Page 362

1  recollection to having told Mr. Wingard of Mr. Norman selling

2  you drugs?

3      MR. MADISON: objection, Judge, there's absolutely

4  nothing in the record so far pertaining to that. May we --

5      THE COURT: overruled. You can ask that question.

6  Q. You don't have any recollection of having told Mr.

7  Wingard in either of those interviews that in 2001 that Mr.

8  Norman -- you were getting drugs from Mr. Norman that he was

9  getting from Mr. Peralte?

10  A. Yeah, I am certain that I did not say that. If I told --

11  I told him yesterday, if I did say that I was mis -- I mis --

12  we got some kind of misunderstanding, because I had told him

13  when he came over there to the facility, I said that me and

14  Mr. Norman didn't do any drug transactions together, the only

15  time we did drug transactions was when I -- when he was

16  working for me.

17  Q. And that was back when he was working in high school?

18  A. Yeah.

19  Q. So you are saying Mr. Wingard must have misunderstood

20  something that you said or --

21  A. I believe he misunderstood me because when I was doing

22  the proffer they thought at first I was talking about

23  Alphonso Norman, but all of a sudden they said who? I said I

24  am talking about Peralte.

25  Q. Well --

## Page 363

1  A. I said I didn't have to go to -- I told him I didn't

2  have to go through Alphonso to get anything, I knew Peralte

3  personally.

4  Q. Well, did you tell him that Norman dealt with Peralte

5  personally.

6  A. I assumed that he did. That's what I said.

7      MR. MADISON: I object to the assumption.

8  A. I don't know personally.

9      THE COURT: wait, Mr. James, if you hear an

10  objection please stop your response so we can address it. The

11  objection?

12      MR. MADISON: In response to that he said he

13  assumed, I object to him testifying to any assumption that he

14  may have made.

15      THE COURT: sustained. Don't tell us what you

16  assumed, tell us what you know, Mr. James.

17  A. I don't know if Peralte and Alphonso had any dealings

18  together.

19  Q. And you don't remember having told Mr. Wingard that?

20  A. Mr. Wingard brought that to my attention when he brought

21  me the paper back and he came back there and I told him the

22  two things that I had a problem with on testifying to. The

23  fact that that part that you brought up and the fact that I

24  saw -- I mean that Peralte told me that he put the dope in

25  the dryer. Them was the two things that I pointed out on that

26  paper that I had a problem with. I don't remember saying.

| Page 364 | Page 366 |
|---|---|
| 1  Q. Okay. | 1  Q. All right. |
| 2  A. And that's what I told him. | 2    MS. JAMES: I don't have any further questions of |
| 3  Q. All right. Well, you said here on your direct | 3  this witness. |
| 4  examination that you were extremely good friends with Mr. | 4    THE COURT: Would it be more convenient, Mr. Madison |
| 5  Norman; is that correct? | 5  or Mr. Arrington to take your cross first or the government's |
| 6  A. Yes, ma'am. | 6  cross first? Which would you prefer? |
| 7  Q. And how much you hated being here; is that right? | 7    MR. MADISON: Judge, I would prefer that the |
| 8  A. Yes, ma'am. | 8  government go first. |
| 9  Q. When is the last time you had a conversation with Mr. | 9    THE COURT: Okay. Mr. Brown. |
| 10  Norman or somebody in his family?  Don't tell me where but I | 10    CROSS-EXAMINATION |
| 11  am just saying when? | 11  BY MR. BROWN: |
| 12  A. Lately? | 12  Q. Mr. James, isn't it true that you had discussions on the |
| 13  Q. Lately, how lately? | 13  date of the search warrant with Mr. Norman and Mr. Peralte? |
| 14  A. I talked to his girlfriend, I think about two or three | 14  A. Yeah.  We discussed the case when we got back to the |
| 15  weeks ago. | 15  jail, yeah. |
| 16  Q. And has the subject of your testimony been discussed | 16  Q. Okay. Prior to that wasn't there some jokes or something |
| 17  with any of those people? | 17  that -- |
| 18  A. No, I don't know if my testimony was discussed or not. I | 18  A. Yeah. |
| 19  know I asked them what was they going to do, was they going | 19  Q. -- when Mr. Norman -- |
| 20  to go to trial, and I might have said what I was going to | 20    MR. MADISON: Judge, objection. May we approach a |
| 21  say. | 21  minute and set forth what the objection is? |
| 22    MR. MADISON: Judge, I object to anything this other | 22    THE COURT: Approach. |
| 23  party may have said, that's a third-party hearsay. | 23    (At which time the following occurred at side-bar:) |
| 24    THE COURT: sustained. | 24    MR. MADISON: To the extent, Judge, they were in |
| 25  Q. Mr. James, how long have you known Mr. Norman? | 25  custody at that point in time I think the conspiracy would |

| Page 365 | Page 367 |
|---|---|
| 1  A. I have known him quite a while. I have known him a long | 1  have ceased.  Any alleged conspiracy would have ceased at |
| 2  time. | 2  that point in time and I think that the testimony that he is |
| 3  Q. Since he was in high school? | 3  trying to elicit would be something after they are already in |
| 4  A. Yes. | 4  custody and not part of a conspiracy or something alleged to |
| 5  Q. Did you know him before he was in high school? | 5  have been said during the course and in furtherance of the |
| 6  A. No. | 6  conspiracy and therefore it would be hearsay and |
| 7  Q. What is the difference in your ages if you know? | 7  inadmissible, number one.  And then secondly, I think it |
| 8  A. I am 39 so I'm assuming that he is 31. | 8  would be hearsay as far as anything that my client may have |
| 9  Q. Okay. So any statements that would -- that were | 9  said or -- because he is not going to take the stand. And it |
| 10  contained in this report that you have just recognized up | 10  would be a violation of the confrontation clause. |
| 11  there as having been shown to you by Mr. Wingard that said | 11    MR. BROWN: First of all I don't know what the |
| 12  you had any drug transactions with Mr. Norman would not be | 12  prohibition is by asking a person about a question after the |
| 13  something that you said; is that correct?  Other than this | 13  object of the conspiracy if it's relevant to the conspiracy, |
| 14  high school situation. | 14  but never the less, I was asking him about something that |
| 15  A. Rephrase the question again. | 15  happened earlier that day, not at the time that he had been |
| 16  Q. You are saying that you did not say those statements. | 16  arrested.  So that's what I was asking him about, and what I |
| 17  A. I told you I said I had two problems on that piece of | 17  was asking about would be within the scope of the conspiracy. |
| 18  paper. | 18    THE COURT: okay. Mr. James was not engaged with the |
| 19  Q. All right. | 19  government as far as participating as a witness on behalf of |
| 20  A. The first problem was the one that you addressed. The | 20  the government at the time that any discussions between Mr. |
| 21  second problem was when they said that Peralte told me that | 21  James and Mr. Norman and Mr. Peralte occurred immediately |
| 22  he put the drugs in the dryer. | 22  after the arrest, was he? |
| 23  Q. Okay. | 23    MR. BROWN: No, sir. |
| 24  A. I did not say them two things.  If I did, I didn't | 24    THE COURT: okay. |
| 25  recall saying them. That's what I am saying. | 25    MR. MADISON: And Judge -- |

Page 368

1    THE COURT: Objection overruled.
2    MR. MADISON: I forgot what I was going to say. I
3    just went blank. I can't remember. Have y'all got anything to
4    add?
5    THE COURT: Anything, Ms. James?
6    MS. JAMES: No, sir.
7    MR. MADISON: I know what it was, Judge, I'm sorry.
8    Mr. Brown is bringing up apparently testimony that wasn't
9    given in direct, and he has already had his opportunity to
10   interview and interrogate this witness previously, and he is
11   raising a new issue which is not properly the subject of
12   cross-examination, he is bringing up new direct evidence.
13   THE COURT: Overruled.
14   (At which time the following occurred in open
15   court:)
16   THE COURT: You may proceed, Mr. Brown.
17   MR. BROWN: Thank you, Your Honor.
18   Q. Mr. James, before we were interrupted there was -- I had
19   a question about some jokes or something that was being told
20   by the two Defendants. Would you just go back into that,
21   what was being said?
22   A. Okay. When I got to the house and start telling the
23   jokes saying if -- if it was a farmer in the garden, he was
24   gardening, he chopped a snake. That when he chopped the
25   snake he took the snake into the house and fed it and got it

Page 369

1    fat, and once the snake got well the snake turned around and
2    bit him.
3    Q. And who was telling that joke?
4    A. Alphonso told that joke.
5    Q. Now, you were at the residence on East 4th Street on the
6    day of the search warrant, obviously; is that right?
7    A. Yes, sir.
8    Q. You had been there on previous occasions; is that right?
9    A. I had been there a time or two.
10   Q. Was Mr. Norman there on those occasions?
11   A. Sometimes he was there, sometimes he wasn't. Sometimes
12   only Tammy was there.
13   Q. Who is that?
14   A. That's his girlfriend.
15   MR. BROWN: No further questions, Your Honor.
16   THE COURT: Mr. Madison, Mr. Arrington?
17   MR. MADISON: No further questions, Your Honor.
18   THE COURT: Any redirect, Ms. James?
19   MS. JAMES: No, sir.
20   THE COURT: You may step down.
21   MS. JAMES: Your Honor, may I step out and get my
22   next witness?
23   THE COURT: Yes.
24   MS. JAMES: Your Honor, at this time we would call
25   Billy Smith.

Page 370

1    THE CLERK: You do solemnly swear or affirm that the
2    testimony you give in the trial of this cause to be the
3    truth, the whole truth, and nothing but the truth, so help
4    you God.
5    THE WITNESS: I do.
6    BILLY SMITH, witness for the Defendant, having
7    been duly sworn or affirmed, testified as follows:
8    DIRECT EXAMINATION
9    BY MS. JAMES:
10   Q. Would you state your name, please.
11   A. Billy Smith.
12   Q. Mr. Smith, how are you employed?
13   A. I am a private investigator.
14   Q. And how long have you worked in that capacity?
15   A. 22 and a half years.
16   Q. Are you located here in Montgomery?
17   A. That's correct.
18   Q. And have you done work for me on previous occasions?
19   A. That's correct, I have.
20   Q. And have you been requested to conduct an investigation
21   to some extent in the present case, United States of America
22   versus Capulco Peralte?
23   A. That's correct, I have.
24   MS. JAMES: Your Honor, may I approach?
25   THE COURT: Yes.

Page 371

1    Q. Mr. Smith, I am going to show you what I have marked for
2    identification purposes as Defendant's Exhibit 5 and ask you
3    if you have seen this before?
4    A. That's correct, I have.
5    Q. And what is it, please?
6    A. That is a video tape of the house over on East 4th
7    Street.
8    Q. What specific request did I make of you with regard to
9    the dwelling at 2429 East 4th Street in Montgomery, Alabama?
10   A. You requested that I go over to the residence and take a
11   video recording of this residence and also some still shots.
12   Q. And did you do that?
13   A. That's correct, I did. And also of the drainage ditch in
14   the back of the house.
15   Q. All right. Does this appear to be in the same condition,
16   this video tape, as when you gave it to me?
17   A. That's correct, it does.
18   MS. JAMES: Judge, may I approach the witness again?
19   THE COURT: Yes.
20   Q. Mr. Smith, I am going to show you what I have marked as
21   Peralte collective Exhibit 6 and ask you if you can identify
22   those photographs. (complies)
23   A. Yes. This is the one of the drainage ditch in the back.
24   This is the rear of the home, it was a shot of the rear
25   windows. This is the rear of the home with the door, the back

## Page 372

1  door. And this is also another picture of the back door.

2  Q. Mr. Smith, when you took these --

3    MS. JAMES: well, at this time, Your Honor, I would

4  move for the admission of collective Exhibit 6, Peralte 6,

5  and also the video tape which is Peralte Exhibit 5.

6    MR. BROWN: No objection from the government.

7    THE COURT: Any objection, Mr. Madison?

8    MR. MADISON: No, sir, Your Honor.

9    THE COURT: without objection Government's Exhibit 5

10  and the collective Government's Exhibit -- I'm sorry, without

11  objection Defendant Peralte's Exhibit 5 and the collective

12  Defendant Peralte's Exhibit 6 are admitted.

13    MS. JAMES: Thank you.

14  Q. Mr. Smith, how long ago did you do this video and the --

15  A. It was conducted back on July the 7th of this year.

16  Q. Okay. And at that time was the dwelling occupied or not?

17  A. It was unoccupied. As a matter of fact it has a for sale

18  sign, Aronov Real Estate Company has a sign in the front yard

19  for sale.

20  Q. Okay.

21    MS. JAMES: Judge, may I approach?

22    THE COURT: Yes.

23    MS. JAMES: And may I have permission to publish?

24    THE COURT: Yes.

25  Q. Mr. Smith, I know you have just identified these, but if

## Page 373

1  you will for the benefit of the jury -- for the benefit of

2  the jury I would like for you to describe. This is collective

3  Exhibit 6, which is now in evidence. Tell us what this is?

4  A. Okay. That's the rear door. It kind -- it's not exactly

5  at the back of the house, it's kind of at the corner on the

6  side.

7  Q. Okay. And would this be just a different angle of that

8  same door?

9  A. That's correct, it's a different angle.

10  Q. All right. And with regard to this photograph. I am just

11  going to kind of slide it over, tell us what that is?

12  A. Okay, that's the rear of the house.

13  Q. All right. And this photograph?

14  A. That is the rear drainage. As you can see the two holes

15  there and the ditch down below.

16  Q. Okay. Now, in relation to the back door or the back

17  windows of the house, how far is that drainage ditch?

18  A. It's approximately 21 yards.

19  Q. Okay.

20    MS. JAMES: Now, at this time, Your Honor, may I

21  play the video?

22    THE COURT: Any objection?

23    MR. BROWN: No, Your Honor.

24    THE COURT: Any objection, Mr. Madison?

25    MR. MADISON: No, sir, just -- just for purposes of

## Page 374

1  cross-examination if she could label them 6-A, 6-B or 6-C or

2  something like that, I would appreciate it. I may not get

3  them accurately.

4    MS. JAMES: He will have to show them to him.

5    THE COURT: How long is the video tape?

6    MS. JAMES: About five minutes max.

7    THE COURT: You may play it. Ms. James, if you would

8  clear that screen, it still has the marks that the witness

9  has made on there even though it's a video.

10    MS. JAMES: Yes, sir.

11  Q. Mr. Smith, I am just going to start this and then I will

12  pause it to make sure it's the video.

13  A. Okay.

14  Q. I don't believe there's any reason for you to narrate it

15  because you have talked on it.

16  A. Right.

17    (At which time, 1:22 p.m., an audio/video tape was

18  played in open court, during which, the following occurred:)

19  Q. All right. I have just paused this video, does this

20  appear to be the video that you have described that's in

21  evidence?

22  A. That's correct, it is.

23  Q. Would that be your voice that is explaining verbally

24  what you are seeing visually?

25  A. That's correct.

## Page 375

1  Q. All right.

2    (At which time, 1:27 p.m., the audio/video tape was

3  turned off, after which, the following occurred:)

4  Q. Does that conclude the video, Mr. Smith?

5  A. That's correct.

6  Q. Now, in addition to your taking the photographs and the

7  video, did I have occasion to ask you to make some inquiries

8  into Mr. Peralte's having done work here in Montgomery?

9  A. That's correct, you did.

10  Q. Tell us what you did at that request.

11  A. Okay. I went by -- well, first of all I called Mr.

12  Richard Thomas, and I had him to --

13  Q. What is he associated with?

14  A. The Rose Club, which used to be Top Flight.

15  Q. What is that, a nightclub?

16  A. That's correct. And we met up at the club and I

17  inquired about the Defendant and he told me that he knew him.

18  He stated that he had put on a couple of promotions at his

19  club.

20  Q. When you say promotions, do you mean some sort of

21  entertainment?

22  A. That's correct.

23  Q. Okay. Did he specify any particular groups or anything

24  like that that he could recall?

25  A. Yes. One, I think this particular one fell through, I

Page 376

1   believe he said, one with -- let's see if I can think of that
2   group. Juvenile, the group Juvenile.
3       MR. MADISON: Judge, I am just going to object,
4   right now he is testifying to hearsay testimony.
5       THE COURT: Overruled.
6   A. Okay. The group Juvenile.
7   Q. Okay.
8   A. And he had put one other promotion on that he could
9   recall right off the top of his head. He was to get some
10  flyers together for me and get back with me.
11      MS. JAMES: Thank you. I don't have any further
12  questions, if you will answer their questions.
13  A. Okay.
14      MS. JAMES: Who do you --
15      THE COURT: Let's take the government first.
16          CROSS-EXAMINATION
17  BY MR. BROWN:
18  Q. Mr. Smith, how are you doing today?
19  A. Fine, thank you.
20  Q. Did you ask Mr. Thomas how much the -- how much he was
21  charging Mr. Peralte for renting the club for those
22  promotions?
23  A. No, I did not ask him that. But I know he had said that
24  it was a misunderstanding on the amount for the group coming,
25  it was like 25 thousand that he thought it was like 25

Page 377

1   hundred.
2   Q. Okay. Anyway, you used he twice.
3   A. When I am talking about he I am talking about the
4   Defendant.
5   Q. All right.
6   A. Right, the Defendant had quoted the Juvenile -- well,
7   the group Juvenile had quoted him, the manager, 25 thousand
8   and Mr. Thomas thought it was like 25 hundred.
9   Q. Okay. And that's just for the group to come in?
10  A. That's correct.
11  Q. That's what they would pay the group.
12  A. That's correct.
13  Q. That's not how much that Mr. Peralte would have to pay
14  to rent the facility?
15  A. To rent the club, that's correct.
16  Q. And you don't know about the other deal how much it
17  would have cost to rent those facilities?
18  A. No, I didn't inquire about that.
19  Q. Okay. Thank you, Mr. Smith.
20  A. You are welcome.
21      THE COURT: Mr. Madison?
22      MR. MADISON: No questions, Your Honor.
23      THE COURT: Any redirect, Ms. James?
24      MS. JAMES: No, Your Honor. May this witness be
25  excused?

Page 378

1       THE COURT: Any objection to him being released?
2       MR. BROWN: No, sir.
3       THE COURT: Any objections, Mr. Madison?
4       MR. MADISON: No, sir.
5       THE COURT: Thank you, Mr. Smith, you are free to
6   go.
7       THE WITNESS: Thank you.
8       THE COURT: Ms. James, if you will call your next
9   witness.
10      MS. JAMES: Your Honor, at this time I would like to
11  recall Detective Wingard.
12          CHRIS WINGARD, witness recalled by the
13  Defendant, having been previously duly sworn or affirmed,
14  testified as follows:
15          DIRECT EXAMINATION
16  BY MS. JAMES:
17  Q. Detective Wingard, you testified before lunch, and you
18  are reminded you are still under oath. You again have been
19  present in the courtroom when everyone has testified and
20  obviously you just heard Mr. James testify and indicate that
21  he had not made a certain statement that was contained within
22  your report that I showed you earlier today, Peralte's
23  Exhibit 4 which was marked for identification purposes. Do
24  you remember that?
25  A. The testimony that he gave?

Page 379

1   Q. Right. You remember the testimony?
2   A. Yes, ma'am.
3   Q. And you remember the document that I showed you earlier,
4   your DEA-6 that I had marked as Peralte's Exhibit 4?
5   A. Yes, ma'am.
6   Q. And Mr. James essentially denied having said certain
7   things about involvement with Mr. Norman and some drug
8   activity in 2001 that's included in your report. What is
9   your recollection of that, did he say it or not?
10  A. Yes, ma'am, he did say it.
11  Q. He did tell you that?
12  A. That's correct.
13  Q. And then he, of course, today denied it, but is it your
14  testimony that it would have been -- wouldn't have been in
15  your report if he had not said it?
16      MR. MADISON: Judge, I am going to object at this
17  point in time, the witness has already testified what he said
18  and what he advised this witness and I would like to approach
19  if we may.
20      THE COURT: I'm sorry, you would like to do what?
21      MR. MADISON: Approach, Your Honor.
22      THE COURT: If you will approach.
23      (At which time the following occurred at side-bar:)
24      THE COURT: The record will show that we are in the
25  presence but outside the hearing of the jury.

Page 380

1   MR. MADISON: Judge, earlier we had an out of the
2   presence conference concerning the testimony of Mr. James and
3   the Court was going to allow Ms. James to call him back.
4   Well, she did call him back and he did testify as to what he
5   said, and he made the statement that he did not make those
6   statements contained in the report. Now they are trying to
7   get in the content of a report which is strictly hearsay, and
8   I think the case law says that the officer's statements are
9   hearsay. And I don't know -- you know, I thought the Court
10  had said earlier --
11      THE COURT: Let's put this issue to rest about the
12  law enforcement reports. First of all, nobody has offered
13  the report into evidence, so that issue is off the table. Any
14  reference to the report can properly be shown to the witness
15  who made the report to refresh their recollection or any
16  other permissible reasons under the rules of evidence.
17      MR. MADISON: But the declarant --
18      THE COURT: And the declarant has testified
19  concerning what his testimony was and he has testified about
20  his relationship to Mr. Norman, so to the extent this witness
21  can be questioned about what Mr. James had told him in the
22  past regarding any involvement in drug activity, I will
23  permit that to show bias or credibility on the part of Mr.
24  James, the testimony as a whole. You have got your objection.
25      MS. JAMES: Thank you.

Page 381

1       (At which time the following occurred in open
2   court:)
3       THE COURT: You may continue.
4   BY MS. JAMES:
5   Q. Thank you, Detective Wingard, I have no further
6   questions. Wait a minute, my memory is getting bad, I think
7   there was a question on the table.
8   A. I apologize, you are going to have to reask it.
9   Q. I can't remember. I don't remember what my question
10  was. I guess if --
11      THE COURT: You can have Mr. Dickens read it back.
12      (At which time the referred to questions and answers
13  were read by the reporter.)
14  Q. Mr. Wingard, or Detective Wingard, my question to you is
15  would there have been any reason that you would have put that
16  in the report if Mr. James had not said it?
17  A. No, ma'am.
18  Q. Okay. That's all the questions I have, thank you.
19      THE COURT: Mr. Brown?
20      MR. BROWN: No redirect, Your Honor.
21      THE COURT: Mr. Madison?
22      MR. MADISON: We don't have any further questions,
23  Your Honor.
24      THE COURT: You may step down.
25      MS. JAMES: Your Honor, at this time I would move

Page 382

1   for admission of Defendant's Exhibit 7.
2       THE COURT: Defendant Peralte Exhibit 7?
3       MS. JAMES: Yes, Your Honor. And by stipulation
4   this is a State of Florida marriage record, Department of
5   Health and Vital Statistics that is certified, that Mr.
6   Peralte's --
7       THE COURT: Is there a stipulation among counsel
8   that this be admitted?
9       MS. JAMES: It is with regard to the government and
10  Peralte.
11      MR. MADISON: I don't have any objection, if that's
12  what it purports to be.
13      THE COURT: By agreement and stipulation, the
14  Defendant Peralte's Exhibit 7 is admitted. Ladies and
15  gentlemen, I instruct you that by agreement certain facts can
16  be submitted to you for your consideration without the
17  requirement of witnesses testifying about the establishment
18  of certain documents such as Defendant Peralte's Exhibit 7,
19  and the attorneys have agreed that that exhibit can be
20  submitted to you without a witness getting on the stand and
21  testifying about the origin of that exhibit. And you can
22  take that as a fact to consider in this case along with all
23  other properly introduced evidence in this case.
24      MS. JAMES: Thank you. Judge, may I have one minute
25  with the clerk?

Page 383

1       THE COURT: Yes. And for the record Defendant
2   Peralte Exhibit 7 is admitted.
3       (pause)
4       MS. JAMES: Your Honor, at this time Defendant
5   Peralte rests.
6       THE COURT: If counsel will approach.
7       (At which time the following occurred at side-bar:)
8       THE COURT: The record will reflect that we are in
9   the presence but outside the hearing of the jury. Any motions
10  on behalf of Defendant Peralte?
11      MS. JAMES: Yes, Your Honor, at this time I would
12  renew my Motions for Judgment of Acquittal as to each and
13  every count of the indictment based on the arguments that
14  were raised as well as the evidence just presented in Mr.
15  Peralte's case.
16      THE COURT: Any further response?
17      MR. BROWN: No, sir.
18      THE COURT: Defendant Peralte's Motion for Judgment
19  of Acquittal under Rule 29 is severely and collectively
20  denied.
21      MR. MADISON: Judge, we renew our Motions for
22  Judgement of Acquittal. Basically we don't think any
23  additional evidence has been submitted to substantiate any of
24  the claims of the conspiracy, and the count two that you
25  reserved your ruling on. We additionally don't think that

Page 384

1  any additional evidence has been presented to support any of
2  the evidence which is the subject of counts three and four to
3  connect our client to that either, and we therefore renew our
4  Motion for Judgment of Acquittal on that too.
5      MR. BROWN: Same response, Your Honor.
6      THE COURT: The Court will continue to reserve the
7  ruling as to counts one and two of the indictment as to
8  Defendant Norman. Defendant Norman's Motion for Judgment of
9  Acquittal as to counts three and four are collectively and
10 individually denied.
11     MR. ARRINGTON: You rest?
12     MR. MADISON: Judge, we were going to rest too. And
13 I think you had said at one time, Your Honor, you wanted to
14 off the record out of the presence of the jury take up with
15 our clients not taking the stand.
16     THE COURT: I do.
17     MS. JAMES: I should have done that before I rested.
18     THE COURT: We can take that up if you will permit
19 me to question each of your clients before we bring the jury
20 back in. Is your intention not to call any witnesses?
21     MR. MADISON: We are not going to call any
22 witnesses.
23     MR. BROWN: And Judge, just for the record the
24 government would not oppose the defense being able to reopen
25 their case should the Defendants on the record indicate that

Page 385

1  they did want to testify.
2      THE COURT: Why don't we take up these matters
3  outside of the presence of the jury. I will excuse them so
4  that we can do that.
5      (At which time the following occurred in open
6  court:)
7      THE COURT: Again, ladies and gentlemen, we are at a
8  proceeding in the case where it would be more efficient for
9  your time and the Court's time to take up matters outside of
10 your presence so that you can be better accommodated as well
11 as us. I would ask that you leave your notes in the courtroom
12 face down. I instruct you not to discuss the case among
13 yourselves or allow anyone to discuss the case with you at
14 this time. We may be in recess for as long as 30 minutes. If
15 you can, make sure you are assembled in the jury assembly
16 room and we will call you when we are through with the
17 Court's business outside of your presence. You are excused.
18     (At which time, 1:53 p.m., the jury left the
19 courtroom.)
20     THE COURT: Ms. James, I understand that you have
21 concluded calling any witnesses with the possible exception
22 of your client; is that accurate?
23     MS. JAMES: Yes, Your Honor. I may have rested
24 prematurely, and it's my understanding that Mr. Peralte
25 chooses not to testify, and if that should change I will seek

Page 386

1  the opportunity to reopen.
2      THE COURT: Certainly I will not preclude that
3  opportunity. Mr. Peralte, if you will stand. Mr. Peralte,
4  your name is Capulco Peralte for the record?
5      THE DEFENDANT: Yes, sir.
6      THE COURT: And you are the accused in the trial of
7  United States versus Capulco Peralte and Alphonso Norman?
8      THE DEFENDANT: Yes, sir.
9      THE COURT: Mr. Peralte, you have heard your
10 attorney indicate that she has called all of the witnesses
11 that she wishes to call in your defense, and I want to ask
12 you if you -- if you intend to testify in your case?
13     THE DEFENDANT: No, sir.
14     THE COURT: You understand you have a right to
15 testify in your own defense, do you not?
16     THE DEFENDANT: Yes, sir.
17     THE COURT: And you understand that no one can force
18 you or coerce you to testify, nor use that to prevent you
19 from testifying; do you understand that?
20     THE DEFENDANT: Yes, sir.
21     THE COURT: Is it your desire not to testify in your
22 own defense a desire that you have or a decision that you
23 have made on your own free will and without any influence
24 from anyone else?
25     THE DEFENDANT: Yes, sir.

Page 387

1      THE COURT: Has anyone threatened you or coerced you
2  to prevent you from testifying in this case?
3      THE DEFENDANT: No, sir.
4      THE COURT: And based upon your understanding of
5  your rights, what is your desire about testifying, Mr.
6  Peralte?
7      THE DEFENDANT: Not to testify.
8      THE COURT: Not to testify?
9      THE DEFENDANT: (Defendant nods head in the
10 affirmative.)
11     THE COURT: You may be seated.
12     MS. JAMES: May I ask just one followup question?
13 Mr. Peralte, have you and I discussed the benefits, positive
14 and negative of your testifying?
15     THE DEFENDANT: Yes.
16     MS. JAMES: And do you understand if you did take
17 the stand to testify the government would be allowed to go
18 into the fact that you have prior convictions?
19     THE DEFENDANT: That's correct.
20     MS. JAMES: And have you considered that in
21 connection with your decision not to testify?
22     THE DEFENDANT: Yes, I have.
23     MS. JAMES: And have we adequately discussed it to
24 the extent that you understand you have a right as the Judge
25 told you absolutely to testify or not testify?

Page 388

1  THE DEFENDANT: To testify.

2  MS. JAMES: Or not.

3  THE DEFENDANT: Right.

4  MS. JAMES: And you understand that.

5  THE DEFENDANT: Yes, I do.

6  MS. JAMES: That's all. Thank you, Judge.

7  THE COURT: The Court is satisfied that you made

8  your decision freely and voluntarily, Mr. Peralte. You may

9  be seated. First of all, Mr. Arrington or Mr. Madison, it's

10  my understanding that you wish to rest without calling any

11  witnesses.

12  MR. MADISON: That's correct, Your Honor.

13  THE COURT: And that would include as you have heard

14  me cover with Mr. Peralte, the election for Mr. Norman not to

15  testify in his own defense?

16  MR. MADISON: That's correct, Your Honor.

17  THE COURT: Mr. Norman, let me cover the same

18  questions with you that I covered with Mr. Peralte. You do

19  understand that you are the accused in this case, do you not?

20  THE DEFENDANT: Yes, sir.

21  THE COURT: And you understand that you have the

22  right to testify in your own defense.

23  THE DEFENDANT: Yes, sir.

24  THE COURT: By choosing not to testify are you

25  making that decision based upon your own free will or has

Page 389

1  someone threatened you, coerced you or promised you anything

2  for you not to testify in your own defense?

3  THE DEFENDANT: No, sir.

4  THE COURT: which is it? Are you making the choice

5  not to testify on your own free will, or has someone

6  threatened you or promised you or coerced you into not

7  testifying?

8  THE DEFENDANT: I made it of my own free will.

9  THE COURT: You understand the consequences and the

10  benefits of testifying in a criminal trial in your own

11  defense?

12  THE DEFENDANT: Yes, I do.

13  THE COURT: And by choosing not to testify you

14  understand that no one can call you on either the

15  government's case or on Mr. Peralte's case or make reference

16  to the fact that you did not testify in your own defense, you

17  understand that?

18  THE DEFENDANT: Yes, sir.

19  THE COURT: And it is still your desire not to

20  testify?

21  THE DEFENDANT: Yes, sir.

22  THE COURT: The Court is satisfied that you have

23  made that decision freely and voluntarily, and you may be

24  seated. Okay. Counsel, we discussed -- well, first of all,

25  Mr. Brown, is there any additional testimony or evidence that

Page 390

1  the government wishes to present?

2  MR. BROWN: No rebuttal evidence, Your Honor.

3  THE COURT: we are to the point in the trial that we

4  are to discuss how we are going to proceed further. I have a

5  draft prepared of the Court's closing instructions. I would

6  like for us to discuss the content of the closing

7  instructions before we proceed further. How long does either

8  side need for us to prepare for the charge conference that we

9  need to conduct?

10  MR. BROWN: Your Honor, before you do that, may I

11  allow the case agent to go and release a potential rebuttal

12  witness that needs to testify before the grand jury?

13  THE COURT: Yes.

14  MR. BROWN: Thank you, Your Honor.

15  MS. JAMES: Judge, is that question in relation to

16  after we get the proposed charges?

17  THE COURT: Well, we need to have a charge

18  conference before we go forward with closing instructions and

19  then after we complete the charge conference we need to

20  discuss how long counsel would need for closing arguments

21  before we charge the jury in the case. It's 2:00 o'clock in

22  the afternoon, I certainly don't want to dismiss the jury

23  today at 2:00 o'clock and waste the opportunity of the

24  benefit that we could have this afternoon if we could conduct

25  any further business. But I am asking counsel what your

Page 391

1  thoughts are in that regard?

2  MS. JAMES: Well, Judge, I just -- logistically I am

3  looking at -- let's say the charge conference, if we started

4  this second took 30 minutes and then it takes another 15

5  minutes or so to get them retyped or whatever, so that's 45

6  minutes, you are pushing close to 3:00 o'clock. And then it

7  will take you what, probably 40 minutes to give the charge?

8  Let's say that's 3:40, and then if you gave us all 30 minutes

9  apiece, that's another hour and a half. So that puts us

10  pretty

11  much -- I hate for the jury to feel pressed at the end of the

12  day if they are going to have to come back again tomorrow.

13  THE COURT: What I would prefer to do -- Mr.

14  Madison, let me hear from you before I make my decision

15  finally.

16  MR. MADISON: I concur with them, I would rather not

17  get to the point where we are making closing arguments and

18  have the jury break if we get to that point, I would rather

19  if we can hold off until tomorrow, as far as that's

20  concerned.

21  THE COURT: Why don't we do this. Let's convene our

22  charge conference. If we can assemble in the robing room and

23  we can go over the Court's instructions and we will just plow

24  through it and see how far we get. At the very minimum I

25  would like for us to get the charge conference completed and

## Page 392

1 look towards the possibility of having closing arguments this
2 afternoon, but let's see what we can do on the charges first.
3    MS. JAMES: Judge, one point I would make, and this
4 is in all sincerity, we have been in trial while these cases
5 are steadily coming out about Blakely and I have been sitting
6 here in between trying to read the Fifth Circuit case. There
7 are some other cases referenced here, and I think in fairness
8 to everyone we may need to go back to our offices and make
9 sure our position is correct. I am saying me personally on
10 behalf of Mr. Peralte with regard to Blakely, because I just
11 don't know what is out there.
12    MR. BROWN: Judge, I was going to suggest that or
13 something like that as well because obviously it would be I
14 guess the inviable position of being in the government's
15 shoes and having something coming out and saying that we need
16 to do one thing or the other, and then, you are right on the
17 step not knowing what that is.
18    THE COURT: Anything, Mr. Madison?
19    MR. MADISON: With respect to that particular case
20 they are referring to, our position is going to be it wasn't
21 charged in the indictment and we are not going to waive that
22 position until the 11th Circuit rules otherwise regardless of
23 what the Fifth Circuit does. Because other Circuits have
24 ruled contrary to the Fifth Circuit and right now there's
25 no -- anything after 1981 issued by the Fifth Circuit is

## Page 393

1 non-binding on this Circuit.
2    THE COURT: Let's be in recess until we can complete
3 our charge conference and we can discuss that at our charge
4 conference.
5    THE CLERK: Court is in recess.
6    (At which time, 2:03 p.m., a recess was had until
7 4:02 p.m., at which time, outside the presence of the jury,
8 the trial continued.)
9    THE COURT: The record will reflect that we are
10 outside of the presence and the hearing of the jury. We have
11 been discussing for more than an hour now during our charge
12 conference the effects that Blakely versus Washington and the
13 prodigy of cases thus far might possibly have on the jury's
14 options, and the verdict forms that are going to be proposed
15 as well as the instructions to the jury. Because of the hour
16 I find that it would be better for us to excuse the jury
17 today so that we can start back in the morning, that way we
18 can discuss in a continued charge conference after the jury
19 has been excused for the night and not worry about keeping
20 them past the 5:00 o'clock hour. Let's bring the Defendants
21 back so that we can excuse the jury for the evening and we
22 need to have them here before we do that.
23    MR. BROWN: Judge, if I could step outside?
24    (pause)
25    THE COURT: Are we ready to proceed?

## Page 394

1    MR. MADISON: Yes, Your Honor.
2    THE COURT: Let's bring the jury back.
3    (At which time, 4:12 p.m., the jury entered the
4 courtroom.)
5    THE COURT: Be seated, please. Ladies and gentlemen,
6 since we have been on break there have been several issues
7 that counsel and I have been discussing concerning how to
8 best utilize your time, and one thing that we are all in
9 agreement about is that given the hour of today's date we
10 will not be concluded with the proceedings today and it would
11 be better to dismiss you before the rush hour traffic in
12 Montgomery rather than wait until 5:00 o'clock and realize
13 that we are not going to be finished today and to dismiss you
14 then. I know that some of you have to travel from as far away
15 as possibly two hours and I would like for you to have the
16 ability to get where you are going today rather than waiting
17 until 5:00 o'clock and be that much later getting home.
18    For that reason I am going to excuse you for the
19 evening, with the instructions not to discuss this case among
20 yourselves at this time or allow anyone to discuss the case
21 with you. If you will leave your notes in the courtroom here
22 that we have provided for you face down and I assure you they
23 will be preserved for your benefit. We will assemble tomorrow
24 morning and begin this trial promptly back at 9:00 o'clock. I
25 anticipate that this case will be -- will begin tomorrow

## Page 395

1 morning with the attorneys making their closing remarks to
2 you on the evidence that has been presented, and the Court
3 instructing you on the law in this case, and then you will be
4 allowed to retire to deliberate your verdict. All of the
5 evidence that you have heard has been presented, but I do
6 instruct you do not discuss this case at this time or to
7 formulate in your mind any decision concerning what the facts
8 may be until you have heard the Court's instructions to you
9 as to what the law is. With that, I will ask that you leave
10 your notes and you are discharged for the evening. If you
11 will follow the marshal.
12    (At which time, 4:14 p.m., the jury left the
13 courtroom.)
14    THE COURT: Is there anything else we need to put on
15 the record before we leave the record for today? Anything
16 from the government?
17    MR. BROWN: No, Your Honor.
18    THE COURT: Anything on behalf of Mr. Peralte?
19    MS. JAMES: Judge, we may have one situation, I was
20 just going to get a couple of exhibit numbers --
21    THE COURT: Mr. Madison, anything on behalf of Mr.
22 Norman?
23    MR. MADISON: No, sir, Your Honor.
24    THE COURT: If you will look at the records, Ms.
25 James.

## Page 396

1    MS. JAMES: Judge, we are kind of looking through
2    this but my Defendant's Exhibit 1 when I came up and checked
3    my exhibits it is noted on there, it's possible in all of my
4    shuffle that I did something with it, but it's a copy of a
5    collective composite that the government did. And in the
6    event that we can't find it, I was going to ask that we just
7    be allowed to substitute it. I don't think there would be a
8    dispute of what it was because I put it on the screen and on
9    the top left and this and that, and I didn't want to hold
10   things up in the morning, if we can not locate it.
11      THE COURT: when we go off the record today if you
12   will get with Kelli and go through the exhibits. I have as
13   Peralte's Exhibit 1 which is a series of photographs admitted
14   into evidence, so if you will make sure if you can't find it
15   consult with Mr. Brown and Mr. Arrington and Mr. Madison and
16   make sure there's no objection, we will substitute it.
17      (pause)
18      THE COURT: Everyone be seated, there's no reason to
19   stand. Ms. James, did you find what you were looking for?
20      MS. JAMES: We found something that can be
21   substituted, Your Honor.
22      THE COURT: Did you show it to Mr. Madison and Mr.
23   Brown?
24      MS. JAMES: No, sir. (complies)
25      THE COURT: Mr. Madison, any objection to

## Page 397

1    substituting that in place of Defendant Peralte's Exhibit 1
2    until -- in case it can not be located?
3       MR. MADISON: None, Your Honor.
4       THE COURT: Mr. Brown?
5       MR. BROWN: No, Your Honor, there's not. What I
6    would like to do, I have asked Ms. James not to mark that
7    exhibit at this particular time, because it's the original
8    Bates stamped exhibit. We have a color printer, I believe I
9    can recover another color copy of that.
10      THE COURT: For the purposes of the record what is
11   the Bates number on that exhibit?
12      MS. JAMES: 32.
13      THE COURT: 32?
14      MR. MADISON: Judge, I have got it right here, they
15   can use one of mine, I had it marked as Defendant's Exhibit
16   7, they can just change the --
17      MR. BROWN: No objection to that.
18      THE COURT: Ms. James, if that is acceptable to you,
19   just mark that as Defendant Peralte's Exhibit Number 1 and we
20   can substitute that without objection in place of the one
21   that has been misplaced.
22      MS. JAMES: Thank you.
23      THE COURT: Anything else that we need to take up
24   for the record?
25      MR. BROWN: Not from the government.

## Page 398

1       THE COURT: Counsel will remain, we will continue
2    our discussions about the verdict form and the jury
3    instructions. And our continuation of our charge conference.
4    I see no reason for us to conduct that on the record this
5    afternoon, and court will be in recess but we will conduct
6    that in here.
7       (At which time, 4:17 p.m., a recess was had until the
8    following day.)

CondenseIt™

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA

vs. CR. NO. 03-229-N

ALPHONSO NORMAN and
CAPULCO PERALTE

* * * * * * * *

Before Hon. Mark E. Fuller, Judge,
and a Jury, at Montgomery, Alabama,
Commencing on July 12, 2004

* * * * * * * *

VOL. III (July 14, 2004)

APPEARANCES: For the Government: Todd A. Brown,
Assistant U.S. Attorney
For the Defendant, Norman: Donald G. Madison
and Leonard Arrington,
Attorneys at Law
For the Defendant, Peralte: Susan G. James,
Attorney at Law

(The above case coming on for trial at Montgomery, Alabama, July 12, 2004, before Honorable Mark E. Fuller, Judge, and a Jury, the following proceedings were had on July 14, 2004 commencing at 9:00 a.m.:)

THE COURT: Is the United States prepared for its closing remarks?
MR. BROWN: The government is ready, Your Honor.
THE COURT: Is Mr. Peralte prepared?
MS. JAMES: Yes, Your Honor.
THE COURT: Mr. Norman?
MR. MADISON: Yes, Your Honor.
THE COURT: Mr. Brown, you may proceed.
MR. BROWN: That you, Your Honor.

(At which time closing arguments were presented by counsel for the Government and counsel for each Defendant, after which, the following occurred:)

THE COURT: Ladies and gentlemen, now that you have the benefit of the closing arguments by counsel it will be my duty to instruct you on the rules of law that you must follow and apply in deciding this case. When I have finished you will go took the jury room and begin your discussions, what we call your deliberations. It will be your duty to decide whether the government has proved beyond a reasonable doubt the specific facts necessary to find the Defend[illegible] the crimes charged in the indictment.

You must make your decision only on the basis of the testimony and other evidence presented here during the trial, and you must not be influenced in any way by either sympathy or prejudice, for or against the Defendants, for or against the government. You must also follow the law as I explain it to you whether you agree with that law or not. And you must follow all of my instructions as a whole. You may not single out or disregard any of the Court's instructions on the law.

The indictment or formal charge against the Defendant is not evidence of guilt. Indeed, every Defendant is presumed by the law to be innocent. The law does not require a Defendant to prove innocence or to produce any evidence at all. And if a Defendant elects not to testify, you should not consider that in any way during your deliberations. The government has the burden of proving a Defendant guilty beyond a reasonable doubt, and if it fails to do so you must find the Defendant not guilty.

Thus, while the government's burden of proof is a strict or a heavy burden, it is not necessary that a Defendant's guilt be proved beyond all possible doubt. It is only required that the government's proof exclude any reasonable doubt concerning the Defendant's guilt. A reasonable doubt is a real doubt, based upon reason and common sense after careful and impartial consideration of all of the evidence in the case. Proof beyond a reasonable doubt,

therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs. If you are convinced that the Defendants have been proved guilty beyond a reasonable doubt, say so. If you are not convinced, say so.

As I said earlier, you must consider only the evidence that I have admitted in the case. The term evidence includes the testimony of the witnesses and the exhibits admitted in the record. Remember, that anything that the attorneys say is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding upon you. Also, you should not assume from anything I may have said that I have any opinion concerning any of the issues in this case. Except for my instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own decision concerning the facts.

In considering the evidence you may make deductions and reach conclusions which reason and common sense lead you to make. And you should not be concerned about whether the evidence is direct or circumstantial. Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eye witness. Circumstantial evidence is proof of a [illegible]in of facts and circumstances tending to prove or disprove [illegible]y fact in dispute. The law makes no distinction between the

CASE NO. 03-229-N

EXHIBIT NO. R-III

## Page 403

1 weight you may give to either direct or circumstance
2 evidence.
3 Now, in saying that you must consider all of the
4 evidence, I do not mean that you must accept all of the
5 evidence as true or accurate. You should decide whether you
6 believe what each witness had to say and how important that
7 testimony was. In making that decision you may believe or
8 disbelieve any witness, in whole or in part. Also, the number
9 of witnesses testifying concerning any particular dispute is
10 not controlling. You may decide that the testimony of a
11 smaller number of witnesses concerning any fact in dispute is
12 more believable than the testimony of a larger number of
13 witnesses to the contrary.
14 In deciding whether you believe or do not believe
15 any witness, I suggest that you ask yourself a few questions.
16 Did the witness impress you as one who was telling the truth?
17 Did the witness have any particular reason not to tell the
18 truth? Did the witness have a personal interest in the
19 outcome of the case? Did the witness seem to have a good
20 memory? Did the witness have the opportunity and the ability
21 to observe accurately the things that he or she testified
22 about? Did the witness appear to understand the questions
23 clearly and answer them directly? Did the witness' testimony
24 differ from the other testimony or other evidence presented
25 during the case?

## Page 404

1 You should also ask yourself whether there was
2 evidence tending to prove that a witness testified falsely
3 concerning some important fact, or whether there was evidence
4 that at some other time a witness said or did something, or
5 failed to say or do something which was different from the
6 testimony the witness gave before you during the trial.
7 The fact that a witness has been convicted of a
8 felony offense or a crime involving dishonesty or false
9 statement is another factor you may consider in deciding
10 whether you believe that witness' testimony. You should keep
11 in mind, of course, that a simple mistake by a witness does
12 not necessarily mean that the witness was not telling the
13 truth as he or she remembers it, because people naturally
14 tend to forget some things or remember other things
15 inaccurately. So, if a witness has made a misstatement, you
16 need to consider whether it was simply an innocent lapse of
17 memory or an intentional falsehood, and the significance of
18 that may depend upon whether it has to do with an important
19 fact or only with an unimportant detail.
20 When knowledge of a technical subject matter might
21 be helpful to the jury, a person having special training or
22 experience in that technical field is permitted to state an
23 opinion concerning those technical matters. Merely because
24 such a witness has expressed an opinion, however, does not
25 mean that you must accept that opinion. The same as with any

## Page 405

1 other witness, it is up to you to decide whether to rely upon
2 it or not.
3 The testimony of some witnesses must be considered
4 with more caution than the testimony of other witnesses. In
5 this case the government called as one of its witnesses a
6 person named as a co-Defendant in the indictment with whom
7 the government has entered into a plea agreement providing
8 for the possibility of a lesser sentence than the witness
9 would otherwise be exposed to. Such plea bargaining, as it's
10 called, has been approved as lawful and proper and is
11 expressly provided for in the rules of this Court. However, a
12 witness who hopes to gain more favorable treatment may have a
13 reason to make a false statement because the witness wants to
14 strike a good bargain with the government. So, while a
15 witness of that kind may be entirely truthful when
16 testifying, you should consider such testimony with more
17 caution than the testimony of other witnesses. And, of
18 course, the fact that a witness has pled guilty to a crime,
19 or to the crime charged in the indictment, is not evidence in
20 and of itself of the guilt of any other person charged.
21 In this case you have been permitted to take notes
22 during the course of the trial and most of you, perhaps all
23 of you, have taken advantage of that opportunity and have
24 made notes from time to time. You will have your notes
25 available to you during your deliberations but you should

## Page 406

1 make use of them only as an aid to your memory. In other
2 words, you should not give your notes any precedent over your
3 independent recollection or the independent recollection of
4 other jurors. You should also not give your notes any
5 precedence over your independent recollection of the evidence
6 or the lack of evidence. And neither should you be unduly
7 influenced by the notes of other jurors. I emphasize that
8 notes are not entitled to any greater weight than the memory
9 or impression of each juror as to what the testimony may have
10 been.
11 At this time I will explain the indictment which
12 charges four separate offenses called counts against the
13 Defendants, Alphonso Norman and Capulco Peralte. I will not
14 read the indictment as you will have the indictment with you
15 during your deliberations. You will also be given a copy of
16 my instructions to aid you in your deliberations.
17 In summary, count one of the indictment charges that
18 the Defendants knowingly and wilfully conspired together to
19 distribute and possess with intent to distribute five hundred
20 grams or more of a mixture or substance containing cocaine
21 hydrochloride. Count two charges that the Defendants
22 knowingly and wilfully conspired together to distribute and
23 possess with intent to distribute a mixture or substance
24 containing a detectable amount of crack cocaine or cocaine
25 base. Counts three and four respectively charge the

Page 407

1 commission of what are referred to as substantive offenses,
2 namely, the Defendants knowingly possessed with intent to
3 distribute certain amounts of cocaine hydrochloride, and
4 certain amounts of cocaine base. I will explain the law
5 governing these substantive offenses in a moment.
6 First, however, as to counts one and two, you will
7 note that the Defendants are not charged in these counts with
8 committing a substantive offense, rather, they are charged
9 with having conspired to do so. These counts allege in
10 relevant part that from an unknown date and continuing to
11 about the month of September, 2003, the exact dates being
12 unknown to the grand jury, in Montgomery County, Alabama,
13 within the Middle District of Alabama, Alphonso Norman, a/k/a
14 Scooter, and Capulco Peralte, a/k/a Cappaccino and a/k/a
15 Black, Defendants herein, did knowingly and wilfully combine,
16 conspire, confederate and agree together and with other
17 persons known and unknown to the grand jury, to knowingly and
18 intentionally distribute and possess with intent to
19 distribute, five hundred grams or more of a mixture or
20 substance containing a detectable amount of cocaine
21 hydrochloride, a Schedule II controlled substance, in
22 violation of Title 21 United States Code Section 841(a)(1),
23 all in violation of Title 21 United States Code Section 846.
24 Count two. From an unknown date and continuing to
25 about the month of September, 2003, the exact dates being

Page 408

1 unknown to the grand jury, in Montgomery County, Alabama,
2 within the Middle District of Alabama, Alphonso Norman, a/k/a
3 Scooter, and Capulco Peralte, a/k/a Cappaccino, a/k/a Black,
4 Defendants herein, did knowingly and wilfully combine,
5 conspire, confederate and agree with other persons known and
6 unknown to the grand jury to knowingly and intentionally
7 distribute and possess with intent to distribute a mixture or
8 substance containing a detectable amount of cocaine base, or
9 crack cocaine, a Schedule II controlled substance, in
10 violation of Title 21 United States Code Section 841(a)(1),
11 all in violation of Title 21 United States Code Section 846.
12 Title 21 United States Code Section 846 makes it a
13 separate federal crime or offense for anyone to conspire or
14 agree with someone else to do something, which, if actually
15 carried out, would be a violation of Section 846 -- I'm
16 sorry, would be a violation of Section 841(a)(1). That
17 section makes it a crime for anyone to knowingly possess a
18 controlled substance with intent to distribute it. So, under
19 the law a conspiracy is an agreement or a kind of partnership
20 in criminal purposes in which each member becomes the agent
21 or partner of every other member. In order to establish a
22 conspiracy offense it is not necessary for the government to
23 prove that all of the people named in the indictment were
24 members of the scheme, or that those who were members had
25 entered into any type of formal agreement. Also, because the

Page 409

1 essence of a conspiracy offense is the making of the scheme
2 itself, it is not necessary for the government to prove that
3 the conspirators actually succeeded in accomplishing their
4 unlawful plan.
5 What the evidence in the case must show beyond a
6 reasonable doubt is this: First, that two or more persons in
7 some way or manner came to a mutual understanding to try to
8 accomplish a common and unlawful plan as charged in the
9 indictment. And, second, that the Defendants, knowing the
10 unlawful purpose of the plan, wilfully joined in. A person
11 may become a member of a conspiracy without full knowledge of
12 all of the details of the unlawful scheme or the names and
13 identities of all of the other alleged coconspirators. So, if
14 a Defendant has a general understanding of the unlawful
15 purpose of the plan, including the nature and anticipated
16 weight of the substance involved, and knowingly and wilfully
17 joins in that plan on one occasion, that is sufficient to
18 convict that Defendant for conspiracy even though the
19 Defendant did not participate before and even though the
20 Defendant played only a minor part.
21 Of course, mere presence at the scene of a
22 transaction or event, or the mere fact that certain persons
23 may have associated with others and may have assembled
24 together and discussed common aims and interests does not,
25 standing alone, establish proof of a conspiracy. Also, a

Page 410

1 person who has no knowledge of a conspiracy but who happens
2 to act in a way which advances some purpose of one, does not
3 thereby become a conspirator.
4 In this instance, with regard to the alleged
5 conspiracy, the indictment charges that the Defendants
6 conspired to distribute a controlled substance, and to
7 possess with intent to distribute a controlled substance. It
8 is charged, in other words, that they conspired to commit two
9 separate substantive crimes or offenses. In such a case it is
10 not necessary for the government to prove that a Defendant
11 under consideration wilfully conspired to commit both of
12 those substantive offenses. It would be sufficient if the
13 government proves beyond a reasonable doubt that a Defendant
14 wilfully conspired with someone to commit one of those
15 offenses, but in that event, in order to return a verdict of
16 guilty you must unanimously agree upon which of the two
17 offenses that Defendant conspired to commit.
18 Also, you will note that the Defendants are charged
19 in the indictment with conspiracy to distribute and possess
20 with intent to distribute a certain quantity or weight of the
21 alleged controlled substances. However, you may find any
22 Defendant guilty of the offense if the quantity of the
23 controlled substance for which he should be held responsible
24 is less than the amount or weight charged. Thus, the verdict
25 form prepared with respect to each Defendant, as I will

## Page 411

1 explain in a moment, will require, if you find any Defendant
2 guilty, to specify on the verdict your unanimous finding
3 concerning the weight of the controlled substance
4 attributable to that Defendant.
5      As to the remaining counts, you will note that the
6 Defendants are charged with a substantive offense, namely,
7 possession with intent to distribute a controlled substance.
8 Specifically, counts three and four of the indictment provide
9 as follows: On or about the 25th day of September, 2003, in
10 Montgomery County, within the Middle District of Alabama, the
11 Defendants, Alphonso Norman, a/k/a Scooter, and Capulco
12 Peralte, a/k/a Cappaccino and Black, did knowingly and
13 intentionally possess with intent to distribute five hundred
14 grams or more of a mixture or substance containing a
15 detectable amount of cocaine hydrochloride, a Schedule II
16 controlled substance, in violation of Title 21 United States
17 Code Section 841(a)(1). Count four alleges that on or about
18 the 25th day of September, 2003, in Montgomery County, within
19 the Middle District of Alabama, the Defendants, Alphonso
20 Norman, a/k/a Scooter, and Capulco Peralte, a/k/a Cappaccino
21 and a/k/a Black, did knowingly and intentionally possess with
22 intent to distribute a mixture or substance containing a
23 detectable amount of cocaine base, or crack cocaine, a
24 Schedule II controlled substance, in violation of Title 21
25 United States Code Section 841(a)(1).

## Page 412

1      As I mentioned previously, Title 21 United States
2 Code Section 841(a)(1) makes it a federal crime or offense
3 for anyone to possess a controlled substance with intent to
4 distribute it. Cocaine hydrochloride and cocaine base, or
5 crack cocaine, are controlled substances within the meaning
6 of the law. The Defendants can be found guilty of these
7 offenses only if all of the following facts are proved beyond
8 a reasonable doubt: First, that the Defendants, each
9 individually, knowingly and wilfully possessed cocaine
10 hydrochloride or cocaine base, or crack cocaine, as charged;
11 and, second, that the Defendants, individually, possessed the
12 substance with the intent to distribute. To possess with
13 the intent to distribute simply means to possess with intent
14 to deliver or transfer possession of a controlled substance
15 to another person with or without any financial interest in
16 the transaction.
17      The Defendants are charged in the indictment with
18 possessing with intent to distribute a certain quantity or
19 weight of the alleged controlled substance. However, you may
20 find any Defendant guilty of the offense if the quantity of
21 the controlled substances for which he should be held
22 responsible is less than the amount or weight charged. Thus,
23 the verdict form prepared with respect to each Defendant as I
24 will explain in a moment will require if you find any
25 Defendant guilty to specify on your verdict form your

## Page 413

1 unanimous findings concerning the weight of the controlled
2 substance attributable to that Defendant.
3      You are further instructed with regard to the
4 alleged conspiracy offense that proof of several separate
5 conspiracies is not proof of a single overall conspiracy
6 charged in the indictment unless one of the several
7 conspiracies which is proved is the single conspiracy which
8 the indictment charges. What you must do is determine whether
9 the single conspiracy charged in the indictment existed
10 between two or more co-conspirators. If you find that no such
11 conspiracy existed, then you must acquit the Defendants of
12 that charge.
13      However, if you decide that such a conspiracy did
14 exist, you must then determine who the members were, and, if
15 you should find that a particular Defendant was a member of
16 some other conspiracy, not the one charged in the indictment,
17 then you must acquit that Defendant. In other words, to find
18 a Defendant guilty you must unanimously find that such
19 Defendant was a member of the conspiracy charged in the
20 indictment, and not a member of some other separate
21 conspiracy.
22      In some cases the law which a Defendant is charged
23 with breaking actually covers two separate crimes. One is
24 more serious than the second, and the second crime is
25 generally called a lesser included offense. So, in this case

## Page 414

1 with regard to the offenses charged in count four, if you
2 should find a Defendant not guilty of that crime as defined
3 in these instructions, you should then proceed to decide
4 whether the Defendant is guilty or not guilty of the lesser
5 included offense, in this particular case, of possession of a
6 controlled substance. The lesser included offense would
7 consist of proof beyond a reasonable doubt of all of the
8 facts stated before you as necessary to convict either
9 Defendant under count four, except the second element,
10 namely, that the Defendant possessed the substance with
11 intent to distribute it.
12      The law recognizes several kinds of possession. A
13 person may have actual possession or constructive possession.
14 A person may also have sole possession or joint possession. A
15 person who knowingly has direct physical control of something
16 is then in actual possession of it. A person who is not in
17 actual possession but who has both the power and the
18 intention to later take control over something, either alone
19 or together with someone else, is in constructive possession
20 of it. If one person alone has possession of something, that
21 possession is sole. If two or more persons share possession,
22 such possession is joint. Whenever the word possession has
23 been used in these instructions it includes constructive as
24 well as actual possession, and also joint as well as sole
25 possession.

Page 415

1    You will also note that the indictment charges that
2    the offenses were committed on or about a certain date. The
3    government does not have to prove with certainty the date --
4    or the exact date of the alleged offenses, it is sufficient
5    if the government proves beyond a reasonable doubt that the
6    offenses were committed on a date reasonably near the date
7    alleged. The word knowingly, as that term has been used in
8    these instructions and in the indictment, means that the act
9    was done voluntarily and intentionally, and not because of
10   mistake or accident. The term wilfully, as that term is used
11   in the indictment or in these instructions, means that the
12   act was committed voluntarily and purposefully, with the
13   specific intent to do something the law forbids, that is,
14   with bad purpose, either to disobey or disregard the law.
15       A separate crime or offense is charged against one
16   or more of the Defendants in each count of the indictment.
17   Each charge and the evidence pertaining to it should be
18   considered separately. Also, the case of each Defendant
19   should be considered separately and individually. The fact
20   that you may find any one or more of the Defendants guilty or
21   not guilty of any of the offenses charged should not affect
22   your verdict as to any other offense or any other Defendant.
23   I caution you members of the jury that you are here to
24   determine from the evidence in this case whether each
25   Defendant is guilty or not guilty. Each Defendant is on trial

Page 416

1    only for the specific offense or offenses alleged in the
2    indictment. Also, the question of punishment should never be
3    considered by the jury in any way in deciding this case. If a
4    Defendant is convicted, the matter of punishment is for the
5    Judge alone to determine at a date later.
6        Any verdict you reach in the jury room, whether
7    guilty or not guilty, must be unanimous. In other words, to
8    return a verdict you must all agree. Your deliberations will
9    be in secret, you will never have to explain your verdict to
10   anyone. It is your duty as jurors to discuss the case with
11   one another in an effort to reach agreement if you can do so.
12   Each of you must decide the case for yourself, but only after
13   full consideration of the evidence with the other members of
14   the jury. While you are discussing the case do not hesitate
15   to re-examine your own opinion and change your mind if you
16   become convinced that you were wrong. But do not give up your
17   honest beliefs solely because the others think differently or
18   merely to get the case over with. Remember, that in a very
19   real way you are judges, judges of the facts. Your only
20   interest is to seek the truth from the evidence in this case.
21       When you go to the jury room you should first select
22   one of your members to act as foreperson. The foreperson will
23   preside over your deliberations and will speak for you here
24   in court. A verdict form has been prepared for your
25   convenience. You will take the verdict form to the jury room

Page 417

1    and when you have reached a unanimous agreement, you will
2    have your foreperson fill in the verdict form, date and sign
3    it, and then return it to the courtroom.
4        If you should desire to communicate with me at any
5    time, please write down your message or question and pass the
6    note to the marshal who will bring it to my attention. I will
7    then respond as promptly as possible, either in writing or by
8    having you return to the courtroom so that I can address you
9    orally. I caution you, however, with regard to any message or
10   question you might send that you should not at any time tell
11   me your numerical division.
12       You have heard a lot of people speak to you this
13   morning, and I assure you we are getting close to the end
14   before you are able to consider the case among yourselves. As
15   I instructed you, you will have a copy of my instructions,
16   all of the evidence that has been presented in this case, a
17   copy of the indictment that has been prepared for your
18   review, and a copy of the verdict form or a verdict form for
19   each Defendant for you to execute after you have considered
20   the evidence in this case. Recall my instructions that the
21   indictment is not evidence of guilt, but merely a vehicle, an
22   accusatory document, that allows the charges to be presented
23   to this Court for you to decide. It contains four counts
24   against each Defendant.
25       The verdict form that has been prepared mirrors the

Page 418

1    counts one through four. For reference, I will use the
2    verdict form that has been provided or will be provided in
3    Mr. Peralte's case. The verdict form is styled in the name of
4    each Defendant, and you should execute a separate verdict
5    form as to each Defendant and as to each charge in the
6    indictment as to each Defendant.
7        Paragraph one of the verdict form for each Defendant
8    begins with the question being answered we, the jury, find
9    the Defendant, then it has the Defendant's name, not guilty
10   or guilty. If, after a full and fair consideration of all of
11   the evidence, that for the government and that for the
12   Defendants, you are convinced beyond a reasonable doubt that
13   the government has not proven its case of conspiracy as
14   charged in count one of the indictment, you should mark the
15   form where it says not guilty. If, on the other hand, you
16   feel that the government has proven its case beyond a
17   reasonable doubt as to the elements charged in count one of
18   the indictment, then you would fill in the portion of the
19   verdict form which says we, the jury, find the Defendant, the
20   appropriately named Defendant, guilty.
21       After, and should you find the Defendant or either
22   of the Defendants guilty, you would then proceed to paragraph
23   1(A) in which you are to consider the weight of the control
24   substances as alleged in this case in count one of the
25   indictment. There are four categories for you to choose

Page 419

1 between. It will be your determination, if you feel that the
2 government has proven its case beyond a reasonable doubt, and
3 you are convinced beyond a reasonable doubt as to the weight
4 category that applies for the Defendant that you feel has
5 been proven guilty beyond a reasonable doubt, then it would
6 be your duty to indicate your choice in the appropriate
7 block.
8       The same analysis would be true as to count two in
9 the indictment, and the same explanation would be true as to
10 response to paragraph number two in the verdict form. Recall
11 the instructions that the Court has given you as to the
12 charge contained in count two, which is the conspiracy to
13 possess with intent to distribute detectable amounts of
14 cocaine base. If, after full and fair consideration of all of
15 the evidence, you should find that the government has not
16 proven its case then you would indicate in the appropriate
17 form your response, not guilty. If, on the other hand, you
18 find that the government has proven its case beyond a
19 reasonable doubt, you would indicate on the appropriate
20 verdict form in the space next to the word guilty.  And then,
21 after that finding, first you would consider the weight that
22 would be attributable to the charge alleged in count two of
23 the indictment.
24       As I said, counts three and four of the indictment
25 charge the substantive offenses, namely, alleging that the

Page 420

1 Defendants possessed with intent to distribute cocaine
2 hydrochloride in count three, and cocaine base or crack
3 cocaine in count four. If, after full and fair consideration
4 of all of the evidence, that for the government and that for
5 the Defendant, you find that the Defendants have not been
6 proven guilty beyond a reasonable doubt as to count three,
7 possession with intent to distribute cocaine hydrochloride,
8 you would indicate in the appropriate box next to the word
9 not guilty. If, on the other hand, you find that the
10 government has proven its case beyond a reasonable doubt that
11 the Defendants are guilty as charged in the indictment in
12 count three as the Court has instructed you on the law, then
13 you would indicate next to the block with the word guilty. If
14 you were to find either Defendant or both Defendants guilty,
15 only then would you consider the amount or the weight charged
16 and indicate your choice after a unanimous verdict in the
17 appropriate block next to the four options that are available
18 for you.
19       The same analysis would be true as to count four of
20 the indictment, and in paragraph four of the verdict form,
21 with the only variation being that count four in the
22 indictment, an option for it in the verdict form, in each of
23 the verdict forms, contains what the Court has described as a
24 lesser included offense. If, after fair consideration and
25 full consideration of all of the evidence, that for the

Page 421

1 government and that for the Defendant, as to the charges
2 contained in count four of the indictment, you find that the
3 government has not proven the particular Defendant that you
4 are considering guilty beyond a reasonable doubt as to the
5 charges contained in count four of the indictment, for the
6 offense of possession with intent to distribute cocaine base,
7 you would indicate on the portion of the form not guilty, but
8 you would then consider whether the government has proven
9 beyond a reasonable doubt the mere charge of possession as
10 opposed to possession with intent to distribute as charged in
11 the indictment -- I'm sorry, as explained in the Court's
12 instructions on the lesser included offense.
13       In summary, count four of the indictment and
14 paragraph four of the verdict form contains a place for you
15 to consider whether the Defendants have been proven guilty
16 beyond a reasonable doubt of the offenses charged, that being
17 possession with intent to distribute a detectable amount of
18 cocaine base.  And if you find that the evidence has not
19 proven beyond a reasonable doubt, your only other
20 consideration would be to decide if the government has proven
21 that the Defendants had merely possessed a detectable amount
22 of cocaine base beyond a reasonable doubt. And if they have,
23 you find, been proven guilty beyond a reasonable doubt of
24 possession with intent to distribute, or mere possession,
25 only then would you consider -- concern yourself with the

Page 422

1 weight options that are available to you. I tell you the
2 weight options that are available to you in count two and
3 count four are different than count one and count three,
4 because of the drugs alleged involved in the case and the
5 evidence that has been presented for you.
6       I instruct you that you are to consider the Court's
7 instructions as a whole.  A copy of my instructions will be
8 provided for you during your deliberations, along with all of
9 the other evidence that has been admitted into this case for
10 you to consider before you deliberate and find your verdict
11 as to each of these Defendants.
12       Before you begin your deliberations we are required
13 to briefly take up matters outside of your presence, and
14 because we have been going over an hour and a half, I am
15 going to allow you a brief recess at this time. You will also
16 recall that there are two alternates on this jury, and when
17 you reconvene back in the courtroom I will excuse the two
18 alternates and allow the remaining 12 of you to begin your
19 deliberations to reach your verdict in this case.
20       I instruct you at this time not to discuss the case
21 among yourselves or allow anyone to discuss the case with
22 you, and to leave your notes face down in your chair. We will
23 be in recess for you to visit the facilities and accommodate
24 yourselves so that we can begin back, and I anticipate within
25 15 minutes we will be ready to proceed and turn this case

Page 423

1　over to you for your deliberations. If you will excuse

2　yourselves and be available at your earliest convenience, we

3　will be in recess.

4　　　　(At which time, 10:45 a.m., the jury left the

5　courtroom.)

6　　　　THE COURT: The record will reflect that we are

7　outside of the presence and the hearing of the jury. What

8　says the government as to the Court's instructions?

9　　　　MR. BROWN: The government is satisfied, Your Honor.

10　　　　THE COURT: What says the Defendant, Mr. Peralte?

11　　　　MS. JAMES: Your Honor, we would object to the

12　Court's failure to give the supplemental requested charge on

13　buyer/seller relationship. Additionally --

14　　　　THE COURT: Let me stop you, Ms. James. You hand

15　wrote a copy of your supplemental requested charge number one

16　and provided it to me yesterday, has that been provided for

17　the record?

18　　　　MS. JAMES: No, sir. I would like that to be made a

19　part of the record.

20　　　　THE COURT: I will make it a part of the record and

21　label it as the Court's next successive exhibit if there's

22　already an exhibit in evidence, if not, this will be Court's

23　Exhibit 1. I find that giving that instruction would not be

24　consistent with the law. It has been included in the Court's

25　other instructions, and otherwise, it is also untimely

Page 424

1　submitted.

2　　　　MS. JAMES: That's all I have on that. I do have

3　another matter I want to put on the record after you are done

4　with this when the jury retires.

5　　　　THE COURT: Okay. Mr. Madison, what says --

6　　　　MR. MADISON: We are satisfied, Your Honor.

7　　　　THE COURT: My records indicate that the two

8　alternates are jurors number 133 and 136; is that correct?

9　　　　MR. BROWN: That's what the government's records

10　indicate.

11　　　　MR. MADISON: I will go along with what I guess the

12　Court said, I don't recall at this point in time.

13　　　　MS. JAMES: I don't have that.

14　　　　THE COURT: Why don't you approach and confer with

15　the courtroom deputy and after that has been confirmed that

16　those will be excused.

17　　　　(At which time an off-the-record discussion was had

18　between the clerk and counsel.)

19　　　　THE COURT: Is everyone satisfied that jurors number

20　133 and 136 are the alternates that will be excused?

21　　　　MR. BROWN: The government is satisfied.

22　　　　MS. JAMES: Yes, sir.

23　　　　MR. MADISON: Yes, Your Honor.

24　　　　THE COURT: Why don't we take about a five minute

25　recess and when the jury is ready to reconvene we will come

Page 425

1　back in and be ready to have the jury reseated at five until

2　11:00.

3　　　　MR. MADISON: Judge, I wanted to take a matter or

4　two up before the jury came back in too.

5　　　　THE COURT: We will do it before the jury comes in.

6　　　　MR. MADISON: Yes, sir.

7　　　　(At which time, 10:48 a.m., a recess was had until

8　11:03 a.m., at which time, outside the presence of the jury,

9　the trial continued.)

10　　　　THE COURT: Mr. Madison, you needed to take

11　something up on the record before we bring the jury in?

12　　　　MR. MADISON: Yes, sir. As the Court is aware we

13　filed a Motion for Judgement of Acquittal at the end of the

14　government's case and Your Honor had reserved ruling, I just

15　wanted to -- I am not aware that you changed your mind on

16　that as of yet, and I just wanted the record to reflect that

17　we are not waiving the fact that we filed that motion by the

18　submission of the case to the jury.

19　　　　THE COURT: I think that the evidence or the record

20　will reflect that and the rules require or allow the Court

21　the opportunity to reserve it even after it's submitted to

22　the jury. As to counts one and two of the indictment as to

23　Mr. Norman the Court has reserved ruling on your Rule 29

24　Motion for Judgement of Acquittal. Anything else? Let's bring

25　the jury back.

Page 426

1　　　　(At which time, 11:05 a.m., the jury entered the

2　courtroom.)

3　　　　THE COURT: Ladies and gentlemen, all of the

4　evidence that has been presented, all of the arguments that

5　will be made and all of the instructions that you will

6　receive on the law as to the charges alleged in this case

7　have been submitted to you. It is now going to be the

8　responsibility of the 12 of you who will comprise the jury in

9　this case to retire and make your decisions and your

10　deliberations consistent with the law and instructions as the

11　Court has given you.

12　　　　In that regard I need to identify the two persons

13　who have served this week as alternate jurors, and want to

14　say first of all to you and to all of you collectively how

15　much I appreciate your service to your country as a juror in

16　this case. People sometimes take this responsibility for

17　granted, but I assure you for the United States and for the

18　Defendants charged it is an extremely important

19　responsibility.

20　　　　I have requested one of the Court security officers,

21　Mr. Calvin, who is going to be available to see that the

22　alternates are escorted from the courthouse, because I remind

23　you, you are never required to discuss anything that you do

24　as a juror in this case with anyone. So, to the that end, if

25　you are approached by any attorney or any person that you

Page 427

1  have come to know that has been associated in this case, you
2  do not have to discuss your function as a juror with anyone
3  unless you choose to do so.
4      Ms. Golson, Mr. Hemphill, you two are the alternates
5  in this case, and you may be excused when the jurors are
6  excused -- the remaining jurors are excused to begin their
7  deliberations. I am instructing you ladies and gentlemen at
8  this time, when you are excused to begin your deliberations,
9  that you can take your notes with you, and you can begin your
10 deliberations consistent with what the Court has instructed
11 you.
12     The first order of business will be to elect one of
13 your members to serve as foreperson. Mr. Hemphill and Ms.
14 Golson, I appreciate your service, and when you are retired
15 with the jurors, Mr. Calvin will see that you are escorted
16 from the courthouse. And if you could, deliver your notes to
17 the deputy clerk and they will be destroyed so that no one
18 would have the benefit of seeing what notes you made. For the
19 remaining 12 of you, if you will retire to the jury room, we
20 will have the evidence and the verdict forms and the other
21 instructions and the indictment delivered back to you and you
22 can begin your deliberations when it is delivered to the jury
23 room.
24     You can retire, take breaks, break for lunch,
25 deliberate or not deliberate on your own schedule. Make sure

Page 428

1  that you do not deliberate until the 12 of you are assembled
2  in the room together so that everyone can have the benefit of
3  the others' thoughts and conversations. But if you wish to
4  take a recess, for instance, for lunch, if you would notify
5  the marshal who will be outside the jury deliberation room of
6  the time that you will be returning for your deliberations so
7  that the marshal can notify me. And if you have questions
8  for the Court, please, as I have indicated, write them down
9  on the form that will be provided for you and we will see
10 that they are responded to in the appropriate form as quickly
11 as we possibly can. With that, you are excused to begin your
12 deliberations, and to the two alternates who have joined us
13 this week, thank you for your service.
14     (At which time, 11:10 a.m., the jury left the
15 courtroom.)
16     THE COURT: Counsel will get together with the
17 courtroom deputy and ensure that the exhibits are accounted
18 for and as soon as they can be delivered to the jury we will
19 be in recess. If you have already done that, Court will be
20 in recess at this time.
21     MS. JAMES: Your Honor, I have one matter I need to
22 put on the record if I might.
23     THE COURT: Yes.
24     MS. JAMES: And this could be premature but because
25 we don't know what is going to happen with Blakely I just

Page 429

1  wanted to note before the case had concluded my objection to
2  the use of the sentencing guidelines in this case, is that
3  they are unconstitutional, and would object to any -- if
4  there's a conviction object to any application of any of the
5  sentencing factors that might be applied, including but not
6  limited to the career offender provision as those have not
7  been charged in the indictment, or offered to the jury for
8  proof beyond a reasonable doubt.
9      THE COURT: Mr. Madison?
10     MR. MADISON: I just incorporate the same
11 objections, Your Honor.
12     THE COURT: Certainly the length of this trial has
13 been extended somewhat because of the effect of Blakely
14 versus Washington, and to that end, without making a
15 determination as to whether Blakely versus Washington applies
16 to the sentencing guidelines and how it will affect the
17 application of the sentencing guidelines in the Middle
18 District of Alabama, I would only say that we have prepared
19 the verdict forms hopefully that would take into
20 consideration how any future Court were to rule on the
21 application of the effect of Blakely versus Washington on the
22 sentencing guidelines, either by the Supreme Court or the
23 11th Circuit. Your objections are noted, and is there
24 anything else we need to take up before the jury begins its
25 deliberations, Ms. James?

Page 430

1      MS. JAMES: No, sir.
2      THE COURT: Mr. Madison?
3      MR. MADISON: No, sir, Your Honor.
4      THE COURT: Anything from the government?
5      MR. BROWN: No, sir.
6      THE COURT: Is the evidence back with the jurors?
7      MR. BROWN: It hasn't gone back but we have gone
8  through it.
9      THE COURT: Has it been accounted for?
10     THE CLERK: Yes, sir.
11     MR. BROWN: It has.
12     THE COURT: Let's deliver that to the jurors and we
13 will be in recess. Ms. James, do you have anything else?
14     MS. JAMES: Can we just be around the courthouse?
15     THE COURT: Yes. If you are around the courthouse,
16 make sure we can get you in the attorney's lounge or
17 somewhere generally public so that we will know where you
18 are. We will be in recess while the jury deliberates.
19     (At which time, 11:13 a.m., a recess was had until
20 4:00 p.m., at which time, outside the presence of the jury,
21 the trial continued.)
22     THE COURT: I understand the jury has reached its
23 verdict. Let's bring the jury back.
24     (At which time, 4:01 p.m., the jury entered the
25 courtroom.)

Page 427 - Page 430

Page 431

1    THE COURT: Please be seated. Members of the jury, I
2  understand that you have reached a verdict in this case?
3    THE FOREPERSON: Yes, sir, we have.
4    THE COURT: If you will deliver the verdict to the
5  clerk.
6    THE FOREPERSON: (complies)
7    THE CLERK: (complies)
8    THE COURT: Members of the jury, I have reviewed the
9  verdict, and as it's published if you would listen to the
10  content of the verdict to assure that it is accurate based
11  upon your findings in each of these cases.
12    THE CLERK: We, the jury, find the Defendant,
13  Capulco Peralte, guilty as charged in count one of the
14  indictment.
15    We, the jury, having found the Defendant guilty of
16  the offense charged in count one, further find with respect
17  to that count that he conspired to distribute or possess with
18  intent to distribute cocaine weighing two kilograms or more,
19  but less than -- excuse me, that's wrong. Cocaine weighing
20  three point five kilograms or more, but less than five
21  kilograms.
22    We, the jury, find the Defendant, Capulco Peralte,
23  guilty as charged in count two of the indictment.
24    We, the jury, having found the Defendant guilty of
25  the offense charged in count two, further find with respect

Page 432

1  to that count that he conspired to distribute or possess with
2  intent to distribute cocaine base, crack cocaine, weighing
3  two grams or more, but less than three grams.
4    We, the jury, find the Defendant, Capulco Peralte,
5  guilty as charged in count three of the indictment.
6    We, the jury, having found the Defendant guilty of
7  the offense charged in count three of the indictment, further
8  find with respect to that count that he possessed with intent
9  to distribute cocaine weighing three point five kilograms or
10  more, but less than five kilograms.
11    We, the jury, find the Defendant, Capulco Peralte,
12  guilty as charged in count four of the indictment.
13    We, the jury, having found the Defendant guilty of ·
14  the offense charged in count four of the indictment, further
15  find with respect to that count that he possessed with intent
16  to distribute cocaine base, crack cocaine, weighing two grams
17  or more, but less than three grams. So say we all,
18  foreperson, Elaine Rutland, July 14th, 2004.
19    THE COURT: If you will stand.
20    MS. JAMES: Your Honor, we would request that the
21  jury be polled, I don't know if you want to do it now or
22  afterwards.
23    THE COURT: Why don't we poll them after both
24  verdicts are read and I will poll individually as to
25  their verdicts.

Page 433

1    THE CLERK: We, the jury, find the Defendant,
2  Alphonso Norman, guilty as charged in count one of the
3  indictment.
4    We, the jury having found the Defendant guilty of
5  the offense charged in count one, further find with respect
6  to that count that he conspired to distribute or possess with
7  intent to distribute cocaine weighing three point five
8  kilograms or more, but less than five kilograms.
9    We, the jury, find the Defendant, Alphonso Norman,
10  guilty as charged in count two of the indictment.
11    We, the jury, having found the Defendant guilty of
12  the offense charged in count two further find with respect to
13  that count that he conspired to distribute or possess with
14  intent to distribute cocaine base, crack cocaine, weighing
15  two grams or more, but less than three grams.
16    We, the jury, find the Defendant, Alphonso Norman,
17  guilty as charged in count three of the indictment.
18    We, the jury, having found the Defendant guilty of
19  the offense charged in count three of the indictment, further
20  find with respect to that count that he possessed with intent
21  to distribute cocaine weighing three point five kilograms or
22  more, but less than five kilograms.
23    We, the jury, find the Defendant, Alphonso Norman,
24  guilty as charged in count four of the indictment.
25    We, the jury, having found the Defendant guilty of

Page 434

1  the offense charged in count four of the indictment, further
2  find with respect to that count that he possessed with intent
3  to distribute cocaine base, crack cocaine, weighing two grams
4  or more, but less than three grams. So say we all, Elaine
5  Rutland, foreperson, July 14th, 2004. (complies)
6    THE COURT: Members of the jury, you have heard the
7  verdict as it has been read for each Defendant charged. The
8  first verdict pertaining to Mr. Peralte, if your verdict was
9  as you have heard read by the clerk, would you indicate by
10  your raising your hands.
11    JURORS: (comply)
12    THE COURT: The record will reflect that it is a
13  unanimous verdict as to each count. Again, I ask you the same
14  question as to your verdict in the case of the United States
15  v. Alphonso Norman, if your verdict is the verdict as you
16  have heard it read by the clerk, would you indicate by
17  raising your hand.
18    JURORS: (comply)
19    THE COURT: The record will reflect that it is a
20  unanimous verdict. Ladies and gentlemen -- you may be
21  seated -- ladies and gentlemen, I know that your
22  responsibilities in this case, as in any case, is not an easy
23  job, and I appreciate the dedication that you put into your
24  findings. Are there any motions that need to be made in the
25  jury's presence by either of the Defendants or the

## Page 435

1  government?

2      MR. BROWN: Not from the government, Your Honor.

3      MS. JAMES: No, sir.

4      MR. MADISON: Not in the jury's presence, no, sir.

5      THE COURT: Ladies and gentlemen, that will conclude

6  your duty in Federal Court this week. Again, I appreciate

7  your service, and you are at this time discharged.

8      (At which time, 4:10 p.m., the jury left the

9  courtroom.)

10      THE COURT: You may be seated. For the record, the

11  Court finds that the verdict that the jury has returned in

12  the case of the United States versus Capulco Peralte, as to

13  each verdict as to each count in the indictment I should say,

14  is properly supported by the evidence and, Mr. Peralte, I

15  adjudge you guilty based upon the jury's finding.

16      In the case of the United States versus Norman, the

17  Court is aware that it had reserved ruling on the Defendant

18  Norman's Motion for Judgment of Acquittal pursuant to Rule 29

19  as to counts one and count two of the indictment. The Court

20  finds that the jury's findings as to counts three and count

21  four of the indictment are properly supported by the facts

22  and as to those counts I adjudge you guilty, Mr. Norman. Now,

23  as to any motions by either defense -- either Defendant, I

24  should say, is there any motions that we need to take up at

25  this time before we proceed with conditions of any detention

## Page 436

1  pending sentencing? Ms. James?

2      MS. JAMES: Yes, Your Honor. I would ask the Court's

3  indulgence on additional time for the filing of a motion for

4  new trial which would be due in I believe seven days. I would

5  ask for 21 -- actually an additional 21 days. And the

6  primary reason, Your Honor, is the press of pending cases

7  based on the Blakely issues, supplements and various briefs.

8  I have got one due with Judge Thompson and one due in the

9  11th Circuit, and it has created chaos, and I have some of

10  those things that have been placed on hold, I had to ask for

11  an extension from Judge Thompson, and it would be great and I

12  would personally appreciate it.

13      MR. MADISON: Same with me, I have got a brief due

14  with the 11th Circuit. And the last two months have been

15  something every day, briefs due every day. And if I could

16  have a little additional time to piggy-back on her request as

17  well, Ms. James' request. Can I have an additional motion

18  outside of that once Ms. James finishes?

19      THE COURT: Under 18 United States Code Section

20  3143, the condition of release or detention would not be

21  affected by the jury's finding as to either Defendant based

22  upon their condition of detention pretrial; is that correct?

23      MS. JAMES: Yes.

24      THE COURT: For Mr. Peralte, Ms. James, and for Mr.

25  Norman?

## Page 437

1      MR. MADISON: Yes, sir,

2      THE COURT: Mr. Brown, do you have any objections to

3  an extension of time for defense to file a Motion for

4  Judgement of Acquittal under Rule 29?

5      MR. BROWN: No, Your Honor.

6      THE COURT: Rule 29(c) as the Court understands it

7  allows the defense seven days after a guilty verdict, or

8  after the Court discharges the jury, and in this case it

9  would be after the verdict of guilty as to each Defendant, to

10  file a Motion for a New Trial or Motion for Judgment of

11  Acquittal. The Court will allow counsel for the Defendants

12  each an additional 21 days. File your Motion for Judgment of

13  Acquittal and to renew your motion as to count one and count

14  two of the indictment on behalf of Mr. Norman, in addition to

15  your Motion for Judgment of Acquittal on count three and

16  count four, Mr. Madison.

17      MR. MADISON: Yes, sir.

18      MS. JAMES: Your Honor, is that an extension from

19  today, 28 days?

20      THE COURT: I will give you an additional 21 days

21  which would be a total of 28 days.

22      MS. JAMES: Okay, thank you.

23      THE COURT: I know that the -- all the courts are in

24  somewhat a state of flux because of the effects of the

25  Blakely versus Washington decision. I will require any

## Page 438

1  motions to be supported by a brief in support of your

2  findings, or in support of your contentions in support of

3  your Motion for Judgement of Acquittal, and I will give the

4  government an additional period of time to respond for the

5  same reason. Mr. Brown, do you require a specific amount of

6  time in response or would you like for me to set your

7  response time in the order that I am going to enter giving

8  each of these Defendants additional time to file Motion for

9  Judgment of Acquittal.

10      MR. BROWN: Your Honor, I am aware of -- I am

11  anticipating being called to active duty at the end of

12  October for a short period of time. So I think that still,

13  regardless of that, I think if the Court would allow me to

14  have 21 days perhaps. I may not need that long, Your Honor.

15      THE COURT: I prefer not to work off times other

16  than dates certain. Ms. James and Mr. Madison, I am going to

17  specify that your Motion for Judgment of Acquittal, Motion

18  for New Trial, along with your briefs will be due on or

19  before August 12th. That's actually 29 days. Mr. Brown, I

20  will require the government's response be due on or before

21  September 2nd.

22      MR. BROWN: That's satisfactory.

23      THE COURT: And I will ask that Kelli enter that as

24  a docket entry as opposed to a separate order, but if you

25  will make a note of that on behalf of your respective clients

Page 439

1  and that will provide additional time hopefully to give
2  counsel time to make its arrangements as it anticipates the
3  Blakely versus Washington decision to be at that particular
4  time. Anything else that we need to take up before we adjourn
5  court today other than sentence, or other than the detention
6  of the Defendants, which is I understand not going to be
7  affected by the decision of the jury.
8        MS. JAMES: No, sir.
9        THE COURT: Mr. Madison, do you agree?
10       MR. MADISON: Yes, sir, I agree.
11       THE COURT: Mr. Peralte, and Mr. Norman, if you will
12  stand. Consistent with what the jury has found and what the
13  Court has ordered, subject to the motions that are going to
14  be filed by your counsel, I order that you be held in custody
15  as you are at this time in the custody of the United States
16  Marshal pending sentence or ruling by this Court on
17  post-judgment motions. Anything else from the government
18  before we adjourn?
19       MR. BROWN: Nothing more from the United States.
20       THE COURT: Anything else on behalf of Mr. Peralte?
21       MS. JAMES: No, sir.
22       THE COURT: Anything else on behalf of Mr. Norman?
23       MR. MADISON: Just to clarify, when the Judge just
24  made that comment you said pending motions on --
25  post-judgment motions, and three of those were pre-judgment

Page 440

1  motions we had filed as well.
2        THE COURT: I am noting that I am addressing your
3  Motion for Judgment of Acquittal you made at the close of the
4  government's case and renewed, and the Court has continued as
5  a Motion for Judgment of Acquittal as to counts one and two
6  on behalf of your client.
7        MR. MADISON: Yes, sir. Thank you, Your Honor.
8        THE COURT: And I will address those in an order. If
9  nothing further, we will be in recess.
10       THE CLERK: Court is in recess.
11       (At which time, 4:21 p.m., the trial was adjourned.)
12        *   *   *   *   *
13       I certify that the foregoing is a correct transcript
14  from the record of proceedings in the above-entitled matter.
15  This the 16th day of August, 2004.
16
17       Official Court Reporter
18
19
20
21
22
23
24
25

03. 0064
TAB

MUD
8-17-04

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES of AMERICA | ) |
| | ) |
| vs | )    **CASE NO. 2:03CR00229** |
| | ) |
| ALPHONSO NORMAN | ) |

### MOTION OF ACQUITTAL AND
### MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT AND
### BRIEF AND MEMORANDUM OF LAW IN SUPPORT THEREOF

### SUMMARY OF FACTS JUSTIFYING GRANTING OF DEFENDANT NORMAN'S
### MOTION FOR JUDGMENT OF ACQUITTAL AT THE CLOSE OF THE
### GOVERNMENT'S CASE

1.    The Defendant Norman respectfully submits that he is entitled to a judgment of

acquittal at the close of the Government's case on Counts I and II of the indictment wherein he was

charged with conspiracy to knowingly and intentionally distribute and possess with intent to

distribute 500 grams or more of cocaine hydrochloride. In Count II Norman was charged with

knowingly and intentionally distributing and possessing with an intent to distribute a mixture or

substance containing a detectable amount of cocaine base.

At the close of the Government's case this Honorable Court reserved and withheld a ruling

on the Defendant Norman's Motion for Judgment of Acquittal on Counts I and II of the Indictment,

and denied the Motion on Counts III and IV. Norman submits that even construing the evidence in a

light most favorably to the prosecution that there are no facts submitted where a trier of the facts

could have found the essential elements of the crimes charged in Counts I and II against Norman.

Note to Court: The trial transcript was ordered from Honorable James Dickens on July 23,

**GOVERNMENT
EXHIBIT**

CASE
NO. **03-229-N**

EXHIBIT
NO. **5**

2004. Due to his schedule, Mr. Dickens has been unable to transcribe said testimony by the date of this response. Therefore, Counsel is referring to the facts according to Counsel's recollection of trial testimony.

As stated in the Brief and Memorandum of Law hereinafter (as well as the elements of which were submitted to the jury in the jury charges provided by the Court), in order to prove a conspiracy under either of Counts I and II, the Government must have establish beyond a reasonable doubt three (3) elements of offense; being: 1) the existence of an agreement among two (2) or more persons; 2) that the defendant knew of the general purpose of the agreement; and 3) that the defendant knowingly and voluntarily participated in the agreement.

Additionally, one must have knowledge of the conspiracy and must intend to join or associate himself or herself with the object of the conspiracy. Presence alone is insufficient to establish participation in a conspiracy.

Norman submits that the Government failed to carry its burden of establishing probable cause as to the existence of the elements of the offenses charged as to Norman as the Government failed to present any evidence whatsoever that there was an agreement which involved Norman concerning the cocaine which was recovered in the house at 2249 East Fourth Street. The Government failed to produce any evidence that the Defendant Norman knew of the meeting between James and Peralte alleged by the Government, and testified to by James concerning the acquisition or sell of cocaine on the date in question. Additionally, there is no evidence whatsoever that Norman participated in any knowing sale and/or conspiracy with James concerning any cocaine sales other than James' testimony (which was objected to by Norman) that Norman and James had a relationship when James was in high school which was twenty (20) years previous to the date of the

search recovering the evidence in the case. Said evidence was so remote in time as to have no probative value; was not relevant nor material to the cocaine charges in this case. There was no evidence of recent drug activity.

There was no testimony provided concerning Norman having any knowledge of, nor voluntarily participating in the, scope of the conspiracy. Norman's recollection of the testimony regarding the three (3) or four (4) bricks of cocaine that were found in the residence is that James and Peralte had dealings with that, but that James testified that Norman had no knowledge of that transaction.

The Government failed to elicit any evidence to even imply that Norman had a girlfriend who owned the residence where the cocaine was discovered prior to the close of the Government's case. The only facts, prior to the close of the Government's case, were that the mother of Norman's child resided at said residence. There was no evidence submitted that related drug activity of the residence existing because of Norman's relationship with Tammy Montgomery. It was not until after the close of the Government's case, and reservation on Norman's Judgment of Acquittal, that James when recalled to the stand by Peralte's Counsel testified that Norman's girlfriend resided at the residence. Notwithstanding, this was still insufficient to establish the essential elements of the conspiracy. There was no evidence presented at all that Norman's girlfriend allowed drug transactions to occur at her residence or even that she had any knowledge that drug transactions occurred there. There is no evidence that Norman had any knowledge that drug transactions occurred there. There was no evidence that Norman engaged in drug transactions from the residence, nor that Norman engaged in drug activity with either James or Peralte at the residence.

James even testified that he had been to the residence on occasions when Norman was not

3

there. There was no causal nexus nor any evidence presented whatsoever that Norman nor his girlfriend had any knowledge that cocaine would be present at the premises. There was no evidence submitted concerning any of the elements of the conspiracy.

No evidence was submitted as to any investigation which was engaged in by the police to verify whether or not Norman stayed at his girlfriend's house on a regular basis. In fact this whole case was premised upon an alleged anonymous source providing evidence which prompted the call to the residence.

The only evidence submitted by the Government prior to the close of this case pertaining to Norman was the allegation that Norman was seen dropping something in the trash (which Norman denies). The officers then purportedly seized something from the trash which ultimately was offered into evidence as residue after testing. The residue was not even sufficient to form a chemical analysis of the composition of the cocaine which was recovered. Notwithstanding, the police officer, when questioned regarding Norman dropping something in the trash, acknowledged that he did not see what it was that Norman dropped in the trash can and that someone else could have dropped the item containing residue which was seized by the police from the trash can which was located on the street. There were thus no facts to establish the allegation that Norman was the perpetrator or person dropping the item which was seized in the trash can. The Government in fact acknowledged that it could have been someone else other than Norman that placed the object there.

The Government failed to present any evidence that the residue which was recovered had any correlation, or may have been the same, as the •crack••cocaine which was allegedly found in the residence. There was no evidence to support, even circumstantially, a conspiracy charge against Norman concerning the 500 grams or more of cocaine hydrochloride which was discovered in the

4

residence.

There was no evidence submitted to indicate that Norman and his girlfriend dealt in drugs

together; were drug users; or that the owner of the residence - being Norman's girlfriend - had any

knowledge that Norman used drugs or sold drugs in any way. There was no nexus made between

Norman and the drugs in the residence established by the Government at any time at trial, other than

the allegations concerning Mr. Norman's walking to the trash can. Again, this did not deal with the

powder cocaine that was in the residence, and no facts were established relating said residue to the

•crack•·cocaine that was found in the residence (of same batch, same chemical composition, etc.).

The only testimony concerning the conspiracy came from James and dealt with James and

Peralte prior to the close of the Government's case; that evidence dealt only with a buyer-seller

relationship while failing short of conduct supporting a conspiracy.

Therefore, Norman submits that the Government failed to prove any element of an

conspiracy to distribute cocaine (powder not crack) asserted against him under either Counts I and

II; and, therefore, he is entitled to a Judgment of Acquittal at the close of the Government's case.

Even at the close of the entire case, no facts were presented to support the essential elements

under either Counts I and II.  James was recalled to the stand by Peralte's Counsel; however, when

questioned (over the objection of Norman's Counsel) regarding what James said in his statement to

Wingard, James clearly stated that Wingard had put something in a statement dated July 6, 2003,

which was almost seven (7) months later than the time that the statement was made, that James

stated he did not say. The statement dealt with some allegation that James had dealt with Norman in

the past. This still (without waving any objection thereto) did not present sufficient evidence to

support any charge of a conspiracy concerning the facts in this case as to the cocaine which was

5

seized at the residence on this occasion. The Government failed to prove any fact to support any of the three (3) elements under the conspiracy statutes.

2.  Norman respectfully Moves this Honorable Court to alter, amend or vacate its opinion in denying Norman's Motion for Judgment of Acquittal as to Counts III and IV of the Indictment. Count III charged Norman with knowingly and intentionally possessing with an intent to distribute 500 grams or more of a mixture containing cocaine hydrochloride.

Knowledge was still the central element of possession with intent to distribute. The Government failed to present any evidence by any witness prior to the close of this case, nor at the close of all the presentation of all the evidence, that Norman had any knowledge of any of the cocaine charged in Count III of the Indictment being present at the premises. James was the only witness testifying as to said cocaine, and he specifically testified that Norman had no knowledge of the transaction that day and had nothing to do with the cocaine at the premises that day. Not only did the Government fail to prove that Norman had any knowledge to possess with the intent to distribute in excess of 500 grams of cocaine powder (Count III), but no evidence was presented as to intent.

In fact, no evidence was presented to imply constructive possession of the cocaine powder as to Norman. Again, there was no evidence presented that Norman had authority nor control of the premises; that Norman had anything nor control of the premises where the cocaine was found. The utilities were in the name of a Mr. Caldwell. Tammy Montgomery leased the premises. No documents were produced to show Norman paid other utilities at the residence. No evidence was submitted that Norman had any say-so over the premises. Dominion and control of the premises by Norman was not established.

6

Norman could only have been convicted by his mere presence and association. There was thus no evidence before the Court as to Count III. Norman's Judgment of Acquittal should have been granted.

3.    That, as to Norman's Motion for Judgment of Acquittal on possession with intent to possess •crack••(2.6 grams) with intent to distribute, Norman submits that this Honorable Court erred in two (2) different manners on this, (a) the first is that there was no evidence to show a possession in Norman. Norman incorporates the facts (or lack thereof) set forth in paragraph 2 above to support his argument on this issue.

The second issue is (b) that alternatively the Government failed to prove that the cocaine was not mere possession, rather than possession with intent to distribute.

The amount (2.6 grams) and location are the only two facts before the court on this.

There was no evidence this cocaine was separately packaged; there was no evidence of Norman and sales of drugs; no evidence of knowledge nor intent to possess to sell; the amount falls with possession amounts (lesser included offense), under the guidelines.

Therefore, with all due respect, this Court erred in denying Norman's Motion for Judgment of Acquittal on this Count.

Alternatively (notwithstanding that Norman denies possession), this Court should amend to state only a charge of only possession as a lesser included offense.

4.    That, based upon the above facts and the applicable jury charges that are referred to hereinafter, the jury verdict was contrary to the law and the facts. There were insufficient facts from which the jury could infer guilt, in accordance with the jury instructions provided by this Court.

The jury basically entered a finding of guilt contrary to law charged and premised upon mere

7

presence and/or association. The jury completely disregarded the instructions of the law of this case.

Therefore, Norman is entitled for relief in the form of a Judgment of Acquittal notwithstanding the jury's verdict.

## BRIEF AND MEMORANDUM OF LAW

1.      **(A) Rule 29,** *Federal Rule of Criminal Procedure* **provides in pertinent part;**

•The Court on motion of a Defendant or of is own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is disclosed, if the evidence is insufficient to sustain a conviction of such offense or offenses.••

2.      **•Judgment of Acquittal**

A motion for judgment of acquittal challenges the sufficiency of the evidence. When the jury returns a verdict of guilty, the court may on such a motion set aside the verdict and enter a judgment of acquittal.     *Fed.R.Crim.P.* 29(c).     When the sufficiency of the evidence supporting a criminal conviction is challenged, the court must examine the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 00 S.Ct. 2781, 61 L.Ed.2d. 560 (1979); *United States v. Miller,* 987 F.2d 1462, 1464 (10th Cir. 1993).••

•"[T]he evidence presented to support the conviction must be substantial; . . . it must do more than raise a mere suspicion of guilt."•• *U.S. v. Torres,* 53 F.3d 1129, 1133-34 (10th Cir.) (quoting *U.S. v. Sanders,* 928 F.2d 940, 944 (10th Cir.), *cert. denied,* 502 U.S. 845, 112 S.Ct., 142, 116 L.Ed.2d 109 (1991)), *cert. denied,* 515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 845 (1995) . . .•• *U.S. v. Walters,* 89 F.Supp.2d 1206, 1211 (D.Kan. 2000).••

3.      •In order to prove a conspiracy to distribute cocaine, the government must establish beyond a reasonable doubt: (1) the existence of an agreement among two or more persons; (2) that the defendant knew of the general purpose of the agreement; and (3) that the defendant knowingly and voluntarily participated in the agreement. Comprehensive Drug Abuse Prevention and Control Act

8

of 1970, ••401 (a)(1), 406, 21 U.S.C.A. •••841(a)(1), 846 - U.S. v. Simpson, 228 F.3d 1294. **C.A.11 (Ala.) 2000.••**

4.    To be convicted of conspiracy, one must have knowledge of conspiracy and must intend to join or associate him/herself with objective of conspiracy. - U.S. v. Rudisill, 187 F.3d 1260, rehearing denied. C.A.11 (Ala.) 1999.••

5.    •Presence alone is insufficient to establish participation in a conspiracy. U.S. v. Bobo; 586 F.2d 355, certiorari denied Rowan v. U.S., 99 S.Ct. 1546, 440 U.S. 976, 59 L.Ed.2d 795, rehearing denied 99 S.Ct. 2188, 441 U.S. 957, 60 L.Ed.2d 1062. C.A.5 (Ala.) 1978.••

6.    •The government may establish a defendant's knowing participation in a narcotics conspiracy through proof of surrounding circumstances, such as acts committed by the defendant that furthered the purpose of the conspiracy. - U.S. v. Matthews, 168 F.3d 1234, opinion amended on denial of rehearing U.S. v. Moore, 181 F.3d 1205, certiorari denied Williams v. U.S., 120 S.Ct. 438, 528 U.S. 981, 145 L.Ed.2d 342, certiorari denied Smiley v. U.S., 120 S.Ct. 454, 528 U.S. 989, 145 L.Ed.2d 369, rehearing and rehearing denied 189 F.3d 488, rehearing denied, certiorari denied 120 S.Ct. 199, 528 U.S. 883, 145 L.Ed.2d 167, certiorari denied 120 S.Ct. 454, 528 U.S. 989, 145 L.Ed.2d 369. C.A.11 (Ala.) 1999.••

7.    •To support conviction for conspiracy to possess cocaine with intent to distribute, Government must prove beyond reasonable doubt that conspiracy to possess cocaine with intent to distribute existed between two or more persons, that defendant knew of conspiracy, and that defendant knowingly and voluntarily became part of conspiracy. Comprehensive Drug Abuse Prevention and Control Act of 1970, •• 401(a)(1), 21 U.S.C.A. •·841(a)(1).

U.S. v. Andrews, 953 F.2d 1312, certiorari denied Sharp v. U.S., 112 S.Ct. 3007, 505 U.S. 1210, 120 L.Ed.2d 882, certiorari denied Taylor v. U.S., 112 S.Ct. 3008, 505 U.S. 1210, 120 L.Ed.2d 882, certiorari denied 112 S.Ct. 3048, 505 U.S. 1227, 120 L.Ed.2d 915, appeal after remand 117 F.3d 1432, certiorari denied 118 S.Ct. 1057, 522 U.S. 1118, 140 L.Ed.2d 119. C.A.11 (Ala.) 1992.••

8.    The applicable jury instructions given by this Court in this case are set in

paragraphs 8, 9 and 11 that follow. The first is: •Controlled Substances (Possession with Intent to

Distribute).  As to the remaining counts, you will note that the Defendants are charged with a

substantive offense, namely possession with intent to distribute a controlled substance.  Specifically,

Counts Three and Four of the Indictment provide:

> •COUNT 3: On or about the 25th day of September, 2003, in
> Montgomery County, within the Middle District of Alabama, the
> defendants, Alphonso Norman, a/k/a, •Scooter,•and Capulco Peralte,
> a/k/a, •Cappuccino,•a/k/a, •Black,•did knowingly and intentionally
> possess with intent to distribute 500 grams or more of a mixture or
> substance containing a detectable amount of cocaine hydrochloride, a
> Schedule II controlled substance, in violation of Title 21, United
> States Code, Section 841(a)(1).

> COUNT 4: On or about the 25th day of September, 2003, in
> Montgomery County, within the Middle District of Alabama, the
> defendants, Alphonso Norman, a/k/a, •Scooter,•and Capulco Peralte,
> a/k/a, •Cappuccino,•a/k/a, •Black,•did knowingly and intentionally
> possess with intent to distribute a mixture or substance containing a
> detectable amount of cocaine base (•crack•), a Schedule II controlled
> substance, in violation of Title 21, United States Code, Section
> 841(a)(1).••

As I mentioned previously, Title 21, United States Code, Section 841(a)(1), makes it a

Federal crime or offense for anyone to possess a •controlled substance••with intent to distribute it.[14]

Cocaine hydrochloride and cocaine base (or •crack••cocaine) are •controlled substances••

within the meaning of the law.

The Defendants can be found guilty of these offenses only if all of the following facts are

proved beyond a reasonable doubt:

---

[14] *Eleventh Circuit Pattern Jury Instructions Criminal,* Offense Instructions No. 85
(Controlled Substances (Possession with Intent to Distribute)) (21 USC •841(a)(1). *See*
Government·s Requested Jury Instruction No. 21.

First:      That the Defendant knowingly and willfully possessed cocaine hydrochloride or cocaine base (•crack••cocaine) as charged; and

Second:    That the Defendant possessed the substance with the intent to distribute it.

To •possess with intent to distribute••simply means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

The Defendants are charged in the Indictment with possessing with intent to distribute a certain quantity or weight of the alleged controlled substances. However, substances for which he should be held responsible is less than the amount or weight charged. Thus the verdict form prepared with respect to each Defendant, as I will explain in a moment, will require, if you find any Defendant guilty, to specify on the verdict your unanimous finding concerning the weight of the controlled substance attributable to the Defendant.

9.     The second applicable jury instruction is: •Possession.[17]   The law recognizes several kinds of possession. A person may have actual possession or constructive possession. A person may also have sole possession or joint possession.

A person who knowingly has direct physical control of something is then in <u>actual possession</u> of it. A person who is not in actual possession, but who has both the power and the intention to later take control over something either alone or together with someone else, is in <u>constructive possession</u> of it. If one person alone has possession of something, that possession is

---

[17] *Eleventh Circuit Pattern Jury Instructions Criminal,* Special Instruction No. 6 (Possession).

sole. If two or more persons share possession, such possession is joint.

Whenever the word •possession• has been used in these instructions it includes constructive
as well as actual possession, and also joint as well as sole possession.

> 10.    •To establish constructive possession of a controlled
> substance, Government must prove defendants• dominion and control
> over drug. Comprehensive Drug Abuse Prevention and Control Act
> fo 1970, • •401(a), 21 U.S.C.A. • •841(a).
>
> U.S. v. Jackson, 588 F.2d 1046, 49 A.L.R.Fed. 461, rehearing
> denied 591 F.2d 1343, certiorari denied 99 S.Ct. 2882, 442 U.S. 941,
> 61 L.Ed.2d 310. C.A.5 (Ala.) 1979.••

11.    The third applicable jury instruction is:  •On or About -- Knowingly-- Willfully.[18]

You will note that the Indictment charges that the offenses were committed •on or about•a

certain date. The Government does not have to prove with certainty the exact date of the alleged

offenses. It is sufficient if the Government proves beyond a reasonable doubt that the offenses were

committed on a date reasonably near the date alleged.

The word •knowingly,•as that term is used in the Indictment, or in these instructions, means

that the act was done voluntarily and intentionally and not because of mistake or accident.

The word •willfully,•as that term is used in the Indictment, or in these instructions, means

that the act was committed voluntarily and purposely, with the specific intent to do something the

law forbids; that is with bad purpose either to disobey or disregard the law.

---

[18] *Eleventh Circuit Pattern Jury Instructions Criminal*, Basic Instruction NO. 9.1 (On or
About--Knowingly--Willfully).

13

Respectfully submitted,
S/DONALD G. MADISON
DONALD G. MADISON
Bar Number:  ASB-5199-M68D
Attorney for Defendant Alphonso Norman
418 Scott Street
Montgomery, Alabama 36104
Telephone (334) 263-4800
Facsimile  (334) 265-8511
E-mail dmadison@bellsouth.net

CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2004, I electronically filed the foregoing with the Clerk of
the Court using the CM/ECF system which will send notification of such filing to the following:

Honorable Todd A. Brown
Assistant United States Attorney
Middle District of Alabama

Honorable Susan James
*James & Associates*
600 South McDonough Street
Montgomery, Alabama 36104

Honorable Michael Petersen
631 South Perry Street
Montgomery, Alabama 36104

Honorable Leonard Arrington

S/DONALD G. MADISON
DONALD G. MADISON
Bar Number: ASB-5199-M68D
Attorney for Defendant Alphonso Norman
418 Scott Street
Montgomery, Alabama 36104
Telephone (334) 263-4800
Facsimile  (334) 265-8511
E-mail dmadison@bellsouth.net

14

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO    2:03cr229-F |
| | ) | |
| ALPHONSO NORMAN | ) | |
| CAPULCO PERALTE | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on the Oral Motion for Judgment of Acquittal on

Counts One and Two made by defendant Alphonso Norman during trial, the Motion for

Judgment Notwithstanding Verdict filed by defendant Alphonso Norman on August 12, 2004

(Doc. # 235), and the Motion for Judgment of Acquittal or in the Alternative Motion for New

Trial filed by defendant Capulco Peralte on August 11, 2004 (Doc. # 234).  On October 29,

2003, the Grand Jury returned a four-count indictment against Defendants Alphonso Norman

and Capulco Peralte charging them with (1) conspiracy to distribute and possess with intent

to distribute 500 grams or more of a mixture or substance containing a detectable amount of

cocaine hydrochloride in violation of Title 21 U. S.C. § 846; (2) conspiracy to distribute and

possess with intent to distribute a mixture or substance containing a detectable amount of

cocaine base ("crack") in violation of Title 21 U.S.C. § 846; (3) possession with intent to

distribute 500 grams or more of a mixture or substance containing a detectable amount of

cocaine hydrochloride in violation of Title 21 U.S.C. § 841(a)(1);  (4) possession with intent

to distribute a mixture or substance containing a detectable amount of cocaine base ("crack")

in violation of Title 21 U.S.C. § 841(a)(1).  On July 14, 2004 a jury found both Defendants

GOVERNMENT
EXHIBIT

CASE
NO.  03-229-N

EXHIBIT
NO.  T

09/30/2004   14:08   3342695511              DANSBYSMITHBOWEMADIM                         PAGE   03

guilty as charged as to all four counts of the indictment.

After careful review of the record and for the reasons to be stated, the court finds that the motions are due to be DENIED.

## MOTIONS FOR JUDGMENT OF ACQUITTAL

Both Defendants filed motions for judgment of acquittal under Federal Rule of Criminal Procedure 29 as to all four counts of the indictment arguing that the government produced insufficient evidence to support their convictions. The test in considering a motion for judgment of acquittal is whether, viewing all evidence in the light most favorable to the government and drawing all reasonable inferences from the evidence and credibility choices in favor of the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt. *See United States v. O'Keefe*, 825 F.2d 314 (11th Cir. 1987). Accepting all reasonable inferences from the evidence which support the verdict, the court will uphold the convictions if a reasonable fact-finder could have reached a conclusion of guilt beyond a reasonable doubt. *United States v. Lopez*, 985 F.2d 520, 524 (11th Cir. 1993); *see United States v. Taylor*, 972 F.2d 1247, 1250 (11th Cir. 1992) (The court must resolve any conflicts in the evidence in favor of the government). It is not necessary for the government to disprove every reasonable hypothesis of innocence, as a jury is "free to choose among reasonable constructions of the evidence." *United States v. Jones*, 913 F.2d 1552, 1557 (11th Cir. 1990).

In light of the foregoing, this court proceeds to examine the claims of each Defendant

SEP 30 2004  THU 15:32   TEL :4046337980            NAME:LAW OFFICE OF MARCIA G. SHEI P.  3

separately, keeping in mind the standard of review for each sufficiency challenge.


*Alphonso Norman*

At trial, Defendant Norman orally moved for a judgment of acquittal at the close of the government's case and at the close of all of the evidence, and the court reserved its decision on Counts One and Two, but denied the motion on Counts Three and Four. After reviewing the evidence presented at trial under the appropriate legal standards, the court now concludes that there is sufficient evidence to convict Norman of all of the charges against him.

As aforementioned, Federal Rule of Criminal Procedure 29 allows a court to grant a defendant's motion for a judgment of acquittal on one or more counts if the evidence is insufficient to sustain a conviction. If the court reserves decision, it must decide the motion on the basis of the evidence presented at the time it reserved decision. *See United States v. Grenier*, 972 F.Supp. 1407, 1409 (M.D. Fla. 1997). The standard of review, however, is the same, regardless of when the defendant makes his motion. *Id.*

To sustain a conviction on the conspiracy counts, the government must show, beyond a reasonable doubt, that two or more people, in some way or manner, came to a mutual understanding to try to accomplish a common and unlawful plan and that Defendant Norman knowingly, intentionally, and willfully joined in this venture. To sustain a conviction on the possession counts, the government must prove, beyond a reasonable doubt, that Defendant

3

Norman knowingly and willfully possessed cocaine and crack with the intent to distribute it. Thus, conviction on any count requires the government to demonstrate scienter. Although the government may establish this element through the use of circumstantial evidence, a defendant's mere presence at the crime scene is not enough.

Because the crime of conspiracy is "predominantly mental in composition," it is frequently necessary to resort to circumstantial evidence to prove its elements. *United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998) (internal citations and quotations omitted). "The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence." *See id.* (quoting *United States v. Gold*, 743 F.2d 800, 824 (11th Cir. 1984)). Moreover,

> the government must prove the conspiracy it charged in the indictment rather than some other conspiracy. The government must show an 'interdependence' among the alleged co-conspirators in order to prove that the indicted conspiracy was a single unified conspiracy as opposed to a series of smaller, uncoordinated conspiracies.

*Id.* (citing *United States v. Coy*, 19 F.3d 629, 634 (11th Cir. 1994).

The conspiracy in this case involved the distribution of cocaine and the conversion of that cocaine into cocaine base (hereinafter "crack") for the ultimate purpose of distributing cocaine and crack on the streets of Montgomery. The government's theory of Defendants Norman and Peralte's involvement in the conspiracy was that Norman and Peralte were partners in the drug business; Peralte was the transporter who brought the cocaine from

4

Florida to Alabama, and Norman permitted Peralte to use his girlfriend's residence as a place to complete drug sales and cook crack. To prove its case against Defendants, the government presented the testimony of numerous witnesses and various documents, however, all evidence was centered around a search of Norman's girlfriend's residence and the arrest of Defendants on September 25, 2003, which was initiated by an anonymous call.[1]

The government adduced evidence during its case in chief that, viewed in the light most favorable to it, reflects the following. On September 25, 2003, an anonymous caller, in a female voice, called the narcotics office of the Montgomery Police Department. Corporal Tommy Conway (hereinafter "Conway") received the call and testified at trial that the anonymous female caller stated the following:

> . . . there was a residence on East Fourth Street, address 2429 East Fourth Street, that there was a vehicle, a maroon vehicle there, with a Florida tag. She said that when the vehicle was there there [sic] was usually drugs in the residence.

(R. 46). In addition, Conway testified that the anonymous female caller also gave him the telephone number to the house and told him that a black male named "Scooter" was at the residence. *Id.* Conway further testified that Defendant Norman was also known as "Scooter." *Id.*

To cut to the chase, the information Conway received resulted in police officers approaching the residence on East Fourth Street where they observed Norman exit the

---

[1] There was no evidence of intercepted telephone conversations, an on-going investigation of the Defendants, nor numerous sales of unlawful substances to undercover agents or confidential informants.

5

residence and discard something in the trash can located on the street. (R. 48). Norman

returned to the residence and the police initiated a "knock and talk."[2] (R. 49). Norman, his

son, and Andrew Kenneth James (hereinafter "James") appeared in the doorway to the

residence. *Id.* The "knock and talk" however was not fruitful, so Conway walked to the

trash can recently utilized by Norman and found a wet paper towel which contained cocaine

residue (R. 51). Conway testified that this trash can discovery led to the procurance of a

search warrant and the arrest of James, Norman and– the third individual who was

subsequently found in the residence– Peralte. Conway further testified that the police

conducted a search of the residence and Peralte's maroon vehicle, and discovered cocaine,

crack, a handgun, two sets of digital scales, cocaine packaging and more than $72,000.00 in

cash.

    The government's principal witness at trial was cooperating witness, James, a

convicted drug dealer and co-defendant who pled guilty before trial. At trial, James'

testimony regarding Norman was scant. During the government's case in chief, James

testified that Norman's nickname was "Scooter," that Norman did not "sell [him] any drugs

[around the relevant time period], but [Norman] used to work for him a long time ago," that

Norman and Peralte "started seeing each other," but he "did not know what they was [sic]

doing," that he met Peralte at Norman's "residence" on the "east side" to purchase some

cocaine from Peralte about "six or seven days" before the day of the search warrant, and that

---

    [2] Conway testified that this technique consists of the following: "[y]ou basically knock on
the door and tell them who you are and what you are doing." (R. 49).

James went over to the residence on the day of the search warrant to obtain some cocaine. (R. 260, 265, 267, 297).

Upon review of the evidence, the court finds that the government produced sufficient evidence to send the conspiracy charges, namely, Counts One and Two to the jury and to support the guilty verdict which resulted. "A conspiracy conviction will be upheld if there is sufficient positive indication that an illegal agreement exists or when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." *United States v. Figueroa*, 720 F.2d 1239, 1246 (11th Cir. 1983) (citations omitted). *See also, e.g., United States v. Villegas*, 911 F.2d 623 (11th Cir. 1990) (citing such factors as plain view, smell, and close working conditions such that anyone ordinarily would discover the contraband being shipped); *United States v. Blasco*, 702 F.2d 1315 (11th Cir. 1983) (attributing knowledge and agreement where crew shipping marijuana stood on the marijuana bales).

The evidence, viewed in the light most favorable to the government, establishes that (1) Norman was present in the residence on the day of the search warrant, (2) that cocaine and crack– along with drug scales and other drug paraphernalia– were found in numerous locations in the residence, (3) that the anonymous female caller informed the police that when Peralte's maroon vehicle was at the residence there were normally drugs in the residence and that Norman was currently at the residence, (4) Norman discarded trash, which contained cocaine residue, in the trash can located on the street, (5) James purchased cocaine

7

from Peralte at Norman's residence a few days prior to the day of the search warrant, and (6) James knew that Peralte and Norman started "seeing each other." Although Norman argues that belief in the government's theory requires inferential leaps, this court cannot agree that such leaps are necessary.

Most of the items of evidence when considered individually are insufficient to prove Norman's knowledge of and participation in the charged conspiracies. However, the evidence that solidly bridges the gap with reasonable inferences and not mere speculation is Norman's own action. Conway's testimony, however questionable its credibility, that Norman discarded trash contaminated with cocaine residue in a trash can located on the street was sufficient to fill in the remaining gaps in the government's case on the conspiracy charges and was reasonably believed by this jury. Although Norman's presence at the scene alone is insufficient to allow an inference of participation in a conspiracy formed by other persons, his presence at the scene coupled with his disposal of a paper towel containing cocaine residue and all of the drugs located in his girlfriend's residence can be considered so obvious that Norman can be implied to have participated in their placement or known about them. *See Figuero, supra.* The jury could reasonably infer that Norman was in the "presence" of the cocaine and crack located in the house because the paper towel he discarded contained cocaine residue. Although James testified that he did not purchase cocaine from Norman and did not know the specific details regarding Norman and Peralte's business relationship, the jury was entitled to disbelieve—all or part of—his testimony, in light

8

of other evidence that could support the opposite conclusion. For instance, the jury was entitled to believe that James knew that Norman and Peralte had an ongoing drug business together, but disbelieve that James never purchased any cocaine from Norman. Nonetheless, in light of Norman's action of discarding cocaine residue, his presence in the residence takes on increased significance and contributes to the case for conviction. Coupled with James' uncontested role as drug courier for Peralte, James' knowledge of Norman and Peralte's business relationship, and James' recent drug transaction at Norman's residence, the disposal of the paper towel bearing cocaine residue establishes a body of evidence from which a reasonable jury could conclude that Norman and Peralte mutually participated in a conspiracy to distribute cocaine and crack.[3] Hence, the court concludes that the record, viewed in the light most favorable to the government, contains sufficient evidence from which a reasonable jury could find, and did find, beyond a reasonable doubt that Norman agreed to participate with Peralte and his co-conspirators, albeit in an obscure way, in the sale of cocaine and crack.[4] Accordingly, Defendant Norman's motion for acquittal as to Counts One and Two

---

[3] Even if that mutual participation was Norman's agreement to allow Peralte to transfer drugs to his residence, allow the conversion of cocaine to crack and/or re-packaging the drugs at Norman's residence.

[4] As noted previously, on Norman's oral motion for acquittal at trial, the court reserved ruling on Counts One and Two. As discussed *supra*, the court finds that the government produced sufficient evidence to send Counts One and Two to the jury and to support the guilty verdict. Accordingly, the oral motion for acquittal is due to be denied as to Counts One and Two. Further, to the extent that Norman renews his motion for acquittal on these counts, the court also finds that the government produced sufficient evidence to support Norman's conviction as to Counts One and Two. As a result, Norman's renewed motion for judgment of acquittal as to Counts One and Two is due to be denied.

9

is due to be denied.

Further, the court is satisfied, without further discussion, that there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt against Defendant Norman on the unlawful possession charges, namely, Counts Three and Four. "A co-conspirator's drug possession can be attributed to other co-conspirators if committed in furtherance of the conspiracy and if it is reasonably foreseeable in the scope of the conspiracy." *Figueroa*, 720 F.2d at 1247 n.13 (citing *United States v. Hodges*, 606 F.2d 520, 523 (5th Cir. 1979)). Because this court holds that conspiracy for both the cocaine and crack was adequately shown, such attribution is reasonably possible and was reasonably found by the jury. Accordingly, Defendant Norman's motion for judgment of acquittal in relation to the charges of unlawful possession with intent to distribute, namely Counts Three and Four is denied.

*Capulco Peralte*

Defendant Peralte attacks his conviction on all four counts. Defendant Peralte argues that the evidence is insufficient to sustain his conviction for the conspiracy counts, namely Counts One and Two, because it establishes nothing more than a buyer-seller relationship between him and James. "Where the buyer's purpose is merely to buy, and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown." *United States v. Burroughs*, 830 F.2d 1574, 1581 (11th Cir. 1987). The evidence presented against Peralte

10

establishes far more than merely a buyer-seller relationship. James testified that he rekindled a previous relationship with Peralte in September or August of 2003, and purchased cocaine from Peralte on several occasions. (R. 267, 272). James also testified that Peralte told him that he could "get some money" by "get[ting] [Peralte] some sales for some powder." (R. 267). James further testified that he had arranged with Peralte to line up customers with cocaine, and that he and Peralte "went around and sold drugs to various people" because Peralte "wouldn't let [James] sell the drugs by [himself]." (R. 268, 281-282). James admitted that Peralte was concerned about his dishonesty and would not front James any drugs, but avowed that he had "sold a lot of drugs for Peralte, [he] and [Peralte] had established a good relationship on making money so [they] made a lot of money together." (R. 284, 286). From this evidence, a reasonable jury could appropriately infer a continuing course of conduct between James and Peralte designed to result in the distribution of cocaine and crack in Montgomery. *See id.* at 1581. *See also United States v. Beasley,* 2 F.3d 1551, 1560-1561 (11th Cir. 1993). Accordingly, the court is satisfied that the evidence is sufficient to sustain Peralte's conviction on the conspiracy charges, namely, Counts One and Two.

Further, the court is satisfied, without further discussion, that there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt against Defendant Peralte on the unlawful possession charges, namely, Counts Three and Four. Accordingly, Defendant Peralte's motion for judgment acquittal is due to be denied.

### MOTION FOR NEW TRIAL

11

Alternatively, Defendant Peralte moves for a new trial under Federal Rule of Criminal Procedure 33. Rule 33 states "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interests of justice." Fed. R. Crim. P. 33. This standard is broad and is not limited exclusively to correcting erroneous court rulings prejudicial to the defendant. *See United States v. Vicaria*, 12 F.3d 195 (11th Cir. 1994). Unlike a motion for judgment of acquittal, "[o]n a motion for a new trial based on the weight of the evidence, the court need not view the evidence in the light most favorable to the verdict. It may weigh the evidence and consider the credibility of the witnesses." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). The decision whether to grant a new trial is within the sound discretion of the trial judge. *United States v. Champion*, 813 F.2d 1154, 1170 (11th Cir. 1987). However, courts should exercise "great caution" when granting new trials and new trials only should be granted in "exceptional cases." *United States v. Sjeklocha*, 843 F.2d 485, 487 (11th Cir. 1988) (citations omitted). In light of the aforementioned principles, the court considers Defendant Peralte's arguments in support of his motion for a new trial.

Defendant Peralte argues that the verdict should be vacated and a new trial ordered because the court committed two errors: (1) the court erred in declining to sever his trial from that of his co-defendant, Alphonso Norman, and (2) the court erred in failing to charge the jury on a buyer-seller relationship. The court addresses each argument in turn.

First, the Eleventh Circuit has clearly established that to compel severance, the defenses of co-defendants must be more than merely antagonistic; the defenses must be

12

antagonistic "to the point of being mutually exclusive." *United States v. Castillo-Valencia*, 917 F.2d 494, 498 (11th Cir. 1990). The Eleventh Circuit elucidated:

> At the outset we recognize that any time a defendant pleads not guilty and proceeds to trial, the defense of a co-defendant which implicates that defendant will be antagonistic to the plea of not guilty. This is not enough, however, to mandate severance. The requirement is a more stringent one, namely, that a co-defendant suffer actual prejudice from the denial of his motion to sever.
>
> <div align="center">* * *</div>
>
> Where appellants presented no evidence amounting to a defense to the charges against them, prejudice cannot be found simply by virtue of the fact that the defenses of their co-defendants further implicated the appellants' guilt.

*Id.* at 499 (citation and footnote omitted). In light of these principles and upon consideration of the evidence adduced at trial, the court is satisfied, without further discussion, that severance was not warranted.

Second, as discussed above in relation to Defendant Peralte's motion for judgment of acquittal, the evidence presented against Peralte establishes far more than merely a buyer-seller relationship between James and Peralte. Thus, the court is satisfied that no jury instruction on the buyer-seller theory of defense was warranted.

In short, the court has considered Defendant Peralte's arguments and finds that a new trial is not warranted. Accordingly, as nothing before the court indicates that this case is "exceptional," the court finds that Defendant Peralte's request for a new trial is due to be denied.

## CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

<div align="center">13</div>

1.    The Motion for Judgment of Acquittal filed by defendant Capulco Peralte (Doc. # 234) is DENIED.

2.    The Alternative Motion for New Trial filed by defendant Capulco Peralte (Doc. # 234) is DENIED.

3.    Defendant Alphonso Norman's Oral Motion for Judgment of Acquittal as to Counts One and Two is DENIED.

4.    The Motion of Acquittal and Motion for Judgment Notwithstanding Verdict filed by defendant Alphonso Norman (Doc. # 235) is DENIED.

5.    The Motion to Strike filed by defendant Alphonso Norman (Doc. # 238) is DENIED.

DONE this 29th day of September, 2004.


_____/s/ Mark E. Fuller_____
CHIEF UNITED STATES DISTRICT JUDGE

14

# DONALD G. MADISON

ATTORNEY AT LAW

418 SCOTT STREET

TELEPHONE 334/263-4800          MONTGOMERY, ALABAMA 36104          FACSIMILE 334/265-8511



September 15, 2004

Ms. Donnelle Thompson
United States Probation Officer
United States Probation Office
One Court Square
Montgomery, Alabama 36104

      Re:  Alphonso Norman
            Docket No. 2:03CR00229-002

Dear Ms. Thompson:

      The following constitutes the objections to the Presentence Report regarding Alphonso Norman.

      This, Norman's Objections, should be prefaced on the fact that no ruling has yet been made on the Motion for Judgment of Acquittal as to Counts I and II of the Indictment, nor has any ruling been made on the Motion to Vacate the Verdict of the Jury as to Counts III and IV.

<u>Objection #1.</u>

      The following should be incorporated as part of the offense Presentence Report information. Though there were drugs found at the residence where Defendant Norman was visiting there was no evidence connecting him to the criminal conduct making up the quantity of cocaine used for purposes of establishing the guidelines. Not only does this information have merit in relationship to the conviction itself but has merit as applied to U.S.S.G. 2D1.1 and 1B1.3. Not all offenders receive the same relevant conduct consideration when each of them may be distinguished from the other in terms of their involvement in the criminal conduct charged.

      The Federal Sentencing Guideline Manual provides the following instructions with respect to the establishment of a base offense level relevant conduct consideration:

> *Because a count may be worded broadly and include the*
> *conduct of many participants over a period of time, the*
> *scope of the criminal activity jointly undertaken by the*



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. U

> defendant (the jointly undertaken activity) is not necessarily
> the same as the scope of the entire conspiracy, and hence
> relevant conduct is not necessarily the same for every
> participant. In order to determine the defendant's
> accountability for the conduct of others under subsection
> (a)(1)(B), the court must first determine the scope of the
> criminal activity the particular defendant agreed to jointly
> undertake (i.e., the scope of the specific conduct and
> objectives embraced by defendant's agreement). The
> conduct of others that was in furtherance of, and reasonably
> foreseeable in connection with, the criminal activity jointly
> undertaken by the defendant is relevant conduct under this
> provision.

See Application Notes 2(ii) (reasonably foreseeable in connection with that criminal activity).

The scope of the jointly undertaken criminal activity (and thus the accountability of the defendant for the contraband that was the object of that jointly undertaken activity) may depend upon whether, in the particular circumstances, the nature of the offense is more appropriately viewed as one jointly undertaken criminal activity or as a number of separate criminal activities. For example see United States v. North, 900 F.2d 131 (8th Cir. 1990), holding "[s]imple knowledge that the supplier supplies other persons is not enough...to assess all quantities distributed by the supplier to each person who purchased drugs from the supplier." (emphasis added)

In U.S. v. Collado, 975 F2d 985 (3rd Cir. 1992), the 3rd Circuit set forth a standard for accomplice attribution. This court acknowledged that a co-conspirator's conduct must be in furtherance of a jointly undertaken activity and within the scope of the defendant's agreement and reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake, Collado at 991-992.

See also Wilkins and Steer, 41 S.C.L.Rev. at 510 (observing that defendants in narcotics conspiracies may be held accountable for different quantities of drugs than his or her co-conspirator); see also Collado at 992, n.7, n.8. In Collado, the government contended that the defendant's sentences should reflect all the quantities sold by suppliers. The Third Circuit in this definitive case rejected the government's definition of reasonable foreseeability reasoning that:

> "if this were true, all of the drugs sold by a dealer could be
> attributed to any and all of his customers, for a person who
> purchases narcotics should reasonably foresee that the
> dealer is likely also selling to others. Collado at 993.

> *We wish to emphasize that in deciding whether accomplice attribution is appropriate, it is not enough to merely determine that the defendant's criminal activity was substantial. Rather, seeking an individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendants' sentence accurately reflects his or her role."*

Evidence at trial clearly reveals that Norman had no relationship to the house where the cocaine or firearm was found, or the parties that were involved with cocaine transactions. In fact, the evidence at best implies he was visiting his child and/or his girlfriend and friends at the residence where the arrests occurred. No tests were given to the Defendant to determine if he was even taking any drugs. Neither is an anonymous telephone tip sufficient to carry the day on a conviction and the enhancement of a sentence based upon drugs found in a residence a defendant had no control over.

There is no evidence of jointly undertaken criminal activity and mere presence in a residence where drugs are found is not sufficient to establish such relevant conduct. *"the scope of criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, hence relevant conduct is not necessarily the same for every participant."* (See Amendment 439, Appendix C, effective November 1, 1992.) This guideline amendment followed criticism that the relevant conduct section failed to adequately distinguish among conspirators and others involved in a jointly undertaken activity. The mere fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation. *See* United States v. Studley, 47 F.3d 569, 574-76 (2nd Cir. 1995). *See also* United States v. Gilliam, 987 F.2d 1009, 1012-13 (4th Cir. 1993)(holding that the act must have been within the scope of the defendant's agreement). *See* United States v. Evbuomwan, 992 F.2d 70, 73-74 (5th Cir. 1993)(holding that the government must prove that the particular crime was within the scope of the defendant's agreement). United States v. Jenkins, 4 F.3d 1338, 1346-47 (6th Cir. 1993)(holding that the Court must determine not only forseeability but the scope of the criminal activity defendant agreed to jointly undertake.) *See* United States v. Olderbak, 961 F.2d 756, 764 (8th Cir. 1992)(conduct is relevant only if it is reasonably foreseable in connection with the criminal activity defendant agreed to jointly undertake.) United States v. Hunter, 323 F.3d 1314 (11th Cir. 2003)(remanding because the Court did not make particularized findings regarding the scope of the defendant's agreements as required by U.S.S.G. 1B1.3.) *See also* United States v. Saro, 24 F.3d 283, 288 (D.C. Cir. 1994)(mere foreseeability is not enough).

Additionally, even under 1B1.3 standards this case is tenuous beyond 2.6 grams of crack cocaine applied to defendant. Notwithstanding any favorable determination on the Request for Judgment of Acquittal, the following facts are significant in that they do not

establish the Defendant had the requisite control or nexus between himself and the larger quantity of drugs found in the residence where the Defendant Norman did not live and did not have control over.

1. According to the government the Defendant "dropped" something in the trash while police officers were observing him. Upon seizing what was alleged to have been thrown in the trash allegations of testing this residue were made and the officers stated that cocaine was present. This residue was not sufficient to form a chemical analysis of the composition of the cocaine that was recovered.

2. The police officers acknowledged at trial that they did not see what it was that the Defendant dropped in the trash can and that someone else could have dropped the item containing the residue that was seized by the police from the trash located on the street. The government acknowledged that it could have been someone else other than Norman that placed the object there.

3. No evidence was submitted to indicate that Norman and his girlfriend dealt in drugs together, were drug users, or that the owner of the residence, Norman's girlfriend, had any knowledge that Norman used drugs or sold drugs in any way.

4. There was no nexus made between Norman and the drugs in the residence established by the government at any time at trial other than the allegation concerning Norman's walking to the trash can.

5. The only testimony concerning any alleged conspiracy was from witness James and co-defendant Peralte prior to the close of the government's case. The evidence dealt only with an old relationship, falling short of conduct supporting a conspiracy in the instant case.

6. There was no evidence presented implying constructive possession of powder cocaine or crack cocaine.

7. Norman had no authority or control over the premises or the cocaine found. Nor is there evidence he even touched or had concern for the drugs, money or firearms.

8. Tammy Montgomery leased the premises, the utilities were in the name of Mr. Caldwell, and no evidence was submitted that Norman had any say so over the premises nor dominion or control.

9. Mere presence is not sufficient to create an association. See United States v. Bobo: 586 F.2d 355, Cert. denied. Rowan v. U.S., 99 S.Ct. 1546, 440 U.S. 976, Rehearing Denied 99 S.Ct. 2188, 441 U.S. 957 (1978).

10. There is no evidence to show that Norman possessed crack cocaine. The amount of 2.6 grams and location of this amount are the only two facts the Court can use in relationship to Norman. However, there still was not enough evidence to show possession or distribution.

11. There is no evidence that the Defendant knew the general purpose of any agreement between the other parties in the residence. United States v. Simpson, 228 F.3d 1294 (11th Cir. 2000).

12. There is no evidence that the Defendant had knowledge of the conspiracy and intended to join or associate himself with the object of the conspiracy. United States v. Rudisill, 187 F.3d 1260, Rehearing Denied (11th Cir. 1999). There is no proof that the Defendant knew of the conspiracy or knowingly and voluntarily became a part of it by agreeing to any illegal acts.

13. In addition, based on the circumstances of this case, the jury should have made a determination of the quantity of the drugs the Defendant should be held accountable for. By not doing so the principles implied in Blakely v. Washington, 159 L.Ed. 2d 403, 124 S. Ct. 2531 (2004) were violated and no enhanced sentence can be given on the basis of information that was not determined by the jury beyond a reasonable doubt.

14. The defendant, if the conviction stands, on any of the charges, cannot be held responsible pursuant to U.S.S.G. 1B1.3 beyond the scope of 2.6 grams of crack cocaine. The Defendant does not concede that he is responsible for that quantity of crack cocaine but represents that that is the best estimate amount without a specific jury verdict on specifics. (There is a base offense level where no drugs are evident. See U.S.S.G. 2D1.1 (17) Base Offense Level 6.)

15. Assuming arguendo that 2.6 grams of crack cocaine are used to establish some relevant conduct for Norman, the base offense level would be 20. (U.S.S.G. 2D1.1(10)). (With a base offense level 6 for no drug amount and Criminal History Score of III, the Defendant's sentence should be 2-8 months incarceration). With an offense level of 20 with no other enhancements applied and a Criminal History Category of III, the guidelines would be 41-51 months. Needless to say, based on the totality of the circumstances in this case, these two sentences are more than adequate to establish the purpose and goals of the Federal Sentencing Guidelines when addressing conflicts of evidence that are so egregious that a person may end up in custody for 15 years on matters not determined by a jury and not supported by the evidence.

The aforementioned information should specifically be added to the Presentence Report and/or used in contravention to the paragraphs that address the limited information incorporated on pages 5 and 6 of the Presentence Report. The

Presentence Report offense section is a recitation of the government investigation and not trial evidence. (See attached).

### Objection #2

The Defendant objects to <u>Paragraph 23</u>. The base offense level should be either 6 or no more than 20. The Defendant asserts that base offense level 6 is accurate based on the conviction but no drug amount assessable to Defendant Norman pursuant to U.S.S.G. 2D1.1 and 1B1.3.

### Objection #3

The Defendant objects to <u>Paragraph 24</u> in that he is not responsible pursuant to U.S.S.G. 2D1.1(b) for a 2-point enhancement for possessing a firearm which was located in the residence he was visiting. The firearm was located in a residence that the Defendant did not have control over, nor did he have knowledge of the firearm present in the residence nor did he have control over the firearm or drugs in a criminal capacity by guidelines or statute. Norman had no relationship to any drug conspiracy and therefore the 2-point enhancement cannot be advanced for that purpose. Furthermore, this enhancement violates the principles established in <u>Blakely v. Washington,</u> 159 L.Ed. 2d 403, 124 S. Ct. 2531 (2004) that has been supported by the <u>Apprendi v. New Jersey,</u> 530 U.S. 466 (2000) and <u>Ring v. Arizona,</u> 536 U.S. 584 (2002).

### Objection #4

Defendant objects to <u>Paragraph 25</u> in that based on the facts of this case Norman's conduct, where criminally liable, is of a minimal or minor role. There is no evidence of any connection to the overall conspiracy and trial testimony clearly supports same. Norman's mere presence is minimal and aberrant. Therefore Norman is eligible for minimal or minor role reduction per U.S.S.G. 3B1.2.

### Objection #5

Defendant objects to <u>Paragraph 28 and 31</u> in relationship to the base offense level being established at 34. Defendant states that the base offense level of 6 applies as there were no drug quantities tied to the Defendant that could be supported by law or by fact. Assuming *arguendo*, that the Court determines some drugs were applicable to the Defendant's presence in the residence, by mere possessory interest in that amount, the 2.6 grams of crack cocaine equals a base offense level of 20.

### Objection #6

The Defendant objects to <u>Paragraphs 33, 34, 35, 36, and 37</u> for juvenile offense adjudications. There are no records of these adjudications, or the facts underlying these adjudications and therefore they should be removed from the Presentence Report. Since there are no facts regarding these offenses that would help the Court understand their circumstances, the mere presentment of the charge and a conviction is insufficient to address mitigating factors that will clearly show that the Criminal History Score over-represents the Criminal History in light of the fact that at least five of the offenses are juvenile offenses with no details. The charged offenses appear serious but may not be with a review of the underlying information. Not having the formal Judgment and Commitment as well as the evidence underlying the offense will prejudice the Defendant by the mere presence of the labeled charges.

<u>Objection #7</u>

<u>Paragraph 59</u>: The Defendant has admitted that he does have a drug problem but this does not make him a drug dealer. Therefore it is recommended that whatever sentence is imposed, if it exceeds 24 months, that the Defendant be recommended for the Intensive Drug Treatment Program afforded to him through the Bureau of Prisons.

<u>Objection #8</u>

The Defendant, based upon the aforementioned objections, must object to <u>Paragraph 70</u> in that the guidelines are more accurately reflected by the aforementioned information.

<u>Defense Sentencing Recommendation</u>
1. Relevant Conduct pursuant to U.S.S.G. 2D1.1     Base Offense Level 6
2. U.S.S.G. 2D1.1(b)(2)     0
3. Base Offense Level 6
4. Criminal History Score III
5. Guidelines 2-8 months in prison.

In the alternative, should the Court determine that 2.6 grams of crack cocaine are applicable to the Defendant's relevant conduct the following recommendation is made.

1. U.S.S.G. 2D1.1 2.6 grams of crack cocaine     Base Offense Level 20
2. U.S.S.G. 2D1.1(b)(2)     0
3. Minor Role     -2[1]
4. Base Offense Level 20     ------
5. Criminal History Score III     18
6. Guidelines     33-41 months

---

[1] If minimal role is applied base level 16 CH III = 27 to 33 months in custody.

This case is wrong on several levels.   Incarcerating this defendant for 188 months on the basis of drugs that have nothing to do with him nor can be shown to have a relatedness to him by law or the Federal Sentencing Guidelines would be a miscarriage of justice and completely unreasonable.

Sincerely,

Donald G. Madison
Attorney at Law

03. 0064
TAB

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

UNITED STATES of AMERICA          )
                                  )
**vs**                            )          **CASE NO. 2:03CR00229**
                                  )
**ALPHONSO NORMAN**               )

### OBJECTION TO PRE-SENTENCE REPORT
### PREDICATED UPON *BLAKELY V. WASHINGTON*

COMES NOW the Defendant Alphonso Norman, by and through counsel, and respectfully

submits the following objections based upon *Blakely v. Washington,* which objections are submitted

pursuant to this Court's Order dated September 21, 2004. The following objections are respectfully

submitted by the Defendant Alphonso Norman premised upon *Blakely v. Washington* rationale:

1.      To the extent that paragraph 16 of the Pre-Sentence Report alludes to the seizure of

a BRYCO.38/.380 semi-automatic handgun, counsel's  recollection is that the Government

stipulated that it shall not seek enhancements for the weapon found at the premises.

Notwithstanding, and in order to ensure that said enhancement is not waived, counsel for Norman

submits that the BRYCO handgun was not pled in the Indictment; was not submitted as an issue to

the jury (through jury questions for enhancement findings), as an offense or enhancement to an

offense through the Indictment; and therefore there can be no finding of any enhancement premised

upon the weapon by reason of the seizure of a firearm in the residence.

The Pre-Sentence Report also makes reference to firearm offenses in paragraph 22 in relying

on 3D1.2, comment (n.6), subsection (d). Again, *Blakely v Washington* precludes use of the weapon

for any enhancement.



GOVERNMENT
EXHIBIT

CASE
NO.  *03-229-N*

EXHIBIT
NO.     V

2.      Norman objects to Paragraph 24 "Specific Offense Characteristics" and the resulting level 2 increase as the indictment did not plead the gun enhancement. Additionally, no jury charges were given thereon. Therefore, the jury could not make this finding under *Blakely v. Washington.*

3.      That use of gross weight equivalencies in paragraph 16 (32.2 grams of cocaine base which was gross weight as opposed to residue) and the conversion thereto to the marijuana equivalency as well as the 2,952 grams of cocaine HCL with its corresponding conversion to 590.40 kilograms of marijuana equivalence; the 983.1 grams of cocain HCL with its conversion to 196.62 kilograms of marijuana equivalency and the 2.6 grams of cocaine base to the extent that the testimony provided by the Government's expert  was submitted only as to the net weight of the cocaine, and not gross weight upon which the Pre-Sentence Report is predicated.  Therefore, the jury could not make an evidentiary finding of amounts based upon gross weights. To do otherwise would represent a violation of *Blakely v. Washington.* Therefore, the use of any weight other than net weight as to any applicable item charged against the Defendant Norman would violate *Blakely v. Washington.*

4.      The use of any weight other than a minimum amount under any respective category submitted with the jury instructions would violate *Blakely v Washington* as there was no finding as to specific amounts of cocaine by the jury (i.e., greater than (x) grams, but less than (y) grams).

5.      Alternatively, the lack of a finding of a specific amount of cocaine on each charge, in lieu of a "greater than" formula set forth in jury instructions, violates *Blakely v Washington.*

6.      Norman submits also the minimum offense level may deviate based upon this Court's ruling on Norman's Motion for Judgment of Acquittal, which ruling has not yet been issued at the time of draft of this objection.

2

WHEREFORE THE PREMISES CONSIDERED, the Defendant Norman respectfully prays

that the above objections premised upon *Blakely v. Washington* be upheld.

Respectfully Submitted,

S/Donald G. Madison
    DONALD G. MADISON
Bar Number ASB-5199-M68D
Attorney for Alphonso Norman
418 Scott Street
Montgomery, Alabama 36104
Telephone: (334) 263-4800
Facsimile: (334) 265-8511
E-Mail: btjarvis @bellsouth.net

## CERTIFICATE OF SERVICE

I hereby certify that on September 28th , 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Honorable Todd A. Brown
Assistant United States Attorney
Middle District of Alabama

Honorable Susan James
*James & Associates*
600 South McDonough Street
Montgomery, Alabama 36104

Honorable Michael Petersen
631 South Perry Street
Montgomery, Alabama 36104

Honorable Leonard Arrington

Respectfully submitted,

S/Donald G. Madison
S/DonaldG. Madison
DONALD G. MADISON
Bar Number ASB-5199-M68D
Attorney for Alphonso Norman
418 Scott Street
Montgomery, Alabama 36104
Telephone: (334) 263-4800
Facsimile: (334) 265-8511
E-Mail: btjarvis @bellsouth.net

4

Page 3

```
 1        IN THE UNITED STATES DISTRICT COURT FOR

 2            THE MIDDLE DISTRICT OF ALABAMA

 3                   NORTHERN DIVISION

 4

 5

 6   UNITED STATES OF AMERICA

 7

 8        Vs.              CR. NO. 03-229-N

 9

10   ALPHONSO NORMAN

11

12        *    *    *    *    *    *    *    *

13                SENTENCE HEARING

14        *    *    *    *    *    *    *    *

15        Before Hon. Mark E. Fuller, Judge,

16        at Montgomery, Alabama, Commencing

17        on October 1, 2004

18        *    *    *    *    *    *    *    *

19

20   APPEARANCES: For the Government: Todd A. Brown

21                        Assistant U.S. Attorney

22        For the Defendant: Donald G. Madison,

23                        Attorney at Law

24

25
```

1      THE COURT: Hopefully so that I can help eliminate
2 any redundancy that may be taking place in this case, based
3 upon my review of the objections that you have filed on your
4 client's behalf, I direct everyone's attention specifically
5 to objection number three. Mr. Brown, does the government
6 wish to introduce any further testimony regarding the
7 enhancement applicable to the possession of a firearm other
8 than the testimony that was presented during the trial of
9 this case?
10      MR. BROWN: The government relies on testimony at
11 the trial of the case, Your Honor.
12      THE COURT: As I have ruled after the trial of this
13 case, prior to the charge conference that we had, I did not
14 find that there was evidence which would support the two
15 point enhancement for possession of the firearm, which at
16 that time of the trial could have been submitted to the jury
17 under the Apprendi versus Washington standard and -- Apprendi
18 versus Arizona and Blakely versus Washington -- I'm sorry,
19 Apprendi versus New Jersey and Blakely versus Washington.
20 But none the less the Court has found that there should not
21 be the application of the two point enhancement for the
22 possession of the firearm as a factual finding in this case
23 without any additional testimony from the government. So
24 that you can proceed on your objections, Mr. Madison, that
25 would necessarily eliminate the requirement for you to

Page 2

1      (The above case coming on for hearing at Montgomery,
2 Alabama, October 1, 2004, before Honorable Mark E. Fuller,
3 Judge, the following proceedings were had commencing at 10:35
4 a.m.:)
5      THE COURT: Call the case of United States of
6 America versus Alphonso Norman. Mr. Brown, is the United
7 States ready to proceed?
8      MR. BROWN: The government is ready to proceed, Your
9 Honor. The government does note that the Defendant on
10 September 28th, two days ago, filed objections to the
11 presentence report based on arguments that are founded upon
12 Blakely versus Washington.
13      MR. MADISON: That was pursuant to the order of this
14 Court.
15      THE COURT: If counsel will approach.
16      (At which time a side-bar conference was had between
17 the Court and counsel, which conference was not attended by
18 the court reporter.)
19      THE COURT: Mr. Norman, have you and your attorney
20 had an opportunity to review the presentence report before
21 today's date?
22      THE DEFENDANT: Yes, sir.
23      THE COURT: Do you have any objections to any of the
24 content of the presentence report, Mr. Madison?
25      MR. MADISON: We did, Your Honor.

Page 4

1 present any testimony or argument as to objection number
2 three. And the calculations will be based as though the
3 enhancement for the firearm were got included.
4      MR. MADISON: And Judge, basically our objections
5 are more narrowed, I guess, with respect to foreseeability of
6 conduct based upon the facts that were presented to the jury
7 in this case, and what drugs might be attributable to Mr.
8 Norman as well as a minimal or minor role reduction under the
9 guidelines as set forth in our objections as well based upon
10 the facts that were presented to the jury. And although --
11 that is going to require me to delve into the facts a little
12 bit which were also the subject of this Court's judgement or
13 ruling on the Judgment of Acquittal and our Motion on
14 Judgment of Acquittal.
15      But in any event, Judge, the argument with respect
16 to what may be attributed to Mr. Norman is, the only evidence
17 presented to the jury in this case was the fact, assuming
18 that evidence is true, which we still deny, that Mr. Norman
19 walked out and placed something in a garbage can. The only --
20 that's the only evidence presented before the jury that had
21 any causal relation between Mr. Norman and any drug offense
22 conduct in this case. The analysis of that drug was residue,
23 therefore we think that any attribution of any drugs over and
24 [b]ond that particular drug amount is inappropriate and
25 [shou]ldn't be attributed to Mr. Norman at all. And we still

CASE NO. 03-229-N

EXHIBIT NO.  W

Page 1 - Page 4

Page 5

1  deny that the facts supported that conclusion, but that's
2  what the jury found and that's what the Judge ruled as far as
3  our Motion for Judgment of Acquittal with respect to that
4  charge.
5       Now, the other -- there were two or three other
6  facts, and I am going to address the Court's Judgement of
7  Acquittal. I think there were five primary facts that the
8  Judge relied on in the Judgement of Acquittal. But I wanted
9  to bring to the Court's attention that I believe two of the
10 facts that the Court relied upon, which dealt with the drugs
11 in this case, one was the relationship of Mr. Norman to Mr.
12 James relating to high school, and the Court at trial
13 sustained our objection to that evidence, which in my mind
14 would have precluded the review of that evidence in any
15 determination as to Mr. Norman's role in this matter. But
16 however, not withstanding that the Court did sustain that
17 objection, the Court did utilize it in its opinion. I say
18 that because I don't think that that should be utilized as
19 relevant conduct, conduct which occurred over 14, 15 years
20 prior to this date.
21      But in any event, with respect to his participation
22 in all of this, not only would our position be that that
23 should not have been considered because of the sustaining of
24 our objection, but that there was testimony regarding Mr.
25 James -- some statements Mr. James made at trial about

Page 6

1  dealing -- I think about -- was at the residence, or Mr.
2  Norman's residence I believe, the Court alluded to, and when
3  I read that testimony, what -- the way I read the testimony
4  of B-2-267 was that Mr. James testified that he had met
5  Peralte to discuss the sales of powder and that that meeting
6  occurred at the residence. I did not understand the testimony
7  to be that that's where the actual transfer of the cocaine
8  occurred. And as a matter of fact, I think at 283 of the
9  testimony James testified he never made any sales on the east
10 side of town and supposedly Ms. Norman's residence was on the
11 east side. I say that in connection with I think the Court
12 misconstrued the testimony of Mr. James in its findings with
13 respect to where the key and a half occurred. I think what he
14 testified to was just that the conversation occurred there,
15 not that the transaction occurred there.
16      Now, not withstanding that, there was still no
17 testimony that Mr. Norman was even present when that
18 conversation occurred so I don't think there was any factual
19 basis for attributing any knowledge or notice to Mr. Norman
20 regarding that conversation. Mr. James just testified it was
21 a conversation between he and Mr. Peralte, did not state that
22 Norman was present, and did not state that he had any
23 knowledge of that conversation, and did not say that Mr.
24 Norman had anything or any connection to do with that prior
25 event, which prior event I think he testified to was seven to

Page 7

1  ten days before the events in this case.
2       Now, concerning the other facts in this case, there
3  was absolutely no evidence to causally connect Mr. Norman to
4  the residence at 4th Street other than the fact that his
5  girlfriend lived there and his child resided there because
6  the girlfriend was the child's mother.
7       As a matter of fact, Mr. Conway at page 83 of the
8  transcript, volume one, when asked whether or not Mr. Norman
9  lived at the residence stated that he didn't know. And there
10 were only two factual witnesses in this case presented as to
11 offense conduct and that would have been Mr. James as well as
12 Mr. Conway. I believe Officer Wingard was more after the fact
13 and dealt more with the items that were seized and did not
14 actually participate in the search. But not withstanding,
15 there's been no evidence in this case that connected Mr.
16 James to drug activity at the residence.
17      The Court noted in its opinion, memorandum opinion,
18 that the residence was connected to an anonymous caller which
19 initiated this event, made reference to a maroon vehicle
20 being at the premises, and that the drug activity increased
21 at the premises. And then the officer asked, do you know
22 anybody there? And they just said Scooter. They didn't say
23 well, did you know Scooter is involved in drug activity
24 there? They just said they just knew he was the person who
25 was there.

Page 8

1       Now, we know that the maroon car had no relevance
2  what so ever to Mr. Norman. We know that that car was
3  attributable to another Defendant in this case. The evidence,
4  as a matter of fact, was Mr. Norman's car was parked on the
5  curb and wasn't even searched during the time that they were
6  executing the search warrant. But not withstanding, with
7  respect to the facts of this case, the fact is, is that all
8  the caller said was he was just there. They didn't say yeah,
9  when the maroon car came so did Mr. Norman and Mr. Norman and
10 the occupant of the maroon car were engaged in drug
11 transactions together. That was an omission and there were
12 absolutely no facts to support that inference.
13      Now, I say that because the primary facts of the
14 case and testimony of Mr. James dealt with what I would refer
15 to as the three bricks of cocaine that were found in the
16 house, the substantial powder cocaine, in brick form that was
17 found in the house, two thousand nine hundred some odd grams
18 in one location, nine hundred 83 grams in another location.
19 In addition to that there were two point six grams found in
20 another location in the house.
21      There are no facts in the record to indicate that
22 Mr. Norman had any authority or possession or control over
23 the residence of his girlfriend. That's a fact that the
24 government assumed in this case, and with all due respect, I
25 think there were no facts presented to the Court on which the

Page 9

1  Court could have predicated a constructive possession
2  argument with respect to the residence.
3        There were no facts -- I believe Mr. James testified
4  at one point Mr. Peralte had met Mr. James at the 4th Street
5  residence even when Mr. Norman was not there, so that
6  indication or that factual premise would be that maybe it was
7  the owner/occupant of the premises who was allowing those
8  things to occur rather than Mr. Norman because Mr. Norman's
9  presence obviously wasn't required in connection with the
10 drug transactions that occurred.
11       We presented evidence that the utilities were in the
12 name of Mr. Caldwell. The lease -- apparently -- there was
13 no evidence presented by the government concerning Mr. Norman
14 paying any utilities. There's no evidence that Mr. Norman
15 had any right -- had a key to the premises or had any right
16 to directly control who entered or who remained on the
17 premises other than the fact that he had the right to go
18 there because his child resided there. There was no factual
19 premise submitted at all during the trial that Mr. Norman and
20 his girlfriend had drug transactions together or engaged in
21 drug transactions together.
22       The only thing, the only inference that we would
23 submit to the Court with respect to any factual premise
24 existing at all, which we still deny, is the fact that if the
25 residue in the trash can were attributable to Mr. James then

Page 10

1  crack cocaine was found in the house and that residue was
2  proven to be crack cocaine. We still deny that was his in the
3  house but that's the only thing that has any factual premise
4  what so ever to attribute to Mr. Norman.
5        And with respect to that, Mr. James as part of his
6  plea agreement accepted responsibility for the two point six
7  grams of crack cocaine at the house I believe. So there's
8  nothing -- Mr. James provided no testimony, Officer Conway
9  provided no testimony, there was no causal link or any
10 testimony what so every to imply that Mr. Norman had anything
11 to do with the three bricks of cocaine that was in that
12 residence.
13       There's nothing to imply that Mr. Norman had any
14 direction or control or exercise of direction or control over
15 that residence to impute constructive possession of those
16 drugs to Mr. Norman. And I understand the Court has entered
17 its order regarding that, but still there's no factual
18 premise for any of that. And I say all that because it's our
19 contention that there's no foreseeability in this case as to
20 Mr. Norman seeing that those drugs were there, those drugs
21 were part of any conspiratorial conduct he might be
22 attributed to, nor that he would possess.
23       And the other thing I forgot to mention earlier too,
24 there is absolutely -- the only reference I saw on the record
25 dealing with cooking of cocaine was at one point Mr. James

Page 11

1  said the powder -- when they bought the powder they converted
2  it. He didn't say where that conversion occurred or anything
3  else. There's no facts from the record to indicate Mr. Norman
4  had any participation in any conversion of cocaine, period. I
5  mean the record is void of any such inference. So I mean
6  there aren't any factual bases for imputing to Mr. James from
7  a foreseeability standard the approximately 37 hundred grams
8  of cocaine, nor the two point six, but at the maximum we
9  would acknowledge for sentencing purposes the residue. And
10 what the argument there is, Judge, basically the base offense
11 goes from a 28 or 30 down to approximately a six on the
12 charts based upon our objections and the factual inferences
13 from those.
14       THE COURT:  Now, let me if I could interrupt you
15 just for a minute. I know -- I believe I understand what your
16 objections are as to the Court's findings that are set forth
17 in the Court's memorandum opinion on the Motion for Judgment
18 of Acquittal and Motion for New Trial. But as to the
19 specifics of your objections to the content of the
20 presentence report, I don't want to imply that we are going
21 to turn this into an argument on the motion that the Court
22 has already entered an order on, I think you have your
23 objections preserved there for appeal if you wish to pursue
24 that. But as to the content of the presentence report,
25 objection number two is the last point you just made,

Page 12

1  particularly as to the application of the base offense level
2  based upon the quantity of drugs, is that what you are
3  arguing?
4        MR. MADISON:  That's correct, Your Honor. And I
5  think that also applies to objection number four based upon a
6  minimal or minor role. Objection number five, with all due
7  respect, Judge, also has an application to objection two, I
8  guess they are sort of repetitive.
9        THE COURT:  I just want to make sure I group these
10 objections together if they can be, and if they are separate
11 you certainly can argue them separately, but I felt like when
12 I reviewed them it looked like your objections were to the
13 conviction and the evidence that supported the conviction,
14 and I term them loosely, in the conspiracy charges and in the
15 possession with intent to distribute charges.
16       MR. MADISON:  Yes, sir.
17       THE COURT:  That's the way that I inferred your
18 objections applying to the presentence report. If that's not
19 right I want you to correct me.
20       MR. MADISON:  Well, that is correct. There was also
21 a foreseeability issue as far as relevant conduct I guess,
22 the utilization of those other amounts of cocaine against Mr.
23 Norman based upon the United States v. Hunter, 11th Circuit
24 case, 2003 case. We are saying I guess, Judge, number one,
25 there was no factual premise for relating those items to Mr.

Page 13

1  Norman based upon the rulings, but also that in sentencing
2  Mr. Norman, that it was not foreseeable or there was no
3  factual premise which would make those items foreseeable as
4  part of the scope of anything that he was involved with.
5      THE COURT: Any other objections?
6      MR. MADISON: Judge, and this is more in the
7  content, but just with respect to the juvenile adjudications,
8  I know they weren't utilized from the standpoint of
9  enhancement, but I think Mr. Norman told me that one of the
10 matters was not even charged -- juvenile matters was not even
11 charged. Their presence in the report I think tends to
12 aggravate or prejudice or tends to show bias because it does
13 nothing but repeat probably seven or eight different matters
14 that the report does not utilize from a base level or
15 sentence standpoint, and that I just object based upon the
16 prejudicial results from that. Plus there were no certified
17 records submitted based upon the notation that they were
18 destroyed, those records were destroyed. Also the --
19     THE COURT: Let me stop you there. Is your client
20 saying that the information is not true or it is not him or
21 the convictions while he was a juvenile did not occur?
22     MR. MADISON: One or two of them did not occur and
23 are untrue. I don't mean untrue from the standpoint that
24 somebody misrepresented it, I think it's just inaccurate
25 information.

Page 14

1      THE COURT: Which of those is not accurate?
2      MR. MADISON: There was a robbery, Judge.
3      THE COURT: Paragraph 36 on page nine of the
4  presentence report? Or paragraph 37 on page nine?
5      MR. MADISON: Both 36 and 37.
6      THE COURT: Is it your client's position that they
7  did not occur or he was not involved and that this
8  information is just erroneous?
9      MR. MADISON: Yes, sir. My client -- the information
10 is from my client that he was not charged with either of
11 those offenses; isn't that correct?
12     THE DEFENDANT: Yes, sir.
13     MR. MADISON: Judge, I would note, not withstanding,
14 there are stated in the report that neither the government
15 nor the probation office premised the sentence on citation of
16 those items.
17     THE COURT: I know that the probation officer has an
18 obligation to disclose all relevant information in a
19 presentence report that could be used by the Court in
20 determining a sentence, and by the Bureau of Prisons in
21 classification. Based upon your objections I have asked the
22 probation office to inquire from the Bureau of Prisons if
23 there would be any classification impediment available to Mr.
24 Norman based upon the inclusion of the juvenile information
25 that you objected to. Ms. Thompson, what have you found out

Page 15

1  from the Court's inquiry? Either of the probation officers,
2  whichever wishes to address that.
3      PROBATION OFFICER: Your Honor, I contacted the
4  Federal Bureau of Prisons about those juvenile records that
5  were reported in the presentence report and was advised that
6  they will look at that when designating the Defendant to an
7  institution. Based on the nature of the offense and other
8  prior records he may not qualify for a prison camp. But that
9  information will be considered by the Bureau of Prisons. It
10 does not disqualify him from getting to a camp at some later
11 time after service of a period of his sentence. There's a
12 graduated procedure. Factors that may impact this Defendant
13 on getting to a camp may be his conduct while at the
14 institution, his participation in self-help programs,
15 counseling treatments, inmate financial responsibility, so
16 forth and so on.
17     MR. MADISON: And Judge, it's my understanding too
18 it could impact his ability to participate, should the Court
19 accept that, any participation in any drug rehabilitation
20 program. And I don't know if that's what you are referring
21 to as a camp.
22     PROBATION OFFICER: In referring to a camp I was
23 referring to an institution like Maxwell Federal Prison Camp,
24 low security level.
25     THE COURT: I am not aware that this would affect

Page 16

1  his ability to participate in a facility where intensive
2  residential substantial abuse treatment is available. Would
3  that affect his ability to be classified in those?
4      PROBATION OFFICER: Your Honor, I don't believe it
5  would. I did not inquire about that, but I wouldn't think
6  that that would keep him from participating in that program.
7      THE COURT: Have there been records from the
8  probation office investigation into Mr. Norman's juvenile
9  history that have been made available to you or provided to
10 you in some fashion that you feel relatively confident that
11 this information is accurate?
12     PROBATION OFFICER: Yes, Your Honor. During my
13 investigation this information was provided from a state law
14 enforcement agency, even though I could not obtain the
15 physical records from the Montgomery County Juvenile
16 Facility. So I am confident that the records are correct.
17     MR. MADISON: Judge --
18     THE COURT: There was a formal disposition, that
19 would imply to me that this Defendant certainly should be
20 aware of anything that occurred and the disposition of these
21 two charges, particularly paragraphs 36 and 37. And if it's
22 his representation or testimony to this Court that they
23 didn't occur, certainly we will take that up. I want Mr.
24 Norman to understand that if there is, in fact, a
25 misrepresentation to the Court that that could be held

Page 17

1  against him punitively as well. So let's make sure that we
2  are accurate in our recollection of what that information is
3  about these two offenses.
4       MR. MADISON: If he may, Judge, if you will tell the
5  Court what your recollection is.
6       THE DEFENDANT: They didn't charge me, Your Honor,
7  with it.
8       MR. MADISON: Was there a co-Defendant or somebody
9  charged instead of you, or --
10       THE COURT: Let's do this, Mr. Norman. If you would,
11  I am going to place you under oath and certainly have your
12  attorney available there to instruct you about what the Court
13  is going to ask you. If you would, Kelli, place Mr. Norman
14  under oath.
15       THE CLERK: You do solemnly swear or affirm that the
16  testimony you give in this cause to be the truth, the whole
17  truth, and nothing but the truth, so help you God.
18       THE DEFENDANT: I do.
19       THE COURT: Mr. Norman, you are Alphonso Norman, the
20  Defendant in this case, case number 03-CR-229 that we are
21  here before on the sentencing today; is that right?
22       THE DEFENDANT: Yes, sir.
23       THE COURT: Mr. Norman, particularly in reference to
24  paragraphs 36 and 37 of the presentence report of
25  investigation, it indicates that in 1989 you were arrested in

Page 18

1  what has been classified as a formal disposition as a
2  juvenile for two separate counts of robbery in the first
3  degree here in Montgomery County Juvenile Court. What is your
4  recollection as to either your arrest for those two charges
5  or the disposition of those two charges and the information
6  that has been provided to this Court by the probation office
7  concerning those two offenses?
8       THE DEFENDANT: Your Honor, I was not charged with
9  one of these charges, and I testified on some Defendants on
10  one of them other robbery charges as a juvenile.
11       THE COURT: Were you convicted as a juvenile or
12  found guilty as a juvenile for either of these two robbery
13  offenses?
14       THE DEFENDANT: No, sir.
15       THE COURT: And it's your testimony that you were
16  only charged with one of them?
17       THE DEFENDANT: I testified against some Defendants
18  on one of them, Your Honor, and I never was charged with one
19  of them.
20       THE COURT: Were you arrested on either of these
21  charges?
22       THE DEFENDANT: Yes, sir.
23       THE COURT: Do you recall which charge you were
24  arrested for?
25       THE DEFENDANT: No. Looks like both of them are the

Page 19

1  same, Your Honor.
2       MR. MADISON: One is February and one is March.
3       THE COURT: I think your attorney asked you, one of
4  them was February of '89, and the other one was March of
5  1989, does that help your recollection?
6       THE DEFENDANT: I don't remember, Your Honor. I
7  testified in a case on one of them, it was a robbery case.
8       MR. MADISON: Were you accused of --
9       THE DEFENDANT: In '89.
10       THE COURT: Were you accused in either of these
11  cases? If you were arrested I would say that that would fall
12  in the classification of being accused.
13       THE DEFENDANT: Yes, sir. I was arrested.
14       MR. MADISON: On each?
15       THE DEFENDANT: No, no.
16       MR. MADISON: Just on one?
17       THE WITNESS: Just on one, Your Honor.
18       THE COURT: And it's your testimony that you were
19  not convicted on either of these charges?
20       THE DEFENDANT: I was a witness.
21       THE COURT: You were a witness but you weren't
22  punished for either of these offenses, and you didn't enter
23  any kind of disposition as a child that needed supervision
24  or --
25       MR. MADISON: Delinquent?

Page 20

1       THE COURT: I'm sorry?
2       MR. MADISON: Was that delinquent, Judge?
3       THE COURT: Yes, delinquent, that's what I am
4  looking for. You weren't adjudicated delinquent?
5       THE DEFENDANT: No, sir.
6       THE COURT: Ms. Thompson, what does the designation
7  formal disposition mean?
8       PROBATION OFFICER: Your Honor, it's been my
9  experience that formal disposition sometimes means
10  probation. It varies, but in this case since they can not
11  provide me with the documents I am not sure.
12       THE COURT: Mr. Norman, do you recall which of these
13  two dates would be the closest to the date for which you were
14  arrested?
15       THE DEFENDANT: No, sir, Your Honor, but I remember
16  in my presentence report at the state when they said it was
17  informal.
18       THE COURT: Informal disposition?
19       THE DEFENDANT: Yes, sir.
20       THE COURT: So you think if one of these two
21  robberies was withdrawn from this report and the designation
22  for the one that remained reflected informal disposition that
23  that would more accurately reflect your juvenile criminal
24  history?
25       THE DEFENDANT: Yes, sir, that's what it was,

Page 21

1  informal. Whatever that means.
2      THE COURT: But do you recall seeing the terminology
3  informal disposition in the past in reference to this robbery
4  that you have testified that you have been arrested for?
5      THE DEFENDANT: Yes, sir.
6      THE COURT: As a juvenile.
7      THE DEFENDANT: Right.
8      MR. MADISON: Was it dismissed against you because
9  you agreed to testify? You think, or -- and Judge, just with
10  respect to my experience, what may be referred as an informal
11  procedure, I represented minors charged with possession of
12  alcohol and it was dispensed with by meeting with the
13  probation officer as opposed to going to court and that may
14  be what an informal disposition is as opposed to a formal.
15      THE COURT: I am aware that an informal disposition
16  can be anything from some type of adjudication of delinquency
17  all the way down to counseling and dismissal. So that is a
18  fairly broad term of disposition. I just want to make sure
19  first of all that we identify which one of these is accurate
20  and then we make sure that we identify the accurate
21  disposition so that there can for the purposes of the
22  information that is necessary to be disclosed to the Bureau
23  of Prisons have accurate information to them.
24      MR. MADISON: Do you recall?
25      THE DEFENDANT: Huh-uh. (negative response) I

Page 22

1  believe it was the February one.
2      THE COURT: February of '89 is the one you believe
3  you were arrested for?
4      THE DEFENDANT: Yes, sir.
5      THE COURT: Any objection from the United States to
6  the Court ordering paragraph 37 be removed from the
7  presentence report of investigation before its transmittal to
8  the Bureau of Prisons based upon any information that is
9  available for us to consider?
10      MR. BROWN: Your Honor, the government reviewed the
11  objections and reviewed objection number five and understood
12  it to mean that the Defendant was objecting because there
13  were no records, that they had been destroyed, that these
14  things could not be substantiated, so the government did not
15  attempt to go beyond what the probation office did. I must
16  say I think I would like to have the opportunity to contact
17  the probation -- the state probation office to determine
18  whether these existed, but in light of the fact that the
19  removal of paragraph 37 doesn't affect the sentence in any
20  way the government will not object to the Court doing that.
21      THE COURT: Ms. Thompson, does probation feel
22  comfortable that the testimony that we have elicited from Mr.
23  Norman concerning his juvenile offenses for robbery in either
24  February or March of 1989 is accurate based upon the
25  information that you have either seen or been told about?

Page 23

1      PROBATION OFFICER: Well, Your Honor, in light of my
2  inability to obtain the records, Mr. -- the records that I
3  observed reflected a formal disposition. But if Mr. Norman
4  remembers that it was informal, since I have no documents to
5  submit, maybe he is correct.
6      THE COURT: I am not going to require probation in
7  the future to go so far as to obtain certified copies of any
8  records, it's your job, and based upon the Court's
9  understanding of the rules and the sentencing guidelines to
10  provide accurate information based upon your best efforts,
11  and I understand your obligations to the Court and I
12  appreciate your work. In this particular case the Court finds
13  that the Defendant's objection as to the accuracy of the
14  robbery offense contained in paragraph 37 is sustained, and I
15  will require that information be withdrawn before its
16  submission to the Bureau of Prisons. I will also require that
17  information contained as to the juvenile conviction or the
18  juvenile offense of robbery first degree contained in
19  paragraph 37 be amended to reflect the disposition
20  designation as informal.
21      MR. MADISON: Is that 36, Your Honor?
22      THE COURT: Yes, 36. Paragraph 36 will be
23  designated informal disposition. And as to that change your
24  objection is sustained. Your objection is sustained as to
25  paragraph 37, and paragraph 37 in its entirety will be

Page 24

1  removed. Do you have any other objections that are contained
2  in objection number five in the presentence report?
3      MR. MADISON: I don't believe so, Your Honor.
4      THE COURT: That will take care of all of the
5  objections articulated in objection number five, do you agree
6  with that, Mr. Madison?
7      MR. MADISON: Yes, Your Honor.
8      THE COURT: The Court has sustained the objection
9  number three and the Court will not consider the two point
10  enhancement for the handgun.
11      MR. MADISON: Judge, I think that was objection
12  number six, not five. You said five I think.
13      THE COURT: The objection number five that I am
14  reading on page three of the addendum, paragraph 16.
15      MR. MADISON: Okay, I'm sorry.
16      THE COURT: That's paragraphs numbered 33 through
17  37.
18      MR. MADISON: And I was looking at my objection,
19  Your Honor, instead of the sentencing objection.
20      THE COURT: I am just trying to narrow down your
21  objections and give you a ruling.
22      MR. MADISON: I'm sorry, that was my fault.
23      THE COURT: As to your objections based upon
24  foreseeability of the conduct or the quantity of drugs, the
25  Court finds that the testimony was certainly contradicted in

Page 25

1  this case and the jury made its finding of fact. The Court
2  has entered its memorandum opinion on your Motion for
3  Judgement of Acquittal and Motion for New Trial, and to that
4  extent the Court will adopt its prior findings based upon
5  your motions that are set forth in the memorandum opinion,
6  and your objections based upon foreseeability of conduct, the
7  drug quantity and constructive possession as you have argued
8  are denied.
9       MR. MADISON: Judge, I forgot to say one other thing
10  too, may I?
11       THE COURT: Yes.
12       MR. MADISON: Your Honor also referred in the
13  memorandum opinion to the testimony against Mr. Norman being
14  scant, and I forgot to mention that earlier.
15       THE COURT: As I said, the Court certainly will
16  stand by the memorandum opinion and respect your right to
17  raise that on appeal if you wish to do so. What other
18  objections remain to the presentence report before we move
19  forward?
20       MR. MADISON: The role enhancement, Your Honor.
21       THE COURT: The minor role participant?
22       MR. MADISON: Yes, sir.
23       THE COURT: Objection number four. Do you have
24  anything else to argue or to present in the way of evidence
25  in support of your objection contained in objection number

Page 26

1  four in the addendum of the presentence report?
2       MR. MADISON: Judge, I would just incorporate my
3  prior argument with respect to the lack of facts pertaining
4  to Mr. Norman and his participation as showing that he had --
5  there were no facts to support his participation as a major
6  role player in this case, and that if anything he was nothing
7  more than a minor role player. The drugs I think --
8  transportation of drugs may have been related to the vehicle,
9  a maroon vehicle. I don't think there was anything that
10  suggested that he sold or possessed other than maybe the
11  constructive possession, but with all due respect, any of the
12  drugs in the residence, he was there.
13       THE COURT: Anything from the United States?
14       MR. BROWN: We adopt or recommend that the probation
15  officer's response to objection number four be adopted. And
16  additionally, point out that the testimony from trial was
17  additionally that Mr. Norman did not -- was not cooperative
18  with law enforcement officers when they showed up, which is
19  further indicative of, as the probation office points out, an
20  intent to conceal the conduct, avoid detection and so forth.
21       MR. MADISON: Just in response thereto, Judge, we
22  just state Mr. Norman didn't feel like he had committed any
23  illegal act at that point in time so there was no -- number
24  one. Secondly, I think his lack of cooperation is referring
25  to the fact that he refused entry into the house and our

Page 27

1  position has been, and always has been, that Mr. Norman
2  didn't have the right to directly control who entered or
3  remained in that house anyway.
4       THE COURT: Anything further?
5       MR. MADISON: Judge, there was one factual
6  reference -- I didn't object to it but when I was reading
7  over the transcript, and I dealt with one of the facts
8  relied upon by the government with respect to Mr. Norman and
9  that was the story of the snake. And I thought that the
10  government presented evidence about the snake being -- the
11  snake story being attributable to Mr. Norman, but when
12  reading through the transcript I thought Mr. James said that
13  it was Mr. Peralte who had said that story, so to the extent
14  that that was attributable to Mr. Norman, I didn't read it
15  that way in the transcript. Not that it has much bearing or
16  impact on it.
17       THE COURT: I will tell you the Court gave no
18  consideration to the story about the snake as it applied to
19  any of the three Defendants in this case.
20       MR. MADISON: Okay, Judge.
21       THE COURT: And will not use that in any role in
22  sentencing today. Anything else on your objection number
23  four, mitigating role objection?
24       MR. MADISON: No, Your Honor.
25       THE COURT: As set out in the probation officer's

Page 28

1  response, the mitigating or minimal participant role is
2  intended to cover Defendants who are plainly among the least
3  culpable of those involved in the conduct of a group of
4  individuals. It goes on further to state in note four that
5  under this provision the Defendant's lack of knowledge or
6  understanding of the scope and structure of the enterprise
7  and of the activities of others is indicative of a role as a
8  minimal participant. I find as has been provided by the
9  Court -- provided to the Court by the probation office and as
10  set forth in Section 3B1.2, particularly note four in the
11  United States Sentencing Guidelines, that the testimony and
12  the evidence that this Court heard would not support this
13  application being provided for the benefit of Mr. Norman, and
14  therefore the Court will not find that Mr. Norman should be
15  afforded a mitigating role reduction as either a minimal
16  participant or a minor participant under Section 3B1.2, and
17  your objection to paragraph number 25 as set forth in
18  objection number four is overruled. Does that cover your
19  objections, Mr. Madison?
20       MR. MADISON: I believe it does, Your Honor. We, of
21  course, don't imply that we are waiving any prior legal
22  argument as to any motions or the facts.
23       THE COURT: Absolutely, but are there any other
24  objections to the presentence report other than what we have
25  already covered?

## Page 29

1  MR. MADISON: No, sir.
2  THE COURT: Are there any other objections other
3  than what we have already covered?
4  MR. MADISON: No, sir, Your Honor.
5  THE COURT: Having made findings as to your
6  objections to the presentence report, the Court finds that
7  the offense level is 30, the criminal history category is
8  III, the guideline range is from one hundred 21 months to one
9  hundred 51 months, the supervised release period is at least
10  four years but not more than five years, and the fine range
11  is from 15 thousand to three million dollars. Mr. Madison, do
12  you or your client have anything to say in mitigation or
13  otherwise before the Court pronounces sentence in this case?
14  MR. MADISON: Yes, sir, Your Honor. I would just
15  like to reiterate basically the fact that the Court did
16  withhold a ruling on the Judgment of Acquittal. I think that
17  shows some concern by the Court as far as the evidence that
18  was presented to the jury, and in that regard, plus with the
19  Court's comments regarding the testimony being scant, not
20  withstanding the convictions being upheld, I think that the
21  Court, with all due respect, should at least give him the
22  benefit of the doubt with the lower range or lower end of the
23  sentencing guidelines being attributable.
24  THE COURT: Anything from the government?
25  MR. BROWN: Your Honor, the government is going to

## Page 30

1  ask for the top of the guidelines range, which is one hundred
2  51 months based on the evidence presented at trial.
3  THE COURT: Mr. Norman, the sentence will now be
4  stated but you will have a final chance to make any legal
5  objections before the sentence is imposed. Pursuant to the
6  Sentencing Reform Act of 1984, it is the judgment of this
7  Court that you are hereby committed to the custody of the
8  Federal Bureau of Prisons to be imprisoned for a total term
9  of one hundred 21 months. The sentence consists of one
10  hundred 21 months on each count, to be served concurrently.
11  The Court recommends that you be designated to a facility
12  where intensive residential substance abuse treatment is
13  available. You are remanded to the custody of the United
14  States Marshal. You shall pay to the United States District
15  Court Clerk a special assessment fee of four hundred dollars,
16  which is due immediately. Based upon your inability to pay
17  the Court waives the imposition of a fine.
18  Upon release from imprisonment you shall be placed
19  on supervised release for a term of four years. This term
20  consists of four years on counts one and three, and three
21  years on counts two and four, all such terms to run
22  concurrently. Within 72 hours of release from custody you
23  shall report to the probation office in the District to which
24  you are released. While on supervised release you shall
25  comply with the mandatory and standard conditions of

## Page 31

1  supervised release on file with this Court.
2  In addition thereto, the Court also orders the
3  following special conditions: First, you shall participate in
4  drug testing and/or treatment if directed by the probation
5  officer. You shall contribute to the cost of any treatment
6  based upon your ability to pay and the availability of
7  third-party payments. Next, you shall submit to a search of
8  your person, residence, office or vehicle pursuant to the
9  search policy of this Court. The Court finds that there is no
10  identifiable victim who incurred a financial loss as a result
11  of this offense. The sentence of one hundred 21 months that
12  has been imposed in this case is imposed due to the nature of
13  the offense and is imposed within the range that would
14  include a range greater than 24 months to deter conduct in
15  the future and to punish for the conduct that you have been
16  convicted of engaging.
17  Are there any objections to the sentence or to the
18  manner in which this Court has pronounced it? For example, do
19  you have any objections to the Court's ultimate findings of
20  fact or conclusions of law? If you fail to state such fully
21  articulated objections at this point you run the risk of
22  being unable to raise them on appeal. Do you have any
23  objections?
24  MR. MADISON: All those that we have argued
25  previously which the Court has denied we incorporate herein.

## Page 32

1  THE COURT: Any objections from the government?
2  MR. BROWN: No objections, Your Honor.
3  THE COURT: Mr. Norman, the sentence is ordered
4  imposed as stated. You have the right to appeal in this case.
5  If you can not afford the cost of an appeal you have a right
6  to apply to appeal in forma pauperis. I am not telling you to
7  appeal or not to appeal, I am merely informing you of your
8  right to appeal. Do you understand your rights?
9  THE DEFENDANT: Yes, sir.
10  THE COURT: Your right to appeal could run as soon
11  as ten days after entry of judgment in this case, and I
12  notify you of that right as well.
13  THE DEFENDANT: Thank you, Your Honor.
14  THE COURT: Anything else we need to take up from
15  the government?
16  MR. BROWN: The government moves to strike the
17  forfeiture allegation.
18  THE COURT: Any objection?
19  MR. MADISON: No, sir, Your Honor.
20  THE COURT: The government's motion to strike
21  forfeiture allegation I believe has been ruled on by this
22  Court's order dated May 17, 2004, but to the extent it has
23  not been ruled on, your motion is granted. Anything else that
24  we need to take up?
25  MR. MADISON: Judge, just to the extent -- not

**CondenseIt™**

## Page 33

1  dealing with sentencing, but just to the extent that Your
2  Honor just issued the order on the Judgment of Acquittal
3  filed at the end of -- or prior to the close of evidence or
4  at the end of the government's case and at the end of the
5  trial, we filed our Motion to Vacate or Amend or Motion for
6  Judgment of Acquittal Not Withstanding the Verdict of the
7  jury, which may be construed as being only on counts three
8  and four as those were filed with Your Honor, and the Court
9  having reserved the other two, so to the extent that a
10  subsequent Judgment not Withstanding the Verdict based upon
11  the Court's now ruling on -- the recent ruling on counts one
12  and two, then we would have just incorporated our prior
13  arguments with respect to those as far as a post-trial or
14  post-verdict motion.
15      THE COURT: I believe that I understood that you had
16  made an oral Motion for Judgment of Acquittal at the
17  conclusion of the government's case and at the conclusion of
18  the trial, or the presentation of all of the evidence before
19  the verdict, and the Court had given you a ruling on counts
20  three and four and reserved rulings on counts one and two.
21      MR. MADISON: Yes, sir.
22      THE COURT: And then you filed a written Motion for
23  Judgement of Acquittal or Motion for a New Trial where the
24  case was over and a verdict had been returned.  The Court's
25  memorandum opinion intended to address all of those motions

## Page 34

1  that you had filed both orally and written, so I understood
2  that the incorporation of the arguments that you alluded to,
3  and I hope I have answered your question, that the Court
4  didn't find to be redundant or didn't find that you waived
5  any of your objections by having filed a written objection
6  subsequent to your oral objections.
7      MR. MADISON: Yes, sir.
8      THE COURT: Is there something else I'm missing
9  about what you are asking?
10      MR. MADISON: No, sir, Judge, it may be just
11  confusion in my own mind. In other words, from my thinking
12  three and four had a finality of judgement to them which
13  would have been more of a new trial type motion.
14      THE COURT: Correct.
15      MR. MADISON: And with the Court having reserved its
16  ruling on one and two then there was no ruling or denial for
17  me to have filed a Motion to Vacate or Amend or for New
18  Trial, so I am just saying now --
19      THE COURT: My memorandum opinion was intended to
20  have addressed both your Motion for Judgment of Acquittal as
21  to all four counts.  Two of those had been reserved orally
22  and then all four of them had been included I took it in your
23  written motion.
24      MR. MADISON: Yes, sir.
25      THE COURT: I also intended in the memorandum

## Page 35

1  opinion to address the Motion for New Trial as it would be
2  applicable to all four counts.  So if you feel like there
3  needs to be further review of that you can certainly file a
4  motion or a motion for out of time motion for a new trial and
5  we will look at that, but it's my intentions that the
6  memorandum opinion be inclusive of all of those.
7      MR. MADISON: we accept your clarification, thank
8  you, Your Honor.
9      THE COURT: Anything else? Good luck to you, Mr.
10  Norman.  You are remanded to the custody of the marshal.
11      MR. MADISON: Thank you, Your Honor, may I be
12  excused?
13      THE COURT: You may.
14      (At which time, 11:35 a.m., the hearing was
15  adjourned.)
16      * * * * *
17      I certify that the foregoing is a correct transcript
18  from the record of proceedings in the above-entitled matter.
19  This the 18th day of October, 2004.
20      _Jones R. Dicken_
21      Official Court Reporter
22
23
24
25

≈AO 245B    (Rev. 12/03) Judgment in a Criminal Case
              Sheet 1

# UNITED STATES DISTRICT COURT

_____MIDDLE_____   District of   _____ALABAMA_____

UNITED STATES OF AMERICA            **JUDGMENT IN A CRIMINAL CASE**
              v.
ALPHONSO NORMAN

Case Number:        2:03CR229-002-F

USM Number:         11288-002

Donald G. Madison
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s)    _____

☐ pleaded nolo contendere to count(s)    _____
   which was accepted by the court.

X was found guilty on count(s)    1,2,3 and 4 of the Indictment by a jury on 7/14/2004
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21:U.S.C. 846 | Conspiracy to Distribute/Possess with Intent to Distribute Cocain Hydrochloride | 9/25/2003 | 1 |
| 21:U.S.C. 846 | Conspiracy to Distr./Possess with Intent to Distr. Cocaine Base | 9/25/2003 | 2 |
| 21:U.S.C. 841(a)(1) | Possess with Intent to Distribute Cocaine Hydrochloride | 9/25/2003 | 3 |
| 21:U.S.C. 841(a)(1) | Possess with Intent to Distribute Cocaine Base | 9/25/2003 | 4 |

       The defendant is sentenced as provided in pages 2 through _____6_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)    _____

☐ Count(s)    _____    ☐ is    ☐ are dismissed on the motion of the United States.

       It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

October 1, 2004
Date of Imposition of Judgment

_____
Signature of Judge

MARK E. FULLER, CHIEF UNITED STATES DISTRICT JUDGE
Name and Title of Judge

5 OCTOBER 2004
Date

**GOVERNMENT EXHIBIT**

CASE NO. 03-229-N

EXHIBIT NO. X

AO 245B   (Rev. 12/03) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:   ALPHONSO NORMAN
CASE NUMBER:   2:03CR229-002

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

121 Months.  This sentence consists of terms of 121 months on each count to be served concurrently.

X   The court makes the following recommendations to the Bureau of Prisons:

The Court recommends that defendant be designated to a facility where Intensive Residential Substance Abuse Treatment is available.

X   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

☐   at _____ ☐ a.m. ☐ p.m.   on _____ .

☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐   before 2 p.m. on _____ .

☐   as notified by the United States Marshal.

☐   as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a_____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page ___3___ of ___6___

DEFENDANT:      ALPHONSO NORMAN
CASE NUMBER:    2:03CR229-002

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

4 Years. This term consists of 4 years on Counts 1 and 3 and 3 years on Counts 2 and 4, all such terms to run concurrently.

 

 

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐   The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of
    future substance abuse. (Check, if applicable.)

X    The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

☐   The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a
    student, as directed by the probation officer. (Check, if applicable.)

☐   The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO 245B     (Rev. 12/03) Judgment in a Criminal Case
            Sheet 3C — Supervised Release

Judgment—Page __4__ of __6__

DEFENDANT:        ALPHONSO NORMAN
CASE NUMBER:      2:03CR229-002

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall participate in drug testing and/or treatment if directed by the probation officer. Defendant shall contribute to the cost of any treatment based on ability to pay and availability of third party payments.

Defendant shall submit to a search of his person, residence, office, or vehicle pursuant to the search policy of this court.

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
           Sheet 5 — Criminal Monetary Penalties

DEFENDANT:        ALPHONSO NORMAN
CASE NUMBER:      2:03CR229-002

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|         | Assessment | Fine | Restitution |
|---------|-----------|------|-------------|
| TOTALS  | $ 400.00  | $ 0  | $ 0         |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---------------|-------------|---------------------|------------------------|
|               |             |                     |                        |

| TOTALS | $ _____ | $ _____ |
|--------|-----------------|-----------------|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

    ☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 12/03) Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page ___6___ of ___6___

DEFENDANT:        ALPHONSO NORMAN
CASE NUMBER:     2:03CR229-002

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

A    X    Lump sum payment of $ ___400.00___ due immediately, balance due

      ☐ not later than _____ , or
      X in accordance  ☐ C, ☐ D, ☐ E, or  X F below; or

B    ☐    Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

E    ☐    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    X    Special instructions regarding the payment of criminal monetary penalties:

      Criminal monetary payments shall be made payable to the Clerk, U.S. District Court, P.O. Box 711, Montgomery, AL 36101.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# RECORD NO. 04-15292-FF

*In The*

## *United States Court of Appeals*

### *For The Eleventh Circuit*

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## ALPHONSO NORMAN, a/k/a Scooter; CAPULCO PERALTE, a/k/a Debby B. Black, a/k/a Cappuccino,

*Defendants – Appellants.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA AT MONTGOMERY

## BRIEF OF APPELLANT ALPHONSO NORMAN

Cloud H. Miller, III
MILLER & ASSOCIATES
2392 North Decatur Road
Decatur, Georgia 30033
(404) 633-3797

*Counsel for Appellant*
*Alphonso Norman*

GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. Y

**UNITED STATES vs. ALPHONSO NORMAN**
**CASE NO. 2:03CR229-002-F**

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Eleventh Circuit Rule 26.1-1, and Federal Rules of Appellate Procedure 26.1, Undersigned Counsel certifies that the following persons and parties have an interest in the outcome of this case. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal pursuant to the Court's local rules.

1.    United States District Court Judge – The Honorable Mark E. Fuller

2.    United States Magistrate Judge – The Honorable Susan Russ Walker

3.    Assistant United States Attorneys/Counsel for Government – Louis V. Franklin, Sr., Todd A. Brown

4.    Appellant – Alphonso Norman.

5.    Trial Counsel for Appellant Norman – Billy Madison

6.    Appellate Counsel for Appellant Norman – Cloud H. Miller, III.

With respect to this Appeal, there are no corporate entities for purposes of disclosure.

i

## STATEMENT REGARDING ORAL ARGUMENT

Appellant submits that the arguments contained herein are complete, but that oral argument would assist in the decision-making process. Therefore, Appellant would request that oral argument be granted, unless this Honorable Court determines that such an argument is not necessary.

## STATEMENT REGARDING TYPE SIZE AND STYLE
## AND REFERENCES TO THE RECORD AND TO THE RECORD EXCERPTS

Appellant submits that the type size and style used in preparing this brief is Courier New 12 point. References to the record on Appeal shall be designated with the symbol (R). References to the Record Excerpt shall be designated with the symbol (R.E.).

## TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS AND

CORPORATE DISCLOSURE STATEMENT ................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................. ii

STATEMENT REGARDING TYPE SIZE AND STYLE

AND REFERENCES TO THE RECORD .................................. ii

STATEMENT REGARDING ADOPTION OF BRIEFS

OF OTHER PARTIES ............................................. ii

TABLE OF CONTENTS ........................................... iii

TABLE OF AUTHORITIES .......................................... v

STATEMENT OF JURISDICTION ..................................... 1

STATEMENT OF ISSUES .......................................... 1

STATEMENT OF THE CASE ........................................ 2

STATEMENT OF FACTS ........................................... 6

SUMMARY OF THE ARGUMENTS ..................................... 12

ARGUMENT .................................................... 16

    ISSUE I

    THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION

    TO SUPPRESS IN VIOLATION OF APPELLANT'S FOURTH

    AMENDMENT RIGHTS ........................................ 16

    Standard of Review ...................................... 16

    Discussion of Issue ..................................... 16

        A.    Anonymous Tipsters ........................... 20

B.    Search of Appellant's person ................... 22

C.    The trashcan search ........................... 28

D.    Affidavit in support of the search warrant ..... 29

E.    Search of the residence and warrant ........... 34

ISSUE II

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION

ON COUNTS I, II, III, AND IV ........................... 37

Standard of Review ..................................... 37

Discussion of Issue .................................... 37

ISSUE III

THE WARRANT IN THIS CASE WAS SIGNED BY A STATE

MAGISTRATE AND NOT A FEDERAL MAGISTRATE IN VIOLATION

OF RULE 41 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE .... 47

Standard of Review ..................................... 47

Discussion of Issue .................................... 48

ISSUE IV

THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION

TO BE TRIED SEPARATELY FROM HIS CO-DEFENDANT ............. 53

Standard of Review ..................................... 53

Discussion of Issue .................................... 54

ISSUE V

THE DISTRICT COURT ERRED IN ENHANCING THE SENTENCING
GUIDELINES BY TWO POINTS FOR POSSESSORY INTEREST IN A
FIREARM PURSUANT TO U.S.S.G. § 2D1.1(b)(2); IN
ATTRIBUTING ALL RELEVANT CONDUCT TO APPELLANT, AND IN
NOT GRANTING REDUCTION FOR MINOR/MINIMAL ROLE IN
VIOLATION OF THE CONSTITUTION AND BLAKELY V.
WASHINGTON, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004)

AND UNITED STATES V. BOOKER, 543 U.S. ___ (2005) ........ 60

Standard of Review ...................................... 60

Discussion of Issue ..................................... 60

    A.    Firearm Enhancement ......................... 60

    B.    Relevant Conduct ............................ 61

    C.    Minor Role .................................. 64

CONCLUSION .............................................. 65

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

## TABLE OF AUTHORITIES

Page(s)

### Cases

Alabama v. White,

    496 U.S. 325 (1990) ................................. passim

Blakely v. Washington,

    159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004) ..... 2, 15, 60, 61

California v. Greenwood,

    486 U.S. 35, 108 S. Ct. 1625 (1988) ....................... 28

Ex Parte Parker,

    858 So.2d 941 (Ala. 2003) ........................... 32, 33

Florida v. J.L.,

    529 U.S. 266, 120 S. Ct. 1375 (2000) ........... 23, 24, 25

Glasser v. United States,

    315 U.S. 60, 62 S. Ct. 457 (1942) ....................... 44

Illinois v. Gates,

    462 U.S. 213, 1035 S. Ct. 266 (2000) ........... 20, 21, 29

Johnson v. United States,

    520 U.S. 461, 117 S. Ct. 1544,

    137 L. Ed. 2d 718 (1997) ................................. 50

Jones v. United States,

    360 U.S. 257 (1960) ..................................... 21

Kerr v. California,

    374 U.S. 22 (1963) ....................................... 21

Lustig v. United States,

    338 U.S. 74, 69 S. Ct. 1372 (1949) .............. 51, 52, 53

Marsaro v. United States,

    538 U.S. 500, 1235 S. Ct. 1690 (2003) .................... 51

Minnesota v. Dickerson,

    508 U.S. 366, 113 S. Ct. 2130 (1993) .................... 34

Nardone v. United States,

    308 U.S. 338, 60 S. Ct. 266 (1939) ...................... 28

Navarro v. United States,

    400 F.2d 315 (5th Cir. 1968) ......................... 51, 52

Nelms v. State,

    568 So.2d 384 (Ala. App. 1998) .......................... 33

Nix v. Williams,

    467 U.S. 431, 104 S. Ct. 2501 (1984) .................... 28

Rowan v. United States,

    99 S. Ct. 1546, 440 U.S. 976 (1978) .................. 41, 43

Stewart v. State,

    420 So.2d. 162 (Fla. 1982) .............................. 51

Strickland v. Washington,

    466 U.S. 668, 104 S. Ct. 2052 (1984) .................... 47

United States v. Blasco,

    702 F.2d 1350 (11th Cir. 1983) ........................ 36

United States v. Bobo,

    586 F.2d 355 (11th Cir. 1978) ............................ 43

United States v. Booker,

    543 U.S. ___ (2005) ............................... passim

United States v. Burke,

    517 F.2d 377 (2d Cir. 1975) ....................... 49-50

United States v. Calandra,

    414 U.S. 338, 94 S. Ct. 613 (1974) ....................... 29

United States v. Clark,

    31 F.3d 831 (9th Cir. 1994) ............................... 21

United States v. Clipper,

    973 F.2d 944 (D.C. Cir. 1992), cert. denied,

    U.S. 113 S. Ct. 1025 (1993) ....................... 26, 27

United States v. Davis,

    170 F. Supp. 2d 1234 (2001) ................... 34, 35, 36

United States v. Evbuomwan,

    992 F.2d 70 (5th Cir. 1993) ............................... 63

United States v. Gianni,

    678 F.2d 956 (11th Cir. 1982), cert denied,

    459 U.S. 1071, 103 S. Ct. 491 (1982) .................... 44

United States v. Gibson,

    64 F.3d 617 (11th Cir. 1995) ............................. 26

United States v. Gilliam,

    987 F.2d 1009 (4th Cir. 1993) ............................ 63

United States v. Guerrero,

 935 F.2d 189, 192 (11th Cir. 1991) ..................... 44, 45

United States v. Hanson,

 469 F.2d 1375 (5th Cir. 1972) ............................ 51

United States v. Hernandez,

 896 F.2d 513 (11th Cir. 1990), cert. denied,

 498 U.S. 858, 111 S. Ct. 159 (1990) ....................... 45

United States v. Hunter,

 323 F.3d 1314 (11th Cir. 2003) ........................... 64

United States v. Jeffers,

 342 U.S. 48, 72 S. Ct. 93 (1951) .......................... 29

United States v. Jenkins,

 4 F.3d 1338 (6th Cir. 1993) .............................. 63

United States v. Jenkins,

 779 F.2d 606 (11th Cir. 1986) ......................... 46, 47

United States v. Keller,

 916 F.2d 628 (11th Cir. 1990), cert. denied,

 499 U.S. 978, 111 S. Ct 1628 (1991) ...................... 37

United States v. Knowles,

 66 F.3d 1146 (11th Cir. 1995) ........................... 53

United States v. Lejarde-Rada,

 319 F.3d 1288 (11th Cir. 2003) ....................... 48, 50

United States v. Leon,

    468 U.S. 897, 104 S. Ct. 3405,

    82 L. Ed. 2d 677 (1984) ...............................33, 49

United States v. Lopez-Ramirez,

    68 F.3d 438 (11th Cir. 1995) ...........................44

United States v. Loyd,

    721 F.2d 331 (11th Cir. 1983) ..........................49

United States v. Malatesta,

    590 F.2d 1379 (5th Cir. 1979) ..........................44

United States v. Matthews,

    168 F.3d 1234 (11th Cir. 1999) .........................44

United States v. Mesa,

    62 F.3d 159 (6th Cir. 1995) ............................27

United States v. Miller,

    664 F.2d 826 (11th Cir. 1981) ..........................44

United States v. Olano,

    507 U.S. 725, 113 S. Ct. 1770,

    123 L. Ed. 2d 508 (1993) ................................50

United States v. Olderbak,

    961 F.2d 756 (8th Cir. 1992) ...........................63

United States v. Perez-Tosta,

    36 F.3d 1552 (11th Cir. 1994),

    cert. denied by, Perez-Aguillera,

    115 S. Ct. 2584 (1995) ...............................45, 46

United States v. Reyes,

    595 F.2d 275 (5th Cir. 1979) ................................ 47

United States v. Rucker,

    915 F.2d 1511 (11th Cir. 1990) ........................ 56, 57

United States v. Rudisill,

    187 F.3d 1260, rehearing denied, (11th Cir. 1999) ........ 43

United States v. Santa,

    236 F.3d 662 (11th Cir. 2000) ........................ 16, 36

United States v. Saro,

    24 F.3d 283 (D.C. Cir. 1994) ............................... 64

United States v. Simpson,

    228 F.3d 1294 (11th Cir. 2000) .......................... 43

United States v. Stanley,

    24 F.3d 1314 (11th Cir. 1994) ........................ 45, 46

United States v. Stefanson,

    648 F.2d 1231 (9th Cir. 1981) ........................... 49

United States v. Studley,

    47 F.3d 569 (2d Cir. 1995) ................................ 63

United States v. Talley,

    108 F.3d 277 (11th Cir. 1997) ........................ 54, 57

United States v. Thomas,

    8 F.3d 1552 (11th Cir. 1993) ........................ 45, 46

Wong v. United States,

    371 U.S. 471, 83 S. Ct. 407 (1963) ....................... 28

Zafiro v. United States,

    506 U.S. 434 (1993) ...................................... 54

**Statutes**

21 U.S.C. § 841(a)(1) ..................................... 2, 3

21 U.S.C. § 846 .......................................... 2, 3

21 U.S.C. § 853 .............................................. 3

28 U.S.C. § 1291 ............................................. 1

28 U.S.C. § 2255 ........................................... 51

**Rules**

Fed. R. App. P. 4(b) ........................................ 1

Fed. R. Crim. P. 41 .................................... 49, 53

Fed. R. Crim. P. 41(a) ................................. 14, 52

Fed. R. Crim. P. 41(a)(2)(c) .............................. 13

Fed. R. Crim. P. 41(b)(1) ................................. 53

Fed. R. Crim. P. 41(c)(1) ................................. 51

**Guidelines**

U.S.S.G. § 1B1.3 ........................................... 64

U.S.S.G. § 2D1.1(b) .................................... 15, 60

U.S.S.G. § 2D1.1(b)(2) ........................... 2, 14, 15, 60

U.S.S.G. § 3B1.2 ........................................... 65

U.S.S.G. § 3B1.2(a) et. seq. ............................... 65

## STATEMENT OF JURISDICTION

Presented, herein, is the appeal from the final judgment of the United States District Court for the Middle District of Alabama, in a criminal case, pursuant to a motion under Federal Rules of Appellate Procedure Rule 4(b). Jurisdiction is in the United States Court of Appeals for the Eleventh Circuit, pursuant to 28 U.S.C. § 1291, which provides that the Court of Appeals has jurisdiction from all final decisions of the United States District Courts.

This appeal has been timely filed.

## STATEMENT OF ISSUES:

### ISSUE I

THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS IN VIOLATION OF APPELLANT'S FOURTH AMENDMENT RIGHTS.

### ISSUE II

THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION ON COUNTS 1,2, 3, AND 4.

### ISSUE III

THE WARRANT IN THIS CASE WAS SIGNED BY A MUNICIPAL JUDGE AND NOT A FEDERAL MAGISTRATE OR STATE COURT JUDGE IN VIOLATION OF RULE 41 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.

### ISSUE IV

THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION TO BE TRIED SEPARATELY FROM HIS CO-DEFENDANT.

ISSUE V

**THE DISTRICT COURT ERRED IN ENHANCING THE SENTENCING GUIDELINES BY TWO POINTS FOR POSSESSORY INTEREST IN A FIREARM PURSUANT TO U.S.S.G. 2D1.1(b)(2); IN ATTRIBUTING ALL RELEVANT CONDUCT TO APPELLANT, AND IN NOT GRANTING REDUCTION FOR MINOR/MINIMAL ROLE IN VIOLATION OF THE CONSTITUTION AND BLAKELY V. WASHINGTON, 159 L.Ed. 2d 403, 124 S. Ct. 2531 (2004) AND UNITED STATES V. BOOKER, 543 U.S. ___ (2005).**

## STATEMENT OF THE CASE

**A. Course of Proceedings and Dispositions**

On October 29, 2003 a four (4) count indictment was filed in the United States District Court for the Middle District of Alabama, Northern Division charging the Defendant/Appellant and others with, Count I - from an unknown date and continuing to about the month of September 2003, in Montgomery County Alabama in the Middle District of Alabama, the Defendant did knowingly conspire and agree together with persons known and unknown to the grand jury to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846; Count 2 - conspiracy to possess with intent to distribute a mixture or substance containing detectable amount of cocaine base (crack) in violation 21 U.S.C. § 841(a)(1) all in violation of 21 U.S.C.

§ 846; Count 3 - on or about September 25, 2003 in Montgomery County, within the Middle District of Alabama, the Defendant did knowingly possess and intend to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1); and Count 4 - on or about September 25, 2003 in Montgomery County, in the Middle District of Alabama, the Defendant did knowingly and intentionally possess with intent to distribute a mixture or substance containing a detectable amount of cocaine base (crack) in violation of 21 U.S.C. § 841(a)(1)(R-47; R.E. 1).

The indictment contained a forfeiture allegation indicating that upon conviction for violation of 21 U.S.C. § 846 and 841(a)(1), as alleged in Counts 1-4 of the indictment, that the Defendant would forfeit to the United States, pursuant to 21 U.S.C. § 853, any and all property constituted or derived from any proceeds the Defendant obtained directly or indirectly as a result of the violation of the aforementioned statutes.

Appellant was arrested by the Montgomery Police Department on September 25, 2003. His jury trial began on July 12, 2004 and ended on July 14, 2004. He was found guilty on July 14, 2004 of Counts 1, 2, 3, and 4.

A presentence report was prepared and objections were filed concerning. 1) Two points for possessing a weapon during a drug

3

crime, U.S.S.G. 2D1.1(b)(2); 2) Relevant conduct as to drug quantity; and 3) Role in the offense (minor or minimal).

Sentencing occurred on October 1, 2004 and the Court imposed a sentence of 121 months to be served concurrently with each of the counts of conviction (R-252; R.E. 22).

During pre-trial proceedings a Motion to Suppress was filed on November 24, 2003 (R-62; R.E. 2). An Amended Motion to Suppress was filed on December 4, 2003 (R-64; R.E. 3). The Government's Response to the Defendant's Motion to Suppress was filed on December 22, 2003 (R-86; R.E. 4). A hearing on the Motion to Suppress was held on January 8, 2004 (R-94). The magistrate's recommendation denying the Motion to Suppress was filed on January 16, 2004 (R-96; R.E. 5). An order of January 16, 2004 was filed by the Honorable Magistrate Judge Walker identifying that any objections should be filed within 13 days of the date of mailing of the Magistrate's Order denying the motion (R-98; R.E. 5). Appellant's objections to the recommendation of the Magistrate were filed on January 29, 2004 (R-105; R.E. 6). On February 3, 2004 an order was submitted correcting a statement within the contents of the detention hearing transcript (R-108; R.E. 7). On February 4, 2004 a Motion to Reopen the Hearing to Suppress was filed by new counsel (R-112; R.E. 8). On February 6, 2004 a Motion to Quash the Search Warrant was filed (R-122; R.E. 9). A Motion for the Out of Time

4

Filing of a Supplement to the Motion to Suppress was filed on March 24, 2004 (R-175; R.E. 11) and Supplement for the Out of Time filing of the Supplement to the Motion to Suppress was filed on April 9, 2004 (R-180; R.E. 13). The government filed a response to the Defendant's Motion for Out of Time Filing of the Supplement to the Motion to Suppress on April 9, 2004 (R-180; R.E. 12). The recommendation of the Magistrate Judge on these motions was filed on June 4, 2004 (R-197; R.E. 14). A second set of objections to the recommendation of the Magistrate Judge was filed on June 21, 2004 (R-200; R.E. 15), followed by a correction to the recommendation of the Magistrate Report on July 1, 2004 (R-213; R.E. 16). The Magistrate's Final Order and Recommendation was filed on July 1, 2004 (R-213; R.E. 16). The District Court judge, in reviewing the above motions denied the Motion to Suppress on July 1, 2004 (R-215, 216; R.E. 16).

Subsequent to conviction in this case, Appellant orally, and in motion form, filed a Motion for Acquittal and Judgment Notwithstanding the Verdict on August 12, 2004 (R-235; R.E. 18). The Government's Reply to this motion was filed on August 31, 2004 (R-236; R.E. 19). Appellant filed a Response to the Government's Reply on September 8, 2004 (R-237; R.E. 20). A Memorandum of Opinion of the District Court was filed denying the Motion for Judgment of Acquittal on September 29, 2004 and denying all motions including the Motion for Judgment of

Acquittal as to Counts 1 and 2, the Motion for Judgment of Acquittal and the Motion for Judgment Notwithstanding the Verdict (R-247; R.E. 21).

Appellant was sentenced to ten (10) years in prison (R-252). He is presently incarcerated at FCI Memphis.

## STATEMENT OF FACTS

This case begins with an anonymous telephone call to the Montgomery, Alabama Police Department drug task force concerning allegations of drug trafficking in a residence located at 2429 East 4th Street (R:TT;pp 7). After receiving the anonymous phone call officers from HIDTA, a federal task force connected to the Montgomery PD, decided to surveille the residence. In the process of doing so they made a "sting" telephone call to the number given by the anonymous tipster. The phone number provided was incorrect and the call went to a different residence than the residence where Appellant was located. The caller told the person at the wrong number that the police were coming. This call was an attempt by the police to see if there would be individuals who would leave the residence after the phone call was initiated (R:TT;pp 60-62). After the phone call was made, Appellant coincidentally exited the residence he was visiting, threw something in the trash, and returned to the residence. Police officers, having observed Appellant exit the house and return, admitted that his conduct had nothing to do with the

telephone call made to flush people out of the residence (R:TT;pp 62). Upon observing Appellant throwing something in the trash, the police officers approached the residence. After a "knock and talk" confronting Appellant, the officers went to the trashcan at the curb and removed a "wet paper towel" with residue on it that field tested positive for cocaine at the scene (R:TT;pp 60-65). (Officers also testified that the paper towel was in a plastic bag (R:TT;p 220) or a "rag, papertowel, whatever" (R-94;p 47 and 49)). Appellant and co-defendant James were questioned on the front porch of the residence before the trash was searched. Officers requested a search of the residence, which Appellant refused. The officers also searched his person for weapons and found none. The police officers admitted that Appellant and James were in a "custodial situation and were not free to go back into the house" (R:TT;pp 64).

Miranda rights were never read despite Appellant's request for a lawyer and his custodial status. A search warrant was obtained while Appellant and James were being held on the front porch and after the search of the trash.

Upon a search of the residence, Sgt. Drummond located a digital scale in the washing machine, a plastic bag with some type of grease in it in the washing machine, and a bundle of cash (R:TT;pp 107). He also located three (3) solid bricks of cocaine hydrochloride and a plastic bag that contained cocaine

in the dryer (R:TT;pp 105-106). He located some loose cocaine in the washing machine and the outer wrapping the cocaine was in (R:TT;pp 106-108). The total amount of money found was approximately $70,000.00 and three (3) kilos of cocaine. A search of the living room found another bundle of approximately one (1) kilogram of cocaine under the couch and a small amount of cocaine base found in one of the kitchen cabinets (R:TT;pp 109). Also seized at the residence above the stove was another digital scale with a small amount of cocaine base lying on a shelf in the kitchen (R:TT;pp 110, 112). No drugs were found on Appellant or in his vehicle (R:TT;pp 113-114).

Testimony at trial revealed that the alleged police phone call to the residence was never made because the anonymous phone caller provided an incorrect phone number. This anonymous call with false information was the entire police premise for investigating, surveilling, and eventually obtaining a search warrant (R:TT;pp 133). The search warrant was contested on the grounds that the search of the trashcan was illegal and not based on probable cause and the search of Appellant's pockets and the house were without probable cause (R:TT;pp 181).

A firearm was located at the residence in a closet and a sum of money were located in a hollowed out bedpost in one of the bedrooms (R:TT;pp 202-203). After several police officers testified to the above information, Andrew K. James was called

to testify on behalf of the government. As a co-defendant he was a cooperating witness and received a benefit for that cooperation (R:TT;pp 290-293). In his testimony James stated he had drug dealings with co-defendant Peralte (R:TT;pp 261). He testified that sometimes he received powder cocaine and sometimes he received crack cocaine from Peralte. He also testified that he dealt with Peralte as far back as 1998 up until the year 2001 (R:TT;pp 262). He testified that Appellant did not sell him any drugs but that he used to work for him "a long time ago" (R:TT;pp 265). Mr. James could offer no other evidence of any connection between Appellant, Peralte or himself as it related to the cocaine found in the residence or anywhere else (R:TT;pp 268). James and Peralte were heavily involved with each other in narcotics trafficking (R:TT;pp 280-287). At no time did Appellant's name enter into the picture concerning conspiracy, possession or trafficking in drugs with either Peralte or James during the time of this conspiracy.

Detective Wingard, a member of HIDTA, was called to testify regarding the search warrant, items seized, and statements made by cooperating witness, James (R:TT;pp 326-327). The statement James allegedly made to Wingard was, in fact, two statements suggesting Appellant's involvement in the offense. In one of the statements in 2001 James allegedly stated Peralte brought drugs to Alabama and was getting some of his cocaine from Appellant

Norman. Wingard further stated that James told him Appellant started dealing with Peralte directly and that Appellant Norman did not want to sell him any cocaine but did on occasions. James' statement at trial did not implicate Norman in any activity regarding the drugs found at the residence. James never adopted the statement allegedly made to Wingard and, in fact, denied making same (R:TT;pp 331, 362).

Counsel, at the close of the government's evidence, moved for a judgment of acquittal on all counts at which time the court reserved ruling on counts 1 and 2 and denied the Motion for Judgment of Acquittal as to Counts 3 and 4 (R:TT;pp 355-357).

After the close of the evidence, James was recalled as a rebuttal witness by Peralte's counsel and testified about his conflicting statements regarding Appellant Norman's involvement in drug activity. James reiterated his involvement with Appellant was limited to when he was in high school (R:TT;pp 359). Peralte's trial counsel asserted that James' testimony was inconsistent with his statement to officer Wingard. Therefore, in an attempt to clarify this issue, further questions were asked. James stated he did not recall saying the things that were in the written report of the statement prepared by Wingard (R:TT;pp 361).

Q: Let me have you read a particular two sentences as well as a paragraph right there. Read it to yourself.

A: I already had read the two statements. These are two things on this piece of paper that I had told Mr. Wingard when I read it yesterday, I said I didn't recall saying. But it would have to come from Norman - drugs would have to come from Norman. I told him I didn't remember. I waited and I tried to think and I tried to recollect, tried to recall, and I didn't recall saying that. He said well, you said it. I said I don't recall saying it. He said only thing I want you to do, Mr. James, is tell the truth. I said I don't remember telling you that. And he said, well, if you don't remember me telling you that, only say the truth...

Continuing to answer, James further stated

"Okay. Where he said about the dryer, I said Mr. Capulco put it in the dryer, I said I didn't say that. He said that's what I wrote down that you said. I said I didn't say that..."

Q: So what your testimony is here today is that you have no recollection of having told Mr. Wingard of Mr. Norman selling you drugs?

A: . . . yeah, I am certain that I did not say that. If I told . . .I told him yesterday, if I did say that I was mis - I mis - we got some kind of misunderstanding, because I was told him when he came over there to the facility, I said that me and Mr. Norman didn't do any drug transactions together, the only time we did drug transactions was when he was working for me. (R:TT;pp 362).

The reference to the drug transaction when Appellant Norman was working for James relates back to high school. James also testified that he did not know if Peralte and Appellant had any dealings together and did not remember telling Mr. Wingard any of that information (R:TT;pp 363). This clarification reveals that Appellant was not a part of the charged conspiracy or drug offenses.

### Summary of the Arguments

### Issue I

Appellant states that the government failed to establish probable cause to surveille the residence in which he was located, search his person, search the trashcan at the curb, and/or search the residence where Appellant was visiting. An

anonymous tip, with little to no details as to Appellant's conduct in any criminal activity was used to set up the surveillance that initiated the aforementioned search procedures and results. The incorrect information provided by the anonymous tipster, coupled with the fact that any reliability or veracity were unknown was insufficient to establish probable cause to search anything.

### Issue II

The evidence, when viewed in the light most favorable to the government, was insufficient to support Appellant's conviction on Counts 1, 2, 3, and 4. Appellant filed a Motion for Acquittal and a Motion for Judgment not withstanding the verdict. In doing so, Appellant stated that he was not guilty of any of the counts of conviction. The evidence was insufficient to support the conviction because there was no evidence showing that Appellant knew of the conspiracy or that he willingly joined any conspiracy. Appellant's mere presence at the location of the drugs was insufficient proof of his participation in a conspiracy and insufficient proof to establish he possessed with intent to distribute any narcotics.

### Issue III

Rule 41(a)(2)(c) of the Federal Rules of Criminal Procedure states "federal law enforcement officer means a government agent (other than an attorney for the government) who is engaged in

the enforcing of criminal laws and is within the category of officers authorized by the Attorney General to request a search warrant." Rule 41(a) states any criminal prosecution in federal court has to arise from a search warrant issued by a federal magistrate or by a state court. The judge that issued the warrant in this case was a "municipal judge" and cannot issue a search warrant in the prosecution of a violation of federal law. Rule 41 applies to any warrant obtained by a federal agent.

### Issue IV

Appellant states, based on the circumstances that present themselves from the preliminary hearing through the Motion to Suppress, that severance should have been granted. The facts are clear that nothing Appellant did created any evidence in support of his relationship to the drug offense for which Peralte and James were involved. It is clear from the preliminary hearing evidence that Appellant was visiting the residence where the narcotics were located. It is also clear that Appellant was in the wrong place at the wrong time when the events unfolded that caused him to be associated with Peralte, James, and the drugs in the residence. Nothing in the evidence suggested that he knew of a conspiracy between Peralte and James or that he knew there were drugs or guns located in the residence.

## Issue V

The evidence at trial did not support the two (2) point enhancement Appellant received for possessing a firearm during the commission of a drug offense. Pursuant to U.S.S.G. § 2D1.1(b)(2) Appellant was given a two (2) point enhancement for possessing a firearm during the commission of a drug offense. Paragraph 24 of the Presentence report enhanced Appellants sentence by two (2) points pursuant to U.S.S.G. § 2D1.1(b). This increased Appellant's base offense level from 32 to 34. At trial, the issue was preserved and an objection was asserted (TT p. 184). The matter was also preserved at sentencing (sent trans p. 3). The jury must make the determination that Appellant possessed a firearm during the commission of a drug offense in order for this enhancement to apply in light of the decision in Blakely v. Washington, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004) and United States v. Booker, 543 U.S. ____ (2005).

15

## ARGUMENT

### ISSUE I

**THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS IN VIOLATION OF APPELLANT'S FOURTH AMENDMENT RIGHTS.**

## Standard of Review

In examining the denial of a motion to suppress, this Honorable Court reviews the district court's factual findings for clear error and its application of the law to the facts *de novo*. <u>United States v. Santa</u>, 236 F.3d 662, 668 (11th Cir. 2000).

## Discussion of Issue

A Motion to Suppress and Amended Motion to Suppress were filed by Appellant (R-62, 64; R.E. 2) and his co-defendant, Peralte. Appellant's motion asked the District Court to suppress evidence found September 25, 2003 at 2429 East 4th Street in Montgomery when officers searched (1) Appellant's pockets where they found a cell phone and a quantity of money; (2) a garbage container where they discovered residue on a paper towel in a plastic bag that field tested positive for cocaine; and (3) the residence of the address where the government seized more than 3.9 kilograms of powder cocaine, 2.6 grams of crack cocaine, a handgun, two sets of digital scales, packaging materials, and more than $72,000 in cash.

On the afternoon of September 25, 2003 Montgomery Police Department Corporal J.T. Conway answered an anonymous telephone call placed to the police department's narcotics' office. The anonymous tip provided the address of 2429 East 4th Street as a location where narcotics trafficking was alleged to have occured. The anonymous caller reported Appellant's nickname to be "Scooter." The tipster also stated that when a maroon vehicle with Florida tags was present there were usually drugs in the residence (R:TT;p 46). The caller never stated Appellant was seen at the residence committing any crimes. Nor did the caller describe Appellant or "Scooter." Conway requested the telephone number of the residence from the anonymous tipster. He wrote the telephone number down. He did not verify that the telephone number belonged to that residence. As a result, a telephone call was made to the wrong residence, indicating that the tipster's information was not reliable. The officer failed to investigate whether the information was accurate before surveilling the residence (R:TT;pp 45-46).

Instead of Conway investigating the anonymous tipster's information and attempting to corroborate the information, he gathered other officers together and drove to the East 4th Street residence. Officer Conway directed another officer (Anderson), via radio, to call the wrong number that he was given by the anonymous tipster. Anderson called that number and

stated on the telephone "hey, the police are coming to your home, you need to get out." The responding male voice stated "okay" and hung up the telephone (R:TT;p 47).

A short time after Anderson made this wrong number telephone call, Conway surveilled Appellant coincidentally walk out of the front door of the house that he was surveilling and place something in the trashcan sitting on the property at the curb. It was noted that Appellant was not visualized as being in a hurry when he walked out of the house. Conway stated he saw Appellant deposit something in the trashcan and return to the residence (R:TT;pp 48-51).

Officers waited for a few minutes before approaching the house. The officer went to the residence to do what Conway called a "knock and talk." Conway and the officers met with Appellant, his young son, who was with him at the door, and Andrew Kenny James, who also appeared at the front door after the officers approached (R:TT;pp 49-50).

Officer Conway identified himself and told Appellant that he had a complaint of drug activity at the residence and asked whether Appellant would give consent to search the home. Appellant denied consent. At that point, Conway noticed Appellant reaching his hands into his pockets and "just fidgeting around" (R:TT;pp 50-51). Conway asked Appellant to take his hands out of his pockets. A pat down search was

18

initiated to determine if Appellant had any weapons. Appellant's pockets contained a cell phone and some money (R-50).[1] Neither of these items suggested that Appellant was involved in drug trafficking. Nor were they related to anything that the officers were investigating.

Officer Conway left the porch of the residence after Appellant requested to speak to his lawyer. As Conway opened the trash, he found a "wadded up paper towel, either in a plastic bag or wadded up in like the cellophane plastic type stuff" (R:TT;p 51; R-47 and 49; R.E. 1). The material tested positive for cocaine residue. Other officers handcuffed Appellant and James while Conway went to get a search warrant for the residence. A search warrant was obtained to search the residence and the vehicles near the residence (R:TT;p 55).

After several pleadings were filed and a hearing held, the recommendation of the magistrate was to deny the Motion to Suppress. The District Court affirmed the findings of the Magistrate's R & R.

The first question this Court must evaluate is whether the police had the authority to even approach and surveille the residence based upon the anonymous tipster's telephone call.

---

[1]  Only the cell phone was removed and returned to Appellant. The money was never taken out of the pocket (R-46).

## A.    Anonymous Tipsters

The law recognizes that anonymous tips, in and of themselves, should not be used without some other corroborating evidence to support the claim. Illinois v. Gates, 462 U.S. 213, 1035 S. Ct. 266 (2000). It was merely coincidental that shortly after a telephone call was made to the wrong phone number Appellant exited the residence he was visiting and threw something in the trash. There was no nexus between these two acts. More importantly, there was no investigative effort made to corroborate the information from the anonymous tipster or to confirm the telephone number was accurate. Simply voiding these conditions to justify the outcome of this case because drugs were found does not bode well for protecting citizens against unreasonable searches and seizures as guaranteed under the Fourth Amendment. There was no probable cause for a "knock and talk" or a request to search the residence. [2]

Officer Conway had no clue who the caller was (R:TT;p 50). Officer Conway neither attempted to corroborate the anonymous tipster's information or to take even a cursory review of the information in determining whether probable cause existed to surveille the residence, much less approach Appellant for a

---

[2] A "knock and talk" requesting to search a residence without probable cause in and of itself is a serious concern. If any accusation of drug activity can cause a "knock and talk" and request to search a residence all citizens are vulnerable to Fourth Amendment abuses.

"knock and talk." In Gates, the Supreme Court said "major portions" of the informant's statements must be verified. Gates, 42 U.S. at 246. In United States v. Clark, 31 F.3d 831 (9th Cir. 1994), an anonymous, uncorroborated tip containing no information other than the allegation that marijuana was being cultivated, which had no indication of reliability, and was insufficient to establish probable cause that Clark was growing marijuana. In Appellant Norman's case nothing but a nickname for Appellant was known.

In Jones v. United States, 360 U.S. 257, 271 (1960), probable cause was established using an informant but only after the affiant stated that he had been given correct information from the informant on previous occasions. No such circumstance occurred in Appellant Norman's case. In Kerr v. California, 374 U.S. 22 (1963), previous contact, which occurred through police officer transactions, corroborated the probable cause to believe drugs could be found in the residence. In other words, the corroboration should be before the fact, not after the fact, as in the circumstances presented in Appellant's case.

The Gates case teaches us that some "veracity" and "basis of knowledge" of a person supplying hearsay information must be determined before initiating additional search activities. Appellant's conduct after the wrong phone call was made, was mere coincidence and does not establish probable cause to

proceed to a "knock and talk." The "knock and talk" produced nothing to support a search of Appellant, the residence he was visiting, or obtain a search warrant. More importantly, no one could actually see what Appellant put into the trashcan or determine Appellant put any particular item in the trashcan.[3]

**B.     Search of Appellant's person**

There was no evidence that what Conway retrieved from the trashcan was the object that Appellant placed there. Conway only searched Appellant after Appellant said he would not consent to a search of the residence and wanted a lawyer. Conway field tested the substance on the paper towel, yielding a positive result for the presence of cocaine. Conway then decided to obtain a search warrant for the residence. Conway directed officers to detain Appellant and James until Conway could obtain a search warrant. When Conway left, other officers heard sounds in the residence. They became concerned and entered the residence without a warrant, observing another black male later identified as Capulco Peralte coming out of the laundry room. Officer Drummond then told Peralte to come outside and join Appellant and James. Peralte went outside and Drummond related to Conway the fact that Peralte had been found. Conway included the presence of Appellant, James, and Peralte in the text of his

---

[3]  Appellant's fingerprints were not found on any drug packaging or trash contents.

affidavit. A search warrant was returned approximately one hour later (R:TT;pp 50-61).

First, this Court must examine how Appellant got searched in the first place. Appellant was searched because of surveillance based upon an uncorroborated anonymous tip and a phone call to a wrong number. His conduct of throwing something in a trashcan did not create probable cause for the officers to continue to investigate. Officer Conway admitted Appellant's conduct was not hurried; and that Appellant's conduct had nothing to do with the anonymous call (R:TT;p 62).

Next, the officers approached Appellant and searched his person finding no weapons or drugs. They then searched the trash. The illegal pat down search and the "knock and talk." produced nothing. No probable cause was ever established before the trashcan search.

Conway could not identify what Appellant put in the trash and could not state Appellant deposited the paper towel (R:TT;p 71).

In Florida v. J.L., 529 U.S. 266, 120 S. Ct. 1375(2000) the Court held that an anonymous tip that a person is carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person. The district court, in denying Appellant's motion using the aforementioned citation, stated, because J.L. was a firearm case, it should somehow change the

23

totality of the circumstances test applied in Appellant's case. (R-96 at page 8 (Magistrate's Report and Recommendation)). This simply is not the case. Florida v. J.L. cannot be dismissed as merely inconsistent with the question of anonymous tipsters because it was a gun case instead of a drug case. In fact, it was clear that in J.L. the Supreme Court held "an anonymous tip that a person was carrying a gun is not, without more, sufficient to justify a police officer's stop and frisk of that person." Id. The Court went on to discuss, however, how they came to that conclusion, incorporating the entire question of anonymous tipsters being used as a reliable source of information to create such probable cause in circumstances such as Appellant has suffered.

An anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity. Alabama v. White, 496 U.S. 325, 329 (1990). In White, as in Appellant's case, the police received an anonymous tip asserting that a woman was carrying cocaine and predicting that she would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named hotel. Only after police observation showed that the informant had accurately predicted the woman's movements did it become reasonable to think the tipster had inside knowledge about the suspect and, therefore, to credit his assertions about the cocaine. Knowledge

about a person's future movements indicates some familiarity with that person's affairs, but having such knowledge does not necessarily imply that the informant knows, in particular, whether that person is carrying hidden contraband. The Supreme Court determined that White was a "close case."

The only thing that the tip in Appellant's case informed the police of was the nickname "Scooter" which Appellant had been known to be called. The phone number was inaccurate and there was no indication of familiarity of Appellant's movements that would create suspicion that he should be surveilled, arrested and/or searched. The informant did not explain how she knew Appellant, or how she thought there were drug activities involving Appellant going on at the residence she identified.[4] In J.L., supra, the Court observed that an accurate description of a subject's readily observable location and appearance is of course reliable in a limited sense: it will help police correctly identify the person the tipster means to accuse. Such tip, however, does not show that the tipster had knowledge of concealed criminal activity. The reasonable suspicion at issue in Appellant's case requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person. J.L., supra. J.L. also suggested a lesser

---

[4] Her description of a maroon vehicle was also not enough as it did not identify any person driving said vehicle.

standard of search should apply to anonymous tips in gun cases. This clearly indicating a higher police standard in cases similar to Appellant's. <u>J.L. Kennedy</u> concurring opinion:

> "An anonymous telephone tip without more is different, however; for even if the officer's testimony about receipt of the tip is found credible, there is a second layer of inquiry respecting the reliability of the informant that cannot be pursued. If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity. The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable."

In <u>United States v. Gibson</u>, 64 F.3d 617 (11th Cir. 1995) this Court discussed <u>Alabama v. White</u> and the concerns over anonymous tipsters. This Honorable Court followed the sister circuit's interpretation of the law under <u>United States v. Clipper</u>, 973 F.2d 944 (D.C. Cir. 1992), <u>cert. denied</u>, U.S. 113 S.Ct. 1025 (1993) in reviewing <u>White</u>. Here too, however, this circuit supports Appellant's complaint. In <u>Clipper</u>, the anonymous tipster's information was sufficiently detailed to establish future movement and information concerning four African American males, one of whom was alleged to have been

armed with a gun. The Second Circuit reasoned that though the anonymous tip did not provide sufficient information by itself to conclude that the caller was honest or the information reliable, the officers were able to corroborate the tipster's information concerning the car and its location, thus supporting the reliability of the tip. Id. at 103. In Appellant's case the only thing that was reliable was the address where Appellant was visiting. The telephone call was meaningless as was Appellant's conduct in throwing something into the trash. The phone call did not initiate the behavior and, therefore, the behavior was normal under the totality of the circumstances test. These circumstances could not be used to further advance Conway's agenda in approaching Appellant and then searching him and James. Nothing the tipster provided was corroborated and nothing found in the search of Appellant's person authorized any additional officer conduct to search the trash or the house.

In United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995) the court affirmed the suppression of five kilograms of cocaine and two firearms "[a]lthough there is always a temptation in cases of this nature when a substantial quantity of drugs and firearms are found to let the end justify the means, it must be remembered that the courts only see cases in which the conduct of the officer resulted in contraband being found. If the officers had found no drugs in the defendant's car, obviously we

would not even know that this traffic stop had ever occurred. Therefore, we must always accept that courts will always be 'thwarting' what some may view as a good piece of police work when a motion to suppress is granted in cases of this nature."

**C.    The trashcan search**

The trashcan search did not occur as a result of the observation of Conway watching Appellant go to the trashcan and deposit something therein. Conway did not search the trashcan immediately after Appellant's conduct that Conway alleged to be related to dialing a wrong phone number. Even if a trashcan in front of a residence, outside of the curtiledge, is searchable, California v. Greenwood, 486 U.S. 35, 108 S. Ct. 1625 (1988), circumstances surrounding the search indicate that it was not done based on any probable cause to suggest that drugs were in the trashcan or that Appellant put them there.

The exclusionary rule bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of police misconduct and evidence derived from the illegal conduct of "fruit of the poisonous tree." Nardone v. United States, 308 U.S. 338, 341, 60 S. Ct. 266 (1939). The rule applies not only to illegally obtained evidence itself, but also other incriminating evidence derived from the primary evidence. Nix v. Williams, 467 U.S. 431, 444, 104 S. Ct. 2501 (1984); Wong v. United States, 371 U.S. 471, 83 S. Ct. 407 (1963). The

purpose behind the exclusion is not to remedy the harm suffered by the victim of the illegal search, but rather to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable search and seizure. United States v. Calandra, 414 U.S. 338, 347, 94 S. Ct. 613 (1974). The burden of proof is on the government to establish that an exception to the Fourth Amendment requirement exists. United States v. Jeffers, 342 U.S. 48, 51, 72 S. Ct. 93 (1951). No such exception has been identified in Appellant's case. "Anonymous tips are generally less reliable than tips from known informants and can form the basis for reasonable suspicion only is accompanied by specific indicia of reliability." Gates, 462 U.S. at 238. All of the searches in Appellant's case were based on police created conduct that did not comply with procedural rules and were not based on reliable source information. It cannot, in hindsight, be said that, despite these circumstances, the result satisfies the means.

**D.    Affidavit in support of the search warrant**

The affidavit in support of the search warrant, prepared by officer Conway, should never have been able to sustain a signature for a warrant of the residence. There are several flaws in the affidavit, including the following:

1.    Officer Conway received a telephone call on December 25, 2003 from a subject he did not identify in the affidavit as an anonymous caller. He only identified the individual as "A."

2.    Officer Conway discussed the information from the anonymous caller but never identified that the information was received from an anonymous source. He also attained a telephone number but did not verify that the telephone number was the number to the residence in question or state so in the affidavit.

3.    Officer Conway used the information in the warrant that Corporal Alexander called the telephone number to the residence when, in fact, the phone call that Corporal Alexander made was not to the residence because the anonymous caller gave incorrect information.

4.    Officer Conway identified that the telephone call was made and that Appellant exited the residence and walked to the trashcan placed on the street. Conway reported that Appellant walked to the trashcan, placed

"something" in it, and returned to the residence. Officer Conway could not verify that Appellant's actions were based on the telephone call because he did not verify the phone number. Further, Appellant's behavior did not suggest that he was being secretive in his conduct.

5.    Officer Conway did not identify in the affidavit all of the facts related to the approach of the residence. He identifies that Appellant became "very defensive" and "wanted a lawyer." Neither of these conditions suggest probable cause to proceed on a search warrant. In fact, Conway had searched Appellant, prior to the application, and found nothing that would indicate or suggest he was involved in drug activity. Requesting a lawyer has no bearing on obtaining a warrant. Requesting a lawyer is a Constitutional right that does not create suspicions of misconduct.

6.    Officer Conway identified that he walked to the trashcan located on the street and found a paper towel containing a quantity of crack cocaine. The paper towel tested positive for cocaine. Conway did not state in the affidavit, with any certainty, that this particular item was the item discarded by Appellant.

7.    Officer Conway suggested that Appellant and Anthony James were known drug dealers in Montgomery Alabama, however, there was no basis for that knowledge identified in the affidavit.

The statements in the affidavit regarding the trashcan and the incorrect telephone number did not establish probable cause. Any other statements are merely sophistry to illustrate an illusion of ongoing cocaine sales from the residence. Ex Parte Parker, 858 So.2d 941 (Ala. 2003). Probable cause to issue a search warrant for illegal drugs may be established on hearsay information of unidentified informants, however, the issuing "magistrate" must be informed of some of the underlying circumstances from which the informant concluded that the drugs were where they claimed and some of the underlying circumstances from which the affiant concluded that the informants were

credible or that their information was reliable. Ex Parte Parker, *supra*. Of significance is the fact that this concept implies that the information should have been verified and corroborated before the fact rather than by the police creating circumstances that would justify a suggestion of probable cause. The Supreme Court has said an "…officers reliance on the magistrate's probable-cause determination on the technical sufficiency of the warrant he issues must be objectively reasonable,… and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued. Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." United States v. Leon, 468 U.S. 897, 922-23, 104 S. Ct. 3405 (1984). An affidavit supporting a warrant to search a residence is deficient if it fails to state when the drugs were seen by the informant at the residence. Nelms v. State, 568 So.2d 384 (Ala. App. 1998). There is no good faith exception in the instant case for Conway not performing his duty and corroborating the statements made by the anonymous tipster, much less misleading a municipal judge by not identifying that the tipster was anonymous.

**E.    Search of the residence and warrant**

Officer Conway approached the residence Appellant was surveilling for a "knock and talk." Conway advised Appellant of the anonymous tipster's statement that drugs were in the residence and asked if they could search the residence. Appellant saying "no" to Conway's request to search. This reply should have ended any further cause to search Appellant or to proceed in obtaining a search warrant.

In <u>United States v. Davis</u>, 170 F. Supp. 2d. 1234, 1238 (2001) the Middle District of Florida, Tampa Division Court discussed the probable cause question as it relates to anonymous tipsters. The district court determined that "[a] warrantless search is per se unreasonable even if there is probable cause, unless the search falls within a recognized exception to the warrant requirement." Id. *Citing* <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 372, 113 S. Ct. 2130 (1993).

The circumstances in <u>Davis</u>, *supra,* surrounding the decision of the district court to suppress the evidence seized are similar to the circumstances in Appellant Norman's case. Probable cause in <u>Davis</u> began with an anonymous tip. In order to determine if an anonymous tip offers the requisite probable cause, the Supreme Court looks at the totality of the circumstances as defined in <u>White</u>, *supra*. The totality of the circumstances analysis includes looking at the informant's

34

veracity, reliability, and basis of knowledge. The anonymous tip in question in _Davis_ stated that on September 22, 2000 Turner would receive a large amount of cocaine from a very dark, thin, black male between 10:00 and 11:00 in the morning. _Davis_ 170 F. Supp. 2d at 1238. It also gave Turner's address and the make and model of two vehicles Turner might be driving. Id. The tipster gave a home phone number and a cell phone number and said that Turner would be carrying a pistol. Id. The court stated it could not be said that the police officers corroborated any information about Turner's address, vehicles, or phone numbers. Police officers retrieved a booking photo of Ricky Turner and showed up at the address stated in the anonymous tip. Id. at 1238-1239. The tipster's voice sounded female according to the detectives. Id. at 1239. The tipster gave no information about herself and there was no information about how she came to know about the drug deal. Id. She did not mention that she had seen drugs firsthand in Turner's home or that she in any way had firsthand knowledge of this information. Id. There was no testimony about the reliability of the informant. Id.

The _Davis_ court required both probable cause and exigent circumstance be present in order to uphold the search and seizure of the items found in Turner's possession. Id. Probable cause requires more than solely an anonymous tip and no police officer or other official able to state that they themselves

verified any information other than a booking photo. (In Appellant's case the only thing known was the nickname "Scooter"). The Davis Court determined that no probable cause existed to enter and search Turner's apartment. In order for a warrantless search to be reasonable, it must fit into one of the narrowly defined exceptions. Exigent circumstances apply only when the delay of obtaining a search warrant risks "flight or escape; danger of harm to police officers or the general public; risk of loss; destruction, removal, or concealment of evidence and 'hot pursuit' of [a] fleeing suspect." United States v. Santa, 236 F.3d 662, 669 (11th Cir. 2000)(quoting United States v. Blasco, 702 F.2d 1350, 1325 (11th Cir. 1983)). It is well settled that there are not normally exigent circumstances when suspects are unaware of police surveillance. Santa, 236 F.3d at 669-670.

When exigent circumstances are created by law enforcement no exigency exists. Rather, the police simply failed to comply with the Fourth Amendment's warrant requirement. Santa at 670. (Since there were no exigent circumstances, and both probable cause and exigent circumstances are required for a warrantless search of a home, the Santa Court found that the initial entry and sweep search were illegal).

Wherefore, Appellant prays this Honorable Court will reverse the determination of the district court and order that the Motion to Suppress be granted.

## ISSUE II

### THE EVIDENCE WAS INSUFFICIENT TO SUPPORT A CONVICTION ON COUNTS I, II, III, AND IV.

## Standard of Review

The 11th Circuit reviews the sufficiency of the evidence *de novo*. United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990), cert. denied, 499 U.S. 978, 111 S. Ct 1628 (1991)

## Discussion of Issue

Appellant filed a Motion of Acquittal and Motion for Judgment Notwithstanding the Verdict and Brief and Memorandum of Law in support (R-235; R.E. 18). The Government responded to said motion (R-237; R.E. 20) and the District Court denied the motion in an order dated September 29, 2004 (R-247; R.E. 21).

In Appellant's Motion for Judgment of Acquittal he submitted that the Government did not prove its case as to Count 1 and 2 of the indictment.

At the close of the Government's case the district court reserved and withheld a ruling on Appellant's oral motion for Judgment of Acquittal as to Counts 1 and 2 of the indictment and denied the motion as to Counts 3 and 4. Ultimately the district

court denied Appellant's motion as to Counts 1 and 2 and allowed the conviction to stand.

The evidence established that (1) Appellant was located at a residence where drugs were found; (2) the residence was placed under surveillance after an anonymous tipster suggested there was some type of drug activity going on at the residence; (3) A wrong telephone number was given to police who made a telephone call in an attempt to initiate some type of "scattering of the ants" response hoping to capture drug dealers frantic to exit the residence identified by the anonymous caller; (4) The officers surveilled the residence and saw Appellant, shortly after this wrong phone call was made, coincidently come out of the residence, not in a hurry, and put something in the trashcan by the curb; (5) Officer Conway, having seen Appellant dispose of something in the trashcan, proceeded to the residence to question Appellant in a "knock and talk"; (6) Appellant was searched and a cell phone and an unknown amount of money was felt in Appellant's pockets. No weapons or drugs were found.

The Government's theory of Appellant's involvement was that he and Peralte were in the drug business together. There was no supporting evidence of this presented at the trial. It was alleged that Peralte transported cocaine from Florida to Alabama and used the 4th Street residence as a place to complete drug sales and cook crack. No testimony established this evidence.

38

To prove its case against Appellant, the Government presented testimony of several witnesses and various documents. All of the evidence was centered around the search of the 4th Street residence. There is no evidence of intercepted telephone conversations or an ongoing investigation of Appellant or his co-defendants.

The Government's principle witness at trial was cooperating witness James, a convicted drug dealer and co-defendant who pled guilty before Appellant's trial. James' testimony was without any inference of Appellant Norman's involvement in a conspiracy. James testified that Appellant's nickname was Scooter and that "Appellant did not sell him any drugs around the relevant time period but that Appellant used to work for him a long time ago." (R-49). In fact, James testified that he used to know Appellant in high school and that he, James, simply met Peralte at the 4th Street residence so James could purchase cocaine about six or seven days before the day of the search warrant (R-260, 265, 267, 297). He did not say Appellant let him in or introduced them.

The Government cannot point to any evidence of an agreement between Appellant and his co-defendant's for the purposes of conducting a drug conspiracy. Knowledge is still the central element of possession with intent to distribute. The Government failed to present any evidence by any witness that Appellant

39

Norman had any knowledge of any of the cocaine charged in the indictment that was present at the premises. There is no evidence that Appellant had authority to control the premises where the cocaine was found. No documents were presented to show that Appellant paid utilities at the residence. Appellant could only have been convicted by his presence or association. Neither are enough to convict him.

There was no evidence of Appellant's intent to possess crack cocaine with the intent to distribute (2.6 grams). There was no evidence that Appellant had anything to do with the sale of these drugs or had the required knowledge of these drugs to possess them, sell them or distribute them.

In its order denying Appellant's Motion for Judgment of Acquittal and Motion for Judgment Notwithstanding the Verdict the district court stated:

> "The evidence, viewed in the light most favorable
> to the government, establishes that (1) Norman
> was present in the residence on the day of the
> search warrant, (2) that cocaine and crack -
> along with drug scales and other drug
> paraphernalia - were found in numerous locations
> in the residence, (3) that the anonymous female
> caller informed the police that when Peralte's
> maroon vehicle was at the residence there were

40

normally drugs in the residence and that Norman

was currently at the residence, (4) Norman

discarded trash, which contained cocaine residue,

in the trashcan located on the street, (5) James

purchased cocaine from Peralte at Norman's

residence a few days prior to the day of the

search warrant, and (6) James knew that Peralte

and Norman started "seeing each other." (p. 7-8)

Appellant states that there are several fatal flaws in the

manner that the district court construed the evidence. Item 1

merely establishes that Appellant was present in the residence

and presence is not enough to establish membership is a

conspiracy. Rowan v. U.S., 99 S. Ct. 1546, 440 U.S. 976 (1978).

Item 2 does not tie evidence to any of the defendant's,

including Appellant. Item 3 incorrectly states the evidence as

presented during Appellant's trial. Specifically, Agent Conway

testified that the anonymous caller told him (1) that there was

a maroon vehicle at the residence (not Peralte's), (2) when the

maroon vehicle was present drugs were usually located there, and

(3) that "Scooter" was at the residence. (R:TT;p 46). Agent

Conway testified that he knew "Scooter" was Appellant but did

not state how he knew this information. (R:TT;p 46, 70-72)).

Item 4 was never established by any witness. The only testimony

regarding Appellant and the trashcan was that he walked out of

41

the house and put "something" in the trashcan. (R:TT;p 48) It was never established that Appellant threw away the paper towel that Conway found and field tested positive for cocaine. In addition, unless the trashcan was empty, and Agent Conway testified that it was not (R:TT;p 64), it cannot be assumed that because Appellant threw something away it must have been this particular item. As to item 5, the government never established that the 4th Street residence was, in any manner, connected to Appellant. Furthermore, James testified that he had gone to 4th Street to attempt to sell Peralte a BMW (R:TT;p 267) and that he had no idea that there were drugs in the 4th Street residence. (R:TT;p 269) In item 6, James did testify that he knew that Appellant and Peralte started "seeing each other" but that he did not know what they were doing. (R:TT;p 266). Peralte's counsel objected and moved to strike James' speculation and this objection was sustained (R:TT;pp 266-267). As such, this information was not properly before the jury for its consideration nor was it properly before the district court when considering Appellant's Motions.

Following the above referenced points, the district court continues to rely on a "fact" that was never proven, namely that Appellant threw away the paper towel containing cocaine residue, to support any inferences the jury may have made. (R-247;p 8-9; R.E. 21). Specifically, the court stated "[t]he jury could

reasonably infer that Norman was in the 'presence' of the cocaine and crack located in the house because the paper towel he discarded contained cocaine residue" (p 8) and "…in light of Norman's action of discarding cocaine residue, his presence in the residence takes on increased significance and contributes to the case for conviction." (p 9)

To be convicted of conspiracy the Government must establish beyond a reasonable doubt (1) the existence of an agreement between 2 or more persons, (2) that the defendant knew of the general purpose of the agreement, and (3) the defendant knowingly became involved and participated in the agreement. United States v. Simpson, 228 F.3d 1294 (11th Cir. 2000).

To be convicted of conspiracy one must have knowledge of the conspiracy and must intend to join or associate themselves with the object of the conspiracy. United States v. Rudisill, 187 F.3d 1260, rehearing denied, (11th Cir. 1999).

Presence alone is insufficient to establish participation in a conspiracy. Rowan v. United States, 99 S. Ct. 1546, 440 U.S. 976 (1978); United States v. Bobo, 586 F.2d 355 (11th Cir. 1978).

Even though the Government may establish a defendant's knowing participation in a narcotics conspiracy through proof of surrounding circumstances, such as acts committed by the defendant that further the purpose of the conspiracy, nothing in

the evidence the Government presented suggested that Appellant furthered the purpose of the conspiracy by any of his conduct. United States v. Matthews, 168 F.3d 1234 (11th Cir. 1999).

The Eleventh Circuit's standard of review for sufficiency of the evidence is determined by whether, when looking at the evidence in the light most favorable to the government, the jury necessarily must have entertained a reasonable doubt concerning the guilt of an appellant. Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457 (1942); United States v. Miller, 664 F.2d 826, 828 (11th Cir. 1981). The Fifth Circuit elaborated on this concept noting that the Court must find "substantial evidence" connecting Appellant to a conspiracy. United States v. Malatesta, 590 F.2d 1379, 1381 (5th Cir. 1979)(en banc), cert. denied Subnon. The reasonably minded juror test applies. United States v. Gianni, 678 F.2d 956, 959 (11th Cir. 1982), cert denied, 459 U.S. 1071, 103 S. Ct. 491 (1982). Therefore when looking at these standards, whether it be the substantial evidence or the reasonably minded juror test, one cannot convict Appellant for the offenses of conspiracy or possession with intent. United States v. Lopez-Ramirez, 68 F.3d 438, 440 (11th Cir. 1995); United States v. Guerrero, 935 F.2d 189, 192 (11th Cir. 1991).

To prove conspiracy to possess with intent to distribute the government must also provide reasonable inferences and not

mere speculation in order to support the jury's verdict. <u>Guerrero</u>, *supra*.

There is no evidence that Appellant voluntarily knew that a conspiracy existed and that with that knowledge voluntarily joined it. <u>United States v. Perez-Tosta</u>, 36 F.3d 1552, 1557 (11th Cir. 1994), <u>cert. denied</u>, by <u>Perez-Aguillera</u>, 115 S. Ct. 2584 (1995). To prove the substantive offense of possession of cocaine with intent to distribute the government must establish that the defendant knowingly possessed the cocaine and that he intended to distribute it. <u>United States v. Stanley</u>, 24 F.3d 1314, 1319 (11th Cir. 1994). Even if the evidence could establish circumstantially that Appellant constructively possessed some of the cocaine or the crack cocaine from the residence, there is no evidence that he knowingly possessed that cocaine with the intent to distribute. Reasonable inferences and not mere speculation must support the jury's verdict. <u>Perez-Tosta</u>, 36 F.3d at 1557. This Honorable Court has repeatedly held that a defendant's association with co-defendants is insufficient to prove conspiracy or possession. <u>United States v. Hernandez</u>, 896 F.2d 513, 519 (11th Cir. 1990), <u>cert. denied</u>, 498 U.S. 858, 111 S. Ct. 159 (1990); <u>United States v. Thomas</u>, 8 F.3d 1552 (11th Cir. 1993); <u>United States v. Stanley</u>, 24 F.3d 1314 (11th Cir. 1994). In <u>Thomas</u> the Court noted that presence with co-conspirators alone, or close association with them, was

insufficient proof of participation in a conspiracy. Thomas at 1555. In Stanley the Court noted that the defendant's presence in a vehicle in which drugs were stored, even while the driver and another passenger were negotiating the sale of cocaine within earshot, was insufficient to establish conspiracy and possession. 24 F.3d 1319 There is even less evidence in Appellant's case.

In Perez-Tosta, *supra*, the evidence was insufficient to convict for conspiracy even though the defendant provided keys, registration, insurance for a vehicle used to transport drugs, and later was present in the car when it was engaged in counter-surveillance. Appellant was at a residence where drugs were located. No one testified he knowingly joined in a conspiracy or possessed those drugs. Appellant's circumstances are even less then those found in Perez Tosta.

In United States v. Jenkins, 779 F.2d 606 (11th Cir. 1986), the Appellant was convicted for merely being present and in association with co-defendants. As in Jenkins, there was no testimony tying Appellant to the drugs or the conspiracy with Peralte and James other than his presence at the residence. Jenkins conviction was based upon unreliable hearsay, mere presence, and assumptions based upon no personal knowledge. In Appellant's case, there was no reliable information that he was involved in any drug transactions, he was merely present at the

46

residence when the police decided to do a "knock and talk." There was no evidence that Appellant put the paper towel that tested positive for cocaine into the trashcan, and no one had any personal knowledge of Appellant engaging in any drug transactions. Mere presence at the scene of the crime is not a sufficient basis for a finding of guilt. United States v. Reyes, 595 F.2d 275, 280 (5th Cir. 1979). Guilt may not be assumed through close association between persons or through family relations. White, *supra*. As in Jenkins, there were no co-conspirator statements offered or admitted at trial implicating Appellant in the conspiracy. Therefore, Appellant's conviction as to Counts I, 2, 3, and 4 should be vacated.

<div align="center">

**ISSUE III**

**THE WARRANT IN THIS CASE WAS SIGNED BY A STATE MAGISTRATE AND NOT A FEDERAL MAGISTRATE IN VIOLATION OF RULE 41 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.**

</div>

**Standard of Review**

This issue presents itself as a novel issue of law but also a question of ineffective assistance of counsel. Therefore, this Honorable Court should review same under the Strickland v. Washington, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 2064-65, 2068 (1984) standard of review. This Honorable Court should also

consider this issue under the plain error standard of review. U.S. v. Lejarde-Rada, 319 F.3d 1288, 1290 (18th Cir. 2003).

## Discussion of the Issue

This issue was not raised on the Motion to Suppress but was raised in a subsequent Supplemental Motion to Reopen the Motion to Suppress and a Motion for Out of Time Filing of Supplement to the Motion to Suppress (R-112 and R-175; R.E. 8 and 11). The Supplement to the Motion to Suppress and Out of Time Motion to Suppress were filed on March 24, 2004 (R-175 and R-180; R.E. 11 and 12). A Supplemental Motion for Out of Time Filing of the Supplement to Motion to Suppress was filed on April 9, 2004 (R-181; R.E. 12). The Government's Response to Defense Motion for Out of Time Filing and Supplemental Motion to Suppress was filed on April 9, 2004 (R-180; R.E. 12). The Report and Recommendation of the Magistrate denying relief regarding this question and others to reopen the motion to suppress was denied on June 4, 2004 (R-197; R.E. 14). Objections to the Magistrate's Recommendation Denying the Supplemental Motion were filed on July 1, 2004 (R-204; R.E. 15). The Judge's order adopting the Magistrate's Report and Recommendation was filed on July 1, 2004 (R-216; R.E. 16).[5]

_____

[5] The original Report and Recommendation of the Magistrate stated that it was granted in part and denied in part. This was amended by the Magistrate on July 1, 2004 denying the entire motion.

One of the issues raised in the Motion for out of time relief and supplementation of the Motion to Suppress was based upon Rule 41 of the Federal Rules of Criminal Procedure. "[U]nless *a clear constitutional violation occurs,* noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that *the search might not have occurred or would not have been so abrasive if the rule had been followed,* or (2) there is *evidence of intentional and deliberate disregard of a provision in the Rule.* United States v. Loyd, 721 F.2d 331, 333 (11th Cir.1983) (per curiam) (quoting United States v. Stefanson, 648 F.2d 1231, 1235 (9th Cir.1981) (citations omitted)) (emphasis added). In Loyd, suppression was denied because the violation of Rule 41 did not affect the occurrence or abrasiveness of the search, and there was "no evidence to indicate bad faith or an intentional disregard of the rule." Loyd, 721 F.2d at 333; *cf.* United States v. Leon, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984) (holding that the exclusionary rule is inappropriate when agents executing a search warrant acted in good faith reliance on the validity of the warrant). In order to show prejudice in this context, a defendant must show that because of the violation of Rule 41 he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed. United States v. Burke, 517 F.2d 377, 386 (2d Cir.

1975). All of the police officers involved in the obtainment of the warrant were employees of the police department of the city of Montgomery, Alabama, however, were working in the capacity of federal agents investigating the instant case.

In denying relief on this question the Magistrate determined that the motion was filed out of time. However, there is plain error in denying the relief requested and this matter should be reviewed further. Under plain-error review, the defendant has the burden to show that "there is (1) 'error' (2) that is 'plain' and (3) that 'affects substantial rights.'" United States v. Lejarde-Rada, 319 F.3d 1288, 1290 (11th Cir. 2003) (quoting United States v. Olano, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776, 123 L. Ed. 2d 508 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" Id. (quoting Johnson v. United States, 520 U.S. 461, 467, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997)) (other internal quotation marks and citations omitted). Under plain-error review, the silent defendant has the burden "to show the error plain, prejudicial, and disreputable to the judicial system." Vonn, 535 U.S. at 65, 122 S. Ct. at 1050.

Furthermore, even though claims of ineffective assistance of counsel are mostly reserved for review pursuant to 28 U.S.C. § 2255, same can be considered by this Court when the evidence at the District Court level sufficiently establishes the claim without further need for evidence to be submitted. Marsaro v. United States, 538 U.S. 500, 1235 S. Ct. 1690 (2003) and Stewart v. State, 420 So.2d. 162 (Fla. 1982). Finally, a miscarriage of justice will occur if this matter is not reviewed by this Court and determined as it presents a novel issue of juris prudence.

All the officers, including Corporal Conway, were members or participants in HIDTA and the Montgomery Police Department Special Operations Division.[6] Because DEA agents and HIDTA agents were involved in the search of the garbage and the house for which Appellant suffers the consequences, the search was federal in the sense that federal officers "had a hand in it." Lustig v. United States, 338 U.S. 74, 78, 69 S. Ct. 1372 (1949); United States v. Hanson, 469 F.2d 1375 (5th Cir. 1972); Navarro v. United States, 400 F.2d 315 (5th Cir. 1968).

Rule 41(c)(1) states "a warrant shall issue only on an affidavit or affidavits sworn before a federal magistrate or

---

[6] DEA 6 Form prepared on October 1, 2003 by Officer Sisson, Jr.. Officer Sisson testified that he was a narcotics investigator with the Montgomery Police Department investigating federal violations of federal law. See also Detention Hearing Transcript October 2, 2003 before Honorable Magistrate Judge Boyd as well as Testimony before Magistrate Judge Walker January 8, 2004 page 126.]

state judge establishing the grounds for issuing the warrant. If the federal magistrate or state judge is satisfied that grounds for the application exists or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched..." In Navarro, *supra,* City police officers obtained a search warrant for narcotics that were allegedly located in Navarro's home. The search warrant was not issued by a court of record. Shortly after obtaining the warrant, the city officer invited federal narcotics agents to participate in the execution of the warrant. The invitation was accepted and both city and federal officers conducted the search which revealed the narcotics. Navarro's subsequent conviction for illegal possession of narcotics was reversed because the narcotics were discovered during a federal search that had not been conducted in accordance with the requirements of Rule 41(a). In Nevarro, the Court turned to Justice Frankfurter's opinion in Lustig v. United States, 338 U.S. 74, 69 S. Ct. 1372 (1949) for a definition of a "federal search." The Honorable Justice Frankfurter stated "[t]he crux of that doctrine is that a search is a search by a federal official if he had a hand in it… It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was accomplished, he must be deemed to have participated in it.

Where there is participation on the part of federal officers it is not necessary to consider what would be the result if the search had been conducted entirely by State officers." Lustig, 338 U.S. at 78-79.

A municipal judge's signature on the warrant violates Rule 41 of the Federal Rules of Criminal Procedure. Rule 41 specifically states that a magistrate with authority in the district or if none is reasonably available, a judge of a state court of record in the district has the authority to issue a warrant to search for and seize a person or property located within the district. (Rule 41(b)(1)). Throughout the remainder of the rule the term magistrate judge or state court judge of record is repeated as being the only authorities applicable to search warrants that have federal ties. Without the warrant there is no arrest, search, or seizure, and all of the evidence from same must be suppressed, warranting a new trial.

## ISSUE IV

### THE DISTRICT COURT ERRED IN DENYING APPELLANT'S MOTION TO BE TRIED SEPARATELY FROM HIS CO-DEFENDANT.

## Standard of Review

The decision to grant a Motion for Severance is reviewed for an abuse of discretion. United States v. Knowles, 66 F.3d 1146 (11th Cir. 1995).

53

**Discussion of Issue**

Appellant filed a Motion for Severance (R-107) as did co-defendant Peralte (R-155). These Motions were denied in an order dated March 19, 2004 (R-195). In denying the Motion for severance, the court determined that mutually antagonistic defenses were not prejudicial defenses, *per se*. In making this determination, the court relied on Zafiro v. United States, 506 U.S. 434 (1993) and United States v. Talley, 108 F.3d 277 (11th Cir. 1997). Appellant asserted that his defense was antagonistic to that of Peralte. Appellant stated that, given Peralte's criminal history, his association with Peralte at the trial would imply guilt due to Peralte's presence at the residence where the drugs were located. Based on all of the evidence, Appellant had reason to blame peralte for the criminal conduct at the 4th Street residence.

In Zafiro and Talley the court determined that "(1) a joint trial would not compromise a specific trial right of one of the defendants and (2) a joint trial would not prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539; 108 F.3d at 279-280.

Appellant states, based on the circumstances that present themselves from the preliminary hearing through the Motion to

Suppress, severance should have been granted. The facts are clear that nothing Appellant did created any evidence in support of his relationship to the drug offense(s) for which Peralte and James were involved.

Appellant was surveilled taking something to the trash, the exact object discarded still being unknown, and no evidence that the paper towel that tested positive for cocaine was, in any manner, tied to Appellant.

Officers approached the residence and began talking to James and Appellant on the front porch. After a pat down search of both James and Appellant, a cell phone was found, and cash felt, in Appellant's pocket. The amount of cash was unknown as it was not removed from Appellant's pocket. Because the officers were not satisfied with the answers given during the "knock and talk," the officers searched the trashcan and obtained the paper towel that tested positive for cocaine residue.

James and Peralte had a long term, mainly ongoing, relationship and both had prior convictions.

The tenuous relationship between the evidence presented in the pre-trial hearings and the trial testimony clearly indicates that severance would have preserved Appellant's right to be free

from any inferences, from the evidence associated with Peralte and James, being attached to him. With the tenuous nature of the evidence against Appellant, any association with the direct parties involved with the drug transactions was more than Appellant could overcome in a combined trial. There were only three (3) adults at the residence and it is easy to see why a jury would infer that anyone in the residence should be convicted of the crime even if there is no evidence directly tying them to the conspiratorial or possessory crimes.

James testified specifically that Appellant had nothing to do with the drug transactions between himself and Peralte (R:TT;pp 262-265). With James' testimony being exculpatory in nature, clearly the testimony regarding Peralte, had they been tried separately and Appellant tried after Peralte, would have made a significant difference to Appellant as no testimony regarding Peralte would have been admissible.

Appellant and Peralte were blaming each other for the criminal conduct they were accused of. In <u>United States v. Rucker</u>, 915 F.2d 1511, 1513 (11th Cir. 1990) this Honorable Court determined that the denial of severance was an abuse of discretion because two (2) related co-defendant's both asserted ignorance of the crack cocaine discovered under the floorboard

of the care in which they were the only occupants. Accordingly, each claimed that the cocaine must belong to the other. This is the exact same set of circumstances presented in Appellant's case. Both Appellant and Peralte were blaming the other for the circumstances they found themselves in.

Testimony indicated that Appellant was outside the residence while Peralte was inside the residence. Cocaine was found in the residence and there was a question regarding who had control over the residence and drugs. (R-142;pp 6-7). Peralte's attorney argued that the only person that had some connection to the residence was Appellant. (R-142;p 8). In both U.S. v. Talley, supra, and U.S. v. Rucker, supra, the two cases the court relied on in denying severance, the defendants were traveling together in the same car. In a residence situation, separation has bearing on who controls the drugs, the residence, and the criminal conduct.

Evidence at trial did not establish a relationship between Appellant and the residence or the drugs in a capacity that created a nexus between him and the crimes charge.

A clear example of this prejudice can be found when the district court allowed evidence that Appellant had a child with the person who occupied the residence, a Miss Tammy Montgomery, to be admitted after the close of government's case in chief.

Over strenuous objection by Defense Counsel as hearsay and information coming from a person who lacked personal knowledge of the subject the court permitted this testimony. Officer Wingard testified concerning his knowledge of persons in the residence who had a relationship with Appellant (R:TT; pp 344-347).

Q:   Okay and have you had occasion to interview or speak with anyone with regard to Miss Montgomery's involvement, if any, with either of these two individuals?

A:  I didn't, no, ma'am.

Q:   Okay. Has anyone done that in the course of this investigation?

A: I believe someone did, but it wasn't me.

Q:   All right. But in response to that, did someone else's investigation - - has that information been provided to you as part of the case file in this case?

A:  That's correct.

Q:   Okay. Now, back to the question. What, if any, relation have you determined Miss Montgomery has with either of these defendants?

Mr. Madison:  Judge, I am going to again object.

The Court:  What is your basis?

Mr. Madison:  Based upon the fact that he has just testified he has no personal knowledge of any matter dealing with that person's relationship with any of the defendants, number one. And secondly, he's already testified that anything that might have been told to him was told by someone else. I mean, it's at a minimum hearsay and possibly double hearsay and maybe triple hearsay.

The Court:  Overruled. You may answer.

This exchange clearly creates an inference of a circumstantial connection between Appellant and the residence he was visiting and was not admitted into evidence during the government's case but, rather, in Peralte's defense creating a conflict Appellant could not resolve without severance.[7]

---

[7]  The hearsay nature of this testimony should not have been admitted at all.

## ISSUE V

**THE DISTRICT COURT ERRED IN ENHANCING THE SENTENCING GUIDELINES BY TWO POINTS FOR POSSESSORY INTEREST IN A FIREARM PURSUANT TO U.S.S.G. § 2D1.1(b)(2); IN ATTRIBUTING ALL RELEVANT CONDUCT TO APPELLANT, AND IN NOT GRANTING REDUCTION FOR MINOR/MINIMAL ROLE IN VIOLATION OF THE CONSTITUTION AND <u>BLAKELY V. WASHINGTON</u>, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004) AND <u>UNITED STATES V. BOOKER</u>, 543 U.S. ___ (2005).**

**Standard of Review**

The district court's interpretations of sentencing guideline issues are subject to *reasonableness*. <u>United States v. Booker</u>, 543 U.S. ____ (2005).

**Discussion of Issue**

**A.     <u>Firearm Enhancement</u>**

The evidence at trial did not support the two (2) point enhancement Appellant received for possessing a firearm during the commission of a drug offense. Pursuant to U.S.S.G. § 2D1.1(b)(2) Appellant was given a two (2) point enhancement for possessing a firearm during the commission of a drug offense. Paragraph 24 of the Presentence report enhanced Appellants sentence by two (2) points pursuant to U.S.S.G. § 2D1.1(b). This

increased Appellant's base offense level from 32 to 34. At trial, the issue was preserved and an objection was asserted (TT p. 184). The matter was also preserved at sentencing (sent trans p. 3). The handgun was located in a living room closet by Corporal S. Simmons during the search of the residence on September 25, 2003. Nothing, at all, connects this firearm to the co-defendants, much less Appellant. The jury must make the determination that Appellant possessed a firearm during the commission of a drug offense in order for this enhancement to apply in light of the decision in Blakely v. Washington, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004) and United States v. Booker, 543 U.S. ___ (2005).

**B.    Relevant conduct**

Appellant states that he objected to the attribution of all of the relevant conduct related to his co-defendants as being applicable to his sentencing guidelines. The information presented in this brief clearly identifies that there is no nexus between Appellant's presence at the residence and the drugs located therein. In addition, there is no indication that Appellant had knowledge of the drugs or that he possessed them in a manner that should attribute the entire quantity of drugs located in the residence to him as relevant conduct. The officers in this case found 32.2 grams of cocaine base in a paper towel, 2952 grams of cocaine hydrochloride in the laundry

room inside the dryer, 983 grams of cocaine under the couch, and 2.6 grams of cocaine base in the kitchen cabinet. All of these locations indicate that the drugs were hidden in such a manner as to be difficult for the Appellant to detect. There is no indication that any of the drugs were hidden as a result of surveillance or the approach of the police officers. There are no facts on the record establishing that Appellant had any authority, possession, or control over the residence where the drugs were located. There are no facts on which the court could have predicated constructive possession of these drugs.

The defense presented evidence that the utilities were in the name of Caldwell. (Sent Tran p.9). No evidence of Appellant paying any utilities was presented. Appellant did not have a key to the residence or any rights to control or enter the residence. There was no factual premise submitted, during the trial or any other time, that Appellant engaged in drug transaction with anyone either at the residence or anywhere else. There were no facts on the record to indicate that Appellant had any conversations about drugs.

Taking the facts together in their entirety, the base offense level could not exceed base offense level 12, the minimum required for a cocaine offense where no drug quantity can be associated with the defendant despite the fact that a guilty verdict has been rendered.

There is no evidence of jointly undertaken criminal activity and mere presence in a residence where drugs are found is not sufficient to establish such relevant conduct. "the scope of criminal activity jointly undertaken by the defendant... is not necessarily the same as the scope of the entire conspiracy, hence relevant conduct is not necessarily the same for every participant." (See Amendment 439, Appendix C, effective November 1, 1992.) This guideline amendment followed criticism that the relevant conduct section failed to adequately distinguish among conspirators and others involved in a jointly undertaken activity. The mere fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation. See United States v. Studley, 47 F.3d 569, 574-76 (2d Cir. 1995). See also United States v. Gilliam, 987 F.2d 1009, 1012-13 (4th Cir. 1993)(holding that the act must have been within the scope of the defendant's agreement). See United States v. Evbuomwan, 992 F.2d 70, 73-74 (5th Cir. 1993)(holding that the government must prove that the particular crime was within the scope of the defendant's agreement). United States v. Jenkins, 4 F.3d 1338, 1346-47 (6th Cir. 1993)(holding that defendant agreed to jointly undertake.) See United States v. Olderbak, 961 F.2d 756, 764 (8th Cir. 1992)(conduct is relevant only if it is reasonably foreseeable in connection with the criminal activity defendant agreed to

jointly undertake.) <u>United States v. Hunter</u>, 323 F.3d 1314 (11th Cir. 2003)(remanding because the Court did not make particularized findings regarding the scope of the defendant's agreements as required by U.S.S.G. § 1B1.3.) *See* also <u>United States v. Saro</u>, 24 F.3d 283, 288 (D.C. Cir. 1994)(mere foreseeability is not enough).

C.  **Minor Role**

Appellant's counsel also objected to the finding that Appellant did not have a minimal or minor role in the offense. The jury should make this determination as it is a specific fact finding issue.

In light of the totality of the circumstances and evidence presented in this case, Appellant clearly was not a primary person involved in the offense even though he was present where hidden drugs were located. The government's main witness, James, indicated that he had no dealings with Appellant since high school. As such, the jury should have been given the opportunity to determine whether Appellant could have been classified as a minor or minimal participant in the charged offenses. Notwithstanding the jury verdict on this issue, the district court was erroneous in making a finding that there was no minimal or minor role application.

The United States Sentencing Guidelines provide for a four (4) level reduction in offense level for "minimal participant",

a two (2) level reduction for a "minor participant", and a three (3) level reduction for those participants falling in between.[8]

This range of reduction is applicable if the Defendant's role in the offense makes him substantially less culpable than the average participant.[9]

A defendant's lack of knowledge, or understanding of the scope and structure of the enterprise in the activities of others is indicative of a role as a minimal participant.[10]

### CONCLUSION

WHEREFORE, Appellant respectfully requests this Honorable Court, based on the arguments presented above, vacate Appellant's conviction , remand Appellant's case for a new trial severed with that of Co-defendant Peralte, or remand Appellant's case for further findings in a sentencing proceeding regarding the gun enhancement, relevant conduct, and/or minor rold reduction pursuant to United States v. Booker, 543 U.S. ___ (2005).

---

[8] U.S.S.G. § 3B1.2(a), et. seq.

[9] Id.

[10] U.S.S.G. § 3B1.2, application note 1.

Respectfully Submitted,


Cloud H. Miller, III
Miller and Associates
2392 North Decatur Road
Decatur, Georgia  30033
(404) 633-3797

## CERTIFICATE OF COMPLIANCE

This <u>Brief of Appellant</u> has been prepared using:

    <u>Microsoft Word 2000</u>;

    <u>Courier New</u>;

    <u>12 Point Type Space</u>.

EXCLUSIVE of the Table of Contents; Table of Citations; the Certificate of Service; this Brief contains <u>13,967</u> words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the Brief and/or a copy of the word or line print-out.

<br>

                       Signature of Filing Party

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 14th day of January, 2005, two (2) bound copies of the foregoing Brief of Appellant have been served via United States First Class Mail, postage prepaid, addressed to the following:

Louis V. Franklin, Sr.
Todd A. Brown
OFFICE OF THE U.S. ATTORNEY
Post Office Box 197
Montgomery, Alabama  36101-0197

*Counsel for Appellee*

I also certify that on the 14th day of January, 2005, the required number of said Brief were filed via UPS Overnight Delivery with the Office of the Clerk, United States Court of Appeals for the Eleventh Circuit.

The necessary filing and service to Counsel were performed in accordance with the instructions given me by counsel in this case.

Alex Jensen
The Lex Group
1108 East Main Street
Suite 1400
Richmond, VA  23219

Westlaw.

162 Fed.Appx. 866                                                            Page 1

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

**H**
U.S. v. Norman
C.A.11 (Ala.),2006.
This case was not selected for publication in the
Federal Reporter.Please use FIND to look at the
applicable circuit court rule before citing this
opinion. Eleventh Circuit Rule 36-2. (FIND CTA11
Rule 36-2.)
United States Court of Appeals,Eleventh Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alphonso **NORMAN**, a.k.a. Scooter, Capulco
Peralte, a.k.a. Debby B. Black, a.k.a. Cappuccino,
Defendants-Appellants.
No. 04-15292.
D.C. Docket No. 03-00229-CR-F-N-2.

Jan. 11, 2006.

**Background:** Defendants were convicted by jury
in the United States District Court for the Middle
District of Alabama of drug possession and
conspiracy offenses. Defendants appealed.

**Holdings:** The Court of Appeals held that:

(1) search warrant affidavit provided probable
cause for search of residence;

(2) evidence supported conspiracy convictions;

(3) district court did not clearly err in sentencing
defendant based on drug quantity determinations
that were made by jury and supported by the
evidence;

(4) denial of sentence reduction under Sentencing
Guidelines for playing minor or minimal role in
offense was not clear error; and

(5) application of mandatory guidelines in
sentencing defendant was harmless error.

Affirmed.
West Headnotes
**[1] Criminal Law 110 ⟜1169.2(6)**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1169 Admission of Evidence
                110k1169.2 Curing Error by Facts
Established Otherwise
                    110k1169.2(6)  k.  Admissions,
Declarations,  and  Hearsay;  Confessions.  Most
Cited Cases
Admission of officer's alleged hearsay testimony
that resident of house searched was defendant's
girlfriend was at most harmless error when different
witness testified, without objection, that resident
was defendant's girlfriend.

**[2] Controlled Substances 96H ⟜148(4)**

96H Controlled Substances
    96HIV Searches and Seizures
        96HIV(C) Search Under Warrant
            96Hk144 Affidavits, Complaints, and
Evidence for Issuance of Warrants
                96Hk148 Informants
                    96Hk148(4)  k.  Confidential  or
Unnamed Informants. Most Cited Cases
Search warrant affidavit provided probable cause
for search of residence, given that affidavit
indicated that police had received anonymous
telephone call reporting ongoing drug activity at
residence, that anonymous caller informed police
that drug activity at residence increased when black
male driving maroon vehicle arrived at residence,
that officer observed defendant exit residence and
place object in trash can which was determined to
be paper towel containing cocaine residue, and that
defendant and another who answered door at
residence were known drug dealers in area.
U.S.C.A. Const.Amend. 4.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. 2

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

**[3] Criminal Law 110 ⟐⟿394.6(4)**

110 Criminal Law
   110XVII Evidence
      110XVII(I) Competency in General
         110k394 Evidence Wrongfully Obtained
            110k394.6 Motions Challenging Admissibility of Evidence
               110k394.6(4) k. Evidence on Motion. Most Cited Cases
Findings that police officer found paper towel in trash can at curb of residence which looked like object that officer had earlier seen defendant drop into trash can and that officer found shavings of what appeared to be cocaine inside paper towel were not clearly erroneous, and thus supported determination that probable cause for search of residence existed, notwithstanding defendants' contention that officer lied in claiming to have discovered cocaine in trash can. U.S.C.A. Const.Amend. 4.

**[4] Conspiracy 91 ⟐⟿47(12)**

91 Conspiracy
   91II Criminal Responsibility
      91II(B) Prosecution
         91k44 Evidence
            91k47 Weight and Sufficiency
               91k47(3) Particular Conspiracies
                  91k47(12) k. Narcotics and Dangerous Drugs. Most Cited Cases
Defendants' drug conspiracy convictions were supported by evidence that anonymous caller advised police officer that maroon vehicle was present at identified residence, that drugs generally were at residence when vehicle was present, and that black male with same nickname as that of one defendant was at residence, that same defendant was seen exiting residence shortly after call and deposited object in trash can outside residence which was discovered to be wet paper towel containing crack residue, that search of residence revealed several kilograms of cocaine, small amount of crack cocaine, cocaine packaging, digital scales, and more than $70,000 in cash, and that defendants were at residence, along with coconspirator who testified on government's behalf respecting defendants' drug activities.

Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(a)(1), 406, 21 U.S.C.A. §§ 841(a)(1), 846.

**[5] Sentencing and Punishment 350H ⟐⟿686**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
      350HIV(B) Offense Levels
         350HIV(B)2 Factors Peculiar to Particular Offenses
            350Hk686 k. Drugs and Narcotics. Most Cited Cases
District court did not clearly err in sentencing defendant who was convicted of drug conspiracies based on drug quantity determinations that were made by jury and supported by the evidence. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(a)(1), 406, 21 U.S.C.A. §§ 841(a)(1), 846.

**[6] Sentencing and Punishment 350H ⟐⟿764**

350H Sentencing and Punishment
   350HIV Sentencing Guidelines
      350HIV(C) Adjustments
         350HIV(C)3 Factors Decreasing Offense Level
            350Hk764 k. Minor or Minimal Participation. Most Cited Cases
Denial of sentence reduction under Sentencing Guidelines for playing minor or minimal role in offense was not clear error, even though defendant, who was convicted of drug conspiracy and drug possession offenses, contended that he was merely present at residence at which drugs were found, given that defendant was only one of three defendants actually seen by police with drugs in his possession, and that amount of drugs attributed to defendant as relevant conduct was the same amount of drugs located in residence and same amount of drugs that defendant was convicted of conspiring with another to distribute from girlfriend's house. Comprehensive Drug Abuse Prevention and Control Act of 1970, §§ 401(a)(1), 406, 21 U.S.C.A. §§ 841(a)(1), 846; U.S.S.G. § 3B1.2, 18 U.S.C.A.

**[7] Jury 230 ⟐⟿34(8)**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

230 Jury
    230II Right to Trial by Jury
        230k30 Denial or Infringement of Right
            230k34 Restriction or Invasion of
Functions of Jury
        230k34(5) Sentencing Matters
            230k34(8) k. Drug Offenses. Most
Cited Cases
    (Formerly 230k34(1))
Defendant convicted of drug offenses was not
entitled, under *Booker* rule generally requiring that
facts supporting enhanced sentence be proved to
jury or admitted by defendant, to have jury
determine his entitlement to Sentencing Guidelines
reduction for playing minor role in offense, given
that Supreme Court's decision in *United States v.
Booker* did not create any right to jury
determinations at sentence, and involved
application of extra-verdict enhancements in
mandatory sentencing guidelines system, not
sentencing reductions in mandatory sentencing
guidelines scheme. U.S.S.G. § 3B1.2, 18 U.S.C.A.

**[8] Criminal Law 110 &#x21CE;1177**

110 Criminal Law
    110XXIV Review
        110XXIV(Q) Harmless and Reversible Error
            110k1177 k. Sentence and Judgment and
Proceedings After Judgment. Most Cited Cases
Statements in the record indicated that district court
would have imposed same sentence under advisory
Sentencing Guidelines scheme, and therefore court's
application of mandatory guidelines in sentencing
defendant was harmless error; district court rejected
request to impose sentence at low end of guidelines
range consistent with sentence imposed on
codefendant, court specifically stated that sentence
at high end of guidelines range was imposed due to
nature and seriousness of offense and was based on
defendant's drug crime history and to promote
respect for the law, and court rejected contention
that mid-range sentence was warranted based on
recommendations of presentence investigation
report (PSI). U.S.S.G. § 1B1.1 et seq., 18 U.S.C.A.

**\*868** Cloud H. Miller, III, Miller & Associates,
Decatur, GA, Susan Graham James, Susan G. James

& Associates, Montgomery, AL, for
Defendants-Appellants.
Todd A. Brown, Montgomery, AL, for
Plaintiff-Appellee.

Appeals from the United States District Court for
the Middle District of Alabama.

Before CARNES, HULL and PRYOR, Circuit
Judges.
PER CURIAM:
**\*\*1** Alphonso Norman ("Norman") and Capulco
Peralte ("Peralte") (collectively, "appellants")
appeal their convictions and sentences for their
roles in a three-person cocaine and crack
distribution conspiracy. After review of the record
and oral argument, we affirm.

## I. BACKGROUND

On September 25, 2003, an anonymous female
tipster telephoned the Narcotics Bureau of the
Montgomery, Alabama Police Department and
informed Corporal J.T. Conway ("Conway") that
there was drug activity ongoing at 2429 East 4th
Street in Montgomery. The tipster advised
Conway that a maroon vehicle with Florida license
plates was present at the **\*869** residence, and further
advised Conway that the presence of that vehicle
was an indication that drugs were at the residence.
The tipster further stated that a black male named "
Scooter" was at the residence, and in response to an
inquiry from Conway, provided a phone number for
the residence. Conway was previously aware that
Norman, a black male, was associated with that area
of 4th Street and was nicknamed "Scooter."

After receiving the anonymous tip, Conway
assembled a group of Montgomery police officers
to accompany him to the 4th Street residence for
surveillance purposes. The officers observed a
maroon vehicle backed up beside the house.
Conway then asked another officer to call the
telephone number that had been provided by the
anonymous tipster and to tell whomever answered
that the police were coming to the house.[FN1]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

> FN1. There was testimony that this is an investigative tactic sometimes used by police to lure individuals suspected to be involved with drug activity out of a residence.

The other officer informed Conway that the telephone call had been made in accordance with Conway's instructions. However, unbeknownst to the officers at the scene, the telephone number that was actually dialed was not the telephone number for the residence.[FN2] Nevertheless, despite the fact that the wrong number was dialed, just after the telephone call was completed, Norman coincidentally exited the 4th Street residence. Norman walked to the street, placed a white object into a curbside trash can located on the street in front of the house, and returned to the residence.

> FN2. There is evidence in the record that the correct phone number for the 4th Street residence was (334) 264l-3l2 77, while the phone number actually dialed during surveillance was (334) 262l-3l4 77.

The officers waited a few additional minutes and observed no further activity. Conway then decided that he would initiate a "knock and talk," which is an investigative technique whereby an officer knocks on the door to a residence and attempts to gather information by explaining to the occupants the reason for the police interest.

Norman and Andrew Kenny James ("James") answered the door. After Conway explained that the police had received a complaint of drug activity at the residence, he asked to search the residence. Norman and James refused this request.

During their discussion with Norman and James, officers observed a young boy located in the front room, visible from where the officers were standing outside the door. Also at this time, despite Conway's instructions to keep his hands out of his pockets, Norman continued to put his hands in his pockets. Accordingly, Conway placed the young boy-who was later identified as Norman's son-behind Conway for the boy's safety; drew his

weapon on Norman and James; and conducted a patdown search of Norman. The search of Norman revealed a cell phone and money in Norman's pockets.

**\*\*2** After the patdown search, Conway went to the curbside trash can located on the street in front of the house. Inside the trash can, sitting on top of the can's contents, Conway found a wet paper towel with a residue that appeared to be cocaine. Conway field-tested the paper towel, and it tested positive for cocaine. Conway then instructed the other officers to detain Norman and James, and he left to obtain a search warrant for the residence.

While Conway was typing his affidavit in support of the search warrant, he received a call from one of the officers at the scene advising him that the officers had located a third person-Peralte-in the house. Officers**\*870** apparently heard a noise inside the house, despite having detained Norman and James and despite having sent Norman's son to the care of a neighbor. Officers then entered the house and detained Peralte, and Conway revised his affidavit to include Peralte.

Conway's affidavit in support of the search warrant stated as probable cause for the search, among other things: (1) Conway received a telephone call from a subject "A" advising that drug activity was ongoing at the 4th Street residence; (2) "A" told Conway that drug activity at the residence increased when a black male driving a maroon vehicle arrived at the residence; (3) after A's phone call, Conway saw Norman exit the residence and place an object in the trash can; (4) Conway's subsequent search of the trash can revealed a paper towel containing cocaine residue; and (5) Norman and James were known drug dealers in Montgomery.

Conway brought the affidavit to a Montgomery Municipal Court judge and revised the affidavit (with the judge's permission) to include the vehicles at the residence. The judge then issued a search warrant that incorporated Conway's affidavit, and Conway called the other officers at the scene and instructed them to commence a search of the residence and the maroon vehicle.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

In the residence, officers found a digital scale on top of the washing machine. Inside the washing machine, officers located a plastic bag containing commercial packing grease and $2,900 in cash. In the dryer, officers located three solid bricks of cocaine hydrochloride with a total weight of approximately three kilograms. The cocaine bricks were yellow-brown in color and appeared to have been packed in grease but subsequently wiped clean.

Under the living room couch, officers located a package containing approximately one kilogram of cocaine hydrochloride. This cocaine was inside one plastic zip-loc bag, covered with packing grease, and placed inside another zip-loc bag. In the kitchen, officers located a two-gram package of cocaine base ("crack") in a cabinet, along with another digital scale. Officers additionally discovered a hollowed-out bedpost that contained approximately $70,000 in cash, and a handgun in a closet near the front door.

Investigation revealed that the maroon vehicle with Florida license plates belonged to Peralte. The search of the maroon vehicle revealed that the passenger side airbag had been removed in order to create a hidden compartment. In the hidden compartment, officers found a zip-loc bag of the same type that held the cocaine that officers located under the living room couch.

**\*\*3** The residue on the paper towel retrieved from the curbside trash can was ultimately determined to be crack residue.

On October 29, 2003, a grand jury from the Middle District of Alabama returned a four-count indictment against Norman, Peralte, and James. Count One charged the defendants with conspiracy to knowingly and intentionally distribute and possess with intent to distribute 500 grams or more of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a)(1) and 846. Count Two charged the defendants with conspiracy to knowingly and intentionally distribute and possess with intent to distribute a mixture or substance containing a detectable amount of crack, also in violation of 21 U.S.C. §§ 841(a)(1) and 846. Counts Three and Four charged the defendants with the acts of

possession referenced in Counts One and Two of the indictment-specifically, knowing and intentional possession with the intent to distribute 500 grams or more of cocaine (Count Three), and knowing and intentional possession with intent to distribute a mixture or substance **\*871** containing a detectable amount of crack (Count Four), in violation of 21 U.S.C. § 841(a)(1).

In June 2004, James pleaded guilty to Count One of the indictment. He subsequently testified for the government at the joint trial of Norman and Peralte.

Both Norman and Peralte filed pretrial suppression motions. The primary basis of their motions was that the anonymous telephone tip was unreliable and that probable cause did not exist for the search warrant. A magistrate judge conducted a suppression hearing, and issued a report and recommendation that the motions to suppress be denied. Among other facts, the magistrate judge found that, as recounted by the police officers, there had been an anonymous tip about drug activity at the 4th Street residence and Conway had observed Norman exit the 4th Street residence and place a paper towel containing cocaine residue in the trash can. The district court adopted the magistrate's report and recommendation and denied the suppression motions. The case proceeded to trial in July 2004.

At trial, the above circumstances surrounding the surveillance and search of the 4th Street residence were introduced in evidence. Additionally, James testified that he met Peralte in 1998 and bought large quantities of cocaine from him in the late 1990s, which James in turn sold. The relationship between James and Peralte deteriorated because James "ran off" with some of Peralte's cocaine in 2000 or 2001, and James owed Peralte $12,000 as a result. Nevertheless, according to James, in approximately August 2003, Peralte reinitiated his relationship with James, and directed James to meet him at the 4th Street residence. James went to the 4th Street residence where James wanted to sell Peralte his automobile as a way to get some money and to repay his debt to Peralte, but instead, at Peralte's insistence, James agreed to sell cocaine for Peralte to repay the debt. Peralte was distrustful of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

James because James "ran off" with Peralte's cocaine in 2000 or 2001, and as a result, Peralte accompanied James on a drive around Montgomery to make the actual cocaine sales. James testified that he sold "about a [kilogram] and a half" of Peralte's cocaine at that time. This occurred approximately six or seven days prior to the police surveillance and search of the 4th Street residence in this case. James also testified that he and Peralte had "made a lot of money together."

**\*\*4 [1]** Moreover, James testified that he had visited the 4th Street residence on multiple occasions other than the day of his arrest, and that on those occasions, sometimes Norman was present and sometimes, only Norman's girlfriend was present. Detective Chris Wingard ("Wingard") testified that the actual resident of the 4th Street house was a woman named Tammy Montgomery (" Montgomery"), Norman's girlfriend.[FN3]

> FN3. On appeal, Norman argues that this testimony was inadmissible hearsay. We review a district court's evidentiary rulings for abuse of discretion. *See* *United States v. Lyons,* 403 F.3d 1248, 1250 (11th Cir.), *cert. denied,* --- U.S. ----, 126 S.Ct. 732, 163 L.Ed.2d 576 (2005). Wingard testified without objection that Montgomery was the actual resident of the 4th Street house, but Norman objected to Wingard's testimony that Montgomery was Norman's girlfriend. Because James testified without objection that Montgomery was Norman's girlfriend, and thus that same evidence came in through another witness, we need not resolve the hearsay issue as the evidentiary error, if any, was harmless.

James further testified that Norman and Peralte had "started ... seeing each other," and "started dealing with each other," and that he believed the 4th Street residence was Norman's residence. Additionally, James testified that because he had **\*872** "ran off" with some of Peralte's cocaine and owed Peralte money, when James went to the 4th Street residence in the days prior to the search of the residence, both

Norman and Peralte were "telling jokes" about snakes. According to James, and taking all inferences in favor of the government, at the 4th Street residence, Norman and Peralte joked that James was like a snake because Peralte was taking another "chance on dealing [drugs] with [James]," despite the fact that "every time" Peralte had previously been engaged in drug activity with James, James had run off with Peralte's money or drugs.

Finally, James testified that Peralte told him that he could "get some money" by get[ting] [Peralte] some sales for some powder cocaine, and that James had " sold a lot of drugs for Peralte."

The jury convicted Norman and Peralte on all four counts of the indictment. The district court had the jury complete a special verdict form. For each count of conviction, the jury was instructed to answer a multiple-choice question regarding the quantity of relevant drugs that each defendant possessed or conspired to possess. The jury expressly found that both Norman and Peralte conspired to possess with intent to distribute between 3.5 and 5 kilograms of cocaine (Count 1); conspired to possess with intent to distribute between 2 and 3 grams of crack (Count 2); possessed with intent to distribute between 3.5 and 5 kilograms of cocaine (Count 3); and possessed with intent to distribute between 2 and 3 grams of crack (Count 4). Both Norman and Peralte moved for judgments of acquittal and judgments notwithstanding the verdicts, and the district court denied those motions.

On October 1, 2004, Norman and Peralte were sentenced. Prior to sentencing, a probation officer prepared a Pre-Sentence Investigation report ("PSI" ), utilizing the November 2003 edition of the United States Sentencing Guidelines. Norman's PSI recommended a base offense level of thirty, pursuant to U.S.S.G. §§ 2D1.1 and 3D1.2 and based on the amount of drugs that the jury attributed to Norman. The PSI also recommended a two-level increase in Norman's offense level based on the firearm that was found in the residence, for a total recommended offense level of thirty-two. Based on Norman's criminal history category of III,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866                                                                      Page 7

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

the PSI calculated Norman's guidelines range at 151-188 months' imprisonment.

**\*\*5** At sentencing, Norman's counsel objected to the quantity of drugs attributed to him by the jury and further objected to the proposed firearm enhancement. Norman's counsel also emphasized that Norman had no control over the premises where he was arrested and only had a right to go there because his girlfriend and child lived there, such that a minor role reduction was appropriate. The district court sustained Norman's objection regarding the firearm enhancement, but overruled his objection regarding the quantity of drugs and rejected the request for a minor role reduction.

After rejecting the firearm enhancement recommended by the PSI, the district court calculated Norman's offense level at thirty and his criminal history category at III, which placed Norman's guidelines range at 121-150 months' imprisonment. The district court then sentenced Norman to 121 months' imprisonment on each of the four counts, to be served concurrently. The district court specifically stated that it sentenced Norman to a 121-month term of imprisonment due to the nature of the offense, to deter future wrongful conduct, and to punish Norman.

Just as in Norman's case, Peralte's PSI recommended a base offense level of thirty, pursuant to U.S.S.G. §§ 2D1.1 and 3D1.2 and based on the amount of drugs that the jury had attributed to Peralte. **\*873** Likewise, Peralte's PSI also recommended a two-level increase based on the firearm found in the residence, such that Peralte's PSI recommended an adjusted offense level of thirty-two. Because Peralte's criminal history category was also III, the PSI calculated Peralte's guidelines range at 151-188 months' imprisonment.

Peralte objected to the PSI, arguing that pursuant to *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), he could not receive a firearm enhancement because the enhancement was not charged in the indictment. The district court sustained Peralte's objection to the firearm enhancement at sentencing, finding that the

evidence did not support the application of the enhancement. The district court subsequently calculated Peralte's offense level at thirty, his criminal history category at III, and his guidelines range at 121-151 months' imprisonment. The district court then sentenced Peralte to 145 months' imprisonment on each of the four counts, to be served concurrently. The district court stated that it sentenced Peralte to 145 months' imprisonment due to the nature of the offense and its seriousness, as well as to promote respect for the law based on Peralte's "criminal history in the drug crime area."

Norman and Peralte timely appealed.

## II. DISCUSSION

On appeal, Norman and Peralte argue that: (1) the district court erred in denying their motions to suppress the evidence recovered from the 4th Street residence; [FN4] (2) the evidence presented at trial was insufficient to support their convictions; and (3) the district court should have severed their trials. [FN5] Additionally, Norman argues that the search warrant for the 4th Street residence was invalid because it was obtained in violation of Rule 41 of the Federal Rules of Criminal Procedure, and Peralte argues that the district court improperly failed to grant him a jury instruction on the purported "buyer-seller" relationship between himself and James. [FN6] Finally, both appellants raise sentencing issues. Norman primarily argues that the district court erred in denying him a minor role reduction and in concluding that the drugs at the 4th Street residence were attributable to him (as opposed to his co-defendants). Peralte argues that the district court committed statutory error under *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), by sentencing him under a mandatory guidelines scheme.

> FN4. We review the denial of a motion to suppress evidence as a mixed question of law and fact. We review the district court's findings of fact for clear error and the district court's application of the law to those facts *de novo.* The facts are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866

Page 8

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

construed in favor of the party that prevailed in the district court. *SeeUnited States v. Perkins,* 348 F.3d 965, 969 (11th Cir.2003); *United States v. Hall,* 47 F.3d 1091, 1094 (11th Cir.1995).

FN5. We review the denial of a motion for severance for abuse of discretion. *United States v. Talley,* 108 F.3d 277, 279 (11th Cir.1997).

FN6. We review a district court's rejection of a proposed jury instruction for abuse of discretion. *United States v. Garcia,* 405 F.3d 1260, 1273 (11th Cir.2005).

**\*\*6** After oral argument and careful review of the record in this case, as well as the arguments of the parties in their briefs, we conclude that all of appellants' claims of error lack merit. Further discussion is warranted only as to appellants' motions to suppress, their argument that the government's evidence was insufficient to establish a conspiracy, and their sentencing claims.

**A. Motions to Suppress**

On appeal, appellants challenge the district court's denial of their motions to suppress**\*874** the evidence obtained pursuant to the search warrant. Appellants' main argument is that the warrant was not supported by probable cause.

[2] "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." *United States v. Brundidge,* 170 F.3d 1350, 1352 (11th Cir.1999). Furthermore, " '[p]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts.' " *Id.* (citation and alterations omitted). "Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin,* 297 F.3d 1308, 1314 (11th Cir.2002).

In this case, Conway's affidavit in support of the search warrant stated that probable cause existed because: (1) the police received an anonymous telephone call that drug activity was ongoing at the 4th Street residence; (2) the anonymous caller informed police that drug activity at the residence increased when a black male driving a maroon vehicle arrived at the residence; (3) Conway observed Norman exit the residence and place an object in the trash can; (4) Conway's subsequent search of the trash can revealed a paper towel containing cocaine residue; and (5) Norman and James were known drug dealers in Montgomery. We readily conclude that the affidavit in this case was more than sufficient to establish probable cause. *SeeUnited States v. Vahalik,* 606 F.2d 99, 100 (5th Cir.1979)[FN7] ("The garbage produced syringes, needles, and other implements that contained traces of methamphetamine; these items, sifted from garbage bags that appellant had placed at the edge of the street for collection, provided the probable cause basis for issuance of the warrant for the subsequent search of appellant's residence.").

FN7. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this Court adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.

[3] Appellants also argue that Conway lied when he claimed to have discovered cocaine in the trash can. However, the magistrate judge heard the evidence and made a specific fact-finding that Conway went to the trash can and found the paper towel, which " looked like what [Conway] had seen Norman drop in the garbage can earlier." The magistrate judge also made a specific fact-finding that inside the paper towel, Conway found shavings of what appeared to be cocaine. The district court adopted the magistrate judge's findings of fact and the magistrate judge's recommendation that the motions to suppress be denied. The findings of fact were supported by the evidence and were not clearly erroneous, and as such we reject appellants' argument that Conway lied as without merit.[FN8]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

FN8. Appellants' argument that the warrant was improperly signed is also without merit and is not discussed further.

**\*\*7** Because probable cause supported the search warrant in this case, the district court properly denied appellants' motions to suppress.[FN9]

FN9. We recognize that Norman also argues that his initial detention and Conway's patdown search were illegal. During his search of Norman's person, Conway removed Norman's cell phone on the chance that it was a weapon. Upon determining that Norman's phone was not a weapon, Conway immediately returned the phone to Norman. Additionally, Conway recognized the money for what it was during the patdown, and as such Conway did not remove the money from Norman's pocket during this initial search. We need not determine whether the detention and patdown search were illegal, because no evidence-neither Norman's cell phone, nor Norman's money, nor any statements made by Norman-was used as part of Conway's affidavit in support of the search warrant. As outlined above, probable cause existed for the search warrant and that probable cause consisted of the anonymous tip and Norman's placement of a paper towel with cocaine residue in the trash can, all of which occurred before the detention and patdown search. *See United States v. Davis,* 313 F.3d 1300, 1304 (11th Cir.2002) ("[E]ven if we assume that the initial search was invalid and that anything related to that search was the fruit of the poisonous tree, the gun's seizure was valid because it had been purged of the 'taint' of the allegedly illegal search. In other words, the firearm, which was recovered pursuant to an independent source, i.e., the third warrant, was admissible....").

**\*875 B. Conspiracy Convictions**[FN10]

FN10. We review a challenge to the sufficiency of the evidence *de novo,* taking all reasonable inferences in favor of the government and the jury's verdict of conviction. *United States v. Rudisill,* 187 F.3d 1260, 1267 (11th Cir.1999).

[4] The crux of appellants' attack on their conspiracy convictions is that the trial evidence at best established their "mere presence" at the 4th Street residence and thus was insufficient to establish either participation in a drug conspiracy or an intent to distribute the drugs located at the residence.

In order to sustain a drug conspiracy conviction, the government must establish that two or more people agreed to distribute the drugs; that the defendant knew of the general purpose of the agreement; and that the defendant knowingly and voluntarily joined the agreement. *See United States v. Simpson,* 228 F.3d 1294, 1298 (11th Cir.2000). "Because the crime of conspiracy is 'predominantly mental in composition,' " the crime is often provable only via circumstantial evidence. *United States v. Toler,* 144 F.3d 1423, 1426 (11th Cir.1998) (citation omitted). Additionally, although appellants are correct that "[m]ere presence alone ... is not indicative of a conspiracy," it is also true that a defendant's "presence is material and probative in the totality of the[ ] circumstances." *United States v. Jenkins,* 779 F.3d 606, 612 (11th Cir.1986).

Here, viewing the evidence in the light most favorable to the government, there is clearly sufficient circumstantial evidence to sustain both appellants' conspiracy convictions. Among other things, the evidence, in the light most favorable to the government, shows the following: An anonymous caller advised Conway that there was a maroon vehicle present at the 4th Street residence, and when that vehicle was present, there were generally drugs at the residence. The anonymous caller also told Conway that a black male named " Scooter" was at the 4th Street residence, and Norman's nickname was "Scooter." Shortly after the phone call, based on surveillance conducted as a result of the phone call, Norman was seen to exit the residence and deposit an object in the trash can

162 Fed.Appx. 866                                                                                          Page 10

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

directly outside the residence. The object thrown away by Norman was a wet paper towel containing crack residue. A subsequent search of the residence itself revealed several kilograms of cocaine (including three bricks of cocaine weighing approximately one kilogram each), a small amount (approximately two grams) of crack, cocaine packaging, digital scales, and over $70,000 in cash. Peralte and James were also located in the residence. The residence belonged to Norman's girlfriend. The maroon vehicle was Peralte's, and in a hidden compartment in Peralte's vehicle, there was cocaine packaging similar to the cocaine packaging found in the residence.

**\*876** With regard to Peralte's participation in the conspiracy, James testified that Norman and Peralte had "started ... seeing each other" and "started dealing with each other," and that he had met Peralte at the 4th Street residence to purchase cocaine from Peralte about six or seven days prior to the police search of the 4th Street residence. James further testified that at that time, Peralte accompanied James on a car ride around Montgomery to sell approximately one and a half kilograms of Peralte's cocaine to "various people," and that previously, in the late 1990s, James had purchased large quantities of cocaine from Peralte and sold it in crack form. James also testified that Peralte told him that he could "get some money" by "get[ting Peralte] some sales for some powder" cocaine; that James had "sold a lot of drugs for Peralte"; and that James and Peralte had "made a lot of money together."

**\*\*8** As for Norman, the evidence also shows more than mere presence at a residence with large amounts of drugs. The evidence shows presence under a set of circumstances and with conversation that raises an inference that Norman intentionally and knowingly was involved in the drug conspiracy. Specifically, again, James testified that Norman and Peralte had "started ... seeing each other" and "started dealing with each other." James also testified that just a few days prior to the police search of the 4th Street residence, James had met Peralte at the 4th Street residence (which James believed to be Norman's residence) in order to obtain cocaine from Peralte to sell, and that he sold

about a kilogram and a half of Peralte's cocaine at that time. Additionally, the anonymous telephone call placed Norman at the residence at the time of drug activity, and indeed, Norman was at the residence with drugs. More importantly, on the day that cocaine was seized from the residence, Norman exited the residence with a paper towel containing cocaine residue. Further, James testified that during his time at the 4th Street residence in the six or seven days prior to the police search of the residence, both Norman and Peralte were joking that James was like a snake in that Peralte was once again willing to participate in drug activity with James even after James had previously stolen from Peralte. This circumstantial evidence was sufficient to support the conclusion that Norman and Peralte were involved in the distribution of drugs from the 4th Street residence and that Norman allowed Peralte to use his girlfriend's residence to sell drugs and cook crack.

As this Court has said numerous times, "[a] conspiracy conviction will be upheld if there is sufficient positive indication that an illegal agreement exists, or when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." *United States v. Figueroa,* 720 F.2d 1239, 1246 (11th Cir.1983) (internal citation omitted); *see also* *United States v. Parrado,* 911 F.2d 1567, 1570 (11th Cir.1990). Moreover, "in elaborating on the mere presence defense, this [C]ourt has stated " that

[i]n most cases ... the evidence establishes not mere presence but presence under a particular set of circumstances. In such a case the task of determining the sufficiency of the evidence is not aided by the ritualistic invocation of the "mere presence" rubric. Rather, it requires an examination of all of the proved circumstances, including presence, to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation.

*Parrado,* 911 F.2d at 1570 (quotation marks and citation omitted). Here, the **\*877** evidence reflects more than just both Norman's and Peralte's presence

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

at the 4th Street residence; instead, the circumstances of their presence, as shown by that evidence, are such that a reasonable jury could have inferred that they were both knowing and intentional participants in an agreement with each other and with James to distribute cocaine and crack.

### C. Sentencing

**\*\*9** [5] We first address Norman's argument that the district court erred in "attributing all relevant conduct" to him, particularly with regard to the drug quantity determinations.[FN11] According to Norman, the evidence failed to demonstrate that he had any "authority, possession, or control over the residence" or knowledge about the drugs in the residence, such that his base offense level should not have exceeded twelve (the appropriate base offense level for a cocaine offense for which no drug quantity can be attributed). *See*U.S.S.G. § 2D1.1(c)(14) (2003). However, as discussed above, we reject Norman's argument that he was "merely present" at the 4th Street residence. Moreover, the drug quantity determinations were made by the *jury,* not by the district court, such that *Blakely* and *Booker* are not implicated by Norman's argument, and the drug quantity determinations themselves were amply supported by the testimony of Clyde Norwood ("Norwood"), a forensic chemist.

> FN11. We review Norman's objection to the district court's drug quantity determinations for clear error. *United States v. Rodriguez,* 398 F.3d 1291, 1296 (11th Cir.), *cert. denied,*--- U.S. ----, 125 S.Ct. 2935, 162 L.Ed.2d 866 (2005).

Indeed, Norwood testified at trial to his analysis of each of the substances seized by the police from the 4th Street residence where Norman was arrested. Specifically, Norwood testified that: (1) the paper towel contained crack cocaine residue; (2) the three bricks taken from the dryer contained 2,950 grams, or just under three kilograms, of cocaine; (3) the package taken from under the couch contained approximately 981 grams of cocaine; and (4) the package taken from the kitchen contained

approximately 2.1 grams of crack. All of these specific drug quantity calculations were included in the jury's verdict. Because the district court's drug quantity determination was based on the amount of drugs attributed to Norman by the jury, and because the evidence supports the jury's drug quantity determination, the district court did not clearly err in sentencing Norman based on those drug quantity determinations. [FN12]

> FN12. Norman's brief also asserts that the district court committed error pursuant to *Blakely* and *Booker,* by enhancing his sentence based on the firearm discovered in the residence. The district court specifically *declined* to impose a firearm enhancement, and thus this sentencing argument is without merit and not discussed further.

[6] The district court likewise did not clearly err in refusing to grant Norman a minor role reduction. [FN13] The sentencing guidelines provide for a four-level decrease in offense level if a defendant was a "minimal participant"; a two-level decrease if a defendant was a "minor participant"; and a three-level decrease for cases in between the two. U.S.S.G. § 3B1.2. A district court is required to assess whether a defendant was a minor or minimal participant with regard to the relevant conduct attributed to the defendant, and is further required to assess whether the defendant was a minor or minimal participant as compared to other identifiable participants in the relevant conduct attributed to the **\*878** defendant. *SeeUnited States v. De Varon,* 175 F.3d 930, 940-44 (11th Cir.1999) ( *en banc*). It is possible that there will be no minor or minimal participants. *Id.* at 944.

> FN13. We review a district court's denial of a minor role reduction for clear error. *United States v. De Varon,* 175 F.3d 930, 937 (11th Cir.1999) (*en banc*).

[7] Here, the district court expressly found that "the testimony and the evidence ..., would not support" a minor or minimal participant reduction for Norman

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

under U.S.S.G. § 3B1.2. Although Norman again argues that he was merely "present" at the 4th Street residence and was entitled to a minor role reduction, the evidence established otherwise. Indeed, although we do not again re-hash the evidence against Norman, we note that Norman was the only one of the three defendants actually seen by police with drugs in his possession (specifically, the paper towel). Moreover, the amount of drugs attributed to Norman as relevant conduct was the same amount of drugs that was located in the residence and the same amount of drugs that Norman was ultimately convicted of conspiring with Peralte to distribute from his girlfriend's residence. Accordingly, the district court did not clearly err in refusing to grant Norman a minor role reduction.[FN14]

> FN14. On appeal, Norman also argues in passing and for the first time that, pursuant to *Booker,* he was entitled to have a jury determine whether he should have received a minor role reduction. We review Norman's *Booker* claim for plain error. Norman's claim fails because (1) *Booker* did not create any right to jury determinations at sentencing, and (2) *Booker* involved the application of extra-verdict *enhancements* in a mandatory guidelines system, and not sentencing *reductions* in a mandatory guidelines system. *SeeRodriguez,* 398 F.3d at 1300-01. In any event, Norman has not shown that it was plain error for the district court, rather than the jury, to evaluate the appropriateness of the minor role reduction. We also note that Norman's counsel conceded at oral argument that a claim of statutory *Booker* error was not raised on appeal-in other words, a claim of error for Norman being sentenced under a mandatory guidelines scheme-because Norman was sentenced to the statutory mandatory minimum sentence. For the sake of thoroughness, we note that the statutory mandatory minimum sentence for a defendant convicted of violating 21 U.S.C. §§ 841 and 846 is ten years, or 120

months, when that defendant has a prior felony drug conviction and the offense at issue involves between 500 grams and 5 kilograms of cocaine. *See*21 U.S.C. § 841(b)(2)(B)(ii)(II). Norman was sentenced to 121 months' imprisonment, which was at the bottom end of his guidelines range, but one month more than his statutory mandatory minimum sentence. Because Norman does *not* raise a statutory *Booker* claim, we do not reach the merits of such a claim.

**\*\*10** Finally, we address Peralte's argument that the district court committed *Booker* error by sentencing him under a mandatory guidelines regime. There are two types of *Booker* error, constitutional and statutory. *United States v. Mathenia,* 409 F.3d 1289, 1291-92 (11th Cir.2005). "The constitutional error is the use of extra-verdict enhancements to reach a guidelines result that is binding on the sentencing judge; the error is in the mandatory nature of the guidelines once the guidelines range has been determined." *United States v. Rodriguez,* 398 F.3d 1291, 1301 (11th Cir.), *cert. denied,*--- U.S. ----, 125 S.Ct. 2935, 162 L.Ed.2d 866 (2005). Meanwhile, "statutory error occurs when the district court sentences a defendant 'under a mandatory guidelines scheme, even in the absence of a Sixth Amendment enhancement violation.' " *Mathenia,* 409 F.3d at 1291 (citation omitted). Given that the jury determined the drug quantities, and given that the district court denied the government's request for a firearm enhancement, there were no extra-verdict enhancements. Thus, Peralte raises a claim of *Booker* statutory error.

[8] Because Peralte raised his *Booker* claim in the district court, we review the **\*879** claim *de novo.* Here, the government correctly concedes that the district court committed statutory *Booker* error by sentencing Peralte under a mandatory guidelines system. However, the government argues that such error was harmless.

There are different harmless error standards for claims of constitutional *Booker* error and claims of statutory *Booker* error. *Mathenia,* 409 F.3d at 1291. Here, we apply the "less demanding test that is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866                                                              Page 13

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

applicable to non-constitutional" (i.e., statutory) errors. *Id.* at 1292. Statutory *Booker* error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the sentence, or had but very slight effect. If one can say with fair assurance that the sentence was not substantially swayed by the error, the sentence is due to be affirmed even though there was error.

*Id.* (quotation marks, alterations, and citations omitted). The government bears the burden of showing that the statutory *Booker* error was harmless.[FN15] *Id.*

> FN15. For preserved claims of constitutional *Booker* error, the government must meet the more demanding burden of showing "beyond a reasonable doubt ... that the error did not contribute to the defendant's ultimate sentence." *Mathenia,* 409 F.3d at 1291.

This Court has previously found statutory *Booker* error to be harmless. For instance, in *United States v. Gallegos-Aguero,* 409 F.3d 1274, 1277 (11th Cir.2005), we found statutory *Booker* error harmless where the district court sentenced the defendant to the highest sentence available under the applicable guidelines range and expressly considered sentencing the defendant to the statutory maximum. Similarly, in *United States v. Mejia-Giovani,* 416 F.3d 1323, 1326 (11th Cir.2005), we found statutory *Booker* error harmless where the defendant was sentenced in the middle of the applicable guidelines range and the district court expressly stated at sentencing that the defendant was at risk for an upward departure; that its patience with the defendant was running thin; and that it saw no potential benefit in the defendant's argument that the guidelines should not be applied. *Cf.United States v. Glover,* 431 F.3d 744, 2005 U.S.App. LEXIS 25675, at \*10-14 (11th Cir.2005) (statutory *Booker* error not harmless where district court imposed sentence in middle of applicable guidelines range and there were no statements in the record suggesting that the district court would have imposed the same or greater

sentence under an advisory guidelines scheme).[FN16]

> FN16. In *United States v. Cain,* 433 F.3d 1345, 2005 U.S.App. LEXIS 28882, at \*5-9 (11th Cir.2005), this Court concluded that constitutional *Booker* error was not harmless even though the district court had imposed a sentence at the top of the applicable guidelines range. However, in *Cain,* the district court made no statement indicating that it would have imposed the same or a higher sentence if it had possessed the discretion to do so. Instead, the district court merely stated that a sentence at the high end of the guidelines was " 'appropriate.' " *Id.* at ----, 2005 U.S.App. LEXIS 28882, at \*9. Moreover, in *Cain,* we expressly declined to consider whether the outcome might have differed if the defendant had raised a claim of statutory *Booker* error instead of his claim of constitutional *Booker* error. *Id.* at ----, 2005 U.S.App. LEXIS 28882, at \*8 n. 3.

\*\*11 Here, we conclude that there are sufficient statements in the record showing that the district court would have imposed the same sentence under an advisory guidelines scheme. The record shows that Peralte's final guidelines range was 121-150 months' imprisonment. The middle of the guidelines range was 135.5 months. Norman and Peralte had identical offense levels and criminal history categories, and the district court sentenced Norman to the low end of the identical guidelines range (121 months' imprisonment). Peralte's \***880** counsel specifically argued at Peralte's sentencing that Norman's just-imposed 121-month sentence favored an identical (low end) sentence for Peralte. However, the district court rejected that request and sentenced Peralte to the higher end of the guidelines range (145 months' imprisonment).

In imposing its sentence, the district court specifically stated that the 145-month sentence was " imposed due to the nature of the offense and to reflect the seriousness of the offense," and further stated that the sentence was based on Peralte's "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

162 Fed.Appx. 866

162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))
**(Cite as: 162 Fed.Appx. 866)**

Page 14

criminal history in the drug crime area to promote respect for the law."

In addition, after the district court imposed its 145-month sentence, it solicited final objections. Peralte's counsel argued this time that Peralte was at worst entitled to a sentence of 139 months' imprisonment, which Peralte's counsel termed the middle of the guidelines range, because Peralte's PSI had initially recommended that he receive a mid-range sentence (albeit within the higher recommended guidelines range of 151-188 months' imprisonment).[FN17] The district court rejected this final argument and imposed the 145-month sentence as stated.

> FN17. We note that, in actuality, the PSI did not recommend a mid-range sentence for Peralte.

Accordingly, the record clearly shows that the district court recognized that it had the authority and discretion to reduce Peralte's sentence from 145 months' imprisonment to either the mid-range sentence of approximately 135 months' imprisonment or the low end sentence of 121 months' imprisonment. However, the district court twice refused to do so. More importantly, the district court explicitly stated that the 145-month sentence was imposed due to the nature of the offense, the seriousness of the offense, Peralte's criminal history, and to promote respect for the law. Thus, the record adequately indicates that the district court would have imposed the same 145-month sentence under an advisory guidelines regime, and we conclude that the statutory *Booker* error in this case "did not affect [Peralte's] sentence, or had but very slight affect." *Mathenia,* 409 F.3d at 1290 (quotation marks, alteration, and citations omitted).

### III. CONCLUSION

For all of the above reasons, we affirm appellants' convictions and sentences.

**AFFIRMED.**

C.A.11 (Ala.),2006.
U.S. v. Norman
162 Fed.Appx. 866, 2006 WL 53801 (C.A.11 (Ala.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**RECORD NO. 04-15292-JJ**

𝕴𝖓 𝕿𝖍𝖊

# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝕺𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

𝕱𝖔𝖗 𝕿𝖍𝖊 𝕰𝖑𝖊𝖛𝖊𝖓𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

## ALPHONSO NORMAN, a.k.a. Scooter,

*Defendant – Appellant.*

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF GEORGIA
### AT MONTGOMERY

---

### PETITION FOR REHEARING *EN BANC*

---

**Marcia G. Shein**
**ATTORNEY AT LAW**
**2392 North Decatur Road**
**Decatur, GA  30033**
**(404) 633-3797**

*Counsel for Appellant*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  gibsonmoore@comcast.net

**GOVERNMENT EXHIBIT**

CASE NO.  03-229-N

EXHIBIT NO.  AA

## UNITED STATES vs. ALPHONSO NORMAN
## CASE NO. 04-15292-JJ

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, and Federal Rules of Appellate Procedure 26.1, Undersigned Counsel certifies that the following persons and parties have an interest in the outcome of this case. These representations are made so that the Judges of this Court may evaluate possible disqualification or recusal pursuant to the Court's local rules.

1.    United States District Court Judge Mark E. Fuller

2.    United States Magistrate Judge Hon. Susan Russ Walker

3.    Assistant United States Attorney/Counsel for Government Lewis V. Franklin, Sr., Todd A. Brown

4.    NORMAN, Alphonso.

      Defendant / Appellant

5.    PERALTE, Capulco

      Co-Defendant

6.    MADISON, Billy

      Trial Counsel for Appellant Norman

7.    SHEIN, Marcia and MILLER, Cloud H. III.

      Appellate Counsel for Appellant Norman

(C1 of 2)

With respect to this Appeal, there are no corporate entities for purposes of disclosure.

(C2 of 2)

## STATEMENT IN SUPPORT OF SUGGESTION FOR REHEARING

I express belief, based on recent study and studied professional judgment that this appeal involves one or more questions of exceptional importance and the panel decision conflicts interpretation of decisions of this Court to which the petition is addressed and consideration by the full court is therefore necessary to secure and maintain uniformity of the Court's decisions:

I.   Whether the Court of Appeals' decision that the evidence in this case

was sufficient to support the conviction was incorrectly analyzed against

Eleventh Circuit precedent and the decision creates a conflict in the

standard of review applied to sufficiency of the evidence review.

II.  Whether a warrant signed by a municipal judge, and not a federal or state

court judge, violates Rule 41 of the Federal Rules of Criminal Procedure

when federal law enforcement officers are involved in the case.

Marcia G. Shein, Esquire
Law Office of Marcia G. Shein
Georgia Bar No. 639820
Federal Bar No. 53667
2392 North Decatur Road
Decatur, GA 30033
(404) 633-3797
(404) 633-7980 (Fax)

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND

    CORPORATE DISCLOSURE STATEMENT .................................................. C-1

STATEMENT IN SUPPORT OF SUGGESTION

  FOR REHEARING ......................................................................................... i

TABLE OF CONTENTS ................................................................................... ii

TABLE OF CITATIONS AND AUTHORITIES ................................................ iii

STATEMENT OF THE ISSUES......................................................................... 1

STATEMENT OF THE CASE............................................................................. 2

   (i)  Course of Proceedings.............................................................................. 2

   (ii) Statement of the Facts ............................................................................ 4

ARGUMENTS AND CITATIONS OF AUTHORITY ........................................ 14

  Issue I....................................................................................................... 14

  Issue II ..................................................................................................... 21

CONCLUSION ................................................................................................... 29

CERTIFICATE OF SERVICE

# TABLE OF CITATIONS

**CASE AUTHORITY**                                                                                           **Page**

Johnson v. United States,

      520 U.S. 461, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997) ........................... 23

Lustig v. United States,

      338 U.S. 74, 69 S.Ct. 1372 (1949) ....................................................... 24, 25, 27

Marsaro v. United States,

      538 U.S. 500, 1235 Ct. 1690 (2003) ............................................................. 24

Navarro v. United States,

      400 F.2d 315 (5th Cir. 1968) .................................................................. 24, 25

Stewart v. State,

      420 So. 2d.162 (Fla. 1982) ........................................................................ 24

United States v. Burke,

      517 F.2d 377 (2d Cir. 1975) ....................................................................... 23

United States v. Figueroa,

      720 F.2d 1239 (11th Cir. 1983) ............................................................. 14, 15

United States v. Hanson,

      469 F.2d 1375 (5th Cir. 1972) .............................................................. 24, 27

United States v. Harris,

      20 F.3d 445 (11th Cir. 1994) ...................................................................... 17

United States v. Hernandez,

    896 F.2d 513 (11th Cir. 1990) *cert. denied*,

    498 U.S. 858, 111 S.Ct. 159 (1990)................................................................. 19

United States v. Jenkins,

    779 F.2d 606 (11th Cir. 1986) .................................................... 10, 15, 18

United States v. Lejarde-Rada,

    319 F.3d 1288 (11th Cir. 2003) .................................................................. 23

United States v. Leon,

    468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)............................ 23

United States v. Loyd,

    721 F.2d 331 (11th Cir.1983) ............................................................ 22, 23

United States v. Newton,

    44 F.3d 913 (11th Cir. 1995) ..................................................................... 17

United States v. Olano,

    507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993)......................... 23

United States v. Parrado,

    911 F.2d 1567 (11th Cir. 1990) .......................................................... 14, 15

United States v. Perex-Tostoff,

    36 F.3d 1550 (11th Cir. 1994) ................................................................... 18

United States v. Pintados,

     17 F.2d 1501 (11th Cir. 1983) ...................................................................... 18

United States v. Reyes,

     595 F.2d 275 (5th Cir. 1979) ...................................................................... 19

United States v. Sarro,

     742 F.2d 1286 (11th Cir. 1984) ...................................................................... 17

United States v. Simpson,

     228 F.3d 1294 (11th Cir. 2000) ...................................................................... 15

United States v. Stanley,

     24 F.3d 1314 (11th Cir. 1994) ............................................................... 18, 19

United States v. Stefanson,

     648 F.2d 1231 (9th Cir.1981) ...................................................................... 22

United States v. Sullivan,

     763 F.2 1215 (11th Cir. 1985) ...................................................................... 18

United States v. Thomas,

     8 F.3d 1552 (11th Cir. 1993) ...................................................................... 19

United States v. Toler,

     144 F.3d 1423 (11th Cir. 1998) ...................................................................... 10

United States v. Vonn,

     535 U.S. 55, 122 S.Ct. 1043 (2002)............................................................... 24

## STATUTES

21 U.S.C. § 841(a)(1) ............................................................... 2, 3

21 U.S.C. § 846 ........................................................................ 2, 3

21 U.S.C. § 853 ........................................................................... 3

## ELEVENTH CIRCUIT RULES

Rule 26.1-1 ............................................................................ C-1

## FEDERAL RULES OF APPELLATE PROCEDURE

Rule 26.1 ............................................................................... C-1

## FEDERAL RULES OF CRIMINAL PROCEDURE

Rule 41 ............................................................................. passim

## UNITED STATES SENTENCING GUIDELINES

U.S.S.G. 2D1.1 (b)(2) ............................................................... 3

## STATEMENT OF THE ISSUES

### ISSUE I

WHETHER THE COURT OF APPEALS' DECISION THAT THE EVIDENCE IN THIS CASE WAS SUFFICIENT TO SUPPORT THE CONVICTION WAS INCORRECTLY ANALYZED AGAINST ELEVENTH CIRCUIT PRECEDENT AND THE DECISION CREATES A CONFLICT IN THE STANDARD APPLIED TO THE SUFFICIENCY OF THE EVIDENCE REVIEW.

### ISSUE II

WHETHER A WARRANT SIGNED BY A MUNICIPAL JUDGE, AND NOT A FEDERAL OR STATE COURT JUDGE, VIOLATES RULE 41 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE WHEN FEDERAL LAW ENFORCEMENT OFFICERS ARE INVOLVED IN THE CASE.

## STATEMENT OF THE CASE

**A.    Course of Proceedings and Dispositions**

On October 29, 2003 a four (4) count indictment was filed in the United States District Court for the Middle District of Alabama, Northern Division charging the Defendant/Appellant and others with, Count I - from an unknown date and continuing to about the month of September 2003, in Montgomery County Alabama in the Middle District of Alabama, the Defendant did knowingly conspire and agree together with persons known and unknown to the grand jury to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846; Count 2 - conspiracy to possess with intent to distribute a mixture or substance containing detectable amount of cocaine base (crack) in violation 21 U.S.C. § 841(a)(1) all in violation of 21 U.S.C. § 846; Count 3 - on or about September 25, 2003 in Montgomery County, within the Middle District of Alabama, the Defendant did knowingly possess and intend to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine hydrochloride in violation of 21 U.S.C. § 841(a)(1); and Count 4 - on or about September 25, 2003 in Montgomery County, in the Middle District of Alabama, the Defendant did knowingly and intentionally possess with intent to

2

distribute a mixture or substance containing a detectable amount of cocaine base (crack) in violation of 21 U.S.C. § 841(a)(1)(R-47; J.A. 1).

The indictment contained a forfeiture allegation indicating that upon conviction for violation of 21 U.S.C. § 846 and 841(a)(1), as alleged in Counts 1-4 of the indictment, that the Defendant would forfeit to the United States, pursuant to 21 U.S.C. § 853, any and all property constituted or derived from any proceeds the Defendant obtained directly or indirectly as a result of the violation of the aforementioned statutes.

Appellant was arrested by the Montgomery Police Department on September 25, 2003. His jury trial began on July 12, 2004 and ended on July 14, 2004. He was found guilty on July 14, 2004 of Counts 1, 2, 3, and 4.

A presentence report was prepared and objections were filed concerning. 1) Two points for possessing a weapon during a drug crime, U.S.S.G. 2D1.1 (b)(2); 2) Relevant conduct as to drug quantity; and 3) Role in the offense (minor or minimal).

Sentencing occurred on October 1, 2004 and the Court imposed a sentence of 121 months to be served concurrently with each of the counts of conviction (R-252; J.A. 22).

Appellant was sentenced to ten (10) years in prison (R-252). He is presently incarcerated at FCI Memphis.

3

In an unpublished opinion dated January 11, 2006 this Honorable Court, in a per curium panel decision, asserted that the Appellant's conviction and sentence should be affirmed. Specific to the Court's findings as to Issue I was a substantial number of inferences that could be easily interpreted as complete acts of innocence which does not comply with the standards of review this Court has previously used in making decisions and determining sufficiency of the evidence in conspiracy cases.

Additionally, this Court failed to review the question of the Rule 41 violation and, therefore, it is a significant issue of consequence to the Appellant and to this Court. One or both issues should be heard by the whole court.

**B.    Statement of Facts**

This case begins with an anonymous telephone call to the Montgomery, Alabama Police Department drug task force concerning allegations of drug trafficking in a residence located at 2429 East 4th Street (R:TT;pp 7). After receiving the anonymous phone call officers from HIDTA, a federal task force connected to the Montgomery PD, decided to surveille the residence. In the process of doing so they made a "sting" telephone call to the number given by the anonymous tipster. The phone number provided was incorrect and the call went to a different residence than the residence where Appellant was located. The caller told the person at the wrong number that the police were coming. This call was an

4

attempt by the police to see if there would be individuals who would leave the residence after the phone call was initiated (R:TT;pp 60-62). After the phone call was made, Appellant coincidentally exited the residence he was visiting, threw something in the trash, and returned to the residence. Police officers, having observed Appellant exit the house and return, admitted that his conduct had nothing to do with the telephone call made to flush people out of the residence (R:TT;pp 62). Upon observing Appellant throwing something in the trash, the police officers approached the residence. After a "knock and talk" confronting Appellant, the officers went to the trashcan at the curb and removed a "wet paper towel" with residue on it that field tested positive for cocaine at the scene (R:TT;pp 60-65). (Officers also testified that the paper towel was in a plastic bag (R:TT;p 220) or a "rag, papertowel, whatever" (R-94;p 47 and 49)). Appellant and co-defendant James were questioned on the front porch of the residence before the trash was searched. Officers requested a search of the residence, which Appellant refused. The officers also searched his person for weapons and found none. The police officers admitted that Appellant and James were in a "custodial situation and were not free to go back into the house" (R:TT;pp 64).

Miranda rights were never read despite Appellant's request for a lawyer and his custodial status. A search warrant was obtained while Appellant and James were being held on the front porch and after the search of the trash.

Upon a search of the residence, Sgt. Drummond located a digital scale in the washing machine, a plastic bag with some type of grease in it in the washing machine, and a bundle of cash (R:TT;pp 107). He also located three (3) solid bricks of cocaine hydrochloride and a plastic bag that contained cocaine in the dryer (R:TT;pp 105-106). He located some loose cocaine in the washing machine and the outer wrapping the cocaine was in (R:TT;pp 106-108). The total amount of money found was approximately $70,000.00 and three (3) kilos of cocaine. A search of the living room found another bundle of approximately one (1) kilogram of cocaine under the couch and a small amount of cocaine base found in one of the kitchen cabinets (R:TT;pp 109). Also seized at the residence above the stove was another digital scale with a small amount of cocaine base lying on a shelf in the kitchen (R:TT;pp 110, 112). No drugs were found on Appellant or in his vehicle (R:TT;pp 113-114).

Testimony at trial revealed that the alleged police phone call to the residence was never made because the anonymous phone caller provided an incorrect phone number. This anonymous call with false information was the entire police premise for investigating, surveilling, and eventually obtaining a search warrant (R:TT;pp 133). The search warrant was contested on the grounds that the search of the trashcan was illegal and not based on probable cause and the search of Appellant's pockets and the house were without probable cause (R:TT;pp 181).

A firearm was located at the residence in a closet and a sum of money were located in a hollowed out bedpost in one of the bedrooms (R:TT;pp 202-203). After several police officers testified to the above information, Andrew K. James was called to testify on behalf of the government. In his testimony James stated he had drug dealings with co-defendant Peralte (R:TT;pp 261). He testified that sometimes he received powder cocaine and sometimes he received crack cocaine from Peralte. He also testified that he dealt with Peralte as far back as 1998 up until the year 2001 (R:TT;pp 262). He testified that Appellant <u>did not</u> sell him any drugs but that he used to work for him "a long time ago" (R:TT;pp 265). Mr. James could offer no other evidence of any connection between Appellant, Peralte or himself as it related to the cocaine found in the residence or anywhere else (R:TT;pp 268). James and Peralte were heavily involved with each other in narcotics trafficking (R:TT;pp 280-287). At no time did Appellant's name enter into the picture concerning conspiracy, possession or trafficking in drugs with either Peralte or James during the time of this conspiracy.

Detective Wingard, a member of HIDTA and DEA, was called to testify regarding the search warrant, items seized, and statements made by cooperating witness, James (R:TT;pp 326-327). The statement James allegedly made to Wingard was, in fact, two statements suggesting Appellant's involvement in the offense. In one of the statements in 2001 James allegedly stated Peralte brought

drugs to Alabama and was getting some of his cocaine from Appellant Norman. Wingard further stated that James told him Appellant started dealing with Peralte directly and that Appellant Norman did not want to sell him any cocaine but did on occasions. James' statement at trial did not implicate Norman in any activity regarding the drugs found at the residence or the instant conspiracy. James never adopted the statement allegedly made to Wingard and, in fact, denied making same (R:TT;pp 331, 362).

After the close of the evidence, James was recalled as a rebuttal witness by Peralte's counsel and testified about his conflicting statements regarding Appellant Norman's involvement in drug activity. James reiterated his involvement with Appellant was limited to when he was in high school (R:TT;pp 359). Peralte's trial counsel asserted that James' testimony was inconsistent with his statement to officer Wingard. Therefore, in an attempt to clarify this issue, further questions were asked. James stated he did not recall saying the things that were in the written report of the statement prepared by Wingard (R:TT;pp 361).

> Q: Let me have you read a particular two sentences as well as a
>
> paragraph right there. Read it to yourself.
>
> A:  I already had read the two statements. These are two things
>
> on this piece of paper that I had told Mr. Wingard when I read it
>
> yesterday, I said I didn't recall saying. But it would have to

8

come from Norman - drugs would have to come from Norman. I told him I didn't remember. I waited and I tried to think and I tried to recollect, tried to recall, and I didn't recall saying that. He said well, you said it. I said I don't recall saying it. He said only thing I want you to do, Mr. James, is tell the truth. I said I don't remember telling you that. And he said, well, if you don't remember me telling you that, only say the truth...

Continuing to answer, James further stated

"Okay. Where he said about the dryer, I said Mr. Capulco put it in the dryer, I said I didn't say that. He said that's what I wrote down that you said. I said I didn't say that..."

Q: So what your testimony is here today is that you have no recollection of having told Mr. Wingard of Mr. Norman selling you drugs?

A: . . . yeah, I am certain that I did not say that. If I told . . .I told him yesterday, if I did say that I was mis - I mis - we got some kind of misunderstanding, because I was told him when he came over there to the facility, I said that me and Mr. Norman didn't do any drug transactions together, the only time we did drug transactions was when he was working for me. (R:TT;pp 362).

9

The reference to the drug transaction when Appellant Norman was working for James relates back to high school. James also testified that he did not know if Peralte and Appellant had any dealings together and did not remember telling Mr. Wingard any of that information (R:TT;pp 363). This clarification reveals that Appellant was not a part of the charged conspiracy or drug offenses.

As noted in the Court of Appeals opinion, the Court accurately cited the cases referencing crime of conspiracy being predominately mental in composition using circumstantial evidence. See United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998)(citations omitted). See also the Court's analysis of United States v. Jenkins, 779 F.2d 606, 612 (11th Cir. 1986) concerning presence is immaterial as probative facts and totality of the circumstances is applied. The Court asserted, among other things, the evidence in a light most favorable to the government showed that:

1.    An anonymous caller advised Conway that there was a maroon vehicle present at the 4th Street residence and when that vehicle was present, there were generally drugs at the residence. (Appellate Opinion ("Opinion"), p. 18). There was no evidence, however, that the Appellant drove that vehicle or that he had a relationship with that vehicle in the capacity of having known that it was part of drug dealing activity.

2.    The anonymous caller also told Conway the black male named Scooter was at the 4th Street residence and Norman's nickname was Scooter. (Opinion, p. 18). Though nicknames are common among different social groups in this country, they are not indicative of "drug dealing."

3.    Shortly after the phone call, based on surveillance conducted as a result of the phone call, Norman was seen to exit the residence and deposit an object in the trashcan directly outside the residence. (Opinion, p. 18). Significantly, the actions of Norman were not based on the phone call as the phone call was admittedly made to a wrong phone number. Norman's conduct was coincidental to that contact. Additionally, the object thrown into the trashcan was unknown. The Court of Appeals statement that the object thrown away by Norman was a wet paper towel containing crack residue is not a fact that was proven. There was no evidence that Norman threw away a paper towel. However, even assuming *arguendo* that the paper towel was the material thrown away by Norman, there are a number of explanations for such a condition on the paper towel including the fact that Norman may have wiped up a "spill" of water or other naturally absorbed substance resulting in pickup of some crack residue that may have been on the countertop of the cleaned surface. Since the residence was not that of Norman's there is no way of knowing how the "crack residue" got on the wet paper towel.

4.    A subsequent search of the residence itself revealed several kilograms of cocaine including three bricks of cocaine weighing approximately one kilogram each and a small amount, approximately two grams of crack cocaine, packing, digital scales and over $70,000 in cash. (Opinion, p. 18-19). Significantly, however, all of the cocaine that was found was hidden and there is no indication that Norman knew that the cocaine was present in the residence or that he had a relationship to the cash or the drugs. The court admits the maroon vehicle was Peralte's and not Appellant Norman's and that the cocaine packaged in that vehicle was that of Peralte. (Opinion, p. 19). There is no other evidence, even by inference, that Appellant had a relationship with Peralte or James in a capacity sufficient to have joined the charged conspiracy to possess with intent to distribute the narcotics found at the house where Appellant was located, which was not his residence. This residence was that of his girlfriend, but Appellant had no key to the residence and was merely visiting his son, a clear inference from the fact that his son was present in the residence when Norman was arrested.

The Appellate opinion indicated that the evidence shows presence under a set of circumstances and that raises an inference that Norman <u>intentionally</u> and <u>knowingly</u> was involved in the charged drug conspiracy. (Opinion,, p. 20) The Court referred to a statement that James testified that Norman and Peralte had started seeing and dealing with each other. As far as the evidence at trial indicates,

12

the statements that James made specifically exonerated Norman. The trial testimony identifies that Norman had not been dealing with Peralte. In fact, James' testimony indicates that Norman did not sell James any drugs but that Norman used to work for him, James, some time ago, a period of time outside the scope of the conspiracy (Trial Transcripts p. 265). James specifically testified that he and Peralte started dealing with each other. (Trial Transcript p. 261) A review of James' testimony is the only evidence supporting any kind of relationship between James, Peralte and the Appellant. His testimony clearly indicates there was no conspiracy where Norman was an active participant or furthered the goals of the conspiracy between James and Peralte. Therefore, it is difficult to understand how the Panel came to the conclusion there was some direct evidence of a relationship between Norman, Peralte, and James in any conspiratorial capacity.

## ARGUMENTS AND CITATIONS OF AUTHORITY

### ISSUE I

**WHETHER THE COURT OF APPEALS' DECISION THAT THE EVIDENCE IN THIS CASE WAS SUFFICIENT TO SUPPORT THE CONVICTION WAS INCORRECTLY ANALYZED AGAINST ELEVENTH CIRCUIT PRECEDENT AND THE DECISION CREATES A CONFLICT IN THE STANDARD APPLIED TO THE SUFFICIENCY OF THE EVIDENCE REVIEW.**

This Court has said that a conspiracy conviction would be upheld if "there was sufficient, positive indication that a illegal <u>agreement</u> exists, or when the circumstances at the scene of a conspiratorial activity is so obvious that knowledge of its character can fairly be attributed." <u>United States v. Figueroa</u>, 720 F.2d 1239, 1246 (11th Cir. 1983); <u>United States v. Parrado</u>, 911 F.2d 1567, 1570 (11th Cir. 1990).

In more recent cases, a conflict with this standard of review has become evident and the Court must look beyond the scope of these cases for determining whether a conviction should be upheld on minimal circumstantial evidence as applied to a conspiracy and the intent to further the goals of that conspiracy.

In the Opinion, several conflicting standards begin to emerge which can make any case swing in favor of a defendant or against a defendant. In fact, a review of cases similar to this case suggests that Norman's circumstances were equally definable as a person not participating in a conspiracy.

14

The Opinion talks about the mere presence at the scene as not being indicative of a conspiracy, however, the totality of the circumstances may imply a conspiracy. See <u>Jenkins</u>, *supra.* The Court also talks about the mental composition of a conspiratorial agreement (see <u>United States v. Simpson,</u> 228 F.3d 1294 (11th Cir. 2000)) as well as the basis of the evidence surrounding a person's presence at the scene of a conspiratorial activity. See <u>Figueroa</u> and <u>Parrado</u>, *supra*. This is the side of the case law review that is supportive of a finding that Norman should be convicted. However, what is missing from this analysis is the other side of the coin that these circumstances are just as easily interpreted as being benign in relationship to a conspiratorial agreement and the furtherance of a conspiracy. There is significant and substantial case law supporting the fact that the Appellant's conduct in this case would not create an inference of actually joining a conspiracy. Therefore, by leaving the standard of review so open-ended we lose perspective on some of the questions that arise in cases similar to Norman's as it relates to inferences that equally suggest that he did not participate in a conspiracy.

We can agree that Norman was present at his girlfriend's home visiting his son. He did not have a key to the residence. He walked out of the residence. not based on a telephone call, but instead based on coincidence, and threw something white in the trash. It was later determined that on this "paper towel," though it is still contested whether or not that is the item that Norman put in the trash, was

15

crack cocaine residue. This could have been obtained through wiping off a spilled drink on a countertop where drugs had been present in the past. Clearly this was not enough to support a substantial conspiracy in this case. A search of Norman produced nothing to indicate he was related to a drug conspiracy. The search of the car in the parking lot area had a hidden compartment. This car was not Norman's nor was there any indication that he knew that the car had drugs in it. James' testimony indicates that Norman had dealings with him in the past, but not during the course of this conspiracy in relation to drug activity. No one testified that Norman was sitting in the house visiting his son knowing drugs were present or were being transacted. Even if he was present and the drugs were present as well this does not mean he knowingly or willingly conspired or agreed to do anything to possess or distribute those narcotics. The evidence of James' testimony completely exonerates Norman in terms of what was going on in that house on that day. The search of the house indicates that the money and the drugs were hidden, and not in plain sight. These circumstantial pieces of evidence can equally determine that Norman had nothing to do with the conspiracy that James and Peralte had been involved in. This Court has equally decided that similar circumstantial evidence does not support a conviction. What makes this case a conviction and other cases not convictions? Is it the inference that can be drawn from the circumstances and should this be narrower in scope as the circumstances in this case show no

16

crack cocaine residue. This could have been obtained through wiping off a spilled drink on a countertop where drugs had been present in the past. Clearly this was not enough to support a substantial conspiracy in this case. A search of Norman produced nothing to indicate he was related to a drug conspiracy. The search of the car in the parking lot area had a hidden compartment. This car was not Norman's nor was there any indication that he knew that the car had drugs in it. James' testimony indicates that Norman had dealings with him in the past, but not during the course of this conspiracy in relation to drug activity. No one testified that Norman was sitting in the house visiting his son knowing drugs were present or were being transacted. Even if he was present and the drugs were present as well this does not mean he knowingly or willingly conspired or agreed to do anything to possess or distribute those narcotics. The evidence of James' testimony completely exonerates Norman in terms of what was going on in that house on that day. The search of the house indicates that the money and the drugs were hidden, and not in plain sight. These circumstantial pieces of evidence can equally determine that Norman had nothing to do with the conspiracy that James and Peralte had been involved in. This Court has equally decided that similar circumstantial evidence does not support a conviction. What makes this case a conviction and other cases not convictions? Is it the inference that can be drawn from the circumstances and should this be narrower in scope as the circumstances in this case show no

conspiratorial agreement or activity in furtherance of any conspiracy in which Appellant Norman participated?

This Court has decided that to determine whether there is sufficient evidence that supports a conviction the evidence and inferences are established in the light most favorable to the government. However, this Court will reverse if there is a lack of substantial evidence for which a reasonable fact finder could find guilt beyond a reasonable doubt. See United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994). Conspiracy convictions have been reversed in United States v. Sarro, 742 F.2d 1286 (11th Cir. 1984), where the defendant was shown to have known about the existence of the conspiracy, was present when overt acts were committed, and fled when the police came to the scene. Nevertheless, evidence of knowledge, presence, and flight, without proving the defendant knowingly agreed to participate in the conspiracy, was not sufficient to support a conviction. How is this different from Norman?

Association with a conspirator is not sufficient to convict a person of being a member of a conspiracy. Rather, a defendant must, in some manner, willfully associate himself in some way with the criminal venture and willfully participate in it as he would in something he wished to bring about. See United States v. Newton, 44 F.3d 913 (11th Cir. 1995). In Newton the government failed to prove that the defendant was a member of the drug and money laundering conspiracy even

17

though the defendant was an acquaintance of a principle member of the conspiracy

and had rented a house in his name which he then allowed the principle to occupy.

This evidence did not show any involvement in the illicit objects of the conspiracy.

Norman was present at his girlfriend's house with two individuals who had an

ongoing relationship in a drug conspiracy. What did the government prove to show

what Norman's conduct did in furtherance of the aims of the conspiracy, nothing.

See United States v. Perex-Tostoff, 36 F.3d 1550 (11th Cir. 1994). Mere presence

does not support a conspiracy conviction. See United States v. Sullivan, 763 F.2

1215 (11th Cir. 1985). Even in Jenkins mere presence did not support the

conviction. With the circumstantial evidence presented in this case the inferences

are equally sufficient to suggest that no conspiratorial agreement existed between

the Appellant and Peralte and James. There is no proof that Appellant was aware of

the purpose for which the other conspirators were trafficking drugs. Even presence

in the house, in a closet, and in the yard in which the marijuana was being

offloaded was not sufficient to support a conviction in United States v. Pintados,

17 F.2d 1501 (11th Cir. 1983). Where is the knowing possession of these drugs?

To prove the substantive offense of possession of cocaine with intent to distribute

the government had to prove and establish that Appellant had knowingly possessed

the cocaine and that he intended to distribute it. See United States v. Stanley, 24

F.3d 1314, 1319 (11th Cir. 1994). This Court has repeatedly held that a defendant's

association with co-defendants is insufficient to prove conspiracy or possession. See <u>United States v. Hernandez</u>, 896 F.2d 513, 519 (11th Cir. 1990) *cert. denied*, 498 U.S. 858, 111 S.Ct. 159 (1990); <u>United States v. Thomas</u>, 8 F.3d 1552 (11th Cir. 1993); <u>United States v. Stanley</u>, 24 F.3d 1314 (11th Cir. 1994). Guilt may not be assumed through close association with persons or through family relations, even if Appellant's girlfriend and son resided in a location that was being used for drug trafficking by Peralte and James. See <u>United States v. Reyes</u>, 595 F.2d 275, 280 (5th Cir. 1979). What evidence is there that Norman knowingly and willingly joined a conspiracy, not just to possess the cocaine but that he actually possessed it himself? What evidence is there that even if he was in the presence of drugs or the presence of co-conspirators involved in the conspiracy that he furthered the purpose of James and Peralte's conspiracy to distribute drugs? The answer to these question is "nothing." Appellant did not bring the drugs to the residence, the maroon car belonged to Peralte, and James testified that he was not involved with Norman in the trafficking of cocaine with Peralte.

It seems as though the interpretation of the evidence can swing either way depending on how you view the case law applied to the evidence. There must be something established more clearly when we look at inferences and circumstantial evidence when the case can be equally surmised in overturning the conviction as affirming it. In this case, the evidence is uncontested as to what Norman did, but

19

that evidence does not indicate an inference of knowledge in willingly joining the conspiracy or furthering its purpose. It is just as easy to suggest that Norman was using drugs and that he wiped off the residue from a line of cocaine he snorted or smoked more so than that he was participating in a large scale drug conspiracy as evidenced in James' and Peralte's conduct and what was found in a residence that did not belong to Norman. His girlfriend let two people use the house. Even if Norman knew they were using the house for drug trafficking this would not make him a participant in the conspiracy as evidenced by the fact that the person who was living in the house was not charged in the conspiracy.

The only evidence in this case is an anonymous tip, that was not corroborated except for the name "Scooter," and notification of a maroon vehicle, that did not belong to Norman, in the driveway. Therefore, the only reference would be to "Scooter." Secondly, Norman coincidentally walked out of the residence and threw something, not identified clearly by the agents, in a trashcan that later proved to contain a paper towel with crack <u>residue</u> on it. This action was not related to the phone call because the phone call was to the wrong number and the anonymous tip was not corroborated or checked out before the agents made the phone call to the wrong number. At any moment a person could be convicted or not depending on how one views the circumstantial evidence. Cases are varied and difficult to resolve, but this Court should take the time to look at the scope of the

law that this Circuit has decided where individual's cases have been overturned and apply that law to the facts in this case in evaluating whether the Court's opinion on the cases they used to affirm Norman's conviction was sufficient in light of seemingly contradictory precedent.

### ISSUE II

**WHETHER A WARRANT SIGNED BY A MUNICIPAL JUDGE, AND NOT A FEDERAL OR STATE COURT JUDGE, VIOLATES RULE 41 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE WHEN FEDERAL LAW ENFORCEMENT OFFICERS ARE INVOLVED IN THE CASE.**

The Court of Appeals opinion did not address this issue at all, stating in a footnote that it was "moot." (Footnote 8, Opinion, p. 17: "Appellant's argument that the warrant was improperly signed is also without merit and is not discussed further."). In fact, the issue is of substantial merit and is worthy of further review.

This issue was not raised on the Motion to Suppress, but was raised in a subsequent Supplemental Motion to Reopen the Motion to Suppress and a Motion for Out of Time Filing of Supplement to the Motion to Suppress (R-112 and R-175; J.A. 8 and 11). The Supplement to the Motion to Suppress and Out of Time Motion to Suppress were filed on March 24, 2004 (R-175 and R-180; J.A. 11 and 12). A Supplemental Motion for Out of Time Filing of the Supplement to Motion to Suppress was filed on April 9, 2004 (R-181; J.A. 12). The Government's Response to Defense Motion for Out of Time Filing and Supplemental Motion to

21

Suppress was filed on April 9, 2004 (R-180; J.A. 12). The Report and Recommendation of the Magistrate denying relief regarding this question and others to reopen the motion to suppress was denied on June 4, 2004 (R-197; J.A. 14). Objections to the Magistrate's Recommendation Denying the Supplemental Motion were filed on July 1, 2004 (R-204; J.A. 15). The Judge's order adopting the Magistrate's Report and Recommendation was filed on July 1, 2004 (R-216; J.A. 16).[1]

One of the issues raised in the Motion for out of time relief and supplementation of the Motion to Suppress was based on Rule 41 of the Federal Rules of Criminal Procedure. "[U]nless *a clear constitutional violation occurs,* noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that *the search might not have occurred or would not have been so abrasive if the rule had been followed,* or (2) there is *evidence of intentional and deliberate disregard of a provision in the Rule.*" United States v. Loyd, 721 F.2d 331, 333 (11th Cir.1983) (per curiam) (quoting United States v. Stefanson, 648 F.2d 1231, 1235 (9th Cir.1981) (citations omitted)) (emphasis added). In Loyd, suppression was denied because the violation of Rule 41 did not affect the occurrence or abrasiveness of the search, and there was "no

---

[1] The original Report and Recommendation of the Magistrate stated that it was granted in part and denied in part. This was amended by the Magistrate on July 1, 2004 denying the entire motion.

evidence to indicate bad faith or an intentional disregard of the rule." <u>Loyd</u>, 721 F.2d at 333; *cf.* <u>United States v. Leon</u>, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (holding that the exclusionary rule is inappropriate when agents executing a search warrant acted in good faith reliance on the validity of the warrant). In order to show prejudice in this context, a defendant must show that because of the violation of Rule 41 he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed. <u>United States v. Burke</u>, 517 F.2d 377, 386 (2d Cir. 1975).

In denying relief on this question, the Magistrate determined that the motion was filed out of time. However, there is plain error in denying the relief requested and this matter should be reviewed further. Under plain-error review, the defendant has the burden to show that "there is (1) 'error' (2) that is 'plain' and (3) that 'affects substantial rights.'" <u>United States v. Lejarde-Rada</u>, 319 F.3d 1288, 1290 (11th Cir. 2003) (quoting <u>United States v. Olano</u>, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776, 123 L. Ed. 2d 508 (1993)). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" <u>Id.</u> (quoting <u>Johnson v. United States</u>, 520 U.S. 461, 467, 117 S. Ct. 1544, 1549, 137 L. Ed. 2d 718 (1997)) (other internal quotation marks and citations omitted). Under plain-error review, the silent defendant has the burden "to

show the error plain, prejudicial, and disreputable to the judicial system." <u>United States v. Vonn</u>, 535 U.S. 55, 65, 122 S.Ct. 1043, 1050 (2002).

Furthermore, even though claims of ineffective assistance of counsel are mostly reserved for review pursuant to 28 U.S.C. § 2255, same can be considered by this Court when the evidence at the District Court level sufficiently establishes the claim without further need for evidence to be submitted, <u>Marsaro v. United States</u>, 538 U.S. 500, 1235 Ct. 1690 (2003) and <u>Stewart v. State</u>, 420 So. 2d.162 (Fla. 1982). Finally, a miscarriage of justice will occur if this matter is not reviewed and determined by this Court as it presents a novel issue of jurisprudence.

All of the officers, including Corporal Conway, were members or participants in HIDTA and the Montgomery Police Department Special Operations Division.[2] Because DEA agents and HIDTA agents were involved in the search of the garbage and the house for which Appellant suffers the consequences, the search was federal in the sense that federal officers "had a hand in it." <u>Lustig v. United States</u>, 338 U.S. 74, 78 69 S.Ct. 1372 (1949); <u>United States v. Hanson</u>, 469 F.2d 1375 (5th Cir. 1972); <u>Navarro v. United States</u>, 400 F.2d 315 (5th Cir. 1968).

---

[2] DEA 6 Form prepared on October 1, 2003 by Officer Sisson, Jr.. Officer Sisson testified that he was a narcotics investigator with the Montgomery Police Department investigating federal violations of federal law. See also Detention Hearing Transcript October 2, 2003 before Honorable Magistrate Judge Boyd as well as Testimony before Magistrate Judge Walker January 8, 2004 page 1 26.]

Rule 41(c)(1) states "a warrant shall issue only on an affidavit or affidavits sworn before a federal magistrate or state judge establishing the grounds for issuing the warrant. If the federal magistrate or state judge is satisfied that grounds for the application exists or that there is probable cause to believe that they exist, he shall issue a warrant identifying the property and naming or describing the person or place to be searched...." In <u>Navarro</u>, *supra,* City police officers obtained a search warrant for narcotics that were allegedly located in Navarro's home. The search warrant was not issued by a court of record. Shortly after obtaining the warrant, the city officer invited federal narcotics agents to participate in the execution of the warrant. The invitation was accepted and both city and federal officers conducted the search which revealed the narcotics. Navarro's subsequent conviction for illegal possession of narcotics was reversed because the narcotics were discovered during a federal search that had not been conducted in accordance with the requirements of Rule 41(a). In <u>Nevarro</u>, the Court turned to Justice Frankfurter's opinion in <u>Lusting</u> for a definition of a "federal search." The Honorable Justice Frankfurter stated, "[t]he crux of that doctrine is that a search is a search by a federal official if he had a hand in it. It is immaterial whether a federal agent originated the idea or joined in it while the search was in progress. So long as he was accomplished, he must be deemed to have participated in it. Where there is participation on the part of federal officers it is not necessary to consider

25

what would be the result if the search had been conducted entirely by State officers." 338 U.S. at 78-79.

A municipal judge's signature on the warrant violates Rule 41 of the Federal Rules of Criminal Procedure. Rule 41 specifically states that a magistrate with authority in the district or if none is reasonably available, a judge of a state court of record in the district has the authority to issue a warrant to search for and seize a person or property located within the district. (Rule 41(b)(1)). Throughout the remainder of the rule the term magistrate judge or state court judge of record is repeated as being the only authorities applicable to search warrants that have federal ties. Without the warrant there is no arrest, search, or seizure, and all of the evidence from same must be suppressed.

The government's assertion on this issue was that all of the police officers, even though members of the Federal Task Force, were employees of Montgomery Police Department and therefore their requirement to obtain a proper search warrant was inapplicable. (Government's Reply Brief at page 27).

On page 12 of the Government's Brief they state "Detective Wingard of the Montgomery Police Department's Narcotics Bureau is assigned to HIDTA Task Force. He explained that the task force participates in a DEA program to which money is made available to smaller law enforcement agencies to purchase large amounts of drugs during investigations of mid or high level drug organizations."

The federal nexus of participation between DEA and HIDTA creates a federal task force which is required to follow federal procedure.

Further, the government stated in their brief that "Wingard assisted in the execution of the warrant, and received the evidence collected from Brad Bartlett. He then recorded all evidence on DEA paperwork and forwarded the drug evidence to DEA Regional Laboratory." (Government's Reply Brief at page 13.) The nexus between DEA and HIDTA cannot be ignored and places a burden on HIDTA agents to follow federal procedure. The fact that the case was filed federally reinforces this requirement.[3] *See* <u>Lustig</u>, 338 U.S. at 78; <u>United States v. Hanson</u>, 469 F.2d 1375 (5th Cir. 1972) and <u>Nevarro v. United States</u>, 400 F.2d 315 (5th Cir. 1968).

Clearly Rule 41 limits any warrants subject to Federal Court scrutiny to a federal magistrate or a state judge establishing the grounds for issuing the warrant. A municipal judge is not a state judge. He is not even necessarily a city judge.

It is important to note the multiple statements and the testimony of the agent's involvement in this investigation as it applies to the question before this Court. A municipal judge is not necessarily a state or federal judge. Several examples appear in the transcript including the following from the Trial Transcript,

---

[3] The government concedes that this issue can reviewed under the clearly erroneous standard of review applicable to suppression rulings pursuant to <u>U.S. v. Perkins</u>, 348 F.3d 965, 969 (11th Cir. 2003). (Government's Brief at 27)

p. 73, which states that HIDTA is a task force of the Montgomery police department along with the United States Drug Enforcement Administration. The testimony reveals that Mr. Wingard was a member of this task force and was the DEA task force agent. (See Trial Transcript, p. 26).

Further, Wingard referred to himself in his testimony as working with the HIDTA/DEA Task Force which stood for High Intensity Drug Trafficking Area and a DEA program set up for smaller agencies. (Trial Transcript p. 307). Also, on page 336, when discussing the duties of the HIDTA Task Force, the witness testified that it was to investigate mid-level or upper-level drug organizations primarily for federal prosecutions. Therefore, not only did this task force have federal members but was designed around federal prosecutions. With all due respect to the Panel opinion, this is a meritorious issue and is unique to the question of whether or not the probable cause to search was issued legally and in accordance with Federal Rules of Criminal Procedure and the Appellant's due process rights. It is respectfully requested that this issue is worthy of *en banc* review because of the nature of its significance to this and other prosecutions.

## **CONCLUSION**

Wherefore it is respectfully requested that this Honorable Court grant a

Rehearing *En Banc* on one or both issues.

Respectfully submitted,

Marcia G. Shein, Esquire
Law Office of Marcia G. Shein
Georgia Bar No. 639820
Federal Bar No. 53667
2392 North Decatur Road
Decatur, GA 30033
(404) 633-3797
(404) 633-7980 (Fax)

## CERTIFICATE OF SERVICE

This is to certify that I have, this date, sent two (2) copies of the foregoing

PETITION FOR REHEARING EN BANC to Assistant United States Attorney,

**TODD BROWN**
*Assistant United States Attorney*
One Court Square
Suite 201
PO Box 197
Montgomery, AL 36101-0197

by placing said copies in the United States Mail, with sufficient postage to ensure

delivery.

This 27th day of January, 2006

Respectfully submitted,

Marcia G. Shein, Esquire
Law Office of Marcia G. Shein
Georgia Bar No. 639820
Federal Bar No. 53667
2392 North Decatur Road
Decatur, GA  30033
(404) 633-3797
(404) 633-7980 (Fax)

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 04-15292

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 11, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00229-CR-F-N-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALPHONSO NORMAN,
a.k.a. Scooter,
CAPULCO PERALTE,
a.k.a. Debby B. Black,
a.k.a. Cappuccino,

Defendants-Appellants.

Appeals from the United States District Court
for the Middle District of Alabama

**(January 11, 2006)**

Before CARNES, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Alphonso Norman ("Norman") and Capulco Peralte ("Peralte") (collectively, "appellants") appeal their convictions and sentences for their roles in a three-person cocaine and crack distribution conspiracy. After review of the record and oral argument, we affirm.

## I. BACKGROUND

On September 25, 2003, an anonymous female tipster telephoned the Narcotics Bureau of the Montgomery, Alabama Police Department and informed Corporal J.T. Conway ("Conway") that there was drug activity ongoing at 2429 East 4th Street in Montgomery. The tipster advised Conway that a maroon vehicle with Florida license plates was present at the residence, and further advised Conway that the presence of that vehicle was an indication that drugs were at the residence. The tipster further stated that a black male named "Scooter" was at the residence, and in response to an inquiry from Conway, provided a phone number for the residence. Conway was previously aware that Norman, a black male, was associated with that area of 4th Street and was nicknamed "Scooter."

After receiving the anonymous tip, Conway assembled a group of Montgomery police officers to accompany him to the 4th Street residence for

2

surveillance purposes. The officers observed a maroon vehicle backed up beside the house. Conway then asked another officer to call the telephone number that had been provided by the anonymous tipster and to tell whomever answered that the police were coming to the house.[1]

The other officer informed Conway that the telephone call had been made in accordance with Conway's instructions. However, unbeknownst to the officers at the scene, the telephone number that was actually dialed was not the telephone number for the residence.[2] Nevertheless, despite the fact that the wrong number was dialed, just after the telephone call was completed, Norman coincidentally exited the 4th Street residence. Norman walked to the street, placed a white object into a curbside trash can located on the street in front of the house, and returned to the residence.

The officers waited a few additional minutes and observed no further activity. Conway then decided that he would initiate a "knock and talk," which is an investigative technique whereby an officer knocks on the door to a residence and attempts to gather information by explaining to the occupants the reason for

---

[1]There was testimony that this is an investigative tactic sometimes used by police to lure individuals suspected to be involved with drug activity out of a residence.

[2]There is evidence in the record that the correct phone number for the 4th Street residence was (334) 264-3277, while the phone number actually dialed during surveillance was (334) 262-3477.

3

the police interest.

Norman and Andrew Kenny James ("James") answered the door.  After Conway explained that the police had received a complaint of drug activity at the residence, he asked to search the residence.  Norman and James refused this request.

During their discussion with Norman and James, officers observed a young boy located in the front room, visible from where the officers were standing outside the door.  Also at this time, despite Conway's instructions to keep his hands out of his pockets, Norman continued to put his hands in his pockets.  Accordingly, Conway placed the young boy—who was later identified as Norman's son—behind Conway for the boy's safety; drew his weapon on Norman and James; and conducted a patdown search of Norman.  The search of Norman revealed a cell phone and money in Norman's pockets.

After the patdown search, Conway went to the curbside trash can located on the street in front of the house.  Inside the trash can, sitting on top of the can's contents, Conway found a wet paper towel with a residue that appeared to be cocaine.  Conway field-tested the paper towel, and it tested positive for cocaine.  Conway then instructed the other officers to detain Norman and James, and he left to obtain a search warrant for the residence.

4

While Conway was typing his affidavit in support of the search warrant, he received a call from one of the officers at the scene advising him that the officers had located a third person—Peralte—in the house. Officers apparently heard a noise inside the house, despite having detained Norman and James and despite having sent Norman's son to the care of a neighbor. Officers then entered the house and detained Peralte, and Conway revised his affidavit to include Peralte.

Conway's affidavit in support of the search warrant stated as probable cause for the search, among other things: (1) Conway received a telephone call from a subject "A" advising that drug activity was ongoing at the 4th Street residence; (2) "A" told Conway that drug activity at the residence increased when a black male driving a maroon vehicle arrived at the residence; (3) after A's phone call, Conway saw Norman exit the residence and place an object in the trash can; (4) Conway's subsequent search of the trash can revealed a paper towel containing cocaine residue; and (5) Norman and James were known drug dealers in Montgomery.

Conway brought the affidavit to a Montgomery Municipal Court judge and revised the affidavit (with the judge's permission) to include the vehicles at the residence. The judge then issued a search warrant that incorporated Conway's affidavit, and Conway called the other officers at the scene and instructed them to commence a search of the residence and the maroon vehicle.

5

In the residence, officers found a digital scale on top of the washing machine.  Inside the washing machine, officers located a plastic bag containing commercial packing grease and $2,900 in cash.  In the dryer, officers located three solid bricks of cocaine hydrochloride with a total weight of approximately three kilograms.  The cocaine bricks were yellow-brown in color and appeared to have been packed in grease but subsequently wiped clean.

Under the living room couch, officers located a package containing approximately one kilogram of cocaine hydrochloride.  This cocaine was inside one plastic zip-loc bag, covered with packing grease, and placed inside another zip-loc bag.  In the kitchen, officers located a two-gram package of cocaine base ("crack") in a cabinet, along with another digital scale.  Officers additionally discovered a hollowed-out bedpost that contained approximately $70,000 in cash, and a handgun in a closet near the front door.

Investigation revealed that the maroon vehicle with Florida license plates belonged to Peralte.  The search of the maroon vehicle revealed that the passenger side airbag had been removed in order to create a hidden compartment.  In the hidden compartment, officers found a zip-loc bag of the same type that held the cocaine that officers located under the living room couch.

The residue on the paper towel retrieved from the curbside trash can was

6

ultimately determined to be crack residue.

On October 29, 2003, a grand jury from the Middle District of Alabama returned a four-count indictment against Norman, Peralte, and James. Count One charged the defendants with conspiracy to knowingly and intentionally distribute and possess with intent to distribute 500 grams or more of cocaine hydrochloride, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged the defendants with conspiracy to knowingly and intentionally distribute and possess with intent to distribute a mixture or substance containing a detectable amount of crack, also in violation of 21 U.S.C. §§ 841(a)(1) and 846. Counts Three and Four charged the defendants with the acts of possession referenced in Counts One and Two of the indictment—specifically, knowing and intentional possession with the intent to distribute 500 grams or more of cocaine (Count Three), and knowing and intentional possession with intent to distribute a mixture or substance containing a detectable amount of crack (Count Four), in violation of 21 U.S.C. § 841(a)(1).

In June 2004, James pleaded guilty to Count One of the indictment. He subsequently testified for the government at the joint trial of Norman and Peralte.

Both Norman and Peralte filed pretrial suppression motions. The primary basis of their motions was that the anonymous telephone tip was unreliable and that probable cause did not exist for the search warrant. A magistrate judge

7

conducted a suppression hearing, and issued a report and recommendation that the motions to suppress be denied. Among other facts, the magistrate judge found that, as recounted by the police officers, there had been an anonymous tip about drug activity at the 4th Street residence and Conway had observed Norman exit the 4th Street residence and place a paper towel containing cocaine residue in the trash can. The district court adopted the magistrate's report and recommendation and denied the suppression motions. The case proceeded to trial in July 2004.

At trial, the above circumstances surrounding the surveillance and search of the 4th Street residence were introduced in evidence. Additionally, James testified that he met Peralte in 1998 and bought large quantities of cocaine from him in the late 1990s, which James in turn sold. The relationship between James and Peralte deteriorated because James "ran off" with some of Peralte's cocaine in 2000 or 2001, and James owed Peralte $12,000 as a result. Nevertheless, according to James, in approximately August 2003, Peralte reinitiated his relationship with James, and directed James to meet him at the 4th Street residence. James went to the 4th Street residence where James wanted to sell Peralte his automobile as a way to get some money and to repay his debt to Peralte, but instead, at Peralte's insistence, James agreed to sell cocaine for Peralte to repay the debt. Peralte was distrustful of James because James "ran off" with Peralte's cocaine in 2000 or

8

2001, and as a result, Peralte accompanied James on a drive around Montgomery to make the actual cocaine sales. James testified that he sold "about a [kilogram] and a half" of Peralte's cocaine at that time. This occurred approximately six or seven days prior to the police surveillance and search of the 4th Street residence in this case. James also testified that he and Peralte had "made a lot of money together."

Moreover, James testified that he had visited the 4th Street residence on multiple occasions other than the day of his arrest, and that on those occasions, sometimes Norman was present and sometimes, only Norman's girlfriend was present. Detective Chris Wingard ("Wingard") testified that the actual resident of the 4th Street house was a woman named Tammy Montgomery ("Montgomery"), Norman's girlfriend.[3]

James further testified that Norman and Peralte had "started . . . seeing each other," and "started dealing with each other," and that he believed the 4th Street residence was Norman's residence. Additionally, James testified that because he

---

[3]On appeal, Norman argues that this testimony was inadmissible hearsay. We review a district court's evidentiary rulings for abuse of discretion. See United States v. Lyons, 403 F.3d 1248, 1250 (11th Cir.), cert. denied, 126 S. Ct. 732 (2005). Wingard testified without objection that Montgomery was the actual resident of the 4th Street house, but Norman objected to Wingard's testimony that Montgomery was Norman's girlfriend. Because James testified without objection that Montgomery was Norman's girlfriend, and thus that same evidence came in through another witness, we need not resolve the hearsay issue as the evidentiary error, if any, was harmless.

9

had "ran off" with some of Peralte's cocaine and owed Peralte money, when James went to the 4th Street residence in the days prior to the search of the residence, both Norman and Peralte were "telling jokes" about snakes. According to James, and taking all inferences in favor of the government, at the 4th Street residence, Norman and Peralte joked that James was like a snake because Peralte was taking another "chance on dealing [drugs] with [James]," despite the fact that "every time" Peralte had previously been engaged in drug activity with James, James had run off with Peralte's money or drugs.

Finally, James testified that Peralte told him that he could "get some money" by get[ting] [Peralte] some sales for some powder" cocaine, and that James had "sold a lot of drugs for Peralte."

The jury convicted Norman and Peralte on all four counts of the indictment. The district court had the jury complete a special verdict form. For each count of conviction, the jury was instructed to answer a multiple-choice question regarding the quantity of relevant drugs that each defendant possessed or conspired to possess. The jury expressly found that both Norman and Peralte conspired to possess with intent to distribute between 3.5 and 5 kilograms of cocaine (Count 1); conspired to possess with intent to distribute between 2 and 3 grams of crack (Count 2); possessed with intent to distribute between 3.5 and 5 kilograms of

10

cocaine (Count 3); and possessed with intent to distribute between 2 and 3 grams of crack (Count 4). Both Norman and Peralte moved for judgments of acquittal and judgments notwithstanding the verdicts, and the district court denied those motions.

On October 1, 2004, Norman and Peralte were sentenced. Prior to sentencing, a probation officer prepared a Pre-Sentence Investigation report ("PSI"), utilizing the November 2003 edition of the United States Sentencing Guidelines. Norman's PSI recommended a base offense level of thirty, pursuant to U.S.S.G. §§ 2D1.1 and 3D1.2 and based on the amount of drugs that the jury attributed to Norman. The PSI also recommended a two-level increase in Norman's offense level based on the firearm that was found in the residence, for a total recommended offense level of thirty-two. Based on Norman's criminal history category of III, the PSI calculated Norman's guidelines range at 151-188 months' imprisonment.

At sentencing, Norman's counsel objected to the quantity of drugs attributed to him by the jury and further objected to the proposed firearm enhancement. Norman's counsel also emphasized that Norman had no control over the premises where he was arrested and only had a right to go there because his girlfriend and child lived there, such that a minor role reduction was appropriate. The district

11

court sustained Norman's objection regarding the firearm enhancement, but overruled his objection regarding the quantity of drugs and rejected the request for a minor role reduction.

After rejecting the firearm enhancement recommended by the PSI, the district court calculated Norman's offense level at thirty and his criminal history category at III, which placed Norman's guidelines range at 121-150 months' imprisonment. The district court then sentenced Norman to 121 months' imprisonment on each of the four counts, to be served concurrently. The district court specifically stated that it sentenced Norman to a 121-month term of imprisonment due to the nature of the offense, to deter future wrongful conduct, and to punish Norman.

Just as in Norman's case, Peralte's PSI recommended a base offense level of thirty, pursuant to U.S.S.G. §§ 2D1.1 and 3D1.2 and based on the amount of drugs that the jury had attributed to Peralte. Likewise, Peralte's PSI also recommended a two-level increase based on the firearm found in the residence, such that Peralte's PSI recommended an adjusted offense level of thirty-two. Because Peralte's criminal history category was also III, the PSI calculated Peralte's guidelines range at 151-188 months' imprisonment.

Peralte objected to the PSI, arguing that pursuant to Blakely v. Washington,

12

542 U.S. 296, 124 S. Ct. 2531 (2004), he could not receive a firearm enhancement because the enhancement was not charged in the indictment. The district court sustained Peralte's objection to the firearm enhancement at sentencing, finding that the evidence did not support the application of the enhancement. The district court subsequently calculated Peralte's offense level at thirty, his criminal history category at III, and his guidelines range at 121-151 months' imprisonment. The district court then sentenced Peralte to 145 months' imprisonment on each of the four counts, to be served concurrently. The district court stated that it sentenced Peralte to 145 months' imprisonment due to the nature of the offense and its seriousness, as well as to promote respect for the law based on Peralte's "criminal history in the drug crime area."

Norman and Peralte timely appealed.

## II. DISCUSSION

On appeal, Norman and Peralte argue that: (1) the district court erred in denying their motions to suppress the evidence recovered from the 4th Street residence;[4] (2) the evidence presented at trial was insufficient to support their

---

[4]We review the denial of a motion to suppress evidence as a mixed question of law and fact. We review the district court's findings of fact for clear error and the district court's application of the law to those facts de novo. The facts are construed in favor of the party that prevailed in the district court. See United States v. Perkins, 348 F.3d 965, 969 (11th Cir. 2003); United States v. Hall, 47 F.3d 1091, 1094 (11th Cir. 1995).

convictions; and (3) the district court should have severed their trials.[5]

Additionally, Norman argues that the search warrant for the 4th Street residence was invalid because it was obtained in violation of Rule 41 of the Federal Rules of Criminal Procedure, and Peralte argues that the district court improperly failed to grant him a jury instruction on the purported "buyer-seller" relationship between himself and James.[6] Finally, both appellants raise sentencing issues. Norman primarily argues that the district court erred in denying him a minor role reduction and in concluding that the drugs at the 4th Street residence were attributable to him (as opposed to his co-defendants). Peralte argues that the district court committed statutory error under <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738 (2005), by sentencing him under a mandatory guidelines scheme.

After oral argument and careful review of the record in this case, as well as the arguments of the parties in their briefs, we conclude that all of appellants' claims of error lack merit. Further discussion is warranted only as to appellants' motions to suppress, their argument that the government's evidence was insufficient to establish a conspiracy, and their sentencing claims.

---

[5]We review the denial of a motion for severance for abuse of discretion. <u>United States v. Talley</u>, 108 F.3d 277, 279 (11th Cir. 1997).

[6]We review a district court's rejection of a proposed jury instruction for abuse of discretion. <u>United States v. Garcia</u>, 405 F.3d 1260, 1273 (11th Cir. 2005).

14

## A.     Motions to Suppress

On appeal, appellants challenge the district court's denial of their motions to suppress the evidence obtained pursuant to the search warrant. Appellants' main argument is that the warrant was not supported by probable cause.

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location." United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999). Furthermore, "'[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts.'" Id. (citation and alterations omitted). "Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).

In this case, Conway's affidavit in support of the search warrant stated that probable cause existed because: (1) the police received an anonymous telephone call that drug activity was ongoing at the 4th Street residence; (2) the anonymous caller informed police that drug activity at the residence increased when a black male driving a maroon vehicle arrived at the residence; (3) Conway observed Norman exit the residence and place an object in the trash can; (4) Conway's

15

subsequent search of the trash can revealed a paper towel containing cocaine residue; and (5) Norman and James were known drug dealers in Montgomery. We readily conclude that the affidavit in this case was more than sufficient to establish probable cause. See United States v. Vahalik, 606 F.2d 99, 100 (5th Cir. 1979)[7] ("The garbage produced syringes, needles, and other implements that contained traces of methamphetamine; these items, sifted from garbage bags that appellant had placed at the edge of the street for collection, provided the probable cause basis for issuance of the warrant for the subsequent search of appellant's residence.").

Appellants also argue that Conway lied when he claimed to have discovered cocaine in the trash can. However, the magistrate judge heard the evidence and made a specific fact-finding that Conway went to the trash can and found the paper towel, which "looked like what [Conway] had seen Norman drop in the garbage can earlier." The magistrate judge also made a specific fact-finding that inside the paper towel, Conway found shavings of what appeared to be cocaine. The district court adopted the magistrate judge's findings of fact and the magistrate judge's recommendation that the motions to suppress be denied. The findings of fact were supported by the evidence and were not clearly erroneous, and as such we reject

---

[7]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all Fifth Circuit decisions rendered prior to October 1, 1981.

appellants' argument that Conway lied as without merit.[8]

Because probable cause supported the search warrant in this case, the district court properly denied appellants' motions to suppress.[9]

**B.    Conspiracy Convictions**[10]

The crux of appellants' attack on their conspiracy convictions is that the trial evidence at best established their "mere presence" at the 4th Street residence and thus was insufficient to establish either participation in a drug conspiracy or an intent to distribute the drugs located at the residence.

---

[8]Appellants' argument that the warrant was improperly signed is also without merit and is not discussed further.

[9]We recognize that Norman also argues that his initial detention and Conway's patdown search were illegal. During his search of Norman's person, Conway removed Norman's cell phone on the chance that it was a weapon. Upon determining that Norman's phone was not a weapon, Conway immediately returned the phone to Norman. Additionally, Conway recognized the money for what it was during the patdown, and as such Conway did not remove the money from Norman's pocket during this initial search.

We need not determine whether the detention and search were illegal, because no evidence—neither Norman's cell phone, nor Norman's money, nor any statements made by Norman—was used as part of Conway's affidavit in support of the search warrant. As outlined above, probable cause existed for the search warrant and that probable cause consisted of the anonymous tip and Norman's placement of a paper towel with cocaine residue in the trash can, all of which occurred before the detention and patdown search. See United States v. Davis, 313 F.3d 1300, 1304 (11th Cir. 2002) ("[E]ven if we assume that the initial search was invalid and that anything related to that search was the fruit of the poisonous tree, the gun's seizure was valid because it had been purged of the 'taint' of the allegedly illegal search. In other words, the firearm, which was recovered pursuant to an independent source, i.e., the third warrant, was admissible . . . .").

[10]We review a challenge to the sufficiency of the evidence de novo, taking all reasonable inferences in favor of the government and the jury's verdict of conviction. United States v. Rudisill, 187 F.3d 1260, 1267 (11th Cir. 1999).

17

In order to sustain a drug conspiracy conviction, the government must establish that two or more people agreed to distribute the drugs; that the defendant knew of the general purpose of the agreement; and that the defendant knowingly and voluntarily joined the agreement. See United States v. Simpson, 228 F.3d 1294, 1298 (11th Cir. 2000). "Because the crime of conspiracy is 'predominantly mental in composition,'" the crime is often provable only via circumstantial evidence. United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998) (citation omitted). Additionally, although appellants are correct that "[m]ere presence alone . . . is not indicative of a conspiracy," it is also true that a defendant's "presence is material and probative in the totality of the[] circumstances." United States v. Jenkins, 779 F.2d 606, 612 (11th Cir. 1986).

Here, viewing the evidence in the light most favorable to the government, there is clearly sufficient circumstantial evidence to sustain both appellants' conspiracy convictions. Among other things, the evidence, in the light most favorable to the government, shows the following: An anonymous caller advised Conway that there was a maroon vehicle present at the 4th Street residence, and when that vehicle was present, there were generally drugs at the residence. The anonymous caller also told Conway that a black male named "Scooter" was at the 4th Street residence, and Norman's nickname was "Scooter." Shortly after the

18

phone call, based on surveillance conducted as a result of the phone call, Norman was seen to exit the residence and deposit an object in the trash can directly outside the residence. The object thrown away by Norman was a wet paper towel containing crack residue. A subsequent search of the residence itself revealed several kilograms of cocaine (including three bricks of cocaine weighing approximately one kilogram each), a small amount (approximately two grams) of crack, cocaine packaging, digital scales, and over $70,000 in cash. Peralte and James were also located in the residence. The residence belonged to Norman's girlfriend. The maroon vehicle was Peralte's, and in a hidden compartment in Peralte's vehicle, there was cocaine packaging similar to the cocaine packaging found in the residence.

With regard to Peralte's participation in the conspiracy, James testified that Norman and Peralte had "started . . . seeing each other" and "started dealing with each other," and that he had met Peralte at the 4th Street residence to purchase cocaine from Peralte about six or seven days prior to the police search of the 4th Street residence. James further testified that at that time, Peralte accompanied James on a car ride around Montgomery to sell approximately one and a half kilograms of Peralte's cocaine to "various people," and that previously, in the late 1990s, James had purchased large quantities of cocaine from Peralte and sold it in

19

crack form.  James also testified that Peralte told him that he could "get some

money" by "get[ting Peralte] some sales for some powder" cocaine; that James had

"sold a lot of drugs for Peralte"; and that James and Peralte had "made a lot of

money together."

As for Norman, the evidence also shows more than mere presence at a

residence with large amounts of drugs.  The evidence shows presence under a set

of circumstances and with conversation that raises an inference that Norman

intentionally and knowingly was involved in the drug conspiracy.  Specifically,

again, James testified that Norman and Peralte had "started . . . seeing each other"

and "started dealing with each other."  James also testified that just a few days

prior to the police search of the 4th Street residence, James had met Peralte at the

4th Street residence (which James believed to be Norman's residence) in order to

obtain cocaine from Peralte to sell, and that he sold about a kilogram and a half of

Peralte's cocaine at that time.  Additionally, the anonymous telephone call placed

Norman at the residence at the time of drug activity, and indeed, Norman was at

the residence with drugs.  More importantly, on the day that cocaine was seized

from the residence, Norman exited the residence with a paper towel containing

cocaine residue.  Further, James testified that during his time at the 4th Street

residence in the six or seven days prior to the police search of the residence, both

20

Norman and Peralte were joking that James was like a snake in that Peralte was once again willing to participate in drug activity with James even after James had previously stolen from Peralte. This circumstantial evidence was sufficient to support the conclusion that Norman and Peralte were involved in the distribution of drugs from the 4th Street residence and that Norman allowed Peralte to use his girlfriend's residence to sell drugs and cook crack.

As this Court has said numerous times, "[a] conspiracy conviction will be upheld if there is sufficient positive indication that an illegal agreement exists, or when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." United States v. Figueroa, 720 F.2d 1239, 1246 (11th Cir. 1983) (internal citation omitted); see also United States v. Parrado, 911 F.2d 1567, 1570 (11th Cir. 1990). Moreover, "in elaborating on the mere presence defense, this [C]ourt has stated" that

> [i]n most cases . . . the evidence establishes not mere presence but presence under a particular set of circumstances. In such a case the task of determining the sufficiency of the evidence is not aided by the ritualistic invocation of the "mere presence" rubric. Rather, it requires an examination of all of the proved circumstances, including presence, to determine whether from them a reasonable jury could infer and find beyond a reasonable doubt knowing and intentional participation.

Parrado, 911 F.2d at 1570 (quotation marks and citation omitted). Here, the

21

evidence reflects more than just both Norman's and Peralte's presence at the 4th Street residence; instead, the circumstances of their presence, as shown by that evidence, are such that a reasonable jury could have inferred that they were both knowing and intentional participants in an agreement with each other and with James to distribute cocaine and crack.

## C.    Sentencing

We first address Norman's argument that the district court erred in "attributing all relevant conduct" to him, particularly with regard to the drug quantity determinations.[11]  According to Norman, the evidence failed to demonstrate that he had any "authority, possession, or control over the residence" or knowledge about the drugs in the residence, such that his base offense level should not have exceeded twelve (the appropriate base offense level for a cocaine offense for which no drug quantity can be attributed).  See U.S.S.G. § 2D1.1(c)(14) (2003).  However, as discussed above, we reject Norman's argument that he was "merely present" at the 4th Street residence.  Moreover, the drug quantity determinations were made by the jury, not by the district court, such that Blakely and Booker are not implicated by Norman's argument, and the drug quantity

---

[11]We review Norman's objection to the district court's drug quantity determinations for clear error.  United States v. Rodriguez, 398 F.3d 1291, 1296 (11th Cir.), cert. denied, 125 S. Ct. 2935 (2005).

determinations themselves were amply supported by the testimony of Clyde

Norwood ("Norwood"), a forensic chemist.

Indeed, Norwood testified at trial to his analysis of each of the substances

seized by the police from the 4th Street residence where Norman was arrested.

Specifically, Norwood testified that: (1) the paper towel contained crack cocaine

residue; (2) the three bricks taken from the dryer contained 2,950 grams, or just

under three kilograms, of cocaine; (3) the package taken from under the couch

contained approximately 981 grams of cocaine; and (4) the package taken from the

kitchen contained approximately 2.1 grams of crack. All of these specific drug

quantity calculations were included in the jury's verdict. Because the district

court's drug quantity determination was based on the amount of drugs attributed to

Norman by the jury, and because the evidence supports the jury's drug quantity

determination, the district court did not clearly err in sentencing Norman based on

those drug quantity determinations.[12]

The district court likewise did not clearly err in refusing to grant Norman a

minor role reduction.[13] The sentencing guidelines provide for a four-level decrease

---

[12]Norman's brief also asserts that the district court committed error pursuant to Blakely and Booker, by enhancing his sentence based on the firearm discovered in the residence. The district court specifically declined to impose a firearm enhancement, and thus this sentencing argument is without merit and not discussed further.

[13]We review a district court's denial of a minor role reduction for clear error. United States v. De Varon, 175 F.3d 930, 937 (11th Cir. 1999) (en banc).

23

in offense level if a defendant was a "minimal participant"; a two-level decrease if a defendant was a "minor participant"; and a three-level decrease for cases in between the two. U.S.S.G. § 3B1.2. A district court is required to assess whether a defendant was a minor or minimal participant with regard to the relevant conduct attributed to the defendant, and is further required to assess whether the defendant was a minor or minimal participant as compared to other identifiable participants in the relevant conduct attributed to the defendant. See United States v. De Varon, 175 F.3d 930, 940-44 (11th Cir. 1999) (en banc). It is possible that there will be no minor or minimal participants. Id. at 944.

Here, the district court expressly found that "the testimony and the evidence . . . would not support" a minor or minimal participant reduction for Norman under U.S.S.G. § 3B1.2. Although Norman again argues that he was merely "present" at the 4th Street residence and was entitled to a minor role reduction, the evidence established otherwise. Indeed, although we do not again re-hash the evidence against Norman, we note that Norman was the only one of the three defendants actually seen by police with drugs in his possession (specifically, the paper towel). Moreover, the amount of drugs attributed to Norman as relevant conduct was the same amount of drugs that was located in the residence and the same amount of drugs that Norman was ultimately convicted of conspiring with Peralte to distribute

24

from his girlfriend's residence.  Accordingly, the district court did not clearly err in refusing to grant Norman a minor role reduction.[14]

Finally, we address Peralte's argument that the district court committed Booker error by sentencing him under a mandatory guidelines regime.  There are two types of Booker error, constitutional and statutory.  United States v. Mathenia, 409 F.3d 1289, 1291-92 (11th Cir. 2005).  "The constitutional error is the use of extra-verdict enhancements to reach a guidelines result that is binding on the sentencing judge; the error is in the mandatory nature of the guidelines once the guidelines range has been determined."  United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir.), cert. denied, 125 S. Ct. 2935 (2005).  Meanwhile, "statutory

---

[14]On appeal, Norman also argues in passing and for the first time that, pursuant to Booker, he was entitled to have a jury determine whether he should have received a minor role reduction. We review Norman's Booker claim for plain error. Norman's claim fails because (1) Booker did not create any right to jury determinations at sentencing, and (2) Booker involved the application of extra-verdict enhancements in a mandatory guidelines system, and not sentencing reductions in a mandatory guidelines system. See Rodriguez, 398 F.3d at 1300-01. In any event, Norman has not shown that it was plain error for the district court, rather than the jury, to evaluate the appropriateness of the minor role reduction.
    We also note that Norman's counsel conceded at oral argument that a claim of statutory Booker error was not raised on appeal—in other words, a claim of error for Norman being sentenced under a mandatory guidelines scheme—because Norman was sentenced to the statutory mandatory minimum sentence. For the sake of thoroughness, we note that the statutory mandatory minimum sentence for a defendant convicted of violating 21 U.S.C. §§ 841 and 846 is ten years, or 120 months, when that defendant has a prior felony drug conviction and the offense at issue involves between 500 grams and 5 kilograms of cocaine. See 21 U.S.C. § 841(b)(2)(B)(ii)(II). Norman was sentenced to 121 months' imprisonment, which was at the bottom end of his guidelines range, but one month more than his statutory mandatory minimum sentence. Because Norman does not raise a statutory Booker claim, we do not reach the merits of such a claim.

error occurs when the district court sentences a defendant 'under a mandatory guidelines scheme, even in the absence of a Sixth Amendment enhancement violation.'" <u>Mathenia</u>, 409 F.3d at 1291 (citation omitted).  Given that the jury determined the drug quantities, and given that the district court denied the government's request for a firearm enhancement, there were no extra-verdict enhancements.  Thus, Peralte raises a claim of <u>Booker</u> statutory error.

Because Peralte raised his <u>Booker</u> claim in the district court, we review the claim <u>de novo</u>.  Here, the government correctly concedes that the district court committed statutory <u>Booker</u> error by sentencing Peralte under a mandatory guidelines system.  However, the government argues that such error was harmless.

There are different harmless error standards for claims of constitutional <u>Booker</u> error and claims of statutory <u>Booker</u> error.  <u>Mathenia</u>, 409 F.3d at 1291. Here, we apply the "less demanding test that is applicable to non-constitutional" (i.e., statutory) errors.  <u>Id.</u> at 1292.  Statutory <u>Booker</u> error

> is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the sentence, or had but very slight effect.  If one can say with fair assurance that the sentence was not substantially swayed by the error, the sentence is due to be affirmed even though there was error.

<u>Id.</u> (quotation marks, alterations, and citations omitted).  The government bears the

26

burden of showing that the statutory <u>Booker</u> error was harmless.[15]  <u>Id.</u>

This Court has previously found statutory <u>Booker</u> error to be harmless.  For instance, in <u>United States v. Gallegos-Aguero</u>, 409 F.3d 1274, 1277 (11th Cir. 2005), we found statutory <u>Booker</u> error harmless where the district court sentenced the defendant to the highest sentence available under the applicable guidelines range and expressly considered sentencing the defendant to the statutory maximum.  Similarly, in <u>United States v. Mejia-Giovani</u>, 416 F.3d 1323, 1326 (11th Cir. 2005), we found statutory <u>Booker</u> error harmless where the defendant was sentenced in the middle of the applicable guidelines range and the district court expressly stated at sentencing that the defendant was at risk for an upward departure; that its patience with the defendant was running thin; and that it saw no potential benefit in the defendant's argument that the guidelines should not be applied.  <u>Cf. United States v. Glover</u>, __ F.3d __, No. 04-16745, 2005 U.S. App. LEXIS 25675, at *10-14 (11th Cir. Nov. 29, 2005) (statutory <u>Booker</u> error not harmless where district court imposed sentence in middle of applicable guidelines range and there were no statements in the record suggesting that the district court would have imposed the same or greater sentence under an advisory guidelines

---

[15]For preserved claims of constitutional <u>Booker</u> error, the government must meet the more demanding burden of showing "beyond a reasonable doubt . . . that the error did not contribute to the defendant's ultimate sentence." <u>Mathenia</u>, 409 F.3d at 1291.

27

scheme).[16]

Here, we conclude that there are sufficient statements in the record showing that the district court would have imposed the same sentence under an advisory guidelines scheme. The record shows that Peralte's final guidelines range was 121-150 months' imprisonment. The middle of the guidelines range was 135.5 months. Norman and Peralte had identical offense levels and criminal history categories, and the district court sentenced Norman to the low end of the identical guidelines range (121 months' imprisonment). Peralte's counsel specifically argued at Peralte's sentencing that Norman's just-imposed 121-month sentence favored an identical (low end) sentence for Peralte. However, the district court rejected that request and sentenced Peralte to the higher end of the guidelines range (145 months' imprisonment).

In imposing its sentence, the district court specifically stated that the 145-month sentence was "imposed due to the nature of the offense and to reflect the

---

[16]In United States v. Cain, __ F.3d __, No. 04-15754, 2005 U.S. App. LEXIS 28882, at *5-9 (11th Cir. Dec. 29, 2005), this Court concluded that constitutional Booker error was not harmless even though the district court had imposed a sentence at the top of the applicable guidelines range. However, in Cain, the district court made no statement indicating that it would have imposed the same or a higher sentence if it had possessed the discretion to do so. Instead, the district court merely stated that a sentence at the high end of the guidelines was "'appropriate.'" Id. at __, 2005 U.S. App. LEXIS 28882, at *9. Moreover, in Cain, we expressly declined to consider whether the outcome might have differed if the defendant had raised a claim of statutory Booker error instead of his claim of constitutional Booker error. Id. at __, 2005 U.S. App. LEXIS 28882, at *8 n.3.

seriousness of the offense," and further stated that the sentence was based on Peralte's "criminal history in the drug crime area to promote respect for the law."

In addition, after the district court imposed its 145-month sentence, it solicited final objections. Peralte's counsel argued this time that Peralte was at worst entitled to a sentence of 139 months' imprisonment, which Peralte's counsel termed the middle of the guidelines range, because Peralte's PSI had initially recommended that he receive a mid-range sentence (albeit within the higher recommended guidelines range of 151-188 months' imprisonment).[17] The district court rejected this final argument and imposed the 145-month sentence as stated.

Accordingly, the record clearly shows that the district court recognized that it had the authority and discretion to reduce Peralte's sentence from 145 months' imprisonment to either the mid-range sentence of approximately 135 months' imprisonment or the low end sentence of 121 months' imprisonment. However, the district court twice refused to do so. More importantly, the district court explicitly stated that the 145-month sentence was imposed due to the nature of the offense, the seriousness of the offense, Peralte's criminal history, and to promote respect for the law. Thus, the record adequately indicates that the district court would have imposed the same 145-month sentence under an advisory guidelines

---

[17]We note that, in actuality, the PSI did not recommend a mid-range sentence for Peralte.

29

regime, and we conclude that the statutory <u>Booker</u> error in this case "did not affect [Peralte's] sentence, or had but very slight affect." <u>Mathenia</u>, 409 F.3d at 1929 (quotation marks, alteration, and citations omitted).

### III. CONCLUSION

For all of the above reasons, we affirm appellants' convictions and sentences.

**AFFIRMED.**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

No. 04-15292-JJ

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

MAR 1 0 2006

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALPHONSO NORMAN,
a.k.a. Scooter,
CAPULCO PERALTE,
a.k.a. Debby B. Black,
a.k.a. Cappuccino,

Defendants-Appellants.

--------------------------

On Appeal from the United States District Court for the
Middle District of Alabama

--------------------------

ON PETITION(S) FOR REHEARING AND PETITION(S) FOR REHEARING EN BANC

Before:  CARNES, HULL and PRYOR, Circuit Judges.

PER CURIAM:

The Petition(s) for Rehearing are DENIED and no Judge in regular active
service on the Court having requested that the Court be polled on
rehearing en banc (Rule 35, Federal Rules of Appellate Procedure), the
Petition(s) for Rehearing En Banc are DENIED.

ENTERED FOR THE COURT:

_Frank M Hull_

STATES CIRCUIT JUDGE



GOVERNMENT
EXHIBIT

CASE
NO. 03-229-N

EXHIBIT
NO. BB